IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **CAMELLIA THERAPEUTIC FOSTER AGENCY, LLC** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO. 2:06 CV 735-MHT** |
| | ) | |
| **ALABAMA DEPARTMENT OF HUMAN RESPURCES** | ) | |
| | ) | |
| **Defendant.** | ) | |

## EVIDENTIARY MATERIALS IN SUPPORT OF MOTION TO DISMISS OR SUMMARY JUDGMENT BY DEFENDANT DEPARTMENT OF HUMAND RESOURCES

COMES NOW Defendant Alabama Department of Human Resources (hereinafter DHR), by and through their undersigned counsel, and, hereby submits the following Exhibits as evidentiary material in support of its Motion to Dismiss or For Summary Judgment:

1. Memo to Alabama Legislators from Commissioner Walley regarding Therapeutic Foster Care RFP dated May 16, 2005

2. Memo from Susan Ward and Gary Mitchell of the Office of Resource Management dated December 27, 2005 to all County Directors of Human Resources regarding availability of Therapeutic Foster Care placements

3. Memo from Susan Ward and Gary Mitchell of the Office of Resource Management dated December 28, 2005 to all County Directors of Human Resources regarding availability of Therapeutic Foster Care placements outside a region

4.      Request for Proposals for Therapeutic Foster Care for Children dated February 28, 2005

5.      Vendors conference sign-in sheet dated March 29, 2005

6.      Alabama DHR receipt of proposal signed log sheet

7.      Deposition of Camellia Therapeutic Foster Agency, LLC represented by Joseph Appiah

        with exhibits

8.      Deposition of Joseph Appiah with exhibit

9.      Affidavit of Susan Ward

10.     Therapeutic Foster Care Slots to be Reallocated by Vendor/Region


                         RESPECTFULLY SUBMITTED,

                         TROY KING (KIN047)
                         ATTORNEY GENERAL

                         SHARON FICQUETTE (FIC001)
                         CHIEF LEGAL COUNSEL


                          **_s/James E. Long_____**
                         James E. Long - LON016
                         Deputy Attorney General

                         State of Alabama
                         Department of Human Resources
                         P.O. Box 304000
                         Montgomery, Alabama  36130-4000
                         Phone:  (334) 242-9330
                         Fax:  (334) 242-0689
                         ATTORNEYS FOR DEFENDANTS

2

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing **EVIDENTIARY MATERIALS IN SUPPORT OF DEFENDANTS MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**, on the following by placing copies thereof, addressed to them as indicated below, in United States Mail, First Class postage prepaid, on this the 29th day of May 2007.

Hon. Kathryn Dickey                      Hon. Janice Spears-Turk
Attorney at Law                          Attorney at Law
322 Alabama Street                       2735 Office Park Circle
Montgomery, Alabama 36104                Montgomery, Alabama  36116
Attorney for Plaintiffs                  Attorney for Plaintiffs


                                         _ s/James E. Long_____
                                         James E. Long - LON016
                                         Deputy Attorney General


                                         State of Alabama
                                         Department of Human Resources
                                         Legal Office
                                         50 Ripley Street, Room 2122
                                         P.O. Box 304000
                                         Montgomery, Alabama  36130-4000
                                         Phone:  (334) 242-9330
                                         Fax:  (334) 242-0689

                                         ATTORNEY FOR
                                         DEFENDANTS

**MERRILL LEGAL SOLUTIONS**
Court Reporting*Legal Videography*Trail Services

## Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
2         FOR THE MIDDLE DISTRICT OF ALABAMA
3                  NORTHERN DIVISION
4
   CIVIL ACTION NO.:  2:06 cv735-MHT
5
6  CAMELLIA THERAPEUTIC FOSTER
   AGENCY, LLC, REPRESENTED BY
7  JOSEPH APPIAH, CHAIRMAN
   THERAPEUTIC FOSTER CHILDREN,
8  FOSTER PARENTS AND STAFF,
   >>
9  >>Plaintiff(s),
10 vs.
11 ALABAMA DEPARTMENT OF
   HUMAN RESOURCES,
12
   >>Defendant(s).
13
14
15           DEPOSITION OF
16  CAMELLIA THERAPEUTIC FOSTER AGENCY, LLC,
17      REPRESENTED BY JOSEPH APPIAH
18 >>>>>>>JOB NO. 1101-53347
19
20
21
22 BEFORE:   Victoria M. Castillo,
           Court Reporter and
23         Notary Public
```

## Page 2

```
1        >In accordance with Rule 5(d) of
2  The Alabama Rules of Civil Procedure, as Amended,
3  effective May 15, 1988, I, Victoria M. Castillo, am
4  hereby delivering to JAMES E. LONG, ESQ. the
5  original transcript of the oral testimony taken on
6  the 15th day of May, 2007, along with exhibits.
7  >>>>Please be advised that this is
8  the same and not retained by the Court Reporter,
9  nor filed with the Court.
10
11      S T I P U L A T I O N
12
13 >>>>IT IS STIPULATED AND AGREED, by
14 and between the parties through their respective
15 counsel, that the deposition of CAMELLIA
16 THERAPEUTIC FOSTER AGENCY, LLC, REPRESENTED BY
17 JOSEPH APPIAH may be taken before Victoria M.
18 Castillo, Commissioner, at the State Department of
19 Human Resources South Conference Room, located at
20 the Gordon Persons Building, 2nd Floor, Room 2128,
21 50 South Ripley Street, Montgomery, Alabama 36130
22 on the 15th day of May, 2007.
23 >>>>IT IS FURTHER STIPULATED AND
```

## Page 3

```
1  AGREED that the signature to and the reading of the
2  deposition by the witness is waived, the deposition
3  is said to have the same force and effect as if
4  full compliance had been had with all laws and
5  rules of Court relating to the taking of
6  depositions.
7  >>>>IT IS FURTHER STIPULATED AND
8  AGREED that it shall not be necessary for any
9  objections to be made by counsel to any questions,
10 except as to form or leading questions, and that
11 counsel for the parties may make objections and
12 assign grounds at the time of trial, or at the time
13 said deposition is offered in evidence, or prior
14 thereto.
15 >>>>IT IS FURTHER STIPULATED AND
16 AGREED that notice of filing of the deposition by
17 the Commissioner is waived.
18
19
20
21
22
23
```

## Page 4

```
1              I N D E X
2  EXAMINATION BY:          PAGE NUMBER:
3  MR. LONG:                      7
4
5  EXHIBITS:                PAGE NUMBER:
6  Exhibit 1                      7
7  Exhibit 2                     13
8  Exhibit 3                     16
9  Exhibit 4                     25
10 Exhibit 5                     29
11 Exhibit 6                     30
12 Exhibit 7                     34
13 Exhibit 8                     38
14 Exhibit 9                     62
15 Exhibit 10                    65
16 Exhibit 11                    66
17 Exhibit 12                    94
18 Exhibit 13                    97
19 Exhibit 14                   108
20 Exhibit 15                   116
21 Exhibit 16                   133
22 Exhibit 17                   149
23 Exhibit 18                   167
```

EXHIBIT 7

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 5

```
 1        A P P E A R A N C E S
 2  FOR THE PLAINTIFF(S):
 3  >>>Janice Spears-Turk, Esq.
 4  >>>LAW OFFICES OF J.D. SPEARS-TURK
    >>>
 5  >>>2735 Office Park Circle
    >>>>
 6  >>>Montgomery, Alabama 36116-1143
 7
    >>>Kay Dickey, Esq.
 8
    >>>DICKEY & McCLELLAND
 9
    >>>322 Alabama Street
10
    >>>Suite B
11
    >>>Montgomery, Alabama 36104
12
13  >>>Robert Johnson, Esq.
14  >>>DICKEY & McCLELLAND
15  >>>322 Alabama Street
16  >>>Suite B
17  >>>Montgomery, Alabama 36104>>>>>
18
19
20
21
22
23
```

Page 6

```
 1  FOR THE DEFENDANT(S):
 2  >>>James E. Long, Esq.
 3  >>>Deputy Attorney General
 4  >>>STATE OF ALABAMA
 5  >>>DEPARTMENT OF HUMAN RESOURCES
 6  >>>50 North Ripley Street
 7  >>>Montgomery, Alabama 36104
 8
 9
    ***********************
10
11
    >>>>I, Victoria M. Castillo, a Court
12
    Reporter of Montgomery, Alabama, acting as
13
    Commissioner, certify that on this date, as
14
    provided by the Alabama Rules of Civil Procedure
15
    and the foregoing stipulation of counsel, there
16
    came before me at State Department of Human
17
    Resources South Conference Room, located at the
18
    Gordon Persons Building, 2nd Floor, Room 2128, 50
19
    South Ripley Street, Montgomery, Alabama 36130,
20
    commencing at 9:21 a.m., CAMELLIA THERAPEUTIC
21
    FOSTER AGENCY, LLC, REPRESENTED BY JOSEPH APPIAH,
22
    in the above cause, for oral examination, whereupon
23
```

Page 7

```
 1
 2      CAMELLIA THERAPEUTIC FOSTER AGENCY, LLC,
 3       REPRESENTED BY JOSEPH APPIAH,
 4    being first duly sworn, was examined and
 5          testified as follows:
 6
 7            EXAMINATION
 8  BY MR. LONG:
 9    Q.>Spell your name for the record.
10    A.>A-P-P-I-A-H, Appiah.
11    Q.>You were telling me a few minutes ago
12  that you have been in the country 35 years?
13    A.>Oh, yes.
14    Q.>So you don't have any communication
15  problems?
16    A.>No.
17    Q.>Let me know if you don't understand
18  anything that I am saying.  Let me show you this
19  document, Exhibit 1.
20      >>MR. LONG:  Let me have that
21  marked.
22      >>(WHEREUPON, a document was marked
23      >>as Exhibit 1 and is attached to
```

Page 8

```
 1      >>the original transcript.)
 2    Q.>(Mr. Long)  This is the deposition
 3  notice for Camellia Therapeutic.  Are you appearing
 4  today as a representative for the plaintiff,
 5  Camellia Therapeutic Foster Agency?
 6    A.>Yes.
 7    Q.>I call your attention to Page 2 of
 8  the notice.  You notice in that paragraph that has
 9  the bold lettering this notice names as a deponent
10  Camellia Therapeutic Foster Agency and it asks that
11  Camellia Therapeutic identify and produce for
12  deposition one or more officers, directors,
13  managing agents, or other agents and employees who
14  consent to testify on its behalf and are the
15  officers, directors, agents, or employees most
16  knowledgeable as to the following matters and
17  documents.  The first indented paragraph asks for
18  persons representing the company who are familiar
19  with the conception, creation, incorporation,
20  organization, and operation of Camellia Therapeutic
21  Foster Agency.  Is that you, Dr. Appiah?
22    A.>Yes, sir.
23    Q.>Is there anyone else more familiar
```

2 (Pages 5 to 8)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 9 | Page 11 |
|---|---|
| 1   with the operation of Camellia Therapeutic than | 1   A.>Yes, an LLC. |
| 2   you? | 2   Q.>LLC? |
| 3   A.>I am more knowledgeable. | 3   A.>Yes. |
| 4   Q.>You are the most knowledgeable | 4   Q.>Does it have a board? |
| 5   person? | 5   A.>Three-member. |
| 6   A.>Yes, about this situation. | 6   Q.>It has a three-member board? |
| 7   Q.>You are the most knowledgeable | 7   A.>Yes. |
| 8   person? | 8   Q.>When was Camellia Therapeutic Foster |
| 9   A.>Yes. | 9   Agency incorporated? |
| 10   Q.>The second indented paragraph asks | 10   A.>2000. |
| 11   for representatives of the company who are the most | 11   Q.>In the year 2000? |
| 12   knowledgeable regarding the review of the DHR | 12   A.>Uh-huh. |
| 13   Request for Proposal, RFP, referred to in the | 13   Q.>Who was the incorporator? |
| 14   complaint and the discussions, preparations, and | 14   A.>I am the incorporator. |
| 15   submission of response or proposal or inquires to | 15   Q.>Are there documents regarding the |
| 16   DHR regarding the RFP.  Is that person you, | 16   incorporation? |
| 17   Dr. Appiah? | 17   A.>Probate Court, Russell County, |
| 18   A.>Yes, sir. | 18   Alabama. |
| 19   Q.>You are the most knowledgeable person | 19   Q.>Do those incorporation papers |
| 20   representing the corporation in those matters? | 20   establish a board of directors for the corporation? |
| 21   A.>Chairman and Chief Executive Officer. | 21   A.>They did not establish a board.  They |
| 22   Q.>You are the Chairman and Chief | 22   established me as the sole LLC partner. |
| 23   Executive Officer of Camellia Therapeutic Foster | 23   Q.>But you do have a board of directors? |

| Page 10 | Page 12 |
|---|---|
| 1   Agency? | 1   A.>Yes.  I brought two more friends in. |
| 2   A.>Yes, sir. | 2   Q.>Who are these friends? |
| 3   Q.>How long have you held that position? | 3   A.>Dr. D. A. Ellis, family practitioner, |
| 4   A.>I am the founder, so from the | 4   Phenix City, Alabama. |
| 5   beginning. | 5   Q.>Family practitioner -- a physician? |
| 6   Q.>You are the founder? | 6   A.>Yes, family practitioner. |
| 7   A.>Yes. | 7   Q.>In Phenix City, Alabama? |
| 8   Q.>We will get back to that in a | 8   A.>Yes. |
| 9   moment. | 9   Q.>Who is the other board member? |
| 10   A.>Yes, sir. | 10   A.>Honorable Arthur Sumbry, City |
| 11   Q.>The third paragraph asks for the | 11   Councilman. |
| 12   correspondence and contact between DHR and Camellia | 12   Q.>Phenix City, City Councilman? |
| 13   Therapeutic Foster Agency about the RFP.  Is the | 13   A.>Yes, sir. |
| 14   person most familiar with those matters | 14   Q.>Dr. D. A. Ellis, is that a man or a |
| 15   representing the Agency going to be you, | 15   woman? |
| 16   Dr. Appiah? | 16   A.>A man. |
| 17   A.>Yes, sir. | 17   Q.>So there is a three-member board that |
| 18   Q.>Let's get back to your relationship | 18   governs Camellia Therapeutic? |
| 19   to Camellia Therapeutic Foster Care Agency. | 19   A.>Ellis's business is to be sure that |
| 20   Camellia Therapeutic Foster Care Agency is a | 20   we have children, and we have a problem with trying |
| 21   corporation; is that correct? | 21   to find a physician to do any assessment for them. |
| 22   A.>Limited liability. | 22   He would be willing to accept them. |
| 23   Q.>It is a limited-liability company? | 23   Q.>Let's back up for a minute.  You have |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

## Page 13

1  a three-member board of directors -- is that a
2  governing board of directors?
3      A.>Yes.
4      Q.>Are there officers of the
5  corporation?
6      A.>They are my assistants because I
7  appoint them on my own.
8      Q.>Who is the president of the
9  corporation?
10     A.>I am the president.
11     Q.>Are there other positions?
12     A.>Any person that is there as a guest
13  member that is a regular member.
14     Q.>So the only officer is the president,
15  and you are the president?
16     A.>Uh-huh.
17     >>MS. SPEARS-TURK:  You have to
18  answer yes and no because she is taking down what
19  you are saying.
20     A.>Yes.
21     >>MR. LONG:  I want to show you
22  what we are going to mark as Exhibit 2.
23     >>(WHEREUPON, a document was marked

## Page 14

1      >>as Exhibit 2 and is attached to
2      >>the original transcript.)
3      Q.>(Mr. Long)  Do you recognize Exhibit
4  2?
5      A.>Yes.
6      Q.>What is it then?
7      A.>I wrote this letter -- I filed this
8  complaint myself.
9      Q.>You filed this complaint in the
10  Circuit Court of Montgomery County, Alabama?
11     A.>Yes, sir.
12     Q.>Case No. CV-06-1819?
13     A.>Yes, I did.
14     Q.>And it was filed by Camellia
15  Therapeutic Foster Agency?
16     A.>Yes.
17     Q.>Represented by you?
18     A.>Yes.
19     Q.>Against various parties; is that
20  correct?
21     A.>Yes.
22     Q.>It's signed by you on the back?
23     A.>Yes, sir.

## Page 15

1      Q.>As the CEO?
2      A.>Yes, sir.
3      Q.>Did the board of Camellia Therapeutic
4  Foster Agency authorize you to file this lawsuit on
5  their behalf?
6      A.>I am on the board.
7      Q.>Do you have a resolution of the board
8  of directors authorizing you to file this complaint
9  on behalf of the organization?
10     A.>I have no resolution.  I am the
11  board.
12     Q.>No resolution was passed?
13     A.>I am the board, yes.
14     Q.>Let me get this straight -- no
15  resolution was passed?
16     A.>No, sir.
17     Q.>No resolution was passed?
18     A.>Yes, sir.
19     Q.>Let's get it straight.  Was a
20  resolution passed by the board of directors
21  authorizing this lawsuit to be filed?
22     A.>We have no resolution -- no, sir --
23  no board.

## Page 16

1      Q.>Subsequent to the filing of this
2  lawsuit, this case was moved to Federal Court; is
3  that correct?
4      A.>I don't know -- I didn't move it
5  there.
6      Q.>But the defendants moved it to
7  Federal Court; is that right?
8      A.>Yes, sir.
9      >>MR. LONG:  I show you what we are
10  going to mark as Exhibit 3.
11     >>(WHEREUPON, a document was marked
12     >>as Exhibit 3 and is attached to
13     >>the original transcript.)
14     Q.>(Mr. Long)  Do you recognize that
15  document?
16     A.>Yes.
17     Q.>Is it an Amended Complaint?
18     A.>Yes.
19     Q.>In United District Court for the
20  Middle District of Alabama?
21     A.>Yes, sir.
22     Q.>Camellia Therapeutic Foster Agency
23  versus the Alabama Department of Human Resources?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 17

1  A.>Yes, sir.
2  Q.>Case No. 2.06cv735-MHT?
3  A.>Yes, sir.
4  Q.>Did the governing board of Camellia
5  Therapeutic authorize this lawsuit to be filed?
6  A.>When you said board, what do you
7  mean?
8  Q.>Is there a resolution of the
9  governing board of directors authorizing this
10  lawsuit to be filed?
11  A.>If you want to use the board, I am
12  the board, so I authorized the filing -- yes, I am
13  the board.
14  Q.>Is there a resolution of the board of
15  directors authorizing it to be filed?
16  A.>I had a personal meeting to file, and
17  I thought about the injustice and being the only
18  board member, I made a decision to file, and that
19  is it.
20  Q.>Dr. Appiah, I don't want to be
21  difficult, but I just need a simple yes or no
22  answer to it. I understand you want to explain
23  it. Is there a written resolution of the governing

Page 18

1  board of directors of Camellia Therapeutic Foster
2  Agency authorizing the filing of the lawsuit that
3  is Exhibit 3?
4  A.>I still don't get your question,
5  because I made it clear that I am the board and I
6  have made a decision to file.
7  Q.>You filed it?
8  A.>Yes.
9  Q.>But did the other members of the
10  board of directors pass a resolution authorizing it
11  to be filed?
12  A.>They are a supporting board -- they
13  are not legal board members.
14  Q.>Not the legal board members?
15  A.>Yes, sir. So the decision to file is
16  based on me.
17  Q.>On you only?
18  A.>Me only.
19  Q.>Not the board of directors?
20  A.>No, just based on me only.
21  Q.>The last two pages of this Amended
22  Complaint list Dwayne Brown as the attorney for
23  Camellia Therapeutic; is that correct?

Page 19

1  A.>Yes.
2  Q.>Is there a resolution of the board of
3  directors of Camellia Therapeutic hiring Mr. Brown
4  as the attorney for the corporation?
5  A.>Yes.
6  Q.>There is a --
7  A.>Yes, and it is me.
8  Q.>You hired him?
9  A.>Yes, sir.
10  Q.>But was there a board meeting where
11  he was hired?
12  A.>I had a meeting with myself, and I
13  hired him.
14  Q.>You hired him?
15  A.>Yes. I am the only board member, so
16  I hired him.
17  Q.>But the legal board didn't pass a
18  resolution to hire him?
19  A.>We have no legal board. I am the
20  only board member.
21  Q.>Did Dr. D. A. Ellis and Arthur Sumbry
22  authorize him to be hired?
23  A.>No. They are aware of the situation,

Page 20

1  but they have no vote in it. I am the vote. I am
2  the only one to make a decision on it that they
3  were being treated unfairly.
4  Q.>But they did not sign off on any
5  resolution authorizing him to be hired?
6  A.>They can't sign on anything.
7  Q.>So they didn't sign on anything?
8  A.>No, sir.
9  >>MS. SPEARS-TURK: Can we go off
10  the record for just a second?
11  >>MR. LONG: Yes.
12  9:37 a.m.
13  (Short break.)
14  9:37 a.m.
15  >>>>MS. SPEARS-TURK: Back on the
16  record.
17  >>>>THE DEPONENT: It is written
18  there, LLC.
19  >>MR. LONG: I see.
20  >MS. SPEARS-TURK: Let him ask the
21  question.
22  Q.>(Mr. Long) Going back to the Notice
23  of Deposition to the corporation, which is Exhibit

5 (Pages 17 to 20)

## Page 21

1  1, the Request for Production asks you to produce
2  all documents in your possession related to your
3  allegations in Paragraph 6 of the Amended
4  Complaint, which is Exhibit 3, relating to the
5  incorporation and organization of Camellia
6  Therapeutic Foster Agency, including an
7  organizational charge. Did you produce that
8  information for us today?
9       A.>Yes.
10      Q.>I don't see a response to Number 1.
11      A.>If you give it to me, I will show
12  you.
13      Q.>Okay.
14      A.>I don't have it.
15      Q.>Dr. Appiah, the document you have
16  given is, if I understand it correctly, part of the
17  Therapeutic Foster Care Proposal Response you made
18  to the DHR -- Therapeutic Foster Care RFP. As part
19  of that on Page 11 it lists what looks like a
20  management chart?
21      A.>Yes.
22      Q.>So that responds to part of the
23  question. Do you have any documents regarding the

## Page 22

1  incorporation and organization of the business
2  other than that document?
3       A.>No, sir.
4       Q.>Can you provide me with a copy of
5  your incorporation papers?
6       A.>Yes, my attorney will provide it to
7  you.
8          >MS. SPEARS-TURK: We will get
9  them to you. I thought they were part of the
10  information we had.
11      Q.>(Mr. Long) Number 2, the second
12  Request for Production, requests that you produce
13  all documents in your position relating to the
14  Department of Human Resources. Have you presented
15  me with information with regard to response to that
16  request?
17         >MS. SPEARS-TURK: Let's go off
18  the record for just a second.
19             9:43 a.m.
20          (Short break.)
21             9:45 a.m.
22      >MR. LONG: The third request asks
23  Camellia Therapeutic to produce all documents in

## Page 23

1  your possession relating to the more than 70 foster
2  parents contracted with Camellia Therapeutic Foster
3  Agency referenced in Paragraph 8 of the Amended
4  Complaint. Have you produced documents relating to
5  that request?
6       A.>Yes, it is right here.
7          >MS. SPEARS-TURK: These are the
8  names.
9          >>THE DEPONENT: 70 foster parents,
10  it has their names right here.
11         >MS. SPEARS-TURK: Documents in
12  reference to those individuals.
13      A.>Here is the document I have.
14      Q.>(Mr. Long) Dr. Appiah, I understand
15  part of your complaint is you claim that you have
16  contracts with these foster parents and these
17  contracts were somehow adversely affected by the
18  RFP. So I am asking you to verify the information
19  in your complaint; that is, that you have contracts
20  with these therapeutic foster parents?
21      A.>Okay. It was my understanding when
22  this was filed that I trained foster parents,
23  prepared them for this. And I have more than 70

## Page 24

1  foster parents, and I am giving you the names.
2  These are people that I have gone out and recruited
3  them and trained them and licensed them, and DHR
4  has taken them. I have an agreement with them --
5  you come here and let me train them to become a
6  foster parent. So that's when I give you-all the
7  names.
8       Q.>The foster parents that you are
9  referencing in Paragraph 8 are foster parents that
10  you licensed as a --
11      A.>And trained.
12      Q.>As a --
13      A.>Potential foster parents.
14      Q.>But you don't have a contract with
15  them?
16      A.>We don't have a written contract.
17  But this is what they do: When they come in, you
18  agree that you are going to train them and hire
19  them to be foster parents. That is the
20  understanding. That is how we do it.
21      Q.>So you don't have a document or a
22  written contract document for each one of these
23  foster parents?

6 (Pages 21 to 24)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

| Page 25 | Page 27 |
|---|---|
| 1    A.>No, we don't work like that. | 1    clear for you. |
| 2    Q.>No -- the answer is no? | 2    Q.>And these are two pages from what |
| 3    A.>No. | 3    document? |
| 4    Q.>But you did provide me with a list? | 4    A.>From the RFP. |
| 5    A.>Yes. | 5    Q.>From Exhibit 4? |
| 6    Q.>The fourth request made to Camellia | 6    A.>The RFP. |
| 7  Therapeutic asked for the production of all | 7    Q.>Page 10 and 11 from the RFP -- that |
| 8  documents in your possession relating to the | 8  is Exhibit 4; is that correct? |
| 9  Request for Proposal, RFP, allegedly issued by DHR | 9    A.>Yes. |
| 10  on or about February 28th, 2005, referenced in | 10    Q.>Do you have any other documents |
| 11  Paragraph 9 of the Amended Complaint.  Do you have | 11  regarding the scoring process that's referenced in |
| 12  documents responding to that request? | 12  Number 10 of the Amended Complaint and Request No. |
| 13    A.>In answer, about 12, 5, and 6 are all | 13  5 of the Request to Camellia Therapeutic? |
| 14  included. | 14    A.>No. |
| 15    Q.>I have a copy of a Request for | 15    Q.>Request No. 6 of the Request to |
| 16  Proposal for Therapeutic Foster Care for Children | 16  Camellia Therapeutic asks for the production of all |
| 17  issued February 28th, 2005 -- this is the RFP that | 17  documents in your possession relating to the RFP |
| 18  you are referencing in your complaint? | 18  deadline referenced in Paragraph 11 of the Amended |
| 19    A.>Yes. | 19  Complaint.  Paragraph 11 of the Amended Complaint, |
| 20    >>MR. LONG:  Let's mark that as | 20  which is Exhibit 3, states that:  Defendant set |
| 21  Exhibit 4. | 21  April 11, 2005, as the deadline for the receipt of |
| 22    >>(WHEREUPON, a document was marked | 22  the RFP.  Do you have documents that respond to |
| 23    >>as Exhibit 4 and is attached to | 23  that request? |

| Page 26 | Page 28 |
|---|---|
| 1    >>the original transcript.) | 1    A.>Yes. |
| 2    Q.>(Mr. Long) Dr. Appiah, when you | 2    Q.>You've given me one page labeled Page |
| 3  referenced Request for Proposals in your complaint, | 3  2.  Is that the only document that you have? |
| 4  you were referring to the Request for Proposal that | 4    A.>Yes. |
| 5  we have now labeled as Exhibit 4; is that correct? | 5    Q.>And this is Page 2 of the RFP |
| 6    A.>Yes. | 6  document that we have labeled as Exhibit 4, |
| 7    Q.>Request No. 5 of the request made to | 7  correct? |
| 8  Camellia Therapeutic asks for the production of all | 8    A.>Yes. |
| 9  documents in your possession relating to -- and | 9    Q.>Request No. 7 asks Camellia |
| 10  that should be scoring process -- in the RFPs | 10  Therapeutic to produce all documents in your |
| 11  referenced in Paragraph 10 of the Amended | 11  possession related to your answers and proposals |
| 12  Complaint.  Paragraph 10 of the Amended Complaint, | 12  submitted in response to the RFP, referenced in |
| 13  which is Exhibit 3, says:  In the RFPs, Defendant | 13  Paragraph 12 of the Amended Complaint.  Paragraph |
| 14  set out a scoring process with a maximum of 1,000 | 14  12 of the Amended Complaint, which is Exhibit 3, |
| 15  points to be earned by individual vendors.  It did | 15  Paragraph 12, states:  Plaintiff submitted its |
| 16  not indicate the points below which a vendor would | 16  answers to the RFPs by the April 11, 2005, deadline |
| 17  not be awarded a contract under the RFP provisions. | 17  for the receipt of proposals from vendors.  You |
| 18  Have you produced documents in response to that | 18  have documents?  I have a thick document here, |
| 19  request? | 19  about a half-inch or more.  Is this your Request |
| 20    A.>Yes, sir. | 20  for Proposals? |
| 21    Q.>Where are those documents?  You have | 21    A.>Yes. |
| 22  given me two pages -- | 22    Q.>Is it the response to the RFP? |
| 23    A.>And I used a yellow marker to make it | 23    A.>Yes. |

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 29

1    >>MR. LONG: I'm going to mark this
2    as Exhibit 5.
3    >>(WHEREUPON, a document was marked
4    >>as Exhibit 5 and is attached to
5    >>the original transcript.)
6    Q.>(Mr. Long)  Are there any other
7    documents that Camellia Therapeutic submitted in
8    response to the RFP?
9    A.>No.
10   Q.>Request No. 8 requests Camellia
11   Therapeutic to produce all documents in your
12   possession relating to the on or about May 12,
13   2005, publication of the Notice of Intent to Award
14   Contracts referenced in Paragraph 13 of your
15   Amended Complaint.  Paragraph 13 of the Amended
16   Complaint, which is Exhibit 3, states that on or
17   about May 12, 2005, the defendant published on his
18   website a Notice of Intent to Award Contracts.  The
19   plaintiff scored 753.3 and did not receive any
20   contracts from defendant because the minimum score
21   to receive a contract was 800.  Do you have any
22   documents responding to that request?  You have
23   given me a five-page document, and will you explain

Page 30

1    to me the top page that talks about the word
2    attachment?  Is that something you put on there?
3    A.>Yes.
4    Q.>That's your language?
5    A.>Yes.
6    Q.>It was an attachment to what?
7    A.>This is part of my original suit to
8    Montgomery County, Honorable Price, so this is a
9    copy of it.
10   Q.>So you made those documents an
11   attachment to that original lawsuit?
12   A.>Yes, it was in there.
13   >>MR. LONG: Let's mark this as the
14   next exhibit.
15   >>(WHEREUPON, a document was marked
16   >>as Exhibit 6 and is attached to
17   >>the original transcript.)
18   Q.>(Mr. Long) Dr. Appiah. Item No. 13
19   on the Amended Complaint, Paragraph 13, talks about
20   the defendant publishing on a website a notice of
21   intent to award contracts. Did you personally see
22   any material on the website?
23   A.>Say that again.

Page 31

1    Q.>Did you see a list on the website of
2    the persons selected for the RFP?
3    A.>Yes.
4    Q.>Is that the document that you have
5    given as an attachment?  Is that the document that
6    was on the website?  Did you actually print that
7    off?
8    A.>Yes, I printed off the website.
9    Q.>Let me have that again.  So the last
10   page of Exhibit 6 -- which you have labeled
11   Attachment 2 with the words:  Changed result to
12   accommodate child/family first -- is that the
13   document that you saw on the website?
14   A.>All of it was on the website.
15   Q.>I noticed that this Exhibit 6 has
16   three different charts?
17   A.>Yes.
18   Q.>Slightly different charts -- and you
19   said all three of these charts were on the website?
20   A.>DHR said print all these on the
21   website.
22   Q.>So you saw all these on the website?
23   A.>Yes, I printed them all.

Page 32

1    Q.>In that Paragraph 13 of the Amended
2    Complaint, Camellia states that Camellia scored
3    753.3 on the RFP; is that correct?
4    A.>Yes, sir.
5    Q.>Where did you get that score from?
6    A.>It's on the website.
7    Q.>It's on these charts?
8    A.>Yes, sir.
9    Q.>It's Exhibit 6?
10   A.>Yes.
11   Q.>The very first chart in Exhibit 6, do
12   you see Camellia Therapeutic listed on that chart?
13   A.>Yes.
14   Q.>And the score beside Camellia
15   Therapeutic is?
16   A.>753.3.
17   Q.>How many programs are listed on that
18   chart?
19   A.>22.
20   Q.>Camellia is listed as what number on
21   the chart?
22   A.>18.
23   Q.>Is the chart listed by the score in

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 33

1 descending order?
2    A.>I don't know -- I think so, because
3 it's not --
4    Q.>Looking at the chart, just trying to
5 explain the chart, does the chart list scores for
6 every one of the providers listed?
7    A.>Yes.
8    Q.>And the list is by descending order
9 of the score, is it not, according to the score?
10    A.>Yes.
11    Q.>Camellia is listed as what number on
12 the chart?
13    A.>18.
14    Q.>According to Paragraph 13 of your
15 Amended Complaint, in part, it says: And Camellia
16 did not receive any contracts from defendant
17 because the minimum score to receive a contract was
18 800. That is your allegation?
19    A.>Yes.
20    Q.>Where did you get that information
21 from?
22    A.>From Attorney Joel Marsh.
23    Q.>One of the co-counsel representing

Page 34

1 the Department?
2    A.>Uh-huh.
3    Q.>He happens to be on military leave
4 right now. I think I have some copies of that, so
5 you can keep that.
6    >>MR. LONG: Mark that as Exhibit
7 7.
8    >>(WHEREUPON, a document was marked
9    >>as Exhibit 7 and is attached to
10    >>the original transcript.)
11    Q.>(Mr. Long) Exhibit 7, August 16,
12 2005, letter from Joel Marsh that you just gave
13 me -- is that the document that you gave me?
14    A.>Yes.
15    Q.>In that document on Page 1 at the
16 bottom it says: A panel of reviewers objectively
17 graded the proposal that was submitted. Each
18 proposal was graded on a variety of issues with a
19 perfect score being 1,000 points. In order to
20 ensure that more than one or two agencies would be
21 selected, the decision was made to award homes to
22 each agency that scored 800 or above on their
23 proposal. That is where you got the 800 score

Page 35

1 from; is that correct?
2    A.>Yes.
3    Q.>So on the document we have, which is
4 the chart on Exhibit 6 -- let's go back to Exhibit
5 6. We already discussed the fact that Camellia
6 scored below 800; isn't that right?
7    A.>Yes.
8    Q.>How many providers on the chart
9 scored 800 or above?
10    A.>I don't know.
11    Q.>Will you count them up, please?
12    A.>Okay -- 17.
13    Q.>17 scored higher than 800 or above;
14 is that correct?
15    A.>Uh-huh.
16    Q.>Request No. 11 of the request to
17 Camellia Therapeutic asks you to produce all
18 documents in your possession relating to contracts
19 between Camellia Therapeutic Foster Agency and DHR
20 regarding the reference in the Amended Complaint.
21 That request comes from Paragraph 13 of the Amended
22 Complaint where you talk about you were not able to
23 receive any contracts from the defendant because

Page 36

1 you didn't get a minimum score. Were you allowed a
2 contract with DHR after not receiving a score of at
3 least 800?
4    A.>No.
5    Q.>Isn't it true that you were given
6 what's called an attrition contract for a year?
7    A.>Yes.
8    Q.>So you did receive a contract from
9 the Department of Human Resources after the RFP
10 decision had been made?
11    A.>Yes.
12    Q.>So that paragraph is not entirely
13 correct, is it?
14    A.>It is correct.
15    Q.>What was the attrition contract?
16    A.>Attrition means that someone is sorry
17 for what they have done -- the Webster Dictionary.
18 So they are sorry for the action, so they let me
19 hold the children while they are preparing them to
20 put in the homes -- somewhere to hold the children
21 for them. I was used.
22    Q.>So after Camellia Therapeutic failed
23 to get a contract on the RFP, you already were

Page 37

1    serving some children at the time; is that correct?
2        A.>Yes.
3        Q.>How many children were you serving at
4    the time?
5        A.>I don't have a ballpark figure --
6    maybe 30 or 35.
7        Q.>But after the RFP process was
8    concluded, DHR still allowed you to serve those
9    children that you already had?
10       A.>They have nowhere to put them. So I
11   hold them until they can give them to the people
12   that they want.
13       Q.>How long did this attrition contract
14   last?
15       A.>They immediately started the removal
16   of the children. So they keep on taking them one
17   by one until eventually by maybe July, August,
18   September all the kids were moved out.
19       Q.>Did it last at least a year?
20       A.>Yes, it lasted a year. It was just
21   they had nowhere to put the children. If you look,
22   a letter was sent from Mr. Mitchell. Mr. Mitchell
23   was rushing the children to go. They have nowhere

Page 38

1    to put them. By attrition, it meant I was sorry
2    for the action and i should hold the kids for them;
3    otherwise, the kids would be in the street or a
4    boarding house -- and that is a violation of RFP.
5        Q.>The Therapeutic Foster Care RFP
6    decision was made in the year 2005; is that
7    correct?
8        A.>Uh-huh.
9        Q.>I will show you a document that we
10   are going to label as Exhibit 8.
11       >>(WHEREUPON, a document was marked
12       >>as Exhibit 8 and is attached to
13       >>the original transcript.)
14       Q.>(Mr. Long) Do you recognize this
15   document?
16       A.>Yes.
17       Q.>March 15, 2006, letter to you?
18       A.>Yes.
19       Q.>Will you read the second line in the
20   first paragraph, read it aloud?
21       A.>Where?
22       Q.>On the first paragraph, second
23   sentence.

Page 39

1        A.>Operating -- we must begin planning
2    for the children currently being served by your
3    program.
4        Q.>That is the first line. Keep on
5    reading the second sentence -- as you know --
6        A.>As you know, the attrition contract
7    will no longer be in effect after September 30,
8    2006. The Department is committed to making the
9    transitions affected by this change to the least
10   disruptive for children as possible.
11       Q.>So the language you just read says
12   that you had an attrition contract at least through
13   September 30th of 2006; is that correct?
14       A.>Yes.
15       Q.>And that was after the RFP decision
16   that was made in 2005?
17       A.>Yes, sir.
18       Q.>Number 12 of the Request to Camellia
19   Therapeutic asks for the production of all
20   documents in your possession relating to the scores
21   of various sections of the RFP referenced in
22   Paragraph 14 of the Amended Complaint. The Amended
23   Complaint, Paragraph 14 states: Defendant failed

Page 40

1    to contact any of plaintiff's references as
2    stipulated in the basis of selection. That section
3    was worth a total of 50 points. So have you
4    produced documents in relation to Request No. 12?
5        >MS. SPEARS-TURK: What I believe
6    you are asking for is the information as it relates
7    to where he learned that the scoring of references
8    was worth 50 points. It is our understanding that
9    that is a part of the RFP.
10       >THE DEPONENT: And it is right
11   here, right there with my references.
12       Q.>(Mr. Long) The document that you
13   have given me has a cover page -- Section 9
14   references 50 points -- has a Page No. 11. Was
15   this part of the RFP response that you submitted
16   that we are already put in as an exhibit?
17       A.>Yes, sir.
18       Q.>On this document it says: References
19   as described in Section 1:4. Where does it say
20   that these references have to be contacted?
21       A.>It is right there in the RFP. If you
22   read the RFP, it says to contact the references.
23       Q.>I am just trying to get where you got

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 41 | Page 43 |
|---|---|
| 1 the information from. | 1 >MS. SPEARS-TURK: I am going to |
| 2 A.>Yes, it is in the RFP -- the book I | 2 object to the form of the question, but you can |
| 3 gave you. And then there was also a meeting here | 3 answer it. |
| 4 where there was a court reporter present with all | 4 A.>-- for which the vendor has performed |
| 5 the providers and Sharon Ficquette, who is also a | 5 similar services outlined in this RFP. This list |
| 6 lawyer here, together with Susan Ward, Gary | 6 should include the names, addresses, and telephone |
| 7 Mitchell. And on the court reporter's notes it | 7 numbers of contact persons within those agencies |
| 8 says that they will contact the references. | 8 responsible for contract monitoring. DHR will be |
| 9 Q.>How do you know that your references | 9 responsible for contacting these agencies for |
| 10 were not contacted? | 10 reference information. DHR did not contact them. |
| 11 A.>Because I called them. | 11 Q.>(Mr. Long) It doesn't say that DHR |
| 12 Q.>Because you called your references? | 12 is going to contact them. |
| 13 A.>Yes. | 13 A.>It says right there. |
| 14 Q.>And they told you that they were | 14 Q.>It said they are going to be |
| 15 never contacted? | 15 responsible for it -- it doesn't say that they are |
| 16 A.>Nobody ever contacted. I gave them | 16 going to contact them. |
| 17 to you in your hand so if you give them to me, I | 17 A.>Responsible for contacting them, and |
| 18 can read them. | 18 DHR did not do it. Maybe my English may not be |
| 19 Q.>In your Request for Proposal, Exhibit | 19 good, but that is my understanding. And you can |
| 20 5? | 20 subpoena the records from the court reporter that |
| 21 A.>Yes. Laura Parchman -- | 21 said they will contact them -- |
| 22 Q.>What page are you reading from? | 22 >>THE DEPONENT: So put it down. |
| 23 A.>Page 12. | 23 Q.>(Mr. Long) Request No. 13 asks for |

| Page 42 | Page 44 |
|---|---|
| 1 Q.>On this list there are 10 that I see | 1 production of all documents in your possession |
| 2 listed on Page 12; is that correct? | 2 relating to Caucasian-owned agencies awarded |
| 3 A.>Yes, 12 and 13. | 3 contract referencing Paragraph 15 of the Amended |
| 4 Q.>So there are some on 13 as well? | 4 Complaint. Paragraph 15 of the Amended Complaint |
| 5 A.>Yes, but we didn't copy from here. | 5 states: As a result, plaintiff was not awarded any |
| 6 It was typed and given to you. | 6 contracts and said contracts were awarded to a |
| 7 Q.>Have you contacted all these | 7 Caucasian-owned agency causing a loss in Federal |
| 8 references? | 8 funds. What documents do you have in your |
| 9 A.>Yes. | 9 possession relating to that Request No. 13? |
| 10 Q.>They all told you nobody has | 10 A.>You can look at AL Mentor is one. AL |
| 11 contacted them from DHR? | 11 Mentor is Caucasian. |
| 12 A.>All of them. | 12 Q.>Let's say that both you and I |
| 13 Q.>Let me see that, please. | 13 understand what you are talking about. Are you |
| 14 >MR. LONG: I show you Exhibit 4, | 14 talking about Alabama Mentor? |
| 15 which is the Request for Proposal document that we | 15 A.>This is my document over here, so I |
| 16 had admitted into evidence. I ask you to turn to | 16 can give it to you if you want my document. |
| 17 Page 9 of that document. | 17 Q.>And that is part of Exhibit 6, that |
| 18 Q.>(Mr. Long) Is there a section on | 18 chart that we were talking about earlier? |
| 19 that document that talks about references? | 19 >MS. SPEARS-TURK: Can we take a |
| 20 A.>Yes. | 20 break for just a minute, please? |
| 21 Q.>Will you read that aloud, please? | 21 >MR. LONG: Sure. |
| 22 A.>List all agencies -- state, Federal, | 22 10:22 a.m. |
| 23 local -- | 23 (Short break.) |

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 45

1    10:37 a.m.
2    Q.>(Mr. Long) Dr. Appiah, before the
3    break I believe I asked you about the documents
4    relating to the Caucasian-owned agencies that were
5    in Request No. 13 and Paragraph 15 of the Amended
6    Complaint. Do you have those documents?
7    A.>Yes, sir.
8    Q.>The document that you gave me appears
9    to be another copy of the chart that we have been
10   discussing as part of Exhibit 6; is that correct?
11   A.>Yes.
12   Q.>Second page of Exhibit 6 has
13   handwritten on it -- Exhibit 2B, so that is the
14   chart that you are now talking about that lists the
15   Caucasian-owned agencies awarded contracts?
16   A.>Yes.
17   Q.>Which agencies on that chart are
18   Caucasian-owned?
19   A.>AL Mentor.
20   Q.>Let's see where that is. That is the
21   sixth program, listed AL, which is Alabama Mentor.
22   Is that the one you are talking about?
23   A.>Uh-huh.

Page 46

1    Q.>How do you know they are
2    Caucasian-owned? Who is the owner?
3    A.>I don't have the name at this time.
4    Q.>So how do you know they are
5    Caucasian-owned?
6    A.>Because I have known some of the
7    staff members who have worked there during the
8    years.
9    Q.>How do you know the staff members?
10   A.>They moved over to another company.
11   Q.>Which staff members have told you
12   that the company is owned by a white person?
13   A.>It has been years now. I don't
14   remember at this time.
15   Q.>Years?
16   A.>They have an office in Georgia, too,
17   and I am about a few miles from Georgia.
18   Q.>When was the last time you talked to
19   a member of this company when they told you that
20   this company was Caucasian-owned?
21   A.>I don't remember.
22   Q.>Was it in 2005?
23   A.>Right about that time, yes.

Page 47

1    Q.>What is the significance, if any, of
2    your putting in your Amended Complaint, Paragraph
3    15, that the companies awarded contracts were
4    Caucasian-owned?
5    A.>What are you trying to get at -- make
6    it clear so I can understand what you are asking
7    me?
8    Q.>I am trying to determine, from what
9    you said in your complaint, why does that matter?
10   A.>Why, you want me to explain?
11   Q.>Yes.
12   A.>That I am a black-owned agency -- I
13   have homes already well-established, and this a
14   company that has no office, no foster parents, and
15   waik in the door and get a contract. What do you
16   think I am going to think? That's my reason why I
17   said what I said. That is my answer.
18   Q.>Is there a place on the response to
19   the Request for Proposal where it lists the race of
20   the provider?
21   A.>No, it doesn't list -- no, sir, I
22   didn't see that.
23   Q.>So in your response to the RFP did

Page 48

1    you list your race on there?
2    A.>No, I didn't list it.
3    Q.>Just for the record, what is your
4    race?
5    A.>I am black -- African-American.
6    Q.>But there is no place in your
7    response to the Request for Proposal where you
8    listed your race or color?
9    A.>I don't think so.
10   Q.>Was there any provision of the RFP
11   document itself that requests that providers list
12   their race or color?
13   A.>I don't remember.
14   Q.>Are there any other providers on this
15   list we have been discussing that you claim are
16   Caucasian-owned and were awarded contracts?
17   A.>Youth Villages of Tennessee.
18   Q.>They are the eighth listed provider.
19   How do you know that Youth Villages is
20   Caucasian-owned?
21   A.>General knowledge.
22   Q.>From what source?
23   A.>From the staff.

12 (Pages 45 to 48)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 49

1    Q.>Who at Youth Villages has told you
2    that they are Caucasian-owned?
3    >>THE DEPONENT: Do you have your
4    papers here? I will point them out for you. That
5    is not Youth Villages -- that is mine.
6    A.>I will get the name of the person on
7    the front of the page, but I can tell the first
8    name is Patience.
9    Q.>(Mr. Long)  Patience -- is that
10   person's first name?
11   A.>Yes.
12   Q.>Are there any other providers on this
13   list who you assert are Caucasian-owned?
14   A.>Basically, with the exception of
15   Seraaj, they are all Caucasian-owned.
16   Q.>So the list of the ones awarded
17   contracts are those who receive, according to that
18   letter, more than 800 points, correct?
19   A.>Yes.
20   Q.>So let's go down the list --
21   Brewer-Poarch, you are sure they are
22   Caucasian-owned?
23   A.>Yes, sir.

## Page 50

1    Q.>SAFY?
2    A.>Of Chicago -- yes, Caucasian-owned.
3    Q.>You assert that they are
4    Caucasian-owned?
5    A.>Yes.
6    Q.>UMCH --
7    A.>United Methodist Church -- yes, they
8    are Caucasian-owned.
9    Q.>TPI, which is --
10   A.>Dr. Mitchell -- Caucasian-owned.
11   Q.>Therapeutic Programs, Incorporated?
12   A.>Yes.
13   Q.>You assert they are Caucasian-owned?
14   A.>Yes, sir.
15   Q.>LCYDC -- do you know what that refers
16   to?
17   A.>Yes, Lee County Youth Development
18   Center -- Caucasian-owned.
19   Q.>Then you have Alabama Mentor that we
20   just discussed -- Wilmer Hall?
21   A.>Caucasian-owned -- Mobile.
22   Q.>Are they affiliated with the Catholic
23   Church?

## Page 51

1    A.>Yes, Episcopal Church.
2    Q.>Youth Villages?
3    A.>Caucasian-owned -- Tennessee.
4    Q.>FIT Homes?
5    A.>In Mobile -- Caucasian-owned --
6    Family in Transition.
7    Q.>Seraaj?
8    A.>African-American.
9    Q.>Eagle Rock?
10   A.>I am not very sure about that, but
11   according to my knowledge Caucasian-owned.
12   Q.>Child/Family Services?
13   A.>Caucasian-owned.
14   Q.>Alliance?
15   A.>Alliance Church -- Caucasian-owned.
16   Q.>Church?
17   A.>Uh-huh.
18   Q.>Gateway?
19   A.>Caucasian-owned.
20   Q.>Is that a church?
21   A.>No, that is Caucasian-owned.
22   Q.>Mountain View?
23   A.>Caucasian-owned.

## Page 52

1    Q.>Catholic SS -- Catholic Social
2    Services?
3    A.>Caucasian-owned.
4    Q.>New Way Out?
5    A.>I am not too sure about it --
6    Caucasian-owned.
7    Q.>Those are the only ones listed on
8    that chart above 800 points?
9    A.>Yes, sir.
10   Q.>And of that list, the ones that you
11   listed as Caucasian-owned, what information do you
12   have that verifies to you that they are indeed
13   Caucasian-owned -- Brewer-Poarch, how do you know
14   they are Caucasian-owned?
15   A.>Common knowledge.
16   Q.>From what source?
17   A.>From Therapeutic Association members.
18   Q.>Isn't it true that Brewer-Poarch is
19   part of a program run through the University of
20   Alabama in Tuscaloosa?
21   A.>Yes, Caucasian-owned.
22   Q.>SAFY, what is that?
23   A.>It is from Chicago --

13 (Pages 49 to 52)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 53

1 Caucasian-owned.
2    Q.>How do you know that they are
3 Caucasian-owned?
4    A.>Because when I decided to come into
5 this program -- first of all, I decided to become a
6 foster parent so that I could understand the
7 program very well, so I applied to SAFY. And they
8 sent me to Chicago go try to do my application, and
9 I said that is too far. So I tried with TPI. I
10 became a foster parent with TPI for two years. TPI
11 is white-owned. The representative said it was
12 white-owned. When I was trying to talk to SAFY, I
13 found out it was white-owned.
14    Q.>So when you talked to SAFY in Chicago
15 and they said it was white-owned, who was the
16 person you talked to?
17    A.>It has been several years, when I was
18 a foster parent. I wanted to become a foster
19 parent to understand the program and know how they
20 feel, so I took up to become a foster parent.
21    Q.>UMCH, which is United Methodist
22 Church Homes, how do you know they are white-owned?
23    A.>I am a pastor, I know.

Page 54

1    Q.>It is church-owned?
2    A.>It is a white church, yes, sir.
3    Q.>Therapeutic Programs, Incorporated,
4 that is TPI?
5    A.>That is Dr. William Mitchell. Yes, I
6 was his foster parent. I know him personally,
7 white man.
8    Q.>LCYDC, Lee County Youth Development
9 Center?
10    A.>It is white-owned.
11    Q.>But that is an agency in Lee County,
12 run by the County?
13    A.>Yes, it is organized by the white
14 people.
15    Q.>Alabama Mentor?
16    A.>That is white-owned.
17    Q.>Wilmer Hall?
18    A.>White-owned.
19    Q.>It is a Catholic church?
20    A.>Episcopal -- England.
21    Q.>In Mobile?
22    A.>Yes.
23    Q.>And you say that is white-owned?

Page 55

1    A.>Yes.
2    Q.>Youth Villages?
3    A.>White-owned -- Tennessee.
4    Q.>How do you know Youth Villages is
5 white-owned?
6    A.>In the past, from a staff member
7 named Patience.
8    Q.>A staff member told you?
9    A.>I don't remember the last name.
10    Q.>FIT Homes, which is Family in
11 Transition Homes, I believe you referenced before.
12 How do you know they are white-owned?
13    A.>When we go to Therapeutic Foster
14 Association of agencies, we know who represents
15 them and they tell us who are the owners -- so it
16 is common knowledge.
17    Q.>Who did they tell you owns FIT Homes?
18    A.>I don't have the information at this
19 time.
20    Q.>You talked about Seraaj. That's
21 Abdul Seraaj? He's black?
22    A.>Yes, African-American.
23    Q.>Eagle Rock?

Page 56

1    A.>It's a new agency. It was just
2 coming in.
3    Q.>How do you know they are white-owned?
4    A.>Common knowledge from other agencies.
5    Q.>Child/Family Services, how do you
6 know they are white-owned?
7    A.>General knowledge.
8    Q.>Are they a religious faith?
9    A.>No.
10    Q.>Alliance?
11    A.>Alliance is like a church,
12 white-owned.
13    Q.>What denomination?
14    A.>It is not a denomination. It's
15 something like Pentecostal or Charismatic.
16    Q.>Where is it out of?
17    A.>Their main office is in California,
18 but they are based in Huntsville.
19    Q.>Gateway?
20    A.>Gateway is also out of California,
21 but they are based in Birmingham -- white-owned.
22    Q.>How do you know Gateway is
23 white-owned?

14 (Pages 53 to 56)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 57 |
|---|
| 1    A.>I have Gateway employees working for |
| 2    me, and I know the executive director himself.  It |
| 3    is white-owned. |
| 4    Q.>So the executive director is white? |
| 5    A.>Yes. |
| 6    Q.>Did he tell you that the owners were |
| 7    white? |
| 8    A.>Yes. |
| 9    Q.>Mountain View? |
| 10   A.>Mountain View is white-owned. |
| 11   Q.>How do you know this? |
| 12   A.>Common knowledge. |
| 13   Q.>From what source? |
| 14   A.>When we go to our Association |
| 15   meetings, we try to let know who owns the |
| 16   company -- chairmen and directors and social |
| 17   workers when we meet who own this company, and we |
| 18   are trying to see how many African-Americans we are |
| 19   bringing in.  Because it is monopolized by |
| 20   all-white agencies, and they are trying to shut the |
| 21   black folks out.  So we know they are white |
| 22   companies -- I know. |
| 23   Q.>Catholic Social Services is |

| Page 58 |
|---|
| 1    white-owned as part of the Catholic church? |
| 2    A.>Yes, and they are in Mobile. |
| 3    Q.>New Way Out? |
| 4    A.>New Way Out is a new agency, but he |
| 5    didn't get a contract.  But it is white-owned -- |
| 6    because he has no license, no office, so he didn't |
| 7    get a contract. |
| 8    Q.>And the owner is what? |
| 9    A.>Is white, but he didn't get a |
| 10   contract. |
| 11   Q.>According to the chart he had 811 |
| 12   points. |
| 13   A.>But he didn't get a contract because |
| 14   he had no office and he couldn't get his license on |
| 15   time. |
| 16   Q.>So he was denied a contract because |
| 17   he couldn't get his license? |
| 18   A.>You can't even go through it that |
| 19   wrong.  How do you give folks a contract and have |
| 20   no office and no license and no children -- where |
| 21   are they going to put them?  And that is what I |
| 22   told the Commissioner, and they took some of them |
| 23   out.  They took so many people, because they can |

| Page 59 |
|---|
| 1    show us how to do this.  It takes a year and a half |
| 2    to get a license, so how can they do them in two |
| 3    months?  It took me a year and a half. |
| 4    Q.>In our discussion that we just had |
| 5    about the list, you stated that Seraaj is |
| 6    black-owned; is that correct? |
| 7    A.>That is correct. |
| 8    Q.>What do these numbers on the chart |
| 9    mean?  Under the score there are various columns -- |
| 10   what do those numbers mean? |
| 11   A.>They are regions. |
| 12   Q.>At the top of the chart it lists |
| 13   regions across the top in bold letters -- regions |
| 14   of the states.  That is your understanding? |
| 15   A.>Uh-huh. |
| 16   Q.>What are the numbers on each column |
| 17   under the regions? |
| 18   A.>They are foster children. |
| 19   Q.>The regions are listed in Roman |
| 20   numerals, is that correct, across the top? |
| 21   A.>Yes. |
| 22   Q.>And under that we have regular |
| 23   numbers, English numerals, and what do those |

| Page 60 |
|---|
| 1    numbers mean? |
| 2    A.>Number of foster children. |
| 3    Q.>Number of slots, or number of |
| 4    children? |
| 5    A.>Number of children, actual physical |
| 6    children, age-count. |
| 7    Q.>That are authorized under the |
| 8    contract; is that correct? |
| 9    A.>Yes, a possibility -- I don't know. |
| 10   Q.>But that is your understanding? |
| 11   A.>That is my understanding. |
| 12   Q.>On the line that says Seraaj, Seraaj |
| 13   had 800 -- what is the score on which the Seraaj |
| 14   proposal was rated? |
| 15   A.>854.75. |
| 16   Q.>Their score, black-owned Seraaj, is |
| 17   854.75, and your score, Camellia, was 753.3; is |
| 18   that correct? |
| 19   A.>Yes, sir. |
| 20   Q.>Under Seraaj, how many children or |
| 21   slots was he given? |
| 22   A.>208. |
| 23   Q.>208? |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

Page 61

1     A.>Uh-huh.
2     Q.>So a black provider was given 208
3  children under the RFP; is that correct?
4     A.>Yes.
5     Q.>Request No. 14 to Camellia
6  Therapeutic asks the company to produce all
7  documents in your possession related to your loss
8  of Federal funds referenced in Paragraph 15 of the
9  Amended Complaint, and that is the second part of
10  Paragraph 15. We have already discussed the
11  Caucasian-owned agencies issued -- but the clause
12  of your Amended Complaint says that you have lost,
13  causing a loss in Federal funds because you were
14  not awarded the contract.
15     A.>Yes.
16     Q.>What documents do you have in
17  response to that?
18     A.>The first 7,000 are Federal and
19  the --
20     Q.>Slow down.
21     A.>Look at the second sheet where the
22  7,000-plus in the Federal -- look at the bottom --
23  right at the bottom --

Page 62

1     >>MR. LONG:  Let's mark it Exhibit
2  9.
3     >>(WHEREUPON, a document was marked
4     >>as Exhibit 9 and attached to the
5     >>original transcript.)
6     Q.>(Mr. Long)  Page 2, what are you
7  trying to explain about Page 2 now?
8     A.>(No response.)
9     Q.>Exhibit 9 across the front, Page 1,
10  says:  Contractor, Camellia Therapeutic Foster
11  Agency -- Contract No. 3095 (TFC). This is the DHR
12  form?
13     A.>Yes.
14     Q.>Is this something that you got from
15  DHR?
16     A.>This is the form that they give to
17  us.
18     Q.>This is the form that you filled out
19  for DHR?
20     A.>Yes.
21     Q.>This is your budget?
22     A.>Yes.
23     Q.>This is the budget for what year?

Page 63

1     A.>2005/2006.
2     Q.>So October 1, 2005, to September 3 of
3  2006, the RFP contracts were made effective under
4  the RFP that we were just discussing for what
5  period of time?
6     A.>Same time.
7     Q.>They came in October 2006; is that
8  correct?
9     A.>October 2005.
10     Q.>But the RFPs were let out in 2005; is
11  that right?
12     A.>Uh-huh.
13     Q.>What date were the RFP contracts to
14  go into effect -- October 2005?
15     A.>Yes.
16     Q.>They were intended to go into effect
17  October 2005; is that correct?
18     A.>Uh-huh.
19     Q.>But this is a budget that you are
20  submitting after the date that the RFP contracts
21  went into effect?
22     A.>Yes, sir.
23     Q.>Is this the budget for the attrition

Page 64

1  contract that you had, the extended contract for
2  one year?
3     A.>No, the budget -- we are dealing with
4  RFP, so that had nothing to do with the attrition,
5  it is RFP, so --
6     Q.>So why are you admitting a budget if
7  you didn't have any children after October 1, 2005?
8     A.>Because I had children when they took
9  it away. This is my proposed budget.
10     Q.>It's a proposed budget?
11     A.>It was requested -- bring your budget
12  in for the RFP.
13     Q.>So this is the proposed budget under
14  the RFP submission -- is it part of Exhibit 5?
15     A.>Yes, sir.
16     Q.>Yes, I see it. It is after Page 50
17  of Exhibit 5. So this is your proposed budget
18  under the RFP that you were not granted?
19     A.>Yes, sir.
20     Q.>So you didn't have any expenses under
21  this RFP because you were not granted it, right?
22     A.>Yes, sir, I was denied contract.
23     Q.>So you never had any expenditures on

16 (Pages 61 to 64)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

| Page 65 | Page 67 |
|---|---|
| 1 it? You never had any expenditures under this<br>2 contract because you never got one. That is<br>3 correct, isn't it?<br>4     A.>Yes, sir.<br>5     Q.>Request No. 15, requests that<br>6 Camellia produce all documents in your possession<br>7 relating to your claim in Paragraph 16 that<br>8 defendant graded plaintiff's answers to the RFPs,<br>9 subjectively causing a further loss in points.<br>10 Let's go back to what Paragraph 16 of the Amended<br>11 Complaint says. Paragraph 16 says the defendant<br>12 graded plaintiff's answers to the RFPs,<br>13 subjectively causing a further loss in points.<br>14 What documents have you produced today responding<br>15 to that request?<br>16     A.>That is the letter to the DHR Board<br>17 members where I listed some of the people when I<br>18 found out, so this right there.<br>19     MR. LONG: Go ahead and mark this<br>20 as the next exhibit.<br>21     >>(WHEREUPON, a document was marked<br>22     >>as Exhibit 10 and is attached to<br>23     >>the original transcript.) | 1     Q.>I am trying to understand where you<br>2 get your information from that the scoring or<br>3 grading was subjective?<br>4     >MS. SPEARS-TURK: Which exhibit<br>5 is this?<br>6     >MR. LONG: That is 10.<br>7     A.>I paid for copies of my RFPs, and<br>8 then the staff sat down and we compared the answers<br>9 of the RFP and found out that it was just a rush<br>10 job. They just put something together to get rid<br>11 of me.<br>12     Q.>(Mr. Long) So if I understand you<br>13 correctly, you say that you got copies of the RFP<br>14 responses that were submitted by some of the other<br>15 providers and you compared those responses to<br>16 yours?<br>17     A.>Yes, most of them.<br>18     Q.>Your position is that your response<br>19 was better than most of them?<br>20     A.>Yes.<br>21     >>MR. LONG: I believe yesterday at<br>22 the depositions, Counsel, during the deposition of<br>23 Susan Ward, I believe, you produced some of those |

| Page 66 | Page 68 |
|---|---|
| 1     Q.>(Mr. Long) Let's look at Exhibit<br>2 10.<br>3     A.>I have two exhibits, but one is<br>4 already in there. My references are included, but<br>5 I gave it to you already so I can't give it back to<br>6 you.<br>7     Q.>You mean your references --<br>8     A.>Yes, it is part of it -- not<br>9 contacting my references.<br>10     Q.>We are going to put this in as<br>11 Exhibit 11.<br>12     >>(WHEREUPON, a document was marked<br>13     >>as Exhibit 11 and is attached to<br>14     >>the original transcript.)<br>15     Q.>(Mr. Long) That Exhibit 11 is<br>16 actually part of that RFP response that you<br>17 submitted that is Exhibit 5. Let's deal with these<br>18 separately. Exhibit 10, this letter to the DHR<br>19 Board, what part of that letter are you referring<br>20 to in response to the request that was sent about<br>21 the subjective scoring or grading?<br>22     A.>Do you want me to start reading<br>23 them? | 1 RFP responses, or at least put into evidence some<br>2 of them?<br>3     >MS. SPEARS-TURK: That is<br>4 correct.<br>5     >MR. LONG: And you were supposed<br>6 to get me a copy of that -- I hope you are working<br>7 on the copies of those documents he says he<br>8 reviewed in making that determination.<br>9     >>THE DEPONENT: I have to do it<br>10 because it is too many. It is going to cost a lot<br>11 of money -- thousands of copies.<br>12     Q.>(Mr. Long) So did you prepare any<br>13 documents or analysis or comparison, any notes that<br>14 you made to compare your response with the<br>15 responses of the other providers?<br>16     A.>I listed a portion of them right here<br>17 in DHR Board members, and I sent the same thing to<br>18 the Commissioner detailing my complaints and what<br>19 saw about the RFP decree and what was going<br>20 wrong -- and it is all in there.<br>21     Q.>Let's take a little time to go over<br>22 Exhibit 10. In Paragraph 1 on Page 1 of Exhibit<br>23 10, the letter to the DHR Board members, you state |

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

Page 69

1  something about trying to get together. What are
2  you talking about in that paragraph?
3      A.>When I was denied a contract, I
4  called the Commissioner's office and they would not
5  return my phone call. So I called the governor's
6  office direct to schedule an appointment to meet
7  the governor because I have five officers, so many
8  children, and invested so much money -- and to take
9  me down and give to someone from Tennessee or
10 someone from Boston is unfair because I am black
11 and they are white companies. So Susan Ward called
12 me back and said you have no right to go to the
13 governor's office for a hearing, and you have to go
14 through the administrative process for a hearing,
15 and you can't just go over there. And that is what
16 I did, so that's why I went to find a name --
17 James, he wrote this Administrative Code 6615. So
18 I pull this up on the Internet, and I file this
19 complaint under the Article of Hearing. I want him
20 to grant me a hearing because my phone call was not
21 being returned, so I had to make it official by
22 writing him letters.
23     Q.>Let's talk about Paragraph 2 of your

Page 70

1  letter. I believe your second sentence says that
2  some of the slots were awarded to out-of-state
3  agencies who have no foster parents or homes in
4  Alabama. Which agencies are you talking about?
5  Let's go back to Exhibit 6 that lists that chart we
6  have been discussing all day -- second page of
7  Exhibit 6. So which agencies do you assert in this
8  letter that were awarded contracts -- now, I assume
9  you are talking about those scoring above 800?
10     A.>First one, AL Mentor.
11     Q.>You claim that they are an
12 out-of-state company?
13     A.>Uh-huh.
14     Q.>Where are they located?
15     A.>Boston, Massachusetts.
16     Q.>Do they have an office in Alabama?
17     A.>As written at the time of the
18 contract, they have no office, no employees, no
19 staff, and no children. And it is on the RFP
20 answers that if you give me a contract, I will
21 start creating an office -- and that is ridiculous.
22     Q.>Was there any provision in the RFP
23 that required the responding agency to be an

Page 71

1  in-state Alabama company?
2      A.>Under minimum standard it says that
3  every person who is an executive director of this
4  agency has to reside here in Alabama. He lives in
5  Georgia. It is in the book, so that means he
6  doesn't qualify at all because he has no Alabama
7  address -- and he was awarded a contract. There is
8  a minimum standard.
9      Q.>I call your attention to Exhibit 4,
10 which is the Request for Proposal issued by DHR for
11 therapeutic foster care we have been discussing
12 today. I call your attention to Page 10 of the
13 RFP. Is it correct that there is a Mandatory
14 Requirement Section on that document?
15     A.>Yes.
16     Q.>Will you read for the record the
17 Mandatory Requirement Section?
18     >MS. SPEARS-TURK: Object to the
19 form. You can answer the question.
20     Q.>(Mr. Long) What is Number 1 on
21 there? How many mandatory requirements are listed
22 there?
23     A.>Five.

Page 72

1      Q.>What is the first one?
2      A.>Vendor must meet the deadline for
3  receipt of proposal.
4      Q.>What is the second one?
5      A.>Vendor must include a completed Tax
6  Identification Number form.
7      Q.>What is the third one?
8      A.>Vendor must include a completed
9  Disclosure Statement form.
10     Q.>What is the fourth one?
11     A.>Vendor must possess a current Child
12 Placing Agency license or submit an application
13 with State DHR to complete licensing by June 7,
14 2005.
15     Q.>Let's see if we get that right. The
16 fourth requirement is: Vendor must possess a
17 current Child Placing Agency license (Alabama) or
18 submit an application with State DHR to complete
19 licensing by June 7, 2005. Is that what the fourth
20 provision says?
21     A.>Yes, sir.
22     Q.>So the RFP did not require that a
23 company responding actually have a license at the

18 (Pages 69 to 72)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 73

1  time of its proposal, did it?
2      A.>It says here: If you don't have it,
3  you must have a complete -- not halfway -- a
4  complete Child Placing application -- license --
5  submit --
6      Q.>Application for a license?
7      A.>Yes, submit an application with the
8  State Department to complete the license by June
9  7th.
10     Q.>What's the fifth requirement?
11     A.>Vendor must provide an original
12  proposal, with original signature of persons
13  legally authorized to bind the applicant to the
14  proposal, plus the required number of copies per
15  RFP document. So that is ten copies or five
16  copies, whatever it is.
17     Q.>What in those mandatory requirements
18  states that the submitting agency must be an
19  in-state agency?
20     A.>It didn't say that. The therapeutic
21  foster care has a minimum standard operated by the
22  Department, and under the minimum standard it says
23  that the executive director must reside in

Page 74

1  Alabama. It is plain and clear, and you check with
2  the license officer, she will tell you. So how can
3  you even have a license when you don't even live
4  here? So this man doesn't even have a license
5  here.
6      Q.>Let's go back to Exhibit 10 -- this
7  is your letter to the DHR Board -- Page 2,
8  Paragraph 2, in that first sentence states that you
9  were surprised to find that some of the new
10  agencies awarded contracts have no physical office
11  in Alabama and have no staff as noted in the RFP,
12  yet they were awarded contracts. Why were you
13  surprised by that?
14     A.>Because, see, I don't mean to make it
15  difficult. But how in the world can you have
16  children, and it takes a year and a half to have
17  your license? And this is a shame over here. It
18  was a shame to take me out. How in the world does
19  it take a year and a half to get the people, train
20  them, and get a license? This was done in about
21  three days, so if you give them a contract and they
22  take a lengthy process for licensing and then you
23  have to go out and walk door-to-door and get foster

Page 75

1  parents and come back and train them for three
2  months, where are the kids going to go? So give me
3  an attrition contract to hold the children, and
4  then take them from me -- no, that is a cheat.
5      Q.>So where in the list of five
6  mandatory requirements that we were looking at,
7  that's in Exhibit 4, Page 10, the Request for
8  Proposal issued by DHR, where it says that there
9  has to be a physical office building in Alabama in
10  order to submit a proposal?
11     A.>This is not just by itself. RFP is
12  subjective to the minimum standard of the DHR
13  Therapeutic Program Book and RFP. You got to have
14  a physical building, physical address. You don't
15  just give a license for -- something you put in
16  your pocket, a driver's license -- you have to have
17  a physical building.
18     Q.>Isn't it true, Mr. Appiah, that we
19  have already discussed the fact that there was one
20  person that was on the list who did not get
21  licensed by the time that the RFP was supposed to
22  go into effect?
23     A.>Because of a lengthy process.

Page 76

1      Q.>Because they didn't get a license,
2  right?
3      A.>Yes, a lengthy process.
4      Q.>They submitted an application, but by
5  the time that contract was scheduled to be in
6  effect they did not have their license; is that
7  correct?
8      A.>Yes.
9      Q.>What is the name of that provider?
10     A.>I don't know how many of them, but I
11  will say New Way Out. He sat right there
12  yesterday -- New Way Out said there was no license.
13     Q.>They didn't have their license by the
14  time the contract was supposed to go into effect,
15  and so they didn't get any children.
16     A.>They were awarded 70 children with no
17  physical building, no license, nothing at all.
18  They give them 70. What kind of crazy stuff is
19  this? I don't expect the State to do crooked
20  things like that. The State should treat people
21  right. I have not been treated like this, like
22  they have been doing to me.
23     Q.>Number 3 of the letter to the

19 (Pages 73 to 76)

Page 77

1  governor, which is Exhibit 10, Page 2, Paragraph
2  No. 3, and that paragraph, these letters sent by
3  you, signed by you, state that SDHR -- which I
4  guess you were referring to State DHR --
5      A.>Yes, State Department of Human
6  Resources.
7      Q.>-- that had not been licensed to do
8  business in Alabama, had no experience in providing
9  therapeutic foster care in the state while denying
10 a contract to Camellia, a licensed and experienced
11 provider in the state of Alabama -- that's your
12 contention?
13     A.>Yes.
14     Q.>In the mandatory requirements that we
15 were just looking at on Page 10 of Exhibit 4 of the
16 Therapeutic Foster Care Requirements it's correct,
17 isn't it, that nothing in those mandatory
18 requirements required a responding provider to be
19 licensed in the state of Alabama at the time of
20 submission of their proposal?  That's correct,
21 isn't it?
22     A.>That is not correct, sir.
23     Q.>That is not what it says?

Page 78

1      A.>That is not correct, no.
2      Q.>Where is it that says something
3  different?
4      A.>Well, I can say that this proposal
5  here is subjective to the minimum standard.  And if
6  you go back and read the tape, Susan Ward and Chief
7  Antonio, DHR, make it clear that this is not by
8  itself.  They have to coincide with the minimum
9  standard of foster care.  So how can you have this
10 without this?
11     Q.>So if I understand what you are
12 saying, they are saying that there's two parts of
13 it -- that you have to submit the proposal, but by
14 the time you are contracting you actually have to
15 have a license?
16     A.>Yes, you have to do everything here.
17     Q.>You have to meet everything in the
18 request -- the request is one thing.  You can get
19 your license later, but you have to have it by the
20 time it's going to go into effect.  Is that what
21 you were told?
22     A.>Well, probably it seems logical.  I
23 can't remember the exact words, but it seems

Page 79

1  logical.  Because I cannot foresee, except that
2  they make it quicker for two big white agencies to
3  get a license in two months and making me wait for
4  a year and a half -- plus, I am paying rent and
5  stuff for a year and a half and can't get a
6  license.  This is the process.  So how can they do
7  this in two months?
8      Q.>Let's turn again to this letter that
9  you wrote to the DHR board of directors, which is
10 Exhibit 10, Page 2, Paragraph No. 4 on Page 2.
11 Let's go back to 3 because I believe you talked
12 about this.  In Paragraph No. 3, the last sentence
13 states that additionally the State requires the
14 executive director of all THC agencies to reside in
15 Alabama.  And you are talking about that that comes
16 from the minimum standards?
17     A.>Yes, sir.
18     Q.>But that is part of licensing, the
19 second stage?
20     A.>Yes, they've got to have that.
21     Q.>But that was the second stage we were
22 talking about earlier?
23     A.>Yes, sir.

Page 80

1      Q.>In Paragraph No. 4 on Page 2 of
2  Exhibit 2 it says:  DHR's method of awarding
3  corrects in that a higher number of contracts were
4  awarded to vendors that scored lower on the
5  1000-point scale, while vendors with higher scores
6  were awarded fewer slots.
7      A.>Yes.
8      Q.>How did you come to that conclusion,
9  and where did that information come from?
10     A.>Look at Exhibit 6.
11     Q.>Back to Exhibit 6 again -- that's the
12 second page of Exhibit 6. -- that is the chart we
13 have been discussing earlier.
14     A.>How can you justify that
15 Brewer-Poarch has a 904.25 score, and you give them
16 a 36 slot -- 36 children?  And then you give TPI,
17 892.75, 313 children.  How do you justify that?  It
18 is big on score.  By giving kids by score, how do
19 you justify that?  What is the rationale in this?
20     Q.>Mr. Appiah, did the RFP ask you to
21 submit a proposal for how many children that you
22 thought you could, or requested a contract to
23 serve?

Page 81

1     A.>Yes, sir.
2     Q.>So in your proposal where is that --
3 Exhibit 5 -- where is that listed?
4     A.>Right here.
5     Q.>On the very first page?
6     A.>Uh-huh.
7     Q.>So on Exhibit 5, the very first page,
8 as a section that divides it into regions --
9 Regions 1 through 9, correct?
10     A.>Uh-huh.
11     Q.>And beside each one you put how many
12 children you proposed to serve in each region?
13     A.>Yes.
14     Q.>You said you reviewed some of the
15 other RFP proposals; is that correct?
16     A.>Yes.
17     Q.>And each one of those RFP proposals
18 that you reviewed also had a similar front page?
19     A.>Yes.
20     Q.>With the number of children that they
21 proposed to serve?
22     A.>Yes, sir.
23     Q.>Let's see if I remember from

Page 82

1 yesterday. I think I wrote those down. From the
2 deposition yesterday, the RFP responses that I am
3 still waiting to receive, I believe I saw an RFP
4 response from Families in Transition. Did you
5 review that one?
6     A.>I don't know.
7     Q.>You don't remember whether you
8 reviewed that?
9     A.>I reviewed so many of them. Those
10 that I reviewed, I put a portion over here. So if
11 you keep on reading them, some of those will come
12 up.
13     Q.>You see some of those in the response
14 that you reviewed?
15     A.>Yes.
16     Q.>We will get there. LY Youth
17 Services, do you remember reviewing theirs?
18     A.>I don't have the reviews with me, but
19 I went ahead and looked at them and found out that
20 there were deficiencies: Their questions were not
21 very good; they have no experience; they have no
22 children; they don't have a child in this state;
23 they have no office. So they just threw something

Page 83

1 together, and they just gave them a contract.
2     Q.>Yesterday I believe we talked about
3 Exhibit No. 19, which was the RFP response by
4 Brewer-Poarch. Did you review the Brewer-Poarch
5 RFP?
6     A.>I don't know if they gave me that or
7 not. They wouldn't give me everything here. They
8 give you a portion of them, so I don't know how
9 many I have. I think I have eleven of them out of
10 eighteen over here, so I don't know if
11 Brewer-Poarch was included.
12     Q.>But on those eleven that you had,
13 each one had listed on them the number of children
14 that they were requesting to serve and what
15 regions?
16     A.>Yes.
17     Q.>So in awarding a contract, contracts
18 would be awarded according to the number of
19 children they requested to serve?
20     A.>Depends on the score. I went by the
21 score. If you go by the score, somebody gets 800,
22 904 and gets 25. And then somebody got 811 and
23 gets 70. How do you come to that conclusion? What

Page 84

1 kind of scale did you use? What kind of scale?
2 Nobody can tell you up and down. I have been
3 asking, asking, asking. Maybe when I go to Judge
4 Thompson somebody can tell me what kind of scale
5 they use.
6     Q.>Let's go back to Exhibit 10, Page 2,
7 Paragraph No. 5 of your letter. In that paragraph
8 you say DHR's criteria for awarding contracts did
9 not give specific weight for the experience of this
10 provider in the state of Alabama?
11     A.>Yes.
12     Q.>Is there a provision in the RFP to
13 grade experience? Was that one of the mandatory
14 provisions?
15     A.>How can you rate a program and affect
16 the lives of children who have already been abused
17 without looking into the provision that where is
18 this person going to go -- is it fully
19 operational? Because if I didn't take this
20 so-called appeasement contract and hold the kids,
21 where do you think they are going to be? So they
22 didn't put any weight on this. They just put
23 something together, and I stand by this one here.

21 (Pages 81 to 84)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 85

1    Q.>Dr. Appiah, Camellia got a DHR
2  license in what year?
3    A.>Probably 2001 or 2002, something like
4  that.
5    Q.>Your RFP response was submitted in
6  what year?
7    A.>2005.
8    Q.>So you had three years of experience
9  at the time?
10   A.>Yes, more than that -- four or five
11 years experience. Because I had my license, and I
12 signed up for a year and a half waiting for
13 children. And this time they don't wait for
14 children, they just give you somebody's kids.
15   Q.>So you got your license in 2001?
16   A.>Yes, possibly -- I don't know because
17 every two years they change, so I don't have the
18 first date.
19   Q.>So when did you get your first DHR
20 contract?
21   A.>Under the administration of Governor
22 -- what was the last governor's name?
23   Q.>Riley is the current governor.

## Page 86

1    A.>No, the previous governor. I don't
2  remember his name -- Don Siegelman, previous
3  administration, is where I got it.
4    Q.>When did you start getting DHR
5  children? When did you get a DHR contract?
6    A.>I don't remember, but it took a long
7  time.
8    Q.>Was it one year or two years after
9  you were licensed?
10   A.>Probably a year and a half. It takes
11 time because they don't give you nothing. You have
12 to go to County and just try to be there when they
13 have nowhere to put the kids, and they give it to
14 you. And besides, they are not going to give them
15 to a new company like me. They give them to TPI,
16 the oldest company. So when their house is full,
17 they get the meanest kid that nobody don't want and
18 they call me -- and nobody wants this child. Do
19 you want them? So I take the meanest kids -- the
20 one that sets houses on fire -- I am the one
21 getting them.
22   Q.>So TPI, Therapeutic Programs,
23 Incorporated, Dr. Mitchell, one of your

## Page 87

1  competitors, you felt that he was getting children
2  because he was more experienced?
3    A.>Yes, he is bigger, very big. If you
4  look at his financial records, TPI, they are paying
5  him 20 million dollars a year.
6    Q.>Let's go back to the chart that's
7  Page 2 of Exhibit 6, the list of programs that were
8  awarded contracts -- Brewer-Poarch, they have been
9  around a long time?
10   A.>Yes.
11   Q.>Longer than your program?
12   A.>Oh, yes.
13   Q.>SAFY, they have been around a long
14 time?
15   A.>Uh-huh.
16   Q.>Longer than your program?
17   A.>Yes.
18   Q.>UMCH, they been around a long time?
19   A.>Uh-huh.
20   Q.>Longer than your program?
21   A.>Yes.
22   Q.>TPI, they have been around a long
23 time?

## Page 88

1    A.>Yes, sir.
2    Q.>Longer than your program?
3    A.>Yes, sir.
4    Q.>LCYDC, that's Lee County Youth
5  Development Center, they have been around a long
6  time?
7    A.>Yes, sir.
8    Q.>Longer than your program?
9    A.>Yes.
10   Q.>Alabama Mentor, they have been around
11 a long time?
12   A.>No, they just came in this year.
13   Q.>They just came in this year?
14   A.>Uh-huh.
15   Q.>And did they get a contract?
16   A.>Yes.
17   Q.>For how many children?
18   A.>Probably 400, something like that.
19   Q.>Where is Alabama Mentor? Are they
20 located in Alabama?
21   A.>I know that they are from Boston,
22 Massachusetts.
23   Q.>They run programs in Massachusetts?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 89

1    A.>Yes.
2    Q.>They run programs in other states?
3    A.>Yes.
4    Q.>So they have experience, just not in
5    Alabama?
6    A.>That's why I say in Alabama. I make
7    specific that they have no experience in doing
8    anything in Alabama. They have no children, no
9    home. So I am not saying that that is not true. I
10   didn't say that they have no experience at all -- I
11   said not in this state. That is what I said right
12   there. You want to go on?
13   Q.>Wilmer Hall, they have been around a
14   long time?
15   A.>They have been here a long time, but
16   they are not therapeutic. They are a group home,
17   and when they came I was already a therapeutic
18   program. They came after me.
19   Q.>As far as the therapeutic part of it?
20   A.>Yes, they came after me.
21   Q.>Youth Villages?
22   A.>They just came after me from
23   Tennessee.

Page 90

1    Q.>They operate homes in Tennessee?
2    A.>Yes.
3    Q.>And they operate therapeutic homes in
4    Tennessee, don't they?
5    A.>I don't know that, but I know they
6    have a group home in Tennessee.
7    Q.>They have been operating a long time?
8    A.>Yes, I believe 10 or 14 years.
9    Q.>FIT Homes, they have been around a
10   long time?
11   A.>Yes, a long time, but they had no
12   children and no homes. When I came to the program,
13   they only had license but they were not operating.
14   Q.>They have been around a long time?
15   A.>I don't know how long they have been
16   there, but I know that they didn't have children,
17   and they have no homes, but I see their names every
18   time I go to meetings.
19   Q.>They have always been there?
20   A.>Their names are there, but they have
21   no children or staff.
22   Q.>Seraaj, that's the black-owned?
23   A.>Yes, black-owned -- been there for

Page 91

1    years.
2    Q.>Been around a long time?
3    A.>14, 15 years.
4    Q.>And they got how many children?
5    A.>208.
6    >>MR. LONG: Since that copy
7    doesn't copy that well, we are going to put in
8    another exhibit number. Do we have one that's
9    clearer so that that chart comes out a little
10   clearer than that? I thought I saw one recently.
11   >>THE DEPONENT: But there are
12   several pages.
13   >>MR. LONG: We will keep it as
14   Exhibit 6, but we are talking about pages.
15   Q.>(Mr. Long) Page 2 and Page 3 are the
16   same chart; is that correct? There is no
17   difference between Page 2 and Page 3 except for the
18   marks on the side?
19   A.>Yes. The last page is the only one
20   that is different.
21   Q.>Let's look at Page 3 on there, and it
22   shows the numbers a little better than Page 2. And
23   it shows Seraaj, the black program, with 14, 15

Page 92

1    years of experience got 208 children. Eagle Rock,
2    they have been around a long time?
3    A.>Eagle Rock, they have been there, but
4    they are not therapeutic. They are a boys' ranch,
5    so they are not part of the Therapeutic Association
6    because they have no kids, they have no homes, so
7    they just came in after us.
8    Q.>But they have been taking care of
9    children a long time as far as sheriff's ranches?
10   A.>But they are not therapeutic. There
11   is a difference. When they put the children in a
12   home, it is not the same system. They are not the
13   same at all. Those are different.
14   Q.>Child and Family Services?
15   A.>They are new.
16   Q.>They are new?
17   A.>Uh-huh.
18   Q.>Newer than you?
19   A.>Uh-huh.
20   Q.>Alliance?
21   A.>Old.
22   Q.>They have been around a long time?
23   A.>Yes.

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

|  |  |
|---|---|
| Page 93 | Page 95 |

**Page 93**

1 Q.>Longer than your program?
2 A.>Yes, sir.
3 Q.>Gateway?
4 A.>Yes, sir.
5 Q.>They have been around a long time?
6 A.>Uh-huh.
7 Q.>Longer than your program?
8 A.>Yes, sir.
9 Q.>Mountain View?
10 A.>They are new, therapeutic -- they are
11 new.
12 Q.>Catholic Social Services has been
13 around a long time?
14 A.>Yes.
15 Q.>Longer than your program?
16 A.>Yes, sir.
17 Q.>New Way Out, has it been around a
18 long time.
19 A.>No, they are new.
20 Q.>That is the program that you said
21 didn't get a contract because they didn't get a
22 license.
23 A.>According to Susan Ward, yes. Who

**Page 94**

1 knows if they got it -- I don't know.
2 >>MR. LONG: Off the record.
3 11:41 a.m.
4 (Short break.)
5 11:41 a.m.
6 >MR. LONG: When we went off the
7 record, Ms. Dickey, co-counsel for Mr. Appiah and
8 Camellia, has replaced Ms. Spears-Turk, and has
9 brought in some more documents. Good to see you.
10 >MS. DICKEY: Good to see you.
11 >>MR. LONG: The first document
12 that we see here is labeled Number 13 and
13 responding to Request No. 13, produce all documents
14 in your possession relating to the Caucasian-owned
15 agencies. Let's mark this Exhibit 12.
16 >>(WHEREUPON, a document was marked
17 >>as Exhibit 12 and is attached to
18 >>the original transcript.)
19 Q.>(Mr. Long) Is this a chart that you
20 prepared?
21 A.>No, I pulled it from the DHR website.
22 Q.>This is a chart that you got off the
23 DHR site -- and what is this a list of, the chart?

**Page 95**

1 A.>This is the list of therapeutic
2 foster care allocations.
3 Q.>It lists at the top: Therapeutic
4 Foster Care Final Allocations?
5 A.>Yes, sir.
6 Q.>To your understanding, is this a list
7 of the providers that were given the final contract
8 for the therapeutic contract?
9 A.>Yes, sir.
10 Q.>That is the final list?
11 A.>Yes, sir.
12 Q.>You have written words beside the
13 chart, and what are you stating there?
14 A.>For one, they are Caucasians, so
15 Caucasian means white. So I put a list of white
16 agencies, and I put it on there so you can know.
17 Q.>And the only one you listed as black
18 is Seraaj?
19 A.>Uh-huh.
20 Q.>And you listed beside Alabama Mentor,
21 is that Boston?
22 A.>Yes.
23 Q.>And beside Youth Villages, Tennessee?

**Page 96**

1 A.>Tennessee, yes.
2 >>MR. LONG: I believe, Ms. Dickey,
3 you brought me something else?
4 >>THE DEPONENT: I gave it to you
5 -- a request for the document I have in my
6 possession from DHR. So here are all my licenses
7 in your hand now, from the time we started to now.
8 They are all in your hand.
9 Q.>(Mr. Long) So these are copies of
10 the DHR licenses that you received?
11 A.>Yes, but I don't have anymore. I
12 gave them all to you now. I don't have licenses
13 now, except the ones you have here. Because you
14 requested it, and I give all my licenses -- as of
15 now, no licenses.
16 Q.>These are copies?
17 A.>I gave the original to you.
18 Q.>So your lawyer has the original
19 license? I don't want your original.
20 >>MS. DICKEY: You'd better check
21 to make sure you don't have it.
22 >>THE DEPONENT: He requested my
23 licenses, so I gave it away, so I have no more

24 (Pages 93 to 96)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 97 | Page 99 |
|---|---|
| 1  licenses. It is the request. | 1  Q.>And you submitted your response to |
| 2  >>MR. LONG: I know what you are | 2  the Request for Proposal in early 2005? |
| 3  getting at. There is a provision in the law that | 3  A.>Yes. |
| 4  you can surrender your licenses by turning them in | 4  Q.>So it is actually less than three |
| 5  to DHR, but I am not requesting that. All I want | 5  years, right? |
| 6  is a copy. | 6  A.>Well, no, it's more than three |
| 7  >>THE DEPONENT: Bring all the | 7  years -- two, three, four, five, six -- we are in |
| 8  documents that belong to DHR. I give you all, my | 8  2007. |
| 9  Medicare license and my DHR license. So the | 9  >>MR. LONG: I want to make sure we |
| 10  Medicare is in the back. | 10  get all this together. I want to staple it. I |
| 11  >MS. DICKEY: Do you have a copy, | 11  already have gotten some separated. |
| 12  or is that the original with the sticky on there? | 12  >MS. DICKEY: I am not sure I see |
| 13  >MR. LONG: I have no idea. I | 13  the one that you just referenced because the last |
| 14  will make a copy just to be sure.> | 14  page of mine says the 11th day of December 2002 to |
| 15  >MS. DICKEY: This is a copy, so | 15  the 11th day of June 2003. |
| 16  look and see. It is hard for me to tell sometimes. | 16  >MR. LONG: Okay. Yes, he has |
| 17  >MR. LONG: That is the original. | 17  another one here -- on this one, which is June 2002 |
| 18  I can tell from the Commissioner's signature. Now | 18  to December 2002. That's why I want to staple it. |
| 19  we are straight. I got a copy here. I want to put | 19  I want to make sure we have everything all |
| 20  this in as the next exhibit, and I want to ask you | 20  together. |
| 21  about it. | 21  Q.>(Mr. Long) I have a document, a |
| 22  >{WHEREUPON, a document was marked | 22  license that goes from June 11, 2002 to December |
| 23  >as Exhibit 13 and is attached to | 23  11, 2002; I have a license from December 11, 2002 |

| Page 98 | Page 100 |
|---|---|
| 1  >the original transcript.) | 1  to June 11, 2003; and I have a license from March |
| 2  Q.>(Mr. Long) As Exhibit 13, the copies | 2  19, 2003 to March 19, 2005; a license from March |
| 3  of the licenses that you gave me -- and I notice | 3  19, 2005 to March 19, 2007; and a license from |
| 4  five pages back there is a copy of a license that | 4  March 19, 2007 to March 19, 2009; is that correct? |
| 5  states the date of the license. Take a look at | 5  A.>Yes. |
| 6  that. What is the date on that license? It is the | 6  Q.>So you are still currently licensed? |
| 7  first date that you got a DHR license. I think you | 7  A.>Yes, sir. I called Susan Ward. I am |
| 8  have got the licenses sorted from most recent back | 8  fully licensed. So thank God I am fully licensed. |
| 9  to the earliest. | 9  Q.>So you can still accept children? |
| 10  A.>Yes. | 10  A.>They said if I accept, they won't pay |
| 11  Q.>What is the earliest date that you | 11  me. |
| 12  had a DHR license? | 12  Q.>But you are a Child Placing Agency, |
| 13  A.>I think June 10th, 2002. | 13  correct? |
| 14  Q.>To what date? | 14  A.>Yes, and adoption. |
| 15  A.>To December, 2002. You are given the | 15  Q.>Licensed as a Child Placement Agency |
| 16  first six-months provisional license for everybody. | 16  in Alabama? |
| 17  Q.>So you got a six-month permit? | 17  A.>And adoption agency in Alabama. |
| 18  A.>It doesn't say permit, it says | 18  Q.>You can accept any children from any |
| 19  license, but it is only for six months. | 19  source for your program? |
| 20  Q.>So when I asked you earlier how long | 20  A.>You can't do it in Alabama. |
| 21  you've been licensed I believe you stated back to | 21  Q.>Why can't you do it in Alabama? |
| 22  2001, but it was actually 2002, June 2002? | 22  A.>You have to go through the Department |
| 23  A.>Uh-huh. | 23  of Human Resources only. |

25 (Pages 97 to 100)

## Page 101

1  Q.>But you don't have to get your
2  children just from DHR?
3  A.>The understanding from the minimum
4  standard is all the kids have to come from DHR.
5  Q.>You said that there is something in
6  the minimum standard that says all the children
7  have to come from DHR?
8  A.>I had one come from the Department of
9  Mental Health, and DHR had to approve.
10  Q.>You are talking about to pay you?
11  A.>No, even to put in the home.
12  Q.>That is your understanding that the
13  only children you can serve are DHR children?
14  A.>DHR has to approve because they said
15  the home that the child is in is licensed by DHR,
16  and they can't put the kids over there.  So they
17  have to approve it before the child is brought in
18  there.
19  Q.>Before we leave we will get a copy of
20  minimum standards and see.
21  A.>You can check with Mr. Mitchell.
22  They made a decision to put a kid over there that
23  come from DHR.

## Page 102

1  Q.>Let's go and continue on the
2  request.  Let's look at Request No. 15 of the
3  Request to Camellia Therapeutic, the request that
4  Camellia produce all documents relating to your
5  claim in Paragraph 16 that defendant graded
6  plaintiff's answers to the RFP, subjectively
7  causing a further loss in points.  What is the loss
8  in points?
9  A.>When I gave you my references, it
10  cost me a loss in points.  If you call my
11  references, how would I get my 50 points?  So by
12  not calling my references, I lost points.
13  Q.>So you got no points on the reference
14  section of the RFP?
15  A.>Yes.
16  Q.>Did you ever get your scores?
17  A.>I requested; I was denied.
18  Q.>So you never got your scores from
19  them?
20  A.>No.
21  Q.>How do you know that you didn't get
22  points on the reference section?
23  A.>If you don't call the people, then

## Page 103

1  how do you assume that you want to give me some
2  points for not calling my references?  It's fraud.
3  These are serious matters -- here is the way I see
4  it, and they refuse to show it to me.  I requested
5  many, many times.  They don't want me to look at
6  it.  And Joel Marsh said you are not going to look
7  at it -- I am not going to give it to you -- you
8  are not going to get it.
9  Q.>As we looked at Exhibit 4 under the
10  mandatory requirements that are listed, the five
11  mandatory requirements, where is it stated in there
12  that the Department has to call your references?
13  A.>We read that already.  It is not
14  here, and we read about where they said they were
15  going to call the references -- the exact page they
16  showed me.
17  Q.>Let's look at Number 16 on the
18  Request to Camellia.  It asks Camellia to produce
19  all documents in your possession relating to your
20  claim in Paragraph 17 --
21  A.>I don't have 16.
22  Q.>I am reading from the request.  I
23  want to make sure that you are with me here.

## Page 104

1  A.>I am listening.
2  Q.>We are back to the request.  Request
3  No. 16, it asks Camellia to produce all documents
4  in your possession relating to your claim in
5  Paragraph 17 of your Amended Complaint that
6  plaintiff asked defendant for a formal hearing to
7  explain the deficiencies in the RFP by the other
8  vendors and that the request was denied.
9  A.>Yes.  I think I gave you information
10  on that, but I will give it to you again.
11  Q.>Are you still talking about that
12  letter to the board as one of those documents?
13  A.>The letter to Mr. William Pendergast
14  who is the administrative law judge.  He asked DHR
15  to give me a hearing, and DHR didn't do it.  A
16  letter -- this is from Pendergast -- is right
17  here.  I have this letter right there, and a letter
18  from Mr. Hank Sanders asking DHR to look into
19  this.  Sanders told me that I hope you secure
20  justice, and I am here to secure justice.  Here is
21  a letter from the Honorable Joe Marsh to
22  Mr. Sanders right here in my hand.
23  Q.>So where is the letter you reference

26 (Pages 101 to 104)

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 105 | Page 107 |
|---|---|
| 1  in your Amended Complaint where you were denied a | 1  governor and his wife. |
| 2  hearing? In these two documents that you gave me, | 2  Q.>Was this letter, Exhibit 7, that was |
| 3  neither one of them state anything about being | 3  written by Joel Marsh, the date of that letter is |
| 4  denied a hearing. | 4  August 16, 2005; is that correct? |
| 5  A.>Where is the letter from Mr. Hilliard | 5  A.>Yes. |
| 6  -- Mr. Marsh stated I'm not going to get a | 6  Q.>Is that the latest response that you |
| 7  hearing. It is written bold, black and white, in | 7  got from DHR in regard to being denied your |
| 8  Mr. Hilliard's letter, and you have the copy in | 8  hearing, or the earliest response? |
| 9  your possession. | 9  A.>The last one is to Hank Sanders. He |
| 10  Q.>Mr -- | 10  said: I write concerning your rejection of |
| 11  A.>L. Hilliard. | 11  Camellia Therapeutic Foster Care Agency |
| 12  Q.>Representative? | 12  participation in AAFC program. We are extremely |
| 13  A.>Yes, Representative L. Hilliard. | 13  concerned about this situation in and of itself and |
| 14  They wrote a letter to me that they are not going | 14  also because it is seeming to be part of a |
| 15  to give me a hearing. Right here, Exhibit 7, and | 15  pattern -- part of what DHR does all the time -- so |
| 16  it says right here: Dr. Appiah will not be given a | 16  he knows -- we will look into this and evaluate the |
| 17  hearing to appeal the decision on this RFP. | 17  situation. Your cooperation is appreciated. I |
| 18  Q.>Exhibit 7, you are talking about the | 18  will deny. So he sent me a letter and it says: |
| 19  letter from Attorney Joel Marsh with DHR? | 19  Dr. Appiah, I am enclosing a letter from the |
| 20  A.>Yes. | 20  Department of Human Resources. I hope you secure |
| 21  Q.>It says you are not going to be given | 21  justice. And from there I sat down, and I filed a |
| 22  an administrative hearing? | 22  suit myself. When I got his letter, I got energy |
| 23  A.>Yes. | 23  that I should secure justice, and I made up my mind |

| Page 106 | Page 108 |
|---|---|
| 1  Q.>He said that statement on Page 2? | 1  that I was going to go to the Supreme Court of the |
| 2  A.>Yes. | 2  United States to secure justice. |
| 3  Q.>Dr. Appiah will not be given an | 3  >>MR. LONG: Let's mark this |
| 4  administrative hearing to appeal the decision on | 4  document as the next exhibit that he was just |
| 5  his RFP. DHR Administrative Code 660-1-.02 | 5  reading from. |
| 6  provides that DHR is required to give a hearing to | 6  >>(WHEREUPON, a document was marked |
| 7  any aggrieved person when the Department's action, | 7  >>as Exhibit 14 and is attached to |
| 8  intended action, or failure to act would adversely | 8  >>the original transcript.) |
| 9  affect the individual's or family's right to | 9  Q.>(Mr. Long) And you were reading from |
| 10  assistance, benefits, or service. Those provisions | 10  a September 21, 2005, letter from Senator Hank |
| 11  are not applicable to an RFP. There is no right to | 11  Sanders? |
| 12  do business with DHR or any other State agency. Is | 12  A.>Yes. |
| 13  that the only document that you are referencing? | 13  Q.>No, it's not that. it's actually a |
| 14  A.>In the 660 written by DHR it says if | 14  letter from DHR Attorney Joel Marsh to Senator |
| 15  you don't hear from them in 45 days, you are | 15  Sanders. |
| 16  automatically denied. | 16  A.>From Hank Sanders to me. |
| 17  Q.>So you got a different letter from | 17  Q.>The third page of that Exhibit 14 is |
| 18  DHR? | 18  a letter from Senator Sanders to DHR Commissioner |
| 19  A.>No, it is part of the Administrative | 19  Page Walley; is that correct? |
| 20  Code 661-5. It is if you appeal and don't hear for | 20  A.>Yes, sir. I don't have a copy in |
| 21  45 days, you are automatically denied. So I waited | 21  front of me. |
| 22  for 45 days before I wrote the Commissioner, before | 22  Q.>The third page is a letter, September |
| 23  I wrote the board, and before I appealed to the | 23  26, 2005, from Senator Hank Sanders to you? |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

## Page 109

1    A.>Yes.
2    Q.>That is what you were reading from?
3    A.>Yes, sir.
4    Q.>Back to Exhibit 7, the letter from
5    Joel Marsh, DHR Attorney, dated August 16, 2004,
6    after being told by Attorney Marsh that you were
7    not going to be granted the administrative hearing,
8    did you appeal that decision to any court?
9    A.>Yes.
10   Q.>To what court did you appeal it to?
11   A.>Montgomery County.
12   Q.>Did you file an actual appeal of that
13   decision as opposed to a lawsuit?
14   A.>Because it says my case does not have
15   no jurisdiction, so what do I do next?  The next
16   place is the courts.
17   Q.>But it's true that you never filed
18   any appeal of the denial of the hearing to any
19   court; isn't that correct?
20   A.>No.
21   Q.>The document that you filed in
22   Montgomery County Circuit Court, is that Exhibit 2
23   that we were talking about earlier -- let's look

## Page 110

1    back at Exhibit 2.  Is that the complaint that you
2    filed in Montgomery County Circuit Court?
3    A.>Yes.
4    Q.>Is there any place in the complaint
5    that you applied for a judicial review of the
6    decision not to grant you a hearing?
7    A.>Where?
8    Q.>In that complaint, in Exhibit 2.
9    A.>It is not here, but I already have
10   made an appeal already and I have been denied.  I
11   have been denied by the Commissioner to his
12   attorney of DHR, and he told me that I have no --
13   there is no jurisdiction in this case here, even
14   though I look at Administrative Section 6601-5
15   tells them that I can.  But he told me that it's
16   not, so I have to go a little higher.  And that is
17   why I'm seeking justice.
18   Q.>Let's look at Request No. 17 to
19   Camellia Therapeutic, the request that the company
20   produce all documents regarding the compensatory
21   damages you claim due to plaintiff by defendant in
22   your Amended Complaint.  What damages do you claim
23   that you have suffered as a result of the

## Page 111

1    defendant's alleged action in the complaint?
2    A.>I will produce that later.
3    Q.>You will produce that later?
4    A.>Uh-huh.
5    Q.>Do you have any partial list?
6    A.>No, no partial list.
7    Q.>What salaries have you lost?
8    A.>It is very complex.  I will have to
9    produce it because DHR ceased my income to the
10   Medicaid, so I have to go and borrow money from
11   banks to pay five officers.  So it is very complex,
12   so I will have to produce it.  Right now from here
13   I am waiting for this to be over, and then I will
14   file my next suit next week against DHR Medicaid.
15   I will let my lawyers look at them.  And then if
16   not, I will just do it on my own.
17       >MR. LONG:  Counsel, when are we
18   going to get your list of claim damages?
19       >MS. DICKEY:  Well, he can
20   verbally tell you his damages today.  If you don't
21   have documents, you tell him.
22   A.>Basically my home is under
23   foreclosure, so I have called different companies.

## Page 112

1    Right now I am trying to combine my first and
2    second mortgage because I borrow so much money for
3    second mortgages in order to pay officers of
4    Mobile, Huntsville, Birmingham, Selma, Phenix City,
5    pay like two or three insurance workers
6    compensation.  It is a lot of money I have to pay
7    because all of a sudden Medicaid said they overpaid
8    me, and DHR just started taking my money without
9    due process, so I am pulling money from everywhere.
10   And it cost me a big pain in losses.  I'm losing
11   everything.  But I am trying to combine all the
12   bills together because I borrow from friends;
13   people; church members; I went to the credit union,
14   and they wrote me a check for $70,000.  I get money
15   from anywhere I can, trying to save me from going
16   down.  At my age I can't go down -- 66, I can't go
17   down anymore.  And there was no due process -- they
18   just seized the money.
19       >MR. LONG:  Counsel, he indicated
20   that there were several documents out there.  When
21   can I get copies of those?
22       >MS. DICKEY:  Can you get those
23   next week?

28 (Pages 109 to 112)

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

## Page 113

1     >THE DEPONENT: I don't prefer to
2   let my home issue become a public document. It is
3   terrible to know that a pastor lost his house. It
4   is not nice.
5     Q.>(Mr. Long) I understand your
6   concern, but you have to make a decision one way or
7   another.
8     A.>It will become a public document. I
9   have already told you my mortgage is all behind,
10  and I had some checks out to borrow to pay
11  different people, even to pay my attorneys. I can
12  get them all and show them to you. It is
13  difficult.
14    >MR. LONG: Counsel, formal notice
15  is given if we are not given copies of any alleged
16  claim damages that we are going to object to that
17  being used in any litigation.
18    >MS. DICKEY: Okay. We will get
19  you documents next week.
20    >>THE DEPONENT: Because I don't
21  want it to become public -- the whole town know
22  that I am losing my house.
23    >MS. DICKEY: Let's you and I talk

## Page 114

1   about that because when you file a lawsuit, things
2   are going to be public.
3     >>THE DEPONENT: They are going to
4   laugh at me, but it is not funny.
5     >MS. DICKEY: I don't think they
6   will laugh at you, Dr. Appiah, but let's talk about
7   that outside of this meeting.
8     Q.>(Mr. Long) To Camellia Therapeutic's
9   requested production of all documents regarding the
10  loss of Federal funding you claim in your Amended
11  Complaint that you suffered by the actions of
12  defendant. What Federal funds do you claim to have
13  lost as a result of the alleged action for the
14  defendant? That's that same document that we
15  marked earlier as the budget, as Exhibit 9.
16    A.>Yes.
17    Q.>That's the proposed budget for
18  October 1, 2005, through September 30, 2006, but
19  you didn't actually have a DHR contract for that
20  year, did you?
21    A.>That was this year.
22    Q.>This was a proposed budget, right?
23    A.>Proposed budget, right.

## Page 115

1     Q.>So you didn't lose anything because
2   you didn't have a contract?
3     A.>Because I have already prepared
4   myself for this. There has not been a history in
5   the Department where they take an existing agency's
6   homes for no reason of any impropriety. So
7   everybody come -- you have a license, you are
8   working, and was no way -- and the RFP say that
9   they are going to take your children. RFP gave us
10  the understanding they were going to give us more
11  children, and they lied to us. It was not the RFP.
12  They didn't say if you have no kids, I will take
13  your child out, and they would have never stayed in
14  there.
15    >MS. DICKEY: I think there was a
16  misunderstanding of the question. But I will try
17  to get that information to you as well. What you
18  are looking for is previous years, not the
19  prospective years?
20    >MR. LONG: Whatever he is
21  claiming as his losses. And the same objection is
22  going to exist that if we are not provided a copy
23  of the list of the claimed Federal funding that was

## Page 116

1   lost, we are going to object to the references to
2   that information he indicates and move for
3   exclusion.
4     Q.>(Mr. Long) Request No. 19 asks that
5   Camellia Therapeutic produce all documents
6   regarding the loss of a contractual relationship
7   with DHR, foster parents, and others that you claim
8   in your Amended Complaint that you lost as a result
9   of the actions of the defendant.
10    A.>I think I gave that to you already
11  this morning, the Request for Production, Number
12  19. I gave a list of all the children, and I call
13  them to DHR, and I call them to everybody. It
14  takes about $2,500 to recruit one parent. DHR uses
15  -- they pay $2,500 to recruit the parents. I have
16  142 parents here that I worked so hard to gain, and
17  I lost them all because of DHR, and that is 355,000
18  U.S. Dollars.
19    >>MR. LONG: Let's mark this
20  document. I don't believe we marked it earlier.
21    >>(WHEREUPON, a document was marked
22    >>as Exhibit 15 and is attached to
23    >>the original transcript.)

29 (Pages 113 to 116)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 117

1  Q.>(Mr. Long)  Discussing your response
2  to Number 3, what we have now marked as Exhibit 15,
3  that's a list of the 114 foster parents; is that
4  correct?
5  A.>Yes.
6  Q.>On Page 11 of that response you have
7  some numbers at the bottom.  Can you explain to me
8  what that is about?
9  A.>142 parents at $2,500 per recruitment
10  training -- that is how much the DHR pays per
11  person.  So by losing all of this, it has cost me
12  $355,000.
13  Q.>But you didn't have a contract for
14  that next physical year; is that correct?
15  A.>No.
16  Q.>DHR paid you for all the services
17  that you provided to September 30th, 2005.  Did DHR
18  pay you for all of those services?
19  A.>No, sir.
20  Q.>I am not talking about the new
21  therapeutic foster care.  I am talking about
22  pre-2004 before that contract.
23  A.>No, sir.

Page 118

1  Q.>What did they not pay you for?
2  A.>That is why I am suing again.
3  Q.>I am trying to get it, and I
4  understand what you are talking about.
5  A.>They seized my money.  I told you
6  that.
7  Q.>They seized your money -- you mean
8  from Medicaid?
9  A.>Yes.  They didn't pay me.  I have
10  been waiting and waiting and praying and been very
11  patient.  Attorney Leiberman -- that was his name
12  -- they seized all my money.
13  Q.>So are you saying that there was a
14  Medicaid investigation contacted by the Attorney
15  General's office?
16  A.>Yes.
17  Q.>And as a result of that
18  investigation, DHR did not pay you for money that
19  was due?
20  A.>Yes.
21  Q.>As a therapeutic foster care provider
22  you are paid by DHR, but it is Medicaid money; is
23  that right?

Page 119

1  A.>I am paid by DHR.
2  Q.>Have you been told that that is
3  essentially Medicaid money?
4  A.>The moneys are combined, State and
5  Federal.  I don't know if there are separate
6  checking for just Medicaid.
7  Q.>Are you a Medicaid rehab provider?
8  A.>Yes.
9  Q.>You are a Medicaid rehabilitation
10  provider?
11  A.>Yes.
12  Q.>You have a Medicaid number?
13  A.>Yes, sir.
14  Q.>And you submit documentation to claim
15  Medicaid dollars?
16  A.>Yes, sir.
17  Q.>And there was a Medicaid
18  investigation?
19  A.>Uh-huh.
20  Q.>And those moneys were withheld?
21  A.>I don't know if they were withheld,
22  but they were taken away.  They have not paid me up
23  to now.

Page 120

1  Q.>But that was taken by the Medicaid
2  Agency.  Did you receive a letter from the Medicaid
3  Agency?
4  A.>Nobody -- I didn't receive a letter
5  from nobody.
6  Q.>But the Attorney General's office did
7  that investigation?
8  A.>They send me a letter that I owe
9  $775,000, so I called Mr. Leiberman, and I said how
10  in the world can they give me that much money in
11  seven months?  And they said all the money is with
12  DHR, so you contact DHR.  And DHR wrote me back and
13  said well, you don't owe that much money, you owe
14  $78,000 out of that.
15  Q.>Attorney Leiberman, he's the head of
16  the Attorney General's Medicaid Fraud Unit, I
17  believe?
18  A.>Yes.  So this is what happened --
19  they hold my money, so they don't pay me.
20  Q.>But as we discussed before, you
21  didn't have an actual written contract with the
22  foster parents that are listed on Exhibit 15?  You
23  don't have an actual document that is a written

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 121 | Page 123 |
|---|---|
| 1   contract with them, do you? | 1   the scoring of your RFP; isn't that correct? |
| 2    A.>That is the understanding. | 2    A.>Yes. |
| 3    Q.>There is no written contract with | 3    Q.>So you don't know if you were not |
| 4   them? | 4   given any points, do you? |
| 5    A.>We only give written contracts when I | 5    A.>I don't know -- but I believe that I |
| 6   actually bring your child to your home, but it is | 6   was not given any points because if you never |
| 7   the understanding that during the training I am | 7   contact my references and you give me a point, that |
| 8   training you -- costing me money to train you and | 8   is a fraud right there because you just can't give |
| 9   prepare you to become a foster parent -- and then | 9   me something you never check. |
| 10   it is going to cost me money if you leave me. | 10    Q.>The list of mandatory requirements |
| 11    Q.>So if DHR doesn't give you any | 11   for the RFP doesn't state that they even have to be |
| 12   children, then there is no placement contract | 12   checked; isn't that correct? |
| 13   signed with the foster parent? | 13    A.>No, it doesn't say that. It says it |
| 14    A.>Through the training they understand | 14   must be checked. DHR will call these references. |
| 15   that they are going to get children because there | 15   It is written right there in black and white. |
| 16   has not been a record where no agency has ever got | 16    Q.>Number 7 of this letter says: Based |
| 17   children -- no record -- except if you show me | 17   on DHR issues of licenses to Camellia through 2008, |
| 18   some. I never seen one. Every agency -- you may | 18   Camellia has offices in several locations -- that |
| 19   not have a whole lot, but you are going to get some | 19   is sort of a half a sentence. What are you trying |
| 20   children. | 20   to communicate in Paragraph 7? |
| 21    Q.>So if DHR doesn't place children with | 21    A.>I said based on DHR assurance of |
| 22   you under an RFP, for example, then you wouldn't | 22   issuing licenses to Camellia through 2008, Camellia |
| 23   have an arrangement with the foster parent; is that | 23   has offices in several locations with obligation to |

| Page 122 | Page 124 |
|---|---|
| 1   correct? | 1   incur expenses for three or more years. That means |
| 2    A.>No, sir. Because basically they have | 2   that I know I have these offices; I must operate my |
| 3   never been RFP before, so it's strange to everybody | 3   offices; and I must train some staff and train some |
| 4   that they are going to go to RFP to go and take all | 4   children. I have done all this because you have to |
| 5   my children. They could have given you something | 5   prepare. You don't just sit there and abort your |
| 6   to think about. They said we are going to give you | 6   child and have nowhere to put them. So I've done |
| 7   more kids, and then I have already 60 kids, and | 7   this all this in advance because they have never |
| 8   they took them all away from me and wiped me with | 8   mentioned RFP, and even the director said she |
| 9   zero. | 9   doesn't remember when RFP was made here. And of |
| 10    MR. LONG: I think we can break | 10   all the 50 states no agency kid has been taken away |
| 11   for a little bit, but I am going to finish up one | 11   for nothing done for these kind of tricks -- none. |
| 12   of those letters we were on. Let me make sure we | 12   I have been calling different people. |
| 13   go through that. I don't know if we finished | 13    Q.>Who have you called? |
| 14   Exhibit 10. This is the letter to the DHR Board. | 14    A.>I called different agencies. |
| 15    Q.>(Mr. Long) We got down through | 15    Q.>What agencies? |
| 16   Number 5 on Page 2 on this August 5, 2005, letter. | 16    A.>Different agencies from different |
| 17   The sixth paragraph, in that paragraph you stated | 17   states. |
| 18   that DHR did not contact or interview any | 18    Q.>What states? |
| 19   references included in the proposal. And that is | 19    A.>Georgia, Maryland, friends in |
| 20   what you were referring to before, that list of | 20   California. And I have been requesting would you |
| 21   references that you provided me? | 21   put RFP and take an existing agency's children -- |
| 22    A.>Yes. | 22   what do you want to do that for? RFP was only |
| 23    Q.>But you also stated you have not seen | 23   issued to give us more children; you don't issue to |

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 125

1  take my children.
2      Q.>Are you saying that you were told in
3  the vendor's conference that it was for more
4  children?
5      A.>Yes.
6      Q.>Who told you that?
7      A.>Would you please get your tape and
8  listen to it.  Because if DHR has 6,000 children
9  and then there is 1,210 over here.  This is 1,210
10 right there.  Where are the rest of the kids?  Am I
11 assuming that they are going to have my kids and
12 that these 1,210 they are going to divide among
13 us?
14     Q.>This contract was for therapeutic
15 foster care; is that correct?
16     A.>Yes.
17     Q.>We have already talked about the fact
18 that some of these providers were providing
19 different kinds of licensing services, right?  Some
20 were just regular residential care?
21     A.>Yes.
22     Q.>So there are some children who are
23 residing under other kinds of licenses?

## Page 126

1      A.>Yes.  So when 6,000 children -- and
2  TPI has 600 by itself, so you want to take the rest
3  of all of us and divide 600?
4      Q.>But therapeutic foster care is only
5  for certain kinds of children, children with
6  certain kinds of problems; is that right?
7      A.>It is the same.  We are all the same,
8  except those that have residential treatment in the
9  way they go and live with different companies in
10 the boarding house and group homes; otherwise, we
11 all do the same.
12     Q.>All child care, but it is different
13 kinds?
14     A.>Yes, we all do the same.  Some use
15 television, some walk, some go to churches and are
16 good parents and do it.
17     Q.>Paragraph No. 8 of this letter to the
18 DHR Board members states that Camellia and other
19 experienced providers not awarded any placements
20 were both African-American-owned businesses.  What
21 other businesses, or other provider -- and let me
22 read that again -- it says Camellia and the only
23 other experienced provider not awarded any

## Page 127

1  placements were both African-American-owned
2  businesses.  Where do you get that information
3  from?
4      A.>I got it from NBACSC.
5      Q.>On Exhibit 6, that lists they scored
6  under 800 points?
7      A.>Yes, they didn't get one.  That's
8  what I'm saying.  They didn't get one.
9      Q.>And they are black?
10     A.>And the executive director told me --
11 she is a black woman -- told me that they didn't
12 give me one.  I said why, is it because we have
13 difficulty, we file bankruptcy -- we are doing
14 fine, but I have good programming, and they just
15 punish me for that.  It was punishment.
16     Q.>There were others scoring under 800
17 points that were not awarded contracts as well;
18 isn't that true?
19     A.>Well, I understand.  But everybody
20 here, they are new ones.  They didn't have children
21 already.  They are just coming in.  So what if they
22 lose -- they don't lose nothing.
23     Q.>So other than NBA and Camellia, the

## Page 128

1  other three --
2      A.>Success Homes, Family Values,
3  Ability -- they have nothing to lose.
4      Q.>Were they black-owned?
5      A.>They are all white -- or black -- I
6  don't know.  But I'm not including them because
7  they are coming in.  I'm talking about people that
8  have something to lose for the top.  They are
9  coming in, what do they have to lose?
10     Q.>The second sentence of your paragraph
11 numbered Number 8 says:  Camellia contends that DHR
12 discriminated against and is in violation of State
13 and Federal law which prohibits discrimination
14 based on race, color, or national origin.  What
15 type of discrimination are you claiming?
16     A.>Where are you reading that?
17     Q.>I'm reading from Paragraph No. 8.  Is
18 it racial, sexual -- what kind of discrimination
19 are you claiming in this case?
20     A.>I am claiming that because I am
21 black.
22     Q.>That is the only kind of prohibiting
23 discrimination that you are claiming in this case?

32 (Pages 125 to 128)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 129

1 A.>Yes. Because I am black they use
2 tricks to take over my contract. They couldn't
3 take me out with other means, except they use
4 this. Because they tried to take me away so many
5 times, and they couldn't do it. And I'm going to
6 say on the record that they came and surrounded my
7 office at 7 in the morning, all the five offices,
8 and check my records and be sure that I am in one
9 hundred percent compliance, all my records were
10 correct because they were trying to shut me down.
11 And when they came, all my books were correct.
12 They were trying to shut me down, and they couldn't
13 do it.
14 Q.>Seraaj Family Homes was granted a
15 therapeutic foster care contract; is that correct?
16 A.>Yes.
17 Q.>And they are black-owned?
18 A.>Yes, and big. And they have nowhere
19 to put Seraaj's 300 kids. They have nowhere to put
20 them. That is why they left him alone. And they
21 have tried to take him out in the past.
22 Q.>Abdul Seraaj is African-American?
23 A.>Yes, African-American.

## Page 130

1 Q.>And under this chart he was given 208
2 children on the contract?
3 A.>Yes. They have tried to take him
4 down before in the past. This time they wouldn't
5 take a chance again. They tried one time.
6 Q.>Number 9 on the letter to the DHR
7 Board stated: Over the years, over many years,
8 Camellia has invested large sums of money to
9 attract foster homes in Alabama --
10 A.>Quality foster care homes.
11 Q.>Quality foster care homes -- and you
12 state that the present market value of the company
13 is 5 million dollars?
14 A.>Uh-huh.
15 Q.>Where do you get that value from?
16 A.>By our estimation.
17 Q.>Based on what?
18 A.>Estimation assessment by what we have
19 put in -- staff training, recruitment, children,
20 and the number of kids that we are projected
21 because you train mainly by projection.
22 Q.>Are you are claiming a loss in the
23 value of your business?

## Page 131

1 A.>Well,.I don't know, but I am claiming
2 that they are discriminating against me as a black
3 person, so whatever I am claiming is whatever the
4 jury sees me fit because I've been done wrong.
5 Q.>I am just trying to determine if you
6 are claiming as part of the damages a loss in the
7 value of your business?
8 A.>Well, yes, sir, possibly, if the jury
9 sees me that -- if they put their selves in my
10 position, someone shuts you down.
11 >>MR. LONG: Counsel, I'm
12 requesting a list of those asserted damages for
13 loss of business or value of the business. And if
14 they are not provided, we will move to exclude.
15 >>THE DEPONENT: I will provide it,
16 sir.
17 Q.>(Mr. Long) Paragraph No. 10 that's
18 on Page 3 of this list to the DHR Board: Camellia
19 along with other vendors present to review the
20 proposals on July 13, 2005, requested a copy of its
21 proposal and the method of scoring evaluation for
22 the proposal, and the request was denied. You
23 received a copy of your Request of Proposal?

## Page 132

1 A.>No, I didn't get a copy.
2 Q.>You didn't get a copy back of your
3 response?
4 A.>They wouldn't give me a copy.
5 Q.>I'm talking about your response that
6 you filed.
7 A.>The response that I filed does not
8 tell -- well, I don't need one. I have one
9 already.
10 Q.>So you have a copy of what you filed?
11 A.>Already, so I don't need that.
12 Q.>But you say here: A copy for the
13 method of scoring the proposal.
14 A.>I want to see how they arrive at 50
15 points so I can see what was put on there. They
16 said no.
17 Q.>But you were given a copy in the
18 original RFP how the scores were arrived at?
19 A.>No.
20 Q.>The RFP doesn't spell out how much
21 scores you get for various sections?
22 A.>Yes, but I wanted to see how mine was
23 scored.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

| Page 133 |
| --- |

1    Q.>You wanted a copy of your own scoring
2  sheet?
3    A.>Yes.  I want to see mine, and I can't
4  see anybody else, but Sharon Ficquette says no, the
5  DHR lead chief attorney.  Do you have a copy now so
6  I can see it?
7    Q.>You know, I don't know if I have any
8  of that.  I was actually surprised by some of the
9  documents that you-all produced yesterday.  We are
10  trying to get documents together.  Remember I was
11  brought in when Mr. Marsh was called up by the
12  military, so I haven't actually seen any of that.
13    A.>I would like to see it.
14    Q.>I am just going over the documents I
15  have to see if there are any of these extra
16  documents that we haven't already talked about.  I
17  think most of them we have talked about.
18    >>MR. LONG:  I am showing you
19  Exhibit 16.  Some of this document may be redundant
20  of other documents, but I want to make sure that
21  all the documents --
22    >>(WHEREUPON, a document was marked
23    >>as Exhibit 16 and is attached to

| Page 134 |
| --- |

1    >>the original transcript.)
2    >THE DEPONENT:  I want to use the
3  restroom.
4    >MR. LONG:  Sure.  We will take a
5  break.
6      12:35 p.m.
7      (Short break.)
8      12:42 p.m.
9    >MR. LONG:  I'll let you make the
10  decision.  It looks like a couple of pages in this
11  document we just marked.  We've still got questions
12  related to counts regarding the Amended Complaint
13  which is the allegations, and we still have, not
14  much, but it's going to be your separate
15  deposition, which is going to be short because this
16  is technically Camellia's deposition that we are
17  doing now and yours will be reaffirming of
18  essentially what you said before.  But that is what
19  we got left. -- we can go forth, or we can take
20  lunch.  If you are like me, I am a diabetic -- I am
21  doing pretty good today because I ate -- we can go
22  forward.  But if you need to take a break and want
23  to take a break, we can go and finish it up.

| Page 135 |
| --- |

1    >MS. DICKEY:  I would rather eat.
2  I am like you.  I don't have diabetes, but I am
3  borderline hyperglycemic.  I had to take my husband
4  to the doctor this morning, so it's been a while
5  since breakfast for me.
6    >MR. LONG:  If we want to take a
7  break, we can certainly do that and reconvene at
8  whatever time.
9    >THE DEPONENT:  Whatever she said,
10  that is fine with me.
11    >MR. LONG:  Let's take a break and
12  give you an hour.
13    >>THE DEPONENT:  That is fine.
14    >MR. LONG:  It is now 12:45.  We
15  will see you back at 1:45.
16      12:45 p.m.
17      (Lunch break.)
18      1:37 p.m.
19    >MR. LONG:  Dr. Appiah, we were
20  talking about an exhibit that we just marked,
21  Exhibit 16.  I asked that you look at Exhibit 16,
22  and about a half dozen pages into it you see a
23  letter under Camellia Therapeutic's letterhead

| Page 136 |
| --- |

1  dated June 14, 2005, to the DHR Commissioner, Page
2  Walley.  Do you see that?
3    A.>Yes.
4    Q.>Is this a letter you wrote to
5  Commissioner Walley?
6    A.>Yes, sir.
7    Q.>I just have one question.  Two pages
8  into that document, you receive a list of
9  grievances, most of which we've already discussed
10  in the previous parts of the deposition, but I want
11  to ask you about one that we haven't yet discussed,
12  and that's on Page 4 of that letter, Paragraph No.
13  14.  In Paragraph No. 14 you say:  One vendor made
14  application for license on April 10th, 2005, which
15  is on Sunday.  SDHR, State DHR employees do not
16  work on Sunday; therefore, who in the State
17  Department received the licensing study and
18  completed application?  Who were you talking about
19  in that paragraph?
20    A.>I don't have the those RFPs over
21  here, so I won't be able to put the exact person.
22  If you remember who it was submitted to yesterday,
23  I can take one and show you.

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

### Page 137

1  Q.>One has a stamp -- where do you get
2  this information from regarding April 10th, 2005?
3  A.>By looking at the RFPs you can see
4  that the deadline is April 11th, and then this
5  application is half-late. They put a ten and slide
6  it in, and it wasn't even a complete application.
7  It was put in on Sunday, so who did he give that
8  stuff to on Sunday?
9  Q.>You don't remember which RFP response
10  you are referring to?
11  A.>I forgot the particular agency
12  because I don't have those books in front of me.
13  But if I want to guess, I could say New Way Out.
14  Q.>You think it may have been New Way
15  Out?
16  A.>Or maybe Child/Family Services. I
17  don't know because I don't have it on me, but I
18  already looked at them. You have copies here?
19  A.>No. Those are the documents that we
20  talked about in a deposition yesterday that I
21  hadn't seen that I am waiting for copies of.
22  A.>Who are those for?
23  Q.>This pile of documents here is

### Page 138

1  actually -- that we haven't marked -- and I don't
2  know if I want to or not because it is going to
3  take up a lot of space. This is your original
4  complaint with your attachment you filed at
5  the Montgomery County Circuit Court which is
6  already part of the Court's file. I'm not sure we
7  need another copy of that in there. We've got the
8  attachments and all that we have for the deposition
9  already. I don't think I need that. I do want to
10  try to wrap this up and go back to the Amended
11  Complaint for a little while. The Amended
12  Complaint is Exhibit 3. I call your attention to
13  that exhibit to the counts; that is, your claims
14  that you make again on Page 3.
15  A.>On what page?
16  Q.>Page 3 -- do you have a copy of the
17  Amended Complaint? I have some extra copies if you
18  want.
19  A.>Okay.
20  Q.>On Page 3 where it says Count 1, in
21  parentheses, you have stated race discrimination
22  and due process, closed parentheses. Paragraph 18,
23  the defendant's actions constitute discrimination

### Page 139

1  by reason of race and violation of plaintiff's
2  rights guaranteed under the due process clause and
3  property rights of the 14th Amendment, et cetera.
4  It goes on, but I will just stop right there. Just
5  to reaffirm again, your only claim of
6  discrimination is based on race; is that correct?
7  A.>Yes, sir.
8  Q.>It is your claim that you have
9  property rights that are protected by the
10  Constitution?
11  A.>This was written by a lawyer.
12  Q.>What rights are you talking about,
13  what property interest rights are you talking
14  about?
15  A.>I have to check with the attorneys on
16  this one.
17  Q.>You have a license to operate under
18  Alabama law; is that correct?
19  A.>Yes.
20  Q.>What is your license?
21  A.>Therapeutic Foster Care Agency
22  License.
23  Q.>You have a Therapeutic Foster Care

### Page 140

1  License?
2  A.>Yes, still have a license still.
3  Q.>You had a Therapeutic Foster Care
4  License in Alabama granted by the Department of
5  Human Resources before the RFP process, correct?
6  A.>Yes.
7  Q.>And you had a license then?
8  A.>Yes.
9  Q.>After the RFP license, you still have
10  a Therapeutic Foster Care License in Alabama?
11  A.>Yes.
12  Q.>So you still have a license?
13  A.>The license process is a separate
14  department.
15  Q.>What other property right or interest
16  are you claiming, if any, that is protected by the
17  Constitution?
18  A.>Here the rights: Guarantee on the
19  due process clause, that I was not given the due
20  process.
21  Q.>So you are claiming that you were not
22  given a hearing?
23  A.>Yes.

35 (Pages 137 to 140)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 141

1      Q.>So when you talk about due process,
2  you were talking about a hearing?
3      A.>And due process clause, yes.
4      Q.>It is your claim that you should have
5  been given a hearing?
6      A.>Yes, sir.
7      Q.>But you still have a license?  Your
8  license was never affected; is that right?
9      A.>Yes, sir.
10     Q.>You still have a license?
11     A.>Yes, sir.
12     Q.>And you are still in business, aren't
13 you?
14     A.>I don't know if I am in business or
15 not.  I'm just sitting there.
16     Q.>You are still operating?
17     A.>I am not operating.  I have nothing
18 to operate with, all my kids are gone.  I am just
19 sitting there waiting for this to be over.
20     Q.>Are you claiming you have a right to
21 have DHR give you a contract?
22     A.>I don't have a right for DHR to give
23 me a contract, no, sir.  I have a right that DHR

Page 142

1  should not take my contract and give it to somebody
2  else.
3      Q.>Contracts that DHR --
4      A.>Taking my hard work and giving it to
5  somebody else.
6      Q.>The DHR contracts were on a yearly
7  basis; is that correct?
8      A.>No, sir.
9      Q.>Did you have to sign a contract every
10 year?
11     A.>It is automatically renewed.
12     Q.>But you have a document that you had
13 to sign, a contractual document with DHR every
14 year?
15     A.>Yes, sir.
16     Q.>For the year prior to the RFP, 2004,
17 physical year 2004 to 2005 you had a contract;
18 isn't that correct?
19     A.>Every year, yes, sir.
20     Q.>But that contract ended on these
21 terms September 30th, 2005; isn't that correct?
22     A.>Yes, sir.
23     Q.>If I remember your earlier testimony,

Page 143

1  you state that even after the RFP process in 2005
2  you were given an attrition contract for the next
3  physical year; isn't that correct?
4      A.>Yes, sir.
5      Q.>So you were given a contract for
6  September 30th, 2005, through October 1st, 2006;
7  isn't that correct?
8      A.>Yes, sir.  I think there was an
9  attrition contract given on the provision that they
10 have nowhere to put the kids.
11     Q.>Now let's get the dates right.  That
12 would have been October 1st, 2005, to September
13 30th, 2006?
14     A.>Yes.
15     Q.>So you did get a contract?
16     A.>Yes, if you say it is a contract.  It
17 is an attrition where you say we are sorry, hold my
18 kids until I get them back.  That is what attrition
19 means, hold my kids until I give them to somebody
20 else.  So I don't consider that a contract.  I
21 consider that doing DHR a favor.
22     Q.>Let's talk about deformation for a
23 little bit.  We talked about earlier that you asked

Page 144

1  in several letters for a DHR administrative
2  hearing; is that correct?
3      A.>Yes.
4      Q.>And you received some letters back
5  from DHR indicating that you were not going to be
6  granted a hearing; isn't that correct?
7      A.>Yes, sir.
8      Q.>That was all in 2005?
9      A.>Yes, sir.
10     Q.>It is a fact that you did not appeal
11 that denial to any Alabama court?
12     A.>No, I appealed to the Board.
13     Q.>You appealed to the Board?
14     A.>Yes, DHR Board.
15     Q.>But you didn't appeal to the court?
16     A.>Well, Section 660 didn't tell me I
17 could appeal to the Board.
18     Q.>But you didn't file anything in
19 circuit court, did you?
20     A.>No, not for this one.  I didn't file
21 for an appeal.
22     Q.>You didn't file for an appeal, you
23 filed for something else?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 145

1   A.>Yes.
2   Q.>Let's look at Page 4, Count 2 of --
3   A.>I think my circuit court is in
4   appeal.
5   Q.>I think we talked about that which
6   was the --
7   A.>I think that was an appeal, appeal to
8   hearing and due process and to stop DHR from doing
9   what they are doing. That is what I put in there,
10  so it was an appeal.
11  Q.>But we talked about it. One of the
12  exhibits we put in was a copy of the complaints you
13  filed in circuit court, was it not?
14  A.>Yes, so I think that was an appeal.
15  Q.>Let's make sure we got that again.
16  That is Exhibit 2?
17  A.>Yes.
18  Q.>This is the complaint that you filed
19  with circuit court. Will you point out to me where
20  you stated that you wanted to appeal the DHR
21  denial?
22  A.>Right here. It think it is stated
23  here in 661-1-5-.08 because they have not gone

Page 146

1   through an administrative hearing. So Camellia
2   made a formal appeal to the Commissioner, and were
3   denied the hearing. Camellia made another appeal
4   for an administrative hearing from Attorney Bill
5   Prendergast, administrative law judge, to further
6   avoid a jury trial, and they would not hear it. So
7   I think I made an appeal -- I did.
8   Q.>Well, look at the Prayer for Relief
9   on Pages 7 and 8 where you point out to me where
10  you state in those sections that you were appealing
11  the DHR denial.
12  A.>1A, Prohibit defendant and its
13  officers, employees, agents, and all other persons
14  -- enjoin and restrain defendant and all other
15  persons in concert with the defendant from further
16  displacing all Camellia's children from our
17  agencies -- that's it. The defendant under pretext
18  of caring about RC has quickly moved 28 children
19  and banned our licensed agency from further
20  recruiting of more foster parents. There is no
21  level playing field here. All goes to political
22  friends. So this is my understanding of appeal.
23  This is my understanding. This is what I would do

Page 147

1   when I wrote this. I'm not a lawyer, so this is
2   what my understanding is.
3   Q.>Subsequent to the filing of this
4   document, Exhibit 2, with the Circuit Court of
5   Montgomery County, this case was removed from State
6   court to Federal court; isn't that correct?
7   A.>Yes, I think so, by the DHR -- I
8   didn't do that.
9   Q.>Then subsequent to that your lawyer,
10  Mr. Brown, filed an Amended Complaint in Federal
11  court?
12  A.>Yes, sir.
13  Q.>In fact, did you not dismiss your
14  original complaint, file something dismissing the
15  original and substituting the Amended Complaint?
16  A.>I don't know. My attorney did all of
17  that. I don't know the difference.
18  Q.>Isn't it true that all your claims in
19  court are now contained in your Amended Complaint,
20  which is Exhibit 3?
21  A.>Uh-huh.
22  Q.>All your claims are in your Amended
23  Complaint; is that correct?

Page 148

1   A.>There is the original and one other
2   complaint on there only because one was not
3   dismissed completely, so that's the combination.
4   And if you look here: The plaintiff asked
5   defendant for a formal hearing to explain the
6   deficiencies in the RFPs of other vendors.
7   Plaintiff was denied a hearing.
8   Q.>You are reading from Paragraph No. 17
9   on the Amended Complaint?
10  A.>Yes.
11  Q.>Plaintiff asked defendant for a
12  formal hearing to explain the deficiencies in RFPs
13  of other vendors. Plaintiff was denied a hearing.
14  A.>Yes. Is this the same?
15  Q.>It is the same, yes, the amended. I
16  didn't mean to take your copy.
17  A.>It's okay.
18  >>>>MR. LONG: Hold on just a
19  minute. I need to check the file folder.
20        1:54 p.m.
21        (Short break.)
22        1:57 p.m.
23     >MR. LONG: Mark this as the next

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 149

1  exhibit, that is Exhibit 17.
2      >(WHEREUPON, a document was marked
3      >as Exhibit 17 and is attached to
4      >the original transcript.)
5      Q.>(Mr. Long)  Exhibit 17 is a voluntary
6  dismissal of complaint filed by your lawyer,
7  Mr. Brown, in the Federal case, isn't that correct,
8  for dismissing the original complaint that was
9  filed in circuit court and giving notice of
10 substitution of the Amended Complaint?
11     A.>Uh-huh.
12     Q.>All I am trying to do is get straight
13 where all the claims are located -- okay?
14     A.>Yes.
15     Q.>We are going to file an Amended
16 Complaint, right?
17     A.>Okay.
18     Q.>All your claims are located in your
19 Amended Complaint; is that right?
20     A.>Depends on the one paper that I
21 have.  It claimed that my complaint isn't enjoined
22 with my original complaint.  That is what it says
23 on there.  So if you pull my old records from

Page 150

1  Mr. Thompson's office, it is on there.
2      Q.>I understand what you are saying, but
3  the document that your lawyer filed withdraws the
4  original complaint and gives notice that the
5  Amended Complaint is going to be filed.  On the
6  Amended Complaint, which is Exhibit 3, the only
7  listed defendant is the Alabama Department of Human
8  Resources; isn't that correct?
9      A.>I think so.
10     Q.>There is your copy again.
11     A.>I have one in my hand.  The court has
12 not dismissed -- according to the court, the
13 dismissal was removed.  They threw out the
14 complaint, so we can come back later.  That is what
15 my understanding is.
16     Q.>So look on Page 2 of that Amended
17 Complaint, Parties.  On Paragraph No. 7 it lists
18 the defendant.  Who is the defendant listed there?
19 Do you see Paragraph No. 7?
20     A.>Alabama Department of Human
21 Resources.
22     Q.>Is any other defendant listed?
23     A.>No.

Page 151

1      Q.>That's all I'm trying to get.  I'm
2  not trying to trick you.  So the Alabama Department
3  of Human Resources is the defendant that you are
4  claiming that has discriminated against you based
5  on race and denied you due process; is that
6  correct?
7      A.>Yes, sir.
8      Q.>Let's look at Count 2 of your
9  Complaint, Page 4, the Amended Complaint.  In
10 parentheses it says:  Interference with an
11 existing, lawful business.
12     A.>Uh-huh.
13     Q.>And Paragraph No. 21 under that
14 states that on or about May 12, 2005, the defendant
15 intentionally interfered with the lawful business
16 of the plaintiff, not checking plaintiff's
17 references, and taking plaintiff's contracts and
18 awarding them to Caucasian-owned businesses that
19 are not licensed to operate in Alabama.  You are
20 still a lawful business in the state of Alabama;
21 isn't that correct?
22     A.>Yes, sir.
23     Q.>Still operating?

Page 152

1      A.>Yes, sir.
2      Q.>If I remember your testimony before,
3  you haven't seen the scores that were done on your
4  proposal; that's correct?
5      A.>Yes, sir.
6      Q.>So you don't know if you were not
7  graded on references, do you?
8      A.>I know I was not graded.
9      Q.>How do you know that?
10     A.>Because in the beginning of the
11 program, I told Susan Ward that I called my
12 references and nobody called them and can they go
13 ahead and give me my 50 points so I can have them,
14 and they told me that they did haven't to call
15 them.
16     Q.>There is no mandatory requirement
17 that says that they have to call them.
18     A.>But I see different.  The way I read
19 it, they told me DHR would call them.  It is a
20 different interpretation.  From my understanding,
21 it said that DHR would call them.
22     Q.>Part of Paragraph 21 talks about
23 taking plaintiff's contracts.  But just verifying

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

### Page 153

1  with you, those contracts were signed on a yearly
2  basis; isn't that correct?
3      A.>Yes, sir, automatic renewal every
4  year.
5      Q.>But you do have to re-sign every
6  year?
7      A.>Automatically sign every year.
8      Q.>But you signed a new contract every
9  year; is that correct?
10      A.>Automatically renewed every year.
11      Q.>Automatically?
12      A.>Yes, you don't do nothing.
13      Q.>You do sign.  You actually get a
14  document --
15      A.>Yes, they send their copy of the
16  contract and you sign your name every year.
17      Q.>And you send them back?
18      A.>Yes.
19      Q.>Was there anything that required them
20  to send you a contract?
21      A.>Yes.
22      Q.>What?
23      A.>Of course, if I have children.

### Page 154

1      Q.>What do you claim required the
2  Department to actually enter the contract every
3  year?
4      A.>Because first of all, I have their
5  children; train, license foster parents; qualifying
6  all these homes that have been approved by DHR for
7  the safety of the children.
8      Q.>But you don't disagree that DHR had
9  the right not to put children with you?
10      A.>They have the right to put the kids
11  with nobody else, too, not me.
12      Q.>But they didn't have to put any
13  children with you?
14      A.>Yes, sir, I believe that, and they
15  did because they don't put kids with more black
16  people.  They put them with all white people.  I
17  wouldn't suffer this if I was white.
18      Q.>Abdul Seraaj isn't white?
19      A.>You know why.  Because they tried him
20  down before, and he didn't back off -- that's why
21  I'm not backing off, too.
22      Q.>Noticing under Count 1 in the
23  Wherefore clause on the top of Page 4 you list an

### Page 155

1  amount of compensatory and punitive damages in the
2  amount of $500,000 plus cost, attorney fees, and
3  any other amount.  How much of that $500,000 figure
4  relates to compensatory damages?
5      A.>Explain to me compensatory damages --
6  explain that.
7      Q.>Well, your lawyer will help you with
8  that.  But that's where you claim that you have
9  suffered some sort of financial loss either
10  personally or for the business as a result of
11  defendant's actions.
12      A.>When it takes a lot of money and time
13  to go to a city and locate an office, knowing that
14  99 percent of workers are women, you have to be
15  sure that where they are -- they work at night 24
16  hours -- they don't need to be raped or anything
17  happen to them.  It takes three days at least to
18  find a location.  So my time is involved in it.
19  And then you furnish the office with tables,
20  chairs, computers, and then you start training so
21  many staffs, and then you hire an executive
22  director, and then she also hires a lot of staff
23  members, preparing yourself and getting ready and

### Page 156

1  training them.  It's a lot of money losing, and
2  then all of a sudden, boom, it's gone.
3      Q.>How many offices does Camellia have
4  now?
5      A.>Camellia has just one office.
6      Q.>Where is that office?
7      A.>The main headquarters is in Phenix
8  City.  The rest have all been shut down.  And you
9  have to do the same thing for every location, week
10  after week.  And it costs me a lot of money trying
11  to even find hotels for Katrina, for parents who
12  live in mobile homes and take all my foster kids to
13  go and stay in hotels.  That don't happen to them.
14  DHR don't know that.  I pay for all of that.  DHR
15  don't know that when kids steal a car from the
16  parents and wreck it up, I pay for it.  DHR don't
17  pay for them.  They don't care, so they are not our
18  employees.  They tell them straight -- foster
19  parents are not our employees.  You hired them; you
20  trained them; it is your responsibility.  I have a
21  lot of losses, if I can continue.  How about now I
22  had to go and get a U-Haul and rent trucks and
23  leave from Phenix City and go to Mobile and move

39 (Pages 153 to 156)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

## Page 157

1  all my stuff -- it is very expensive -- and come
2  back all the way and hire a rental place, bigger
3  place, and put tables and chairs and computers and
4  training rooms, all the stuff from room to room
5  from big offices. This place is not big enough for
6  one office equipment. This place is not big
7  enough. And I'm still paying for all of this. It
8  is not easy. I have to go to Russell County Court
9  for eviction of my headquarters because all my
10  money has gone to trying to keep the doors open and
11  to be sure that the kids are not thrown out on the
12  street, the staff don't quit on me, the parents
13  don't quit on me. Because the Medicaid has seized
14  my money, and I got to be sure they are paid and
15  continue to do their job.
16      Q.>How many offices did you have in 2005
17  when RFP --
18      A.>Five offices.
19      Q.>In what locations?
20      A.>It is all in here. I have Phenix
21  City is my main headquarters; I have Mobile;
22  Huntsville; Birmingham; Selma.
23      Q.>And all five offices were in

## Page 158

1  operation at the time the RFP was sent out for
2  public response?
3      A.>Yes.
4      Q.>After the RFP was awarded, did all
5  five offices continue to operate?
6      A.>Partially.
7      Q.>Under the attrition contract that was
8  laid out that was given to you after the RFP was
9  awarded, were all five offices in operation?
10      A.>They were open partially.
11      Q.>Were they all operated?
12      A.>Partially, yes.
13      Q.>Were all five offices in operation
14  when the Medicaid order occurred?
15      A.>Yes.
16      Q.>The Medicaid fraud order?
17      A.>Yes.
18      Q.>Then Medicaid said that you owed them
19  $775,000; is that correct?
20      A.>Yes.
21      Q.>That's when you shut down some of the
22  offices?
23      A.>Yes, sir. Because I wake up one

## Page 159

1  morning, for three months I wasn't getting paid.
2  They wouldn't tell me what happened. And this
3  really has caused me -- even the doctor has had to
4  increase blood pressure pills for me. My potassium
5  is wacky, and my heart is having some heart problem
6  that my doctor's office called me and said your
7  potassium is way low. You are troubled by many
8  things. We have to increase your potassium. My
9  high blood pressure has caused me such a big
10  problem as a result of this. It has affected my
11  health real, real bad because you have constant
12  phone calls from phone companies calling for bills,
13  renter calling for bills. It's a nightmare.
14      Q.>Were all five offices rented?
15      A.>I had to move out.
16      Q.>Originally they were rental
17  properties?
18      A.>Yes, rental properties.
19      Q.>So I assume there is documentation
20  with regard to the expenses with those locations?
21      A.>Yes, I can give you that. If you put
22  every office together, five times a month I have to
23  pay for just the offices alone.

## Page 160

1      >MR. LONG: Counsel, same
2  objection that if you are going to claim loss of
3  your expenses, compensatory damages, if we don't
4  get those documents, we are going to move to
5  exclude.
6      A.>I have given them to you already. I
7  give them to you now, my suffering. I want to go
8  on the record -- embarrassment and humiliation that
9  I have suffered from this. As of now, DHR owes me
10  so much money still. Because what I do is I pay
11  for criminal history background check for my foster
12  --
13      Q.>But you are not required by law to
14  pay for it?
15      A.>My agency -- everybody gets their own
16  rules. If someone is going to come in and take
17  your children and be good to you, then the best you
18  can do is pay for the background check for them.
19      Q.>According to minimum standards your
20  staff are required to have criminal history checks;
21  is that correct?
22      A.>Yes, and it doesn't say who to pay,
23  so I pay them. The last check I paid them is

40 (Pages 157 to 160)

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

### Page 161

1  almost $7,000 because I know I got more kids
2  coming. I don't get that money back, and still I
3  don't have a penny back.
4      Q.>Let's look at Count 3 on the Amended
5  Complaint, Page 5, Number 24 says Plaintiffs had
6  contracts with more than 70 foster parents in the
7  state of Alabama. We have talked about this issue
8  several times. And if I remember your repeated
9  statement, you don't have a written contract with
10  any of these foster parents; isn't that correct?
11      A.>No.
12      Q.>You don't have a written contract?
13      A.>Not a written contract, an oral
14  contract.
15      Q.>What is your oral contract?
16      A.>Come here, let's train you and be a
17  foster parent. And nobody wants to come and spend
18  three months in training without knowing I'm going
19  to get some children, so they invest their time and
20  promise that I am going to pay you. And I have to
21  have people to train you because I am not a
22  trainer. I have to pay social workers to train
23  them.

### Page 162

1      Q.>But DHR was not involved in that
2  process of your negotiations and arrangements
3  between you and your foster parents?
4      A.>They don't have to be, but I am
5  required to do this so I can have children. It is
6  a requirement. How can you get kids without
7  training them and do all that of that? DHR can't
8  say I am not going to deal with it. You have
9  licensed me to train a foster parent and do this,
10  I'm going to train them, so I hire people to do all
11  the work for me. And it costs me a lot of pain and
12  headache.
13      Q.>Did DHR ask you to apply for a Child
14  Placing License?
15      A.>No, DHR didn't ask me. It's my
16  interest in the life of children because I have
17  seen so many lost kids that could be helped, but
18  they have been abandoned. And I have a divine
19  nature that I love to help children and go out of
20  my way to make them happy and be there for them.
21  Everybody's got a calling, so I guess my calling is
22  to be looking out for children. It is a calling
23  from God.

### Page 163

1      Q.>Just a couple of final questions
2  here. We talked about the $500,000 figure that's a
3  part of your claim under Count 1. Under Count 2
4  you have an $800,000 claim for compensatory and
5  punitive damages, and under Count 3 a $650,000
6  claim for compensatory and punitive damages. Why
7  are those amounts different?
8      A.>Probably you have to talk to my
9  lawyer, Mr. Brown, because I didn't do this, and he
10  knows how the law applies, going by the law. He
11  went by the law because for me my suit was 20
12  million. I don't know how he came to this small
13  amount -- mine was 20 million.
14      Q.>Under the Prayer for Relief that
15  starts on the bottom of Page 5 and the top of Page
16  61 there is one thing I want to talk about there
17  and that is Roman No. 2: Enter mandatory requiring
18  plaintiff to be awarded its contracts which were
19  intentionally taken away. Is it your contention
20  that Camellia should be awarded a contract
21  regardless of what its score was on the RFP?
22      A.>My contention was that DHR -- I was
23  cheated by DHR. I worked too hard, and they took

### Page 164

1  my contract away. But I am not given the 50 points
2  I lost. They could have given me a hearing, showed
3  me my books, and all this would not be here by this
4  time. I was cheated.
5      Q.>But you were not the only provider
6  who lost children under the contract; isn't that
7  correct?
8      A.>I don't know. If you know, you can
9  tell me because I lost all my children.
10      Q.>I believe this is a document you gave
11  me yesterday.
12      A.>I read it. It didn't say they are
13  taking his children. It said they were about to
14  take his children.
15      Q.>This is a document that you provided
16  at the depositions yesterday. Let's have that
17  marked.
18      >>(WHEREUPON, a document was marked
19      >>as Exhibit 18 and is attached to
20      >>the original transcript.)
21      A.>He said they have taken all my
22  children away from me. He will lay down and
23  fight. He wants to fight you if you take his

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 165

1  children away from him.
2      Q.>(Mr. Long)  Exhibit 18 is a letter
3  that you provided in the depositions yesterday of
4  Susan Ward, supposedly from William Mitchell,
5  executive director.  Who is William Mitchell?
6      A.>The owner of TPI.
7      Q.>Therapeutic Programs, Incorporated,
8  one of the providers that was awarded a contract?
9      A.>Yes.
10     Q.>The first two sentences states:
11  Thursday, May 12th we learned that TPI's contract
12  to provide therapeutic foster care has been
13  dramatically reduced.  The number of children TPI
14  will be able to serve has been reduced by 43
15  percent.  Another sentence:  That will be a loss of
16  about 240 foster homes and children that were
17  referred to TPI by local DHR caseworkers.  Bill
18  Mitchell is Caucasian, isn't he?
19     A.>Yes.
20     Q.>This letter that you provided states
21  that he was going to lose slots as well; isn't that
22  right?
23     A.>A wrong has been perpetrated against

Page 166

1  TPI.  He was complaining, too, that he had lost
2  children; isn't that right?
3      >MR. LONG:  That is all I have.
4      >THE DEPONENT:  That is why he
5  sold his business because he lost interest.
6      Q.>(Mr. Long)  That's why he sold his
7  business?
8      A.>Yes, he has lost interest because you
9  guys are not fair.
10     >MR. LONG:  That's all I have
11  today.
12     >THE DEPONENT:  Thank you sir, I
13  appreciate it.
14     **********************
15        2:21 p.m.
16     FURTHER DEPONENT SAITH NOT
17
18
19
20
21
22
23

Page 167

1
2              CERTIFICATE
3  STATE OF ALABAMA
4  AT LARGE
5
6      >I hereby certify that the above
7  and foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription and that the foregoing represents and
11  true and correct transcript of the testimony given
12  by said witness upon said deposition.
13     >I further certify that I am
14  neither of counsel nor of kin to the parties to the
15  action, nor am I in anywise interested in the
16  result of said cause.
17
18
19
20
21
22
     Victoria M. Castillo, Court Reporter
23     Commissioner and Notary Public

**1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com**
**1-800-888-DEPO**



DEFENDANT'S
EXHIBIT
1



COPY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

CAMELLIA THERAPEUTIC FOSTER )
AGENCY, LLC, REPRESENTED BY )
JOSEPH APPIAH, CHAIRMAN )
THERAPEUTIC FOSTER CHILDREN, )
FOSTER PARENTS AND STAFF )
                               )
        Plaintiffs, )
                                )
v.                            )      CIVIL ACTION NO. 2:06 cv735-MHT
                                )
ALABAMA DEPARTMENT OF )
HUMAN RESOURCES )
                                )
        Defendant. )

## NOTICE OF DEPOSITION

To:    Camellia Therapeutic
       c/o Hon. Kathryn Dickey
       Attorney for Plaintiffs
       322 Alabama Street
       Montgomery, AL 36104

                     Camellia Therapeutic
                     c/o Hon. Jamie Spears-Turk
                     Attorney for Plaintiffs
                     2735 Office Park Circle
                     Montgomery, AL 36116

You are hereby notified that, in accordance with the Alabama Rules of Civil Procedure, the Defendant, Alabama Department of Human Resources will take the testimony by deposition upon oral examination of the Plaintiff Camellia Therapeutic Foster Agency for the purpose of discovery or for use as evidence in this case, or for both purposes. Said deposition shall be taken at the State Department of Human Resources South Conference Room, located at Gordon Persons Building, 2nd Floor, Room 2128, 50 S. Ripley Street, Montgomery, AL 36130, commencing at **9:00 a.m.** on the **15th day of May, 2007**. Said deposition shall be taken before a

Court Reporter, or before some officer authorized by law to take depositions. Defendant DHR reserves the right to continue the depositions as incomplete if any of the documents requested below are not produced at or before the deposition.

**This Notice names as the Deponent Camellia Therapeutic Foster Agency.** Under the provisions of **Rule 30(b)(6)**, Camellia Therapeutic is required to identify and produce for deposition one or more officers, directors, managing agents, or other agents and employees who consent to testify on its behalf and are the officers, directors, agents, or employees most knowledgeable as to the following matters and documents.

1. The conception, creation, incorporation, organization, and operation of Camellia Therapeutic Foster Agency.

2. The review of the DHR Request For Proposal (RFP) referred to in the complaint and the discussions, preparations, and submission of a response or proposal or inquiries to DHR regarding the RFP.

3. Correspondence and contact between DHR officials and Camellia Therapeutic Foster Agency about the RFP.

In accordance with the Alabama Rules of Civil Procedure, you are hereby requested to bring with you to said deposition the following documents separated by request number:

## DEFINITIONS

1. "Document" means any written, (including handwritten, printed, mimeographed, lithographed, duplicated, typed, or other graphic, photographic, or electronic) matter of any kind or nature, whether original or copy, and includes, without limiting the generality of the foregoing, all letters, telegrams, e-mails, correspondence, contracts, agreements, purchase orders, specifications, shop drawings, blueprints, manuals, instructions, warranties, memoranda, notes,

2

video and audio recordings and transcripts thereof, memoranda of telephone or personal conversations or of meetings or conferences, minutes, board of directors minutes, studies, reports, analyses, test results, interoffice communications, receipts, canceled checks, money orders, invoices, and bills in the possession and/or control of Plaintiff or known by Plaintiff to exist.

2.    "You" or "Your" includes, without limitation, individuals, associations, partnerships, and corporations.

## REQUESTS FOR PRODUCTION

1.    Produce all documents in your possession relating to your allegations in Paragraph 6 of the Amended Complaint relating to the incorporation and organization of Camellia Therapeutic Foster Agency, including any organizational chart.

2.    Produce all documents in your possession relating to the Department of Human Resources.

3.    Produce all documents in your possession relating to the more than seventy (70) foster parents contracted with Camellia Therapeutic Foster Agency, referenced in Paragraph 8 of the Amended Complaint.

4.    Produce all documents in your possession relating to the Request for Proposals (RFP) alleging issued by DHR on or about February 28, 2005, referenced in Paragraph 9 of the Amended Complaint.

5.    Produce all documents in your possession relating to the scanning process in the RFPs, referenced in Paragraph 10 of the Amended Complaint.

6.    Produce all documents in your possession relating to the RFP deadline, referenced in Paragraph 11 of the Amended Complaint.

3

7.    Produce all documents in your possession relating to your answers and proposals submitted in response to the RFP, referenced in Paragraph 12 of the Amended Complaint.

8.    Produce all documents in your possession relating to the on or about May 12, 2005 publication of the Notice of Intent to Award Contracts, referenced in Paragraph 13 of your Amended Complaint.

9.    Produce all documents in your possession relating to the Camellia Therapeutic Foster Agency score of 753.3 as referenced in Paragraph 8 of your Amended Complaint.

10.    Produce all documents in your possession relating to the minimum RFP score of 800 referenced in Paragraph 13 of the Amended Complaint.

11.    Produce all documents in your possession relating to contracts between Camellia Therapeutic Foster Agency and DHR regarding the RFP referenced in the Amended Complaint.

12.    Produce all documents in your possession relating to the scores of various sections of the RFP referenced in Paragraph 14 of the Amended Complaint.

13.    Produce all documents in your possession relating to the Caucasian-owned agencies awarded contract, referenced in Paragraph 15 of the Amended Complaint.

14.    Produce all documents in your possession relating to your loss of federal funds, referenced in Paragraph 15 of the Amended Complaint.

15.    Produce all documents in your possession relating to your claim in Paragraph 16 that Defendant graded Plaintiff's answers, to the RFPs subjectively causing a further loss in in points.

16.    Produce all documents in your possession relating to your claim in Paragraph 17 of your Amended Complaint that Plaintiff asked Defendant for a formal hearing to explain the deficiencies in the RFPs by the other vendors and that the request was denied.

17.    Produce all documents regarding the compensatory damages you claim due to Plaintiff by Defendant in your Amended Complaint.

18.    Produce all documents regarding the loss of federal funding you claim in your Amended Complaint that you suffered by the actions of Defendant.

19.    Produce all documents regarding the loss of contractual relationship with DHR, foster parents, and others that you claim in your Amended Complaint that you lost as the result of actions by the Defendant.

RESPECTFULLY SUBMITTED,

TROY KING
ATTORNEY GENERAL

SHARON E. FICQUETTE
CHIEF LEGAL COUNSEL
STATE OF ALABAMA

James E. Long (LON016)
Deputy Attorney General
State of Alabama
Department of Human Resources
Post Office Box 304000
Montgomery, Alabama 36130-4000
Telephone:    (334) 242-9330

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing NOTICE OF DEPOSITION on the following by placing copies thereof, addressed to them as indicated below, in United States Mail, First Class postage prepaid, on this the _2th_ day of _April_, 2007.

Camellia Therapeutic
Hon. Kathryn Dickey
Attorney at Law
322 Alabama Street
Montgomery, Alabama 36104
Attorney for Plaintiffs

Camellia Therapeutic
Hon. Janice Spears-Turk
Attorney at Law
2735 Office Park Circle
Montgomery, Alabama 36116
Attorney for Plaintiffs

James E. Long - LON016
Deputy Attorney General

State of Alabama
Department of Human Resources
P.O. Box 304000
Montgomery, Alabama 36130-4000
Phone: (334) 242-9330
Fax: (334) 242-0689

ATTORNEY FOR DEFENDANT





IN THE CIRCUIT COURT
FOR MONTGOMERY COUNTY, ALABAMA

CAMELLIA THERAPEUTIC FOSTER )
AGENCY, LLC Represented By )
JOSEPH APPIAH, Chairman )
THERAPEUTIC FOSTER CHILDREN, )
FOSTER PARENTS AND STAFF )
    Plaintiff )
 )
V. )
 )  CASE NO: CV-06-1819
HON. BOB RILEY, Governor of Alabama in his )
Official Capacity as the Chairman of the )
ALABAMA STATE DEPARTMENT OF )
HUMAN RESOURCES )   PLAINTIFF DEMANDS A
 )   TRIAL BY JURY
 )
 )
HON. PAGE WALLEY, Commissioner of the )
Department of Human Resources )
 )
HON. SUSAN WARD, Director of Federal and )
State Contracts of the Alabama Department of )
Human Resources )
 )
    Defendant )

## COMPLAINT

Camellia Therapeutic Foster Agency, LLC ("Camellia"), plaintiff herein, by and

through its undersigned Chairman Joseph Appiah, for its complaint herein alleges as

follows:

## INTRODUCTION

1. This is an action to enjoin and restrain the defendant from engaging in

discrimination an other unlawful conduct, and to compel the defendant to reinstate and/or

award contracts to plaintiff pursuant to the defendant's Request for Proposals ("RFP") for

Therapeutic Foster Care for Children in Alabama.

2. This action is brought pursuant to Title VI of the Civil Rights Act (1964), 42 U.S.C. 2000d, et seq. and Code of Alabama (1975), S38-2-6 Specifically, 42 U.S.C. 2000d states that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

## JURISDICTION

3. Jurisdiction in this action is predicated upon Alabama Code (1975), SS12-11-30,12-11-31, 38-4-5, 41-22-1 through 27.

## VENUE

4. Venue for this action is predicated upon Rule 82, Alabama Rules of Civil Procedure (ARCP)

## THE PARTIES

5. Plaintiff, Camellia, is an Alabama company with its principal place of business at 2310 Crawford Road, Suite 104 P.O. Box 788 Phenix City, Alabama 36868.

6. Defendant, Hon. Governor Bob Riley, Governor of Alabama, who is the chairman of the Board of Directors of the State Department of Human Resources. His Commissioner (SDHR) Hon. Page Walley and Hon. Susan Ward the Director of SDHR State and Federal Contracts and Grants.

## ADMINISTRATIVE HEARING 660-1-5-.08

Camellia did not want the court to send the suit back, because it had not gone through Administrative Hearing, so Camellia made a formal appeal to the Commissioner and we were denied a hearing. Camellia made another request for Administrative Hearing from Attorney Bill Prendergast Administrative Law Judge to further avoid a Jury Trial and the public knowing all the secrets going on at SDHR, but Attorney Hon. Joel C. Marsh

following the advice of the Commissioner denied the hearing. After all if they lose it does not cost them anything, because it's the public money. Camellia made a final appeal to the Governor and we were denied a hearing. We have no choice but to take our case to the court.

## FACTUAL AVERSMENT

7. On or about February 28, 2005 DHR issued the RFP to Camellia and other vendors that provides therapeutic foster care for children in Alabama. **(EXHIBIT 1)**

8. In the Selection section (pp. 10-11 of the RFP), DHR set out a scoring process with a maximum of 1000 points to be earned by individual vendors. DHR did not indicate the points below which a vendor would not be awarded a contract under the RFP.

9. DHR did not indicate in the RFP, that if you fail below 800 points, all your foster Children as well as foster parents would be distributed to new agencies with no Therapeutic Foster Care License from Tennessee and Boston, MA. This is exactly what they did.

10. DHR set March 18, 2005, as the deadline for the receipt of written letters of intent to Propose and written inquiries from proposes.

11. Camellia submitted its answers to RFP by DHR's April 11, 2005 deadline for the receipt of proposals from vendors. **(EXHIBIT 2)**

12. On May 12, 2005, DHR published on its website a Notice of Intent to Award a Contract (s). **(EXHIBIT 3)** Camellia scored 753.3, but did not receive any contracts from DHR in both the original and amended Notices of Intent to Award a Contract (s).

13. DHR did not contact of Camellia's references (50 points) **(EXHIBIT 4)** as stipulated in the Basis of Selection (Section VI(D)(9).

14. DHR is in violation of its own RFP by not contacting Camellia's references (50 Points) (**EXHIBIT 4**). Camellia called all its references to be sure that SDHR RFP Division did not contact them. Camellia also recorded the date of the calls and noted the conversations between Camellia and references. The references said that they were not contacted by E-Mail, phone, or letters, knowing that they were subject to be subpoenaed in a Trial sooner or later. The moment SDHR, together with it's Commissioner, Director of Federal Contracts and State Grants along with their Attorneys changed the rules, it became a matter of courts business to explain to this Honorable Court why our references were not called to allow us to receive 803.3 points.

15. Camellia is a licensed therapeutic foster care provider in Alabama with 5 offices and trained and experienced social workers and family consultants located in Phenix City, Montgomery, Birmingham, Mobile and Huntsville.

16. Camellia avers that DHR awarded contracts to vendors that have not been licensed to do business in Alabama, and therefore have had no experience in providing therapeutic foster care in the state.

17. Camellia further avers that DHR did not grade its answers to the RFP objectively, and that DHR has no rational basis for awarding a higher number of contracts to vendors that scored lower on the 1000 point scoring process while those with higher scores received fewer contracts.

18. Camellia, a minority-owned company, further avers that DHR has discriminated against it in violation of federal and state laws that prohibit race, color, or national origin discrimination.

19. Camellia alleges that, the State Department of Human Resources with its

4

Chairman of Board of Directors and the Honorable Governor Bob Riley, Commissioner Honorable Page Walley, Ph.D. and Director of the Federal & State Grants and Contract Honorable Susan Ward just handed Youth Villages of Tennessee ($2,427,250.00) for becoming a Therapeutic Foster Care Agency because they couldn't recruit parents on their own. So they took the hard working, minority black owned Agencies children and licensed foster parents and handed them over to them. After all they are from the Commissioners home state, Tennessee. It will take almost 7 to 10 years to have a stable 70 Licensed foster parent in a new agency and they couldn't wait that long, so they were rewarded. (THE GOOD OLD BOYS) Camellia alleges that they can get their gratuity later, for destroying one black company and giving it to a major white company.

Attached are exhibits on how I reached $2,427,250.00 (**EXHIBIT 5**)

20. Another example of an Agency whose Executive Director lives in Boston, was awarded 20 foster homes with no offices and no foster parents even though according to SDHR records scored higher than the Tennessee Agency. Camellia paid for copies of the following agencies R.F.P. and found numerous deficits in their proposal and Camellia asked for a formal hearing to point them out. AL MENTOR, CHILD AND FAMILY 1ST, CHILDREN AND FAMILY SERVICES, YOUTH VILLAGES, WILMER HALL, FIT HOMES, EAGLE ROCK, MOUNTAIN VIEW, NEW WAY OUT. The department flatly denied the request. Camellia is willing to show this Honorable Court that Camellia was targeted because we are Black (minority owned agency) and all but one agency who received a contract was black, Serraji was already in business over 12 years with too many children and would have caused more problems for the R.C. Consent Decree for removing his children, that why they were spared. They took one Black Company

Camellia who has worked hard for 6 years recruiting 70 plus foster parents, and iterally handed over to a brand new company from Tennessee who is struggling in Huntsville to recruit foster parents. Commissioner Page Waller's administration does not believe in hard work. They reward their political friends with others hard work. Please commissioner Page Walley show me which states in America takes people hard work and give to their political friends besides Alabama State Department of Human Resources. We are willing to take our case to Federal Court.

## OUT COME

Camellia petitions this Honorable Court that the out come of our RFP would have been different if SDHR'S RFP graders would have taken the time to call our references, this would have enabled us to score the 50 points needed in order bring our score to the required 803.3 points needed to receive the contract. Our score would have far exceeded the 800 points required to receive a contract.

21. As a result of the treatment and unlawful actions and inactions of the State Department of Human Resources, its Chairman of the Board of Directors, Hon. Governor Bob Riley, Governor of Alabama in his official capacity as Chairman, the Commissioner Hon. Page Walley and Director of State and Federal Contracts Hon. Susan Ward, Camellia has been irreparably damaged.

## PERMANENT INJUNCTION

Camellia petitions this Honorable Court to issue permanent injunction and order SDHR to release its funds they are holding. Alleging that Medicaid errors of Foster Parents and Staff by using the State Attorney General office for Harassment, intimidation and holding

their funds. By not paying the Agency any money, from April, May, June, and July is already here, they have actually closed our business, without due process. SDHR claimed that, they are the GOD of ALABAMA. SDHR thinks that they can take Black Agencies money and nobody can do anything about it. They are holding a small black (minority) agency funds totaling over $79,000.00 without due process. (Nancy Sledge of SDHR is holding our funds we are unable to hire a Lawyer.)

## PRAYER FOR RELIEF

WHEREFORE, Camellia prays for relief and judgment against defendant as follows:

A.    Equitable Remedies:

Pursuant to 42 U.S.C. 2000d, et seq., that this Court issue an order and judgment against defendant providing the following relief:

1.    That this court issue a **permanent injunction** that will do the following:

1a. Prohibit defendant and its officers, employees, agents, and all other persons acting in concert with defendant from committing any act of discrimination as defined in 42 U.S.C. 2000d, et seq., and Alabama Code (1975), S38-2-6, and from associating directly or indirectly with any other person in concert or participating with defendant.

1b. Enjoin and restrain defendant and all other persons in concert with defendant from further displacing all Camellia's children from our agencies. The defendant under pretext of caring about R.C. has quickly moved 28 children and banned our licensed agency for further recruiting more foster parents. There is no level of plain

7

field here. All goes to Political friends.

      1c. Enjoin and restrain the defendant State Department of Human Resources for further removing all our children until all the issues are fully litigated on February 28, 2005 RFP.

      1d. Order defendant to disclose, disseminates, and make available to Camellia all documents relating to Notice of Intent to Award a Contract (s) on May 12, 2005.

      1e. Award Contracts to Camellia on the basis of answers submitted to DHR in response the RFP, where Camellia was cheated on 50 points and bring our score to 803.3

      1f. Order defendant to establish an objective and rational scoring process for awarding contracts pursuant to RFP.

      1g. Order the defendant to release the names of independent objective personnel who graded the scores of the RFP. SDHR lied that they would use independent faculties who have experience in grading RFP's and whose job does not involve in day to day operations of the agency. That didn't happen.

      2. That this Court award Camellia the cost of this suit, together with such other and further relief as may be necessary and appropriate to prevent and restrain further violations of 42 U.S.C. 2000d, et seq., and Alabama Code(1975), S38-2-6, and to end the ongoing wrongful conduct of defendant.

      3. Camellia seeks 20 million dollars in damages including punitive damages and pain suffering.

## B. DECLARATORY RELIEF

That this Court declare that defendant has violated 42 U.S.C. 2000d, et seq., and Alabama Code (1975), S38-2-6.

Dated this  27  day of  _June_  , 2006.

_Joseph Appiah_  C-E.O
Joseph Appiah
Plaintiff
P.O. Box 788
Phenix City, AL 36868
(334)448-2999

## SERVE DEFEENDANT BY SHERIFF

1.    Chairman of Board of Directors
      State Department of Human Resources
      Hon. Governor Bob Riley
      1142 South Perry Street
      Montgomery, AL 36104

2.    Alabama State Department of Human Resources
      Attn: Hon. Page B. Walley, Ph.D., Commissioner
      Gordon Persons Building 2nd Floor
      50 Ripley Street
      Montgomery, AL 36130-4000

3.    Alabama State Department of Human Resources
      Defendant Hon. Susan Ward Director of State & Federal Contracts
      Gordon Persons Building 2nd Floor
      50 Ripley Street
      Montgomery, AL 36130-4000



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALBAMA**
**MONTGOMERY DIVISION**

CAMELLIA THERAPEUTIC
FOSTER AGENCY, LLC

     Plaintiff,               Civil Action No.: <u>2.06cv735-MHT</u>

                              **Plaintiff** Demands Trial **By Jury**

v.

**THE ALABAMA DEPARTMENT**
**OF HUMAN RESOURCES,**

     Defendant.

### <u>AMENDED COMPLAINT</u>

#### 1. <u>PRELIMINARY STATEMENT</u>

1. This action seeks declaratory, injunctive, and equitable relief; compensatory and punitive

damages; and costs and attorney's fees for subjecting Plaintiff Camellia Therapeutic

Foster Agency, LLC, to racial discrimination regarding its participation in a federally

assisted program.

#### II. <u>JURISDICTION</u>

2.   This action arises under the Fourteenth Amendment of the United States Constitution,

the Thirteenth Amendment of the United States Constitution, and Title VI of the Civil

Rights Act of 1964, 42 USC § 2001W et seq.

3. Jurisdiction of this Court is invoked pursuant to: Title 28, U.S.C., Section 1331 and

pendent jurisdiction to entertain all state law claims.

4. Costs and attorney fees may be awarded pursuant to Title 42 U.S.C., 1988 and Fed R Civ

P. 54.

Case 2:06-cv-00735-MHT-CSC     Document 8     Filed 09/22/2006     Page 2 of 7

### III. VENUE

5. This action properly lies in the Middle District of Alabama, Montgomery Division,

    pursuant to 29 USC § 1391(b), because the claim arose in this judicial district, and

    pursuant to 42 USC § 2000d et seq., because the unlawful discrimination practices were

    committed in this judicial district.

### IV. THE PARTIES

6. Plaintiff, Camellia Therapeutic Foster Agency, LLC, is a federally funded minority

    owned corporation organized under and pursuant to the laws of the State of Alabama,

    with its principal place of business being located at 2310 Crawford Road, Suite 104, P.O.

    Box 788, Phenix City, Alabama 36868.

7. Defendant, The Alabama Department of Human Resources, is a corporation organized

    under and pursuant to the laws of the State of Alabama, with its principal place of

    business being located at Gordon Persons Building, Suite 2104, 50 North Ripley Street,

    Montgomery, Alabama 36130.

### V. ALLEGATIONS OF FACTS

8. Plaintiff is a therapeutic and foster agency that contracted with more than seventy (70)

    foster parents in the state of Alabama.

9. On or about February 28, 2005 Defendant issued Requests for Proposals (RFPs) to

    Plaintiff and other foster care agencies.

10. In the RFPs, Defendant set out a scoring process with a maximum of 1000 points to be

    earned by individual vendors. It did not indicate the points below which a vendor would

    not be awarded a contract under the RFPs.

2

11. Defendant set April 11, 2005 as the deadline for the the receipt of the RFPs.

12. Plaintiff submitted its answers to the RFPs by the April 11, 2005 deadline for the receipt of proposals from vendors.

13. On or about May 12, 2005, Defendant published on its website a Notice of Intent to Award Contracts. Plaintiff scored 753.3 and did not receive any contracts from Defendant because the minimum score to receive a contract was 800.

14. Defendant failed to contact any of Plaintiffs references *as* stipulated in the "Basis of Selection." That section was worth a total of fifty (50) points.

15. As a result, Plaintiff was not awarded any contracts and said contracts were awarded to Caucasian owned agencies, causing a loss in federal funds.

16. Defendant graded Plaintiffs answers to the RFPs subjectively, causing a further loss in points.

17. Plaintiff asked Defendant for a formal hearing to explain the deficiencies in the RFPs of other vendors. Plaintiff was denied a hearing.

## VI. COUNT ONE

### (Race Discrimination and Due Process)

Plaintiff incorporates all previous paragraphs as if fully set out herein and further shows unto this Honorable Court the following:

18. Defendant's action constitutes discrimination by reason of race in violation of Plaintiff's rights guaranteed under the due process clause and property rights of the Fourteenth Amendment, First Amendment to the Constitution of the United States, the Constitution of the State of Alabama, 1901 and 42 U.S.C., Section 2000d, et seq, and the Thirteenth

3

Amendment to the United States Constitution.

WHEREFORE THE PREMISES CONSIDERED, Plaintiff requests that the Court grant judgment in favor of Plaintiff and award compensatory and punitive damages in the amount of $500,000.00; plus costs, attorneys' fees, and any other amount to which Plaintiff may show itself to be justly entitled.

## VII. COUNT **TWO**

### (Interference with an Existing Lawful **Business**)

Plaintiff incorporates all previous paragraphs as if fully set out herein and further shows unto this Honorable Court the following:

19. Plaintiff was a lawfully operating therapeutic foster care business in the state of Alabama.

20. Defendant was aware that Plaintiff was a lawful therapeutic and foster agency doing business in Alabama.

21. On or about May 12, 2005, Defendant intentionally interfered with the lawful business of the Plaintiff by discriminating against Plaintiff, not checking Plaintiffs references, and taking Plaintiffs contracts and awarding them to Caucasian owned businesses that are not licensed to operate in Alabama.

22. There is no justification for Defendant's interference with Plaintiffs lawful business.

23. As a result of said interference, Plaintiff was caused to suffer a loss of business relations.

WHEREFORE THE PREMISES CONSIDERED, Plaintiff requests that the Court grant judgment in favor of Plaintiff and award compensatory and punitive damages in the amount of $800,000.00; plus costs, attorneys' fees, and any other amount to which Plaintiff may show

itself to be justly entitled.

## VIII. COUNT THREE

### (Interference with Contract Relations)

Plaintiff incorporates all previous paragraphs as if fully set out herein and further shows unto

this Honorable Court the following:

24. Plaintiff had contracts with more than seventy (70) foster parents in the state of

    Alabama.

25. Defendant knew that Plaintiff contracted with more than seventy (70) foster parents.

26. On or about May 12, 2005, Defendant intentionally interfered with the contracts of the

    Plaintiff by discriminating against Plaintiff, not checking Plaintiffs references, and taking

    Plaintiffs contracts and awarding them to Caucasian owned businesses that are not

    licensed to operate in Alabama at the time they were awarded contracts by Defendant.

27. There is no justification for Defendant's interference with Plaintiffs contracts.

28. As a result of said interference, Plaintiff was caused to suffer a loss of contractual

    relationships with said foster parents.

WHEREFORE THE PREMISES CONSIDERED, Plaintiff requests that the Court grant

judgment in favor of Plaintiff and award compensatory and punitive damages in the amount of

$650,000.00; plus costs, attorneys' fees, and any other amount to which Plaintiff may show

itself to be justly entitled.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that after a hearing hereon, the Court will:

I. Issue declaratory judgment stating that:

5

1. The actions of Defendant in refusing to check Plaintiffs references and refusing to renew Plaintiffs contracts due to his race constitute a violation of Plaintiffs rights, an interference with a lawful business, and an interference with contractual relationships.

2. The actions of Defendant constitutes discrimination by reason of Plaintiff's race in violation of Plaintiff's rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, the Constitution of the State of Alabama, 1901, and 42 U.S.C. Section 2000d, et. seq.

II. Enter mandatory, preliminary and permanent injunctions requiring Plaintiff to be awarded its contracts that were intentionally taken away.

III. Enter an Order awarding Plaintiff punitive damages.

IV. Enter an Order awarding Plaintiff his costs incurred in this case, together with reasonable attorneys' fee to be taxed as part of the costs against Defendants.

V. Grant such additional and further relief as the Court deems proper and just in the premises.

DONE this the    .day of Seiletkr 2006.


## X. <u>JURY DEMAND</u>

28. Plaintiff demands a trial by jury.


Respectfully submitted,

s/Dwayne L. Brown
Dwayne Brown(ASB BRO149)
Attorney for Plaintiff


6

**Of Counsel:**
The Law Office of Dwayne L. Brown
5925 Carmichael Road, Suite C
Montgomery, AL 36106
Phone (334) 277-3757
Facsimile (334) 277-3613
Dbrownadbrownatty.com

### CERTIFICATE OF SERVICE

This is to certify, that on September 22, 2006, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Troy King
Attorney General
11 South Union Street
Montgomery, AL 36130


Joel C. Marsh
Assistant Attorney General
State of Alabama
Department of Human Resources
Legal Office
Post Office Box 304000
Montgomery, AL 36130-4000


/s/Dwayne L. Brown
Of Counsel

7

*EX-H-IB-IT 1*



DEFENDANT'S
EXHIBIT
4

# REQUEST FOR PROPOSALS

## FOR

## THERAPEUTIC FOSTER CARE for CHILDREN



## ISSUED BY

## ALABAMA DEPARTMENT OF HUMAN RESOURCES

## FAMILY SERVICES

## Monday, February 28, 2005

Alabama Department of Human Resources • 50 Ripley Street • Gordon Persons Building • Montgomery, Alabama 36130

# ALABAMA DEPARTMENT OF HUMAN RESOURCES
## REQUEST FOR PROPOSALS

CONTENT                                                                              Page

I.    INTRODUCTION ........................................................................................... 2

II.   RESERVATIONS .......................................................................................... 3

III.  SUBMISSION OF PROPOSALS .................................................................. 4

IV.   PROGRAM NARRATIVE .............................................................................. 6

V.    COMPENSATION FOR PROVIDING SERVICE ........................................... 9

VI.   SELECTION ............................................................................................... 10

VII.  VENDOR CERTIFICATIONS ...................................................................... 11

ATTACHMENT A-THERAPEUTIC FOSTER CARE SERVICE PROGRAMS ........... 13

ATTACHMENT B- RFP TIME TABLE ..................................................................... 19

ATTACHMENT C- TAXPAYER IDENTIFICATION NUMBER .................................. 20

ATTACHMENT D- DISCLOSURE STATEMENT ..................................................... 21

ATTACHMENT E- PROPOSAL COVER PAGE ...................................................... 22

1

# I.    INTRODUCTION

A.    PURPOSE: This Request for Proposals (RFP) is for the sole purpose of soliciting proposals for **Therapeutic Foster Care for Children** in Alabama. Each proposal must indicate the vendor's ability to meet the provisions set forth in the *Therapeutic Foster Care Manual* Revised 2004, including the implementation of step-down, provision of Core Services, tracking and aftercare and provision of in-home services to the birth family. Therapeutic foster care is to be a time-limited, intensive intervention for children, who are not able to live at home and who fit the diagnostic and behavioral criteria set forth by the Department. Attachment A provides the definition of this therapeutic foster care, the population of children to be served, and the core services.

B.    The contract, if awarded, will be for a period of one (1) year with the option of renewing for two (2) additional one-year periods based on the same terms and conditions. Exercise of option years will be determined in part by an evaluation of the Vendor's performance. Continuation of any agreement between the Alabama Department of Human Resources (Department) and Vendor beyond a fiscal year is contingent upon the receipt of sufficient federal and state funds. Non-availability of funds at any time will cause any agreement to become void and unenforceable and no liquidated damages will accrue to the Department as a result. The Department will not incur liability beyond the accrued payments as of the official date of non-availability of funds.

C.    ENTITIES ELIGIBLE TO SUBMIT A PROPOSAL: Vendors may include governmental agencies, faith-based organizations, non-governmental public or private organizations or individuals who: 1) are legally authorized to conduct business within the State of Alabama; 2) possess the skills needed to perform the services described herein and in the attachment(s) that may accompany this RFP; and, 3) meet the terms and conditions of the RFP.

D.    LETTER OF INTENT TO PROPOSE: A letter indicating a vendor's intent to respond to the RFP should be sent to the RFP Coordinator (Page 3 – Where to Respond) no later than Friday, March 18, 2005. Submission of a *Letter of Intent to Propose* by the specified deadline is not a prerequisite for submitting a proposal, but it is necessary to ensure a vendor's receipt of RFP amendments and other communication regarding the RFP. The letter must include the name of a contact person, full address and email address. The Department will notify vendors of receipt of the *Letter of Intent to Propose* via email.

E.    RFP PROPOSED TIMETABLE: For reference, a timeline for the process of issuing the RFP to the awarding of FY'06 contracts is noted in Attachment B. Note that the proposed timetable is for reference and does not bind the Department to exact dates and time(s).

F.    DUE DATE: Proposals must be received by the Department of Human Resources, Policy, Planning and Research, at the address shown in paragraph G below **no later than 12:00 Noon (Central Time) on Monday, April 11, 2005** in order to be considered. Each vendor is solely responsible for assuring that its proposal is received by the Department by the due date established in the RFP. **The Department shall not be responsible for late proposals, and late or incomplete proposals shall not be allowed after the deadline.**

G.   WHERE TO RESPOND: All Proposals must be <u>hand delivered</u> to:

> Alabama Department of Human Resources
> Starr Stewart -Policy, Planning and Research
> **THERAPEUTIC FOSTER CARE PROPOSAL**
> Gordon Persons Building, Suite 2104
> 50 Ripley Street
> Montgomery, Alabama 36130-4000

**Proposals may not be faxed, mailed or submitted electronically.**

H.   VENDORS CONFERENCE: A vendors conference is scheduled for Tuesday, **March 29, 2005** in the auditorium of the Gordon Persons Building (Plaza level) from 1:30 p.m. – 3:30 p.m. Central Time.

I.   QUESTIONS REGARDING RFP:

1.   Interested vendors may submit written questions (preferably via e-mail) regarding this RFP to, Starr Stewart - Policy, Planning and Research e-mail: **ssstewart@dhr.state.al.us.**

2.   Each question must cite the particular section of the RFP to which it relates.

3.   All questions must be received by **5:00 p.m. (Central Time) on Friday, March 18, 2005.**

4.   Answers to written questions will be posted on the DHR website by **Friday, March 25, 2005 after 5:00 p.m.**

5.   Any oral explanations or instructions given during the procurement process shall not bind the Department.

J.   COST: Vendors are solely responsible for paying all costs incurred as a result of responding to, and complying with this RFP.

## II.   RESERVATIONS

A.   PRE-SELECTION DISCRETION: The Department reserves the right, at its sole discretion, at any time and for any reason, to reject any or all of the proposals submitted in response to this RFP, or to cancel the RFP, if it is deemed by the Department to be in the its best interest to do so.

B.   POST-SELECTION DISCRETION: If a proposal is selected, the Department reserves the right, at its sole discretion, at any time and for any reason, to change its decision with respect to the selection and to select another proposal, or to cancel the RFP, if it is deemed by the Department to be in its best interest to do so.

C.   WAIVERS: Notwithstanding the amendment provisions otherwise set forth herein, the Department reserves the right, at its sole discretion, to waive any minor irregularity in an otherwise valid proposal which would not jeopardize the

3

overall program and to award a contract on the basis of such a waiver in the event the Department determines that such award is in the best interest of the Department. Minor irregularities are those which will not have a significant adverse effect on overall program cost or performance.

D.    NEGOTIATIONS: The Department reserves the right to negotiate with any vendor whose proposal is within the competitive range with respect to technical plan and cost.

E.    DISCLAIMER: Issuance of this RFP does not constitute a commitment by the Department to select any proposal submitted in response to the RFP, or to award a contract to any vendor who responds to the RFP.

F.    NO GUARANTEE OF CONTRACT: Selection of a proposal shall not be binding upon the Department and may or may not, at the Department's sole discretion, result in the Department entering into a contract with the vendor.

G.    ADOPTION OF IDEAS: The Department reserves the right to adopt to its use all, or any part, of a vendor's proposal and to use any idea or all ideas presented in a proposal.

H.    ORAL PRESENTATIONS: The Department reserves the right to require some or all of the vendors to provide oral presentations of their proposals.

I.    AMENDMENTS: The Department reserves the right to amend the RFP. Except as provided above with respect to "WAIVERS" made by the Department, all amendments to the RFP will be made by written addendum issued by the Department and will be mailed to all vendors to whom the RFP was originally mailed, or who have expressed an intent.

*All contracts awarded by this Department are subject to review and approval by the Legislative Oversight Committee and the Governor's Office.*

III.    SUBMISSION OF PROPOSALS

A.    SIGNATURES: The proposal cover page must contain the original ink signature of the person(s) legally authorized to bind the vendor to the proposal. The original proposal should be **stamped or otherwise annotated** so that the Department can easily identify which bears the original signature.

B,    NUMBER OF COPIES: The vendor must submit **one original proposal and five (5) copies** of the proposal.

C.    NATURE AND FORMAT OF PROPOSALS: To be considered, the proposal must be concise; describe the vendor's ability to meet the RFP requirements; comply with the time specifications of the RFP; and, provide a specific schedule of implementation that is consistent with the time constraints specified in the RFP. The proposal must also be responsive to the content and format specifications, in sequence, specified in the RFP. All material submitted in response to this RFP shall become the property of the Department.

4

1.  Vendors should use exclusively 8½ x 11 white paper, proposals should be single-spaced, typed using Times New Roman (font) and a minimum font size of 12. *Double space between paragraphs.* Vendors should avoid the use of elaborate bindings and promotional materials within the proposal.

2.  The proposal must include a completed **Proposal Cover Page** (Attachment E) with an original signature of the person(s) legally authorized to bind the vendor to the proposal. All items on this form must be completed. **(Do not number this page).**

3.  The Proposal Cover Page should be followed by the completed and signed **Request for Taxpayer Identification Number** (Attachment C) form enclosed with the RFP. All items on this form must be completed. **(Do not number this page).**

4.  The Request for Taxpayer Identification Number form should be followed by the **Program Narrative.** Number the pages of the Program Narrative, beginning the narrative with page 1. Page numbers should be aligned at the right corner in the bottom margin. The Program Narrative must follow the outline prescribed in the RFP.

5.  The Program Narrative should be followed by a **Compensation for Providing Services Plan** as outlined in Section V.

6.  The Compensation for Providing Services Plan should be followed by a completed copy of the **Disclosure Statement.** All items on this form must be completed.

7.  The Disclosure Statement should be followed by a copy of the **current child placing agency license (Alabama) or a copy of the application submitted to State DHR to complete licensing by Tuesday, June 07, 2005.**

D.  WORK PRODUCT: The proposal must be the work product of the vendor. If the proposal is determined not to be the work product of the vendor, the proposal may, at the Department's sole discretion, be rejected.

E.  PROPRIETARY INFORMATION: Proprietary information submitted to the Department in response to this RFP will be handled in accordance with the applicable procurement regulations and laws of the State of Alabama. The vendor must clearly designate any page(s) to which it has a proprietary claim in the proposal by indicating on each page in bold type at the top and bottom as "Confidential" and include a confidentiality statement on the Proposal Cover Page. There is no guarantee that pages marked "Confidential" will be kept confidential if disclosure of the information is required under Alabama Law.

Cost information shall not be confidential. Designating the entire proposal confidential or proprietary is not acceptable and may cause the Department to reject the proposal.

5

IV.    **PROGRAM NARRATIVE**

The Program Narrative must follow the specified format, which includes IV-A through IV-I, below. **(Not to exceed 50 pages)**

A.    ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE: Provide a brief summary about the applicant's organization, including the following:

1.    ORGANIZATION INFORMATION: Include the name of Organization, complete mailing address and street address or physical location of site, name, title and phone number of contact person.

2.    GOVERNING BOARD AND OTHER AGENTS: The names, titles and responsibilities of all of the applicant's governing board of directors, officers, and paid consultants, delineating each individual's role and relationship to the vendor.

3.    HISTORY:   A brief history of the formation and development of the applicant's organization, with the date of incorporation or, if unincorporated, the date the business began; other programs operated in the past and currently; and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

4.    MISSION STATEMENT: Provide a brief statement regarding the goals of the Organization or its' mission statement.

5.    MANAGEMENT STRUCTURE: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organizational chart. Ratios of staff to supervisors should be clearly indicated.

6.    FINANCIAL AUDIT: The date of the most recent financial audit and name of the audit firm.

7.    QUALIFICATIONS AND EXPERIENCE OF VENDOR: The vendor qualifications and experience for assuring the successful completion of the requirements of this RFP. It must include a description of past or current experience providing the proposed service and, as applicable, the rate of successful completion by previous program participants. A list of persons with addresses, telephone numbers and e-mail addresses who are familiar with the delivery of similar services by the vendor to the Department in the past or to other programs similar to that of the Department, if any. It must further describe any licenses and/or certifications held by the vendor.

B.    START UP PLAN: All vendors must provide a plan of action detailing the steps necessary to reach program operation including target dates. New programs will necessarily require a start up plan of greater scope but all proposals from providers with a current contract with the Department must include start up plans,

6

and must describe changes to the existing program structure as required to meet the terms of this RFP.

C.   REFERRAL, ADMISSION and EXCLUSION POLICY:

1.   Describe specific target population of children accepted into the program, to include, age, sex and type(s) of behavior.

2.   Describe specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

3.   Describe specific criteria for exclusion from the program.

D.   SERVICE DELIVERY: Describe the delivery of service proposed by the vendor to meet, or exceed, the Core Services outlined in Attachment A of this RFP and the provisions of the *Therapeutic Foster Care Manual*. The proposal should outline how the agency will serve the birth family or relatives while the child is in the therapeutic out-of-home placement to reduce the length of stay. It is expected that a child should be ready to step-down in the level of service that is needed to meet his/her needs by six (6) months, at which time he may continue his treatment goals in the context of family. Should a child need a longer length of stay, the proposal should clearly define what the provider will do to ensure that goals are expeditiously achieved in a designated timeframe thereafter.

E.   TARGET AREA: Identify the geographic scope for the service by naming the **specific region** and specific counties within each identified region for which the service is proposed. Contracts will be awarded based on the following criteria:

Region 1: (Pike, Barbour, Henry, Houston, Dale, Coffee, Covington, and Geneva Counties)   **62 slots**

Region 2: (Mobile, Baldwin, Escambia, Monroe, Washington, Clarke and Choctaw Counties)   **125 slots**

Region 3: (Autauga, Dallas, Lowndes, Montgomery, Wilcox, Crenshaw, Butler and Conecuh Counties)   **97 slots**

Region 4: (Coosa, Tallapoosa, Chambers, Elmore, Macon, Lee, Bullock and Russell Counties)   **87 slots**

Region 5: (Pickens, Tuscaloosa, Bibb, Perry, Hale, Greene, Sumter and Marengo Counties)   **88 slots**

Region 6: (Jefferson, Shelby, Chilton, Talladega, Clay, Randolph and Cleburne Counties)   **413 slots**

Region 7: (Marion, Lamar, Fayette, Walker, Winston, Cullman and Blount Counties)   **54 slots**

Region 8: (St. Clair, Calhoun, Etowah, Cherokee, DeKalb and Marshall Counties)   **150 slots**

7

**Region 9:** (Jackson, Madison, Morgan, Limestone, Lawrence, Lauderdale, Colbert and Franklin Counties) **134 slots**

Additionally, each county in a region must have at least two (2) therapeutic foster homes and more based upon the needs of the county. Madison, Walker, Etowah, Calhoun, Tuscaloosa, Jefferson, Lee, Montgomery, Dallas, Mobile, and Houston must have adequate resources to serve their children within their county boundaries.

F.    DISCHARGE POLICY:

1.    Describe the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements. The proposal should explain the means that a child's placement will be tracked to the extent possible at 6-month, 12-month, 18-month and 24-month intervals post-discharge. It should also clearly delineate what aftercare services will be provided post-discharge. Services that will be provided to family to expedite the discharge of the child from the out-of-home placement should be clear and detailed.

2.    State the program's policy on discharge prior to program completion, including emergency discharges.

3.    State the program's policy concerning re-admission of children.

4.    Provide an example of the program's process for moving children through the goals and objectives outlined in an ISP, to include provisions of "step down" to a less restrictive placement. The proposal must indicate how the agency will implement the step-down policy as outlined in the *Therapeutic Foster Care Manual*.

G.    PRIOR EXPERIENCE: Describe the Organization's prior history of providing the core service(s) and Family Services requirements outlined in Attachment A.

H.    STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS and TRAINING REQUIREMENTS:

1.    Describe staffing patterns, including administrative and programmatic, and provide a brief rationale for the levels of staffing proposed.

2.    Provide information regarding the qualifications, including education and licensure and experience required for Administrative, Program and Treatment staff. Include job descriptions for proposed positions.

3.    Describe in detail the steps that the program owners and/or administrators take to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into question the propriety of that employee's working with this population of children. Provide documentation that each employee has had a criminal

8

background check. If an incident or allegation is reported, founded or unfounded, describe your organization's general procedure in this regard.

4.  Describe in detail the level of education, experience and training possessed by management level staff in the provision of services identified in this RFP. Specify the organization's staff development program regarding orientation and on going training for all staff.

5.  Describe how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Provide a specific plan addressing emergencies and critical incident response.

6.  Describe the use of volunteers and interns within the organization and how they are selected and screened for background checks.

7.  Describe in detail the plans to meet the training requirements established in the Department's rules and training related to operating this selected program.

I.  REFERENCES: List all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. This list should include the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring. DHR will be responsible for contacting these agencies for reference information.

V.  COMPENSATION FOR PROVIDING SERVICE

A.  As a part of the vendors response to the RFP, it is a requirement that you submit the total amount of compensation that the agency requires to provide this placement with the program requirements and core services outlined in Attachment A. The compensation should be listed as a daily rate per child and the number of beds offered at this rate.

B.  It is expected that all vendors, who are awarded contracts, as a result of this RFP, possess a thorough knowledge of Chapter 105 of the Medicaid Provider Manual. The vendor must certify that they have the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'06.

C.  Accordingly, the vendor should identify the portion of the daily rate submitted in Section V-A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section V-A above. The Department specifically reserves the right to determine the percentage of the total compensation that a vendor will be required to recover from "Net Medicaid Reimbursement" for Medicaid eligible children.

9

1.  "Net Medicaid Reimbursement" is determined by applying the Federal Medical Assistance Percentage (FMAP) to the total Federal Medicaid reimbursements received by the Department, as a result of Vendor billing, less a two percent (2%) administrative fee.

## VI.  SELECTION

A.  GENERAL:  The Department will review proposals received from eligible vendors in response to this RFP and, if a selection is made, will make its selection in accordance with the general criteria defined below.  Failure of the vendor to provide information required in the RFP may result in the disqualification of the proposal.

B.  REJECTION OF A PROPOSAL AS NON-RESPONSIVE: A proposal must meet the basic requirements for delivery of services in order to be considered in the selection process.  A proposal may be found non-responsive at any time during the selection process.  Once a proposal is determined to be non-responsive, no further consideration is given in the selection process to that proposal.  A proposal that is not presented in the required format, does not contain all the requested information, contains clearly erroneous information, or is deficient in any respect may be rejected as non-responsive and may receive no further consideration.

C.  **MANDATORY REQUIREMENTS: Failure of the vendor to meet the following mandatory requirements will result in the disqualification of the proposal.**

1.  Vendor must meet the deadline for receipt of proposal.

2.  Vendor must include a completed Taxpayer Identification Number form.

3.  Vendor must include a completed Disclosure Statement form.

4.  Vendor must possess a current Child Placing Agency license (Alabama) or submit an application with State DHR to complete licensing by June 07, 2005.

5.  Vendor must provide an original proposal, with original signature of person(s) legally authorized to bind the applicant to the proposal, plus the required number of copies per RFP document.

D.  BASIS OF SELECTION:  A scoring process, using detailed criteria, will be used to measure the degree to which each proposal meets the following general evaluation criteria, with a maximum of 1000 points possible:

1.  Organization Information and Management Structure as described in Section IV–A. (Maximum of 25 points)

2.  Start up Plan as described in Section IV-B.  (Maximum of 50 points)

3.  Referral, Admission and Exclusion Policy as described in Section IV-C. (Maximum of 75 points)

10

4.  Service Delivery as described in Section IV-D. (Maximum of 250 points).

5.  Target Area as described in Section IV-E. (Maximum of 50 points)

6.  Discharge Policy as described in Section IV-F. (Maximum of 75 points)

7.  Prior Experience as described in Section IV-G. (Maximum of 75 points)

8.  Staff Qualifications, Staff Recruitment, Job Descriptions and Training Requirements as described in Section IV-H. (Maximum of 150 points)

9.  References as described in Section IV-I. (Maximum of 50 points)

10.  Compensation for providing services as described in Section V. (Maximum of 200 points)

11.  The Department may determine other criteria, in addition to, or in lieu of, the criteria described above, as the Department deems necessary and appropriate.

E.  HOLD BACK: As a guarantee for the delivery of services required by this RFP, and the acceptance by the Department of those services in accordance with the specifications set forth in the RFP, in the event the contractor fails to deliver or perform the said services to the Department's satisfaction, the Department reserves the right to withhold part or all of any funds committed by the Department under any contract that may result from a proposal submitted in response to this RFP and to cancel the said contract without any resulting liability, present and future, to the Department or to the State of Alabama.

## VII.  VENDOR CERTIFICATIONS

A.  By submitting a proposal in response to this RFP, the vendor warrants and represents to the Department that the vendor accepts and agrees with all of the terms and conditions of the RFP. Further, by so submitting the vendor certifies to the Department that the applicant is legally authorized to conduct business within the State of Alabama and to carry out the services described in this RFP, and that all of the following statements are true and correct.

B.  REVOLVING DOOR POLICY: Neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants or employees is a current employee of the Department, and none of the said individuals have been employees of the Department in violation of the revolving door prohibitions contained in the state of Alabama ethics laws.

C.  DEBARMENT: Neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants or employees (whether paid or voluntary) is debarred or suspended or otherwise excluded from or ineligible for participation in federal assistance programs under Executive Order 12549, "Debarment and Suspension."

11

D. **STANDARD CONTRACT:** The vendor will agree to the use of the Department's standard contract document. The vendor will further comply with all the terms and conditions of that document, including, but not limited to, compliance with the Title VI of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, as amended, the Americans with Disabilities Act, Alabama Act No. 2000-775 (governing individuals in direct service positions who have unsupervised access to children), the Health Insurance Portability and Accountability Act of 1996 (HIPPA) as applicable, and all other federal and state laws, rules and regulations applicable to receiving funds from the Department to carry out the services described in this RFP. Further, any contract executed pursuant to the RFP shall be subject to review by the Department's legal counsel as to its legality of form and compliance with State contract laws, terms and conditions, and may further be subject to review by the Alabama Legislative Contract Review Committee, Examiners of Public Accounts, the State Finance Director and the Office of the Governor.

E. **CHARITABLE CHOICE** (applies to faith-based organizations only): The vendor will not use funds received from the Department for sectarian instruction, worship, proselytizing or for any other purely religious activities that are not directed toward the secular social goals related to the services described in this RFP. The vendor will also serve all eligible members of the public without regard to their religious beliefs and, further, will not require clients' active participation in any religious practice. (In carrying out the said services, the vendor will remain independent from federal, state and local governments; will retain control over the expression of its religious beliefs, and is NOT required to remove its religious writings or symbols or to alter its internal governance as a condition of doing business with the Department.)

F. **FINANCIAL ACCOUNTING:** The vendor's accounting system is consistent with General Accepted Governmental Accounting Principles (GAAP). Further, the vendor maintains sufficient financial accounting records to allow the vendor to account for and document the source and application of all funds from all sources, including, as applicable, required matching funds.

G. **FINANCIAL AUDIT:** The vendor will, upon the Department's request, provide the Department a copy of its most recent financial audit report. (The report should not be submitted with the proposal.)

H. **PROPOSAL LIFE:** The proposal submitted to the Department in response to this RFP will be binding on the applicant for ninety (90) calendar days following the due date prescribed in the RFP.

12

## ATTACHMENT A

**DEFINITION:**   Therapeutic foster care (TFC) is a least-restrictive, community-based program for children whose special needs can be met through services delivered primarily by trained therapeutic foster parents working in partnership with the child, the child's family and the other members of the Individualized Service Planning Team. TFC is not meant to be a long-term placement option but should be an intervention, which serves to meet a child's specific treatment needs until he/she is able to step-down to a lower level of placement *as determined by the family's ISP.*

Children served in a TFC foster home must have a DSM-IV diagnosis on Axis I that would require the treatment and structure offered through a TFC placement. The diagnosis must have an accompanied behavior, which requires an out-of-home therapeutic foster home setting as determined by a standardized assessment tool implemented by State DHR. Only children who are in the custody of DHR may be served by this contract.

Families, whose children are placed in TFC, should be offered services, which are remedial in nature, to enable children to return home or to the home of relatives safely, where continued therapy will be provided to the family as a unit.

## CORE SERVICES FOR STANDARD TFC CATEGORY OF CARE

### Services to Foster Children from the TFC Agency

- *Matching process for children and their families identifying needs of the child/family and strengths of prospective TFC parents for initial placements and moves within a TFC program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care services.
- *Pre-placement visits. As placements in TFC homes should not be a crisis placement, pre-placement visits should occur to make sound decisions for appropriate matching. Pre-placements visits must be documented as such in the child's and foster parent records at the TFC agency.
- *Schedule and coordinate the child's treatment plan; initial treatment plan within 10 days, comprehensive treatment plan within 30 days and reviews every 90 days. All treatment plans developed by the agency should be coordinated with the DHR county social worker and based upon the goals established in the child's Individualized Service Plan (ISP). The TFC agency is required to obtain a copy of the Comprehensive Family Assessment/Intake Evaluation form and an ISP from the referring county DHR office. **(DHR staff is required to complete Intake Evaluations on all children in TFC placements. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days.)**
- *Individual, weekly visit with the TFC child. **(This contact does not negate the requirement for DHR staff to make face-to-face contact minimally once per month with children in TFC placements.)**
- Monthly face-to-face or telephone contact with school (minimum) to monitor the child's progress.
- Monthly face-to-face or telephone contact with child and/or family therapist (minimum) to monitor progress in counseling.
- *Assist in referral to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.

13

- Assist the child with the development or maintenance of skills by the provision of no more than 18 hours weekly of individual basic living skills training and no more than 5 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas must be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.
- Coordinate the child's involvement in at least one extracurricular activity, e.g., band, karate, various sports, Boy or Girl Scouts, etc. per the family's ISP. **(This does not include paying for the activity or materials required in the performance of the activity. DHR shall be responsible for payment of the activity from flex or other available local funds.)**
- *Attend ISPs and IEP's along with the child and therapeutic foster parents.
- Assist in the development of independent living skills, as identified in the ISP. **(DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.)**
- Provide monthly group therapy (counseling) sessions for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.
- Provide five hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.
- *Discharge planning shall be a part of the agreement/ISP when a child first enters care with the TFC program.
- Maintain a no-reject/no-eject policy for children who meet program criteria.
- Provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.
- Regularly administer outcome measures, at a minimum of every 90 days.
- Monthly report to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.
- Maintain regular communication with DHR, counselors, teachers and other persons relevant to the child that is being served by the program.
- Quality assurance component, which includes outcomes, measures for all children in the TFC program
- Ensure program compliance with Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes, and the Therapeutic Foster Care Manual.
- *Assistance in creating a behavior management plan for the child with the other members of the ISP team. All TFC agencies shall maintain staff that have expertise in the development of such plans. **(DHR shall assume the responsibility that behavioral management plans have been completed on all children that require them.)**
- *Participation in the ISP team in determining goals for children and their families, including allowances, need for clothing, observance of special occasions, etc. **(DHR shall be fiscally responsible for clothing allowance above the board payment, allowances, gifts for special occasions, etc. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days)**

## Services to Birth Families or Relatives of Children in TFC Placements:

- *Be an active participant in the assessment of parental functioning to assist the ISP team in determining treatment goals for a safe placement of the child back with the family, when return to parents is the goal, or with relatives, when relative placement is the goal.

14

- *Assist with the implementation of the goals of the family as identified in the ISP to expedite the child's safe return home. This will include making referrals to appropriate resources, when the agency is not able provide the service in-house.
- *Provide 2 hours per week of therapeutic visitation coaching with families and their children who are in TFC placements to assess the parents' ability to safely care for their children and to determine the progress (or lack thereof) in attaining the goals for re-unification or relative placement.
- *Provide family support to birth family as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's illness and how to help the child be maintained in the community by providing education about the child's illness, expected symptoms, medication management, parenting support, educational advocacy and/or to encourage school success, as identified in the family's ISP.

### Services to TFC Families From the TFC Agency:

- Daily difficulty of care payment as identified in the contract between the agency and the foster parent. A minimum daily rate of $16.00 per day is required. There is no requirement regarding the maximum a foster parent may be paid as a daily rate for care. All contracts between foster parents and the TFC agency are considered subcontracting arrangements and, therefore, require prior approval from State DHR. The standard document, not each individual document, is subject to this approval.
- Forty hours pre-service training, including GPS, to TFC families prior to licensure.
- Twenty-four hours of annual training to each TFC parent.
- Monthly support group/meeting for therapeutic foster parents.
- Ensure homes comply with Minimum Standards for Foster Family Homes.
- Conduct annual license renewal and semi-annual visits.
- Weekly face-to-face contact/support to foster families to strengthen their ability to provide a safe nurturing environment for the child.
- On-call crisis intervention.
- Forty-eight hours respite per month. For respite periods longer than 48 hours, the agency and foster parents shall have in their contractual agreement how respite will be paid. The county department will not be billed for respite.
- *Reimbursement for mileage to the TFC child's appointments, visits, etc. if the destination is outside a fifty (50) mile radius from the foster home. **(For special circumstances, which are clearly delineated in the ISP on rare occasions, county departments may authorize mileage to be paid through the county department.)**
- Assistance with transportation of child, when needed.
- Assistance with and ensuring that required Medicaid documentation of provided billable services is being properly maintained and in compliance with all policy and billing guidelines per the Medicaid Provider Manual, Medicaid Rehabilitative Services, Chapter 105.
- Have staff available to TFC families and children 7 days per week, 24 hours per day.

**\*All bulleted points (\*) require intense collaboration with DHR.**

**DHR will be responsible for many services that have traditionally been provided by TFC providers. These are highlighted in BOLD within the bulleted section above. Should the ISP team agree that these services are needed, and the TFC agency agrees to provide them, they must be authorized by the ISP document and an 1878 completed to authorize**

15

payment. All services, whether core or ancillary, must be authorized by the ISP document with outcomes identified to a specific area of need.

## CORE SERVICES FOR STEP-DOWN TFC CATEGORY OF CARE (contingent on 50% reduction in TFC provider's daily rate for Step-Down TFC category of care)

### Services to Foster Children from the TFC Agency

- *Matching process for children and their families identifying needs of the child/family and strengths of prospective TFC parents for initial placements and moves within a TFC program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care services.

- *Schedule and coordinate the child's treatment plan; initial treatment plan within 10 days, comprehensive treatment plan within 30 days and reviews every 90 days. All treatment plans developed by the agency should be coordinated with the DHR county social worker and based upon the goals established in the child's Individualized Service Plan (ISP). The TFC agency is required to obtain a copy of the Comprehensive Family Assessment/Intake Evaluation form and an ISP from the referring county DHR office. (DHR staff is required to complete Intake Evaluations on all children in TFC placements. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days.)

- *Individual, *bi-weekly* visit with the TFC child. (This contact does not negate the requirement for DHR staff to make face-to-face contact minimally once per month with children in TFC placements.)

- Quarterly face-to-face or telephone contact with school (minimum) to monitor the child's progress.

- Quarterly face-to-face or telephone contact with child and/or family therapist (minimum) to monitor progress in counseling.

- *Assist in referral to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.

- Assist the child with the development or maintenance of skills by the provision of no more than 9 hours weekly of individual basic living skills training and no more than 3 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas must be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.

- Coordinate the child's involvement in at least one extracurricular activity, e.g., band, karate, various sports, Boy or Girl Scouts, etc. per the family's ISP. (This does not include paying for the activity or materials required in the performance of the activity. DHR shall be responsible for payment of the activity from flex or other available local funds.)

- Attend ISPs and IEP's along with the child and therapeutic foster parents.

- *Provide family support with birth family/supervise family visitation as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's illness and how to help the child be maintained in the community by providing education about the child's illness, expected symptoms, medication management, parenting support, therapeutic visitation support, educational advocacy and/or to encourage school success, as identified in the family's ISP. It is expected that if the child's permanent plan is to return home, more time may be spent in family support when a child has reached a step-down level. (DHR has the responsibility to

16

recruit traditional foster homes for children for who return to home or placement with relatives is not an option. It is not expected that all children in TFC shall step-down within the TFC program.)

- Assist in the development of independent living skills, as identified in the ISP. (DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.)
- Provide group therapy (counseling) sessions, only as needed, for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.
- Provide 3 hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.
- *Discharge planning.
- Maintain a no-reject/no-eject policy for children who meet program criteria.
- Provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.
- Regularly administer outcome measures, at a minimum of every 90 days.
- Monthly report to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.
- Maintain regular communication with DHR, counselors, teachers and other persons relevant to the child that is being served by the program.
- Quality assurance component, which includes outcomes, measures for all children in the TFC program
- Ensure program compliance with Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes, and the Therapeutic Foster Care Manual.
- *Assistance in creating a behavior management plan for the child with the other members of the ISP team. All TFC agencies shall maintain staff that have expertise in the development of such plans. (DHR shall assume the responsibility that behavioral management plans have been completed on all children that require them.)
- *Participation in the ISP team in determining goals for children and their families, including allowances, need for clothing, observance of special occasions, etc. (DHR shall be fiscally responsible for clothing, allowances, gifts for special occasions, etc. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days)

## Services to TFC Families From the TFC Agency:

- Daily difficulty of care payment as identified in the contract between the agency and the foster parent. A minimum daily rate of $8.00 per day is required. There is no requirement regarding the maximum a foster parent may be paid as a daily rate for care. All contracts between foster parents and the TFC agency are considered subcontracting arrangements and, therefore, require prior approval from State DHR. The standard document, not each individual document, is subject to this approval.
- Twenty-four hours of annual training to each TFC parent.
- Monthly support group/meeting for therapeutic foster parents.
- Ensure homes comply with Minimum Standards for Foster Family Homes.
- Conduct annual license renewal and semi-annual visits.
- Bi-weekly face-to-face contact/support to foster families to strengthen their ability to provide a safe nurturing environment for the child.
- On-call crisis intervention.

17

- Twenty-four (24) hours respite per month. For respite periods longer than 48 hours, the agency and foster parents shall have in their contractual agreement how respite will be paid. The county department will not be billed for respite.
- *Reimbursement for mileage to the TFC child's appointments, visits, etc. if the destination is outside a fifty (50) mile radius from the foster home. **(For special circumstances, which are clearly delineated in the ISP on rare occasions, county departments may authorize mileage to be paid through the county department.)**
- Assistance with transportation of child, when needed.
- Assistance with and ensuring that required Medicaid documentation of provided billable services is being properly maintained and in compliance with all policy and billing guidelines per the <u>Medicaid Provider Manual</u>, Medicaid Rehabilitative Services, Chapter 105.
- Have staff available to TFC families and children 7 days per week, 24 hours per day.

**\*All bulleted points (\*) require intense collaboration with DHR.**

**DHR will be responsible for many services that have traditionally been provided by TFC providers. These are highlighted in BOLD within the bulleted section above. Should the ISP team agree that these services are needed, and the TFC agency agrees to provide them, they must be authorized by the ISP document and an 1878 completed to authorize payment. All services, whether core or ancillary, must be authorized by the ISP document with outcomes identified to a specific area of need.**

18

**ATTACHMENT B**

## REQUEST FOR PROPOSALS re: THERAPEUTIC FOSTER CARE FOR CHILDREN

The projected timetable is shown below; **all times are shown as Central time.** The Department reserves the right to amend the RFP timetable in the State's best interest. If the Department finds it necessary to change any of these activities/dates/times, all changes will be posted to the web at www.dhr.state.al.us. **Potential Vendors should refer to the web site often for changes to the RFP.**

Proposed Time Table:

| Activity | Date & Time | Location and/or Contact Staff |
|---|---|---|
| RFP Issued by DHR | February 28, 2005 5:00pm | Department of Human Resources Gordon Persons Bldg. – 2nd Floor 50 Ripley St. Montgomery, Al 36130-4000 Internet: https://www.dhr.state.al.us |
| Deadline for Receipt of Written Letter of Intent to Propose | March 18, 2005 | Department of Human Resources Starr Stewart - Policy, Planning and Research Gordon Persons Bldg. – Suite 2104 50 Ripley St. Montgomery, Al 36130-4000 |
| Deadline for Receipt of Written Inquires from Proposers | March 18, 2005 5:00 p.m. | DHR - Attn: Starr Stewart Policy, Planning and Research Internet: ssstewart@dhr.state.al.us |
| Deadline for DHR to Respond To Written Inquires | March 25, 2005 | Inquires will be posted on the DHR website. |
| Vendors Conference | March 29, 2005, 1:30pm – 3:30 p.m. | Department of Human Resources (Gordon Persons Building, Plaza Level – Auditorium ) |
| Deadline for Receipt of Proposals from Vendors | April 11, 2005 12:00 Noon | Starr Stewart - Policy, Planning and Research DHR – Gordon Persons Bldg. – Office # 2104 |
| Evaluation and Selection of Technical Proposals | April 18-22, 2005 | Starr Stewart (Scoring and Selection Teams will be established |
| Posting of Notice of Intent To Award a Contract(s) | May 05, 2005 5:00 p.m. | Starr Stewart - Policy, Planning and Research |
| Meeting with selected vendors | May 26, 2005 | Gary Mitchell, Program Manager Susan Ward, Director |
| All providers must have a current license or completed a Child Placing Agency license application | June 07, 2005 | Gloria Derico, Licensing |
| Finalize all Contract Documents & Budgets (Note: 3 yr. Contracts w/Annual Budgets) | August 05, 2005 | Susan Ward, Director Office of Contracts & Federal Claiming |
| Contract Start Date | October 1, 2005 | |

19

## ATTACHMENT C

### STATE OF ALABAMA
### REQUEST FOR TAXPAYER IDENTIFICATION NUMBER
### STATE COMPTROLLER'S OFFICE

**INSTRUCTIONS.**   In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files. To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.  In PART 1 below provide your Tax Identification Number and check FEIN or SSN. Also provide the name and address to which payments should be sent. In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.  Circle the business designation that identifies your type of trade or business in PART 2.

3.  Sign and return this form as part of the response to the RFP:

**PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.**

IDENTIFICATION NUMBER
Check one_____     Federal Employer Identification Number (FEIN)
                             Social Security Number (SSN)

NAME OF ORGANIZATION: _____     PHONE : _____

LEGAL BUSINESS ADDRESS: _____

FAX: _____     EMAIL: _____

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: _____

**PART 2 – BUSINESS DESIGNATION.** Circle the designation that identifies your type of trade or business.

1 -  CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2 -  NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 -  PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 -  SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 -  NONCORPORATE RENTAL AGENT
6 -  GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 -  FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
     (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:  Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____          _____          _____
SIGNATURE                        DATE                    TELEPHONE NUMBER
                                                         (If different from above)

_____
TITLE

## PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES

20

## ATTACHMENT D

## VENDOR DISCLOSURE STATEMENT

A completed copy of the Vendor Disclosure Statement is a **mandatory requirement** to this RFP.

A copy of the Vendor Disclosure Statement is included in all RFP documents that are mailed to vendors.

Note: If the potential vendor has downloaded the RFP document from the Department website, a copy of the Vendor Disclosure Statement can be downloaded from Alabama State Purchasing. The website address for State Purchasing is: www.purchasing.state.al.us.

21

ATTACHMENT E        Alabama Department of Human Resources
## Therapeutic Foster Care Proposal Cover Page

**Organization Information:**

Name of Organization:_____

Address:_____

City:_____ State:_____ Zip:_____

Telephone:(___)_____ Fax: (___)_____

e-mail address:_____

Federal Employer Identification Number (FEIN):_____

Name/title of Authorizing Official:_____

Signature of Authorizing Official:_____Date:_____

**Contact Person Information:**

Name/title of program contact person:_____

Address:_____

City:_____ State:_____ Zip:_____

Email Address:_____

Telephone:(___)_____ Fax:(___)_____

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties_____No. of Slot(s)_____

Region 2: Counties_____No. of Slot(s)_____

Region 3: Counties_____No. of Slot(s)_____

Region 4: Counties_____No. of Slot(s)_____

Region 5: Counties_____No. of Slot(s)_____

Region 6: Counties_____No. of Slot(s)_____

Region 7: Counties_____No. of Slot(s)_____

Region 8: Counties_____No. of Slot(s)_____

Region 9: Counties_____No. of Slot(s)_____

## PROPRIETARY STATEMENT

Indicate any page(s) to which vendor has a proprietary claim: _____

_____

_____

_____

1

ATTACHMENT E

**Alabama Department of Human Resources**
## Therapeutic Foster Care Proposal Cover Page

DEFENDANT'S EXHIBIT
5

**Organization Information:**

Name of Organization: Camellia Therapeutic Foster & Adoption Agency, LLC.

Address: 2310 Crawford Road #104   P.O. Box 788

City: Phenix City                    State: AL          Zip: 36868

Telephone:(334-448-2999              Fax:(334-448-1666

email address: ctfa8@cs.com

Federal Employer Identification Number (FEIN): 020574633

Name/title of Authorizing Official: Dr. Joseph Appiah Chairman & CEO

Signature of Authorizing Official: _Joseph Appiah_          Date: 04-04-05

**Contact Person Information:**

Name/title of program contact person: Karen Jurls/Executive Director

Address: 2310 Crawford Rd. #104 P.O. Box 788

City: Phenix City                    State: AL.         Zip: 36868

Email Address: ctfa8@cs.com

Telephone:(334-448-2999              Fax:(334-448-1666

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties _____ No. of Slot(s) _____

Region 2: Counties Mobile _____ No. of Slot(s) 48

Region 3: Counties Montgomery/Dallas _____ No. of Slot(s) 50

Region 4: Counties Russell _____ No. of Slot(s) 16

Region 5: Counties _____ No. of Slot(s) _____

Region 6: Counties Jefferson _____ No. of Slot(s) 100

Region 7: Counties _____ No. of Slot(s) _____

Region 8: Counties _____ No. of Slot(s) _____

Region 9: Counties Madison _____ No. of Slot(s) 100

## PROPRIETARY STATEMENT

Indicate any page(s) to which vendor has a proprietary claim: N/A

_____

_____

_____

## ATTACHMENT C

**STATE OF ALABAMA**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER**
**STATE COMPTROLLER'S OFFICE**

INSTRUCTIONS.    In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files.  To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.  In PART 1 below provide your Tax Identification Number and check FEIN or SSN.  Also provide the name and address to which payments should be sent.  In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.  Circle the business designation that identifies your type of trade or business in PART 2.
3.  Sign and return this form as part of the response to the RFP.

PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER  02-574633

Check one     __X__     Federal Employer Identification Number (FEIN)
                        Social Security Number (SSN)

NAME OF ORGANIZATION: Camellia Therapeutic Foster Ag.  PHONE: (334)448-2999

LEGAL BUSINESS ADDRESS: 2310 Crawford Rd. #104 Phenix City, AL. 36868

FAX:  334-448-1666    EMAIL: ctfa8@cs.com

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: Dr. Joseph Appiah Chairman/CEO

PART 2 – BUSINESS DESIGNATION.  Circle the designation that identifies your type of trade or business.

1.  CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2.  NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3.  PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4.  SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5.  NONCORPORATE RENTAL AGENT
6.  GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7.  FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
    (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:    Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____   04-05-05    (334 )448-2999
        SIGNATURE            DATE          TELEPHONE NUMBER
Chairman/CEO                              (If different from above)
_____
        TITLE

**PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES**

20

# IV. PROGRAM NARRATIVE

**A.   ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE:**
Provide a brief summary about the applicant's organization:

Camellia Therapeutic Foster Agency, LLC. was founded by Dr. Joseph Appiah. Camellia Therapeutic Foster Agency is a licensed child placing and adoption agency for the state of Alabama. The name Camellia came from Alabama's state flower. Our children are our flowers and they need attention, nourishment, and water, from us to stay healthy. Camellia Therapeutic Foster Agency, LLC. was founded on January 10, 2000 and was incorporated as a limited liability company on January 15, 2002, the start date of Camellia TFA. Its founder had a vision to make a difference in the lives of Alabama's children by starting a new child placement agency with the intent to support foster parents, biological parents, and social workers, in their mission to provide services to youth in need of a therapeutic foster home placement.

Camellia Therapeutic Foster & Adoption Agency LLC. was born out of a desire to provide therapeutic services with kindness, compassion and understanding of true foster children's behavior, and respect to both foster parent and biological families.  In 1998 when I completed the GPS training and became a therapeutic foster parent/surrogate parent for the school board, I found out that most foster parents are not made part of the treatment team. Most of them felt that the should be made apart of the ISP and the behavior modification and day to day treatment of the child. Most of the time, some of the foster parent complained that the agencies never say thank you for the services they provide for our therapeutic foster children. Based on that in mind, as a foster parent, I decided to be more understanding, and become a shining example of how the program should be operated.

Camellia Therapeutic Foster Agency, LLC. provides services that offer the least restrictive home environment for children whose special needs can be met by trained therapeutic foster parents, and by a treatment team who are focused on the child's individual needs. Camellia Therapeutic Foster Agency currently has six offices throughout the state of Alabama. Camellia Therapeutic Foster Agency is operated by a board of directors with Dr. Joseph Appiah as the Chief Executive   Officer and Chairman of the Board.

Including the following:

**1.   ORGANIZATION INFORMATION:** Include the name of Organization, complete mailing address and street address or physical location of site, name, title and phone number of contact person.

1

1. **NAME OF ORGANIZATION:** Camellia Therapeutic Foster and Adoption Agency

Physical Address:        2310 Crawford Road #104
                         Phenix City, AL. 36868

Mailing Address:         P.O. Box 788
                         Phenix City, AL. 36868

Contact Person:          Dr. Joseph Appiah
                         **Chairman  of the Board & C.E.O.**
                         (334) 448-2999
                         Karen Jurls, LCSW, PIP
                         **Executive Director**
                         (334) 448-2999

2. **GOVERNING BOARD AND OTHER AGENTS:** The names, titles, and responsibilities of all of the applicant's governing board of directors, officers, and paid consultants, delineating each individual's role and relationship to the vendor

**Name:** Dr. Joseph Appiah
**Title:**  Chairman of the Board
**Responsibilities:**      Dr. Joseph Appiah is responsible for overseeing the board of directors. He acts as the chief executive officer of the agency.
**Role and Relationship to Vendor:**  This member has no relationship to the vendor.

**Name:** Dr. Darell Ellis
**Title:**  Vice President
**Responsibilities:**      Dr. Daryl Ellis is a member of the Board and responsible for the decision making of the agency and is the Community Affairs Director. (Please see the attached responsibilities for Camellia's Board of Directors)
**Role and Relationship to Vendor:** This member has no relationship to the vendor.

**Name:** Dr. Agyeman Osei Yeboah
**Title:**  2nd Vice President/Economic & Personnel Director
**Responsibilities:**      Dr. Yeboah is a member of the board and is responsible for the decision making of the agency relating to personnel matters. (Please see the attached responsibilities for Camellia's Board of Directors)
**Role and Relationship to Vendor:**  This member has no relationship to the vendor.

2

### Governing Board and other Agents (Continued).

**Name:** Justina Okeke LGSW, M.Ed. LPN/Social Worker
**Title:** Board Member
**Responsibilities:**    Mrs. Justina Okeke is a member of the board and is responsible for making sure the social workers/staff have benefits from the agency. She also is the foster home licensure specialist. (Please see the attached responsibilities for Camellia's Board of Directors).

**Role and Relationship to Vendor:**  This member has no relationship to the vendor.

The members of Camellia's Board of Directors are appointed by Camellia's CEO and work independently from other staff members.

**\*Camellia Therapeutic Foster Agency's Board of Directors are responsible for:**
- Articulating the purpose, goal, and functions of the agency.
- Establishing written by-laws governing the  organization, duties and operation of the board.
- Establishing written operating policies concerning organizational structure, personnel practices, and policies of serving children and their families.
- Providing a plan for regular review and updating of goals, policies, purposes and procedures of Camellia
- Acquainting its members with specific requirements of minimum standards, and familiarize itself with and promote progressive philosophies of child care, and seek constantly to provide a professionally sound program for children.
- Employing a qualified executive director and delegate to him/her the responsibility  for administration of Camellia
- Being responsible for providing operating and capital funds. Financial policies and practices shall be in accordance with sound budgeting disbursement, and audit procedures.
- Providing evidence that sufficient funds are available to equal twenty-five percent of the projected operating budget for the first full year of operation and annually thereafter.
- When there is a fee for adoption, the board shall establish a fee policy and publish it in the agency's operating policy. Such information shall be provided to
- Individuals and families who are considered using the agency's services.
- Assure that voluntary contributions are not accepted nor solicited from adoptive parents during the placement process and prior to the final order of adoption.
- Approving the annual budget, and revisions, if any to the annual budget, in advance of the applicable fiscal period.
- Providing for proper bonding of board officers and agency employees who handle operating of capital funds
- Providing an opinion audit on an annual basis by a certified public accountant who is not a member of the staff or a board member.
- Providing a copy of the audit to the Department which the chief officer of the board certifies has been presented to the board as a whole.

3

3.    **HISTORY:** A **brief history** of the formation and development of the applicant's organization, with the date of incorporation or, if unincorporated, the date the business began; other programs operated in the past and currently; and prior names of the organization, if any. A **description of all services provided** by the vendor, including the **location of service sites.**

**Brief History of formation and development:**

Camellia Therapeutic Foster Agency, LLC. has been **a licensed child placing** and adoption agency for the state of Alabama for three years.

Camellia Therapeutic was founded in the year 2000 by Dr. Joseph Appiah and was incorporated on January 15, 2002. Camellia Therapeutic Foster Agency's main goal is to contribute to the community by being a placement resource for therapeutic foster children that were in need of a safe and nurturing home environment. Camellia provides services to the Alabama Department of Human Resources for therapeutic foster child placements and Adoptions. During its time of operation, Camellia has successfully provided therapeutic placement services to the Department of Human Resources for the state of Alabama. Camellia currently has therapeutic foster homes in five of the state's nine regions. Camellia has plans to expand its services throughout the state. Camellia has retained its name from the date of its incorporation. We have previously and are presently providing all services outlined in the core services for therapeutic foster care programs for the State of Alabama.

**Description of all Services Provided by the Vendor (including the location of service sites)**

Camellia Therapeutic Foster Agency's LLC. provides **therapeutic foster placement services,** an intense system of clinical and support services for youth with moderate to severe emotional or behavioral disorders. Camellia services include foster home placement, case management, and the coordination of the child's educational and medical planning. The Camellia foster parents receive extensive training and supervision to assist them in successfully addressing the needs of the child in their home. The family systems approach is integrated in the treatment planning of the child. Please note that during the step-down the child will not be moved from the home. Services will reduced with less financial benefit if the agency deems necessary to cut the daily rate.

The child/family partnership is strengthened in the delivery of our services for the child. Camellia's foster parents and staff are trained on the importance of **the Multi Ethnic Placement Act** in the delivery of services. **Regular foster homes(Code 03)** are also available for children who have stepped down from the therapeutic program. This program utilizes entry-level foster parents to provide short-term and transitional services in their home.

4

**History (Continued).**

The children placed in this program often require basic care and the foster parents will need minimal support during this period. Camellia conducts adoptions for both the state and private families. Camellia recruits, trains, licenses, and supervises foster homes or adoption family homes. **Group Preparation and Selection (GPS) training and licensure** is provided to families with no expense to them.

Camellia Therapeutic Foster Agency provides **matching** for the child referred to the agency for placement, which entails looking at the child's strength and needs and the family's strength in order to find the most suitable placement for the child/family.

The Camellia Therapeutic Foster child and foster family are allowed to have a **pre-placement visit** which allows them the opportunity to become acquainted before a decision is made on the placement. The desires of the child, family and the county DHR worker are taken into consideration during this period. Placement is only considered after careful consideration of how well the prospective foster parent can meet the child's needs. Once placement is agreed upon a placement meeting is scheduled with DHR, the child and the family.

Within the first ten days of the child's placement the **intake evaluation** and the **initial treatment plan** is completed by the county's DHR, the **comprehensive treatment plan** is completed within 30 days of the initial treatment plan, and the **treatment plan reviews** occur at every ninety days following the comprehensive treatment plan by the Agency. Camellia coordinates with the DHR worker in developing the child's treatment plan. The child's ISP is thoroughly reviewed in the preparation of his/her treatment plan. Support from all team members allows each child to benefit from intensive treatment and clinical services provided by this team approach. Camellia provides **weekly face-to-face contact** with the child, each child is assigned a family consultant who meets with him/her to discuss any concerns or needs. The Camellia consultants will provide supportive coaching to the child, during these individual meetings. The consultant maintains regular **contact with child's school**; which is done in an effort to support the child's educational development. The consultant act's as an advocate for the child at school. Camellia's consultants attend all educational meetings for the child.

Camellia also provides **basic living skills training,** through the foster parents of the child, areas covered are money management, personal, healthy lifestyle, personal hygiene, laundry, meal preparation, shopping and behavior education that prepare the child for self sufficiency. Support from the consultant is provided to the foster parents on a weekly or as needed basis. Staff are available to the foster parents on a twenty four day hour basis. Foster parents and Camellia's staff are expected to **attend all ISP's, IEP's,** and any other important meeting regarding the TFC child. They act as the child's representative and offer support to assure that he/she is receiving the most appropriate services available.

5

**History (Continued).**

Camellia encourages the foster parent to enroll the child in at least one **recreational activity** of the child's choice, the Camellia treatment team understand that each child needs some form of physical or other activity that provides them stimulation. Camellia also provides **family support** to the child's birth families and assistance **with visitation** as outlined in the ISP for the family. Camellia's services are centered on the child's individual needs. Camellia Therapeutic Foster Agency attempts to combine the benefits of a healthy functioning foster home with an assortment of specialized supportive services.

Camellia Therapeutic Foster Agency foster parents provide consistent care and serve as role models, disciplinarians, mentors and treatment team members for the child in their care. Camellia's foster parents work closely with the Camellia consultant to review and plan for the child's ongoing care and treatment. Services provided by Camellia Therapeutic Foster Agency to the foster parents are **family support,** 24 hours of **respite** per month **after hour crisis intervention** monthly **foster parent meetings, support groups, annual foster home re-licensure** and **semi-annual site visits** to the foster family home.

Camellia's staff **assist and coordinates transportation** of the foster child to all **appointments** for medical, dental and counseling. When necessary Camellia's staff will assist with the transportation of the child to his/her appointments. Camellia's staff are available to foster parents on **a twenty-four hour** basis for crisis or emergency situations involving the TFC child. **Family support visits** are made bi-weekly to reinforce *parenting skills* and encourage the foster parents to maintain a safe and nurturing home environment for the child placed in their home.

**Foster parents are educated** on the use of behavior management. Camellia encourages the foster parents to adhere to the Camellia discipline policy when dealing with inappropriate behaviors in the child placed in their care. Camellia offers monthly foster parent support meetings, reimbursement for travel for a child's appointment over 50 miles, referrals to appropriate resources as needed Other Camellia services provided by Camellia Therapeutic Foster Agency include **crisis intervention, discharge planning, 14 days of notice prior to a child being discharged, respite,** and **quality assurance.** Quality assurance is utilized to measure outcomes, monitor achievement of outcomes, monitor barriers to goals, and prevent the barriers to achieving the goals. Camellia's staff are trained to work closely with the ISP team to determine the goals that are suitable to the child's need.

History (Continued).

## Child and Family Planning Team

Camellia Therapeutic Foster Agency composes a group of individuals to focus on the needs of the family involved in the ISP process. Individuals invited and who make the team are the child's family, the DHR social worker, family friends, relatives or significant others, service providers, foster parents, the child's guardian ad-litem, and school personnel. The team is responsible for evaluating goals and identifying steps to achieve identified outcomes in various areas, including behavior management plans, safety plans and crisis plans.

## Treatment Team

Camellia composes a team for each child in placement that includes the Camellia family consultant, the child, the child's family, the foster parent, the DHR social worker, and the child's teachers, therapist and any other relevant person. This team is responsible for the development of the child's treatment plan within the TFC program and shall ensure that it is congruent with the family's ISP.

## Initial Treatment Plan

DHR completes an Initial treatment plan at the time of each child's admission into the program.

The initial treatment plan is based on early assessment and relationship-building efforts during the first ten days of admission. This plan can serve as the comprehensive treatment plan if enough information is available to prepare an adequate plan.

## Comprehensive Treatment Plan

Camellia completes a comprehensive treatment plan that is completed within thirty days of a child's admission into the program. The plan coordinates short-term and long-term goals with target dates and services to meet the identified goals of the treatment plan. The plan is developed and implemented in a manner to achieve the overall outcomes for the family identified in the ISP.

## Monthly Reports

Monthly reports are provided to DHR in regard to the child placed with Camellia by the 5th of each month. The monthly reports notes the child's progress for the month at home and in school. The report contains any significant events involving the child. The monthly report will document any behavioral or emotional concerns regarding the child at home and at school. The report entails an update on the child's current dental, medical, psychiatric and any other pertinent information. The report lists the child strength and weaknesses, and any contact with the child's family or other relevant other. The crisis plan is outlined, relevant appointments and services provided by Camellia.

7

History (Continued).

## Treatment Plan Review

A treatment plan review will be completed at every ninety days from the date of the initial treatment plan. The Camellia worker will summarize the child's progress and make any needed changes n the treatment goals and strategies. The treatment plan review will document progress on the child's goals for the month. The Camellia treatment team members are invited and will provide their input.

## Discharge Summary

Camellia provides DHR with a discharge summary on every child who has been discharged from the program. The discharge summary contains services provided during care, the growth and accomplishments, assessed needs which remain to be met, and recommendations of the services to meet these goals. Date of discharge, reason for discharge, and the name and telephone number and relationship of the person or agency to whom the child was discharged After-care plans will specify the responsibility for follow through.

## Crisis Intervention and Resolution

This is a two party professional service team, composed of a master's level staff and a bachelor level staff, who in the event of a crisis involving a Camellia TFC child after normal working hours will attempt to bring the situation to a pre-crisis state.

Camellia's crisis staff are available on a twenty four hour basis to respond to any crisis involving the child placed in the Camellia TFC home. The staff will work with the foster parent, child, and any other party to diffuse the situation that has caused the crisis.

## Location of Service Sites

RUSSELL COUNTY
Camellia Therapeutic Foster Agency
2310 Crawford Road #104
Phenix City, AL 36867
(334) 448-2999/office
(334) 448-1666/fax

MONTGOMERY COUNTY
Camellia Therapeutic Foster Agency
1434 Mulberry Street
Montgomery, AL 36106
(334) 834-4088/office
(334) 834-5888/fax

MADISON COUNTY
Camellia Therapeutic Foster Agency
2019 Sparkman Drive # A
Huntsville, AL 35810
(256) 858-6500/office
(256) 858-0055/fax

MOBILE COUNTY
Camellia Therapeutic Foster Agency
22 North Florida Street
Mobile, AL 36607
(251) 476-5156/office
(251) 476-5245/fax

8

**Location of Service Sites (Continued).**

JEFFERSON COUNTY
Camellia Therapeutic Foster Agency
3600 6th Avenue South
Birmingham, AL 35222
(205) 595-2760/office
(205) 595-2761/fax

Satellite Office
DALLAS COUNTY
Camellia Therapeutic Foster Agency
1003 Broad Street
Selma, AL 36701
(334) 874-3800/office
(334) 874-3005

**4. MISSION STATEMENT:** Provide a brief statement regarding the goals of the Organization or its' mission statement.

Camellia Therapeutic Foster Agency's mission statement is "Giving each foster child a place to call home and ultimate unification of birth families". Camellia's mission statement was derived by the desire of its founders to deliver services to place the therapeutic child in the least restrictive environment. Camellia's goal also was to give children placed in foster care a place to call home in a family setting. Camellia Therapeutic Foster Agency plans to provide the best possible care for Alabama's foster children who are entrusted in our care. It is our aim that each child will experience positive and precious lasting memories into their adulthood. The agency will ensure that we never abuse them nor overlook their needs. It is also the agency's goal to work hard to reunite them with their biological parents. Camellia Therapeutic plans to provide an environment that includes Christian values integrated with quality education and parenting to each child placed in our care. Our mission is to seek and discover the individuals need of the whole child focusing on mental, intellectual, physical, social, and above all, spiritual growth.

Our mission also strives to offer support to the families and to encourage family involvement in all areas of their child's life while they are in foster care.

Camellia plans to offer a unique setting where therapeutic foster care takes place in a variety of ways. We want to integrate laughter and tears and the reasons behind them are of utmost importance. We also want the child to feel free to express himself and to dare to dream where children believe in themselves and know they have the possibility to do anything God wants them to be. Our mission and purpose is not based on financial benefit, it is all about making a difference in the life of a child.

The primary goals of the mission statement are to:
* Offer services that provide each child a place to call home in a safe/therapeutic environment.
* Provide intervention that gives children a second chance before placement in a restrictive setting, providing them the most normative environment as appropriate to their treatment plan.

9

**Mission Statement (Continued).**

- Honor the family/child relationship by allowing TFC child to maintain contact with is/her birth families as permitted by the ISP and attend all treatment team meetings.
- Provide culturally competent services that are responsive to the racial and ethnic differences of the children/families served.
- Provide children with behavioral/emotional disturbances individualized services in accordance with their own strengths and needs and that are guided by an individualized service plan.

5.      **MANAGEMENT STRUCTURE:** Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organizational chart. Ratios of staff to supervisors should be clearly indicated.(See page 11 for Camellia's Organizational Chart)

6.      **FINANCIAL AUDIT:** The date of the most recent financial audit and the name of the audit firm.

**DATE OF MOST RECENT FINANCIAL AUDIT:**      February 5, 2005

**NAME OF AUDIT FIRM:**      Chancellor Hoffman C.P.A.

**INDEPENDENT ACCOUNTING SERVICES:**      John Kuforiji, Ph. D
Optimal, INC.

7.      **QUALIFICATIONS AND THE EXPERIENCE OF THE VENDOR:** The vendor qualifications and experience for assuring the successful completion of the requirements of this RFP. It must include a description of past or current experience providing the proposed service and, as applicable, the rate of successful completion by previous program participants.

A list of persons with addresses, telephone numbers and e-mail addresses who are familiar with the delivery of similar services by the vendor to the Department, in the past or to other programs similar to that of the Department, if any. It must further describe any licenses and/or certifications held by the vendor.

## SECTION IV A PROGRAM NARRATIVE

## MANAGEMENT STRUCTURE

| **Dr. Joseph Appiah**<br>President/Board Chairman |
|---|

| Dr. Darryl Ellis<br>Vice President<br>Children EPSDT Screening & Medical | Dr. Osei-Yeboah<br>2nd Vice President<br>Budget & Finance/ Employee<br>Benefits | Justina Okeke, LGSW M. Ed, LPN<br>Licensing Specialist<br>Board Member |
|---|---|---|

| **Administrative Staff** |
|---|

| Camellia's Chain of Command begins with the Executive<br>Director to the Receptionist |
|---|

| Karen Jurls, LCSW PIP<br>Executive Director | Katrina Jefferson, MSW<br>Quality Assurance<br>State-Wide Camellia Agencies | Cathleen Dixon, LCSW PIP<br>Supervisor of Social Services |
|---|---|---|

| **Justina Okeke, LGSW**<br>Licensing Specialist |
|---|

| **Latonya Tinsley, MS**<br>Therapist |
|---|

| **Family Consultants** |
|---|

| Kareema Jacobs, MSW |
|---|
| Joselyn Hereford, MSW |
| Eva Ransom, MSW |
| Debra Winston, BSW |
| Lakeisha Bearden, BS |
| Clementine Ellis, BS |

| **Renee Lyles**<br>Medicaid Billing Specialist | **Brenda Ayers**<br>Receptionist/Children Transportation |
|---|---|

**Ratio of Staff to Supervisor:** Camellia Therapeutic Foster Agency, LLC. has one supervisor for every six workers.

11

## Section IV A Program Narrative

Camellia Therapeutic Foster Agency has previously and is currently serving Alabama's Department of Human Resources. We have attempted to develop a positive working relationship with each DHR county in our service area. We plan to continue this relationship with DHR as one of our main goals is to accommodate and delivery service to provide the counties with a safe and therapeutic placement for their child. We feel that we have hired a group of highly professional staff who are able to deliver services for the therapeutic child.(Please see the Vendor/Employee Qualifications below)

- **Vendor/Employee Qualifications to Assure the Successful Completion of the Program:**

| Employee | Title | Credentials |
|---|---|---|
| Agyeman Osei-Yeboah | Personnel Manager | Ph.D. |
| Karen L. Jurls | Executive Director | LCSW, PIP |
| Katrina Jefferson | Statewide Supervisor/QA | MSW |
| Cathleen Dixon | Supervisor of Social Workers/Social Services | LCSW, PIP |
| Latonya Tinsley | Therapist/Manager | MS |
| Kareema Jacobs | Family Consultant | MSW |
| Joselyn Hereford | Family Consultant/GPS Facilitator | MSW |
| Eva Ransom | Family Consultant/Manager | MSW |
| Lakeisha Bearden | Family Consultant | BS |
| Clementine Ellis | Family Consultant/GPS Facilitator | BS |
| Debra Winston | Family Consultant | BSW |
| Justina Okeke | Licensing Specialist | LGSW |
| Renee Lyles | Medicaid Billing | AA |
| Brenda Ayers | Receptionist | Diploma |

A list of our service references are listed below:

## References

**Laura Parchman, LGSW**
DHR Supervisor
Jefferson County
4500 5th Avenue South
Birmingham, AL. 35233
(205) 918-5169
**email: l.parchman@DHR.State.AL.US**

**Patti Way, MSW**
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256)-535-4527
**email: p.way.@DHR.State.AL.US**

12

**References (Continued).**

Chuck Evans, MSW
DHR Supervisor
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4680
email: c.evans@DHR.State.AL.US

Cherry Jones, MSW
Program Supervisor
Russell County
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5803
email: c.jones@DHR.State.AL.US

Darnell Sharpeson, BSW
DHR Social Worker
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 517-1410
email: d.sharpeson@DHR.State.AL.US

Annie Poles, MSW
Service Supervisor
Russell County
1003 25th Avenue
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5853
email: a.poles@DHR.State.AL.US

Jacqueline Griffin, MSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4645
email: j.griffin@DHR.State.AL.US

Chasidity Perry, BSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4655
email: c.perry@DHR.State.AL.US

Mary Ann Wilson, LGSW
Program Analyst
50 Ripley Street
Montgomery, AL. 36130
(334) 242-1659
email: m.wilson@DHR.State.AL.US

Robin King, MSW
Jefferson County DHR
4500 5th Avenue South
Birmingham, AL. 35223
(205) 918-5193
email: r.king@DHR.State.AL.US

**Licenses and/or certifications held by the vendor.**
Camellia has therapeutic foster care licensure/# 34627 for the periods of March 19, 2005 to March 19, 2007. We also hold certification for "Standard Medicaid Provider# 339091102" and Step-Down Medicaid Provider #339091202".

13

**B.    START UP PLAN:** All vendors must provide a plan of action detailing the steps necessary to reach program operation including target dates. New programs will necessarily require a start up plan of greater scope but all proposals from providers with a current contract with the Department must include start up plans, and must describe changes to the existing program structure as required to meet the terms of the RFP.

Camellia Therapeutic Foster Agency, LLC. is currently a licensed child placing agency for the state of Alabama. Camellia has been in operation for to three years at this point. Camellia Therapeutic plans to continue offering our service to the Department of Human Resources. Camellia plans to retain and continue recruiting staff who are both professional and qualified in the area of child development and case management. To continue to meet the needs for placement requests from DHR Camellia will continue recruiting and training foster parents. Camellia plans to assure that our parents first have the desire to care for therapeutic children and then became properly trained to deal with the behaviors of the therapeutic child. The steps necessary to gain and maintain operation are listed as follows.

- **Research:**
  Before becoming a licensed therapeutic foster care provider, in 1992, Camellia obtained material to gain knowledge of the therapeutic foster care system. We researched possible locations for office space and operation, the need for service, and began to develop a relationship with DHR

- **Funding:**
  Prior to start-up Camellia went through the process of acquiring the funds necessary to operate. Enough funding was needed to recruit and maintain staff, maintain office space, and meet full operation for a total of six months before a child could be placed.

- **Advertise:**
  After establishing a need for therapeutic foster care services, and acquiring funds necessary to operate, Camellia through advertisement, began to seek foster parents and staff to provide our program's services. Advertisements were geared towards, foster parents, social workers and DHR.

- **Licensure/Contract:**
  To obtain licensure, Camellia completed an application process and submitted all required paperwork to the office of licensure and contracts at DHR's state office. To maintain operation of agency operations relating to therapeutic foster care, Camellia needs to abide by all rules and regulations set forth. A renewal application will be resubmitted in advance of the expiration date of the current license.

14

**START UP PLAN (Continued).**

- **Office Space:**

  To operate as a therapeutic foster agency Camellia located the proper office space to house staff, and conduct agency business. To meet program operation, Camellia needs adequate office space for daily operations, staff and foster parent training, and the compiling/storing of the child and foster parent/personnel records. Camellia currently has six offices available for agency operations. Local Camellia offices are located in Huntsville, AL, Mobile, AL, Montgomery, AL, Phenix City, AL, Birmingham, AL. and Selma, AL. Each office has a reception area, individual offices for agency staff, a conference room for meetings and trainings, a room designated for file storage which includes file cabinets for housing of foster parents and child records, and restrooms for staff and public use. To maintain these office spaces, Camellia pays monthly rent, electrical bills, water bills, and gas bills.

- **Office Equipment/Supplies:**

  Before Camellia was ready to open its doors, the agency needed to secure office equipment, chairs, computers, office desks, etc. Each Camellia office is equipped with several telephone lines for incoming and outgoing telephone calls. Individual computers and printers are available for each staff members daily use. A fax machine is available for agency transmittal and receiving of documents, and a copy machine is available for copying of agency documents. Camellia has to maintain copier paper, ink pens, paper clips, file folders, file dividers, calculators, business cards for staff, highlighters, markers, pencils, staples, staplers, envelopes, letterhead, and other office equipment to maintain operation of the agency.

- **Medicaid Billing:**

  To continue agency operations, Camellia needs staff and the required system in place in order to bill Medicaid electronically. Camellia currently has the staff and system in place for proper Medicaid billing.

**START UP PLAN (Continued).**

- **Maintain Adequate Agency Structure & Daily Operation:**
The family consultants and social workers will serve as the child, foster parents, and DHR's direct line of communications. They will assure the delivery of the core services. Camellia Staff will conduct intake, and maintain all necessary documentation for the foster parent and child files. The therapist will provide individual, group and family counseling along with crisis intervention to the child and parents, as needed. The Camellia staff supervisors will serve as support for the family consultants, social workers, and therapist, they will provide direction and supervision of all case work that is done. Camellia currently has a Quality Assurance team available for evaluation of agency function. The Quality Assurance staff will provide feedback on the quality of the agency's operation and foster parent/foster child/DHR satisfaction surveys including outcomes and measures of the child in care. Camellia plans to utilize the Quality Assurance staff to monitor staff, foster parent and children performance.

Describe changes to the existing program structure as required to meet RFP.
We will hire more staff and recruit quality foster parents to meet the RFP.

Camellia requires all staff to maintain their daily time in and time out of the office for work arrival departure, home visits, or agency meeting. Camellia currently has a board of directors to monitor the daily operations of the agency. Camellia plans to maintain a board of directors to monitor the agency's operations, create and update agency policy and deal with agency grievances. Camellia currently maintains staff for janitorial services and lawn maintenance. Camellia will need to continue maintaining these staff for the maintenance of the offices indoor and outdoor structure. Camellia will need to maintain staff for intake, case management, supervision of staff, and management of office operations.

- **Foster Parents**
Camellia will continue recruiting, training and licensing foster homes. To recruit foster parents, Camellia will continue placing ads in local newspapers, producing agency brochures/fliers, purchasing radio or television advertisement and paying recruitment personnel. Camellia also will visit local churches and speak with local congregations to recruit foster parents with good moral and spiritual character to mold kids into productive adults

- **Therapeutic Children:**
Camellia needs to work closely with DHR to accommodate their needs for placement. Camellia plans to continue letting DHR know of placement vacancies available for therapeutic children.

16

**START UP PLAN (Continued).**

- **Maintain Positive Relationship w/DHR/Foster Parents/Public:**
  Camellia currently works closely with DHR in an effort to meet their needs for placement. Camellia will need to continue accepting referrals from DHR in an effort to properly place the child in need of therapeutic care. Camellia plans to continue accepting referrals for placement from DHR .

- **Changes to Meet terms of RFP:**
  Camellia is already providing all the services in the RFP. The limited changes are that DHR staff is required to complete intake evaluations on all children in TFC placements within ten days, and it is understood, by Camellia that if the intake evaluation is not received in ten days the agency will complete the intake evaluations but will not bill the services nor receive payment for it. The county DHR shall be responsible for paying for the activities outside the core services from the flex funds. Department of Human Resources shall be responsible to purchase the individual items to accomplish Individual Living Program goals. Camellia Agency staff along with the foster parents will continue to help in creating behavior management plans for the child with other ISP team members which Camellia Agency is already performing those services.

- **Target Date:**
  The date we plan to begin this contract is on October 1, 2005.

**C.    REFERRAL, ADMISSION AND EXCLUSION POLICY**

1. **Describe specific target population of children accepted into the program, to include, age, sex, and type(s) of behavior.**

   The target population for children placed in the care of Camellia Therapeutic Foster Agency for placement are children who are in the state of Alabama's Department of Human Resource's custody through a court order. Children who are accepted into Camellia Therapeutic Foster Agency for placement must have at least a DSM IV diagnosis on Axis I, accompanied by behaviors that require intensive treatment and structure. Camellia accepts referrals for children between the ages of newborn to age 21 who are male or female. Examples of diagnosis for admission are emotional or behavioral problems, depression, sexual abuse issues, poor social skills, mild to severe mood disorders, conduct disorders, anxiety disorders, childhood trauma, borderline personality disorder, identity disorder, sexual offenders, etc...

17

## REFERRAL, ADMISSION AND EXCLUSION POLICY (Continued).

2.    **Describe specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.**

Camellia accepts referrals from any county DHR office for the placement of a child into our program. At the time of the intake, Camellia provides the county with a referral checklist of needed information. During the screen in process, we ask for the child's most recent psychological exam, comprehensive family assessment and social summary to identify the needs of the child. Referrals are matched to a Camellia family based on the needs of the child along with the strengths of the foster family. A pre-placement visit is then arranged with the child and the Camellia family. A Camellia staff member provides supervision during this time period. Once all parties have agreed on this placement and Camellia has received all necessary paperwork for admission; admission is finalized. **(please see attached intake application)**

3.    **Describe specific criteria for exclusion from the program.**

Camellia accepts all referrals and does not exclude any child from our program. Each child who enters the program must have a DSM-IV diagnosis.

Camellia TFA attempt to match each child based on strengths and needs of both the child and the foster parent. Camellia maintains a strong <u>no reject no eject policy</u>. Camellia adheres to the guidelines of the Multi-Ethnic Placement Act.

18

# CAMELLIA THERAPEUTIC FOSTER CARE AGENCY, LLC.

2310 CRAWFORD ROAD SUITE 104
PHENIX CITY, AL. 36767
(334) 448-2999/TELEPHONE
(334) 448-1666/FAX

## INTAKE APPLICATION

**Date of Application:** _____

**Date Placement Needed:** _____

**Reason for Placement:** _____

**Person Making Referral:** _____

**Contact Information: Telephone #:** _____ **Other:** _____

**Name of Child Needing Placement:** _____
DOB:_____ Sex:_____ Race_____ Age_____ SSN:_____
Medicaid #:_____ Active (Yes or No)Date Applied For:_____

**Legal Guardian:** _____

**Address:** _____

**DHR County of Responsibility:** _____

**DHR Social Worker:** _____

**DHR Contact #'s:** _____ **Other:** _____

**After Hour Contact #'s :** _____ **Other:** _____

**DHR Case Number:** _____

**DHR Case Plan:** _____

**Financial Eligibility Code:** _____

**Biological Mother of Child:** _____
Address: _____
Telephone Number: _____ Other:_____
Is this Parent allowed Contact with Child: Yes or No
Is this Contact Supervised or Un-Supervised

**Biological Father of Child:** _____
Address: _____
Telephone Number: _____ Other:_____

19

Is this Parent allowed Contact with Child: Yes or No
Is this Contact Supervised or Un-Supervised

**Siblings of Child**            Age            Address            Telephone #
1. _____
2. _____
3. _____
4. _____

**Type of Contact allowed with Siblings:** _____

**Is there any other relative this child may have contact with?**
Name: _____
Address: _____
Telephone Number: _____

**Is there any one who this child should not have contact with ?**
Name: _____
Address: _____
Telephone Number: _____

**Medical History of Child:**
Current Diagnosis: _____
Current Medications: _____
Name of Provider & Date of Last Medical Exam:(attach copy)
_____
Name of Provider & Date of Last Dental Exam:(attach copy)
_____
Name of Provider & Date of Last Vision Exam:(attach copy) (Circle)Glasses or Contact
_____
Name of Provider & Date of Last EPSDT Screening(attach copy)
Allergies: _____
Past Diagnosis: _____
**Other:** _____

**Psychological History of Child**
Current Diagnosis: _____
Current Medications: _____

**Child's Current Medical Doctor:**
Name: _____
Address: _____
Telephone #: _____

**Current Medical Conditions that Require Special Attention:**
_____

20

**Upcoming  Appointments/Court Dates  for Child**
1. _____
2. _____
3. _____
4. _____

**Child's Placement  History & Date:**
1. _____
2. _____
3. _____
4. _____

**Child's Current School**
Grade:_____
Name:_____
Address:_____
Telephone #/Contact Person:_____
(attach copy of current report cards)

**Does Child Have a Special Education Ruling(list)**
1. _____
2. _____
3. _____

**Has Child Been Tested for Special Education Services?**_____
Date:_____
Where:_____

**Does Child Receive Speech Therapy?**_____
Frequency:_____

**Date of  Current Individualized Education Program**_____
School Provided_____
Contact Information:_____

____What Degree is Child Working On in High School
____High School Diploma
____High School Diploma with Advanced Academic Endorsement
____Occupational Diploma
____Graduation Certificate
____General Education Diploma          Program Attending:_____
                                        Contact Info:_____

**Has Child Passed the High School Graduation Exam?**_____

**When is Child Scheduled to Take the Exit Exam for Graduation?**_____

21

**Date of Anticipated Graduation?**_____

**Check Child Current Behaviors**

___Theft

___Uncontrollable Behavior

___Defiant with Adults

___Alcohol or Drug Use

___Sexually Active

___Destruction of Property

___Oppositional

___Verbally Assault

___Sexually Abusive towards other children

___Threat of Run Away

___Truancy

___Depression

___Poor Peer Relations

_____Other:_____

**Please comment:**_____

**Please Forward:**

Application

Social Summary

Social Security Card

Medicaid Card

Current Medical

Interagency Agreement

Current Discharge Summaries

Current Psychological Evaluation

Comprehensive Family Assessment

Birth Certificate

Current EPSDT Screening

Form 724

Current ISP & School Records

Immunization Records

**Local Offices:**

Camellia Therapeutic Foster Agency
2310 Crawford Road #104
Phenix City, AL. 36867
(334) 448-2999/office
(334) 448-1666/fax

Camellia Therapeutic Foster Agency
2019 Sparkman Drive # A
Huntsville, AL. 35810
(256) 858-6500/office
(256) 858-0055/fax

Camellia Therapeutic Foster Agency
3600 6th Avenue South
Birmingham, AL. 35222
(205) 595-2760/office
(205) 595-2761/fax

Camellia Therapeutic Foster Agency
1434 Mulberry Street
Montgomery, AL. 36106
(334) 834-4088/office
(334) 834-5888/fax

Camellia Therapeutic Foster Agency
22 North Florida Street
Mobile, AL.36607
(251) 476-5156/office
(251) 476-5245/fax

Camellia Therapeutic Foster Agency
DALLAS COUNTY
1003 Broad Street
Selma, AL. 36701
(334) 874-3800/office
(334) 874-3005/fax

22

## IV. PROGRAM NARRATIVE

**D.    SERVICE DELIVERY:** Describe the delivery of services proposed by the vendor to meet or exceed, the Core Services outlined in Attachment A of this RFP and the provisions of the Therapeutic Foster Care Manual. The proposal should outline how the agency will serve the birth family or relatives while the child is in the therapeutic out-of-home placement to reduce the length of stay. It is expected that a child should be ready to step-down in the level of service that is needed to meet his/her needs by six (6) months, at which time he may continue his treatment goals in the context of family. Should a child need a longer length of stay, the proposal should clearly define what the provider will do to ensure that goals are expeditiously achieved in a designated timeframe thereafter.

It is very important for Camellia Therapeutic Foster Agency to maintain the guidelines of the R.C. Decree with the ultimate goal of reunification of the child with the birth family in the delivery of the core services for therapeutic foster care. Our services are outlined in accordance to meet the guidelines of the R.C. Decree, and the Minimum Standards for Foster Family Homes and Child Placing Agencies.

Camellia strives to accommodate the placement needs of the Department of Human Resources by providing and maintaining highly trained staff and foster parents. We plan to do so by providing an effective screening process that matches each child with the most compatible Therapeutic Foster parent.

Camellia Therapeutic provides **therapeutic foster placement services,** an intense system of clinical and support services for youth with mild to moderate or severe emotional or behavioral disorders. Camellia services include foster home placement, case management, and the coordination of the child's educational and medical planning. The Camellia foster parents receive extensive training and supervision to assist them in successfully addressing the needs of the child in their home. The family systems approach is integrated in the treatment planning of the child. The child/family partnership is reinforced in the delivery of our services for the child. Camellia's foster parents and staff are trained on the importance of **the Multi Ethnic Placement Act** in the delivery of services. **Regular foster homes** are also available for children who have stepped down from Camellia's therapeutic program. This program utilizes entry-level foster parents to provide short-term and transitional services in their home.

23

## D. SERVICE DELIVERY (CONTINUE).

Camellia's therapeutic foster parents have dual licenses so they are licensed to care for a child who has stepped down from the therapeutic program. The children placed in this program often require basic care and the foster parents will need minimal support during this period. It is estimated that children who enter the therapeutic program can be stepped down in six months of their admission. However, we base this decision on the child's individual needs, we also depend greatly on the input of the child's treatment team. Camellia conducts adoptions for both the state and private families. Camellia recruits, trains, licenses, and supervises foster homes or adoption family homes. **GPS training and licensure** is provided to these families with little or no expense to them during the adoption proceedings. Camellia Therapeutic Foster Agency plans to provide services in relation to the core services as follows below :

### "Core Services for Standard TFC Category of Care"

### Services to Foster Children from the TFC Agency

- **Matching and Screening Process:** Camellia Therapeutic Foster Agency provides matching for the child referred to the agency for placement, which entails looking at the child's strength and needs and the family's strength in order to find the most suitable placement for the child/family. Camellia's matching criteria include composition of the foster family, the ability and willingness of the foster home to work with the child's family, the foster family's ability to communicate with the child, the proximity of the child to his/her family, local availability and access to needed supportive resources, the foster parent's skills, abilities, attitude, and  the foster family's lifestyle. The **screening process** entails screening each child's  referral for appropriateness for therapeutic foster care placement.

- **Pre-placement visits:** The foster child and family are allowed to have an  overnight visit allowing them to become acquainted. The Camellia worker will meet with the child and family to discuss the pre-placement visit. Based on the report given by the child and family, a decision is made to place the child with the  family. The pre-placement visit is documented in both the child's and foster parent's case file.

24

## SERVICE DELIVERY (CONTINUE).

- **Schedule & Coordinate the Child's Treatment Plan: DHR** staff will complete the intake evaluation and initial treatment plan for each child entering the program within the first ten days of placement. The intake evaluation addresses the immediate needs of the child and all services to be provided. The initial treatment plan will rely heavily on the child's individual needs as set in the child's ISP. Camellia works closely with the DHR worker in establishing the child's treatment plan. The Comprehensive treatment plan will follow the initial treatment plan at the child's 30th day of placement. Camellia staff will conduct a treatment plan review every ninety days to assure the progression of the child's treatment plan. Support from all Camellia team members allow each child to benefit from intensive treatment and clinical services provided by the team approach.

- **Individual visits with the TFC child:** Camellia's staff maintains regular contact with the child while in the home. The Camellia family consultant meets with the child in the home individually at least once per week.

- **Monthly face-to-face or telephone contact with the child's school:** Camellia's staff maintain regular contact with the child's school to monitor his/her progress. The Camellia family consultant acts as an advocate for the child at school and will attend all educational meetings relating to the child. At a minimum, the child's consultant will have contact with the child's school.

- **Monthly face-to-face or telephone contact with child and or therapist** to monitor the child's progress in counseling.

- **Assist in referral to other programs/services the TFC child may need:** As identified in the child's ISP or as needed the Camellia family consultant will coordinate the child's transportation to all appointments, family visits, or other activities.

- **Provide 18 hours of basic living skills and five hours of group basic living skills:** The Camellia Foster parents provide a maximum of 18 hours of basic living skills relating to behavior education, money management, shopping, healthy lifestyle, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry, and public transportation, as based on the child's individual needs. Camellia staff work closely with the foster parents in ensuring the maintenance of these skills in relation to the child's individual goals.

- **Attend child's ISP and IEP:** The Camellia family consultant will attend all   IEP and ISP meetings along with the TFC foster parent.

25

## SERVICE DELIVERY (CONTINUE).

- **Assist in the development of independent living skills:** The Camellia family consultant will assist the foster parent in the development of independent living skills relevant to the child's needs. DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.

- **Monthly Group Therapy:** The Camellia family consultant will ensure that each child who enters the program is in attendance at monthly counseling sessions that are tailored toward achieving specific goals as identified in the child's ISP.

- **Five Hours of Crisis Intervention:** The Camellia family consultant is on call on a twenty four hour/seven day a week basis for emergency and crisis situation that involve the TFC child. Crisis Intervention and Resolution is provided as needed to the TFC family in an effort to alleviate the crisis and to sustain the child's placement.

- **Discharge Planning:** Discharge planning begins at intake as therapeutic foster care is a time limited program. Discharge planning is addressed in the child's treatment plan in preparation for discharge and aftercare planning. A discharge summary is provided to DHR by the 5th day of each month. It contains services provided during care, the growth and accomplishments, assessed needs which remain to be met, and recommendations of the services to meet these goals. The summary contains date of discharge, reason for discharge, and the name and telephone number and relationship of the person or agency to whom the child was discharged to and after-care plans.

- **No Reject/No Eject Policy:** Camellia maintains a no reject/no eject policy for children who meet program criteria.

- **Regularly administer outcome measures:** Camellia regularly administers outcome measures every ninety days in order to monitor the child's treatment and progress through the behavioral assessment tool included in the ISP.

- **Regular Communication with relevant parties:** Camellia maintains regular contact with DHR, the child's counselors, teachers and any other relevant party in an effort to monitor the child's progress.

- **Coordinate involvement in at least one recreational activity:** Camellia assists the foster parents in enrolling the TFC child in at least one recreational activity of his/her choice.

- **Provide a 14-day notice in the event of a disruption:** Camellia provides a 14 day notice in the event of a placement disruption.

**SERVICE DELIVERY (CONTINUE).**

- **Monthly Reports:**  Monthly reports are provided to DHR in regard to the child placed with Camellia by the 5th of each month. The monthly reports notes the child's progress for the month at home and in school. The report contains any significant events involving the child. The monthly report will document any behavioral or emotional concerns regarding the child at home and at school. The report entails an update on the child's current dental, medical, psychiatric and any other pertinent information. The report lists the child's strengths/needs and weaknesses, and any contact with the child's family or other relevant parties. The crisis plan is outlined in the monthly report, along with all relevant appointments for the child and all services provided by Camellia.

- **Quality Assurance:** Camellia has a Quality Assurance program that monitors our program's performance in each Camellia office. The QA staff are responsible for regularly collecting and analyzing data, conducting case studies, special studies, and site visits to evaluate the program's performance according to the goals and principles of the R.C. Decree.

- **Ensure Program Compliance with <u>Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes and Therapeutic Foster Care Manuals</u>:** Camellia ensures that its' programs meet the Minimum Standards for Child Placing Agencies, <u>Minimum Standards for Foster Family Homes and Therapeutic Foster Care Manuals</u> through regular training and encouraged compliance of the manuals' policies and procedures.

- **Assistance in Creating a Behavior Management Plan:** At the time of the placement meeting Camellia staff coordinate a behavior management plan for the child entering the program. Camellia maintains staff who have experience in  behavior management planning and child development.

- **Participate in the ISP team in determining goals for children and their families:** Camellia's staff participates in all ISP meetings. ISP meetings are conducted in order to assist the child's family members in understanding the nature of the child's illness and how to help the child to be maintained in the community.

## Service To Birth Families of Children in TFC Placements

- **Be an active participate in the assessment of the parental functioning to assist the ISP team in determining treatment goals for the safe placement of the child back with her family when the goal is return to parent:** Camellia staff will work with the birth families as outlined in the child's ISP to determine the reunification of the child to the home.

27

**SERVICE DELIVERY (CONTINUE).**

- **Assist with implementation of the goals of the family as identified in the ISP to expedite the child's safe return home:** Camellia will work with the child's birth family to ensure referrals to appropriate resources as needed.

- **Provide 2 hours per week of therapeutic visitation coaching with the family and their children who are in the placement to assess the parents ability to safely care for the child and to determine the progress in attaining goals:** Camellia's staff will work with the child's birth family for 2 hours per week to provide therapeutic coaching and to determine the family's ability to care for the child.

- **Provide family support to birth families as outlined in the ISP treatment plan:** Camellia's staff will work with the child's birth family to assist the child's family in understanding the child's illness and how to help the child be maintained in the community.

## Services to TFC Families From the TFC Agency

- **Difficulty of care payment as identified in the contract at a minimum of $16.00 per day:** Camellia provides a difficulty of care payment to all foster parents with a child in their home.

- **Forty hours of pre-service training including GPS prior to licensure:** Camellia provides forty hours of pre-service training to all foster families prior to their home being licensed.

- **Twenty hours of yearly training:** Camellia provides 20 hours of training to foster parents in our program annually for re-licensure.

- **Monthly Support Group Meetings:** Camellia provides a monthly support group meeting for foster parents in the program.

- **Ensure homes comply with minimum standards for foster family homes:** Camellia ensures that all homes licensed have met the standards for foster family homes.

- **Conduct annual licensure and semi annual visits to TFC home:** Camellia re-licenses it homes yearly. A semi annual visit is also made to the home.

- **Weekly face to face contact to support families to strengthen their ability to provide a safe and nurturing home environments for the child.** Camellia provides weekly face to face contact with the TFC family for **family support.**

28

**SERVICE DELIVERY (CONTINUE).**

- **On-Call Crisis Intervention:** Camellia staff are available to assist the TFC foster parents in the event of a crisis on a twenty-four hour/seven day a week basis.

- **Forty eight hours of respite per month:** Each Camellia home is provided with 48 hours of respite per month.

- **Reimbursement for travel expenses over 50 miles for child's appointments:** Camellia provides reimbursement for travel expenses by foster families that are over a 50 mile radius from the foster home.

- **Assistance with transportation:** Camellia provides transportation assistance as needed for all TFC children's appointments.

- **Assistant with ensuring Medicaid documentation is properly maintained for billable services in compliance with policy and billing guidelines per the Medicaid provider manual:** All foster parents are instructed on the proper completion of forms needed for Medicaid documentation. Staff are available to assist the foster parents as needed.

- **Have staff available to assist the TFC family on a 24 hour basis:** Camellia staff are on call 24 hours per day and 7 days per week to assist the foster family in the event of an emergency. All foster parents have been provided with the on-call numbers to locate staff after hours.

Camellia Therapeutic Foster Agency plans to provide services in relation to the core services as follows below :

## "Core Services for Step-down TFC Category of Care"

### Services to Foster Children from the TFC Agency

**All core services** as outlined in the Core Services for Standard TFC category of care are included in the core services for step-down TFC Category of Care.
The only differences are noted as follows to services to TFC child are:

- **Individual bi-weekly visits with the TFC child.**

- **Quarterly face to face or telephone contact with school (minimum) to monitor the child's progress.**

- **Quarterly face to face or telephone contact with child and or therapist to monitor the child's progress in counseling.**

29

## SERVICE DELIVERY (CONTINUE).

- **Provide 9 hours of basic living skills and no more than 3 hours of group basic living skills training per week:** The Camellia Foster parents provide a maximum of 9 hours of basic living skills relating to behavior education, money management, shopping, healthy lifestyle, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry, and public transportation, as based on the child's individual needs. Camellia staff work closely with the foster parents in ensuring the maintenance of these skills in relation to the child's individual goals.

- **Provide 3 weeks of crisis intervention services,** as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.

### Services to TFC Families From the TFC Agency

**All core services** as outlined in the Core Services for Standard TFC category of care are included in the core services for step-down TFC Category of Care.

- **Difficulty of care payment as identified in the contract at a minimum of $8.00 per day:** Camellia provides a difficulty of care payment to all foster parents with a child in their home.

- **Twenty-four hours of yearly training:** Camellia provides 24 hours of training to foster parents in our program annually for re-licensure.

- **Monthly Support Group Meetings:** Camellia provides a monthly support group meeting for foster parents in the program.

- **Ensure homes comply with minimum standards for foster family homes:** Camellia ensures that all homes licensed have met the standards for foster family homes by a License Social Worker.

- **Conduct annual licensure and semi annual visits to TFC home:** Camellia re-licenses it homes yearly. A semi annual visit is also made to the home, to be sure that the home still meets the minimum standard.

- **On-Call Crisis Intervention:** Staff are available to assist in crisis resolution on a 24 hour basis.

30

## SERVICE DELIVERY (CONTINUE).

The following includes a plan to ensure that ISP goals are expeditiously achieved should a child need a length of stay greater than six months:

- Camellia's staff will make face-to-face contact with the TFC child at least twice per month in the TFC home.
- Camellia's staff will encourage DHR staff to fulfill their responsibilities as outlined in the TFC Manual.
- Camellia's staff will also work cooperatively with DHR, the TFC child and family to expedite the step-down process.

## Comprehensive Treatment Plan(30 days following the Initial Treatment Plan)
1.      Complete Camellia Comprehensive Treatment Plan(FP, child, and social worker may be present
2.      Send for Medicaid billing

## Treatment Plan Review(every ninety days)
1.      Complete Camellia Treatment Plan review at ninety days after Comprehensive Treatment Plan and then every ninety days.(done by Master Level Social Work Staff who is not apart of the treatment team)
2.      Send for Medicaid billing

## Monthly Reports
1.      Complete by the 5th of each month.
2.      File copy, mail copy to social worker, send copy to Medicaid(Renee) for billing.

## Discharge Summaries
1.      Complete on each child discharged from the program within 30 days of discharge.
2.      File copy, mail copy to social worker, send copy to Medicaid(Renee) for billing.

## Monthly Meetings
1.      Arrange once a month and invite all parents who have foster children, as well as those without a child in the home. Place a copy of the subject studied in each foster parent's case file.

## Other
1.      Crisis Intervention Resolution: This is a two party professional service team, composed of a master's level staff and a bachelor level staff after normal working hours.
2.      Arrange counseling for child
3.      Make sure parent has child in at least one recreational activity.
4.      Maintain contact with child's school at least once monthly.
5.      Make sure all documents in foster parents files are up to date
6.      Delivery all other services as needed.

31

**E.    TARGET AREA:** Identify the geographic scope for the service by naming the specific region and specific counties within each identified region for which the service is proposed.

Camellia Therapeutic Foster Agency is licensed statewide for therapeutic foster child placement. We are proposing slots for five regions. Camellia has a total of six offices in the state of Alabama. Our services are focused within the same geographic region to enable the agency to continue the good work they are already doing. Camellia strives to have licensed therapeutic homes available to accommodate the nine region area of the state of Alabama. The areas Camellia now serve are Region 2 at Mobile county, Region 3 at Montgomery & Dallas County, Region 4 at Russell County, Region 6 at Jefferson County, and Region 9 at Madison County.

Camellia plans to expand staff and foster homes in the future and propose the necessary slots to accommodate this plan. (See Target Chart below).

| Region | County | Seeking number of Slots |
|--------|--------|------------------------|
| 2 | Mobile | 48 |
| 3 | Dallas & Montgomery | 50 |
| 4 | Russell | 16 |
| 6 | Jefferson | 100 |
| 9 | Madison | 100 |

Camellia Therapeutic Foster Agency, LLC. plans to continue to recruit therapeutic foster parents/homes based upon the need of each county we serve. We also plan to provide adequate services to the county DHR offices in an effort to continue serving the TFC child within the county boundaries.

**F.    DISCHARGE POLICY:**

1.    Describe the process and criteria for **reunification planning** with children/families and coordination with the ISP Team; as well as **pre discharge and aftercare planning requirements.** The proposal should explain the means that a **child's placement will be tracked to the extent possible at 6-month, 12-month, 18-month, and 24-month intervals post-discharge.** It should clearly delineate what **after care services will be provided** post-discharge. **Services that will be provided to family to expedite the discharge** of the child from the out-of-home placement should be clear and detailed.

32

**Discharge Policy (Continued).**

**Reunification Planning**

Camellia Therapeutic Foster Care Agency follows the guidelines for reunification between the child placed in our care and the birth parent as outlined in child's ISP. During the ISP the DHR worker will detail the plan for reunification of the TFC child. The reunification plan is added to the child's ISP by the DHR worker. The ISP team will coordinate whether the child is allowed visitation and the length of the visitation, telephone contact and with what family members, and any supervised or unsupervised contact, time and place of visitation, (monthly or bi-monthly), etc... if this is not ordered through the youth court. The Camellia worker will implement the plan in the child's treatment planning as set forth in the ISP.

- **6 month**

  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement.

- **12 month**

  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement. Also, in order to further track child's placement, at this point an ISP will be held to monitor/ evaluate progress.

- **18 month**

  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement. Also, in order to further track child's placement, at this point an ISP will be held to monitor/ evaluate progress.

- **24 month**

  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement. Also, in order to further track child's placement, at this point an ISP will be held to monitor/ evaluate progress.

  Evaluate for step-down completion and possible discharge via questionnaire or satisfactory survey by mail, phone, or face-to-face, when possible.

33

## IV. Program Narrative

**Discharge Policy (Continued).**

### Pre-discharge/Aftercare Planning

Camellia will regularly administer outcome measures every 90 days in order to plan for the discharge of the TFC child. At the time of placement, Camellia's staff communicates with the DHR worker on the strengths and needs of the child. In order to estimate the TFC child's discharge date Camellia will measure the progress of the child regularly. Prior to the date of the expected discharge the Camellia worker will meet with the DHR worker in an ISP meeting to discuss the aftercare plan for the child. The aftercare plan will include the nature of aftercare services, frequency of services, and the duration of services to the child/family and to the designate responsible for service delivery. Camellia will either consult with the person/agency responsible for working with the child during aftercare or outline if the services will come directly from Camellia.

### Post-discharge Planning

Once a child is discharged from Camellia for six months, we will track the progress of the child and his/her need for re-admission. Re-admission will be allowed for respite, emergency, or regular re-admission during this six month period. We will offer relapse prevention to family and the child's family is able to participate in our monthly foster family support group. Camellia will track the child who is discharged for a minimum of six months following their discharge. Areas that will be tracked are placements, behaviors, education and work status, law enforcement stats and family involvement. Camellia will secure the discharge placement of the child from his/her DHR social worker to ensure we will be able to provide follow-up to the child.

### State the program's policy on discharge prior to program completion, including emergency discharges.

In order to transition a child into a new placement Camellia will provide all pertinent discharge material to the DHR worker. When there is a need for a child to be discharged from our program, Camellia will provide a discharge summary to the DHR worker outlining the child's needed services and plan for continued and aftercare services to prevent any interference in the child's treatment. In the event that there is a need for an emergency discharge Camellia will forward all discharge information the DHR worker within ten working days. Camellia's policy is to give a fourteen day notice prior to discharge. In that event, if a child disrupts their placement, he/she will be placed in another Camellia respite home.

34

**Discharge Policy (Continued).**

**State the program's policy on re-admission prior to program completion, concerning re-admission of children.**
TFC children who have been discharged from the program will be accepted for re-admission within six months of their discharge without a new application. After six months have past, the DHR worker will need to re-submit an application for placement along with any new pertinent information and required paperwork. (social/discharge summaries)

**Provide an example of the program's process for moving children through the goals and objectives outlined in an ISP, to include provisions of "step-down" to a less restrictive placement. The proposal must indicate how the agency will implement the step-down policy as outlined in the Therapeutic Foster Care manual.**

Camellia's process for moving children through the goals and objectives include the completion of the initial treatment plan at ten days, the comprehensive treatment plan at thirty days, and the treatment plan review at every ninety days. During each treatment plan, the child's progression, or lack of, can be seen. At this time, the treatment team will decide on steps necessary to alter the child's treatment response to the progression/step-down or lack of/continued treatment. The child's strengths and needs will be identified. A goal is identified, and the action plan is identified to complete the goal. A person responsible is assigned to see to the goals completion.

To provide for step-down to the least restrictive placement, the child's progression is measured on a regular basis. A standardized behavior assessment tool determines whether the child can be maintained in a TFC placement with fewer therapeutic services. Once it is determined that the child is ready for step-down services, the DHR worker is notified and an ISP will be scheduled to address the child's progression. When step down is initiated, **regular foster homes** are also available through Camellia for children who have stepped down from the therapeutic program. This program utilizes entry-level foster parents to provide short-term and transitional services in their home. The children placed in this program often require basic care, and the foster parents will need minimal support during this period.

G.    **PRIOR EXPERIENCE: Describe the Organization's prior history of providing the core service(s) and family Services requirements outlined in Attachment A.**

Camellia Therapeutic Foster Agency, LLC. has been licensed for approximately three years. We have provided all core services as outlined in the RFP-Attachment A, during this time period. Camellia has provided therapeutic and regular foster care for children since it was licensed in 2002. During this time, we have followed the core services for standard TFC category of care with great diligence and care in the matching process for children and their families, identifying needs of the child's family and strengths of prospective TFC parents for initial placements and moves within the program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care service. Pre-placement visits are documented and stay within normal 2-3 day period. The initial treatment plans are completed within ten days, comprehensive treatment plan within 30 days, and treatment plan reviews are completed every 90 days.

Camellia staff work hard to obtain the copy of the child's ISP from the county DHR social worker in a timely manner to assure that the child's treatment plan is designed with the child's individual needs in mind.

Camellia provides the following services to the DHR agencies it serves: intake evaluations, crisis intervention and resolution, individual counseling and psychotherapy, group counseling and psychotherapy, family counseling and psychotherapy, individual basic living skills, group basic living skills, individual family support, group family support, treatment plan review, mental health consultation, and in home intervention. However, each service is provided to meet the specific and individual needs of the children placed in our therapeutic foster homes. Because of our experience providing these individualized services, Camellia has established a long-lasting relationship with the county agencies in the following regions: (Region 2, Region 3, Region 4, Region 6, and Region 9). It is our hope that our prior positive experiences will open doors for us to expand to other regions and counties where there is a need for therapeutic foster care services.

36

**H    STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS:**

1.    **Describe staffing patterns, including administrative and programmatic, and provide a brief rationale for the levels of staffing proposed.**

Camellia Therapeutic Foster Agency, LLC. feels that we have hired staff who are highly qualified and knowledgeable in the field of child care/development. Each Camellia office has a total of one family consultant/social worker assigned per every eight children. Camellia staff are assigned a maximum of eight therapeutic children per caseload. Staff caseloads are based on overall job responsibilities, difficulty of children served, and the size and density of the geographical area served. If a worker's job duties exceed his/her job responsibilities, his/her caseload is decreased. Camellia has one supervisor for every six workers.

Camellia Therapeutic Foster Agency utilizes several licensed social worker who provide licensure for our foster homes. They assure that the homes that we are licensing meets the minimum standards for foster family homes as set forth in the minimum standards handbook. Camellia's staff consists of family consultants, social workers, and therapist who are all BS, BSW, LBSW, MS, MSW, or LGSW degreed. The family consultants work closely with the foster parents, offering family support, and are on call twenty four hours a day during the week. Camellia also employs several contract consultants who add support to the service delivery of the Camellia treatment team.

Camellia Therapeutic Foster Agency estimates that our program will need approximately 52 staff/support workers to meet the requirements of the RFP.

2.    **Provide information regarding the qualifications, including education and licensure and experience required for Administrative, Program and Treatment staff. Include job descriptions for proposed positions.**

**The Executive Director** of Camellia Therapeutic Foster Agency, LLC. shall have a master's degree in the field of social work, psychology, education, administration, or a closely related field, plus five years experience in family and children's services with progressively responsible duties in supervision and/or administration.

**Social workers** chosen for employment with Camellia are required to be licensed and shall practice social work pursuant to Code of Alabama 1975, 34-30-1 through 34-30-58, have at least a license as a graduate social worker, license as a certified social worker or a license as a bachelors, social worker with continuing supervision from a person so licensed.

37

## STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).

Camellia's **Family Consultants** required to possess at least a BSW or Bachelor's degree in social work or a closely related field.

**Clerical Staff** employed with Camellia are selected based on personal and technical qualifications and job descriptions.

**Other Professional staff** employed with Camellia are required to be qualified or licensed in their professional fields as required by state law.

**All staff/vendor** of Camellia are licensed and qualified in their respective fields.

| Employee | Title | Credentials |
| --- | --- | --- |
| Agyeman Osei-Yeboah | Personnel Manager | Ph.D. |
| Karen L. Jurls | Executive Director | LCSW, PIP |
| Katrina Jefferson | Statewide Supervisor/QA | MSW |
| Cathleen Dixon | Supervisor of Social Workers/Social Services | LCSW, PIP |
| Latonya Tinsley | Therapist/Manager | MS |
| Kareema Jacobs | Family Consultant | MSW |
| Joselyn Hereford | Family Consultant/GPS Facilitator | MSW |
| Eva Ransom | Family Consultant/Manager | MSW |
| Lakeisha Bearden | Family Consultant | BS |
| Clementine Ellis | Family Consultant/GPS Facilitator | BS |
| Debra Winston | Family Consultant | BSW |
| Justina Okeke | Licensing Specialist | LGSW |
| Renee Lyles | Medicaid Billing | AA |
| Brenda Ayers | Receptionist | Diploma |

**Executive Director**\*\*Camellia Therapeutic Foster Agency's Executive Director is responsible for;

- Articulating the purpose, goal, and function of the agency.
- Establishing written operating policies concerning organizational structure, personnel practices, policies of intake, care, services, and discharge of children.
- Direct and evaluate a program of child placing which is child and family centered which is within the limits of functions and policy established by the board, or by the executive where there is no board, and which is based on sound professional concepts.
- Organizing the work of the agency, and delegate responsibility to various staff members as appropriate
- Making regular reports to the board, where applicable on all aspects of the operation of the agency and its program

38

## STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).

- Handling expenditures according to allocations in the budget, and develop the annual budget in conjunction with the board, where applicable
- Developing a plan for orientation, training and development of staff
- Appointing, evaluating, and terminating staff
- Making provision for continuity of administrative authority in her/his own absence.
- Developing a program of public relations, including interpretations to the community, the board, and the insurance carrier.
- Notifying the state Department in the event of an incident that is considered to jeopardize the life of a child, staff member, or other person.

**Supervisor/Manager\*\***Camellia Therapeutic Foster Agency's Supervisor Manager are responsible for:

- **Case Work Supervision**
  The supervisor provides regular support and guidance to the caseworkers through weekly supervisory meetings. Formal supervisory meetings shall be supplemented as needed by informal contact between the supervisor and the caseworker. Each supervisor's caseload shall net exceed 6 case workers
- **Treatment Planning**
  The supervisor takes ultimate responsibility for the development of a comprehensive treatment plan, based on a thorough case assessment for each child admitted into the program. The comprehensive treatment plan shall consist of the strengths, needs, and steps identified in the family's ISP, as developed by the ISP team. Also included are supervision of ongoing treatment planning, and implementation of services for each child.
- **Treatment team**
  The supervisor oversees and supports the caseworker as leader of the treatment team and shares ultimate responsibility for the team plans and decisions.
- **Crisis On-call**
  The supervisor provides coordination and back-up to assure that 24 hour on-call crisis intervention services are available and delivered as needed to the TFC foster parents, the children in care, and their families.

**Family Consultant**
**\*\***Camellia Therapeutic Foster Agency's Family Consultants are responsible for:
- **Treatment Plan**
  Provides leadership of the treatment plan, organizes and manages all treatment team meetings, coordinates, team decision making regarding the care and treatment of the child and services to the child's family as identified in the comprehensive treatment plan, provides, information and training as needed to treatment team members, responsible for preparing each child's comprehensive treatment plan.

39

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

- **Support and Consultation to Foster Parents**

  Provides regular support and technical assistance to the TFC foster parents in their implementation of the treatment plan, and other responsibilities they undertake, provide in home teaching, modeling, coaching, and feedback to foster parents, at least bi-weekly contact wit foster parent.

- **Caseloads**

  Carry a caseload of eight children, provide bi-weekly face to face contact to communicate special concerns, make direct assessments of child's progress, to monitor for potential abuse and to build relationships. Also the family consultant must have  reliable transportation with insurance and proper registration. The family consultant also must be able to type and use compute effectively, with at least a minimum of 60 wpm. All notes should be typed on the computer neatly and ready for billing.

- **Support and Consultation to Families of Children**

  Seek to enhance the child's relationship with their parents, establish contact and visitations between parents and child, involve parents in treatment team meetings. plans and decisions, keeping them informed of the child's progress in the program. The family consultant must be available to assist the parent with transportation in child appointments and must be willing to take the child if the foster parent is unable to attend the appointment.

- **Community Liaison and Advocacy**

  Jointly with ISP team identify resources and or services that may be utilized to reach the child's treatment plan.

- **Crisis On-Call**

  Be on-call to TFC foster parents, children and their families on a 24 hour/seven day a week basis. All crisis must be responded to within 15 minutes. All consultants must have a cell phone or beeper made available to the foster parent and foster child in the event of a crisis.

**\*\*Camellia Therapeutic Foster Agency's caseloads are as follows: Family Consultants are responsible for a caseload of 8, Therapist are assigned a caseload of 18, and each supervisor has a caseload of 6.**

## STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).

### Clerical Staff

These staff are responsible for carrying out business, secretarial, and clerical duties, such as maintenance of records, correspondence, fiscal matters, and bookkeeping, so that professional staff can carry out the services of the agency. These staff are also available for general housekeeping including watering the office plants, making sure the lights are turned on/off each day, vacuuming the floors, regulating the heat and air conditioning and keeping the office clean of excessive debris.

3. **Describe in detail the steps that the program owners and/or administrators take to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into question the propriety of that employee's working with this population of children. Provide documentation that each employee has had a criminal background check. If an incident or allegation is reported, founded or unfounded, describe your organization's general procedure in this regard.**

- Each Camellia staff considered for employment must complete a request for a criminal history clearance and CAN clearance prior to employment with Camellia.
- Each Camellia staff prior to employment must submit three non-relative references that will attest to his/her character, temperament and suitability to work with TFC children. All references are contacted by telephone.
- After the clearances are received from the ABI/FBI and CAN registry, and the references are returned with a positive report the staff person is made an official employee and can then report to the assigned Camellia office.
- The ABI/FBI and CAN clearances are documented in the staff's personnel file along with the reference reports.
- If an incident or allegation is reported as founded, Camellia will terminate the staff immediately. If the allegation is unfounded, Camellia will consult with the Board of Directors as to what measures to take.

### List of Camellia Therapeutic Foster Agency's Staff

Agyeman Osei-Yeboah, PhD.     Karen L. Jurls, LCSW          Katrina Jefferson, MSW
Cathleen Dixon, LCSW          Latonya Tinsley, MS           Kareema Jacobs, MSW
Joselyn Hereford, MSW         Eva Ransom, MSW              Lakeisha Bearden, BS
Clementine Ellis, BSW         Debra Winston, BSW           Justina Okeke, LGSW
Renee Lyles, AA               Brenda Ayers, D

\* It is certified by submission of this RFP that all of the above Camellia TFA staff have ABI/FBI & CAN clearances in their personnel files.

41

STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).

4.  **Describe in detail the level of education, experience and training possessed by management level staff in the provision of services identified in this RFP. Specify the organization's staff development program regarding orientation and on going training for all staff.**

- Camellia's **Executive Director** is required to have a master's degree in the field of social work psychology, education, administration, or a related filed, along with five years experience in family and children's services with progressively responsible duties in supervision and administration.

- Camellia requires that all **Case supervisors/Managers** be either a LGSW, LCSW or LPC, a master's level degreed in either social work, counseling, psychology, or a closely related field with completion of a field practicum in that course, or who have six months of supervision by a master leveled professional or above with 2 years of post graduate professional experience, or an individual with an LBSW with five years of experience in a therapeutic setting.

- **Social workers** chosen for employment with Camellia are required to be licensed and shall practice social work pursuant to Code of Alabama 1975, 34-30-1 through 34-30-58, have at least a license as a graduate social worker, license as a certified social worker or a license as a bachelors, social worker with continuing supervision from a person so licensed.

- Camellia's Family Consultants are required to possess at least a BSW or Bachelor's degree in social work or a closely related field.

- **Clerical Staff** employed with Camellia are selected based on personal and technical qualifications and job descriptions.

- **Other Professional staff** employed with Camellia are required to be qualified or licensed in their professional fields as required by state law.

42

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

**STAFF DEVELOPMENT( All staff, including volunteers)**

1. Orientation
   A. New Staff shall receive orientation within thirty days of employment
      Orientation will cover (20 hours):
      - Agency Philosophy, Policies, and Procedures
      - Generally Accepted Principles of Child Care and Behavior Management Practices
      - Overview of the Child Care Institution, Group Homes, and Child Placing Agencies
      - Confidentiality Issues
   B. The program is administered under the supervision of qualified staff to the position being assumed by the new employee. Completion of orientation must be documented in the employee's file.

2. New Hire Training
   A. Training consisting of a minimum of 30 hours will be completed within the first one hundred eighty days of hire.
   B. The training shall consist of the following components:
      - Child Development
      - Behavior Management
      - The Process of Grief and Loss
      - The Dynamics of Attachment and Separation
      - The Value of Families
      - Individualized Service Plan
      - Identifying the Strengths and Needs of Families and Children
      - Behavior as an Expression of Underlying Needs
      - The Value of Partnerships
      - How Foster Children Enter the Foster Care System
      - Family Implications among Agency Personnel
      - Overview of the R.C. Consent Decree
      - Understanding and Valuing Cultural Differences

3. Continuing Education
   A. After one year of employment a program of in-service training will provide staff with a minimum of fifteen(15) hours of in-service training annually. Participation at conferences and workshops may be included as part of the 15 hours as documented by attendance certificates.
   B. Training may include, but is not limited to:
      - Child Safety Issues
      - Crisis Intervention/Engaging Families
      - The Impact of the Media of Children
      - Effects of Multiple Placements

43

## IV. PROGRAM NARRATIVE

**H.    STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

- Cultural Sensitivity
- Significance of Birth Families
- Substance Abuse
- Gang Activity
- Universal Precautions and Infection Control
- Cardiopulmonary Resuscitation (CPR)

**C.    Responsibilities**

- Interns and Volunteers shall not be permitted to assume total responsibility or duties of any paid staff member
- Written job descriptions and responsibilities shall be developed for all volunteers and interns
- A staff member shall be designated to supervise and evaluate the activities of the volunteers and interns
- A file will be maintained on the schedules, hours worked and activities of all volunteers and interns

**5.    Describe how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Provide a specific plan addressing emergencies and critical incident response.**

Camellia Therapeutic Foster agency have staff available twenty-four hours each day to handle emergencies and other crisis events. The following is a list of Camellia's procedure for dealing with these occurrences.

- All foster parents will be given the numbers for the Camellia on-call worker after hours in the event of a crisis or emergency.
- The Camellia worker will respond to the foster parent immediately and within 15 minutes of the call.
- In the event of any emergency, the Camellia on-call or assigned worker should arrive on the scene within thirty minutes of the call or earlier, as it is deemed necessary. As deemed necessary the Camellia worker will provide the needed intervention by telephone in order to alleviate the situation until he/she arrives on the scene. The Camellia supervisor and/or executive director will be notified of the situation and direct the worker on the proper protocol.

## STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).

**\*\*Arrest of any child or involvement by police:** In the event that a TFC child is arrested or involved in a police altercation, the Camellia foster parent must immediately notify the Camellia consultant. The consultant will speak with the appropriate party to find out what has lead up to this incident. The consultant will immediately notify the Camellia supervisor who will notify DHR as soon as possible.

**Child Away without Permission/ Runaway Child:** In the event that a child runs away, the following procedure should be followed by the Camellia foster parent/worker. The Foster Parent should begin attempting to locate the child throughout the neighborhood, immediate vicinity, known locations of friends of the child. The foster parent should then check the locations of known friends or relatives of the child. The foster parent should immediately report this incident to the Camellia worker. The worker will then assist the foster parent on procedure and in locating the child. The worker will assess the situation to determine the need for police or other intervention. The worker will immediately notify the child's DHR worker or the county on-call worker of the child running away. After attempting to locate the child for several hours, assessing the child's desire to run away, or locating material verifying the child intent to run away the worker will instruct/assist the foster parent to file a run away petition. If the child is located the worker will assess the situation and need for respite or another placement.

**Suicidal Threats/Ideation or Self Injurious Behaviors:** In the event that a child threatens to harm himself Camellia TFA have established a protocol for foster parents, staff to follow. If a child threatens to harm him/herself, makes threats of bodily harm to someone else, or is noticed to participate in self-injurious activities, the foster parent should immediately notify the Camellia worker assigned or on-call to assess the situation by telephone or in person. The foster parent should make sure that the child is not left alone for any time period. The foster parent should make sure that all potentially injurious or dangerous items are locked away or out of the child's reach(medicine, knives, weapons, etc...) The Camellia worker will do a face to face assessment of the child to determine if there is a risk of self harm or harm to another party. Once this assessment is made, the worker will contact his/her supervisor for further instruction on how to handle service delivery.

45

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

**Medical Emergencies:**   In the event of a medical emergency or need for medical treatment, Camellia has the following guidelines in place for foster parents with children in their care.

In the event that a Camellia TFC child has a medical emergency or needs medical treatment, the foster parent should first assess the need for immediate treatment, if there are any questions on whether the child needs immediate medical attention the foster parent should confer with the child's medical doctor. If there is a need for immediate treatment the foster parent should take the child to the local emergency room or his/her physician immediately. The foster parent should immediately notify the child's Camellia worker or on-call worker of the situation. The Camellia worker will assist the foster parent as needed. If the child is taken for emergency treatment the Camellia worker will meet the parent at the hospital/physician's office as deemed necessary. Neither the foster parent or Camellia worker may authorize surgery for a foster child. The Camellia worker will contact the child's DHR worker or on call worker immediately. If there is a need for any type surgery, medical procedure or administering of certain medication, involving an DHR foster child, permission will be obtained through DHR by the way of a youth court order.

**Delinquent Behavior/Possession of Illegal Substances or Weapons:**   In the event that a youth is believed to be or found to be in possession of any illegal substances or weapons the foster parent should first attempt to remove the items from the child's possession. The foster parent should notify the child's Camellia worker immediately for assistance. The Camellia worker will determine if the situation warrants the involvement of the local police department. The child's DHR worker or the on-call worker will be notified of the situation immediately.

**Incidents of Physical Injury/ and or Abuse Neglect to a Foster Child:**  All incidents of physical injury, and or abuse/neglect suspected should be immediately reported to the case supervisor and or executive director. The Camellia worker should immediately make a verbal report and within 24 hours make a written report to DHR via the CAN report as deemed necessary. The Camellia worker should assess the situation to determine what happened and the potential for harm to the child. The case supervisor will determine the need for immediate removal of the foster child from the home.

**Discipline, seclusion, and restraint**
Camellia staff/foster parents adhere to the DHR's policy on discipline, as set forth in the Foster Family Home Standards and in the Behavioral Management Policy guide. Physical restraint is only allowed by a trained person in the event of acting to protect the child or others from injury or to prevent excessive property damage.

46

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

6.    Describe the use of volunteers and interns within the organization and how they are selected and screened for background checks.

Volunteers and interns are used mainly as a supporting agents to professional staff. They work directly with agency staff in assisting the staff with the completion of assignments, maintenance of case files, and light clerical duties. All volunteers and interns who have direct contact with the therapeutic child complete the criminal background and CAN clearances and provide the agency with three non-relative references.

7.    Describe in detail the plans to meet the training requirements established in the Department's rules and training related to operating this selected programs.

Camellia has outlined above its Staff development program. This program is used to ensure the training of each staff member prior to and during employment with Camellia Therapeutic Foster Agency.

**I. REFERENCES:** List all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. This list should include the names, addresses,  and telephone numbers of contact persons within those agencies responsible for contract monitoring. DHR will be responsible for contacting these agencies for reference information.

<u>References</u>

Laura Parchman, LGSW
DHR Supervisor
Jefferson County
4500 5th Avenue South
Birmingham, AL. 35233
(205) 918-5169
email: Lparchman@DHR.State.AL.US

Patti Way, MSW
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256)-535-4527
email: p.way@DHR.State.AL.US

Chuck Evans, MSW
DHR Supervisor
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4680
email: c.evans@DHR.State.AL.US

Cherry Jones, MSW
Program Supervisor
Russell County
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5803
email: c.jones@DHR.State.AL.US

47

**References (Continued).**

Darnell Sharpeson, BSW
DHR Social Worker
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 517-1410
**email: d.sharpeson@DHR.State.AL.US**

Annie Poles, MSW
Service Supervisor
Russell County
1003 25th Avenue
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5853
**email: a.poles@DHR.State.AL.US**

Jacqueline Griffin, MSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4645
**email: j.griffin@DHR.State.AL.US**

Chasidity Perry, BSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4655
**email: c.perry@DHR.State.AL.US**

Mary Ann Wilson, LGSW
Program Analyst, SDHR
50 Ripley Street
Montgomery, AL. 36130
(334) 242-1659
**email: m.wilson@DHR.State.AL.US**

Robin King, MSW
Jefferson County DHR
4500 5th Avenue South
Birmingham, AL. 35223
(205) 918-5193
**email: r.king@DHR.State.AL.US**

E.    **HOLD BACK:**

As a guarantee for the delivery of services required by this RFP. and the acceptance by the Department of these service in accordance with the specifications set forth in the RFP, in the event Camellia Agency fails to deliver or perform the said services to the Department's satisfaction the Department reserves the right to withhold part of all of any funds committed by the Department under any contract that may result from a proposal submitted in response to this RFP and to cancel the said contract without any resulting liability, present and future, to the Department or to the state of Alabama.

# VII. VENDOR CERTIFICATION

**A.**     Vendor warrants and represents to the Department that the vendor accepts and agrees with all of the terms and conditions of the RFP certified to the department that the applicant is legally authorized to conduct business within the State of Alabama and to carry out the services described in this RFP and that all of the following statements are true and correct

_Joseph Appiah_            _Nathan L. Dudy_
Vendor                     Notary Public

My Commission expires
1-10-07

**B.**     **REVOLVING DOOR POLICY**
The vendor further certify that neither the vendors trustees, officers, agents, servants, or employees is a current employee of the Department and none of the said individuals have been employees of the Department in violation of the revolving door prohibitions contained in the State of Alabama's ethics laws.

**C.**     **DEBARMENT**
The vendor further certifies that neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants, or employees(whether paid or voluntary) is debarred or suspended or otherwise excluded from or ineligible for   participation in federal assistance programs under Executive Order 12549, "Debarment and Suspension."

**D.**     **STANDARD CONTRACT**
The vendor agree to use the Department's standard contract document. The vendor will further comply with all the terms and conditions of that document including, but not limited to compliance with the Title VI of the Civil rights Act of 1964, the Rehabilitation Act of 1973 as Amended, the Americans with Disabilities Act, Alabama Act 2000-775 (governing individuals in direct services positions who have unsupervised access to children) the Health   Insurance Portability and Accountability Act of 1996(HIPPA) as applicable, and all other federal and state laws, rules and regulations applicable to receiving funds from the Department to carry out the services described in this RFP.

Further any contract executed pursuant to the RFP shall be subject to review by the Department's legal counsel as to its legality of form and compliance with state contract laws, terms, and conditions, and may further be subject to review by the Alabama Legislative Contract Review Committee, Examiners of Public Accounts, the State Finance Director and the Office of the Governor.

49

**VENDOR CERTIFICATION (Continued).**

**E.** **CHARITABLE CHOICE**
This Section does not apply.

**F.** **FINANCIAL ACCOUNTING:**
The vendor's accounting system is consistent with General Accepted Governmental Accounting Principals(GAAP). Furhter, the vendor maintains sufficient financial accounting records to allow the vendor to account for and document the sources, including, as applicable, required matching funds.

**G.** **FINANCIAL AUDIT:**
The vendor will, upon the Department's request, provide the Department a copy of its most recent financial audit report. (The report should not be submitted with the proposal.)

**H.** **PROPOSAL LIFE**
The proposal submitted to the Department in response to this RFP will be binding on the applicant for ninety (90) calendar days following the due date prescribed in the RFP.

## V. COMPENSATION FOR PROVIDING SERVICE

### FORM TO ESTABLISH RATE FOR SERVICE

**CONTRACTOR:** _Camellia Therapeutic Foster Agency, LLC_    **CONTRACT NO.** _3095 (TFC)_

### BUDGET RECAP OF EXPENSES

Proposed: October 1, ___2005___
September 30, ___2006___

**I.      Personnel:**

    A.      Salaries (Attach
          Personnel  Addendum)        ___2,368,000.00___

    B.      Fringe Benefits:
          Health Insurance        ___58,000.00___        FICA  _$540,000_
          Retirement        __Match Social Security__        Other _____
          Group Life Insurance        ___2,880.00___
    C.      Foster Parent        ___3,323,690.00___

**II.     Subcontracted Services:**

    A.      Consultants        ___90,000.00___
    B.      Audit Service        ___10,000.00___
    C.      Transportation
          (Provided By Another
          Agency)        ___3,000.00___        most  transportation is
                                            done by staff/ parent

**III.    Travel:**

    A.      Mileage (Show rate of
          Reimbursement)        __0.32 per mile__
    B.      Per Diem (Show Rate of
          Reimbursement)        __150.00 per day__        (including Hotel and
                                            food)

**IV.     Space:**

    A.      Telephone        ___21,600.00___
    B.      Rent (include copy of lease)        ___71,220.00___        for six offices
    C.      Use Allowance (No
          More than 2% of
          Acquisition Cost/Year)
    D.      Rental Rate System        __2.00 sq ft__
    E.      Utilities        ___20,000.00___
    F.      Maintenance of Building
          or Grounds        ___1680.00___
    G.      Minor Repairs to
          Building        ___N/A___

**\*** Per diem Payment of $500 per Social Worker per month for gasoline expenses is cheaper than paying for mileage at the rate of $ .32 per mile, since each Social Worker covers at least 2000 miles per week.

V.      **Supplies:**

| | | | |
|---|---|---|---|
| A. | Office | 10,000.00 | |
| B. | Household | | |
| C. | Recreational | 188,400.00 | **314x 50x12months** |
| D. | Educational | 3,000.00 | **Extra tutorial services** |
| E. | Medical | | |
| F. | Personal Care | 10,000.00 | |

VI.     **Equipment:**

A.      Rental (include rental
              agreement)      **Equipment Purchased**
B.      Repair                    **3,000.00**
C.      Depreciation (Attach
              Depreciation Addendum)

VII.    **Other:**

| | | | |
|---|---|---|---|
| A. | Insurance | 19,200.00 | |
| B. | Vehicle Operation | 6,000.00 | |
| C. | Taxes | | |
| D. | Food in Excess of USDA | N/A | |
| E. | Foster Parent | 3,151,775.00 | **at 27.50x 314x365days** |
| F. | Other Allowable Cost, Specify General Categories: | N/A | |

VIII.   **Unallowable Costs:**
(Building Costs, Bad Debts,
Contingencies, etc. Refer to
Unallowable Costs Section in
POS Manual.)                        **20,000.00**

IX.     **Total Program Cost:**            **$9,921,445.00 (M)**

X.      **Program Income:**          Please report all income from all sources available to your program.
(Detail Sources)
        **State DHR**                      **County DHR**

**Rate Information R.F.P.**

XI.     **Client Date:**          **October 1, 2005- September 1, 2006**

A.      Potential Units of        **Medicaid Eligible Children**
        Service (Multiply          314 slots at $66 Fixed Rate at 365 days
        License Capacity by
        Day in Year.)

                        TOTAL        **$7,564,260.00 (M)**

**DHR Eligible Units** of 314 slots at $29.00 fixed rate service at 365 days

TOTAL       $3,323,690.00 (M)

I certify that the above reflects the true actual and estimated expenditures of this program for the time frames listed.

Signed   _Joseph Appiah_

Title    _Chairman / C.E.O_

Date     _April 5, 2005_

**Personal Addendum Attached.**

✻   Unit cost is based on Total Program Cost less Unallowable Costs.

PERSONNEL ADDENDUM (ATTACH TO "FORM TO ESTABLISH RATES")

PROPOSED

| A. No. of Persons | B. Position | C. Monthly Gross Salary | D. % Time on Project | E. Months Employed | F. Cost (AxCxDxE) |
|---|---|---|---|---|---|
| 1 | Executive Director | $6,000.00 | 100% | 12 months | $72,000.00 |
| 5 | Supervisor/LCSW | $5,000.00 | 100% | 12 months | $300,000.00 |
| 30 | Social Workers | $4,000.00 | 100% | 12 months | $1,400,000.00 |
| 1 | Program Director | $4,160.00 | 100% | 12 months | $50,000.00 |
| 6 | Administrative Assistant | $2,500.00 | 100% | 12 months | $180,000.00 |
| 6 | Janitors | $1,000.00 | 100% | 12 months | $72,000.00 |
| 4 | Medicaid Billing Specialist | $2,500.00 | 100% | 12 months | $120,000.00 |
| 1 | Bookkeeper | $2,500.00 | 100% | 12 months | $30,000.00 |
| 1 | Accountant | $2,500.00 | 100% | 12 months | $30,000.00 |
| 1 | Auditor/CPA | $1,200.00 | 100% | 12 months | $14,000.00 |
| 1 | Quality Assurance Director | $5,000.00 | 100% | 12 months | $60,000.00 |
| 52 | | $36,360.00 | | | $2,368,000.00 |

| NAME | POSITION | EDUCATION(NO. YRS.) | | | DEGREES | NO. OF YRS EXPERIENCE IN FIELD OF CHILD | % WORK PER WEEK |
| | | High School | Under-Graduate | Graduate | | | |
|---|---|---|---|---|---|---|---|
| Karen Juris | Executive Director | X | X | X | MSW/LCSW | 18 | 100% |
| Katrina Jefferson | Asst. Director/QA | X | X | X | MSW | 5 | 100% |
| Cathleen Dixon | Supervisor | X | X | X | MSW/LCSW | 10 | 100% |
| Justina Okeke | Licensing Specialist | X | X | X | MSW | 15 | 100% |
| Osei Yeboah | Personnel | X | X | X | Ph. D. | 3 | 100% |
| Latonya Tinsley | Therapist | X | X | X | MS | 3 | 100% |
| Kareema Jacobs | Family Consultant | X | X | X | MSW | 2 | 100% |
| Josely Hereford | Family Consultant | X | X | X | MSW | 3 | 100% |
| Eva Ranson | Supervisor | X | X | X | MSW | 16 | 100% |
| Lakeisha Bearden | Family Consultant | X | X | N/A | BS | 3 | 100% |
| Clementine Ellis | Family Consultant | X | X | N/A | BS | 3 | 100% |
| Debra Winston | Family Consultant | X | X | N/A | BSW | 5 | 100% |
| Donna Gibson | Licensing Specialist | X | X | X | MSW/LGSW | 10 | 20% |
| Renee Lyles | Medicaid Billing | X | X | N/A | AA | 3 | 100% |
| Brenda Ayers | Transportation | X | N/A | N/A | N/A | 2 | 100% |
| Corliss Massey | LPC/Therapist | X | N/A | X | MS/LPC | 15 | 20% |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |



# State of Alabama
# Department of Human Resources



License Number: **34627**

This is to certify that   **CAMELLIA THERAPEUTIC FOSTER AGENCY**
(Licensee)

is hereby granted this LICENSE to conduct and maintain
**CAMELLIA THERAPEUTIC FOSTER AGENCY**
(Name of Child Care Facility)

as a    **CHILD PLACING AGENCY**     for      **N/A,**
(Type of Child Care Facility)          (Number of children)

ages    **N/A**
(Age range of children)

located at  **2310 CRAWFORD RD, SUITE 104**    **PHENIX CITY**
       (Street Address)                  (City)

in    **RUSSELL,**
   (County)                                State of Alabama.

This LICENSE shall be in force for a period of two years from the **19TH** day of **MARCH, 2005,** to the **19TH** day of **MARCH, 2007,** subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975,* or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this **16TH** day of **MARCH, 2005.**

BY      _____ , Ph.D.
Commissioner
State Department of Human Resources

NOTE: This LICENSE must be posted in a conspicuous place on the premises.

FSD-1969
(8/99)

*Standard*

EDS
P.O Box 244035
301 Technacenter Dr
Montgomery, AL 36124-4035

DECEMBER 6, 2004

CAMELLIA THERAPEUTI FOSTER AG LLC
50 RIPLEY ST

MONTGOMERY AL 36130-0000

Re: Notification of New Alabama Medicaid Provider Number

Dear Provider:

Thank you for your interest and participation in the Alabama Medicaid Program. Your enrollment has been reviewed and processed. Your new    STATE REHAB SERVICES performing provider identification number is   339091102      Your billing/payee number is    339000000       You have been enrolled for the following enrollment period: 12-01-04     through    NO END     Please refer to program specific enrollment and claims filing information on the Medicaid Provider Manual.

If any of the information on your enrollment application and/or contact should change in the future, please notify us in writing at the address above.

Mailing addresses for specific claim types are listed in Appendix N in the Medicaid Provider Manual. If you have any questions regarding claims processing, please contact us at 334-215-0111. If you are in the State of Alabama, you may also call 1-800-688-7989.

If you have any questions regarding your provider number, please contact the Provider Enrollment Unit at 334-215-0111 or 1-888-223-3630.

Sincerely,

*Chasity Morga*

Provider Enrollment

Enclosure

Stepdown

EDS
P.O Box 244035
301 Technacenter Dr
Montgomery, AL 36124-4035

DECEMBER 6, 2004

CAMELLIA THERAPEUTIC FOSTERAG LL
50 RIPLEY ST

MONTGOMERY AL 36130-0000

Re: Notification of New Alabama Medicaid Provider Number

Dear Provider;

Thank you for your interest and participation in the Alabama Medicaid Program. Your enrollment has been reviewed and processed. Your new STATE REHAB SERVICES performing provider identification number is 339091202. Your billing/payee number is 339000000. You have been enrolled for the following enrollment period: 12-01-04 through NO END. Please refer to program specific enrollment and claims filing information on the Medicaid Provider Manual.

If any of the information on your enrollment application and/or contact should change in the future, please notify us in writing at the address above.

Mailing addresses for specific claim types are listed in Appendix N in the Medicaid Provider Manual. If you have any questions regarding claims processing, please contact us at 334-215-0111. If you are in the State of Alabama, you may also call 1-800-688-7989.

If you have any questions regarding your provider number, please contact the Provider Enrollment Unit at 334-215-0111 or 1-888-223-3630.

Sincerely,

*Chasity Morgan*

Provider Enrollment

Enclosure



# State of Alabama
# Disclosure Statement

(Required by Act 2001-955)

ENTITY COMPLETING FORM
Camellia Therapeutic Foster Agency, LLC.

ADDRESS
2310 Crawford Road #104

CITY, STATE, ZIP
Phenix City, AL. 36867

TELEPHONE NUMBER
( 334 ) 448-2999

STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD
ALABAMA STATE DEPARTMENT OF HUMAN RESOURCES

ADDRESS
50 Ripley Street

CITY, STATE, ZIP
Montgomery, AL. 36150

TELEPHONE NUMBER
( 334 ) 242-1650

This form is provided with:

[X] Contract    [ ] Proposal    [X] Request for Proposal    [ ] Invitation to Bid    [ ] Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

[X] Yes    [ ] No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| Alabama State Dept. of Human Resources | Therapeutic Foster Care | $1/1 million |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

[ ] Yes    [X] No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| N/A | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
|---|---|---|
| N/A | | |

*OVER*

2. List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| N/A | |
| | |

By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.

_Joseph Appiah_
Signature

April 05, 2005
Date

_William L. Dudly_
Notary's Signature

4-5-05
Date

1-10-07
Date Notary Expires

Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.

DEFENDANT'S
EXHIBIT
6

ATTACHMENTS:

Attachment I:  Alabama Department of Human Resources TFC Care Vendor Selection by Regions (original) posted on website on May 12, 2005.

Please see the attachments to note that the vendor's <u>Children and Families First of Alabama</u> was not included on the <u>original</u> posting, yet they appeared on the website <u>one</u> week later, scored higher than Camellia and were awarded <u>8</u> slots.

6

**Alabama Department of Human Resources**
**Therapeutic Foster Care Vendor Selection by Regions**

| Program | Score | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | 904.25 | | | | | | | | | | |
| SAFY | 893.5 | 8 | | | | 24 | 8 | 4 | | | 36 |
| UMCH | 893.25 | | | | | 83 | 14 | 16 | 7 | | 201 |
| TPI | 892.75 | 13 | | | | 8 | 16 | 14 | 30 | 30 | |
| LCYDC | 889.5 | 13 | 38 | 28 | 20 | 8 | 83 | 23 | | | 313 |
| AL Mentor | 887 | | 16 | 29 | | 20 | | | | | 96 |
| Wilmer Hall | 871.5 | 8 | | | | | 12 | 12 | 50 | 54 | |
| Youth Villages | 869.25 | 8 | | 20 | | 12 | | | | | |
| FIT Homes | 867 | 8 | 8 | 8 | | | | | | | |
| Seraaj | 854.75 | 10 | 20 | | | 40 | | | | | |
| Eagle Rock | 849.25 | 10 | 16 | | 8 | | | | | 30 | |
| Child/Fam Svs | 838 | 8 | | | 19 | 75 | 8 | | 44 | 20 | 70 |
| Alliance | 833.25 | 8 | | | | | | | | | |
| Gateway | 820 | | | | | | | | | | |
| Min View | 818.65 | | | | | 16 | | 8 | 8 | | 8 |
| Catholic SS | 817.25 | | | | | 50 | | | | | 8 |
| New Way Out | 811 | | 16 | | | | | | | | 18 |
| NBA CSC | 754.25 | | 16 | 8 | 8 | 30 | | 18 | | | 50 |
| Camellia | 753.3 | | | | | | | | | | 18 |
| Success Hms | 712.5 | | | | | | | | | | 16 |
| Fam. Values | 683.5 | | | | | | | | | 70 | 70 |
| Ability + | 639 | | | | | | | | | | 0 |
| **Total** | | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |

*(Handwritten notes on page:)*

OFFICIAL Rated Score,

EXHIBIT 2B

Where is Child/Fam 1st? miraculously appeared on the 2nd page?

How did they...

## Alabama Department of Human Resources
### Therapeutic Foster Care Vendor Selection by Regions

*(handwritten annotation: "Final Result")*

*(handwritten region labels above columns: I — Pike/Barbour, II — Mobile, III — Montgomery, IV — Russell, V — Tuscaloosa, VI — Jefferson, VII — Blount, VIII — Etowah, IX — Madison)*

*(handwritten "New 1"/"New Enroll" marks next to: AL Mentor, Wilmer Hall, Youth Villages, Eagle Rock, Child/Fam Svs, New Way Out)*

| Program | Score | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | 904.25 | | | | | | | 4 | | | 36 |
| SAFY | 893.5 | 8 | | | | | 8 | | | 30 | 201 |
| UMCH | 893.25 | 8 | | | | 8 | | | | | 96 |
| TPI | 892.75 | 13 | 16 | 29 | | | 14 | 16 | | | 313 |
| LCYDC | 889.5 | 13 | 33 | 28 | 20 | 20 | 83 | 14 | 7 | 54 | 96 |
| AL Mentor | 887 | | | | 20 | 20 | 83 | 12 | 23 | | 201 |
| Wilmer Hall | 871.5 | | | | | | | | | | |
| Youth Villages | 869.25 | | | 8 | | | 12 | | | | 20 |
| FIT Homes | 867 | | | | | | | | | | 16 |
| Seraaj | 854.75 | 10 | 20 | 20 | 19 | 12 | 40 | | | 30 | 70 |
| Eagle Rock | 849.25 | 10 | 16 | | | 24 | | | | | 42 |
| Child/Fam Svs | 838 | | 8 | 8 | 8 | 8 | 75 | 8 | 44 | | 208 |
| Alliance | 833.25 | | | | | | | | 8 | | 8 |
| Gateway | 820 | | | | | | 18 | | | 20 | 8 |
| Mtn View | 818.65 | | | | | | | | 18 | | 18 |
| Catholic SS | 817.25 | | | | | | 50 | | 50 | | 50 |
| New Way Out | 811 | | 16 | | | 30 | | | | | 18 |
| NBA CSC | 754.25 | | 16 | | | | | | | | 16 |
| Camellia | 753.3 | | | | | | | | | | 70 |
| Success Hms | 712.5 | | | | | | | | | | 0 |
| Fam. Values | 683.5 | | | | | | | | | | 0 |
| Ability + | 639 | | | | | | | | | | 0 |
| Total | | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |

Attachment II:

An amended vendor selection chart was posted on website

When the score was posted I called Ms. Susan Ward, MBA, Director of Contracts and Federal Claiming, and asked her if this was a final score of all agencies, and she replied, "Yes", and I called Mr. Gary Mitchell, Manager of T.F.C. and he also said, yes". Could the Commissioner explain where was Child/Fam 1st proposal, how did it miraculously come into view in front of Wilmer Hall with 16 slots, a week later?

*Changed Result to Accomodate Child/Fa... 1-*

*Attachment II*

| Program | Score | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | 904.25 | | | | | 24 | 8 | 4 | | | 36 |
| SAFY | 893.5 | 8 | | 28 | 20 | | 8 | | | | 36 |
| UMCH | 893.25 | 13 | 16 | 8 | | 8 | 32 | 16 | 8 | 30 | 189 |
| TPI | 892.75 | 13 | 33 | 26 | | 20 | | 14 | 14 | 22 | 95 |
| LCYDC | 889.5 | | 20 | | 20 | 20 | 82 | 12 | 48 | 54 | 310 |
| AL Mentor | 867 | | | | 20 | | | | | | 20 |
| Child/Fam 1st | 884 | | | 8 | | | 12 | | | | 20 |
| Wilmer Hall | 871.5 | | 8 | 8 | | | 8 | | 8 | | 16 |
| Youth Villages | 869.25 | | | | | | 8 | | 8 | | 16 |
| FIT Homes | 867 | 10 | 20 | | | 12 | | | | 30 | 68 |
| Seraaj | 854.75 | 10 | 16 | 8 | | 8 | | | | | 42 |
| Eagle Rock | 849.25 | 10 | 16 | 8 | 19 | 8 | 74 | | 42 | 20 | 205 |
| Child/Fam Svs | 838 | | | | | | | 7 | | | 7 |
| Alliance | 833.25 | 8 | | | | | | | | | 8 |
| Gateway | 820 | | | | | 17 | | | | | 17 |
| Min View | 818.65 | | | | | | 49 | | | | 49 |
| Catholic SS | 817.25 | | | | | | | | 17 | | 17 |
| New Way Out | 811 | | 16 | | | | | | | | 16 |
| NBA CSC | 754.25 | | 16 | 8 | 8 | 8 | 29 | | | | 69 |
| Camellia | 753.3 | | | | | | | | | | 0 |
| Success Hms | 712.5 | | | | | | | | | | 0 |
| Fam. Values | 683.5 | | | | | | | | | | 0 |
| Ability+ | 689 | | | | | | | | | | 0 |
| Total | | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |





# State of Alabama
## Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us



**BOB RILEY**
*Governor*

**Page B. Walley, Ph.D.**
*Commissioner*

August 16, 2005

Hon. Earl F. Hilliard
Hilliard, Smith & Hunt, LLC
Post Office Box 12445
Birmingham, Alabama 35202-2445

Hon. Peter A. Dumbuya
Post Office Box 3302
Phenix City, Alabama 36868-3302

RE:   *Dr. Joseph Appiah/Camellia Therapeutic Foster Agency*

Dear Sirs:

Your client, Dr. Joseph Appiah, sent a letter to Coleman Campbell, the former Chief Legal Counsel at the Department of Human Resources, regarding the failure of Camellia Therapeutic Foster Agency to qualify to be award any therapeutic foster care homes under a recent DHR request for proposals. Attached to his letter was a copy of a letter to the DHR Board members and a request for an administrative hearing before DHR to appeal the RFP process. Sharon Ficquette the current DHR Chief Legal Counsel, asked me to respond to Dr. Appiah's letter.

Dr. Appiah made several allegations in his letters to Mr. Campbell and the DHR Board Members, which were not true. I will not attempt to answer each and every allegation, but will address his major contentions. These major contentions are that he was not rated fairly on his proposal and that the poor rating was based on discrimination because Camellia was a black owned agency. He also alleges that out-of-state agencies and unlicensed agencies were improperly awarded homes under the RFP.

A panel of reviewers objectively graded the proposals that were submitted. Each proposal was graded on a variety of issues with a perfect score being 1000 points. In order to ensure that more than one or two agencies would be selected, the decision was made to award homes to each agency that score 800 or above on their proposal.

α 5

agency was allowed to review their own scores and the scores of other proposals and to request copies of the proposals submitted by the other agencies.

Camellia Therapeutic did not receive any homes under this RFP because of its low score, not because of any discrimination. There were other companies who did not receive any homes because their score was too low (4 other companies scored below 800).

There were some agencies from out-of-state that received homes. However, all but one of these agencies had already been working in Alabama. DHR had no ability to restrict out-of-state agencies from submitting proposals on the RFP as long as they complied with the RFP and all DHR licensing requirements. In fact, DHR would be legally prohibited from restricting the RFP process to in-state companies. There would be no constitutionally valid reason to do so. Additionally, there were some agencies awarded homes that were not licensed at the time they submitted their proposals. The RFP required that the license application had to be completed by July 31, 2005, or the homes awarded would be reassigned to other agencies. Those agencies that did not meet that deadline did have their awarded homes redistributed to other agencies that scored above 800 points.

DR. _____ will not be given an administrative hearing to appeal the decision on this RFP. DHR administrative code 660-1-5-.02 provides that DHR is required to give a hearing to any aggrieved person when the Department's action, intended action, or failure to act would adversely affect the individual's or family's right to assistance, benefits, or service. These provisions are not applicable to an RFP. There is no "right" to do business with DHR or any other state agency. There is no "assistance, benefits, or services" at stake here. An individual or business doing business with the State or one of its agencies through a contract has no right or guarantee that it will be able to continue doing business with the state in subsequent years after that contract expires.

I hope that this letter has clarified and explained DHR's position in this matter. Please contact me if there are any additional questions.

Sincerely,

Joel C. Marsh
Assistant Attorney General
Phone: (334) 242-9330
Fax:   (334) 242-0689

cc:    Ken Wallis
       Toby Roth



# State of Alabama
# Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130
334.242.1310
www.dhr.state.al.us



**BOB RILEY**
*Governor*

**Page B. Walley, Ph.D.**
*Commissioner*



March 15, 2006

Dr. Joseph Appiah
Camellia Therapeutic Foster Care
2310 Crawford Rd.
Phenix City, AL 36868

Dear Dr. Appiah

Due to the timeframes of the attrition contract under which you are currently operating, we must begin planning for the children that are currently being served by your program. As you know, the attrition contract will no longer be in effect after September 30, 2006. The Department is committed to making the transitions affected by this change to be the least disruptive for children as possible.

Please be advised to notify your staff and approved foster homes of the changes immediately. We will be sending a copy of this letter to your foster parents, as there have been concerns that foster parents are not aware of the changes to come. We must have plans in place no later than June 30, 2006 for the children that are currently being served by your program. Counties will be notified to make planned decisions for each child at the next meeting of the Individualized Service Planning (ISP) team. Foster parents should have the opportunity to continue to serve as placements for the children in their care, if the ISP team feels it is in a child's best interest.

Should you have any questions, please feel free to contact me at 334.353.1196.

Sincerely,

Gary W. Mitchell, Program Manager
Office of Resource Management

CC:    Commissioner
       Deputy Commissioner
       Family Services
       Office of Resource Management
       DHR Legal
       County DHR Directors
       TFC Foster Parents

*An Affirmative Action/Equal Opportunity Employer*

## V. COMPENSATION FOR PROVIDING SERVICE

### FORM TO ESTABLISH RATE FOR SERVICE

DEFENDANT'S
EXHIBIT
9

CONTRACTOR:  __Camellia Therapeutic Foster Agency, LLC__    CONTRACT NO.  __3095 (TFC)__

### BUDGET RECAP OF EXPENSES

Proposed: October 1,  __2005__
September 30,  __2006__

I.    **Personnel:**

    A.    Salaries (Attach
        Personnel Addendum)      __2,368,000.00__

    B.    Fringe Benefits:
        Health Insurance      __58,000.00__    FICA  __$540,000__
        Retirement      __Match Social Security__    Other _____
        Group Life Insurance      __2,880.00__
    C.    Foster Parent      __3,323,690.00__

II.    **Subcontracted Services:**

    A.    Consultants      __90,000.00__
    B.    Audit Service      __10,000.00__
    C.    Transportation
        (Provided By Another
        Agency)      __3,000.00__    __most transportation is__
                __done by staff/ parent__

III.    **Travel:**

    A.    Mileage (Show rate of
        Reimbursement)      __0.32 per mile__
    B.    Per Diem (Show Rate of
        Reimbursement)      __150.00 per day__    __(including Hotel and__
                __food)__

IV.    **Space:**

    A.    Telephone      __21,600.00__
    B.    Rent (include copy of lease)      __71,220.00__    __for six offices__
    C.    Use Allowance (No
        More than 2% of
        Acquisition Cost/Year)
    D.    Rental Rate System      __12.00 sq ft__
    E.    Utilities      __20,000.00__
    F.    Maintenance of Building
        or Grounds      __1680.00__
    G.    Minor Repairs to
        Building      __N/A__

**＊**    Per diem Payment of $500 per Social Worker per month for gasoline expenses is cheaper than paying
for mileage at the rate of $ .32 per mile, since each Social Worker covers at least 2000 miles per week.

V.   **Supplies:**

    A.   Office
    B.   Household          10,000.00
    C.   Recreational
    D.   Educational       188,400.00        314x 50x12months
    E.   Medical          3,000.00         Extra tutorial services
    F.   Personal Care      10,000.00

VI.   **Equipment:**

    A.   Rental (include rental
            agreement)    **Equipment Purchased**
    B.   Repair           3,000.00
    C.   Depreciation (Attach
            Depreciation Addendum)

VII.   **Other:**

    A.   Insurance        19,200.00
    B.   Vehicle Operation   6,000.00
    C.   Taxes
    D.   Food in Excess of USDA  N/A
    E.   Foster Parent    3,151,775.00   at 27.50x 314x365days
    F.   Other Allowable Cost,
         Specify General
         Categories:      N/A

VIII.   **Unallowable Costs:**
(Building Costs, Bad Debts,    20,000.00
Contingencies, etc. Refer to
**Unallowable Costs Section in
POS Manual.)**

IX.   **Total Program Cost:**    **$9,921,445.00 (M)**

X.   **Program Income:**   Please report all income from all sources available to your program.
(Detail Sources)
       **State DHR**          **County DHR**

**Rate Information R.F.P.**

XI.   **Client Date:**    **October 1, 2005- September 1, 2006**

    A.   Potential Units of   **Medicaid Eligible Children**
       Service (Multiply   314 slots at $66 Fixed Rate at 365 days
       License Capacity by
       Day in Year.)

                TOTAL     **$7,564,260.00 (M)**

DHR Eligible Units of 314 slots at $29.00 fixed rate service at 365 days

TOTAL _____ $3,323,690.00 (M) _____

I certify that the above reflects the true actual and estimated expenditures of this program for the time frames listed.

Signed _Joseph Appiah_

Title _Chairman / C.E.O_

Date _April 5, 2005_

**Personal Addendum Attached.**

\* Unit cost is based on Total Program Cost less Unallowable Costs.

DEFENDANT'S
EXHIBIT
_10_

*Camellia Therapeutic Foster Agency, LLC*

ALABAMA STATE LICENSED CHILD PLACING & ADOPTION AGENCY

MONTGOMERY COUNTY • 1434 MULBERRY STREET

MONTGOMERY, ALABAMA 36106

DR. JOSEPH APPIAH
*Chairman & Chief Executive Officer*

PHONE  334-834-4088

KAREN JURLS, LCSW, PIP, EXECUTIVE DIRECTOR
*CYNTHIA DAVIS, LCSW, PROGRAM DIRECTOR*

FAX:  334-834-4089

E-MAIL:

August 05, 2005

Dear DHR Board Members,

I am formally requesting a hearing with the Board of Human Resources to address my grievance with the State Department of Human Resources' decision to not award any slots to Camellia Therapeutic Foster Agency, LLC. (Camellia) in the SDHR's awarding of contracts for therapeutic foster care. Camellia is an established therapeutic foster agency, which has trained and employed more licensed social workers than all of the newly agencies. We are fully-furnished and have more qualified and quality foster parents than all of the newly agencies. Our annual budget is over three million dollars($3,000,000), "split the net". Our proposal was submitted on April 05, 2005, before the deadline given of April 11, 2005. I am alleging that the State Department of Human Resources (SDHR) discriminated against Camellia, in part, because it is a black-owned company. SDHR also changed the requirements for the awarded slots and failed to give Camellia full credit in its calculation of Camellia's overall score.

In addition to the above, Camellia has a list of grievances regarding SDHR's awarding of contracts for therapeutic foster care vendors. The following is a partial list of our grievances.

1.   I, on behalf of Camellia, had arranged to meet with the Governor, but prior to that meeting I was contacted by Susan Ward, Director of Contracts and Federal Claiming, and the Commissioner's office. They requested that I not meet with Governor Bob Riley without first appealing to the Commissioner. Ms. Ward stated that information regarding the appeal process would be posted on DHR's website within one week. However, that was not done. Time is of the essence in this matter. Therefore, I have filed my appeal based on the Administrative Code 660-1-5 Hearings (Alabama Department of Human Resources-General Administration Division.) However, forty-five days (45) has passed, and the Commissioner's has not granted me a hearing.

2.   Camellia's proposal for the proposal for therapeutic foster care was superior to the other vendor's proposals, yet were given zero(0) slots. Some of the slots were awarded to out-of-state agencies who have no foster parents or foster homes in the State of Alabama. This is contrary to the R. C. Decree.

2. You will be surprised to find out that some of the newly agencies awarded contracts have no physical office building in Alabama and they have no staff as noted in the RFP, yet they were awarded contracts. You will also discover that even though the Governor's plan for the RFP was to reduce cost (shop and compare prices and services as the Governor stated). Yet, Camellia's rate was lower than those who were awarded slots. So you can see that their whole intention was to eliminate black owned agencies(Discrimination).

3. SDHR awarded contracts to agencies that had not been licensed to do business in Alabama and had no experience in providing therapeutic foster care in the State, while denying a contract to Camellia, a licensed and experienced therapeutic foster care provider in the State of Alabama. Additionally, the State of requires the Executive Director of all TFC agencies to reside in Alabama, which is not the case for a portion of the agencies awarded contracts/slots.

4. DHR's method of awarding contracts was not objective or rational in that a higher number of contracts were awarded to vendors that scored lower on the 1000-point scale while vendors with higher scores were awarded fewer slots.

5. DHR's criteria for awarding contracts did not give sufficient weight for the experience of this provider in the State of Alabama.

6. In the process of evaluating Camellia, SDHR did not contact or interview any references included in Camellia's proposal during the period of time between submission of the references and the publishing of the Notice of Intent to Award Contracts(scoring). Camellia should therefore, be given the entire fifty-points credit for the references category, thereby increasing its score to 803.3.

7. Based on DHR's issuance of licenses to Camellia through the year 2008, Camellia has offices in several locations with obligations to incur expenses for three(3) years.(Montgomery/Selma, Mobile, Birmingham, Huntsville, & Phenix City)

8. Camellia and the only other experienced provider not awarded any placements were both African-American owned businesses. Camellia contends that DHR discriminated against it in violation of federal and state laws, which prohibit discrimination based on race, color, or national origin.

9. Over many years, Camellia has invested large sums of money to attract and maintain a network of quality foster care homes for the State of Alabama. Camellia Agency's present market value is five million dollars($5,000,000). To direct our foster parents and children to another agency would be a financial burden on Camellia and a taking of its business without due process.

10. Camellia, along with other vendors present to review proposals on June 13, 2005 requested a copy of its proposal and method of scoring/evaluation for the proposals, and this request was denied. Failure to allow vendors to view the scoring of their own proposal is unfair and unjust.

As noted above in its treatment of Camellia in this process, the State Department of Human Resources has violated both Federal and State laws, in addition to the R. C. Decree. As a result of this treatment and unlawful actions of SDHR, Camellia has been severely damaged.

Camellia Therapeutic Foster Agency is committed to upholding its mission to provide a safe, and natural environment where children can grow and mature into law abiding, productive citizens. SDHR should reward agencies that work hard to provide quality services to foster parents and foster children in the State of Alabama. We believe that our proposal was superior to those submitted by vendors statewide for numerous reasons, including the fact that we followed the exact guidelines of the RFP, while most others did not. SDHR failed to give Camellia full credit in its evaluation of Camellia's proposal. As an agency experienced in providing quality therapeutic care in the State of Alabama, Camellia request that we be awarded a contract for the 314 that were requested in our original proposal. Therefore, I urgently request a meeting of the full board to communicate my grievance as soon as possible. I am trying hard to avoid the media and a jury trial. I pray to God that you can use your good offices to intervene before it becomes too costly to the State and Camellia.

Sincerely,

Dr. Joseph Appiah
Chairman & Chief Executive Officer


Copy: Hon. Earl Hilliard Attorney-At-Law
              Hilliard, Smith, & Hunt, LLC.
Copy: Hon Mac Otts, Executive Director
              AACCA
Copy: Alabama House & Senate Members
Copy: Lt. Governor Lucy Baxter
Copy: Hon. Larry Simms Civil Rights/EEOC



(EXHIBIT 4)



## IX.

# REFERENCES

# 50 POINTS

**I.      REFERENCES**

4.    Service Delivery as described in Section IV-D. (Maximum of 250 points).

5.    Target Area as described in Section IV-E. (Maximum of 50 points)

6.    Discharge Policy as described in Section IV-F. (Maximum of 75 points)

7.    Prior Experience as described in Section IV-G. (Maximum of 75 points)

8.    Staff Qualifications, Staff Recruitment, Job Descriptions and Training Requirements as described in Section IV-H. (Maximum of 150 points)

9.    References as described in Section IV-I. (Maximum of 50 points)

10.   Compensation for providing services as described in Section V. (Maximum of 200 points)

11.   The Department may determine other criteria, in addition to, or in lieu of, the criteria described above, as the Department deems necessary and appropriate.

E.    HOLD BACK: As a guarantee for the delivery of services required by this RFP, and the acceptance by the Department of those services in accordance with the specifications set forth in the RFP, in the event the contractor fails to deliver or perform the said services to the Department's satisfaction, the Department reserves the right to withhold part or all of any funds committed by the Department under any contract that may result from a proposal submitted in response to this RFP and to cancel the said contract without any resulting liability, present and future, to the Department or to the State of Alabama.

## VII.   VENDOR CERTIFICATIONS

A.    By submitting a proposal in response to this RFP, the vendor warrants and represents to the Department that the vendor accepts and agrees with all of the terms and conditions of the RFP. Further, by so submitting the vendor certifies to the Department that the applicant is legally authorized to conduct business within the State of Alabama and to carry out the services described in this RFP, and that all of the following statements are true and correct.

B.    REVOLVING DOOR POLICY: Neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants or employees is a current employee of the Department, and none of the said individuals have been employees of the Department in violation of the revolving door prohibitions contained in the state of Alabama ethics laws.

C.    DEBARMENT: Neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants or employees (whether paid or voluntary) is debarred or suspended or otherwise excluded from or ineligible for participation in federal assistance programs under Executive Order 12549, "Debarment and Suspension."

11

References    (EXHIBIT 4)

Camellia Therapeutic Foster Agency has previously served Alabama's Department of
Human Resources. We have attempted to develop a positive working relationship with
each DHR county in our service area. We plan to continue this relationship with DHR as
one of our main goals is to accommodate and delivery service to provide the counties
with a safe and therapeutic placement for their children. A list of our service references are
listed below.

## References

Laura Parchman, LGSW
DHR Supervisor
Jefferson County
4500 5th Avenue South
Birmingham, AL 35233
(205) 918-5169

Chuck Evans MSW
DHR Supervisor
Madison County
2206 Oakwood Avenue
Huntsville, AL 35810
(256) 535-4680

Darnell Sharpeson BSW
DHR Social Worker
Madison County
2206 Oakwood Avenue
Huntsville, AL 35810
(256) 517-1410

Patti Way MSW
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL 35810
(256) 535-4527

Cherry Jones, MSW
Program Supervisor
Russell County
1003 25th Avenue
P.O. Box 67
Phenix City, AL 36868
(334) 214-5803

Annie Poles MSW
Service Supervisor
Russell County
1003 25th Avenue
P.O. Box 67
Phenix City, AL 36868
(334) 214-5853

Jacqueline Griffin MSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL 35810
(256) 535-4645

Mary Ann Wilson, LGSW
Program Analyst
50 Ripley Street
Montgomery, AL 36130
(334) 242-1659

Chasidity Perry MSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL 35810
(256) 535-4655

Robyn King MSW
Jefferson County DHR
4500 5th Avenue South
Birmingham, AL 35223
(205) 918-5193


DEFENDANT'S EXHIBIT 12
PENGAD 800-531-6989

## Alabama Department of Human Resources
## Therapeutic Foster Care Final Allocations

| Program | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| AL Mentor | | | | | | 7 | | | | 7 |
| Alliance | | | | | | 17 | | | | 17 |
| Brewer Poarch | | | | | 48 | 5 | 2 | | | 55 |
| Catholic SS | | 16 | | | | | | | | 16 |
| FIT Homes | 10 | 20 | | | | | | | | 30 |
| Gateway | | | | | | 49 | | | | 49 |
| LCYDC | | | | 20 | | | | | | 20 |
| Mountain View | | | | | | | | 8 | | 8 |
| SAFY | 1 | | 43 | 20 | | 22 | 1 | 1 | 7 | 95 |
| Seraaj | 3 | 10 | 7 | 15 | | 139 | 6 | 62 | 20 | 262 |
| TPI | 13 | 60 | 34 | 32 | 36 | 131 | 25 | 39 | 77 | 447 |
| UMCH | 35 | 11 | 8 | | 3 | 3 | 20 | 15 | | 95 |
| Wilmer Hall | | 8 | 5 | | | | | | | 13 |
| Youth Villages | | | | | | 40 | | | 30 | 70 |
| Total | 62 | 125 | 97 | 87 | 87 | 413 | 54 | 125 | 134 | 1184 |

*(Handwritten marginal annotations alongside rows: White, White, White, White, White, White, White, White, Black, White, White, White, White — "Tennessee")*

# State of Alabama
# Department of Human Resources



DEFENDANT'S EXHIBIT
B

License Number: __034627__

This is to certify that __CAMELLIA THERAPEUTIC FOSTER AGENCY__
(Licensee)

is hereby granted this LICENSE to conduct and maintain

### CAMELLIA THERAPEUTIC FOSTER AGENCY
(Name of Child Care Facility)

as a   __CHILD PLACING AGENCY__      for        __N/A__
(Type of Child Care Facility)                        (Number of children)

ages   __N/A__
Age  range of children)

located at  __2310 CRAWFORD ROAD, SUITE 104__       __PHENIX CITY__
(Street Address)                               (City)

in     __RUSSELL__                        State of Alabama.
(County)

This LICENSE shall be in force for a period of two years from the __19TH__ day of __MARCH, 2007__, to the __19TH__ day of __MARCH, 2009__, subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975,* or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this __19TH__ day of __APRIL,  2007__.

BY _____ , *Ph.D.*
Commissioner
State Department of Human Resources

NOTE:  This LICENSE must be posted in a conspicuous place on the premises.

DHR-FSD-1969
(8/99)



# State of Alabama
## Department of Human Resources



License Number: **34627**

This is to certify that     **CAMELLIA THERAPEUTIC FOSTER AGENCY**
(Licensee)

is hereby granted this LICENSE to conduct and maintain

**CAMELLIA THERAPEUTIC FOSTER AGENCY**
(Name of Child Care Facility)

as a     **CHILD PLACING AGENCY**     for     **N/A**,
(Type of Child Care Facility)     (Number of children)

ages    **N/A**
Age range of children

located at    **2310 CRAWFORD RD, SUITE 104**     **PHENIX CITY**
(Street Address)     (City)

in     **RUSSELL,**             State of Alabama.
(County)

This LICENSE shall be in force for a period of two years from the **19TH** day of **MARCH**, **2005**, to the **19TH** day of **MARCH**, **2007**, subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this **16TH** day of **MARCH**, **2005**.

BY     _____ , Ph.D.
               Commissioner
         State Department of Human Resources

NOTE: This LICENSE must be posted in a conspicuous place on the premises.

DHR-FSD-1969
(8/99)



# State of Alabama
# Department of Human Resources



License Number: _____34627_____

This is to certify that _____Camellia Therapeutic Foster Agency_____
( Licensee )
is hereby granted this LICENSE to conduct and maintain

_____Camellia Therapeutic Foster Agency_____
( Name of Child Care Facility )
as a ___Child Placing Agency_____ for ____N/A____ ,
( Type of Child Care Facility )       (Number of children )
ages ___N/A_____ ,
( Age range of children )
located at ___2310 Crawford Rd, Suite 104_____ Phenix City___
( Street Address )                    ( City )
in _____Russell_____ , State of Alabama.
( County )

This LICENSE shall be in force for a period of two years from the ___19th___ day
of ___March___ , ___2003___ , to the ___19th___ day of ___March___ , ___2005___ ,
subject, however, to be revoked on the failure of the above-named Child Care Facility to
comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, or the
standards and regulations prescribed by the Department of Human Resources of the State
of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this ___3rd___ day of

___April___ , ___2003___ .

BY _____
Commissioner
State Department of Human Resources

DHR-FSD-1969    NOTE: This LICENSE must be posted in a conspicuous place on the premises.
(8/99)



# State of Alabama
# Department of Human Resources



License Number: _____34627_____

This is to certify that _____Camellia Therapeutic Foster Agency_____
( Licensee )
is hereby granted this LICENSE to conduct and maintain

_____Camellia Therapeutic Foster Agency_____
( Name of Child Care Facility )

as a ___Child Placing Agency___ for ___N/A___ ,
( Type of Child Care Facility )          (Number of children )

ages ___N/A___ ,
( Age range of children )

located at ___2310 Crawford Rd, Suite 104___    ___Phenix City___ ,
( Street Address )                ( City )

in _____Russell_____ , State of Alabama.
( County )

This LICENSE shall be in force for a period of two years from the ___11th___ day
of ___December___ , ___2002___ , to the ___11th___ day of ___June___ , ___2003___ ,
subject, however, to be revoked on the failure of the above-named Child Care Facility to
comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, or the
standards and regulations prescribed by the Department of Human Resources of the State
of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this ___28th___ day of

___January___ , ___2003___

BY _____

Commissioner
State Department of Human Resources

DHR-FSD-1969     NOTE: This LICENSE must be posted in a conspicuous place on the premises.
(8/99)



# State of Alabama
# Department of Human Resources



License Number: _____034627_____

This is to certify that _____Camellia Therapeutic Foster Agency_____
*( Licensee )*

is hereby granted this LICENSE to conduct and maintain

_____Camellia Therapeutic Foster Agency_____
*( Name of Child Care Facility )*

as a __Child Placing Agency__ for ____N/A____ ,
*( Type of Child Care Facility )* *( Number of children )*

ages __Birth to 19 years__ ,
*( Age range of children )*

located at __2310 Crawford Rd, Suite 104__ __Phenix City__ ,
*( Street Address )* *( City )*

in _____Russell_____ , State of Alabama.
*( County )*

This LICENSE shall be in force for a period of two years from the ___11th___ day
of __June__ , __2002__ , to the __11th__ day of __December__ , __2002__ ,
subject, however, to be revoked on the failure of the above-named Child Care Facility to
comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, or the
standards and regulations prescribed by the Department of Human Resources of the State
of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this ___10th___ day of

__June__ , __2002__

BY _____
Commissioner
State Department of Human Resources

DHR-FSD-1969
(8/99)

NOTE: This LICENSE must be posted in a conspicuous place on the premises.

EDS
P.O. Box 244035
301 Technacenter Dr
Montgomery, AL 36124-4035

DECEMBER 6, 2004

CAMELLIA THERAPEUTI FOSTER AG LLC
50 RIPLEY ST

MONTGOMERY  AL  36130-0000

Re: Notification of New Alabama Medicaid Provider Number

Dear Provider:

Thank you for your interest and participation in the Alabama Medicaid Program. Your enrollment has been reviewed and processed.  Your new    STATE REHAB SERVICES performing provider identification number is  339091102        Your billing/payee number is   339000000        You have been enrolled for the following enrollment period: 12-01-04       through    NO END    . Please refer to program specific enrollment and claims filing information on the Medicaid Provider Manual.

If any of the information on your enrollment application and/or contact should change in the future, please notify us in writing at the address above.

Mailing addresses for specific claim types are listed in Appendix N in the Medicaid Provider Manual. If you have any questions regarding claims processing, please contact us at 334-215-0111. If you are in the State of Alabama, you may also call 1-800-688-7989.

If you have any questions regarding your provider number, please contact the Provider Enrollment Unit at 334-215-0111 or 1-888-223-3630.

Sincerely,

*Chasity Monge*

Provider Enrollment

Enclosure

# State of Alabama
# Department of Human Resources

S. Gordon Persons Building
50 Ripley Street
P.O. Box 304000
Montgomery, Alabama 36130-4000
(334) 242-1310
www.dhr.state.al.us

**BOB RILEY**
*Governor*



Page B. Walley, Ph.D.
*Commissioner*

DEFENDANT'S
EXHIBIT
14

September 21, 2005

Hon. Hank Sanders
Alabama State Senator
Post Office Box 1290
Selma, Alabama 36702

RE:   *Camellia Therapeutic Foster Agency*

Dear Mr. Sanders:

Commissioner Walley has asked me to respond to your letter dated, September 12, 2005, regarding the Camellia Therapeutic Foster Agency.

The Department of Human Resources published a request for proposals for therapeutic foster care. A total of 23 providers submitted proposals to provide therapeutic foster care for children in DHR custody. A panel of reviewers objectively graded the proposals that were submitted. Each proposal was graded on a variety of issues with a perfect score being 1000 points. In order to ensure that more than one or two agencies would be selected, the decision was made to award homes to each agency that score 800 or above on their proposal. *(when was the decision made) after the grading, what*

Camellia Therapeutic's proposal was score 753.3, well below the cut-off score of 800. The scores given to each agency was posted on the DHR web site. Additionally, each agency was allowed to review their own scores and the scores of other proposals and to request copies of the proposals submitted by the other agencies. *g*

Camellia Therapeutic did not receive any homes under this RFP because of its low score, not because of any discrimination. There were other companies who did not receive any homes because their score was too low (4 other companies scored below 800). *for a State Agency*

There were some agencies from out-of-state that received homes. However, all but one of these agencies had already been working in Alabama. DHR had no ability to restrict out-of-state agencies from submitting proposals on the RFP as long as they complied with the RFP and all DHR licensing requirements. In fact, DHR would be legally prohibited from restricting the RFP process to in-state companies. There would be no constitutionally valid reason to do so. Additionally, there were some agencies awarded

An Affirmative Action /Equal Opportunity Employer

homes that were not licensed at the time they submitted their proposals. The RFP required that the license application had to be completed by July 31, 2005, or the homes awarded would be reassigned to other agencies. Those agencies that did not meet that deadline did have their awarded homes redistributed to other agencies that scored above 800 points.

I hope this letter answers your questions concerning the RFP process for therapeutic foster homes. Please contact me if I can provide you with any additional information.

Sincerely,

Joel C. Marsh
Assistant Attorney General
Phone: (334) 242-9330
Fax:    (334) 242-0689



**ALABAMA STATE SENATE**
ALABAMA STATE HOUSE
MONTGOMERY, ALABAMA 36130-4600

ALABAMA

HANK SANDERS
STATE SENATOR 23RD DISTRICT
P.O. BOX 1290.
SELMA, ALABAMA
35702
SELMA (334) 875-9254
MONTGOMERY (334) 242-7860

COMMITTEES:
CHAIRMAN, FINANCE & TAXATION
EDUCATION FUND
CONFIRMATIONS
CONSTITUTION, CAMPAIGN
FINANCE, ETHICS & ELECTIONS
ECONOMIC EXPANSION & TRADE
EDUCATION
JUDICIARY
LOCAL LEGISLATION #1
RULES

September 12, 2005

Honorable Page B. Walley
S. Gordon Persons Building
50 Ripley Street
P. O. Box 304000
Montgomery, AL 36130

Dear Dr. Walley:

I write concerning your rejection of the Camille Therapeutic Foster Agency participation in the ATFC program. We are extremely concerned about this situation in and of itself but also because it seems to be part of a pattern. Please look into this situation and advise.

Your cooperation is appreciated.

Sincerely,

*Hank Sanders*

Hank Sanders

HS/gjp

cc: Dr. Joseph Appiah



ALABAMA

# ALABAMA STATE SENATE
## ALABAMA STATE HOUSE
### MONTGOMERY, ALABAMA 36130-4600

HANK SANDERS
STATE SENATOR 23RD DISTRICT
P.O. BOX 1290
SELMA, ALABAMA
36702
SELMA, (334) 875-8254
MONTGOMERY (334) 242-7860

COMMITTEES:
CHAIRMAN, FINANCE & TAXATION
EDUCATION FUND
CONFIRMATIONS
CONSTITUTION, CAMPAIGN
FINANCE, ETHICS & ELECTIONS
ECONOMIC EXPANSION & TRADE
EDUCATION
JUDICIARY
LOCAL LEGISLATION #1
RULES

September 26, 2005

Dr. Joseph Appiah
Camellia Therapeutic Foster Agency, LLC
P. O. Box 788
Phenix City, AL 36868-0788

RE:   Camellia Therapeutic Foster Agency

Dear Dr. Appiah:

I am enclosing a copy of a letter from the Department of Human Resources in response to my letter. I hope you secure justice.

Sincerely,

Hank Sanders

Hank Sanders

HS/gjp

# Request for Production

## #3



More than 142 Foster Parents Recruited, Trained and Ready to Foster. DHR took all away from me.

1. Juanita Love

2. Janette Pole

3. Benito Sherrod

4. Shalonda Sherrod

5. Glenda Allen

6. Darren Allen

7. Danny Askins

8. Jessica Askins

9. John Dixon

10.     Christina Dixon

11.     Sophenia Partlow

12.     Marian Toney

13.     Dorothy Jones

14.     Joyce Jackson

15.    Sharon Jackson

16.    Lonney Carr

17.    Lisa Carr

18.    Patricia Shaw

19.    Deborah Winston

20.    Tammy Green

21.    David Valadez

22.    Diane Valadez

23.    Jose Rivas

24.    Theresa Rivas

25.    Bertha Houston

26.    Linda Jennings

27.    Barbara Jefferson

28.    Edye Cartwright

29.    Linda Simington

30.    Luis Vegas

31.    Theresa Vegas

32.    Carol Thomas

33.    Janice Hayden

34.    Brenda Ayers

35.    Noah Ricks

36.    Cathy Ricks

37.    Marvin Jones

38.    Diana Jones

39.    Willie Gibbs

40.    Sheilia Gibbs

41.    Alfreda White

42.    Zelda Floyd

43.    Duncan White

44.    Robert Tindal

45.    Nonna Tindal

46.    Joana Bailey

47.    Carol Allen

48.    Sherinna Rice

49.    Joana Ali

50.    Shirley Massengale

51.    Brenda Hurley

52.    Barbara Gibbs

53.    Tony Shepherd

54.    Ronnie Shepherd

55.    Colletta Williamson

56.    Toni Ballard

57.    Adonus Thomas

58.    Laura Thomas

59.    Daisy Turner

60.    Robin Knight

61.    Victoria Yelder

62.    Tiffany Brown

63.    Dianne Butler

64.    Mary Smothers

65.    Ruby Joyce Stephens

66.    Arethia Morton

67.    Laray Byrd

68.    Antione Banks

69.    Crystal L. Winston

70.    Lester Pittman

71.    Lora Pittman

72.    Amy Christina Evans

73.    Tammy Bolton

74.    Elaine Thompson

75.    Angela Denise Sharp

76.    Carlos Evans

77.    Dale Evan Broughton

78.    Ethel M Williams

79.    Ada Mae Daniels

80.    Teola Shuntall

81.    Lynette Robinson

82.    Debra Simpson

83.    Michael Harris

84.    Patricia Harris

85.    Olabisi Babatunde

86.    Ayodele Babatunde

87.    Dorothy Petty

88.    Timothy Yearwood

89.    Tracy Yearwood

90.    Raymond Gable

91.    Bonita Gable

92.    Jacqueline Abrams

93.     Clementine Ellis

94.     Patricia Hall

95.     Roger Hall

96.     Joana Bailey

97.     Linda Harris

98.     Lucinda Walker

99.     Judith Fich

100.    Diana Butler

101.    Willie Gibbs

102.    Shelia Gibbs

103.    Angela D. Sharp

104.    Cathy Adams

105.    Clydell Wagner

106.    Carl Byrd

107.    Toni Ballard

108.    Cheryl Gravel

109.    Mary Harris

110.    Alice Muhammad

111.    Patricia Reimbert

112.    Rev. Roy Jones

113.    Cynthia Jones

114.    Emma Shaw

115.    Ora Carter

116.    Betty Hicks

117.    Lenora Pearson

118.    Yvette Turner

119.    Westin Hughley

120.    Barbara Jefferson

121.    Jimmy Dean Robinson

122.    Laverne Robinson

123.    Monica Lawrence

124.    Barbara Reed

125.    Jesse Belser

126.    Linda Belser

127.    Barbara Taylor

128.    Abraham Thomas

129.    Patricia Thomas

130.    Ruth Russell

131.    Roger Hall

132.    Patricia Hall

133.    Joana Bailey

134.    Wanda Stanfield

135.    Elvira Davis

136.    Tamera Harris

137.    Zadie Harris

138.    Delois Mayberry

139.    Julie Norrell

140.    Tommy Robinson

141.    Carletta Robinson

142.    Sheila Norman

142 Parents @ 2500.00 = 355000.00





**Camellia Therapeutic Foster Agency, LLC**

ALABAMA STATE LICENSED CHILD PLACING & ADOPTION AGENCY

RUSSELL COUNTY • 2310 CRAWFORD ROAD, SUITE 104

POST OFFICE BOX 788 • PHENIX CITY, ALABAMA 36868-0788

DR. JOSEPH APPIAH
*Chairman & Chief Executive Officer*





PHONE: (334)448-2999

FAX: (334)448-1666

E-MAIL: ctfa8 @cs.com

August 01, 2005

Dear Hon. Mrs. Susan Ward,

I am officially asking your good office to intervene into the erroneous and discriminating decision by the Alabama State Department of Human Resources to take away our Alabama Therapeutic Foster Care program; as they are obviously planning to give it to a Tennessee Therapeutic, Georgia Therapeutic, and California Therapeutic Agency and other newly unlicensed agencies, simply because we are a black owned agency.

It is not fair that my proposal was equivalent too or better than the agencies that were given a contract, yet I was not given one. I can not see a legitimate reason why Camellia was not graded fairly or given a contract. I believe that SDHR took this process and made it into a personal vendetta by awarding and eliminating whomever they pleased from the contract. They did not look at Camellia's actual responses to the RFP but only to the fact that they could make their own personal choice to eliminate Camellia for personal/political reasons.

Even though some of the newly agencies have stated that they have no office, no homes to place the children, and no staff; yet the Department awarded them contract and cancelled our contract beginning October 01, 2005; Simply because we are a black owned a agency. If there are any reasons besides the fact that we are black, we will be glad to hear it. We are in 100% compliance with the State Department of Human Resources. We have more qualified master degree full time social workers than all the other agencies and we take the most difficult children that all the other agencies have rejected.

2

Furthermore, the Governor asked that the Department bring the cost of services down lower than they were. We heard of that, from $70.00 daily rate to $29.00 daily rate, of which we pay the foster parents a $27.50 daily rate. We are dealing with $1.50 daily rate plus Medicaid's daily rate of $66.00 to pay all staff, rent, insurance(Blue Cross & Blue Shield), federal taxes, state taxes, and children breaking expensive items in the foster parents homes, stealing foster parents cars and wrecking it, etc... Our agency pays for all of these emergencies to keep the foster parents encouraged to do a good job.

As I sit on my desk to write this appeal, on the 1st day of August 2005, our agency has not received one dime from the Medicaid for the month of June1-30 and July 1-31: How do you run an effective program with over $90,000 a month for overhead and the SDHR is not even paying you, but we have love for the children and we are willing to provide a safe environment for Alabama's children.

You will find a copy of my grievance to the Commissioner of SDHR and a second appeal to the Board of SDHR who has the primary responsibility of the children of Alabama, to see that Justice is done. I am trying to avoid a Jury Trial, and time is of essence in this matter.

May God Bless you.

Sincerely,

Joseph Appiah

cc:    Attorney Earl F. Hilliard
       Lead Attorney

cc:    Attorney Peter Dumbuya
       Constitutional Attorney

*Camellia Therapeutic Foster Agency, LLC*

ALABAMA STATE LICENSED CHILD PLACING & ADOPTION AGENCY

MONTGOMERY COUNTY • 1434 MULBERRY STREET

MONTGOMERY, ALABAMA 36106

DR. JOSEPH APPIAH
*Chairman & Chief Executive Officer*

KAREN JURLS, LCSW, PIP, EXECUTIVE DIRECTOR
*CYNTHIA DAVIS LOSH, PROGRAM DIRECTOR*

PHONE: (334) 264-1088

FAX: (334) 264-1566

E-MAIL: cthe@aol.com

August 05, 2005

Dear DHR Board Members,

I am formally requesting a hearing with the Board of Human Resources to address my grievance with the State Department of Human Resources' decision to not award any slots to Camellia Therapeutic Foster Agency, LLC. (Camellia) in the SDHR's awarding of contracts for therapeutic foster care. Camellia is an established therapeutic foster agency, which has trained and employed more licensed social workers than all of the newly agencies. We are fully-furnished and have more qualified and quality foster parents than all of the newly agencies. Our annual budget is over three million dollars($3,000,000), "split the net". Our proposal was submitted on April 05, 2005, before the deadline given of April 11, 2005. I am alleging that the State Department of Human Resources (SDHR) discriminated against Camellia, in part, because it is a black-owned company. SDHR also changed the requirements for the awarded slots and failed to give Camellia full credit in its calculation of Camellia's overall score.

In addition to the above, Camellia has a list of grievances regarding SDHR's awarding of contracts for therapeutic foster care vendors. The following is a partial list of our grievances.

1.      I, on behalf of Camellia, had arranged to meet with the Governor, but prior to that meeting I was contacted by Susan Ward, Director of Contracts and Federal Claiming, and the Commissioner's office. They requested that I not meet with Governor Bob Riley without first appealing to the Commissioner. Ms. Ward stated that information regarding the appeal process would be posted on DHR's website within one week. However, that was not done. Time is of the essence in this matter. Therefore, I have filed my appeal based on the Administrative Code 660-1-5 Hearings. (Alabama Department of Human Resources-General Administration Division.) However, forty-five days (45) has passed, and the Commissioner's has not granted me a hearing.

2.      Camellia's proposal for the proposal for therapeutic foster care was superior to the other vendor's proposals, yet were given zero(0) slots. Some of the slots were awarded to out-of-state agencies who have no foster parents or foster homes in the State of Alabama. This is contrary to the R. C. Decree.

2.   You will be surprised to find out that some of the newly agencies awarded contracts have no physical office building in Alabama and they have no staff as noted in the RFP, yet they were awarded contracts. You will also discover that even though the Governor's plan for the RFP was to reduce cost (shop and compare prices and services as the Governor stated). Yet, Camellia's rate was lower than those who were awarded slots. So you can see that their whole intention was to eliminate black owned agencies(Discrimination).

3.   SDHR awarded contracts to agencies that had not been licensed to do business in Alabama and had no experience in providing therapeutic foster care in the State, while denying a contract to Camellia, a licensed and experienced therapeutic foster care provider in the State of Alabama. Additionally, the State of requires the Executive Director of all TFC agencies to reside in Alabama, which is not the case for a portion of the agencies awarded contracts/slots.

4.   DHR's method of awarding contracts was not objective or rational in that a higher number of contracts were awarded to vendors that scored lower on the 1000-point scale while vendors with higher scores were awarded fewer slots.

5.   DHR's criteria for awarding contracts did not give sufficient weight for the experience of this provider in the State of Alabama.

6.   In the process of evaluating Camellia, SDHR did not contact or interview any references included in Camellia's proposal during the period of time between submission of the references and the publishing of the Notice of Intent to Award Contracts(scoring). Camellia should therefore, be given the entire fifty-points credit for the references category, thereby increasing its score to 803.3.

7.   Based on DHR's issuance of licenses to Camellia through the year 2008, Camellia has offices in several locations with obligations to incur expenses for three(3) years.(Montgomery/Selma, Mobile, Birmingham, Huntsville, & Phenix City)

8.   Camellia and the only other experienced provider not awarded any placements were both African-American owned businesses. Camellia contends that DHR discriminated against it in violation of federal and state laws, which prohibit discrimination based on race, color, or national origin.

9.   Over many years, Camellia has invested large sums of money to attract and maintain a network of quality foster care homes for the State of Alabama. Camellia Agency's present market value is five million dollars($5,000,000). To direct our foster parents and children to another agency would be a financial burden on Camellia and a taking of its business without due process.

10. Camellia, along with other vendors present to review proposals on June 13, 2005 requested a copy of its proposal and method of scoring/evaluation for the proposals, and this request was denied. Failure to allow vendors to view the scoring of their own proposal is unfair and unjust.

As noted above in its treatment of Camellia in this process, the State Department of Human Resources has violated both Federal and State laws, in addition to the R. C. Decree. As a result of this treatment and unlawful actions of SDHR, Camellia has been severely damaged.

Camellia Therapeutic Foster Agency is committed to upholding its mission to provide a safe, and natural environment where children can grow and mature into law abiding, productive citizens. SDHR should reward agencies that work hard to provide quality services to foster parents and foster children in the State of Alabama. We believe that our proposal was superior to those submitted by vendors statewide for numerous reasons, including the fact that we followed the exact guidelines of the RFP, while most others did not. SDHR failed to give Camellia full credit in its evaluation of Camellia's proposal. As an agency experienced in providing quality therapeutic care in the State of Alabama, Camellia request that we be awarded a contract for the 314 that were requested in our original proposal. Therefore, I urgently request a meeting of the full board to communicate my grievance as soon as possible. I am trying hard to avoid the media and a jury trial. I pray to God that you can use your good offices to intervene before it becomes too costly to the State and Camellia

Sincerely,

Dr. Joseph Appiah
Chairman & Chief Executive Officer


Copy: Hon. Earl Hilliard Attorney-At-Law
         Hilliard, Smith, & Hunt, LLC.
Copy: Hon Mac Otts, Executive Director
         AACCA
Copy: Alabama House & Senate Members
Copy: Lt. Governor Lucy Baxter
Copy: Hon. Larry Simms Civil Rights/EEOC



**Camellia Therapeutic Foster Agency, LLC**
ALABAMA STATE LICENSED CHILD PLACING & ADOPTION AGENCY
RUSSELL COUNTY • 2310 CRAWFORD ROAD, SUITE 104
POST OFFICE BOX 788 • PHENIX CITY, ALABAMA 36868-0788

DR. JOSEPH APPIAH
*Chairman & Chief Executive Officer*

PHONE: (334) 448-2999

FAX: (334) 448-1666

E-MAIL: ctfa8@cs.com

June 14, 2005

Honorable Page B. Walley, Ph.D., Commissioner
Alabama Department of Human Resources
S. Gordon Persons Building
P. O. Box 304000
Montgomery, AL 36130

Dear Dr. Page Walley:

As a result of the State Department of Human Resources clearly erroneous method of grading the Request For Proposal (RFP) our organization Camellia Therapeutic Foster & Adoption Agency received zero (0) slots for all our 5 regional offices:

CAMELLIA'S HUNTSVILLE OFFICE

2019 SPARKMAN DRIVE, SUITE A

HUNTSVILLE, AL 35810

PHONE NUMBERS 256-858-6500

256-851-6612

256-851-6702

FAX 256-858-0055

CAMELLIA'S BIRMINGHAM OFFICE

3600 6TH AVENUE SOUTH, BIRMINGHAM, AL 35222

PHONE NUMBERS 205-595-2760

205-592-7615

205-595-0069

FAX 205-595-2761

1

CAMELLIA'S MONTGOMERY / SELMA OFFICE

1434 MULBERRY STREET,

MONTGOMERY, AL 36106

1829 WEST 2ND STREET

MONTGOMERY, AL 36106

PHONE NUMBERS 334-834-4088

334-834-4033

FAX 334-834-5888

CAMELLIA'S MOBILE OFFICE

22 NORTH FLORDIA STREET

MOBILE, AL 36607

PHONE NUMBERS 251-476-5156

251-476-5185

FAX 251-476-5245

CAMELLIA'S PHENIX CITY OFFICE

2310 CRAWFORD ROAD, SUITE 104

PHENIX CITY, AL 36867

PHONE NUMBERS 334-448-2999

334-448-2666

FAX 334-4481666

I am formally requesting a hearing to address my grievances with the State Department's decision not to award any slots to Camellia Therapeutic Foster Agency, LLC in the SDHR'S awarding of contracts for Therapeutic Foster Care. Camellia is already established, fully furnished, trained, and employs more Licensed Social Workers than any other agency, our organization has more qualified and quality foster parents than all the agencies, and our annual budget of over 3 MILLION DOLLARS split the net. The State Department has discriminated against our agency simply because we are a black owned company. Our proposal was submitted on April 5, 2005 before the deadline of April 11, 2005. I am alleging discrimination based upon Title VI of the Civil Rights Act (1964), 42 U.S.C. 2000d, et seq., and Code of Alabama (1975), section 38-2-6 which specifically (42 U.S.C. 2000d) states that: "No person in the United States shall , on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance."

2

The following is a (brief) list of some of our grievances:

1. The State Department of Human Resources need to reward people who work hard to provide service to foster parents and foster children instead of punishing them.

2. We will show by comparison with other vendors' proposals, how ours was the best offer, but because we are a black owned company, we were given zero (0) slots. This means they will take all our hard work and give to out of the State Agencies, who have no foster parents, even a home to place our children. This is against the R.C. DECREE (refer to R.C. Decree).

3. SDHR awarded contracts to agencies that had not been licensed to do business in Alabama and had no experience in providing therapeutic foster care in the state while denying a contract to Camellia, a licensed and experienced therapeutic foster care provider in the State of Alabama.

4. SDHR's method of awarding contracts was not objective or rational in that a higher number of contracts were awarded to vendors that scored lower on the 1000-point scale while vendors with higher scores were awarded fewer contracts/placements.

5. SDHR's criteria for awarding contracts did not give sufficient weight for the experience of this provider in the State of Alabama.

6. Based on telephone conversations, it appears to Camellia that SDHR did not interview Camellia's references, nor were the references contacted by anyone from the Department during the period of time between submission of the references and the publishing of the Notice of Intent to Award Contracts. Camellia should therefore be given the entire fifty (50) points- credit for the references category, thereby increasing its score to 803.3 which exceeds the SDHR's acceptable score of 800 for awarding slots (please see ATTACHMENT I).

7. Based on SDHR's issuance of licenses to Camellia through the year 2007, Camellia set up offices in several locations with obligation to incur expenses for three (3) years.

8. Over many years, Camellia has invested large sums of money to attract and maintain a network of quality foster homes. To redirect those foster homes to another agency would be a financial burden on Camellia and a waste of it's investment without due process of law. Camellia Agency's present market value is 5 MILLION DOLLARS, and by taking all of our staff, children, foster parents, and all our resources without compensation is a violation of law without due process of law.

9. Camellia and the only other provider not awarded any placements were both African-American owned businesses. Camellia contends that DHR

3

discriminated against it in violation of federal and state laws which prohibit discrimination based on race, color or national origin in the award to contract.

10. The State of Alabama requires that the Executive Director of all TFC agencies reside in Alabama. One vendor resides in or has its headquarters located in Georgia and none of its references are located in Alabama. This vendor was awarded 20 slots.

11. The R.F.P. guidelines gave specific instructions to vendors submitting proposals. Failure to adhere to specific guidelines and instructions of writing the proposal indicate non-compliance with the State's R.F.P. requirements.

12. Camellia, along with other vendors present to review proposals on June 13th, 2005, requested a copy of its proposal and the method of scoring/evaluation for proposals. Starr Stewart, SDHR Policy Planning and Research representative stated the following: "Our legal division has said that such information is not available for any vendor to view." This response suggests a violation of our Civil Rights. Failure to allow vendors to view their own proposal and scoring of each section (or points awarded for each section) seems unjust and suggests an unfair method of scoring or evaluation.

13. The R.F.P. guidelines require that vendors who are not yet licensed to submit a complete application. The normal time frame from application date to receiving a Medicaid Billing number to completing licensing process is usually one and a half years. One vendor submitted a licensing application on February 2, 2005, and was awarded slots three (3) months later without undergoing the complete licensing process.

14. One vendor made application for license on April 10, 2005 which is on Sunday. SDHR employees do not work on Sundays, therefore, who in the State Department received the Licensing Study and completed application to conduct/operate a child care facility in time to meet the R.F.P. deadline the next day. (April 11, 2005). This brand new agency with no foster homes received 16 slots. It takes almost 3 years to have 32 homes to enable you to place 16 children. This vendor has no foster parent homes, yet it was awarded 16 slots. It appears this agency has no genuine interest in the future of TFC in Alabama. How in the name of Justice, can a brand new Agency, be awarded a Contract, a License, and Licensing Study in one (1) day. Even though their application and Licensing Study that was submitted was incomplete? Please Sir could you give us some answers.

15. I, on behalf of Camellia, had arranged to meet with the Governor, but prior to that meeting I was contacted by Susan Ward, Director of Contracts and Federal Claiming, and the Commissioner's office. They requested that I not meet with Governor Bob Riley without first appealing to the Commission. Ms. Ward stated that information regarding the appeal process would be posted on the SDHR's website within one week. However, as of today's date, no such process has been posted on the website. Time is of the essence in this matter. Therefore, I am filing my appeal based on the Administrative Code, Chapter

4

660-1-5 Hearings (Alabama Department of Human Resources- General Administration division).

16. State Department of Human Resources is in violation of Federal and State Laws in addition to the R.C. Consent Decree by restricting Camellia's ability to establish foster homes in areas of the State where children need to be placed to work towards reunification with their natural parents and maintain stability.

As a result of the treatment and unlawful actions of SDHR, Camellia has been irreparably damaged.

## PRAYER FOR RELIEF

Camellia Therapeutic Foster Agency, LLC request to be awarded 314 slots as submitted in response to the State DHR's R.F.P.

As noted above, in its treatment of Camellia in this process, the State Department of Human Resources has violated both Federal and State Laws, in addition the R.C. Consent Decree. As a result of the treatment and unlawful actions of SDHR, Camellia has been severely damaged.

Camellia Therapeutic Foster Agency is committed to upholding its mission to provide a safe, natural environment where children can grow and mature into law abiding productive citizens. SDHR should reward agencies that work hard to provide quality services to foster parents and foster children in the state of Alabama. We believe that our proposal was superior to those submitted by vendors' state wide for numerous reasons, including the fact that we followed the exact letter of the R.F.P., while most others did not. SDHR failed to give Camellia full credit in its evaluation of Camellia's proposal. As an agency experienced in providing quality Therapeutic Foster Care in the State of Alabama, Camellia requests that it be awarded a contract for the 314 slots requested in our original proposal.

Sincerely Yours,

Dr. JOSEPH APPIAH., CHAIRMAN
Karen Jurls, MSW, LCSW, PIP, EXECUTIVE DIRECTOR
Cynthia Davis, MSW, LGSW, DIRECTOR OR SOCIAL SERVICES


CC:  Governor Bob Riley
CC:  Honorable Hilliard, Smith, & Hunt, ATTORNEY AT LAW
CC:  Honorable Peter Dumbuya, ATTORNEY AT LAW
CC:  Honorable Susan Ward, Director Contract/ Federal Claiming

     Copy to File

ATTACHMENTS:

Attachment I:  Alabama Department of Human Resources TFC Care Vendor Selection by Regions (original) posted on website on May 12, 2005.

Please see the attachments to note that the vendor's <u>Children and Families First of Alabama</u> was not included on the <u>original</u> posting, yet they appeared on the website <u>one</u> week later, scored higher than Camellia and were awarded <u>8</u> slots.

*Final Result* (handwritten)

*Attachment I* (handwritten)

Alabama Department of Human Resources

## Therapeutic Foster Care Vendor Selection by Regions

| Program | Score | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | 904.25 | | | | | | | | | | 36 |
| SAFY | 893.5 | 8 | | | | 24 | 8 | 4 | | | 201 |
| UMCH | 893.25 | 13 | 16 | 29 | 20 | 8 | 83 | 16 | 7 | 30 | 90 |
| TPI | 892.75 | 13 | 33 | 8 | 20 | 8 | 14 | 14 | 23 | | |
| LCYDC | 889.5 | | | 28 | 20 | 20 | 83 | 12 | 50 | 54 | |
| AL Mentor | 887 | | | | 20 | | | | | | |
| Wilmer Hall | 871.5 | | 8 | 8 | | | 12 | | | | 20 |
| Youth Villages | 869.25 | | | 8 | | | | | | | 20 |
| FIT Homes | 867 | | 20 | | | | 40 | | | | 16 |
| Seraaj | 854.75 | 10 | | 8 | | 12 | | | | 30 | |
| Eagle Rock | 849.25 | 10 | 16 | 8 | 19 | 8 | 75 | | | 20 | |
| Child/Fam. Svs. | 838 | 8 | | | 8 | | | 8 | 44 | | 8 |
| Alliance | 833.25 | 8 | | | | | | | 8 | | 8 |
| Gateway | 820 | | | | | | 18 | | | | 18 |
| Mtn View | 818.65 | | | | | | 50 | | | | 50 |
| Catholic SS | 817.25 | | 16 | | | 8 | | | 18 | | 18 |
| New Way Out | 811 | | | | | | | | | | |
| NBA CSC | 754.25 | | 16 | | | | 30 | | | | 16 |
| Camellia | 753.3 | | | | | 8 | | | | | 70 |
| Success Hms | 712.5 | | | | | | | | | | 0 |
| Fam. Values | 683.5 | | | | | | | | | | 0 |
| Ability + | 639 | | | | | | | | | | 0 |
| Total | | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |

Attachment II:

An amended vendor selection chart was posted on website

When the score was posted I called Ms. Susan Ward, MBA, Director of Contracts and Federal Claiming, and asked her if this was a final score of all agencies, and she replied, "Yes", and I called Mr. Gary Mitchell, Manager of T.F.C. and he also said, yes". Could the Commissioner explain where was Child/ Fam 1st proposal, how did it miraculously come into view in front of Wilmer Hall with 16 slots, a week later?

7

*Changed Result to Accomodate child!*

| Program | Score | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | 904.25 | | | | | 24 | 8 | 4 | | | 36 |
| SAFY | 893.5 | 8 | | 29 | 20 | 8 | 82 | 16 | 6 | 30 | 199 |
| UMCH | 893.25 | 13 | 16 | 8 | | 8 | 14 | 14 | 22 | | 95 |
| TPI | 892.75 | 13 | 33 | 28 | 20 | 20 | 82 | 12 | 48 | 54 | 310 |
| LCYDC | 889.5 | | | | 20 | | | | | | 20 |
| AL Mentor | 887 | | | 8 | | | 12 | | | | 20 |
| Child/Fam 1st | 884 | | | | | | 8 | | 8 | | 16 |
| Wilmer Hall | 871.5 | | 8 | 8 | | | | | | | 16 |
| Youth Villages | 869.25 | | | | | | 38 | | | 30 | 68 |
| FIT Homes | 867 | 10 | 20 | | | 12 | | | | | 42 |
| Seraaj | 854.75 | 10 | 16 | 8 | 19 | 8 | 74 | 8 | 42 | 20 | 205 |
| Eagle Rock | 849.25 | | | | | | | | 7 | | 7 |
| Child/Fam Svs | 838 | 8 | | | | | | | | | 8 |
| Alliance | 833.25 | | | | | | 17 | | | | 17 |
| Gateway | 820 | | | | | | 49 | | | | 49 |
| Mtn View | 818.65 | | | | | | | | 17 | | 17 |
| Catholic SS | 817.25 | | 16 | | | | | | | | 16 |
| New Way Out | 811 | | 16 | 8 | 8 | 8 | 29 | | | | 69 |
| NBA CSC | 754.25 | | | | | | | | | | 0 |
| Camellia | 753.3 | | | | | | | | | | 0 |
| Success Hms | 712.5 | | | | | | | | | | 0 |
| Fam. Values | 683.5 | | | | | | | | | | 0 |
| Ability + | 539 | | | | | | | | | | 0 |
| Total | | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |

Attachment III:

After we reviewed over one half of the following proposals, we have concluded that there are deficits in each proposal: AL MENTOR, CHILD AND FAMILY 1ST, CHILDREN AND FAMILY SERVICES, YOUTH VILLAGES, WILMER HALL, FIT HOMES, EAGLE ROCK, MOUNTAIN VIEW, NEW WAY OUT.

Camellia is prepared to cite all deficiencies to your office if a hearing is granted.

8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALBAMA
# MONTGOMERY DIVISION

DEFENDANT'S
EXHIBIT

**CAMELLIA THERAPEUTIC**
**FOSTER AGENCY, LLC**

       Plaintiff,                **Civil** Action No.: **2.06ev735-MHT**

v.

**THE ALABAMA DEPARTMENT**
**OF HUMAN RESOURCES,**

    **Defendant.**

## VOLUNTARY DISMISSAL OF COMPLAINT

COMES NOW the Plaintiff, by and through his attorney of record and voluntarily dismisses without prejudice its Complaint under Federal Rules of Civil Procedure Rule 41. Plaintiff moves to dismiss its Complaint due to the substantive and procedural deficiencies of said complaint. When Plaintiff filed said Complaint, it was represented by a non- attorney. Consequently, this Honorable Court ordered Plaintiff to obtain counsel in this matter because an LLC cannot be represented by a non-attorney. (Doc No.4). Therefore, on or about September 5, 2006, the undersigned counsel filed a notice of appearance (Doc. No. 5) on behalf of Plaintiff. Plaintiff is filing an Amended Complaint that will cure the deficiencies of the original Complaint. Plaintiff is herein filing a Motion for Leave to Amend Complaint contemporaneously with their filing of an amended complaint.

WHEREFORE premises considered, Plaintiff prays that its Complaint be dismissed without prejudice.

Respectfully Submitted,

s/Dwayne L. Brown
Dwayne L. Brown

Of Counsel:
The Law Office of Dwayne L. Brown
5925 Carmichael Road, Suite C
Montgomery, AL 36106
Phone (334) 277-3757
Facsimile (334) 277-3613
Dbrown@dbrownatty.com

## CERTIFICATE OF SERVICE

This is to certify, that on **September 2.2 , 2006**, a copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Troy King
**Attorney General**
**11 South Union Street**
**Montgomery, AL 36130**

Joel C. Marsh
**Assistant Attorney General**
**State of Alabama**
**Department of Human Resources**
**Legal Office**
**Post Office Box 304000**
**Montgomery, AL 36130-4000**

/s/Dwayne L. Brown
Of Counsel

Thursday May 12, we learned that TPI contract to provide therapeutic foster care has been dramatically reduced. The number of children TPI will be able to serve has been reduced by 43%. That will be a loss of about 240 foster homes and children that were referred to TPI by local DHR caseworkers. There is no reason for this drastic reduction. TPI scored among the highest ranking of providers submitting proposals, and yet TPI was the only provider scoring above the minimum requirement that was cut. A great wrong has been perpetrated against TPI. This is after we have provided high quality services to the children and families in Alabama for 16 years. Throughout that time TPI has been praised for always doing what it was suppose to do. We have grown because we provided the best service and because we were willing to risk going into underserved areas of the state and establishing programs. Now we are being attacked by the very people wo have served for no reason besides the fact that we have grown. In my opinion this is grossly unfair and arbitrary. We are uncertain of how DHR plans to deal with the families and children that they are displacing. I expect they plan to pirate our homes and give them to other providers. Please help to try to get DHR to reverse this unwise and unfair decision. The changes that State DHR is requiring will be detrimental to the children with whom we work. The process will be very disruptive. Family consultants will be changed, supervisors will change, and entire new relationships will have to be built with the new and untested providers, and all for no valid reason.

Your family consultant will supply you with phone numbers and addresses of the governor, Bob Riley, and your state representative. I am asking that you call the governor and tell him that you believe in TPI and want this attack to be stopped because it is unfair and will hurt the child you are caring for. Call your representative and ask him or her to represent you by calling the governor and lodging a protest against these unwise changes. TPI has and can continue to provide the best therapeutic service for the child that you are caring for.

Thank You,

DEFENDANT'S EXHIBIT

William J. Mitchell, Ed.D.
Executive Director