**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **CAMELLIA THERAPEUTIC** ) | |
| **FOSTER AGENCY, LLC, ETC.,** ) | |
| ) | |
| **Plaintiff,** ) | **CASE NO.: 2:  06CV735-MHT** |
| ) | |
| **v.** ) | |
| ) | |
| **THE ALABAMA DEPARTMENT OF** ) | |
| **HUMAN RESOURCES,** ) | |
| ) | |
| **Defendant.** | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S**

**MOTION FOR SUMMARY JUDGMENT**

In response to the Motion by Defendant Alabama Department of Human

Resources for summary judgment, this Court issued an order on June 1, 2007,, requiring

that the Plaintiff file his Opposition Response to said Motion on or before June 20, 2007.

Therefore, this Opposition Response is submitted, together with supporting brief,

affidavits, deposition pages, and exhibits.

**I.**

**INTRODUCTION**

This is a meritorious claim of Title VI discrimination along with various state

claims filed by Camellia Therapeutic Foster Agency, LLC, represented by Joseph

Appiah, an African-American. There are genuine issues of material fact in this case

which are discussed below.

## II.

## STATEMENT OF FACTS

1.    Joseph Appiah, an African-American from South Africa, is the Chairman and Chief Executive Officer of the Camellia Therapeutic Foster Agency, a limited liability company. (Camellia Therapeutic Foster Agency, LLC, represented by Joseph Appiah dep. pgs. 9-10).

2.    Camellia Therapeutic Foster Agency, LLC, was incorporated in 2000. Members include, in addition to Joseph Appiah, Dr. D.A. Ellis, Honorable Arthur Sumbry, all of Phoenix City, Alabama. (Camellia Therapeutic Foster Agency, LLC, dep. p. 12, lines 1-18).

3.    Camellia Therapeutic Foster Agency, LLC, began accepting foster care children in 2002. Joseph Appiah recruited, trained, confirmed that all foster parents were licensed, and prepared foster parents. It is very difficult to recruit foster care parents. All of the foster parents were licensed and trained. By 2005 Camellia Foster Care Agency had approximately sixty-six (66) foster care children and over one hundred (100) foster parents. (Camellia Therapeutic Foster Agency, LLC, dep. pgs. 23, lines 15-23 and 24, lines 1-7; Appiah Aff.).

4.    On or about May 14, 2004, Gary Mitchell, Director of Resource Development, asked Dr. Appiah to attend a meeting in his office in Montgomery. Also present was Nan Johnson, Marlene Henning, and Carol Davenport, all of whom are Resource Supervisors with DHR. Mitchell advised Appiah that his agency was growing too fast. Mitchell said he was

concerned that all of Camellia Therapeutic Foster Care Agency's foster parents were not licensed.  Dr. Appiah assured Mitchell that all of his parents were properly licensed. Office Manager, Renee Lyles can testify that all of the foster care parents were fully licensed and trained according to DHR standard.   (Appiah aff.; Lyles aff.).

5.     Gary Mitchell is the director of the Office of Resource Development.  His staff reviews individual children's records to determine that they are receiving the services they need.  (Ward pgs. 26, lines 22-23; 27, lines 1-10).

6.     Mitchell also told Dr. Appiah that foster parents were coming to his agency because he paid more money than the state required.  Dr. Appiah assured Mitchell that his foster parents were not paid more than the state required.  (Appiah aff.).

7.     Following this May 14, 2004, meeting, Dr. Appiah was harassed by Gary Mitchell and his staff.  Nan Johnson (now Nan Bagget) went to Camellia Agency and requested that two of its foster care children be removed from his foster homes, because the foster care parents had come to Camellia from other agencies, TPI and Seraaj.  One child went into a rage when he was told he had to leave his foster home for another one.  DHR did not act in the best interest of those children by taking this action.  (Appiah aff.; Lyles aff.).

8.     Between May and June of 2004 about thirty (30) children were removed from foster homes under the supervision of Camellia Therapeutic Foster Care Agency.  This action disrupted the lives of these children, the foster

parents and the Camellia agency. Renee Lyles, Office Manager, observed the destruction and the injury caused to the children. (Appiah aff.; Lyles aff.).

9.    On July 26, 2004, Dr. Appiah received a letter from Commissioner Page Walley stating that there were foster parents within his agency that had not been cleared by FBI/ABI.  This was not correct.  Dr. Appiah submitted copies of all documentation proving that his foster parents had been cleared and approved by DHR.  (Appiah aff.).

10.    On or about August 10, 2004, DHR sent staff to the Camellia agency offices located in Montgomery, Birmingham, Huntsville, and Phoenix City to audit his records.  DHR staff were at his offices before 8:00 am.  After a thorough check of all records it was determined that the Camellia agency was in full compliance with DHR requirements.  (Appiah aff.).

11.    Even though Dr. Appiah's agency was in complete compliance, the harassment did not stop.  Numerous spontaneous audits were conducted at all offices within his agency.  (Appiah aff., Exhibit 19).

12.    In November of 2004 DHR revised its Therapeutic Foster Care Manual. The responsibility of completing Intake Evaluations on all children in therapeutic foster care traditionally was done by the individual agencies. That was changed so that DHR staff was required to complete Intake Evaluations on all children in TFC.  Copies of the assessment and ISP must be provided to TFC agencies.  (Appiah aff.; Exhibit 1, DHR's Therapeutic Foster Care Manual revised November 2004).

13.     Joyce Wilson was asked by Gary Mitchell to participate in the evaluation of the February 2005 RFP's.  She apparently did not know of the revision in the 2004 manual that DHR perform the initial treatment plan, since she took points away from Dr. Appiah's proposal for stating that DHR would perform the initial treatment plan for foster care children.  (Wilson dep. pgs. 12-13; Exhibit 9).

14.     The Division of Resource Management is the specific division of the Alabama Department of Human Resources at issue in this case, since it awards contracts to vendors that have been selected through the RFP process.   Susan Ward is the division director.  (Ward dep. p. 7, lines 3-23).

15.     As the director Susan Ward oversees the activities of the Office of Contracts, the Office of Licensing, the Office of Resource Development, and the Office of Utilization Review.  (Ward dep. p. 8, lines 3-10).

16.     The Division of Resource Management, under the supervision of Susan Ward, awards contracts to vendors (providers) that have been selected through the RFP process.  (Ward dep. p. 8k lines 14-18).

17.     Mary Baggett, Resource Consultant/Program Specialist with DHR, visited therapeutic foster care agencies at least once a year to evaluate their programs.  Her immediate supervisor is Gary Mitchell.  Mitchell's supervisor is Susan Ward.  (Baggett dep. pgs. 5-7).

18.     Baggett reviewed the files of Camellia Care Foster Agency based in Russell, Madison, and Jefferson counties.  (Baggett dep. p. 10, lines 8-13).

19.     Baggett used a checklist, the Foster Family Homes Minimum Standards, and the Therapeutic Foster Home guidelines when monitoring the records. Vendors (providers) are provided an opportunity to correct any deficiencies. Dr. Appiah's agency corrected any deficiencies that may have been discovered during Baggett's visits.  (Baggett dep. pgs. 10, lines 15-23; 12, lines 1-20; 19, lines 11-19).

20.     Baggett reported her findings to her supervisor, Gary Mitchell, by way of a form.  (Baggett dep. p. 14, lines 8-12).

21.     Program analysts monitor the various contracts for compliance.  (Ward p. 27, lines 12-23).

22.     In February of 2005 foster care agencies that wanted to accept foster care children first had to send a letter of intent to DHR.  They then could send in questions regarding foster care and these questions were answered at a conference.  Following the conference RFP's were released to the interested vendors.  An RFP is the Request for Proposal released February 28, 2005 by DHR.  An RFP is an "invitation for qualified vendors to submit a response or to offer their services to the state based on the requirements of the document". Dr. Appiah submitted a response for the Camellia Therapeutic Foster Care Agency in a timely manner.  (Wilson dep. p. 11; Stewart dep. pgs. 9-10; Appiah aff; Exhibit 2, Feb. 28, 2005 RFP.).

23.     Starr Stewart was over the RFP process.  (Ward dep. p. 16, lines 15-18).

24.     Starr Stewart is the director of policy planning and research.  Steward's responsibilities include coordinating procurement for services for children

and families, working on various service oriented type projects, and posting

policies online and ensuring accuracy of the policies.  (Sterwart dep. p. 8).

25.     Stewart worked with divisions to develop and issue RFP's.  She

coordinated and facilitated vendor conferences when needed.  Stewart also

coordinated the evaluation of RFP's. (Steward dep. pgs. 9, ones14-23; 10

lines 1-2).

26.     Dr. Appiah submitted a proposal for Camellia Foster Care Agency, LLC.

He attended the conference held in Montgomery for question and answer

session with DHR.  (Appiah aff., Exhibit 4, Camellia Foster Care Agency

RFP).

27.      Joyce Wilson was asked by Gary Mitchell to participate in the evaluation

process.  She had nothing to do with drafting the RFP and does not know

who did. (Wilson dep. pgs 12-13).

28.     Even though Wilson participated in the evaluation process, she could not

recall how many evaluators were involved in this particular process.

According to Wilson all of the evaluators met in the same room, but worked

independently and had no interaction.  (Wilson dep. p. 14, lines 7-17).

29.     Wilson was instructed not to evaluate Roman numeral one, Mandatory

Requirements.  She does not know who scored Roman numeral one.  Wilson

did not have anything to do with drafting the document used in scoring the

RFP's and does not know who did.  She was instructed to stop the

evaluation process after Roman numeral ten.  She does not know who

evaluated Section XI.  (Wilson dep. pgs. 15; 18, lines 10-23).

30.     Section ten involved compensation.  Wilson does not know who did score that section.  Wilson did not sign nor did she date the evaluation document used in the evaluation process.  (Wilson p. 16).

31.     Wilson gave Camellia Foster Care Agency a very low score.  Under the scoring process a proposal that scored below 800 would not be awarded a contract.  There were five evaluators who each scored the RFP's individually.  They scored at least thirteen (13) proposals over a two day period.  Each evaluator signed in and out on a Scoring sign in/out Sheet. (Exhibit 13).  The five scores were then averaged for the final score given to each agency that submitted a proposal.  There was a wide discrepancy between the individual scores indicating lack of objective criteria for scoring.  The scoring was very subjective.  For example, Camellia's high score was 932 and the low score given by Joyce Wilson was 495.  (Ward dep. pgs. 40, lines 8-12; 41, lines 9-17; Exhibit 3, Scoring Sheets for Camellia).

32.     Joyce Wilson was the evaluator giving Camellia Therapeutic Foster Care Agency the lowest score, 495.  Wilson gave Dr. Appiah's agency ten out of a possible twenty-five points for Roman numeral two.  She arrived at that figure by multiplying "forty times twenty-five, so that was ten points….forty percent".  When asked where she got the forty percent she responded, "That was the score."  (Wilson dep. p. 19).

33.     Wilson testified that she found several grammatical errors in Dr. Appiah's proposal.  She could not recall whether she found grammatical errors in

other proposals.  A review of Dr. Appiah's response reflects that he drafted a well constructed, well organized, grammatically correct document.  Dr. Appiah is from South Africa and speaks with an accent, but that did not affect the writing of this document.   Wilson states on the scoring sheet that Dr. Appiah "did not give length of time with agency". Dr. Appiah states under History portion that Camellia was "founded in 2000 by Dr. Appiah" and incorporated on January 15, 2002.  Section A of the guidelines issued by DHR on February 28, 2005, does not request the length of time with the agency.   Dr. Appiah provides a very thorough description of the services provided by the vendor, as part of the History section.  Wilson takes points away from Dr. Appiah for not including treatment in his mission statement. The instructions for Mission Statement from the guidelines provided by DHR state:  "Provide a brief statement regarding the goals of the Organization or its' mission statement." (Wilson dep. p. 20, Exhibit 2, Exhibit 9).

34.     Wilson states that "references listed here" as her comment by Section II. C. Management Structure.  Dr. Appiah lists under Section II. 7 Qualifications and the Experience of the Vendor a list of service references which he was required by DHR to do.  It seems that perhaps Wilson is confusing that section with another section that requests references, Section X.  Dr. Appiah named ten (10) references, DHR supervisors with whom he has worked, just as the instructions indicated.  None of his references were called.  Also, other proposals that listed references in this section were

apparently not penalized, since they scored above 800 and were awarded contracts. (Appiah aff., Exhibit 4; Exhibit 9; Exhibit 10).

35.     When comparing proposals submitted for the 2005 RFP, it is noted that some of the agencies awarded contracts charged higher rates than Camellia Therapeutic Foster Care Agency. (Exhibits 10 and 4).

36.     Children and Families First of Alabama states in its RFP that it offers "no current operating programs because the agency is in the process of applying for licensure as a Child Placing Agency. (Exhibit 10).

37.     Wilson took points away from Camellia's proposal in Section III A for not addressing the training of staff. Training is addressed in another section. However, it is noteworthy that other agencies did not address training in Section III. A and were awarded contracts. One example is the Children and Families First of Alabama. (Exhibits 10 and 15).

38.     When asked how she arrived at forty percent Wilson responded, "I don't know…..That was what I felt it scored." (Wilson dep. pgs. 20, lines 7-23; 33, lines 1-4).

39.     Wilson responded to questions from her own handwritten notes during her deposition that she had written the morning of her deposition.

    Q:      Can you tell me when you wrote those notes?
    A:       Today.

    Q:      Okay. Can you be sure those notes reflect your thinking in 2005?

    A:      As sure as anybody.

Q:    Okay.  But I'm asking you specifically about those notes.

A:    These would reflect my thinking when I scored the document.(Wilson dep. pgs. 20, lines 20-23; Exhibit 9).

40.    In addition to poor grammar, Wilson alleges that Dr. Appiah's organization of the proposal did not follow the scoring instrument.  She further alleges that Dr. Appiah stated in his proposal that "DHR did the initial treatment plan" and that, according to Wilson, is incorrect.  Wilson alleges that the initial treatment plan is "done by the therapeutic agency".  However, Dr. Appiah is quite accurate according to the Therapeutic Foster Care Manual published and posted on DHR's website.   (Wilson dep. pgs. 21-22; 37, lines 4-12; Exhibit 1).

41.    Wilson also counted off for the following: Regarding Section 6 Target Area: There is a maximum of fifty (50) points if service is proposed as statewide.  Wilson gave Camellia a score of twenty (20). Wilson stated in deposition that her reason for not giving the maximum score is because Dr. Appiah should have stated a reason for selecting to accept foster care children in Russell, Montgomery, Madison, Mobile, Jefferson, and Dallas counties, since he did not specify that he could accept foster care children statewide.  Wilson admits that none of the vendors offer services statewide. (Wilson pgs. 44- 46).  Alabama Mentor makes this statement for Section E Target Area:  "Alabama Mentor proposes to proved services to children in need of Therapeutic Foster Care in the following regions:

Region 3 (Autauga, Dallas, Lowndes, Montgomery, Wilcox, Crenshaw, Butler and Conecuh Counties)

Region 6 (Jefferson, Shelby, Chilton, Talladega, Clay, Randolph and Cleburne Counties)"   (Exhibit 6) Similar language is found in other agencies that were awarded contracts by DHR on the basis of their RFP proposals.  (Exhibits 5, 7, and 8).

42.     Wilson gave Dr. Appia's proposal a low score in the section regarding references.  Out of a possible fifty (50) points, he was given only twenty (20).  Wilson states in her deposition that Dr. Appiah did not name references in all six counties where he had offices, only four, and he only named DHR officials.  The RFP did not state that references had to be from all counties where offices were located.  Youth Villages only listed six references and Wilson awarded it forty-five points out of a possible fifty (50).  (Wilson pgs. 51-52; Exhibit 5; Exhibit 15; Appiah Aff.).

43.     Some contracts were awarded to foster care agencies that did not yet have offices in the state of Alabama, no staff, and no license.  For example, National Mentor Agency d/b/a Alabama Mentor stated in its RFP that it had "potential office space in Montgomery and Birmingham".  This agency was granted a contract.  The Executive Director of National Mentor Agency was a resident of Atlanta, GA, at the time his proposal was submitted.  (Appiah aff; Exhibit 6).

44.    Youth Villages was given a contract without going through the RFP process in January 2005. In February Youth Villages submitted a proposal and was awarded seventy additional foster care children. (Appiah aff.; Exhibit 5, Youth Villages RFP).

45.    The Therapeutic Foster Care Proposal submitted by Camellia Therapeutic Foster & Adoption Agency, LLC is professionally written. It responds completely and fully to each category required by the Therapeutic Foster Care for Children manual issued February 28, 2005. It was timely submitted and signed. According to the Scoring Instrument (Exhibit 9) and the Request for Proposals issued by DHR on February 28, 2005 guidelines (Exhibit 2), Camellia's responses included all required information.

46.    It appears from the documents provided by Defendant DHR to Plaintiff Camellia Therapeutic Foster Care and Adoption Agency, and Dr. Joseph Appiah, through discovery, that the Children and Family First Agency was omitted from the original list of agencies that scored 800 or above, but later added as an agency that was awarded a contract. (Exhibits 11 and 12).

47.    There were only two African-American owned agencies who submitted proposals for the February 2005 RFP issued by Alabama Department of Human Resources. Camellia Therapeutic Foster Care and Adoption Agency and Seraaj. It is the understanding of Dr. Appiah, chairman of the Camellia agency that Defendant did not want to award a contract to Seraaj, but did so after members of the Black Caucus intervened. Renee Lyles observed that

African-American owned agencies were treated differently than Caucasian agencies. (Appiah aff.; Lyles aff.).

48.    A comparison of Wilson's scoring of Alabama Mentor and Youth Villages to Camellia's shows a wide discrepancy. A comparison of the three proposals shows very little difference in the amount and quality of information. (Exhibits 14, 15, 3, 4, 5, 6,7, and 8).

49.    Dr. Appiah submitted two proposals in 2006 and was again denied, because of a low score. Dr. Appiah responded to an RFP for Foster Care Recruitment Services in Mobile and Jefferson Counties. Camillia Therapeutic Foster Care Agency was the only agency that had the facility and staff in both Mobile and Jefferson Counties to offer those services. DHR denied Camillia the contract and offered a contract to Family in Transition, a new contractor with no staff to perform the services. Another RFP was issued for Crisis Stabilization Services March 28, 2006, and due May 9, 2006. Camellia agency was the only agency that qualified. DHR issued a Statement of Cancellation. (Appiah aff.; Exhibit 20).

50.    Dr. Appiah is very passionate about his involvement with foster care children. He has taken children that nobody else wanted and made a positive difference in the life of those children. (Appiah aff.).

51.    Nothing in the February 28, 2005 RFP states that the cut off score is 800 for awarding contracts. (Exhibit 2; Appiah aff.)

52.    All of Dr. Appiah's hard work and the good will that he had established with his foster parents, the foster care children, and the communities where

he served were lost. He lost income. He lost all of his offices, except for the one in Phoenix City, AL. Dr. Appiah has been damaged financially and emotionally by the actions of DHR

## III.

## <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of

material fact. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548 (1986), material fact. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548 (1986), 91 L.Ed. 2d. 265 (1986), citing, Fed. Rules Civ. Proc. Rule 56(c). A fact is material if, under applicable substantive law, it might affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d. 202 (1986). It is genuine if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F. 2d 994, 998 (11th Cir. 1992). This Court considers the evidence and all inferences drawn in the light most favorable to the non-moving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970)**;** <u>Hairston v. Gainesville Sun Publishing Co.</u>, 9 F. 3d 913 (11th Cir. 1993)**.**

# IV.

## LEGAL ARGUMENT

**Defendant's Motion to Dismiss and For summary judgment is Due to be Dismissed for improper pleading.**

Rule 10(a) of the Federal Rules of Civil Procedures sets out the form of pleadings.

The rule provides the following:

> Every pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, and a designation as in rule 7(a). In the complaint the title of the action shall include the names of all parties, but in other pleading it is sufficient to state the name of the first party on each side with an appropriate indication of other parties. Federal Rules of Civil Procedure 10(a).

Plaintiff contends that Defendant has failed to comply with the requirements of the rule. The caption of defendant's motion does not identify the proper Defendant in this cause of action. Further, Defendant makes arguments which are not relevant to the cause of action related to improper defendants which were cited in the caption of Defendant's motion. As such, Defendant's motion should be dismissed as its caption is in direct contradiction with the requirements of Rule 10(a) of the Federal Rules of Civil Procedure.

**Plaintiff's Claims Against Defendant are Proper Under the Construction of Title VI of the Civil Rights Act of 1964, as Amended**

Sec. 2000d-7 provide in pertinent part that:

(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for violation of section 504 of the Rehabilitation Act of 1973 [29U.S.C.794], title IX of the Education Amendments of 1972 [20 U.S.C.1681 et seq.] the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance. (42 U.S.C. Sec. 2000d-7).

In United States v. City of Yonkers, that Court rejected the sovereign immunity argument by the State.  Instead the court concluded that not only does the plain language of Section 200d-7 defeat the States assertion, but also:

> Nothing in the legislative history of Title VI compels the conclusion that an entity must be a 'program' or 'activity' to be a Title VI defendant… We therefore hold that the State of New York can be sued under Title VI as long as it, along with those of its agencies receiving federal financial assistance, is alleged to have been responsible for a Title VI violation.  (United States v. City of Yonkers, 880 F.Supp, 212, (S.D.N.Y. 1995)   vacated and remanded on other grounds.

As such, Plaintiff contends that the law is clear that the Eleventh Amendment does not act to bar claims made by Plaintiff against this Defendant in accordance with Title VI of the Civil Rights Act of 1964.

### In Accordance With The Federal Rules Of Civil Procedure, Plaintiff Has Stated A Cause Of Action For Which Relief Can Be Granted

Rule 8(a) of the Federal Rules of Civil Procedure provide 1) that to state a claim plaintiff  must merely state a cause of action which contains a short and plain statement of the grounds upon which the courts jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it.  2)  Plaintiff must also show that he is entitled to relief.   **Federal Rules of Civil Procedure 8(a).**

Further, Title VI of the Civil Rights Act of 1964 provides the relief to which Plaintiff may be entitled.  In pertinent part the statute provides:

(2)  In a suit against a State for a violation of a statue referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.  (42 U.S.C. Section 2000d(7)(a)(2).

Defendant further contends that Plaintiff has failed to state a cause of action in accordance with Title VI of the Civil Rights act of 1964. More specifically Defendant contends that Plaintiff has not alleged intentional discrimination, and that as such, Plaintiff's claim fails.

The statutory language of Title VI is designed to prevent intentional discrimination, **and agency Title VI regulations prohibit conduct that has an "unjustified discriminatory effect.** (Emphasis ours. *Guardians Ass'n v. Civil Serv. Comm'n* 463 U. S. 582 (1983) and *Alexander v. Choate*, 469 U.S. 287, 293

As such, Plaintiff's Amended Complaint states a cause of action which is in accordance with Title VI, for which relief is available and can be granted. Further, Plaintiff contends that Defendant's Supplemental Jurisdictional claim is without merit as Title VI provides the conduit through which Plaintiff is entitled to pursue this claim against the Alabama Department of Human Resources. Therefore, it is Plaintiff's contention that *Ex Parte Young* would not apply in this matter as the federal statute provides the available remedies to Plaintiff.

**Plaintiff's Pleading are Sufficient to Allege Claim for Due Process**

Pursuant to the plain language of Title VI Plaintiff should have been awarded a hearing. He made numerous requests and all were denied. Plaintiff requested an appeal to Susan Ward, Page Walley, to the Board of Directors, Governor Riley, and Administrative Law Judge Honorable Bill Predergrast. Dr.

Appiah exhausted all administrative remedies prior to filing a lawsuit. (Appiah aff.).

### Punitive Damages is an available remedy In Accordance with the language of Title VI of the Civil Rights Act of 1964

In a suit against a State for a violation of a statue referred to in paragraph (1),  remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.  (42 U.S.C. Section 2000d(7)(a)(2). Plaintiff per the statutory language has all remedies available that are available to any public or private entity.  As such, plaintiff contends that punitive damages are an available and necessary remedy against the Alabama Department of Human Resource in this matter.

### Plaintiff has established a Cause of action in accordance with the McDonald Douglas requirements

### Prima Facie Case

Title VI of the Civil Rights Act of 1964 prohibits discrimination based on race, color, or national origin, etc., under any program or activity, which receives Federal financial assistance.  42 U.S.C. Sec.2000d.   As such, Title VI bars intentional discrimination.  Alexander v. Choate, 469 U.S. 287,293 (1985).  Further Title VI specifically directs and authorizes Federal agencies to enact "rules, regulations or orders of general applicability" that will provided for the objective of the statute to be  achieved.  42 U.S.C. 2000d-1 A significant number of federal agencies have followed this directive and have

adopted regulations that forbid recipients of federal monies from utilizing criteria or methods of administering their programs that have the effect of discrimination.

As such, the Supreme Court has held that these regulations may validly prohibit practices having a disparate impact on protected groups, even if the actions or practices are not intentionally discriminatory. Alexander v. Choate, 469 U.S. at 292-94; Elston v. Talladega County Bd of Education, 997 F.2d 1394, 1406 (11th Cir. Reh'g denied, 7 F.3d 242 (11th Cir. 1993). Given the Court's holding Plaintiff may prove claims of discrimination under the theory of disparate impact/effects. Under this theory a recipient in violation of an agency's regulation uses a neutral procedure or practice that has a disparate impact on individuals or a particular race, color or national origin and such practice lacks a substantial legitimate justification. Larry P. v. Riles, 793 F. 2d 969,983 9th Cir . 1984. As such, Title VI disparate impact claims are analyzed using principles very similar to the principles utilized in analyzing Title VII disparate impact claims. Young v. Montgomery county (Ala.) Bd. Of Educ., 922 F. Supp.544, 549 (m.D. Ala. 1996). A number of other cases recognize the validity of Title VI disparate impacts claims. See Villanueva v. Carere, 85 F. 3d481 (10th Cir. 1996); Branches of NAACP v. Georgia, 775 F. 2d 1403(11th Cir. 1985).

The Department of Justice regulations specifically provide the following:

2    A recipient, in determining the type of disposition, services, financial aid, benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration **which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respects individuals of a particular, race, color, or national origin.** 28C.F. R. Section 42.104(b)(2. (emphasis ours).

In the case at bar, the February 2005 Request for Proposal, as written and scored by the Alabama Department of Human Resources, was discriminatory in nature. The 2005 RFP was neutral on its face, but had a significant disparate impact effect on the Plaintiff in this matter who is African-American, who is from South Africa and who speaks with a distinct accent.

Further, DHR did not provide an objective standard to be followed by those it enlisted to score the respective responses to the RFPS.

Plaintiff contends that its response to the request for proposal submitted by plaintiff to the Alabama Department of Human Resources was as good or better than any of the other proposals submitted for consideration. To support this contention Plaintiff submitted his proposal in a very timely fashion; it is undisputed that it conformed to all of the requirements outlined in DHR's RFP; and he attended the conference held in Montgomery for a question and answer session with DHR, concerning the RFP before submitting the proposal; It is also note worthy to mention that Plaintiff was a current

contractor for the Alabama Department of Human Resources when he was required to submit a response to the RFP in an effort to continue his program.  Further, Plaintiff who had contracted with the department for a period of years had been monitored for his program work and was within compliance with agency standards at the time that he submitted his response to the RFP.  The department was familiar with Dr, Appiah, as he had been investigated for alleged non-compliance and cleared of any wrong doing by both  the Alabama Attorneys General Office and the Alabama Department of Human Resources.

As stated in the facts there were five evaluators who graded each of the proposals, and their scores were averaged to reach the final score.  As to Plaintiff, there is a high score of 932  and a low score of 495.  Joyce Wilson was the evaluator providing the lowest score to Plaintiff.  During Wilson's deposition when questioned about how she arrived at the low score Wilson was very vague and replied that she did not know how or why she arrived at the score for Plaintiff.  (Wilson Deposition pg.19).

## **PRETEXT**

Since Plaintiff has successfully established a *prima facie* case of discrimination, under the McDonnell Douglas test, the burden shifts to the Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's failure to be awarded the contract. Bass v. Board of County Commissioners, 256 F. 3d 1095, 1104 (11th Cir. 2001). If an employer meets that burden then the plaintiff must establish that defendant's proffered reasons are pretextual. Id. In order to show pretext, a plaintiff must demonstrate that the proffered reason was not the true reason for the adverse decision. The plaintiff may

succeed in doing this either directly, by persuading the Court that a discriminatory reason more likely motivated the Defendant, or indirectly by showing that the Defendant's proffered explanation is unworthy of credence. <u>Texas Dept. Of Community Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981).

Plaintiff may defeat summary judgment concerning the issue of pretext if he has demonstrated such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." <u>Combs v. Plantation Patterns</u>, 106 F. 3d 1519, 1538 (11th Cir. 1997). There is substantial evidence which would lead a reasonable jury to conclude that Defendant's proffered "legitimate" reasons for failing to award Plaintiff a contract are not worthy of credence.

In offering alleged legitimate non-discriminatory reasons for failing to award Plaintiff a contract in response to the RFP, Defendant relies upon the subjective scoring of an instrument that has no objective criteria for measurement. Only three proposals were submitted by African-American agencies. All three had been servicing foster care children prior to the February 2005 RFP. Only one was awarded a contract out of thirteen contracts awarded. There does exist an alternative non-discriminatory practice and that is: all of the agencies submitting proposals could not have been awarded contracts, especially when considering that some of the contracts were awarded to agencies that charged more money than the Camellia agency did and that there are many children who are in need service.  (Exhibit 10 )

The evidence also shows that Plaintiff's state claims are meritorious, as Defendant intentionally and maliciously interfered with its existing business.

## CONCLUSION

Because Plaintiff has produced substantial evidence establishing a *prima facie* case and that Defendant's reasons for not awarding a contract to Plaintiff were pre-textual, Defendant's Motion for Summary Judgment is due to be denied.

s/Kathryn Dickey

Law Offices of Kathryn Dickey

322 Alabama Street

Montgomery, AL 36104

(334) 262-0728

(334) 265-7696 fax

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Honorable James Long

/s/ Kathryn Dickey

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **CAMELLIA THERAPEUTIC FOSTER AGENCY, LLC, ETC.,** | ) <br> ) <br> ) |
| **Plaintiff,** | )    **CASE NO.: 2: 06CV735-MHT** |
| | ) |
| **v.** | ) |
| | ) |
| **THE ALABAMA DEPARTMENT OF HUMAN RESOURCES,** | ) <br> ) <br> ) |
| **Defendant,** | ) |

### AFFIDAVIT OF JOSEPH APPIAH

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

Before me, the undersigned notary public, appeared JOSEPH APPIAH, who being by me first duly sworn deposes and states as follows:

1.    My name is Joseph Appiah, and I am over the age of nineteen years. I am a resident of the State of Alabama.

2.    I have personal knowledge of the facts contained in this Affidavit.

3.    If called as a witness, I could and would testify confidently to the matters set forth below.

4.    I am Chairman and CEO of Camellia Foster Care Agency, LLC. Camellia Foster Care Agency, LLC, was established in 1998 and was incorporated in 2002 in Russell County, Alabama. In 2002 Camellia had approximately twenty (20) foster care children. The agency grew so that by 2005 there were sixty-six (66) foster care children and over two hundred (200) foster parents. I had offices set up in Mobile, Phenix City,

Montgomery, Selma, Huntsville, and Birmingham for purpose of accepting foster care children.

5.      A difficult part of building a foster care agency is recruiting and training of foster parents. I worked very hard to build Camellia Foster Care Agency. All of my foster parents were licensed and well trained. They were dedicated to helping foster care children.

6.      Gary Mitchell, Director of Resource Development, called me on the telephone on or about May 14, 2004 to come to Montgomery and meet with him in his office regarding the rapid growth of my agency. I complied with his request and me with him, as well as, Nan Johnson (now Baggett), Marlene Henning, and Carol Davenport, Resource Supervisors met. Mr. Mitchell said he was concerned that my agency was growing too fast, because it was difficult to recruit foster parents. He was concerned that all of my foster parents were not licensed. Mr. Mitchell also told me that most of the foster parents were coming to my agency because I paid more money than the state required. I assured Mr. Mitchell that all of my foster parents were properly licensed by the agency and were paid no more than the state required.

7.      The State of Alabama Department of Human Resources requires background checks of all foster care parents by the Alabama Bureau of Investigations and the Federal Bureau of Investigations along with Central Clearance Alabama Registry of Child Abuse and Neglect. All of my foster parents were cleared by these background checks and approved by the Alabama Department of Human Resources.

8.      Following the May 2004 meeting in Gary Mitchell's office, I was continuously harassed by his office. Nan Johnson came to my agency office  and told me

to move two of our foster care children from their home because the foster care parents had come to our agency from another (TPI) and (DHR) and Seraaj. These foster parents were fully licensed and trained. One child went into a rage, because he did not want to be moved. DHR was not acting in the best interest of these children. DHR was acting in retaliation to me.

9.    Following this meeting, Gary Mitchell authorized DHR County Directors where my agencies were located, to begin removing children from my foster care homes. Between May and July of 2004 about thirty (30) children were removed from my foster care homes. This action disrupted the lives of our foster care children, our foster parents, and our office staff.

10.    Gary Mitchell reported me to Hon. Page Walley, PHD, Commissioner. I received a letter from him dated July 26, 2004, stating that there were foster parents in my agency without FBI/ABI clearance. These allegations were not true.

11.    I submitted documentation to Hon. Page Walley, PHD, on every single foster care parent showing that I was in 100% in compliance with DHR requirements.

12.    On or about August 10, 2004, DHR sent to my agency offices located in Huntsville, Birmingham, Mobile, Phenix City, and Montgomery with no prior warning to conduct an audit of all my records. DHR staff was at my offices before 8:00 am. They wanted to see the original documents of all of the ones submitted to Honorable Page Walley, PHD to make sure no signatures were forged. I complied with their requests. After all records were thoroughly checked, I was still found to be 100% in compliance with DHR requirements at all locations.

13.     Even though I was in compliance, the harassment did not stop. Numerous spontaneous audits were conducted at all of my agencies.

14.     In February 2005 DHR published on its website to Request for Proposal (RFP). I submitted my RFP response in a timely manner, but was not awarded a contract.

15.     I requested an appeal of DHR's decision to Susan Ward, Director of Federal Contract and Grant but was denied a hearing. I then went to Honorable Page Walley, PHD, to the Board of Directors, and to the Governor with no success. I requested an appeal to Hon. Bill Prendergrast, Administrative Law Judge. I exhausted all known administrative remedies prior to filing this law suit. I was notified by letter from a DHR attorney that I would not be given a hearing.

16.     Some contracts were awarded to foster care agencies that did not yet have offices in the states of Alabama, no staff and no license. For Example, Alabama Mentor Agency stated in its RFP that it did not have an office, staff, or license, but would if granted a contract; he would get all of this. The Executive Director of Alabama Mentor Agency who applied for the contract resides in Atlanta, GA, which was a violation of DHR's licensing process. Youth Villages was given a contract without going through the RFP process in January 2005 with 25 slots. In February, Youth Villages submitted another proposal and was awarded seventy additional foster care children. Alabama Mentor LLC and Youth Villages of Tennessee Inc are Caucasian Agencies.

17.     The foster care parents that I trained were moved to other foster care agencies without compensation.

18.    All of my foster care children were taken from me. I have lost all of my offices, except the one in Phenix City. I have been damaged financially and emotionally by the unlawful actions of DHR.

19.    About one week after DHR posted the names of all foster care agencies that were awarded contracts, another posting appeared on the website with an additional name, Child and Families First, which had not previously been there. They appeared with a score higher than my agency. DHR refused to explain how it miraculously appeared.

20.    The RFP states that 50 points are awarded for providing references. According to the conference for question/answer held in Montgomery for all prospective foster care providers, we were to provide references of individuals with whom we had worked in a foster care relationship. We were told that DHR would call our references. I provided a substantial list of DHR references. Not one of my references was called by anyone regarding the February 2005 RFP. I called each one of them and asked and recorded the date and time of my call.

21.    In the Defendant Motion to Dismiss or for Summary Judgment file on May 29, 2007. In the United States District Court for the Middle District of Alabama, Northern Division page 27, first paragraph, the defendant supported his motion with a memorandum to the members of the Legislative by Hon. Page Walley, PHD. " I quote one of the objectives of the RFP was to expand both the number and geographical distribution of TFC homes and providers in the state, i.e. (W)e believe that having more diverse and larger numbers of providers is better for the department and the children" Memorandum to the Alabama Legislators dated May 16, 2005.

22.     If the Commissioner's idea of expanding TFC providers, both numbers and geographical distribution, then the commissioner has failed. Taking Camellia Agency out and replacing him with two Caucasian Agencies who are not prepared to place our children in their foster homes in Alabama is a disgrace to this administration and Department of Human Resources. After Camellia and other agencies have worked hard to comply with the R-C consent Decree, DHR has destroyed all of my labor and achievements. The Commissioner had little knowledge of how tough it is to recruit and train foster parents. If he had an idea he would not use discriminative practices to take a Black owned agency's hard work and hand it over to two rich Caucasian out of state agencies.

23.     I applied for my license and incorporated in 2002. I did not want to be another major provider who had no personal knowledge of the challenges and abuse these children face, or the difficulties the parents face day to day. I wanted to have real hands on experience.

24.     At TPI I was given a child no parent wanted, because this particular child slept with knives. He had threatened several parents and several children. The Agency TPI wanted me to use my experience as a parent for 35 years to help this child.

25.     Within six months, the foster child, nicknamed "Cici Pizza", had opened up to me and explained why he slept with the knives. We nicknamed him "Cici Pizza", because he could eat pizza 7 days a week.

26.     In his explanation he said, while living with his grandmother, two armed robbers broke into the house slashed off her fingers, took all of her expensive diamond

and gold rings and killed her. Cici was six years old when this happened. Ever since that happened he had had nightmares that those bad guys were still looking for him.

28.    Cici felt that knives gave him protection. All previous foster parents were afraid of him. He had been to several parents from Lee County to Montgomery County without apparent success, until he came to my home.

29.    I explained to him that he was safe in my home and no one would hurt him. I also told him that those bad people were probably now in jail.

30.    He went under his mattress and gave me three knives he had been hiding under his bed. Cici's life changed from that time on.

31.    He did not like going to church and I could not force him. Therefore, we agreed that he would ride with me and sit in my pastoral office while I delivered the sermons on Sundays.

32.    It was not too long before Cici began playing the drums for the church. This is what these children need; patience, kindness, love, and supervised medication and their lives will turn around. I gave him all of that.

33.    I go from church to church, house to house recruiting foster parents. I felt used by DHR when they closed my business without compensation and handed it on a silver platter to Caucasian Agencies. The actions of DHR have hurt me deeply and cause me to suffer damages, financially and emotionally.

34.    Even though Cici has returned home, I still support him. I am the only father he knows and has ever known.

35.    My experience as a Therapeutic Foster Care parent helped my Agency to grow faster than DHR wants to accept. They were always telling me that my agency was

growing too fast. There was a case in Huntsville where one of my foster parent's car was stolen by the twelve year old foster child in her home. The child stole the keys from the parent's bedroom, drove the car without the parent's permission and wrecked the car just a block away from her house. The foster parent made an agreement with the other driver to pay for repairs and settle the matter. She approached DHR for the money but DHR refused to pay for the repairs.

36.    The foster parent requested that the child be removed immediately. That disruption would be another failure to the system. The NAACP became involved and I called Ms. Thomas to send me the estimate and mailed her a check to diffuse the situation. The disruption was avoided.

37.    The foster parent was happy and the home was saved. I went in to make a difference. DHR did not even recognize my ability to resolve family problems. The amount I paid was $3223.13 to save a child's home from disruption. This parent had high hopes that my agency would stand behind her in any situation. She refused to file an insurance claim, in fear that her insurance premium would go higher. I take this business of abused children real serious.

38.    There is nothing in the RFP issued by DHR on February 28, 2005, that states the cut off score was 800 in order to qualify for a contract.

39.    I submitted two RFP's to give DHR the opportunity to correct the wrongful and discriminative conduct, but that also failed. The RFP issued by DHR April 4, 2006, and due date May 16, 2006, was submitted, but no contract awarded. I responded to an RFP for Foster Care Recruitment Services in Mobile and Jefferson Counties.

41.    Camellia was the only agency that had the facility and staff in Mobile and Jefferson Counties to offer those particular services. DHR gave me a low score again and awarded the contract to Family in Transition, a new contractor with no staff to perform the services.

42.    Family in Transition was awarded its first contract for February 2005. Family in Transition did not have enough homes for February and needed to spend time to recruit foster parents for their own program, but were awarded a contract over me, even though I had a foster care agency in operation.

43.    Another RFP was issued for Crisis Stabilization Services March 28, 2006 and due May 9, 2006. This time my agency (Camellia) was the only qualified agency. I submitted my RFP in a timely manner before the due date. DHR issued a Statement of Cancellation. Since there was no competition, DHR refused to grant me the contract. It takes several thousand dollars to submit a RFP.

44.    DHR used the RFP for Therapeutic Foster Care to take from me an established agency's program, foster parents, foster children and staff and handed it over to new programs with no office, no license, and no staff.

45.    When I submitted my RFP I submitted with the belief that I was getting additional children to what I had. I had 66 foster children and DHR used discriminatory practices to take away my children.

46.    They dispatched the office of the Assistant Attorney General Hon. Joe Lieberman, and the Office of Medicaid Fraud to come to my Phenix City office, giving me seven hours notice to produce Medicaid records for 248 children. This was impossible to produce with such a short notice. Due to my inability to produce about six children's

records on time from Montgomery County and two children records in Mobile, l was cited $790,000.00 U.S. Dollars. The records were available but were faint due to faxing.

47.    I never received the $790,000.00 in six months. All of our billing goes to DHR; we are only paid 28% of our total billing. This is another ongoing retaliation, harassment and discrimination from DHR.

48.    DHR seized my Therapeutic Foster Care Payment of over $200,000 and has not paid me as of this date, together with interest.

49.    I was graded subjectively by an unqualified grader, Joyce Wilson of Montgomery County DHR. I am a Dual Licensee. She penalized me for saying that I can take children from 0 months to 19 years of age. I have taken a new born child straight from the hospital in Birmingham in one of my Licensed Therapeutic Foster Care Homes. Ms Joyce Wilson penalized me for saying that DHR is responsible for preparing the initial treatment plan. Therapeutic Foster Care manual supports my claim. Even though she has been employed by the county for over 30 years, she has no knowledge of rules for Therapeutic Agencies. Therefore she was not qualified to grade my proposal.

50.    Only three African-American owned agencies submitted RFP's to DHR in 2005. Two were not awarded contracts because of scoring below 800, Camellia Therapeutic Foster Care Agency and NBA. Years ago DHR tried to close the only African-American owned agency at that time, Scraaj, until the NAACP/Black Caucus intervened.

51.    I declare under penalty of perjury pursuant to the Laws of the State of Alabama the foregoing is true and correct to the best of my knowledge.

FURTHER, THE AFFIANT SAITH NOT

Dated this the 19th day of June 2007

Joseph Appiah

STATE OF ALABAMA

COUNTY OF MONTGOMERY

On this the 19th day of June 2007, before me, the undersigned Notary Public, in and for said State and County, personally appeared Joseph Appiah, who is known to me, and states that the foregoing information is true and correct to the best of his information, belief and knowledge, and that he executed same voluntarily on the day the same bears date.

NOTARY PUBLIC

My Commission Expires:
2/03/08

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| **CAMELLIA THERAPEUTIC FOSTER AGENCY, LLC, ETC.,** | ) ) ) | |
| **Plaintiff,** | ) | **CASE NO.: 2: 06CV735-MHT** |
| **v.** | ) ) ) | |
| **THE ALABAMA DEPARTMENT OF HUMAN RESOURCES,** | ) ) ) | |
| **Defendant,** | | |

## AFFIDAVIT OF RENEE LYLES

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

Before me, the undersigned notary public, appeared RENEE LYLES, who being by me first duly sworn deposes and states as follows:

1.    My name is Renee Lyles, and I am over the age of nineteen years. I am a resident of the State of Alabama.

2.    I have personal knowledge of the facts contained in this Affidavit.

3.    If called as a witness, I could and would testify confidently to the matters set forth below.

4.    I am the Office Manager of Camellia Foster Care Agency, LLC. Camellia Foster Care Agency, LLC, located at 2310 Crawford Road, Phenix City, Alabama. I have been with Camellia since 1999. I helped recruit foster parents and completed all paperwork required by DHR, including the Medicaid billing.

5.    I observed agents from the Attorney General's Office make spontaneous visits and demand to see files. In 2002 all of our foster care children records were taken from the Phenix City office by agents from the Attorney General's Office. These records were kept for approximately four weeks. Records were returned in boxes. It took me two days to get all of the records back in order.

6.    When Dr. Appiah opened the Birmingham office, we had flyers printed for the purpose to recruit foster parents. DHR representatives said that we could not use language relating to "financial gain", so that language was deleted and new ones printed. However, I have personally seen flyers printed by the Caucasian owned agency, TPI, that had the same language and they were not told that they could not use those flyers to recruit foster parents.

7.    DHR frequently changed rules and regulations.

8.    I have personal knowledge that all of the foster care children's records of the Camellia Therapeutic Foster Care Agency were 100% in compliance.

9.    When DHR removed foster care children from our foster homes, the children were very upset. They did not want to leave. I received telephone calls from foster care children and foster parents. Transferring the children to other agencies was very difficult for these children who were comfortable and happy in their foster homes. I still receive telephone calls from children who are not happy in their new setting and want to return to Camellia agency.

10.    DHR frequently did not give the correct amount of Medicaid money to the Camellia agency. Whenever I would call for an explanation, no one could ever explain it to me.

11.     I am very saddened by the way DHR has taken away our children and caused Camellia agency to have to close its offices in Montgomery, Huntsville, Mobile, Birmingham, and Selma. We no longer have foster homes and no foster care children.

12.     I was involved in transferring all of the records to other agencies, including the certificates showing that our foster care parents were trained and met all of DHR requirements.

13.     I declare under penalty of perjury pursuant to the Laws of the State of Alabama the foregoing is true and correct to the best of my knowledge.

FURTHER, THE AFFIANT SAITH NOT

Dated this the 20th day of June 2007.

_Renee Lyles_

STATE OF ALABAMA

COUNTY OF MONTGOMERY

On this the 20th day of June 2007, before me, the undersigned Notary Public, in and for said State and County, personally appeared Renee Lyles who is known to me, and states that the foregoing information is true and correct to the best of her information, belief and knowledge, and that she executed same voluntarily on the day the same bears date.

_Paula Marie Gonsalves_
NOTARY PUBLIC

My Commission Expires:
02/03/08

# THERAPEUTIC

# FOSTER

# CARE

# MANUAL

**REVISED NOVEMBER 2004**


Plaintiff EXHIBIT

1

# THERAPEUTIC FOSTER CARE MANUAL
## INDEX

|                                             | PAGE |
|---------------------------------------------|------|
| INTRODUCTION                                | 4    |
| DEFINITIONS                                 | 4    |
| PHILOSOPHY                                  | 6    |
| POLICY                                      | 9    |

**SECTION I          PROGRAM GUIDE**

| A. | Agency Personnel | | 17 |
|----|------------------|--|----|
|    | 1. | Case Supervisor | 19 |
|    | 2. | Case Worker | 21 |
|    | 3. | Staff Training and Support | 27 |

**SECTION II          THERAPEUTIC FOSTER PARENTS**

| A. | Introduction | | 29 |
|----|--------------|--|----|
| B. | Therapeutic Foster Home Responsibilities | | 30 |
|    | 1. | Fostering Role | 30 |
|    | 2. | Treatment Role | 30 |
|    | 3. | Qualifications | 32 |
|    | 4. | Training | 37 |
|    | 5. | Support | 42 |
|    | 6. | Capacity | 45 |

**SECTION III     CHILDREN, YOUTH AND THEIR FAMILIES**

| | | | |
|---|---|---|---|
| A. | | Introduction | 46 |
| | 1. | Placement and Support Services | 47 |
| | 2. | Treatment | 52 |
| | 3. | Step-Down | 57 |

**SECTION IV     PROGRAM EVALUATION**

| | | |
|---|---|---|
| A. | Program Evaluation | 73 |
| B. | Program Summary | 75 |

**APPENDICES**

| | | |
|---|---|---|
| A. | Core Services for TFC | 78 |
| B. | Core Services for Step-Down TFC | 81 |
| C. | Monthly Reporting Form | 84 |
| D. | Site Visit Checklists | 85 |
| E. | Satisfaction Surveys | Not on web |
| F. | Consent Decree | Not on web |
| G. | Foster Parent Bill of Rights | Not on web |
| H. | Baby Douglas Law | Not on web |

# INTRODUCTION

The R.C. Consent Decree has been a significant influence on Child Welfare practice in the State of Alabama. The goals and principles of the decree have allowed and encouraged the development of a constellation of state-of-the-art resources to meet the varying individual needs of the children and families served by the Alabama Department of Human Resources. This array consists of services from those that are provided in a child's own home to those that are provided in restrictive placement environments. Therapeutic foster care (TFC) is an essential component in the service array for emotionally or behaviorally disordered children and youth. Requirements for programs that offer TFC services are set forth in this *Therapeutic Foster Care Manual*. Any exception to these requirements must be authorized by designated staff of the Alabama Department of Human Resources. TFC is designed to serve children who may ordinarily be placed in a residential setting due to treatment needs but who can be maintained in a family-like setting or who may have experienced or is at high risk of multiple placements or placement in a more restrictive environment. TFC services are not meant to be long-term placement services but shall be provided in a manner to enable children to step-down to a less restrictive environment in a reasonably short period of time, when it is in the child's best interest.

# DEFINITIONS

System of Care: A community-based comprehensive spectrum of services organized into a coordinated network to meet the multiple and changing needs of emotionally and behaviorally disordered children and youth and their families.

Individualized Service Plan (ISP): The primary tool for working with families in identifying strengths and needs, identifying culturally responsive services to address needs, authorizing and obtaining needed services, and measuring outcomes in areas of safety, permanency and well-being. It also serves as an organizer and a tool for communicating with those involved with the family.

Child and Family Planning (or ISP) Team: A group-think team focused on individual needs of the family involved in the ISP process. It may be composed of any of the following but must have significant participation to direct case planning activities that will achieve expected reasonable outcomes: the age-appropriate child(ren); the child's family; the DHR social worker; family friends, relatives or significant others; service providers; foster parents; the child's guardian-ad-litem; school personnel; etc. It is the team's responsibility to evaluate goals and steps to achieve identified outcomes in various areas, including behavior management plans, safety plans and crisis plans.

Treatment Team: A team for children in TFC that includes the TFC caseworker, the child or youth, the child or youth's family, the TFC foster parent, the DHR social worker, and others, e.g. therapist, teacher, others. The TFC Treatment Team is responsible for the development of the child's treatment plan within the TFC program and shall ensure that it is congruent with the family's ISP.

Initial Treatment Plan (ITP): A plan that is completed at the time of admission to therapeutic foster care and is based on early assessment and relationship-building efforts during the first ten

(10) days. This can serve as the comprehensive treatment plan, if enough information is available to prepare an adequate plan.

Comprehensive Treatment Plan (CTP): A treatment plan that is to be completed within the first thirty (30) days of a child's or youth' admittance into therapeutic foster care.  The plan coordinates long-term goals and services to meet the identified goals.  The Comprehensive Treatment Plan shall be developed and implemented in a manner to achieve the overall outcomes for the family identified in the ISP.  Specific strategies will be employed by the TFC program to achieve the goals identified in the CTP.

Difficulty of Care Payment:  The difficulty of care payment is the daily rate paid to TFC foster parents for providing  services to meet the therapeutic needs of children placed in their homes and supervised by the child placing agency offering the therapeutic foster care services.

## PHILOSOPHY

Therapeutic foster care is a least restrictive, community-based program for children whose special needs can be met through services delivered primarily by trained therapeutic foster parents working in full partnership with the child, the child's family and all other persons on the Child and Family Planning (ISP) Team. Support from all other team members allows the child to benefit from a home environment and community-based setting while receiving intensive treatment and clinical services. TFC is not meant to be a long-term placement option but should serve to meet a child's specific treatment needs until he is ready to be stepped down to a lower

6

level of placement. All children placed in TFC should be continually evaluated to determine the continued need for TFC services. At no later than 6-months after placement in a TFC program, the TFC provider should request that the ISP team to convene to determine if outcomes are being achieved, and if not, what barriers prevent such.

The following are specific philosophy statements, which guide the TFC programs:

A.      All services provided are family-oriented and community-based for children and youth with emotional disturbances that lead to significant behaviors that must be addressed in a therapeutic setting.

B.      All children/youth and their families have unique strengths and needs, and planning with them must build upon their strengths in helping to meet needs.

C.      All children/youth and their families shall be treated as partners in the planning and delivery of services.

D.      All therapeutic foster parents shall be treated as partners in the planning and delivery of services for the children and families they serve.

E.      A healthy relationship between the therapeutic foster parents, the children/youth in their care and the children/youth's family is a key element to the overall effectiveness of the treatment program.

7

F.    The supportive family setting offered through the TFC program is a vital part of positive intervention with children/youth and is a key ingredient to successful outcomes in treatment.

G.    The family systems approach will focus on how interactions of all family members affect the behaviors of individual family members. It should always be considered that all treatment with families and their children in care is interrelated in achieving lasting outcomes for family re-unification.

H.    Therapeutic foster care affirms the use of an individualized behavior management plan, based on rewards, assessing the antecedent of the behavior and recognizing that most behavior is driven by needs.

I.    Therapeutic foster care shall be sensitive to cultural differences and special needs. Services shall be provided in a manner that respects these differences and attends to these special needs. All placements shall adhere to the Multi-Ethnic Placement Act (MEPA) and shall not impede permanency for any child or youth.

J.    All services are provided on the premise of unconditional care.

8

**POLICY**

The following policy statements are the operating procedures by which TFC agencies and county

DHR departments work in partnership. Any deviation in policy must be approved by State

DHR. Any changes in policy may be addressed as an Administrative Letter or Memorandum

until it can be incorporated into the *Therapeutic Foster Care Manual.*

A.    **Case Management.** The Department of Human Resources assumes the parental role for

all children who are in the care or custody of the Department. In all such cases, DHR

staff maintains the case management role and must have access to the children, as

needed. No TFC program shall promulgate a policy to require its staff be present at the

time of visits between the DHR caseworker and the child/youth in placement. DHR staff

shall notify TFC providers of planned visits, but DHR staff shall be able to contact foster

parents on an individual basis to arrange visits or contacts or to assess the children in

their care. DHR staff shall not attempt to address foster parent concerns or licensing

issues unrelated to the care of a specific foster child but shall notify the licensing TFC

provider of such concerns nor shall a DHR social worker discuss with a TFC foster

parent permanency planning, e.g. Another Planned Permanent Living Arrangement or

Adoption, without prior consultation with the licensing agency.

B.    **Placements for Children under the Age of Six.** Good gatekeeping is essential to

ensuring that TFC programs serve the children for which the program was designed.

TFC programs are able to serve children from birth until they age out of the system;

9

however in the majority of the occasions, when children under the age of six enter the foster care system, traditional foster care with the aid of wraparound services is able to provide care that can meet their individual needs. In rare circumstances, therapeutic foster care services may be required for this younger population. Before a county DHR office may place a child under the age of six in a therapeutic foster care setting, the Office of Foster Care at State DHR must concur in writing with the placement decision. This requirement is not necessary for non-therapeutic siblings, who are placed in a therapeutic foster home with a child who needs the structure of TFC. The county department shall be the entity that initiates the exception request.

C.  **Diagnoses for Entrance into TFC.** A child/youth entering into TFC must have a DSM-IV diagnosis on Axis I that would require the treatment and structure offered through TFC. A DSM-IV diagnosis alone may not warrant a placement into TFC. The diagnosis must have an accompanied behavior that would require the treatment and structure of TFC before a child or youth would be a candidate for TFC placement. For any child being assessed by an individual employed with a TFC program, DHR must obtain a second opinion by an independent provider before the child/youth can be placed with the program providing the initial assessment. **Only children in the custody of DHR may be accepted into a TFC program, unless authorized by State DHR.**

D.  **Services for Non-TFC Siblings.** TFC providers are able to provide homes for siblings, all of which may not have diagnoses requiring TFC services. The provider may not bill for services for the non-TFC siblings; however, the foster parents caring for the children

will receive the traditional board rate or the full Supplemental Security Income (SSI) check without the difficulty of care payment. If needs for non-TFC siblings are identified through the comprehensive family assessment and services to meet these needs are authorized through the ISP, the TFC provider may bill the county department for any services that it provides through vendor agreement. In Section C Child and Family Services, subsection 3, Placement, paragraph (a), pages 30 and 31 of the Child Placing Agency (CPA) Standard, there is a requirement that, at the time of placement, a case/treatment plan shall be developed. Minimum requirements for that plan are clearly delineated. For children with TFC needs that are placed in TFC foster homes, treatment plans are routine; but for non-TFC siblings who receive no services from the Child Placing Agency, an abbreviated plan must also be developed. Since the plan for these children and the family is the family's ISP, the information from the ISP may be developed as the case plan for the CPA. If the agency is designated by the ISP team to provide services for the non-TFC children in their home, the ISP must authorize the services and a DHR-1878 issued for the payment of the services. If the CPA is required to do nothing more than provide room and board, that information, as well as the strengths and needs of the child and other required information for the case plan, should be documented in the child's ISP and may be developed into the CPA's case plan for the child. If it is determined that non-TFC siblings have no needs at the time of the ISP, it remains the responsibility of DHR to monitor the non-TFC child at their monthly visits into the home.

D.  **Placements in Counties Other than the Child's County of Origin.** When a TFC program places a child in a foster home outside the child's county of origin, the TFC provider <u>must</u> immediately notify the receiving county DHR office of the placement. Many county school systems and DHR offices are not aware of children who are placed within their service areas. When crises or situations that require DHR intervention arise, it is necessary to know whom to contact.

E.  **Licensing/Approval of Homes.** A TFC provider shall notify the county DHR office when it approves/licenses a therapeutic foster home within the county. Foster parents may not be approved by more than any one agency concurrently.

F.  **Employment by Therapeutic Foster Parents.** TFC foster parents may maintain employment outside the home, if they are able to meet the needs of children placed within their homes and meet the requirements of their employment. This employment must also allow the foster parent the flexibility to meet the special needs of therapeutic foster child placed in their home.  These special needs or conditions often require immediate response by the foster parent to attend school conferences, treatment or ISP team meetings, doctor's or counseling appointments, etc.  Due to the significant needs that TFC children have and due to safety issues around TFC children with emotional or behavioral disorders for young children in the home daycare setting, TFC foster parents may not operate a daycare from their home.  Child Placing Agencies providing TFC

12

services shall not license therapeutic foster parents who are currently licensed as home daycare providers or who are seeking dual licenses to provide home daycare and TFC.

G.    **Recruitment.** Recruiting viable homes to provide TFC services for children/youth is vital. State DHR encourages vigorous and innovative recruitment initiatives by Child Placing Agencies to maintain an adequate pool of foster parents to facilitate appropriate matching of children and foster homes. Advertisements, whether by television or radio announcements, by newspaper articles or by billboards or individual signs, should be focused on the services that a respective agency is providing to vulnerable children or youth in the State. To place a dollar amount for reimbursement for services or to imply that a provider earns a wage for providing a home for a child does not appear to exhibit a sensitivity for the children and families that DHR and the provider community serve. It is certainly permissible to discuss the difficulty of care payment with prospective TFC foster parents. It is not appropriate to openly advertise rates to entice recruits. Recruitment of the foster parents of a TF provider by another licensing agency or a representative of that agency is unethical and is prohibited. If a provider engages in such activity, they will be placed on a corrective action plan to cease the activity and to monitor any staff who may be involved in it. If there are two additional verifiable accounts of such activity after the agency has been warned and placed on corrective action, they will be in jeopardy of losing their contract with the State to provide TFC services.

13

H.    **Movement of Foster Parents among Agencies.** When children and foster families are receiving therapeutic services prescribed by a treatment plan with one agency and the foster home changes to another agency, the service plan is disrupted and the child's progress toward his treatment goals may be impeded or regression may occur. There may be instances in which it is in the best interests of the child in care and the foster parents that a change be made, especially if the licensing agency is not providing the support services that are needed to maintain the placement or to achieve the goals of the child. Should a foster parent express to a provider the desire to leave a program, the provider should negotiate ways to improve the relationship between the provider and the foster home. If negotiations fail to achieve the desired results, a meeting of foster parents, the licensing agency, the agency to become the licensing agency, the custodial county department and the Office of Resource Development and Management at State DHR will be scheduled by the licensing agency to attempt to resolve the concerns or to facilitate a smooth transition between agencies. An ISP will be scheduled as soon as possible to address additional supports and/or services that will be initiated by the licensing agency or to address the transition process. If there are no children in the home, this protocol does not apply; however, it is strongly suggested that negotiations between the foster home and the licensing agency occur before a final decision is made. TFC foster parents must make known in writing to their licensing agency 30 days in advance that they wish to transfer to another program.

I.    **TFC and Enhanced Foster Care (EFC).** TFC providers may also provide Enhanced Foster Care services, which are provided to foster parents in order to keep sibling groups

14

of four or more together. (See Guideline for Enhanced Foster Care for requirements.) A sibling group of four (4), for example, may have one child that needs therapeutic services. The TFC program would be allowed to bill TFC for that child on their contract, and the county may choose to make an enhanced payment to the foster parent from flex funds for the non-therapeutic children. Foster parents must meet the criteria for EFC, and the decision to make EFC shall be determined by the ISP team.

J.    **Number of Children per Home.** Due to challenging needs of children in TFC, no more than one (1) child needing TFC services shall be placed in a foster home. To maintain sibling groups, non-therapeutic siblings may be placed in a TFC home with a TFC child, after it has been assessed that the family can meet all the children's needs. No more than two (2) siblings that are considered TFC children can be maintained in the same TFC foster home. Any exceptions for larger sibling groups must be approved by State DHR. Two (2) unrelated children may not be placed in the same foster home, and a foster home providing TFC services for a child **may not** be used to provide respite for another child for over **7 days without SDHR permission.**

K.    **Medication Administration.** The policy on the use of medication commits TFC programs to the following principles of practice:

       1.    The first line of intervention with children and youth should be non-medical unless clearly indicated as needed by a licensed physician. When psychotropic medications are recommended by a physician, they should be used in conjunction with other interventions.

15

2.    Therapeutic foster parents shall be trained by medical staff to detect side effects of any prescribed medication used for treatment in their care.

L.    **Discipline, seclusion and restraint.** Policy as set forth in the Foster Family Home Standards and in the Behavioral Management Policy shall guide practice in the areas of discipline. Physical restraint will only be used by a person who has been trained in its use and will not be used as punishment. It should be used only to protect the child or others from injury or to prevent excessive property damage.

M.    **Crisis Planning.** There should be an emergency care plan, including respite plan, identified in the family's ISP as a crisis plan in the event that a child's placement in a therapeutic foster home should become in jeopardy of disruption.

N.    **Written Protocols.** TFC agencies shall have in writing protocols dealing with crisis situations to enable their foster parents to have a foreknowledge of expected responses. These protocols will be evaluated at the time of site visits conducted by State DHR with the various therapeutic agencies. The TFC agencies shall develop a protocol for reporting allegations of maltreatment or misconduct toward children by therapeutic foster parents or children in their homes. Protocols involving the following shall also be developed:

1.    arrest of any child or involvement by police
2.    allegations by a child or adult of physical injury, any type of assault or threat of bodily injury

16

3.    child is away without permission or has not returned at a designated time

4.    discovery of drugs, alcohol, weapons or other illegal or dangerous material

5.    physical restraint or physical intervention.

In any of the cases above the protocol should elaborate on connecting with the appropriate DHR office as soon as possible.

## SECTION I: PROGRAM GUIDE

### A.    AGENCY PERSONNEL

Professional TFC personnel perform several roles and carry a wide variety of responsibilities. Primary among these is their responsibility for treatment planning and the coordination of the child's treatment team. This team is typically composed of a TFC worker, a DHR caseworker, a supervisor or clinical consultant, the child, the child's parents, the TFC foster parents and others closely involved with the child and family, e.g. therapists or educational personnel.    Other major responsibilities required of TFC program staff include, but are not limited to, case assessment, case management, parent support and consultation, clinical and administrative supervision of staff, 24-hour crisis intervention, on-call services, participation on child and family planning (ISP) team, therapeutic foster care recruitment, orientation, training and selection, child intake and placement, record keeping and program evaluation. A written job description shall be provided to all staff and shall be maintained on site in each staff member's personnel folder. Agency personnel must adhere to, in addition to the requirements herein, any

17

applicable rules, regulations and standards set forth by federal, state or local governments or agencies for the purpose of governing agencies providing care or responsible for the placement of children.

The program shall designate someone responsible for its administration. This individual assumes final responsibility for the provision and oversight of all essential tasks and services described in these requirements within the parameters specified.

While documented performance of the tasks and functions described here is essential, their distribution among program staff will vary according to size, nature and discretion of individual agencies. Critical responsibilities and minimum qualifications are described below for the positions of Case Supervisor and Case Worker. The responsibilities ascribed to each must be met but may be allocated differently according to an individual agency's internal organization and staffing. Requirements for training and support pertain to all professional staff.

At least one staff member with programmatic authority and responsibility for the oversight of a TFC program shall be one of the following:
- A physician licensed under Alabama law to practice medicine or osteopathy
- A psychologist licensed under Alabama law
- A professional counselor licensed under Alabama law
- A Master's level social worker licensed under Alabama law
- A Registered Nurse who has completed a Master's Degree in psychiatric nursing

18

- An individual possessing a Master's Degree or above from a university or college with an accredited program with a degree in psychology, social work, counseling or other area that requires equivalent clinical course work and who has completed a practicum as a part of the requirement for the degree or who has 6 months post-Master's level professional experience supervised by a Master's level or above with 2 years of post-graduate professional experience.

1.    **CASE SUPERVISOR**

The role of the Supervisor is to provide support and consultation to the CaseWorker in much the same manner as the CaseWorker provides support and assistance to the TFC foster parents. Specifically, the Supervisor shall perform the functions and meet the qualifications listed hereafter:

a.  **Responsibilities.**

i.    **Casework Supervision.** The Supervisor provides regular support and guidance to the CaseWorker through weekly supervisory meetings. Formal supervisory meetings shall be supplemented as needed by informal contact between Supervisor and CaseWorker. The Supervisor's caseload shall not exceed 6 CaseWorkers.

ii. **Treatment Planning.** The Supervisor takes ultimate responsibility for the development of a comprehensive treatment plan based on a thorough case assessment for each child admitted to the program. The comprehensive treatment plan shall contain the strengths, needs and steps identified in the family's ISP as developed by the ISP team. He supervises ongoing treatment planning and implementation of services for each child.

iii. **Treatment Team.** The Supervisor oversees and supports the CaseWorker as leader of the treatment team and shares ultimate responsibility for team plans and decisions.

iv. **Crisis On-call.** The Supervisor provides coordination and back-up to assure that 24-hour on-call crisis intervention services are available and delivered as needed to the TFC foster parents, the children in care and their families.

b. **Qualifications.**

The Supervisor shall be

i. a licensed certified social worker (LCSW) or licensed professional counselor (LPC) **or**

ii. an individual possessing a Master's Degree or above from a college or university with an accredited program in the respective degree in

20

psychology, social work, counseling or other area that requires equivalent course work and who has successfully completed a practicum as a requirement for the degree or who has 6 months post-Master's level professional experience supervised by a Master's level or above with 2 years of post-graduate professional experience **or**

iii.    an individual who is a licensed bachelor of social work (LBSW) with 5 years experience in children's therapeutic setting.

2.    **CASE WORKER**

The CaseWorker is the practical leader of the treatment team. As such, the Case Worker initiates the development of the treatment plans **based upon the strengths and needs identified in the family's ISP**; provides support and consultation to TFC foster parents, to families of children in care and to other team members related to their role in the treatment plan; and advocates for, coordinates, and links children and their families with needed services available within the TFC agency or greater community. Specifically, the CaseWorker must perform the functions and meet the qualifications listed below:

a.    **Responsibilities.**

i.    **Treatment Plan.** Under the supervision of the Case Supervisor, the CaseWorker takes the primary day-to-day responsibility for leadership of the treatment team. The CaseWorker organizes and manages all treatment team meetings. If the CaseWorker is

prevented from participation in a treatment team meeting by a crisis or personal reason, the Supervisor takes over that responsibility. As treatment team leader, the Case Worker coordinates team decision-making regarding the care and treatment of the child and services to the child's family, as identified in the comprehensive treatment plan. The comprehensive treatment plan must be congruent with the family's ISP, and all services provided by the agency **must** be authorized by the ISP prior to their provision, if compensation by DHR is expected. If services provided by the agency are not considered Core Services according to the agency's contract with DHR, the agency must have a DHR-1878 Authorization for Services prior to their delivery. All services, whether Core Services or those authorized on an 1878, must be identified and authorized in the family's ISP.

The CaseWorker provides information and training as needed to treatment team members, who may not be familiar with the TFC model. The CaseWorker prepares these individuals to work with the TFC foster parents to facilitate their participation in the treatment of the child in a manner consistent with TFC practices and values. The Case Worker shall take an active role in identifying goals and coordinating treatment services provided to the child by persons or agencies outside the TFC program, whether

or not these persons or agencies participate regularly as treatment team members.

Under the supervision of the Supervisor, the CaseWorker takes primary responsibility for the preparation of each child's comprehensive treatment plan.  The CaseWorker signs off on treatment plans and updates.

ii.    **Support and Consultation to Therapeutic Foster Parents.** The CaseWorker shall provide regular support and technical assistance to the TFC foster parents in their implementation of the treatment plan and with regard to other responsibilities they undertake. Fundamental components of such technical assistance will be the design or the revision of the in-home treatment strategies including pro-active goal setting and planning and the provision of ongoing child-specific skills training and problem solving in the home during home visits.  This can be best facilitated through in-home teaching, modeling, coaching and feedback.

Other types of support and supervision should include emotional support and relationship-building, the sharing of information and general training to enhance professional development, assessment of a child's progress, observation and assessment of family

23

interactions, stress and safety issues. The CaseWorker or other program staff shall provide at least <u>weekly</u> contact in person with the TFC foster parent of each child in his caseload. The CaseWorker shall visit the TFC foster home to meet with at least one TFC foster parent no less than <u>bi-weekly</u>. **NOTE: It is expected that the frequency of home visits will increase substantially beyond the minimum during the initial week of a child's placement, during discharge planning, during crisis or emergency situations in which the child is considered to be at greater risk, and as otherwise required by the child's individual needs and clinical status or the needs of the TFC family.**

iii.    **Caseloads.** The number of children assigned to a Case Worker is a function of several variables, including the size and density of the geographic area served, the array of job responsibilities assigned, and the difficulty of the population assigned. The number of children assigned to any CaseWorker shall range from **eight (8) to ten (10),** based upon the difficulty of the caseload. If a caseload consists of more than eight children, it must contain a sibling group of children in TFC care to maximize at ten. The caseload size shall be adjusted downward if (1) the Case Worker's responsibilities exceed those described under the Case Worker's Responsibilities

in this *Therapeutic Foster Care Manual*, (2) the difficulty of the client population served requires more intensive supervison and training of the TFC foster parents, or (3) local travel conditions impede the Case Worker's ability to maintain the minimum direct contact frequencies identified in this manual.

iv.     **Contact with Child.**  The Case Worker shall spend time alone with the children in care to allow them the opportunity to communicate special concerns, to make a direct assessment of the child's progress, to monitor for potential abuse and to build relationships. Such face-to-face contact should be made weekly by **the CaseWorker.** (Due to the importance of the continuity of care for children, the use of other designated staff to make these visits should be limited to rare times when the Case Worker may be ill or on leave. On these occasions, the Supervisor or other professional staff must make the contact. On even rarer occasions may circumstances be encountered which prohibit program staff from achieving face-to-face contact in a given week.    These circumstances should be documented in the child's case record when they occur.)

v.     **Support and Consultation to Families of Children.** During a child's tenure in a therapeutic foster home, the CaseWorker shall seek to support and enhance the child's relationship with family members.    The CaseWorker in collaboration with the DHR caseworker shall establish regular contact and visitation between children and their parents, other family members, and significant others, as specified in the family's ISP.    The CaseWorker shall involve the child's parents in treatment team meetings, plans and decisions and will keep them informed of the child's progress in the program. If the child's family is not actively involved in planning, the family's ISP must identify this fact, and a copy of the ISP kept in the child's record.    Any problems identified by the TFC program with maintaining family connections should be documented in the child's record and reported to the family's DHR caseworker.

vi.    **Community Liaison and Advocacy.** The Case Worker will work jointly with the DHR caseworker and the family planning (ISP) team in identifying which community resources and/or services are required and how they may be used to achieve the goals of the child's treatment plan.    The Case Worker in collaboration with these others will advocate and assist in creating and coordinating the provision of such services and shall provide technical

assistance to community service providers as needed to maximize the benefit of these services to the child.

vii.    **Crisis On-Call.** The CaseWorker, together with other professional staff as designated by the agency, shall be on-call to TFC foster parents, children and their families.  This coverage is on an around-the-clock, 7-day-a-week basis.  Each CaseWorker through agency procedures should be given opportunity for respite from on-call duties.

b.    **Qualifications**

The CaseWorker shall be at a minimum a person with a BSW or Bachelor's Degree in a closely related field.

3.    **STAFF TRAINING AND SUPPORT**

It is required of all professional staff, including, the TFC Case Worker, the TFC Supervisor, the Social Worker and all other licensed staff, to have pre-service and ongoing professional development relevant to the treatment foster home care model and their individual job responsibilities. **All training must be documented in the <u>worker's</u> individual staff record at least annually.**

a.    **Agency Staff Development.** Professional staff shall participate in twenty (20) hours of pre-service training prior to assuming casework

27

responsibilities and participate in ongoing training as scheduled by the agency throughout the year. At a minimum, training shall address

i.      an overview of therapeutic foster home care

ii.     the history and development of therapeutic foster care

iii.    orientation to the agency's treatment philosophy

iv.     skill training in the specific treatment methodologies it employs

v.      the use of passive physical restraint

vi.     crisis intervention

vii.    grief and loss issues for children in foster care

viii.   the significance and value of birth families to children placed in TFC

ix.     cultural competence and culturally responsive services

x.      significance of relationship building and connections to significant others

xi.     specific agency policies and procedures, including documentation and evaluation requirements

xii.    skill building in analyzing behaviors, recognizing the behavior's antecedent and facilitating the development of skills to change the antecedent and consequent conditions. Professional staff shall also participate in the first available sequence of the agency's pre-service training for therapeutic foster parents following the start of their employment

xiii.   characteristics, strengths and needs of R.C. class members and their families

xiv.   the philosophy and characteristics of the system of care required by the R.C. Consent Decree

xv.    the rights of R.C. class members and their families as set for by the Consent Decree

xvi.   the damage caused to children through multiple placements

xvii.  staff's role in minimizing multiple placements

xviii. staff's role in the ISP process

xix.   all R.C. policies, including behavior management, ISP, siblings' placement, visitation, etc.

xx.    Health Insurance Accountability and Portability Act (HIPAA)

The program shall provide a minimum of forty (40) hours of in-service training per year to professional staff. Programs may request training slots for Basic Alabama Certification Training (ACT I), Group Preparation and Selection (GPS), Deciding Together, and any other training that meets or exceeds professional licensing standards.

b.    **Liability Insurance.** Professional staff shall be covered by liability insurance.

c.      **Legal Advocacy and Representation.** The agency may assist staff in obtaining legal advocacy and representation should the need arise in connection with the proper performance of their professional duties.

## SECTION II: THERAPEUTIC FOSTER PARENTS

A.      **INTRODUCTION**

The role of the TFC foster parent is central to the success in the TFC treatment model. TFC foster parents are viewed as colleagues and team members by all staff. They serve as in-home treatment agents, implementing strategies specified in a child's treatment plan.

1.      **The Fostering Role.** Prospective TFC parents shall be provided with a written list of duties, clearly detailing their role and responsibilities prior to their approval into the program. A copy of the list with the date provided must be kept in the foster parents' records for documentation purposes.

2.      **The Treatment Role.** TFC foster parents are integral members of a treatment team. They are not expected to function independently. They are asked and expected to perform tasks, which are central to the therapeutic process in a manner consistent with the family's ISP and the child's comprehensive treatment

plans. In addition to their basic foster parenting responsibilities, TFC foster parents perform the following tasks and functions:

a.  **Treatment Planning.** TFC foster parents and the child's family contribute vital input based upon their observations of the child in the natural setting of the home, and they shall be considered as partners in the planning process.

b.  **Treatment Implementation.** TFC foster parents shall assume primary responsibility for implementing the in-home treatment strategies specified in the child's comprehensive treatment plan and authorized by the family's ISP.

c.  **Treatment Team Meetings.** TFC foster parents shall work cooperatively with the other treatment team members under the leadership of the Case Worker and shall attend team meetings, training sessions and other gatherings required by the program or by the child's treatment plan.

d.  **Record Keeping.** In order to allow tracking and evaluation of services provided in the TFC foster home and of the agency's program as a whole, the TFC foster parents shall systematically record information and document activities, as required by the agency and the standards under which it operates. The TFC foster parent shall keep a systematic and

descriptive record of the child's behavior and progress in targeted areas at least weekly and preferably on a daily basis. When applicable, documentation will include elements required for the Alabama Medicaid Agency.

c.    **Contact with Child's Family.** The TFC agency in partnership with DHR will support and encourage the child maintain connections with his family and will actively support and enhance these relationships as outlined in the family's ISP. The ISP team shall decide if there are safety issues that must be addressed in maintaining connections through visitation.

f.    **Permanency Planning Assistance.** TFC foster parents shall assist with efforts specified by the family's ISP team to meet the child's permanency planning goals. Such efforts may include emotional support, coaching and modeling of effective child behavior management and other therapeutic interventions to the child's family, as well as the provision of support to the family and child during the initial separation period.

g.    **Community Relations.** TFC foster parents shall develop and maintain positive working relationships with service providers in the community, e.g. schools, departments of recreation, social service agencies, mental health programs and other professionals.

h.    **Advocacy.** TFC foster parents, in conjunction with the TFC Case Worker and other staff, shall advocate on the behalf of the child to achieve the goals identified in the child's comprehensive treatment plan and the family's ISP to obtain educational, vocational, medical and other services needed to implement the plan and to assure full access to the provision of public services to which the child is legally entitled.

3.    **Qualifications and Selection of TFC Foster Parent.** TFC foster parent selection is a process, which begins at the time of initial recruitment and extends through orientation and training. TFC foster parents are selected in part on the basis of their acceptance of the program's treatment philosophy and their ability to practice or carry out this philosophy on a daily basis. They need to be willing and able to accept the intense level of involvement and supervision provided by the program staff in their TFC fostering functions and understand the impact of that involvement on their family life. TFC foster parents need to be willing to carry out all tasks specified in their therapeutic foster program's roles and responsibilities, including working directly and in a supportive fashion with the families of children placed in their care.

In selection of prospective TFC foster parents, several important qualities should be sought. These may include, but are not limited to, commitment, a positive attitude, willingness to implement treatment plans and follow the program's treatment philosophy, a sense of humor, enjoyment of children, flexibility,

33

tolerance and the ability to adjust expectations concerning achievement and progress to children's individual needs and capabilities. TFC foster parents need to approach work with a child as a family commitment with a sense of unconditional care, informing their own children of the nature of the program. TFC foster families shall be financially stable and shall demonstrate emotional stability individually and as a family unit. TFC foster parents shall have access to reliable back up and a network of support, in addition to the professional support provided by the approving agency. **This support must be documented in the foster parent record.** TFC foster parent selection criteria shall also apply to those TFC parents who provide respite only and shall include at a minimum the following:

a.    **Approval/Certification.** All TFC foster parents shall be subject to the same minimum standards as traditional foster parents as outlined in *The Minimum Standards for Foster Family Homes* with additional requirements as prescribed by the *Therapeutic Foster Care Manual*. A profile of each TFC family, which covers all the elements required by these standards and requirements, shall be compiled, as per GPS policy. The profile shall include the prospective foster family's ability to meet the special needs of the children served by the TFC program. These profiles should be very explicit as to how the licensing agency feels that this home can provide the type of care that is needed by children who fit the criteria for acceptance. A history of the family should be in-depth and complete.

TFC foster parents will participate in GPS. TFC agencies may **not** provisionally license or approve foster parents. It must be clearly documented in the foster parent record that the family has been approved **prior** to a child's being placed in the home. No provider number will be assigned to a TFC foster parent until the application and approval process is complete, **including receipt of the criminal history for each parent**.

b.    **Checks and References.** Alabama Bureau of Investigation (ABI) and Federal Bureau of Investigation (FBI) criminal records checks and a Child Central Registry child abuse/neglect (CAN) clearance shall be completed for each foster parent. A minimum of **three (3) non-relative** references shall be collected and evaluated by the program on each TFC foster family **prior** to their approval or licensure. If a prospective TFC foster parent has served previously as an approved foster parent for another agency, references and, if possible, a copy of the home study shall be obtained from that agency, as well. All TFC home studies shall be available to county DHR offices, should the foster parent step-down to a traditional foster home to be approved by the county department. At the time of renewal, one (1) letter of reference from a non-relative source will be required as documentation in the family record.

c.    **Language.** At least one TFC foster parent shall demonstrate minimal communication in language of the child in their care at the time of

placement, and there must be a specific plan to meet a proficient level of communication, including interpretation as needed. At least one TFC foster parent must demonstrate effective communication in the language of the program treatment team with which they work.

d.    **Cultural Competency.** TFC foster parents must be willing to become cross-culturally competent and able to understand the importance of cultural issues in planning for children, youth and families.

e.    **Age.** TFC foster parents shall be at least 25 years of age.

f.    **Health.** The physical health of TFC foster parents shall be equal to the stress inherent to the care of special needs children as evidenced by a physician's statement to that effect. TFC foster parents must meet the health requirement of the *Minimum Standards for Foster Family Homes*.

g.    **Transportation.** TFC foster parents shall have access to reliable transportation. If using a car, they shall have a valid driver's license and documented ownership of liability insurance as required by the State.

h.    **Discipline.**    TFC foster parents **must** refrain from using corporal punishment with children placed in their care and to adhere to DHR's policies, e.g. the Behavior Management policy, regarding the use of

36

punishment generally. A signed statement by TFC foster parents must be placed in the family record to serve as documentation. Parents who use other strategies than corporal punishment on their own children are preferred. TFC foster parents' input should be sought and valued in developing behavior management plans for children in TFC care.

i.     **Physical environment.** The TFC foster home shall meet the *Minimum Standards for Foster Family Homes* The TFC home shall provide each child in therapeutic care a separate bed and private space for personal belongings. Each TFC home shall have a telephone.

j.     **Respite.** TFC foster parents shall be willing to serve as a respite resource for other TFC foster parents. Each TFC foster home shall be entitled to a minimum of 48 hours of respite per month (24 hours , if a child is in step-down). **Any respite for longer than one (1) week, unless provided as a result of a foster parent's temporary incapacity, may be considered a placement.** A TFC foster home providing care for a child may not serve as a respite provider for another home for more than seven (7) days without DHR permission. If longer respite is necessary, it must be provided by a home with no children placed in the home.

k.     **Employment.** TFC foster parents may be employed outside the TFC program. It is preferable, but not necessarily required unless for a special

37

situation, that one parent is present in the home at all times. There must be flexibility in their employment position to enable them to meet a child's needs, e.g. school conferences, doctor's appointments, etc. A TFC provider may not have a daycare or nightcare home in their home and be approved as a TFC provider.

4.    **Training for Therapeutic Foster Parents.** Training for TFC foster parents is a planned, systematic means by which they are prepared to provide care for children with difficult behaviors prior to their having children placed in their homes and are bolstered to improve their skills for such children through a continual process of learning as they provide in-home placement services. Training shall be consistent with the program's treatment philosophy and methods and shall equip TFC foster parents to carry out their responsibilities as agents of the treatment process. At a minimum, all TFC foster parents (including **both partners** of a couple and respite providers) **must** meet the following training requirements. Their completion of each requirement must be clearly documented in the **family record.**

a.    **Pre-service Training.** Prior to the placement of the children in their homes, all TFC providers shall satisfactorily complete **forty (40)** hours of primarily skills-based training consistent with the agency's treatment methodology and the service needs of children. Group Preparation and Selection (GPS) or Deciding Together (DT) will comprise 30 hours of the

pre-service training. Foster parents must also meet the additional training requirements of the *Minimum Standards for Foster Family Homes*, e.g. CPR, etc. The additional 10 hours of training shall cover clinical training for foster parents' skill development. Medicaid requirements must be trained but shall not comprise any portion of the skills-building or clinical training sessions. **NOTE: Time spent completing the program's orientation or home study/assessment shall not be considered a part of this training requirement.**

b.   **In-service Training.** A <u>**written**</u> professional development plan, which describes the contents and objectives of in-service training for all TFC foster parents, shall be maintained by each agency. All TFC foster parents **must** satisfactorily complete at least **twenty-four (24) hours** of in-service training **(not to include CPR, First Aid and other non-clinical training)** annually, if they are maintained as a currently approved foster home. Respite parents must complete at least **twelve (12) hours** of in-service training annually. More may be dictated, as required by the needs of a child. This training shall emphasize skill development, as well as knowledge acquisition, and may include a variety of formats, procedures, venues or means (ex. monthly meetings, Internet training, film or video, books, etc.) An agency, if using a means other than monthly meetings, must be able to ensure by some manner that the training was actually completed by each parent. This training must be documented in the family

record. (It is strongly encouraged that a spreadsheet, which shows the subject, dates and means of the training for on-site review, be maintained in each family record.) **Twelve (12) hours** of the in-service training must meet the annual requirements of foster parents as prescribed by the *Minimum Standards for Foster Family Homes*. Banquets, holiday celebrations, etc. may **not** substitute for in-service training. **NOTE: In-home child-specific training shall be a part of the technical assistance provided to TFC parents by TFC caseworkers or others contracted by the agency.**

c.    **Evaluation of training.** All TFC foster parents shall be provided an opportunity to evaluate training. Documentation of this feedback must be maintained by the TFC agency for inspection by State DHR.

d.    **Core Curriculum for Pre-service Training.** The core curriculum for pre-service training for TFC foster parents shall include, but shall not be limited to the following:

   i.    Introduction to foster care
   - At-risk children and their families
   - Legal issues
   - Foster family rules
   - Philosophy and characteristics of the system of care

ii.    Agency Policy and Review

- Home study

- Financial

- Safety (CPR, first aid, fire safety, HIV)

iii.    Minimum Standards for Foster Family Homes

iv.    TFC Foster Children and Their Families

- Strengths, needs and services assessment

- ISP's, re-unification, concurrent planning and permanency

- The family's role in the treatment team

- Family strengthening and visitation

- Separation and loss issues

- Special needs of the TFC child (sexual abuse issues, understanding emotional disturbance, medication management, educational and vocational needs, emotional deprivation of children)

- Rights of R.C. Class Members and their families

- Damage to children as a result of multiple placements

iv.    Therapeutic Foster Families

- Standards and record keeping

- Team and group approach

- Partnership principles

- Parenting techniques

- Behavioral management based on positive reinforcers

- TFC foster family strengthening (matching, non-TFC siblings' needs and services)

- Crisis prevention and intervention

- Understanding allegations of abuse/neglect and the reporting process

- Building positive relationships and interpersonal helping skills

- Stress management

- Unconditional care

- Foster parents' role in the ISP

- Health Insurance Portability and Accountability Act (HIPAA)

5. **Support for TFC Foster Parents.** TFC programs shall provide intensive support, technical assistance and supervision to all TFC foster parents. TFC foster parents shall be provided the support and assistance as described in Section I above. Additional types of support services shall include the following:

   a. **Information disclosure.** All information that the TFC program receives on a child that is to be placed within that program shall be shared with and explained to the prospective TFC foster parent prior to placement. (Please

42

refer to the Foster Parents' Bill of Rights in the addendum.)  This must be documented in the foster child's record. Agency staff shall discuss with the prospective TFC foster parents the child's strengths and assets, potential problems and needs, and the initial intervention strategies for addressing these areas.  As full treatment team members, TFC foster parents have access to full disclosure of information concerning the children to be placed in their homes. With this access goes the responsibility to maintain agency standards of confidentiality regarding such information.  Exceptions to full disclosure would be client/patient confidentiality.  TFC foster parents must be trained in the expectations of HIPAA.

b.    **Respite.** TFC foster parents shall have access to both planned and crisis respite care for the children placed in their homes.  This respite must occur in home, which have been selected and trained according to the standards for TFC foster parents as outline in this document. Respite providers shall be informed of the child's comprehensive treatment plan and will be supervised in their implementation of the plan. They shall also be provided a written explanation of the child's history.

c.    **Counseling.** TFC foster parents and their own children shall have access to counseling and therapeutic services arranged by the TFC program for personal issues or needs caused or complicated by their work as TFC

foster parents. Such issue may include, for example, marital stress or abuse of their own children by a TFC child placed in the home.

d.    **Support Network.** The program shall facilitate the creation of formal or informal support networks for its TFC foster parents, e.g. foster parent support groups, TFC "buddy" systems, etc. Foster parents will also be encouraged to join the local foster parent association.

e.    **Financial Network.** Program financial support to TFC foster parents shall cover the cost of care as well as payment for the difficulty of care associated with their treatment responsibilities and special needs of the children they serve. TFC foster parents shall receive from the program a difficulty of care payment as designated by the TFC program (no less than $16.00 per day) and identified in the contract between the TFC provider and the foster parent. TFC foster parents shall also receive from DHR either the reduced traditional board rate or the child's entire SSI check, if the child is eligible. TFC foster parents shall receive the difficulty of care payment in addition to the reduced board payment or the entire SSI check.

f.    **Damages and Liability.** The program shall have a **written** plan concerning the availability of compensation for damages to a TFC family's personal property by a TFC child placed in their home. This plan shall be given and explained to TFC parents prior to their approval, and

documentation that the written plan was given and explained must be maintained for review by State DHR in the foster parent record. TFC foster parents shall document that they maintain home/apartment, automobile, property and liability insurance in addition to the liability insurance carried by the parent TFC program.

g.    **Legal Advocacy.** The agency may assist TFC foster parents in obtaining legal advocacy for matters associated with the proper performance of their role as TFC foster parents.

6.    **Therapeutic Foster Home Capacity.** Given the challenging nature of the children served in TFC and the intensity of the services required, the number of children placed in each TFC home shall be limited to **one (1)**; or a sibling group with no more than **two (2)** of the siblings in TFC status; or a minor parent and child. There will be **NO** exceptions to this rule except for extenuating circumstances. Should a county DHR office request a program for an exception, the county office must send to State DHR's Office of Resource Development and Management the concurrence of their respective Office of County Systems Support consultant, the concurrence of the county who already has a child placed in the home, the concurrence of the TFC program and a copy of each child's ISP, including a respite and disruption plan. Approvals for exceptions will be very infrequent and for specific time periods.

**NOTE: Programs who disregard this policy may be held in violation of the program requirements, which may lead to licensing or financial sanctions.**

## SECTION III: CHILDREN, YOUTH AND THEIR FAMILIES

A.    **INTRODUCTION**

**TFC exists to serve children and youth whose special emotional needs lead to behaviors, that in the absence of such programs, they would be at risk of placement into restrictive residential settings, e.g. hospitals, psychiatric centers, correctional facilities, or residential treatment programs. A DSM-IV Axis I diagnosis as documented by a current psychological or psychiatric evaluation within 24 months without the associated behaviors is not necessarily an entrance criterion into the TFC program.** DHR will be financially responsible for timely evaluations for children in TFC placements. TFC also aims to serve the families of the children that are placed within the program, supporting child-family relationships consistent with the permanency goals outlined in the family's ISP.

Children and youth in TFC placements and their families have a right to services designed to promote interdependence. Services to children and youth should target not only the remediation of specific referral needs but also address their needs in all the

major developmental domains associated with successful interdependent living. Children and their families have the right to participate in decisions about what and how services will be provided to them.

These rights begin prior to the child's formal placement into a therapeutic foster family, continue through his direct involvement in treatment and other services while in the program, and extend into the period following TFC placement. Specifically they include the following:

1.    **Placement and Support Services.** Children, youth and their families have the right to receive all supportive services described in sections I and II above, as well as all other services identified in the ISP. The family will be adequately prepared for the child's placement into a TFC foster home by the county DHR office and, when possible, will be a part of the placement decision. The child will be matched with the TFC family, which best meets his needs, and will receive support to maintain and enhance their relationship with the TFC family and his own birth family.

a.    **Pre-placement visits.** Children referred to a TFC foster home shall have **at least one (1)** overnight visit with the TFC foster family with whom they are to be placed **prior** to their admission into the program. The families of children to be placed shall have the opportunity to meet with their child's prospective TFC foster parents prior to the placement unless otherwise

47

indicated by their ISP or court order. There **must** be documentation in the child's record that a pre-placement visit has occurred.

b.   **Placement decisions.** Children, youth and their families shall be consulted as to their preference for placement with specific foster parents, whenever possible and appropriate.

c.   **Matching.** The TFC program shall develop and maintain a <u>written</u> protocol on matching of children and TFC foster families. Placement shall be made only after a careful consideration of how well the prospective therapeutic foster family will meet the child's needs and preferences. Additional resources may be necessary for the foster family to best meet a child's needs. Important matching variable include, but are not limited to:

i.    The composition of the TFC foster home

ii.   The willingness and ability of the TFC home to work with the child's family

iii.  TFC foster family's ability to communicate with the child

iv.   Proximity to the child's family

v.    Local availability and access to needed supportive resources

vi.   TFC foster parent's skills, abilities and attitudes

vii.  TFC foster family's lifestyle

48

d.    **Assessment and records.** The DHR worker is responsible for holding an ISP meeting at the time of placement in order to achieve sound placement decisions. If a placement ISP is not possible, the DHR must hold the meeting within **72 hours** of placement. A copy of the ISP shall be sent by DHR to the TFC provider within **ten (10) days** of the ISP meeting for inclusion into the TFC record. The TFC provider will not be held responsible if this requirement is not met, if documentation is available that a request for the ISP is maintained in the record. Other materials that should be available to the TFC program prior to placement are as follows:

i.     a strengths and needs assessment (Comprehensive Family Assessment)

ii.    a discharge plan

iii.   a social summary

iv.    previous and current psychological assessments (within 24 months)

v.     educational information

vi.    a medical summary

vii.   a summary of placement history and outcomes

viii.  the reason for placement

For children admitted to TFC, an individual case record, including a chronological narrative shall be kept and shall include the following:

49

i.       copy of birth certificates

ii.      copy of Social Security card

iii.     pre-admission psychological evaluation (within 24 months)

iv.      child's social and family history

v.       educational history, including school reports and Individual Educational Program (IEP)

vi.      medical information, including EPSDT screening; sight, hearing and dental examination report; current medications and allergies; immunization records; medical history; Medicaid number; lead screening for children under the age of 6

vii.     authorizations for routine and emergency medical care, dental care and other medical procedures

viii.    authorizations required by the State for out-of-state travel, participation in special events, etc.

ix.      correspondence with/from agencies involved with the child

x.       initial Individualized Service Plan

xi.      follow-up Individualized Service Plans

xii.     progress reports

xiii.    any reports submitted by foster parents

xiv.     case notes including contacts with child's family/extended family

xv.      incident logs or records on serious behavior problems, illnesses or injuries

xvi.   court orders

xvii.   measure of child specific behaviors as identified by a behavioral assessment tool implemented by the department

xviii.   comprehensive treatment plans

xix.   treatment plan review

xx.   Health Insurance Portability and Accountability ACT (HIPAA) information

e.   **Child's access to agency staff.** Therapeutic foster children shall have access to designated staff at all times to discuss concerns including any problems they are experiencing in/with their therapeutic foster family. Agency staff shall provide regular face-to-face contact alone with each child. No TFC program shall promulgate a policy to require its staff be present at the time of visits between the DHR caseworker and the child/youth in placement. DHR staff shall notify TFC providers of planned visits, but DHR staff shall be able to contact foster parents on an individual basis to arrange visits or contacts or to assess the children in their care.

f.   **Child-family contact/relationships.** Therapeutic foster children shall have access to regular contact with their families as described in Department of Human Resources policies regarding visitation and mail and telephone access. The TFHC program shall work to actively support and enhance child-family relationships. Specific activities to be

undertaken in this regard shall he described in the child" Individualized Service Plan.

g.  **Rights of children and youth in therapeutic foster home care.** Children in therapeutic foster home care have the same basic rights as all foster children including the right to privacy, to humane treatment, to adequate shelter, clothing, nutrition, essential personal care items and allowances, access to religious worship services of their choice, access to counsel and the courts, access to family members, freedom from excessive medication, freedom from unnecessary seclusion and restraint, and advocacy services. The program shall explain to each child what his/her rights are in a manner consistent with the child's level of understanding and make this information available to the child in writing and must be documented.

2.  **Treatment.** Therapeutic foster children have the right to receive direct treatment and related services planned to meet the specific needs associated with their placement in therapeutic foster care. Treatment assumes written plans based upon the family's ISP with clearly specified procedures and services designed to achieve measurable goals within a set period of time and with regular assessment of progress. All services provided above core services must be authorized in the ISP with associate 1878 (authorization).

An Intake Evaluation and a written Initial Treatment Plan shall be completed within 10 **working** days of admission. If initial plan is not comprehensive, a Comprehensive Treatment Plan shall be completed

within 30 days of initial treatment plan to coordinate the long-term treatment and permanency planning goals with the family and/or child's ISP and the services to be provided to meet these goals. The plan also shall address specific strategy to be employed by the therapeutic foster parents in the home to meet long-term goals and to achieve short-term objectives related to current needs or treatment issues. Significant revisions or extensions of these specific treatment strategies shall be documented along with progress on long and short-term goals.

Treatment planning shall involve the child from the outset and to increase and maximize that involvement over time. The process likewise shall involve the child's family to address strategies to promote reunification and/or to enhance and maintain child-family relationships. Planning shall extend beyond the period of the child's tenure in therapeutic foster home care to guide and stabilize transitions to subsequent settings and to maximize the transfer and maintenance of treatment gains. Aftercare services shall be addressed as an integral component of the ISP planning process.

At a minimum, treatment planning shall include the following:

1. **Initial treatment plan.** An initial written treatment plan shall be completed within 10 **working** days of the child's admission to the program. The plan shall describe specific tasks to be carried out by the

treatment team during the first 30 days of placement. It shall describe strategies to ease the child's adjustment to the therapeutic foster home including plans for visitation with his/her family, as well as describe the child strengths, skills, interests, and needs for treatment within the home. The initial plan shall address short-term goals for the first 30 days of placement, identify potential needs likely to be encountered with the child and specify how the treatment team is to respond to them. The initial plan shall provide a rationale for the child's placement in the particular therapeutic foster home chosen as a suitable match based upon the child's permanency plan identified in the ISP.

2. **Comprehensive treatment plan.** A written comprehensive treatment plan shall be completed for each child within 30 days of initial placement addressing the long-term goals of treatment including criteria for discharge, projected length of stay in the program, projected post-TFHC setting and aftercare services. It shall address the child's permanency plan, adhering to the requirements of PL 96-272 regarding the goals of placement. The plan shall identify and build on the child's strengths and assets as well as respond to presenting needs, as identified in the family and/or child's ISP. It shall assess the child's needs in major developmental domains, describing goals and strategies as necessary to promote pro-social, adaptive behavior, emotional well being, cognitive development, interpersonal

54

skills and relationships, self-care and daily living skills.  For older youth and those remaining in THFC for longer periods, independent living skills will be developed.  The comprehensive treatment plan shall include proactive short-term treatment goals that are measurable and time limited along with specific strategies for promoting and regularly evaluating progress.

The comprehensive treatment plan should include the following:

    i.      name of child

    ii.     identifying child data

        a.  DOB

        b.  custody status

        c.  referring agency

        d.  placement date

    iii.    family data

    iv.    treatment team members and roles

    v.     strengths/needs of child and family

    vi.    goals of treatment

    vii.   services to be provided

    viii.  tasks and steps to achieve goals

    ix.    assignment of tasks and steps

    x.     crisis plan

    xi.    evaluation and review plans

xii.    behavior management plans, when identified as a need by the ISP team

3   **Quarterly progress reports/updates.**  Each child's treatment plan shall be specific, reviewed at least quarterly by the treatment team and revised as necessary.  Quarterly reports shall document progress on specific short-term treatment goals, describe significant revisions in goals and strategies, and specify any new treatment goals and strategies initiated during the period covered.  The quarterly progress report shall summarize progress and also any changes, as identified by the ISP team, regarding long-term placement and treatment goals.  A copy of this report should be sent to the appropriate county DHR.

4.  **Aftercare plan.**   All discharges from TFC shall be reviewed and discussed by the ISP team.  An aftercare plan shall be prepared through the ISP and ready to be implemented for each child prior to his/her planned departure from the program.  The plan shall specify the nature, frequency, and duration of aftercare services to be provided to the child and to his/her family and designate responsibility for service delivery.  The TFC program may provide these aftercare services directly or provide consultation as needed to the person/agency assuming responsibility for working with the child following his/her discharge from the program.

56

3.    **Movement within the System of Care (Step-down/Step-up Protocol)**

    a.    Movement within the system of care, including step-down and step-up, can take many forms and may include the following:

- A move between psychiatric hospitalization and TFC foster home.

- A move between residential treatment and TFC foster home.

- A move between out-of-state placement and TFC foster home.

- A move between DYS placement and TFC foster home.

- A move from TFC to adoption through state office placement.

- A move from TFC to foster parent adoption.

- Remaining in TFC foster home with reduced services.

- A move between TFC foster home and traditional foster care.

- A move from TFC foster home to independent or transitional living.

- A move between TFC foster home and home of a relative.

- A move between TFC foster home and the parent(s) home.

- A move from TFC to emancipation.

b.   **Reasons for Step-Down within the TFC Program:** There are occasions when children should be stepped down within a TFC program. The following conditions must be present in the decision to step-down a child within a TFC program:

- The child has established a strong bond with the foster parents and a move would adversely affect the child's stability and emotional well being.

- The ISP team has established that there are no relative placement resources, the child cannot return home, there is no identified adoption resource, and step-down within the TFC program is in the best interest of the child.

- The child can be maintained in the placement with fewer therapeutic services, as determined by a standardized behavioral assessment tool that places the child in the Step-Down TFC category of care.

c.   **Definition of Step-Down:** Step-down is the process for decreasing the level of services for a child in out-of-home care. After a child has been in placement for 6 months, an assessment of step-down will be made to determine his/her treatment needs. Step-down will be continually assessed after this timeframe to determine when a child may be stepped down.

- In the context of the *Therapeutic Foster Care Manual* document, step-down refers to three categories of care within the TFC program, i.e., Standard TFC, Step-Down TFC and Traditional Foster Care.

- The criterion for assigning a child to a specific category of care is pre-determined through the use of a standardized behavioral assessment tool. Scores resulting from the standardized behavioral assessment tool will determine the appropriate category of care for the child and will be identified in the child's ISP. Movement between the three categories of care within the same TFC foster home will then occur in accordance with the predetermined criterion established with the ISP team. If a change in the level of services is needed, an ISP will be held within 72 hours of when the needed change is identified.

d.  **Categories of Care:** There will be three categories of care within the TFC program, 1) Standard TFC, 2) Step-Down TFC and (3) Traditional Foster Care.

- As long as the child remains in the TFC system, a standardized behavioral assessment tool will be used to assign the child to an appropriate category of care within the same foster home, thus

promoting stability of placement and flexibility of services defined by individual needs of the child and family.

- State DHR will develop or adopt a standardized behavioral assessment tool to be used in the TFC programs, along with the corresponding scores that will indicate the three categories of care.

- The admission assessment utilizing the standardized behavioral assessment tool will use a timeframe of 90 days prior to admission to rate behavioral severity. In completing the rating, all available information including previous treatment records and information provided by the DHR case record, the child's parents, family, teachers, and other treatment professionals involved with the child will be considered.

c.  **Criteria for TFC Categories of Care:** All children entering a TFC program will be initially placed in the Standard TFC category of care.

- The category of care will be re-assessed using the standardized behavioral assessment tool during the child's treatment in the TFC foster home. TFC providers shall ensure that DHR caseworkers are invited to all treatment team meetings. The foster parent and the TFC agency will

60

be an integral part of the assessment process to determine when a child is ready to step down to a lower level of service.

- The criteria for TFC categories of care will primarily be the score obtained on the standardized behavioral assessment tool. In the event that the TFC provider recommends a category of care not congruent with the behavioral assessment rating, then a letter documenting the reasons for a different category of care will be sent to DHR and other ISP team members. Factors to be considered include, but are not limited to, the following:

  1. History of severe behaviors causing harm to the child and/or others (as described below under "Exceptions to Step-Down TFC category of care")
  2. The frequency of crisis intervention contacts.
  3. The involvement of Juvenile Court.

If these factors result in a higher level of care being recommended than what is indicated by the behavioral assessment tool, then an ISP will be held to determine the appropriate category of care. If the intensity of services at the higher rate are needed for crisis stabilization, the TFC agency must notify DHR, who will poll ISP team members for concurrence, unless steps are already identified in a crisis plan for the

child. An ISP to determine a needed level of service change must occur within 72 hours. All step-down ISP meetings shall have the DHR supervisor of the case or above in the chain-of-command in attendance. DHR shall sign-off on decisions that are made in the step-down meeting.

- If children are identified who need to step-down completely to traditional foster care, the TFC agency may request that the county DHR identify a provider outside the TFC agency to meet the child's needs. If the TFC agency chooses to continue to serve the child in the current foster home within their own program, the following criteria shall apply.

    1. During the ISP meeting in which the decision is made to step a child down, a determination will be made by the team as to which therapeutic services need to continue, if needed, and to what degree. If therapeutic services are needed after the child has been discharged as a TFC child, they may be authorized on a DHR-1878. Services authorized on an ISP and 1878 must not surpass 25% of the contract daily rate for TFC.

    2. To ensure the continued care for the child in the traditional status, the DHR social worker will visit the child at least once per month face-to-face in the therapeutic foster home. As in all

cases, DHR social workers will be able to visit in TFC foster homes without the accompaniment of a TFC social worker.

3.    As determined by the ISP team, all services and needs identified for the child will be assumed by the DHR following the policies for children in out-of-home placements. (See Core Services for Children in Step-Down.)

4.    The requirement that a TFC foster home can provide services to only one child in the home is waived, if one of the children stepped down to traditional foster care within the TFC program. Two unrelated TFC children can be placed in a TFC foster home when one of them is in traditional status and placement of the second child does not jeopardize the stability and progress made by the child already in the home. If a foster home has a sibling group with one TFC child and that child is stepped down to traditional care in the home, the home would be able to accept another TFC child after the program has assessed their ability to serve all the children in the home. The number of children that may be placed within the home must not exceed six and must follow the Foster Family Home Standards. Before a provider is able to place another TFC child in a foster home, where a child has been stepped down to traditional care, that foster home must have no other children placed, other than serving as a respite provider, for thirty days to ensure the stability of the stepped down child.

5.    Foster parents will receive the traditional foster care board rate ($14) or the entire SSI check for children who are in traditional foster care in their home.

6.    As TFC programs will receive no compensation for children who are in traditional foster care in their program, face-to-face visits with these children and all support activities for the foster child and foster parents will be identified in the ISP and arranged by DHR and made by the county DHR staff or a provider with whom DHR vendors or contracts.

7.    The TFC agency will be represented in attendance at all ISP's involving children in step-down or traditional foster care within their respective programs.

8.    If a child is stepped down to traditional foster care within a program and another TFC child is placed in the home, the child-placing agency must retain liability for the home.

f. **Exceptions to Step-Down TFC Category of Care:** Dangerous behaviors that have occurred prior to the child's admission to TFC may have a serious risk of recurring and causing harm to the child and/or others. In evaluating these behaviors, consideration should be given to the age at which the behavior(s) was first exhibited and the frequency of the behavior. The earlier the age of onset and the greater the frequency of the behavior, the higher the risk of additional violent or dangerous acts.

- A history of dangerous behaviors may constitute an exception to consideration for the Step-Down TFC category of care. These behaviors include, but are not limited to:

    1. The deliberate setting of a fire with intent to harm others or cause extensive property damage.
    2. Seriously injuring or killing an animal.
    3. Sexually offending behavior that rises to the level of a crime, i.e., sexual assault or rape. Sexual acting out behavior in which there is an age difference of 3 or more years between the victim and the perpetrator.
    4. Physically aggressive behavior that has resulted in serious injury to a child or an adult, i.e., medical attention was required and/or criminal charges were filed.
    5. A suicide attempt that resulted in hospitalization.

- If the child has successfully completed treatment for the behavior and has been able to live in a community-based setting without recurrence of the behavior for a minimum of one year, then the Step-Down TFC category of care may be considered. The current behavior, as measured by the standardized behavioral assessment tool, would need to result in a score that would indicate the Step-Down TFC category of care, as defined by the child's ISP team.

g. **Process for Changing Category of Care:** If the TFC agency feels there is a need for change in the category of care, the following will occur:

- A 72-hour ISP will be requested. All step-down ISP meetings shall have the DHR supervisor of the case or above in the chain-of-command in attendance. DHR shall sign-off on decisions that are made in the step-down meeting.
- The change in category of care and reimbursement rate will be effective date identified in the ISP.

h. **Services Addressed in Standard TFC Category of Care:** The core services list for the Standard TFC category of care is attached as Addendum A.

i.  **Services Addressed in Step-Down TFC Category of Care:** The core services list for the Step-Down TFC category of care is attached as Addendum B. These services are contingent on a 50% reduction in the TFC provider's daily rate.

- At a minimum, the child in Step-Down TFC category of care will be seen face-to-face in-home twice per month by the TFC provider.

- The responsibility for funds to support extracurricular activities, children's allowances, additional clothing, counseling, family support, and tutoring above the Core Services for children in step-down will be assumed by DHR and paid from local flex funds.

j.  **Definition of Step-Up:** Step-up is the process of providing more extensive services for children, when it is assessed that these services are needed.

- In the context of the *Therapeutic Foster Care Manual*, step-up refers to the three categories of care within the TFC program.

- Whenever a child steps down to the Step-Down TFC or traditional foster care category of care, the possibility that he/she may have to

68

step back up to the Standard TFC category of care is understood and should be addressed as a crisis plan in the ISP. Likewise, a child in traditional foster care may have to step up to Step-Down TFC. It is expected that a child would step up no more than one level, except in very rare circumstances.

- The TFC provider will provide, within 5 working days of the behavioral assessment, written notification to DHR and the foster parent of the need for change in category of care. A 72-hour ISP shall be requested. All step-down ISP meetings shall have the DHR supervisor of the case or above in the chain-of-command in attendance. DHR shall sign-off on decisions that are made in the step-down meeting. The change in category of care and reimbursement rate will be effective on the date identified in the ISP.

k.    **Policy:**
- Therapeutic foster care is a placement to address children's emotional and behavioral disorders.

- The need for TFC services will be evaluated at each ISP team meeting. If a child has been in TFC care for longer than 6 months, the ISP team

will evaluate barriers to the child's return to parent or other identified permanency goals and the need for continued TFC services.

- The number of children placed in each therapeutic foster home shall be limited to one; or a sibling group with no more than two (2) of the siblings in therapeutic status; or a minor parent and child. In the event of an exception, a case-specific exception will be required from State DHR based on clinical data and input from all children affected and the foster parent. The county DHR office holding custody of the child shall request this exception.

- The TFC provider will be represented in attendance at all ISP's involving children in either Standard TFC or Step-Down TFC categories of care.

I.   **TFC Reimbursement:**
- When a child meets the criteria for Step-Down TFC category of care, the rate to the TFC provider will decrease by 50% effective the date identified in the ISP.

- Medicaid services will be reduced according to the reduced needs of the child.

- The foster parent will receive the TFC foster care board rate (up to $8 per day) or the entire SSI check for children who are in the Step-Down TFC category of care in their home in addition to the 50% of the standard difficulty-of-care rate established by the TFC provider.

m.  **Therapeutic Foster Parents:**

- All TFC foster parents must be apprised as a part of their training that 1) there are three categories of care, i.e., Standard TFC, Step-Down TFC and traditional foster care, in the TFC program and 2) that Step-Down TFC may occur with the children they serve. They must understand and sign an agreement that they understand the categories of care, the process of changing categories of care, and will abide by any decisions made.

- Annually, the in-service training for TFC foster parents will reiterate the categories of care, the process of changing categories of care, and related policies.

- TFC foster parents will be an integral part of the ISP team in making decisions regarding children in their care. They will be adequately prepared jointly by the TFC social worker and the DHR social worker prior to the ISP meetings. Their strengths and needs will be assessed

during the ISP process to maintain stability in the placement of children in their homes.

- Foster parents with children in the Step-Down TFC category of care will continue to be approved by the child-placing agency and will receive the core services for the Step-Down TFC category of care, as described in Addendum B, for the children in Step-Down TFC from the TFC provider.

n. **Reports:** Monthly reports from TFC providers will be modified to show the number of children that are in each category of care, i.e., Standard TFC, Step-Down TFC and traditional foster care, within their programs. An average length of stay for children served in each category shall be reported, as well.

o. **Caseload Standards for Standard TFC and Step-Down TFC Categories of Care:**

- The number of children assigned to a Case Worker is a function of several variables, including the size and density of the geographic area served, the array of job responsibilities assigned, and the difficulty of the population assigned.

- The maximum number of children in the Standard TFC category of care assigned to any CaseWorker shall not exceed eight (8).

- Children in the Step-Down TFC category of care will count as one-half (.50) case for purposed of caseload count.

- The maximum number of children in the Step-Down TFC category of care assigned to any CaseWorker shall not exceed sixteen (16).

- The caseload size shall be adjusted downward if (1) the Case Worker's responsibilities exceed those described under the Case Worker's Responsibilities in the *Therapeutic Foster Care Manual*, (2) the difficulty of the client population served requires more intensive supervision and training of the TFC foster parents, or (3) local travel conditions impede the Case Worker's ability to maintain the minimum direct contact frequencies identified in the manual.

## SECTION IV:  PROGRAM EVALUATION

A.    **PROGRAM EVALUATION**

Evaluation is essential for programmatic self-knowledge, self-improvement and accountability. Information concerning service delivery and outcomes shall be collected, reviewed and analyzed to maintain, improve, and document sound therapeutic foster home care program operations. This information will be needed for subsequent review and revision of these requirements. At a minimum TFHC program evaluation efforts should address the following:

1. **Documentation of service delivery.**  A therapeutic foster home care program shall clearly document delivery of all services in its program statement as well as compliance with all minimum-operating standards.

2. **Individual treatment.** TFHC programs shall document the implementation of all treatment plans and track progress and outcomes on all long and short term goals throughout each child's stay in care. Specific areas to track are specific behaviors (examples of tools which may be used are the Global Assessment Scale, Achenbach & Edelbroch, etc.), child's educational status, law enforcement status, and family involvement. If goals are not achieved in a specified time frame, the treatment plan will be changed in accordance with the ISP.

3. **Follow-up to individual treatment.**  TFHC programs shall track children discharged from their care for a minimum of 6 months following their discharge. Areas to track are placements, behaviors, educational and work status, law enforcement status, and family involvement.

4.    **Performance evaluations.** TFCH programs shall provide TFC parents and Professional staff with written performance evaluations at least annually which include descriptive assessments of their performance and specific job responsibilities and goals for improved performance.

5.    **Quality assurance.** TFCH program shall have a written QA plan to monitor the performance of each program of therapeutic foster care. Each TFC program will designate the composition of the persons who conduct the annual QA review. It is recommended the following persons be appointed to serve on the QA team: TFC parents, family members of child in care, youth in care, DHR social worker, TFC staff member, and other community partners such as teachers, therapists, behavior specialists, nurses, etc. The QA system is intended to provide an independent check on the daily decisions concerning TFC as well as monitor outcomes for children and youth in TFC. The QA system must operate with a sufficient degree of independence to accomplish its mission.

The TFC QA system will regularly collect and analyze data, conduct case studies, special studies and site visits to evaluate the program's performance according to the goals and principles of the R. C. Consent Decree. Data may be collected on a continuous basis or by sampling techniques. "Case studies" are general studies of the functioning of TFC performed through reading case files and interviewing significant persons. "Special studies" are studies focused on the functioning of specific aspects of TFC. They should be based on a review of case files and interviews of significant persons in the case, among other data. "Site visits" are

75

visits to the TFC homes for the purpose of observing the TFC parents and staff interacting in the TFC setting.

6.  **Satisfaction surveys.** Surveys will be completed at the end of 90 days after a child enters the TFC program. The following surveys will be completed, thereafter, annually, or at a child's discharge from the program:

   a.  therapeutic foster parent

   b.  child or youth

   c.  family

   d.  placing agency

## B. PROGRAM SUMMARY

The Therapeutic Foster Care Program is intended to provide an intensive therapeutic environment for children and youth in a home-like setting. On a continuum of services, it lies between a residential setting and a traditional home setting, whether it be a foster home, a relative placement or the child's birth family's home. The service should be provided when a child's therapeutic needs can not be met at his own home due to significant safety issues that can not be resolved with an appropriate safety plan. As soon as safety issues can be resolved, continued therapy should occur in the child's own home through intensive in-home treatment services. Step-down from therapeutic foster care is to be expected, as a child reaches his treatment goals and permanent living arrangements are identified. The TFC programs are an integral part of Alabama's continued efforts to provide a true continuum of services for its

children and families to assist them in becoming self-sufficient, safe and stable functioning units.

# APPENDICES

# CORE SERVICES FOR STANDARD TFC CATEGORY OF CARE

<u>Services to Foster Children and Their Families from the TFC Agency</u>

- *Matching process for children and their families identifying needs of the child/family and strengths of prospective TFC parents for initial placements and moves within a TFC program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care services.
- *Pre-placement visits. As placements in TFC homes should not be a crisis placement, pre-placement visits should occur to make sound decisions for appropriate matching. Pre-placements visits must be documented as such in the child's and foster parent records at the TFC agency.
- *Schedule and coordinate the child's treatment plan; initial treatment plan within 10 days, comprehensive treatment plan within 30 days and reviews every 90 days. All treatment plans developed by the agency should be coordinated with the DHR county social worker and based upon the goals established in the child's Individualized Service Plan (ISP). The TFC agency is required to obtain a copy of the Comprehensive Family Assessment/Intake Evaluation form and an ISP from the referring county DHR office. **(DHR staff is required to complete Intake Evaluations on all children in TFC placements. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days.)**
- *Individual, weekly visit with the TFC child. **(This contact does not negate the requirement for DHR staff to make face-to-face contact minimally once per month with children in TFC placements.)**
- Monthly face-to-face or telephone contact with school (minimum) to monitor the child's progress.
- Monthly face-to-face or telephone contact with child and/or family therapist (minimum) to monitor progress in counseling.
- *Assist in referral to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.
- Assist the child with the development or maintenance of skills by the provision of no more than 18 hours weekly of individual basic living skills training and no more than 5 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas must be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.

- Coordinate the child's involvement in at least one extracurricular activity, e.g., band, karate, various sports, Boy or Girl Scouts, etc. per the family's ISP. **(This does not include paying for the activity or materials required in the performance of the activity. DHR shall be responsible for payment of the activity from flex or other available local funds.)**
- *Attend ISPs and IEP's along with the child and therapeutic foster parents.
- *Provide family support with birth family/supervise family visitation as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's illness and how to help the child be maintained in the community by providing education about the child's illness, expected symptoms, medication management, parenting support, therapeutic visitation support, educational advocacy and/or to encourage school success, as identified in the family's ISP.
- Assist in the development of independent living skills, as identified in the ISP. **(DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.)**
- Provide monthly group therapy (counseling) sessions for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.
- Provide five hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.
- *Discharge planning shall be a part of the agreement/ISP when a child first enters care with the TFC program.
- Maintain a no-reject/no-eject policy for children who meet program criteria.
- Provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.
- Regularly administer outcome measures, at a minimum of every 90 days.
- Monthly report to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.
- Maintain regular communication with DHR, counselors, teachers and other persons relevant to the child that is being served by the program.
- Quality assurance component, which includes outcomes, measures for all children in the TFC program
- Ensure program compliance with <u>Minimum Standards for Child Placing Agencies</u>, <u>Minimum Standards for Foster Family Homes</u>, and the <u>Therapeutic Foster Care Manual.</u>
- *Assistance in creating a behavior management plan for the child with the other members of the ISP team. All TFC agencies shall maintain staff that have expertise in the development of such plans. **(DHR shall assume the responsibility that behavioral management plans have been completed on all children that require them.)**
- *Participation in the ISP team in determining goals for children and their families, including allowances, need for clothing, observance of special occasions, etc. **(DHR shall be fiscally responsible for clothing, allowances, gifts for special occasions, etc. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days)**

### Services to TFC Families From the TFC Agency:

- Daily difficulty of care payment as identified in the contract between the agency and the foster parent. A minimum daily rate of $16.00 per day is required. There is no requirement regarding the maximum a foster parent may be paid as a daily rate for care. All contracts between foster parents and the TFC agency are considered subcontracting arrangements and, therefore, require prior approval from State DHR. The standard document, not each individual document, is subject to this approval.
- Forty hours pre-service training, including GPS, to TFC families prior to licensure.
- Twenty-four hours of annual training to each TFC parent.
- Monthly support group/meeting for therapeutic foster parents.
- Ensure homes comply with Minimum Standards for Foster Family Homes.
- Conduct annual license renewal and semi-annual visits.
- Weekly face-to-face contact/support to foster families to strengthen their ability to provide a safe nurturing environment for the child.
- On-call crisis intervention.
- Forty-eight hours respite per month. For respite periods longer than 48 hours, the agency and foster parents shall have in their contractual agreement how respite will be paid. The county department will not be billed for respite.
- *Reimbursement for mileage to the TFC child's appointments, visits, etc. if the destination is outside a fifty (50) mile radius from the foster home. **(For special circumstances, which are clearly delineated in the ISP on rare occasions, county departments may authorize mileage to be paid through the county department.)**
- Assistance with transportation of child, when needed.
- Assistance with and ensuring that required Medicaid documentation of provided billable services is being properly maintained and in compliance with all policy and billing guidelines per the Medicaid Provider Manual, Medicaid Rehabilitative Services, Chapter 105.
- Have staff available to TFC families and children 7 days per week, 24 hours per day.

**\* All bulleted points (\*) require intense collaboration with DHR. DHR will be responsible for many services that have traditionally been provided by TFC providers. These are highlighted in BOLD within the bulleted section above. Should the ISP team agree that these services are needed, and the TFC agency agrees to provide them, they must be authorized by the ISP document and an 1878 completed to authorize payment. All services, whether core or ancillary, must be authorized by the ISP document with outcomes identified to a specific area of need.**

# CORE SERVICES FOR STEP-DOWN TFC CATEGORY OF CARE (contingent on 50% reduction in TFC provider's daily rate for Step-Down TFC category of care)

### Services to Foster Children from the TFC Agency

- *Matching process for children and their families identifying needs of the child/family and strengths of prospective TFC parents for initial placements and moves within a TFC program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care services.
- *Schedule and coordinate the child's treatment plan; initial treatment plan within 10 days, comprehensive treatment plan within 30 days and reviews every 90 days. All treatment plans developed by the agency should be coordinated with the DHR county social worker and based upon the goals established in the child's Individualized Service Plan (ISP). The TFC agency is required to obtain a copy of the Comprehensive Family Assessment/Intake Evaluation form and an ISP from the referring county DHR office. **(DHR staff is required to complete Intake Evaluations on all children in TFC placements. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days.)**
- *Individual, bi-weekly visit with the TFC child. **(This contact does not negate the requirement for DHR staff to make face-to-face contact minimally once per month with children in TFC placements.)**
- Quarterly face-to-face or telephone contact with school (minimum) to monitor the child's progress.
- Quarterly face-to-face or telephone contact with child and/or family therapist (minimum) to monitor progress in counseling.
- *Assist in referral to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.
- Assist the child with the development or maintenance of skills by the provision of no more than 9 hours weekly of individual basic living skills training and no more than 3 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas must be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.
- Coordinate the child's involvement in at least one extracurricular activity, e.g., band, karate, various sports, Boy or Girl Scouts, etc. per the family's ISP. **(This does not include paying for the activity or materials required in the performance of the activity. DHR shall be responsible for payment of the activity from flex or other available local funds.)**
- Attend ISPs and IEP's along with the child and therapeutic foster parents.

82

- *Provide family support with birth family/supervise family visitation as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's illness and how to help the child be maintained in the community by providing education about the child's illness, expected symptoms, medication management, parenting support, therapeutic visitation support, educational advocacy and/or to encourage school success, as identified in the family's ISP. It is expected that if the child's permanent plan is to return home, more time may be spent in family support when a child has reached a step-down level. **(DHR has the responsibility to recruit traditional foster homes for children for whom return to home or placement with relatives is not an option. It is not expected that all children in TFC shall step-down within the TFC program.)**

- Assist in the development of independent living skills, as identified in the ISP. **(DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.)**

- Provide group therapy (counseling) sessions, only as needed, for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.

- Provide 3 hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.

- *Discharge planning.

- Maintain a no-reject/no-eject policy for children who meet program criteria.

- Provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.

- Regularly administer outcome measures, at a minimum of every 90 days.

- Monthly report to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.

- Maintain regular communication with DHR, counselors, teachers and other persons relevant to the child that is being served by the program.

- Quality assurance component, which includes outcomes, measures for all children in the TFC program

- Ensure program compliance with <u>Minimum Standards for Child Placing Agencies</u>, <u>Minimum Standards for Foster Family Homes</u>, and the <u>Therapeutic Foster Care Manual</u>.

- *Assistance in creating a behavior management plan for the child with the other members of the ISP team. All TFC agencies shall maintain staff that have expertise in the development of such plans. **(DHR shall assume the responsibility that behavioral management plans have been completed on all children that require them.)**

- *Participation in the ISP team in determining goals for children and their families, including allowances, need for clothing, observance of special occasions, etc. **(DHR shall be fiscally responsible for clothing, allowances, gifts for special occasions, etc. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days)**

**Services to TFC Families From the TFC Agency:**

- Daily difficulty of care payment as identified in the contract between the agency and the foster parent. A minimum daily rate of $8.00 per day is required. There is no requirement regarding the maximum a foster parent may be paid as a daily rate for care. All contracts between foster parents and the TFC agency are considered subcontracting arrangements and, therefore, require prior approval from State DHR. The standard document, not each individual document, is subject to this approval.
- Twenty-four hours of annual training to each TFC parent.
- Monthly support group/meeting for therapeutic foster parents.
- Ensure homes comply with <u>Minimum Standards for Foster Family Homes.</u>
- Conduct annual license renewal and semi-annual visits.
- Bi-weekly face-to-face contact/support to foster families to strengthen their ability to provide a safe nurturing environment for the child.
- On-call crisis intervention.
- Twenty-four (24) hours respite per month. For respite periods longer than 48 hours, the agency and foster parents shall have in their contractual agreement how respite will be paid. The county department will not be billed for respite.
- *Reimbursement for mileage to the TFC child's appointments, visits, etc. if the destination is outside a fifty (50) mile radius from the foster home. **(For special circumstances, which are clearly delineated in the ISP on rare occasions, county departments may authorize mileage to be paid through the county department.)**
- Assistance with transportation of child, when needed.
- Assistance with and ensuring that required Medicaid documentation of provided billable services is being properly maintained and in compliance with all policy and billing guidelines per the <u>Medicaid Provider Manual,</u> Medicaid Rehabilitative Services, Chapter 105.
- Have staff available to TFC families and children 7 days per week, 24 hours per day.

**\* All bulleted points (\*) require intense collaboration with DHR. DHR will be responsible for many services that have traditionally been provided by TFC providers. These are highlighted in BOLD within the bulleted section above. Should the ISP team agree that these services are needed, and the TFC agency agrees to provide them, they must be authorized by the ISP document and an 1878 completed to authorize payment. All services, whether core or ancillary, must be authorized by the ISP document with outcomes identified to a specific area of need.**

## Therapeutic Foster Care Monthly Report Form

Name of Program: _____   Location: _____

Month/Year: _____

### CHILDREN

**Number of children in care at the end of the previous month:**   _____

Number of admissions (not including pre-placement visits
during the month:   _____

Number of discharges during the month:   _____
    **The following must be completed.**
    Of the number discharged, how many were <u>planned</u>?   _____
    <u>Unplanned</u>?   _____
    Of the number discharged, how many went to more restrictive
        placements?   _____
    Less restrictive?   _____
    Number stepped down within program   _____

**Total number of children in <u>TFC</u> care at the end of this month:**   _____
**\*\*Number in <u>step-down</u> within program at end of month:**   _____
Number of children moved from one home to another within your
program during the month:   _____

**Number of children in pre-placement visits during month:**   _____

Number of children receiving aftercare services during month:   _____

### FOSTER HOMES

**Total number of approved homes (including TFC and TFC respite):**   _____
    **Of the number of TFC homes (not respite only), how many**
        **are vacant?**   _____
    Of the total number, how many are for **respite only**?   _____
Number of homes are in the approval/license process at the end of the
month:   _____
Number of homes in attendance at monthly in-service training:   _____

Submitted by: _____

**Reports must be submitted by the <u>5th of the following month</u>. FAX (334) 242-0939**

    **Form TFC-1**

Agency Name _____ Date _____ Reviewer _____

## CHILD'S CASE RECORD CHECKLIST

Child's Name _____ County of Origin _____

Race _____ Sex _____ Religious Preference, if applicable _____

Referral Source _____ Date of Placement _____

Reason for Referral_____

CPA Caseworker _____

Current Foster Parent(s) _____

TFC ☐     Residential/Shelter [MSCCF (Child Care Facility)] ☐     Regular FC ☐
Adoptive ☐

*TFC must also meet the Minimum Standards for Child Placing Agency (CPA), as well as Family Foster Homes*

| STANDARDS/GUIDELINES | Yes | No | | *TFC | CPA | CCF |
|---|---|---|---|---|---|---|
| ☐ Application on File (CCF only) | | | Date | X | X | 21 |
| ☐ Face Sheet, including parents names | | | | CPA | 38 | 20 |
| ☐ Pre-placement Visit | | | Date | 47 | 30 | 24 |
| ☐ Current ISP | | | Date | 48-49 | 30 | 21 |
| ☐ ISP Participants Listed (CCF only) | | | | X | X | 22-23 |
| ☐ Initial Treatment Plan | | | Date | 52-54 | 30 | 22 |
| ☐ Comprehensive Treatment Plan (TFC only) | | | Date | 54-55 | X | X |
| ☐ Treatment Plan Reviews | | | Date(s) | 55-56 | 30 | 23 |
| ☐ Long Term Goal (listed on treatment plans) | | | | 52-55 | 30 | 22-23 |
| ☐ Strengths and Needs (listed on treatment plans) | | | | 54-55 | 30 | 22-23 |
| ☐ Progress notes; daily, weekly, monthly summaries | | | | 50 | 30 | 21,23 |
| ☐ Court Order Custody held by: | | | Date | 50 | 38 | 20 |
| ☐ Social History | | | Date | 49 | 38 | 20 |
| ☐ Psychological Assessment(s)—Previous and Current | | | Date(s) | 49 | 38 | 20 |
| ☐ Psychiatric Report(s) | | | Date(s) | CPA | 38 | 20 |
| ☐ Placement History | | | | 49 | 38 | 20 |
| ☐ Educational History/School Information | | | Grade | 50 | 38 | 20 |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ | Special Education/IEP | | | Date | 50 | 38 | 20 |
| ☐ | Current Medical Examination/Information | | | Date | 46 | 38 | 20,26 |
| ☐ | Current Immunizations | | | Exp. Date | 50 | 38 | 20 |
| ☐ | Current Dental Examination | | | Date | 50 | 38 | 20,27 |
| ☐ | EPSDT Referral with Approval for Services (TFC) | | | Date | 50 | X | X |
| ☐ | Birth Certificate | | | DOB | 49 | 38 | 20 |
| ☐ | Social Security Card | | | | 49 | X | 20 |
| ☐ | Financial Arrangements | | | | CPA | 31 | 20 |
| ☐ | Placement Agreements Forms | | | 823 (IAA) ☐ <br> 824 (private pay)☐ | 46 | 30 | 21 |
| ☐ | Authorizations for Routine and Emergency Medical Care | | | | 50 | 30 | 21 |
| ☐ | Authorizations for Out-of-State Travel | | | | 50 | 32 | 31 |
| ☐ | Correspondence to/from Agencies | | | | 50 | 39 | 21 |
| ☐ | Incident Logs | | | | 50 | X | 23 |
| ☐ | Discharge/Aftercare Plan, if applicable | | | | 56 | 31,32 | 21,24 |
| ☐ | Pre-admission psychological eval (within 24 mos.) | | | | 40 | X | X |
| ☐ | Exception letter for child under 6 in TFC | | | | 9-10 | X | X |
| ☐ | Behavioral Assessment Tool completed 90 days prior to admission | | | Date | 59-60 | X | X |
| ☐ | Step-down assessment completed at 6 mos. | | | Date | 7,58 | X | X |
| ☐ | All services, core/1878, authorized/identified in ISP | | | | 22 | X | X |

Comments/Recommendations:

*Revised 10-08-02, OLRD*

## FOSTER PARENT RECORD CHECKLIST

Date of Review: _____    Reviewer: _____

Child Placing Agency and Location _____

CPA Case Worker _____    Name of Foster Parents: _____

County of FP Residence: _____    Marital Status:  Single ☐    Married ☐    Separated ☐

Divorced ☐

Address of FP: _____    Telephone Number _____

Date of Application _____    Current Approval Date: _____    Original Approval Date: _____

TFC ☐        Regular FFH ☐        Adoptive ☐

| STANDARDS/GUIDELINES | YES | NO | COMMENTS | TFC | FFH | CPA |
|---|---|---|---|---|---|---|
| ☐ Approved before child placed --Placement Date: | | | See FFH application, dated _____ | 34 | X | 5,32 |
| ☐ Home Study Completed--By Whom: | | | Licensed? | 32-35 | X | 29,32,39 |
| ☐ Financial Report on File  (Total Income: $ | | | | 33 | 9,44,iii | 39 |
| ☐ Smoke Alarms/Fire Extinguishers/Emergency Plan | | | | FFH | 32-34 | 32 |
| ☐ List of Children placed in the home, including dates of placement  and removal, on file | | | | CPA | CPA | 39 |
| ☐ Annual Renewal/Evaluations | | | | 35,74 | 47 | 39 |
| ☐ Separate bed and space per child | | | | 37 | 29,38 | 32 |
| ☐ Written list of duties | | | See FFH application, dated _____ | 30 | iii | 32 |

| | | | TFC | FFH | CPA |
|---|---|---|---|---|---|
| Agrees not to use corporal punishment | | | 36 | 39 | 32 |
| Assist in development of treatment plans and implementation | | See FFH application, dated | 30-31 | 9 | 32 |
| Agree to attend team meetings | | See FFH application, dated | 31 | 6 | 32 |
| Keeps Required Documentation | | | 31 | iii | 32 |
| Supports contact between child and birth family | | | 31 | 5,40 | 32 |
| Agrees to 14 days notice for removal of child | | | FFH | iii,49 | 32 |
| Child's information shared with parent before placement | | | 42 | X | X |
| Documentation on matching of children in file | | | 48 | X | 33 |
| Planned and crisis respite available | | | 43,16 | X | X |
| Document home/apartment insurance with liability coverage | | Exp. date | 44 | X | X |
| Automobile Insurance | | Exp. date | 36,44 | X | X |
| Compensation agreement, include. difficulty of care payment | | | 44 | X | X |
| Correspondence on file | | | CPA | CPA | 39 |
| Record of Support/ Supervisory Visits by Professional Staff | | | 23-24 | 49 | 39 |
| Number of foster children in home | **** | | 15,45,69 | 49 | 32 |
| Number of biological child(ren) in home | ---- | | CPA | iii,45 | 32 |
| ADOPTION: Record of Contacts Prior to Placement | | | X | X | 40 |
| ADOPTION: Record of Placement and Subsequent Supervision | | | X | X | 40 |
| ADOPTION: Legal Documents (Mar., Div., Citizenship, etc) | | | X | X | 39 |
| ADOPTION: Home Study & Disposition of Application | | | X | X | 40 |

Foster Parent Record Checklist
of 2

Page 2

| STANDARDS/GUIDELINES | FOSTER FATHER | FOSTER MOTHER | OTHERS | TFC | FFH | CPA |
|---|---|---|---|---|---|---|
| Criminal Records Check ABI<br>After 11-2000 FBI | Yes ☐ No ☐ N/A ☐<br>Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐<br>Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐<br>Yes ☐ No ☐ N/A ☐ | 34-35 | 15 | 32 |
| Central Records Clearances | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | 34-35 | 14 | 39 |
| ☐ 3 Non-Relative References (original approval) | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | 35 | 13,14, 45 | 39 |
| ☐ 1 Non-Relative Reference at annual renewals | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | 35 | 9 | 39 |
| Foster Parents "shall be able to read and write" | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | | X | 9 | 32 |
| Current Physician's Statement of Health on File<br>(renewed every 2 years)<br>Date(s) | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | 36<br>X | 12,44, 47 | 39<br>39 |
| ☐ 40 hrs. Pre-Service Training (TFC only) | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | 37-38 | 10 | 32,39 |
| ☐ 30 hrs. Pre-Service Training (RFC only) | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | | | |

88

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ General safety rules on play areas, pools, chemicals, firearms, & ammunition storage | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | | X | 29 | 32 |
| ☐ CPS trained | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | X | 12 | 32 |
| ☐ 24 hrs. Year In-Service Training (TFC only) ☐ 15 hrs. Year In-Service Training (RFC only) | Yes ☐ No ☐ N/A ☐ Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ Yes ☐ No ☐ N/A ☐ | 39 | 11,46 | 32,39 |
| ☐ Driver's License | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | 36 | 9 | 32 |
| Expiration Date(s)s | | | | | | |
| Date(s) of Birth | | | | | | |
| ☐ Number of Pets _____    Inoculations Current | Yes ☐ No ☐ N/A ☐ | | | FFH | 35 | 32 |
| ☐ Demonstrates minimal communication in language of child | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | | 35 | X | X |
| ☐ Agreement signed/3 categories of care, step down may occur | Yes ☐ No ☐ N/A ☐ | Yes ☐ No ☐ N/A ☐ | | 70 | X | X |
| ☐ Pre-placement occurred/documented | | | | 47 | X | X |
| ☐ Exception letters/approval filed in record | | | | 15 | X | X |

Comments/Recommendations:
*Revised 10-08-02, OLRD*

89

**Therapeutic Foster Care Program Checklist**
Page 1 of 2

Date of Review: _____          Reviewer Name: _____

Person(s) Interviewed and Title: _____

_____

_____

TFC Program Name: _____

| TFC GUIDELINES | YES | NO | COMMENTS | Page(s) |
|---|---|---|---|---|
| **STAFFING:** | | | | --- |
| 1 Supervisor per 6 workers | | | | 19 |
| 1 worker per 8-10 children | | | | 24 |
| 1 staff = Medicaid signoff status | | | | 18 |
| List of Supporting Staff (Optional) | N/A | N/A | | X |
| Supervisor = LCSW, Master's, LBSW + 5 years | | | | 20-21 |
| Worker(s) = LBSW, other | | | | 27 |
| Written job descriptions on site for staff | | | | 17 |
| Annual evaluations for staff | | | | 74 |
| Supervisor meets weekly with each worker | | | | 19 |
| Enrolled for Medicaid Rehab Services Certification | | | | |
| **TRAINING:** | | | | --- |
| 20 hrs. pre-service training for professional staff | | | | 27 |
| 40 hrs. year in-service training for professional staff | | | | 29 |
| Maintain written plan for all foster parent training | | | | 38-39 |
| 40 hrs pre-service training for foster parents | | | | 38 |
| 24 hrs. year in-service training for foster parents | | | | 39 |
| 8 hrs. year in-service training for respite parents | | | | 39 |
| Foster Parents have opportunity to evaluate training | | | | 40 |

90

| PRACTICE: | | | | ... |
|---|---|---|---|---|
| ☐ Written list of duties for foster parents | | | | 30 |
| ☐ Annual evaluations for foster parents | | | | 35,74 |
| ☐ Intake evaluation and treatment plan within 30 days | | | | 52-55 |
| ☐ Written protocol on matching and doc. to support | | | | 48 |
| ☐ 1 child per home [siblings excluded (no more than 2 therapeutic siblings in one home)] | | | | 15,69,45 |

**Therapeutic Foster Care Program Checklist**
of 2

Page 2

| TFC GUIDELINES | YES | NO | COMMENTS | Page(s) |
|---|---|---|---|---|
| **PRACTICE:** *(Continued from page 1)* | | | | ... |
| ☐ 1 overnight visit prior to placement | | | | 47 |
| ☐ Birth families have opportunity to meet foster parents | | | | 6,47 |
| ☐ Worker meets weekly face-to-face with child | | | | 25 |
| ☐ Worker meets weekly with foster parents | | | | 23,25 |
| ☐ Worker visits home at least biweekly | | | | 24 |
| ☐ 24 hours on call provided to foster parents | | | | 20,26-27 |
| ☐ Written protocol for reporting abuse/neglect | | | | 16 |
| ☐ Program carries liability coverage | | | | 44 |
| ☐ Doc that foster parents have home and auto insurance | | | | 36, 44 |
| ☐ Discharges reviewed and discussed | | | | 56 |
| ☐ After care plan prepared prior to planned discharge | | | | 56 |
| ☐ Written plan re: compensation to foster parents for damage by child | | | | 44 |
| **QUALITY ASSURANCE:** | | | | ... |
| ☐ Written quality assurance plan | | | | 74 |
| ☐ Track children for 6 months after discharge | | | | 73 |
| ☐ Satisfaction surveys [child, birth parent(s), foster parent(s), and referring agency] | | | | 75 |
| ☐ Documentation of child placed outside county of origin | | | | 12 |
| ☐ Monthly reports received timely | | | | |

91

COMMENTS/RECOMMENDATIONS: _____

Revised 04-08-02, OLRD

## Therapeutic Foster Child Interview

1.  How long have you been in TFC?

2.  What skills have you learned from being in this program?

3.  Did you have at least one overnight visit with your foster parents before you went to live with them?

4.  Were you involved in the decision for placement with your current foster parents?

5.  Do you have your own bed?

6.  Where do you go when you want to be alone?

7.  What is the best thing about your foster parents?

8.  What do you like least about your foster parents?

9.  What activities/sports are you involved with?

10. How many different TFC caseworkers have you had?

11. How often do you see your TFC caseworker?

12. How often does he/she visit you in your TFC home?

13. How often does he/she visit your school?

92

14. If you have a problem, whom do you discuss it with?

15. Are you allowed to call your TFC caseworker if you need to talk with him/her?

16. Are you currently going to counseling?        If so, how often?        Who attends counseling with you?

17. How often do you visit with your birth family?

18. Who is present at your visits?

19. (If age appropriate) Do you participant in your ISP's and treatment plans?

20. How often do you have contact with your DHR caseworker?

21. (if age appropriate) Have you ever filled out a satisfaction survey regarding the TFC program?

22. (if age appropriate) What are your plans when you leave this program?

23. If you could live with anyone you wanted, who would that be?

92

93

# REQUEST FOR PROPOSALS

## FOR

## THERAPEUTIC FOSTER CARE for CHILDREN



## ISSUED BY

## ALABAMA DEPARTMENT OF HUMAN RESOURCES

## FAMILY SERVICES

## Monday, February 28, 2005



PLAINTIFF'S
EXHIBIT
#2

*Alabama Department of Human Resources • 50 Ripley Street • Gordon Persons Building • Montgomery, Alabama 36130*

**ALABAMA DEPARTMENT OF HUMAN RESOURCES**
**REQUEST FOR PROPOSALS**

CONTENT                                                                           Page

I.    INTRODUCTION.................................................................................................. 2

II.   RESERVATIONS ................................................................................................ 3

III.  SUBMISSION OF PROPOSALS........................................................................ 4

IV.   PROGRAM NARRATIVE.................................................................................... 6

V.    COMPENSATION FOR PROVIDING SERVICE................................................ 9

VI.   SELECTION ..................................................................................................... 10

VII.  VENDOR CERTIFICATIONS............................................................................ 11

ATTACHMENT A-THERAPEUTIC FOSTER CARE SERVICE PROGRAMS ........... 13

ATTACHMENT B- RFP TIME TABLE ....................................................................... 19

ATTACHMENT C- TAXPAYER IDENTIFICATION NUMBER .................................... 20

ATTACHMENT D- DISCLOSURE STATEMENT ...................................................... 21

ATTACHMENT E- PROPOSAL COVER PAGE ........................................................ 22

1

I.  **INTRODUCTION**

A.  PURPOSE: This Request for Proposals (RFP) is for the sole purpose of soliciting proposals for **Therapeutic Foster Care for Children** in Alabama. Each proposal must indicate the vendor's ability to meet the provisions set forth in the *Therapeutic Foster Care Manual* Revised 2004, including the implementation of step-down, provision of Core Services, tracking and aftercare and provision of in-home services to the birth family. Therapeutic foster care is to be a time-limited, intensive intervention for children, who are not able to live at home and who fit the diagnostic and behavioral criteria set forth by the Department. Attachment A provides the definition of this therapeutic foster care, the population of children to be served, and the core services.

B.  The contract, if awarded, will be for a period of one (1) year with the option of renewing for two (2) additional one-year periods based on the same terms and conditions. Exercise of option years will be determined in part by an evaluation of the Vendor's performance. Continuation of any agreement between the Alabama Department of Human Resources (Department) and Vendor beyond a fiscal year is contingent upon the receipt of sufficient federal and state funds. Non-availability of funds at any time will cause any agreement to become void and unenforceable and no liquidated damages will accrue to the Department as a result. The Department will not incur liability beyond the accrued payments as of the official date of non-availability of funds.

C.  ENTITIES ELIGIBLE TO SUBMIT A PROPOSAL: Vendors may include governmental agencies, faith-based organizations, non-governmental public or private organizations or individuals who: 1) are legally authorized to conduct business within the State of Alabama; 2) possess the skills needed to perform the services described herein and in the attachment(s) that may accompany this RFP; and, 3) meet the terms and conditions of the RFP.

D.  LETTER OF INTENT TO PROPOSE: A letter indicating a vendor's intent to respond to the RFP should be sent to the RFP Coordinator (Page 3 – Where to Respond) no later than Friday, March 18, 2005. Submission of a *Letter of Intent to Propose* by the specified deadline is not a prerequisite for submitting a proposal, but it is necessary to ensure a vendor's receipt of RFP amendments and other communication regarding the RFP. The letter must include the name of a contact person, full address and email address. The Department will notify vendors of receipt of the *Letter of Intent to Propose* via email.

E.  RFP PROPOSED TIMETABLE: For reference, a timeline for the process of issuing the RFP to the awarding of FY'06 contracts is noted in Attachment B. Note that the proposed timetable is for reference and does not bind the Department to exact dates and time(s).

F.  DUE DATE: Proposals must be received by the Department of Human Resources, Policy, Planning and Research, at the address shown in paragraph G below **no later than 12:00 Noon (Central Time) on Monday, April 11, 2005** in order to be considered. Each vendor is solely responsible for assuring that its proposal is received by the Department by the due date established in the RFP. The Department shall not be responsible for late proposals, and late or incomplete proposals shall not be allowed after the deadline.

2

G.    WHERE TO RESPOND: All Proposals must be <u>hand delivered</u> to:

> Alabama Department of Human Resources
> Starr Stewart -Policy, Planning and Research
> **THERAPEUTIC FOSTER CARE PROPOSAL**
> Gordon Persons Building, Suite 2104
> 50 Ripley Street
> Montgomery, Alabama 36130-4000

**Proposals may not be faxed, mailed or submitted electronically.**

H.    VENDORS CONFERENCE: A vendors conference is scheduled for Tuesday, **March 29, 2005** in the auditorium of the Gordon Persons Building (Plaza level) from 1:30 p.m. – 3:30 p.m. Central Time.

I.    QUESTIONS REGARDING RFP:

1. Interested vendors may submit written questions (preferably via e-mail) regarding this RFP to, Starr Stewart - Policy, Planning and Research e-mail: **ssstewart@*dhr.state.al.us*.**

2. Each question must cite the particular section of the RFP to which it relates.

3. All questions must be received by **5:00 p.m. (Central Time) on Friday, March 18, 2005.**

4. Answers to written questions will be posted on the DHR website by **Friday, March 25, 2005 after 5:00 p.m.**

5. Any oral explanations or instructions given during the procurement process shall not bind the Department.

J.    COST: Vendors are solely responsible for paying all costs incurred as a result of responding to, and complying with this RFP.

## II.    **RESERVATIONS**

A.    PRE-SELECTION DISCRETION: The Department reserves the right, at its sole discretion, at any time and for any reason, to reject any or all of the proposals submitted in response to this RFP, or to cancel the RFP, if it is deemed by the Department to be in the its best interest to do so.

B.    POST-SELECTION DISCRETION: If a proposal is selected, the Department reserves the right, at its sole discretion, at any time and for any reason, to change its decision with respect to the selection and to select another proposal, or to cancel the RFP, if it is deemed by the Department to be in its best interest to do so.

C.    WAIVERS: Notwithstanding the amendment provisions otherwise set forth herein, the Department reserves the right, at its sole discretion, to waive any minor irregularity in an otherwise valid proposal which would not jeopardize the

3

overall program and to award a contract on the basis of such a waiver in the event the Department determines that such award is in the best interest of the Department. Minor irregularities are those which will not have a significant adverse effect on overall program cost or performance.

D.    NEGOTIATIONS: The Department reserves the right to negotiate with any vendor whose proposal is within the competitive range with respect to technical plan and cost.

E.    DISCLAIMER: Issuance of this RFP does not constitute a commitment by the Department to select any proposal submitted in response to the RFP, or to award a contract to any vendor who responds to the RFP.

F.    NO GUARANTEE OF CONTRACT: Selection of a proposal shall not be binding upon the Department and may or may not, at the Department's sole discretion, result in the Department entering into a contract with the vendor.

G.    ADOPTION OF IDEAS: The Department reserves the right to adopt to its use all, or any part, of a vendor's proposal and to use any idea or all ideas presented in a proposal.

H.    ORAL PRESENTATIONS: The Department reserves the right to require some or all of the vendors to provide oral presentations of their proposals.

I.    AMENDMENTS: The Department reserves the right to amend the RFP. Except as provided above with respect to "WAIVERS" made by the Department, all amendments to the RFP will be made by written addendum issued by the Department and will be mailed to all vendors to whom the RFP was originally mailed, or who have expressed an intent.

*All contracts awarded by this Department are subject to review and approval by the Legislative Oversight Committee and the Governor's Office.*

## III.    SUBMISSION OF PROPOSALS

A.    SIGNATURES: The proposal cover page must contain the original ink signature of the person(s) legally authorized to bind the vendor to the proposal. The original proposal should be **stamped or otherwise annotated** so that the Department can easily identify which bears the original signature.

B.    NUMBER OF COPIES: The vendor must submit **one original proposal and five (5) copies** of the proposal.

C.    NATURE AND FORMAT OF PROPOSALS: To be considered, the proposal must be concise; describe the vendor's ability to meet the RFP requirements; comply with the time specifications of the RFP; and, provide a specific schedule of implementation that is consistent with the time constraints specified in the RFP. The proposal must also be responsive to the content and format specifications, in sequence, specified in the RFP. All material submitted in response to this RFP shall become the property of the Department.

4

1.  Vendors should use exclusively 8½ x 11 white paper, proposals should be single-spaced, typed using Times New Roman (font) and a minimum font size of 12. *Double space between paragraphs.* Vendors should avoid the use of elaborate bindings and promotional materials within the proposal.

2.  The proposal must include a completed **Proposal Cover Page** (Attachment E) with an original signature of the person(s) legally authorized to bind the vendor to the proposal. All items on this form must be completed. **(Do not number this page).**

3.  The Proposal Cover Page should be followed by the completed and signed **Request for Taxpayer Identification Number** (Attachment C) form enclosed with the RFP. All items on this form must be completed. **(Do not number this page).**

4.  The Request for Taxpayer Identification Number form should be followed by the **Program Narrative.** Number the pages of the Program Narrative, beginning the narrative with page 1. Page numbers should be aligned at the right corner in the bottom margin. The Program Narrative must follow the outline prescribed in the RFP.

5.  The Program Narrative should be followed by a **Compensation for Providing Services Plan** as outlined in Section V.

6.  The Compensation for Providing Services Plan should be followed by a completed copy of the **Disclosure Statement.** All items on this form must be completed.

7.  The Disclosure Statement should be followed by a copy of the **current child placing agency license (Alabama) or a copy of the application submitted to State DHR to complete licensing by Tuesday, June 07, 2005.**

D.  WORK PRODUCT: The proposal must be the work product of the vendor. If the proposal is determined not to be the work product of the vendor, the proposal may, at the Department's sole discretion, be rejected.

E.  PROPRIETARY INFORMATION: Proprietary information submitted to the Department in response to this RFP will be handled in accordance with the applicable procurement regulations and laws of the State of Alabama. The vendor must clearly designate any page(s) to which it has a proprietary claim in the proposal by indicating on each page in bold type at the top and bottom as "Confidential" and include a confidentiality statement on the Proposal Cover Page. There is no guarantee that pages marked "Confidential" will be kept confidential if disclosure of the information is required under Alabama Law.

Cost information shall not be confidential. Designating the entire proposal confidential or proprietary is not acceptable and may cause the Department to reject the proposal.

5

IV.    **PROGRAM NARRATIVE**

The Program Narrative must follow the specified format, which includes IV-A through IV-I, below. **(Not to exceed 50 pages)**

A.    ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE: Provide a brief summary about the applicant's organization, including the following:

1.    ORGANIZATION INFORMATION: Include the name of Organization, complete mailing address and street address or physical location of site, name, title and phone number of contact person.

2.    GOVERNING BOARD AND OTHER AGENTS: The names, titles and responsibilities of all of the applicant's governing board of directors, officers, and paid consultants, delineating each individual's role and relationship to the vendor.

3.    HISTORY: A brief history of the formation and development of the applicant's organization, with the date of incorporation or, if unincorporated, the date the business began; other programs operated in the past and currently; and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

4.    MISSION STATEMENT: Provide a brief statement regarding the goals of the Organization or its' mission statement.

5.    MANAGEMENT STRUCTURE: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organizational chart. Ratios of staff to supervisors should be clearly indicated.

6.    FINANCIAL AUDIT: The date of the most recent financial audit and name of the audit firm.

7.    QUALIFICATIONS AND EXPERIENCE OF VENDOR: The vendor qualifications and experience for assuring the successful completion of the requirements of this RFP. It must include a description of past or current experience providing the proposed service and, as applicable, the rate of successful completion by previous program participants. A list of persons with addresses, telephone numbers and e-mail addresses who are familiar with the delivery of similar services by the vendor to the Department in the past or to other programs similar to that of the Department, if any. It must further describe any licenses and/or certifications held by the vendor.

B.    START UP PLAN: All vendors must provide a plan of action detailing the steps necessary to reach program operation including target dates. New programs will necessarily require a start up plan of greater scope but all proposals from providers with a current contract with the Department must include start up plans,

6

and must describe changes to the existing program structure as required to meet the terms of this RFP.

C.   REFERRAL, ADMISSION and EXCLUSION POLICY:

   1.   Describe specific target population of children accepted into the program, to include, age, sex and type(s) of behavior.

   2.   Describe specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

   3.   Describe specific criteria for exclusion from the program.

D.   SERVICE DELIVERY: Describe the delivery of service proposed by the vendor to meet, or exceed, the Core Services outlined in Attachment A of this RFP and the provisions of the *Therapeutic Foster Care Manual*. The proposal should outline how the agency will serve the birth family or relatives while the child is in the therapeutic out-of-home placement to reduce the length of stay. It is expected that a child should be ready to step-down in the level of service that is needed to meet his/her needs by six (6) months, at which time he may continue his treatment goals in the context of family. Should a child need a longer length of stay, the proposal should clearly define what the provider will do to ensure that goals are expeditiously achieved in a designated timeframe thereafter.

E.   TARGET AREA: Identify the geographic scope for the service by naming the **specific region** and specific counties within each identified region for which the service is proposed. Contracts will be awarded based on the following criteria:

   **Region 1:** (Pike, Barbour, Henry, Houston, Dale, Coffee, Covington, and Geneva Counties)   **62 slots**

   **Region 2:** (Mobile, Baldwin, Escambia, Monroe, Washington, Clarke and Choctaw Counties)   **125 slots**

   **Region 3:** (Autauga, Dallas, Lowndes, Montgomery, Wilcox, Crenshaw, Butler and Conecuh Counties)   **97 slots**

   **Region 4:** (Coosa, Tallapoosa, Chambers, Elmore, Macon, Lee, Bullock and Russell Counties)   **87 slots**

   **Region 5:** (Pickens, Tuscaloosa, Bibb, Perry, Hale, Greene, Sumter and Marengo Counties)   **88 slots**

   **Region 6:** (Jefferson, Shelby, Chilton, Talladega, Clay, Randolph and Cleburne Counties)   **413 slots**

   **Region 7:** (Marion, Lamar, Fayette, Walker, Winston, Cullman and Blount Counties)   **54 slots**

   **Region 8:** (St. Clair, Calhoun, Etowah, Cherokee, DeKalb and Marshall Counties)   **150 slots**

7

**Region 9:** (Jackson, Madison, Morgan, Limestone, Lawrence, Lauderdale, Colbert and Franklin Counties) **134 slots**

Additionally, each county in a region must have at least two (2) therapeutic foster homes and more based upon the needs of the county. Madison, Walker, Etowah, Calhoun, Tuscaloosa, Jefferson, Lee, Montgomery, Dallas, Mobile, and Houston must have adequate resources to serve their children within their county boundaries.

F.    DISCHARGE POLICY:



1.    Describe the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements. The proposal should explain the means that a child's placement will be tracked to the extent possible at 6-month, 12-month, 18-month and 24-month intervals post-discharge. It should also clearly delineate what aftercare services will be provided post-discharge. Services that will be provided to family to expedite the discharge of the child from the out-of-home placement should be clear and detailed.

2.    State the program's policy on discharge prior to program completion, including emergency discharges.

3.    State the program's policy concerning re-admission of children.

4.    Provide an example of the program's process for moving children through the goals and objectives outlined in an ISP, to include provisions of "step down" to a less restrictive placement. The proposal must indicate how the agency will implement the step-down policy as outlined in the *Therapeutic Foster Care Manual.*

G.    PRIOR EXPERIENCE: Describe the Organization's prior history of providing the core service(s) and Family Services requirements outlined in Attachment A.

H.    STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS and TRAINING REQUIREMENTS:

1.    Describe staffing patterns, including administrative and programmatic, and provide a brief rationale for the levels of staffing proposed.

2.    Provide information regarding the qualifications, including education and licensure and experience required for Administrative, Program and Treatment staff. Include job descriptions for proposed positions.



3.    Describe in detail the steps that the program owners and/or administrators take to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into question the propriety of that employee's working with this population of children. Provide documentation that each employee has had a criminal

8

background check. If an incident or allegation is reported, founded or unfounded, describe your organization's general procedure in this regard.

4. Describe in detail the level of education, experience and training possessed by management level staff in the provision of services identified in this RFP. Specify the organization's staff development program regarding orientation and on going training for all staff.

5. Describe how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Provide a specific plan addressing emergencies and critical incident response.

6. Describe the use of volunteers and interns within the organization and how they are selected and screened for background checks.

7. Describe in detail the plans to meet the training requirements established in the Department's rules and training related to operating this selected program.

I. REFERENCES: List all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. This list should include the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring. DHR will be responsible for contacting these agencies for reference information.

## V. COMPENSATION FOR PROVIDING SERVICE

A. As a part of the vendors response to the RFP, it is a requirement that you submit the total amount of compensation that the agency requires to provide this placement with the program requirements and core services outlined in Attachment A. The compensation should be listed as a daily rate per child and the number of beds offered at this rate.

B. It is expected that all vendors, who are awarded contracts, as a result of this RFP, possess a thorough knowledge of Chapter 105 of the Medicaid Provider Manual. The vendor must certify that they have the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'06.

C. Accordingly, the vendor should identify the portion of the daily rate submitted in Section V-A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section V-A above. The Department specifically reserves the right to determine the percentage of the total compensation that a vendor will be required to recover from "Net Medicaid Reimbursement" for Medicaid eligible children.

9

1.    "Net Medicaid Reimbursement" is determined by applying the Federal Medical Assistance Percentage (FMAP) to the total Federal Medicaid reimbursements received by the Department, as a result of Vendor billing, less a two percent (2%) administrative fee.

## VI.    SELECTION

A.    GENERAL: The Department will review proposals received from eligible vendors in response to this RFP and, if a selection is made, will make its selection in accordance with the general criteria defined below. Failure of the vendor to provide information required in the RFP may result in the disqualification of the proposal.

B.    REJECTION OF A PROPOSAL AS NON-RESPONSIVE: A proposal must meet the basic requirements for delivery of services in order to be considered in the selection process. A proposal may be found non-responsive at any time during the selection process. Once a proposal is determined to be non-responsive, no further consideration is given in the selection process to that proposal. A proposal that is not presented in the required format, does not contain all the requested information, contains clearly erroneous information, or is deficient in any respect may be rejected as non-responsive and may receive no further consideration.

C.    **MANDATORY REQUIREMENTS: Failure of the vendor to meet the following mandatory requirements will result in the disqualification of the proposal.**

1.    Vendor must meet the deadline for receipt of proposal.

2.    Vendor must include a completed Taxpayer Identification Number form.

3.    Vendor must include a completed Disclosure Statement form.

4.    Vendor must possess a current Child Placing Agency license (Alabama) or submit an application with State DHR to complete licensing by June 07, 2005.

5.    Vendor must provide an original proposal, with original signature of person(s) legally authorized to bind the applicant to the proposal, plus the required number of copies per RFP document.

D.    BASIS OF SELECTION: A scoring process, using detailed criteria, will be used to measure the degree to which each proposal meets the following general evaluation criteria, **with a maximum of 1000 points possible:**

1.    Organization Information and Management Structure as described in Section IV–A. (Maximum of 25 points)

2.    Start up Plan as described in Section IV-B. (Maximum of 50 points)

3.    Referral, Admission and Exclusion Policy as described in Section IV-C. (Maximum of 75 points)

10

4.    Service Delivery as described in Section IV-D. (Maximum of 250 points)

5.    Target Area as described in Section IV-E. (Maximum of 50 points)

6.    Discharge Policy as described in Section IV-F. (Maximum of 75 points)

7.    Prior Experience as described in Section IV-G. (Maximum of 75 points)

8.    Staff Qualifications, Staff Recruitment, Job Descriptions and Training Requirements as described in Section IV-H. (Maximum of 150 points)

9.    References as described in Section IV-I. (Maximum of 50 points)

10.   Compensation for providing services as described in Section V (Maximum of 200 points)

11.   The Department may determine other criteria, in addition to, or in lieu of, the criteria described above, as the Department deems necessary and appropriate.

E.    HOLD BACK: As a guarantee for the delivery of services required by this RFP, and the acceptance by the Department of those services in accordance with the specifications set forth in the RFP, in the event the contractor fails to deliver or perform the said services to the Department's satisfaction, the Department reserves the right to withhold part or all of any funds committed by the Department under any contract that may result from a proposal submitted in response to this RFP and to cancel the said contract without any resulting liability, present and future, to the Department or to the State of Alabama.

## VII.   VENDOR CERTIFICATIONS

A.    By submitting a proposal in response to this RFP, the vendor warrants and represents to the Department that the vendor accepts and agrees with all of the terms and conditions of the RFP. Further, by so submitting the vendor certifies to the Department that the applicant is legally authorized to conduct business within the State of Alabama and to carry out the services described in this RFP, and that all of the following statements are true and correct.

B.    REVOLVING DOOR POLICY: Neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants or employees is a current employee of the Department, and none of the said individuals have been employees of the Department in violation of the revolving door prohibitions contained in the state of Alabama ethics laws.

C.    DEBARMENT: Neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants or employees (whether paid or voluntary) is debarred or suspended or otherwise excluded from or ineligible for participation in federal assistance programs under Executive Order 12549, "Debarment and Suspension."

11

D.    STANDARD CONTRACT: The vendor will agree to the use of the Department's standard contract document. The vendor will further comply with all the terms and conditions of that document, including, but not limited to, compliance with the Title VI of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, as amended, the Americans with Disabilities Act, Alabama Act No. 2000-775 (governing individuals in direct service positions who have unsupervised access to children), the Health Insurance Portability and Accountability Act of 1996 (HIPPA) as applicable, and all other federal and state laws, rules and regulations applicable to receiving funds from the Department to carry out the services described in this RFP. Further, any contract executed pursuant to the RFP shall be subject to review by the Department's legal counsel as to its legality of form and compliance with State contract laws, terms and conditions, and may further be subject to review by the Alabama Legislative Contract Review Committee, Examiners of Public Accounts, the State Finance Director and the Office of the Governor.

E.    CHARITABLE CHOICE (applies to faith-based organizations only): The vendor will not use funds received from the Department for sectarian instruction, worship, proselytizing or for any other purely religious activities that are not directed toward the secular social goals related to the services described in this RFP. The vendor will also serve all eligible members of the public without regard to their religious beliefs and, further, will not require clients' active participation in any religious practice. (In carrying out the said services, the vendor will remain independent from federal, state and local governments; will retain control over the expression of its religious beliefs, and is NOT required to remove its religious writings or symbols or to alter its internal governance as a condition of doing business with the Department.)

F.    FINANCIAL ACCOUNTING: The vendor's accounting system is consistent with General Accepted Governmental Accounting Principles (GAAP). Further, the vendor maintains sufficient financial accounting records to allow the vendor to account for and document the source and application of all funds from all sources, including, as applicable, required matching funds.

G.    FINANCIAL AUDIT: The vendor will, upon the Department's request, provide the Department a copy of its most recent financial audit report. (The report should not be submitted with the proposal.)

H.    PROPOSAL LIFE: The proposal submitted to the Department in response to this RFP will be binding on the applicant for ninety (90) calendar days following the due date prescribed in the RFP.

12

## ATTACHMENT A

**DEFINITION:** Therapeutic foster care (TFC) is a least-restrictive, community-based program for children whose special needs can be met through services delivered primarily by trained therapeutic foster parents working in partnership with the child, the child's family and the other members of the Individualized Service Planning Team. TFC is not meant to be a long-term placement option but should be an intervention, which serves to meet a child's specific treatment needs until he/she is able to step-down to a lower level of placement *as determined by the family's ISP.*

Children served in a TFC foster home must have a DSM-IV diagnosis on Axis I that would require the treatment and structure offered through a TFC placement. The diagnosis must have an accompanied behavior, which requires an out-of-home therapeutic foster home setting as determined by a standardized assessment tool implemented by State DHR. Only children who are in the custody of DHR may be served by this contract.

Families, whose children are placed in TFC, should be offered services, which are remedial in nature, to enable children to return home or to the home of relatives safely, where continued therapy will be provided to the family as a unit.

### CORE SERVICES FOR STANDARD TFC CATEGORY OF CARE

#### Services to Foster Children from the TFC Agency

- *Matching process for children and their families identifying needs of the child/family and strengths of prospective TFC parents for initial placements and moves within a TFC program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care services.
- *Pre-placement visits. As placements in TFC homes should not be a crisis placement, pre-placement visits should occur to make sound decisions for appropriate matching. Pre-placements visits must be documented as such in the child's and foster parent records at the TFC agency.
- *Schedule and coordinate the child's treatment plan; initial treatment plan within 10 days, comprehensive treatment plan within 30 days and reviews every 90 days. All treatment plans developed by the agency should be coordinated with the DHR county social worker and based upon the goals established in the child's Individualized Service Plan (ISP). The TFC agency is required to obtain a copy of the Comprehensive Family Assessment/Intake Evaluation form and an ISP from the referring county DHR office. **(DHR staff is required to complete Intake Evaluations on all children in TFC placements. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days.)**
- *Individual, weekly visit with the TFC child. **(This contact does not negate the requirement for DHR staff to make face-to-face contact minimally once per month with children in TFC placements.)**
- Monthly face-to-face or telephone contact with school (minimum) to monitor the child's progress.
- Monthly face-to-face or telephone contact with child and/or family therapist (minimum) to monitor progress in counseling.
- *Assist in referral to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.

13

- Assist the child with the development or maintenance of skills by the provision of no more than 18 hours weekly of individual basic living skills training and no more than 5 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas must be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.
- Coordinate the child's involvement in at least one extracurricular activity, e.g., band, karate, various sports, Boy or Girl Scouts, etc. per the family's ISP. **(This does not include paying for the activity or materials required in the performance of the activity. DHR shall be responsible for payment of the activity from flex or other available local funds.)**
- *Attend ISPs and IEP's along with the child and therapeutic foster parents.
- Assist in the development of independent living skills, as identified in the ISP. **(DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.)**
- Provide monthly group therapy (counseling) sessions for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.
- Provide five hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.
- *Discharge planning shall be a part of the agreement/ISP when a child first enters care with the TFC program.
- Maintain a no-reject/no-eject policy for children who meet program criteria.
- Provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.
- Regularly administer outcome measures, at a minimum of every 90 days.
- Monthly report to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.
- Maintain regular communication with DHR, counselors, teachers and other persons relevant to the child that is being served by the program.
- Quality assurance component, which includes outcomes, measures for all children in the TFC program
- Ensure program compliance with <u>Minimum Standards for Child Placing Agencies</u>, <u>Minimum Standards for Foster Family Homes</u>, and the <u>Therapeutic Foster Care Manual.</u>
- *Assistance in creating a behavior management plan for the child with the other members of the ISP team. All TFC agencies shall maintain staff that have expertise in the development of such plans. **(DHR shall assume the responsibility that behavioral management plans have been completed on all children that require them.)**
- *Participation in the ISP team in determining goals for children and their families, including allowances, need for clothing, observance of special occasions, etc. **(DHR shall be fiscally responsible for clothing allowance above the board payment, allowances, gifts for special occasions, etc. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days)**

### Services to Birth Families or Relatives of Children in TFC Placements:
- *Be an active participant in the assessment of parental functioning to assist the ISP team in determining treatment goals for a safe placement of the child back with the family, when return to parents is the goal, or with relatives, when relative placement is the goal.

14

- *Assist with the implementation of the goals of the family as identified in the ISP to expedite the child's safe return home. This will include making referrals to appropriate resources, when the agency is not able provide the service in-house.
- *Provide 2 hours per week of therapeutic visitation coaching with families and their children who are in TFC placements to assess the parents' ability to safely care for their children and to determine the progress (or lack thereof) in attaining the goals for re-unification or relative placement.
- *Provide family support to birth family as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's illness and how to help the child be maintained in the community by providing education about the child's illness, expected symptoms, medication management, parenting support, educational advocacy and/or to encourage school success, as identified in the family's ISP.

### Services to TFC Families From the TFC Agency:

- Daily difficulty of care payment as identified in the contract between the agency and the foster parent. A minimum daily rate of $16.00 per day is required. There is no requirement regarding the maximum a foster parent may be paid as a daily rate for care. All contracts between foster parents and the TFC agency are considered subcontracting arrangements and, therefore, require prior approval from State DHR. The standard document, not each individual document, is subject to this approval.
- Forty hours pre-service training, including GPS, to TFC families prior to licensure.
- Twenty-four hours of annual training to each TFC parent.
- Monthly support group/meeting for therapeutic foster parents.
- Ensure homes comply with Minimum Standards for Foster Family Homes.
- Conduct annual license renewal and semi-annual visits.
- Weekly face-to-face contact/support to foster families to strengthen their ability to provide a safe nurturing environment for the child.
- On-call crisis intervention.
- Forty-eight hours respite per month. For respite periods longer than 48 hours, the agency and foster parents shall have in their contractual agreement how respite will be paid. The county department will not be billed for respite.
- *Reimbursement for mileage to the TFC child's appointments, visits, etc. if the destination is outside a fifty (50) mile radius from the foster home. **(For special circumstances, which are clearly delineated in the ISP on rare occasions, county departments may authorize mileage to be paid through the county department.)**
- Assistance with transportation of child, when needed.
- Assistance with and ensuring that required Medicaid documentation of provided billable services is being properly maintained and in compliance with all policy and billing guidelines per the Medicaid Provider Manual, Medicaid Rehabilitative Services, Chapter 105.
- Have staff available to TFC families and children 7 days per week, 24 hours per day.

**All bulleted points (*) require intense collaboration with DHR.**

**DHR will be responsible for many services that have traditionally been provided by TFC providers. These are highlighted in BOLD within the bulleted section above. Should the ISP team agree that these services are needed, and the TFC agency agrees to provide them, they must be authorized by the ISP document and an 1878 completed to authorize**

15

payment. All services, whether core or ancillary, must be authorized by the ISP document with outcomes identified to a specific area of need.

**CORE SERVICES FOR STEP-DOWN TFC CATEGORY OF CARE (contingent on 50% reduction in TFC provider's daily rate for Step-Down TFC category of care)**

### Services to Foster Children from the TFC Agency

- *Matching process for children and their families identifying needs of the child/family and strengths of prospective TFC parents for initial placements and moves within a TFC program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care services.
- *Schedule and coordinate the child's treatment plan; initial treatment plan within 10 days, comprehensive treatment plan within 30 days and reviews every 90 days. All treatment plans developed by the agency should be coordinated with the DHR county social worker and based upon the goals established in the child's Individualized Service Plan (ISP). The TFC agency is required to obtain a copy of the Comprehensive Family Assessment/Intake Evaluation form and an ISP from the referring county DHR office. **(DHR staff is required to complete Intake Evaluations on all children in TFC placements. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days.)**
- *Individual, *bi-weekly* visit with the TFC child. **(This contact does not negate the requirement for DHR staff to make face-to-face contact minimally once per month with children in TFC placements.)**
- Quarterly face-to-face or telephone contact with school (minimum) to monitor the child's progress.
- Quarterly face-to-face or telephone contact with child and/or family therapist (minimum) to monitor progress in counseling.
- *Assist in referral to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.
- Assist the child with the development or maintenance of skills by the provision of no more than 9 hours weekly of individual basic living skills training and no more than 3 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas must be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.
- Coordinate the child's involvement in at least one extracurricular activity, e.g., band, karate, various sports, Boy or Girl Scouts, etc. per the family's ISP. **(This does not include paying for the activity or materials required in the performance of the activity. DHR shall be responsible for payment of the activity from flex or other available local funds.)**
- Attend ISPs and IEP's along with the child and therapeutic foster parents.
- *Provide family support with birth family/supervise family visitation as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's illness and how to help the child be maintained in the community by providing education about the child's illness, expected symptoms, medication management, parenting support, therapeutic visitation support, educational advocacy and/or to encourage school success, as identified in the family's ISP. It is expected that if the child's permanent plan is to return home, more time may be spent in family support when a child has reached a step-down level. **(DHR has the responsibility to**

16

**recruit traditional foster homes for children for who return to home or placement with relatives is not an option. It is not expected that all children in TFC shall step-down within the TFC program.)**

- Assist in the development of independent living skills, as identified in the ISP. **(DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.)**
- Provide group therapy (counseling) sessions, only as needed, for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.
- Provide 3 hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.
- *Discharge planning.
- Maintain a no-reject/no-eject policy for children who meet program criteria.
- Provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.
- Regularly administer outcome measures, at a minimum of every 90 days.
- Monthly report to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.
- Maintain regular communication with DHR, counselors, teachers and other persons relevant to the child that is being served by the program.
- Quality assurance component, which includes outcomes, measures for all children in the TFC program
- Ensure program compliance with <u>Minimum Standards for Child Placing Agencies</u>, <u>Minimum Standards for Foster Family Homes</u>, and the <u>Therapeutic Foster Care Manual.</u>
- *Assistance in creating a behavior management plan for the child with the other members of the ISP team. All TFC agencies shall maintain staff that have expertise in the development of such plans. **(DHR shall assume the responsibility that behavioral management plans have been completed on all children that require them.)**
- *Participation in the ISP team in determining goals for children and their families, including allowances, need for clothing, observance of special occasions, etc. **(DHR shall be fiscally responsible for clothing, allowances, gifts for special occasions, etc. Copies of the assessment and ISP MUST be provided to TFC agencies within 10 days)**

### <u>Services to TFC Families From the TFC Agency:</u>

- Daily difficulty of care payment as identified in the contract between the agency and the foster parent. A minimum daily rate of $8.00 per day is required. There is no requirement regarding the maximum a foster parent may be paid as a daily rate for care. All contracts between foster parents and the TFC agency are considered subcontracting arrangements and, therefore, require prior approval from State DHR. The standard document, not each individual document, is subject to this approval.
- Twenty-four hours of annual training to each TFC parent.
- Monthly support group/meeting for therapeutic foster parents.
- Ensure homes comply with <u>Minimum Standards for Foster Family Homes.</u>
- Conduct annual license renewal and semi-annual visits.
- *Bi-weekly* face-to-face contact/support to foster families to strengthen their ability to provide a safe nurturing environment for the child.
- On-call crisis intervention.

17

- Twenty-four (24) hours respite per month. For respite periods longer than 48 hours, the agency and foster parents shall have in their contractual agreement how respite will be paid. The county department will not be billed for respite.
- *Reimbursement for mileage to the TFC child's appointments, visits, etc. if the destination is outside a fifty (50) mile radius from the foster home. **(For special circumstances, which are clearly delineated in the ISP on rare occasions, county departments may authorize mileage to be paid through the county department.)**
- Assistance with transportation of child, when needed.
- Assistance with and ensuring that required Medicaid documentation of provided billable services is being properly maintained and in compliance with all policy and billing guidelines per the Medicaid Provider Manual, Medicaid Rehabilitative Services, Chapter 105.
- Have staff available to TFC families and children 7 days per week, 24 hours per day.

**\*All bulleted points (\*) require intense collaboration with DHR.**

**DHR will be responsible for many services that have traditionally been provided by TFC providers. These are highlighted in BOLD within the bulleted section above. Should the ISP team agree that these services are needed, and the TFC agency agrees to provide them, they must be authorized by the ISP document and an 1878 completed to authorize payment. All services, whether core or ancillary, must be authorized by the ISP document with outcomes identified to a specific area of need.**

18

**ATTACHMENT B**

**REQUEST FOR PROPOSALS re: THERAPEUTIC FOSTER CARE FOR CHILDREN**

The projected timetable is shown below; **all times are shown as Central time.** The Department reserves the right to amend the RFP timetable in the State's best interest. If the Department finds it necessary to change any of these activities/dates/times, all changes will be posted to the web at www.dhr.state.al.us. **Potential Vendors should refer to the web site often for changes to the RFP.**

Proposed Time Table:

| Activity | Date & Time | Location and/or Contact Staff |
|---|---|---|
| RFP Issued by DHR | February 28, 2005 5:00pm | Department of Human Resources Gordon Persons Bldg. – 2nd Floor 50 Ripley St. Montgomery, Al  36130-4000 Internet:  https://www.dhr.state.al.us |
| Deadline for Receipt of Written Letter of Intent to Propose | March 18, 2005 | Department of Human Resources Starr Stewart - Policy, Planning and Research Gordon Persons Bldg. – Suite 2104 50 Ripley St. Montgomery, Al  36130-4000 |
| Deadline for Receipt of Written Inquires from Proposers | March 18, 2005 5:00 p.m. | DHR - Attn: Starr Stewart Policy, Planning and Research Internet:  ssstewart@dhr.state.al.us |
| Deadline for DHR to Respond To Written Inquires | March 25, 2005 | Inquires will be posted on the DHR website. |
| Vendors Conference | March 29, 2005, 1:30pm – 3:30 p.m. | Department of Human Resources (Gordon Persons Building, Plaza Level – Auditorium ) |
| Deadline for Receipt of Proposals from Vendors | April 11, 2005 12:00 Noon | Starr Stewart - Policy, Planning and Research DHR – Gordon Persons Bldg. – Office # 2104 |
| Evaluation and Selection of Technical Proposals | April 18-22, 2005 | Starr Stewart (Scoring and Selection Teams will be established |
| Posting of Notice of Intent To Award a Contract(s) | May 05, 2005 5:00 p.m. | Starr Stewart - Policy, Planning and Research |
| Meeting with selected vendors | May 26, 2005 | Gary Mitchell, Program Manager Susan Ward, Director |
| All providers must have a current license or completed a Child Placing Agency license application | June 07, 2005 | Gloria Derico, Licensing |
| Finalize all Contract Documents & Budgets (Note: 3 yr. Contracts w/Annual Budgets) | August 05, 2005 | Susan Ward, Director Office of Contracts & Federal Claiming |
| Contract Start Date | October 1, 2005 | |

19

## ATTACHMENT C

**STATE OF ALABAMA**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER**
**STATE COMPTROLLER'S OFFICE**

INSTRUCTIONS.    In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files.  To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.    In PART 1 below provide your Tax Identification Number and check FEIN or SSN.  Also provide the name and address to which payments should be sent.  In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.    Circle the business designation that identifies your type of trade or business in PART 2.
3.    Sign and return this form as part of the response to the RFP:

PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER _____
Check one    _____    Federal Employer Identification Number (FEIN)
             _____    Social Security Number (SSN)

NAME OF ORGANIZATION: _____    PHONE: _____

LEGAL BUSINESS ADDRESS: _____

FAX: _____    EMAIL: _____

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: _____

PART 2 – BUSINESS DESIGNATION.  Circle the designation that identifies your type of trade or business.

1 -    CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2 -    NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 -    PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 -    SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 -    NONCORPORATE RENTAL AGENT
6 -    GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 -    FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
       (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:    Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____    _____    ( _____ )_____
SIGNATURE                          DATE           TELEPHONE NUMBER
                                                  (If different from above)

_____
TITLE

**PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES**

20

## ATTACHMENT D

## VENDOR DISCLOSURE STATEMENT

A completed copy of the Vendor Disclosure Statement is a **mandatory requirement** to this RFP.

A copy of the Vendor Disclosure Statement is included in all RFP documents that are mailed to vendors.

Note: If the potential vendor has downloaded the RFP document from the Department website, a copy of the Vendor Disclosure Statement can be downloaded from Alabama State Purchasing. The website address for State Purchasing is: www.purchasing.state.al.us.

21

ATTACHMENT E    Alabama Department of Human Resources
## Therapeutic Foster Care Proposal Cover Page

**Organization Information:**

Name of Organization:_____

Address:_____

City:_____State:_____Zip:_____

Telephone:(___)_____Fax: (___)_____

e-mail address:_____

Federal Employer Identification Number (FEIN):_____

Name/title of Authorizing Official:_____

Signature of Authorizing Official:_____Date:_____

**Contact Person Information:**

Name/title of program contact person:_____

Address:_____

City:_____State:_____Zip:_____

Email Address:_____

Telephone:(___)_____Fax:(___)_____

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties_____No. of Slot(s)_____

Region 2: Counties_____No. of Slot(s)_____

Region 3: Counties_____No. of Slot(s)_____

Region 4: Counties_____No. of Slot(s)_____

Region 5: Counties_____No. of Slot(s)_____

Region 6: Counties_____No. of Slot(s)_____

Region 7: Counties_____No. of Slot(s)_____

Region 8: Counties_____No. of Slot(s)_____

Region 9: Counties_____No. of Slot(s)_____

**PROPRIETARY STATEMENT**

Indicate any page(s) to which vendor has a proprietary claim:_____ __ ___

_____

_____

_____

1

<u>SCORING INSTRUMENT</u>

<u>THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN</u>

Vendor Name: *Carrellia Therapeutic Foster & Adoption Agency, L.L.C.*

I.  **MANDATORY REQUIREMENTS**
    Failure of the vendor to provide the following mandatory items will result in the
    disqualification of the proposal.

    |     |                                                                                                                                                   | Yes | No  |
    |-----|---------------------------------------------------------------------------------------------------------------------------------------------------|-----|-----|
    | A.  | Vendor met the deadline for receipt of proposal?                                                                                                  | ___ | ___ |
    | B.  | A completed Taxpayer Identification form is included?                                                                                             | ___ | ___ |
    | C.  | A completed Disclosure Statement form is included?                                                                                               | ___ | ___ |
    | D.  | Proposal contains a copy of current child placing agency license or application to be licensed?                                                   | ___ | ___ |
    | E.  | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

    **Note: If <u>No</u> is checked for any item A through E, provide a brief explanation.** ____

    _____

    _____

    _____

II. **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

    A.  Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.

    B.  History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

    C.  Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

    D.  Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

    **Percent awarded Section II:** __100%__ x 25 max points = __25__ Total


PLAINTIFF'S EXHIBIT 3

### III.    Start Up Plan (50 Points Max)

   A.  Vendor provided a plan of action detailing the steps necessary to reach program
       operation including target dates.
   B.  Providers with current contracts have provided a start up plan and have described
       changes to the existing program structure as required to meet the terms of the
       RFP.

   **Percent awarded Section III:** $\underline{\quad 90\% \quad}$ **x 50 max points =** $\underline{\quad 45 \quad}$ **Total**

### IV.    Referral, Admission and Exclusion Policy (75 Points Max)

   A.  Proposal describes specific target population of children accepted into the
       program, to include age, sex, and type(s) of behavior.
   B.  Proposal includes specific policy and procedure for admission and intake including
       criteria for referral and acceptance into the program.
   C.  Proposal describes specific criteria for exclusion from the program.

   **Percent awarded Section IV:** $\underline{\quad 80\% \quad}$ **x 75 max points =** $\underline{\quad 60 \quad}$ **Total**

### V.    Service Delivery (250 Points Max)

   The proposal describes the delivery of service to meet, or exceed, the Family Services
   Program requirements and Core Services outlined in Attachment A of this RFP.

   A.  Planning Responsibility: Does the proposal narrative support the provider's ability
       to accept DHR as having planning responsibility for the child, indicate that the
       family's ISP will drive all service delivery and have all services comply with the RC
       Consent degree?

   B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the
       facility meets the definition of being a Therapeutic Foster Care provider by
       describing the setting, which provides room, board and the array of services for a
       child.

   C.  Program Services for Therapeutic Foster Care Providers:

       1.  Does the proposal address how the provider plans to participate and/or provide
           meaningful input in the ISP process including scheduling and coordinating the
           child's treatment plan in conjunction with the family's ISP? The following
           timeline will be maintained: the initial treatment plan developed within 10 days
           from admission date; the comprehensive treatment plan developed within 30
           days from admission date; and, a treatment plan review held every 90 days
           thereafter. (Note: The discharge plan shall be developed at the time of
           placement.)
       2.  Does the proposal address how the provider will assist in developing a
           behavioral management plan for the child or youth?
       3.  Does the proposal address how the provider currently completes or plans to
           complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan?  Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4.  Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5.  Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6.  Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7.  Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8.  Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9.  Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided?  Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care?  Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP?  Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling?  Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided?  Does it address how the program will bill for this service?  This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: $80\%$ x 250 points = $200$ Total

## VI. Target Area (50 Points Max)

A. If service is proposed as statewide, is the proposal identified as such?
B. If the service is not statewide, the proposal should identify reasons why.

Percent awarded Section VI: $90\%$ x 50 max points = $45$ Total

## VII. Discharge Policy (75 Points Max)

A. Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
B. The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
C. The proposal describes the vendor's policy concerning re-admission of children.
D. The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

Percent awarded Section VII: $80\%$ x 75 max points = $60$ Total

## VIII. Prior Experience (75 Points Max)

The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

Percent awarded Section VIII: $90\%$ x 75 max points = $67.5$ Total

## IX. Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)

A. The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
B. Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
C. Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
D. The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: *Camellia Therapeutic Foster + Adoption Agency, L.*

I.  **MANDATORY REQUIREMENTS**
    Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

    |   |   | Yes | No |
    |---|---|---|---|
    | A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
    | B. | A completed Taxpayer Identification form is included? | ___ | ___ |
    | C. | A completed Disclosure Statement form is included? | ___ | ___ |
    | D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
    | E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

    Note: If <u>No</u> is checked for any item A through E, provide a brief explanation. ___

    _____

    _____

    _____

II.  **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

    A.  Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.
    B.  History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.
    C.  Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.
    D.  Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

    **Percent awarded Section II: __100%__ x 25 max points = __25__ Total**

III.   **Start Up Plan (50 Points Max)**

     A. Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

     B. Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

     **Percent awarded Section III:** ___90%___ x 50 max points = ___45___ Total

IV.   **Referral, Admission and Exclusion Policy (75 Points Max)**

     A. Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

     B. Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

     C. Proposal describes specific criteria for exclusion from the program.

     **Percent awarded Section IV:** ___80%___ x 75 max points = ___60___ Total

V.   **Service Delivery (250 Points Max)**

The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

     A. Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

     B. Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

     C. Program Services for Therapeutic Foster Care Providers:

          1. Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)

          2. Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

          3. Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. **Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?**

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: ___80%___ x 250 points = _200_ Total

VI.    **Target Area (50 Points Max)**

    A.  If service is proposed as statewide, is the proposal identified as such?
    B.  If the service is not statewide, the proposal should identify reasons why.

    Percent awarded Section VI: ___90%___ x 50 max points = ___45___ Total

VII.    **Discharge Policy (75 Points Max)**

    A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
    B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
    C.  The proposal describes the vendor's policy concerning re-admission of children.
    D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

    Percent awarded Section VII: ___80%___ x 75 max points = ___60___ Total

VIII.    **Prior Experience (75 Points Max)**

    The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

    Percent awarded Section VIII: ___90%___ x 75 max points = _67.5_ Total

IX.    **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

    A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
    B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
    C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children.  The proposal documents that each employee has had a criminal background check.  The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
    D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP.  The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.
F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.
G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: __90%__ x 150 max points = __135__ Total

## X.    References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: __100%__ x 50 max points = __50__ Total

## XI.    Compensation for Providing Service (200 Points Max)

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.
B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.
C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: __100__ x 200 max points = __800__ Total

Total Points awarded:
Section II: 25
Section III: 45
Section IV: 60
Section V: 200
Section VI: 45
Section VII: 60
Section VIII: 67.5
Section IX: 135
Section X: 50

687.5

Section XI: _200_

**Final Points for Proposal:** _887.5_

**Signature of Scorer:** _____    Date: _____

## SCORING INSTRUMENT

### THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: *Camellia Therapeutic Foster & Adoption Agency, L.L.C.*

I. **MANDATORY REQUIREMENTS**
Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
| B. | A completed Taxpayer Identification form is included? | ___ | ___ |
| C. | A completed Disclosure Statement form is included? | ___ | ___ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

**Note: If No is checked for any item A through E, provide a brief explanation.** ____
_____
_____
_____

II. **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

A. Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes, the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B. History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

C. Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D. Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

Percent awarded Section II: __90__ x 25 max points = __22.5__ Total

III.    **Start Up Plan (50 Points Max)**

    A. Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

    B. Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

    **Percent awarded Section III:** _____90_____ **x 50 max points =** _____45_____ **Total**

IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

    A. Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

    B. Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

    C. Proposal describes specific criteria for exclusion from the program.

    **Percent awarded Section IV:** _____90_____ **x 75 max points =** _____67.5_____ **Total**

V.    **Service Delivery (250 Points Max)**

The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

    A. Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

    B. Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

    C. Program Services for Therapeutic Foster Care Providers:

        1. Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)

        2. Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

        3. Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: _____90_____ x 250 points = _____225_____ Total

**VI.    Target Area (50 Points Max)**

    A.  If service is proposed as statewide, is the proposal identified as such?
    B.  If the service is not statewide, the proposal should identify reasons why.

    Percent awarded Section VI: _____90_____ x 50 max points = _____45_____ Total

**VII.   Discharge Policy (75 Points Max)**

    A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
    B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
    C.  The proposal describes the vendor's policy concerning re-admission of children.
    D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

    Percent awarded Section VII: _____10_____ x 75 max points = _____15_____ Total

**VIII.  Prior Experience (75 Points Max)**

    The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

    Percent awarded Section VIII: _____90_____ x 75 max points = _____67.5_____ Total

**IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

    A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
    B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
    C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
    D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.
F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.
G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's Minimum Standard rules regarding training related to operation of this selected program.

**Percent awarded Section IX:** _____ 90 _____ x 150 max points = _____ 135 _____ Total

## X.     References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

**Percent awarded Section X:** _____ 10 _____ x 50 max points = _____ 50 _____ Total

## XI.     Compensation for Providing Service (200 Points Max)

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.
B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.
C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

**Percent awarded for Section XI:** _____ 100 _____ x 200 max points = _____ 200 _____ Total

**Total Points awarded:**

| Section | Points |
|---|---|
| Section II: | 22.5 |
| Section III: | 95 |
| Section IV: | 67.5 |
| Section V: | 225 |
| Section VI: | 95 |
| Section VII: | 75 |
| Section VIII: | 67.5 |
| Section IX: | 135 |
| Section X: | 50 |

Section XI: _____ 200

Final Points for Proposal: _____ 932.5

Signature of Scorer: _____     Date: _____

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: _Camellia Therapeutic Foster & Adoption Agency, LLC_

### I.  MANDATORY REQUIREMENTS

Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  | | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ✓ | |
| B. | A completed Taxpayer Identification form is included? | ✓ | |
| C. | A completed Disclosure Statement form is included? | ✓ | |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ✓ | |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ✓ | |

*no*
*4-18-05*

Note: If <u>No</u> is checked for any item A through E, provide a brief explanation. ____

_____
_____

### II.  ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)

A.  Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B.  History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

C.  Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D.  Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

Percent awarded Section II: ___ _60_ ___ x 25 max points = ___ _15_ ___ Total

**III.    Start Up Plan (50 Points Max)**

  A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.
  B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

  **Percent awarded Section III: _____ ﹩0 x 50 max points = ___ 23ʳ ___ Total**

**IV.    Referral, Admission and Exclusion Policy (75 Points Max)**

  A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.
  B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.
  C.  Proposal describes specific criteria for exclusion from the program.

  **Percent awarded Section IV: ___ 50 ___ x 75 max points = __ 31.5 __ Total**

**V.    Service Delivery (250 Points Max)**

  The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

  A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

  B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

  C.  Program Services for Therapeutic Foster Care Providers:

    1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)
    2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?
    3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4.  Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5.  Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6.  Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7.  Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8.  Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9.  Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

**Percent awarded Section V:** ___*50*___ x 250 points = ___*125*___ Total

## VI.    Target Area (50 Points Max)

    A.  If service is proposed as statewide, is the proposal identified as such?
    B.  If the service is not statewide, the proposal should identify reasons why.

    **Percent awarded Section VI:** ___*80*___ x 50 max points = *40*___ Total

## VII.    Discharge Policy (75 Points Max)

    A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
    B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
    C.  The proposal describes the vendor's policy concerning re-admission of children.
    D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

    **Percent awarded Section VII:** ___*80*___ x 75 max points = ___*60*___ Total

## VIII.    Prior Experience (75 Points Max)

    The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

    **Percent awarded Section VIII:** ___*80*___ x 75 max points = ___*60*___ Total

## IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)

    A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
    B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
    C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
    D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's Minimum Standard rules regarding training related to operation of this selected program.

**Percent awarded Section IX:** ___50___ x 150 max points = ___75___ Total

## X.    References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

**Percent awarded Section X:** ___90___ x 50 max points = ___45___ Total

## XI.   Compensation for Providing Service (200 Points Max)

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

**Percent awarded for Section XI:** _100_ x 200 max points = _200_ Total

**Total Points awarded:**

Section II: ___15___
Section III: ___25___
Section IV: ___37.5___
Section V: ___125___
Section VI: ___40___
Section VII: ___60___
Section VIII: ___60___
Section IX: ___75___
Section X: ___45___

4825

Section XI: _____ 200 _____

Final Points for Proposal: _____ 682.5 _____

Signature of Scorer: _____    Date: _____

## SCORING INSTRUMENT

### THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: *Camellia Therapeutic Foster + Adoption Agency, LLC.*

I.  **MANDATORY REQUIREMENTS**
    Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

    |  |  | Yes | No |
    |---|---|---|---|
    | A. | Vendor met the deadline for receipt of proposal? | ____ | ____ |
    | B. | A completed Taxpayer Identification form is included? | ____ | ____ |
    | C. | A completed Disclosure Statement form is included? | ____ | ____ |
    | D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ____ | ____ |
    | E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ____ | ____ |

    Note: If <u>No</u> is checked for any item A through E, provide a brief explanation. ____

    _____
    _____
    _____

II. **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

    A.  Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.
    B.  History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.
    C.  Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.
    D.  Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

    Percent awarded Section II: ___.80___ x 25 max points = ___20.0___ Total

III.  **Start Up Plan (50 Points Max)**

    A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

    B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

    **Percent awarded Section III:** _____,30_____ x 50 max points = _____15.0_____ **Total**

IV.  **Referral, Admission and Exclusion Policy (75 Points Max)**

    A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

    B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

    C.  Proposal describes specific criteria for exclusion from the program.

    **Percent awarded Section IV:** _____.50_____ x 75 max points = _____37.5_____ **Total**

V.  **Service Delivery (250 Points Max)**

    The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

    A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

    B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

    C.  Program Services for Therapeutic Foster Care Providers:

        1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP?  The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter.  (Note: The discharge plan shall be developed at the time of placement.)

        2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

        3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

**8.** Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: ___.7 0___ x 250 points = __/ 7 5.0__ Total

## VI.    Target Area (50 Points Max)

A.  If service is proposed as statewide, is the proposal identified as such?
B.  If the service is not statewide, the proposal should identify reasons why.

Percent awarded Section VI: ___.5 0___ x 50 max points = __25. 0___ Total

## VII.    Discharge Policy (75 Points Max)

A.  Proposal describes the process and criteria for reunification planning with
    children/families and coordination with the ISP Team; as well as pre-discharge and
    aftercare planning requirements.
B.  The proposal describes the vendor's policy on discharge prior to program
    completion, including emergency discharges.
C.  The proposal describes the vendor's policy concerning re-admission of children.
D.  The proposal provides an example of, or describes the program's process for
    moving children through the goals and objectives outlined in the ISP, to include
    provisions of "step down" to a less restrictive placement.          51.5

Percent awarded Section VII: ___.70___ x 75 max points = ~~52.5~~ Total

## VIII.    Prior Experience (75 Points Max)

The proposal describes the Organization's prior history of providing the core services
and Family Service program requirements as outlined in Attachment A of the RFP.

Percent awarded Section VIII: ___.80___ x 75 max points = __60.0__ Total

## IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training
         Requirements (150 Points Max)

A.  The proposal describes staffing patterns, staff availability, including administrative
    and programmatic, and provides a brief rationale for levels of staffing proposed.
B.  Proposal provides information regarding the qualifications, including education and
    licensure and experience required for administrative, program and treatment staff.
    Job descriptions are included for proposed positions.
C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all
    staff, regardless of level, have not been the subject of any incident or investigation
    which would call into the propriety of that employee's working with this population
    of children.  The proposal documents that each employee has had a criminal
    background check.  The proposal also, describes the organization's general
    procedure regarding if an incident or allegation is reported, founded or unfounded.
D.  The proposal describes, in detail, the level of education, experience and training
    possessed by management level staff regarding the provision of services identified
    in the RFP.  The proposal describes the organization's staff development program
    regarding orientation and on going training for all staff.

E.  The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.
F.  Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.
G.  Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

**Percent awarded Section IX:** _____.90_____ x 150 max points = __13 5.0__ Total

## X.    References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

**Percent awarded Section X:** ____1.00____ x 50 max points = ___50___ Total

## XI.   Compensation for Providing Service (200 Points Max)

A.  Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.
B.  The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.
C.  The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

**Percent awarded for Section XI:** __100__ x 200 max points = __200__ Total

**Total Points awarded:**

| | |
|---|---|
| Section II: | 20.0 |
| Section III: | 15.0 |
| Section IV: | 37.5 |
| Section V: | 175.0 |
| Section VI: | 25.0 |
| Section VII: | 51.5 |
| Section VIII: | 60.0 |
| Section IX: | 175.0 |
| Section X: | 50.0 |

569

Section XI: _____ 200

Final Points for Proposal: _____ 769

Signature of Scorer: _____    Date: _4 / 19 / 05

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: *Camellia Therapeutic Foster & Adoption Agency LLC*

I. **MANDATORY REQUIREMENTS**
Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
| B. | A completed Taxpayer Identification form is included? | ___ | ___ |
| C. | A completed Disclosure Statement form is included? | ___ | ___ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

Note: If <u>No</u> is checked for any item A through E, provide a brief explanation. ____

_____
_____
_____

II. **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

A. Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B. History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

C. Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D. Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

Percent awarded Section II: ___40___ x 25 max points = ___10___ Total

III.    **Start Up Plan (50 Points Max)**

    A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

    B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

    **Percent awarded Section III:** ___*40*___ x 50 max points = ___*20*___ **Total**

IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

    A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

    B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

    C.  Proposal describes specific criteria for exclusion from the program.

    **Percent awarded Section IV:** ___*40*___ x 75 max points = ___*30*___ **Total**

V.    **Service Delivery (250 Points Max)**

The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

    A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

    B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

    C.  Program Services for Therapeutic Foster Care Providers:

        1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP?  The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter.  (Note: The discharge plan shall be developed at the time of placement.)

        2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

        3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: ___3 O___ x 250 points = ___75___ Total

VI.    Target Area (50 Points Max)

   A. If service is proposed as statewide, is the proposal identified as such?
   B. If the service is not statewide, the proposal should identify reasons why.

   Percent awarded Section VI: ___7O___ x 50 max points = ___2O___ Total

VII.    Discharge Policy (75 Points Max)

   A. Proposal describes the process and criteria for reunification planning with
      children/families and coordination with the ISP Team; as well as pre-discharge and
      aftercare planning requirements.
   B. The proposal describes the vendor's policy on discharge prior to program
      completion, including emergency discharges.
   C. The proposal describes the vendor's policy concerning re-admission of children.
   D. The proposal provides an example of, or describes the program's process for
      moving children through the goals and objectives outlined in the ISP, to include
      provisions of "step down" to a less restrictive placement.

   Percent awarded Section VII: ___4O___ x 75 max points = ___3O___ Total

VIII.    Prior Experience (75 Points Max)

   The proposal describes the Organization's prior history of providing the core services
   and Family Service program requirements as outlined in Attachment A of the RFP.

   Percent awarded Section VIII: ___4O___ x 75 max points = ___3O___ Total

IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training
        Requirements (150 Points Max)

   A. The proposal describes staffing patterns, staff availability, including administrative
      and programmatic, and provides a brief rationale for levels of staffing proposed.
   B. Proposal provides information regarding the qualifications, including education and
      licensure and experience required for administrative, program and treatment staff.
      Job descriptions are included for proposed positions.
   C. Proposal describes, in detail, the steps that the vendor takes to ensure that all
      staff, regardless of level, have not been the subject of any incident or investigation
      which would call into the propriety of that employee's working with this population
      of children. The proposal documents that each employee has had a criminal
      background check. The proposal also, describes the organization's general
      procedure regarding if an incident or allegation is reported, founded or unfounded.
   D. The proposal describes, in detail, the level of education, experience and training
      possessed by management level staff regarding the provision of services identified
      in the RFP. The proposal describes the organization's staff development program
      regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.
F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.
G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: ___40___ x 150 max points = ___60___Total

X.   **References (50 Points Max)**

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: ___40___ x 50 max points = ___20___ Total

XI.   **Compensation for Providing Service (200 Points Max)**

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A.  The compensation is listed as the daily rate per child and the number of beds offered at this rate.
B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.
C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: ___100___ x 200 max points = _200_ Total

Total Points awarded:

| Section | Points |
|---|---|
| Section II: | 10 |
| Section III: | 30 |
| Section IV: | 3 d |
| Section V: | 75 |
| Section VI: | 20  20 |
| Section VII: | 30 |
| Section VIII: | 30 |
| Section IX: | 60 |
| Section X: | 20 |

295

Section XI: _____200_____

Final Points for Proposal: _____495_____

Signature of Scorer: _____    Date: _____



ATTACHMENT E          Alabama Department of Human Resources
## Therapeutic Foster Care Proposal Cover Page

**Organization Information:**

Name of Organization: Camellia Therapeutic Foster & Adoption Agency, LLC.

Address: 2310 Crawford Road #104   P.O. Box 788

City: Phenix City          State: AL          Zip: 36868

Telephone: (334-448-2999          Fax: (334-448-1666

email address: ctfa8@cs.com

Federal Employer Identification Number (FEIN): 020574633

Name/title of Authorizing Official: Dr. Joseph Appiah Chairman & CEO

Signature of Authorizing Official: Joseph Appiah          Date: 04-04-05

**Contact Person Information:**

Name/title of program contact person: Karen Jurls/Executive Director

Address: 2310 Crawford Rd. #104 P.O. Box 788

City: Phenix City          State: AL.          Zip: 36868

Email Address: ctfa8@cs.com

Telephone: (334-448-2999          Fax: (334-448-1666

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties _____ No. of Slot(s) _____

Region 2: Counties Mobile _____ No. of Slot(s) 48

Region 3: Counties Montgomery/Dallas _____ No. of Slot(s) 50

Region 4: Counties Russell _____ No. of Slot(s) 16

Region 5: Counties _____ No. of Slot(s) _____

Region 6: Counties Jefferson _____ No. of Slot(s) 100

Region 7: Counties _____ No. of Slot(s) _____

Region 8: Counties _____ No. of Slot(s) _____

Region 9: Counties Madison _____ No. of Slot(s) 100

## PROPRIETARY STATEMENT

Indicate area(s) to which vendor has a proprietary claim: N/A

Alabama Department of Human Resources • 50 Ripley Street • Gordon Persons Building • Montgomery, Alabama 36130

## ATTACHMENT C

**STATE OF ALABAMA**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER**
**STATE COMPTROLLER'S OFFICE**

INSTRUCTIONS.   In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files. To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.    In PART 1 below provide your Tax Identification Number and check FEIN or SSN.  Also provide the name and address to which payments should be sent.  In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.    Circle the business designation that identifies your type of trade or business in PART 2.
3.    Sign and return this form as part of the response to the RFP:

PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER 02-574633

Check one    X        Federal Employer Identification Number (FEIN)
                            Social Security Number (SSN)

NAME OF ORGANIZATION: Camellia Therapeutic Foster Ag.   PHONE (334)448-2999

LEGAL BUSINESS ADDRESS: 2310 Crawford Rd. #104 Phenix City, AL. 36868

FAX: 334-448-1666    EMAIL: ctfa8@cs.com

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: Dr. Joseph Appiah Chairman/CEO

PART 2 – BUSINESS DESIGNATION. Circle the designation that identifies your type of trade or business.

1.    CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2 -    NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 -    PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 -    SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 -    NONCORPORATE RENTAL AGENT
6 -    GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 -    FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
        (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:    Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____    04-05-05    (334 )448-2999
SIGNATURE                            DATE              TELEPHONE NUMBER
                                                                    (If different from above)
Chairman/CEO
_____
TITLE

**PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES**

20

## IV. PROGRAM NARRATIVE

**A.    ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE:**
Provide a <u>brief</u> summary about the applicant's organization:

Camellia Therapeutic Foster Agency, LLC. was founded by Dr. Joseph Appiah. Camellia Therapeutic Foster Agency is a licensed child placing and adoption agency for the state of Alabama. The name Camellia came from Alabama's state flower. Our children are our flowers and they need attention, nourishment, and water, from us to stay healthy. Camellia Therapeutic Foster Agency, LLC. was founded on January 10, 2000 and was incorporated as a limited liability company on January 15, 2002, the start date of Camellia TFA. Its founder had a vision to make a difference in the lives of Alabama's children by starting a new child placement agency with the intent to support foster parents, biological parents, and social workers, in their mission to provide services to youth in need of a therapeutic foster home placement.

Camellia Therapeutic Foster & Adoption Agency LLC. was born out of a desire to provide therapeutic services with kindness, compassion and understanding of true foster children's behavior, and respect to both foster parent and biological families. In 1998 when I completed the GPS training and became a therapeutic foster parent/surrogate parent for the school board, I found out that most foster parents are not made part of the treatment team. Most of them felt that the should be made apart of the ISP and the behavior modification and day to day treatment of the child. Most of the time, some of the foster parent complained that the agencies never say thank you for the services they provide for our therapeutic foster children. Based on that in mind, as a foster parent, I decided to be more understanding, and become a shining example of how the program should be operated.

Camellia Therapeutic Foster Agency, LLC. provides services that offer the least restrictive home environment for children whose special needs can be met by trained therapeutic foster parents, and by a treatment team who are focused on the child's individual needs. Camellia Therapeutic Foster Agency currently has six offices throughout the state of Alabama. Camellia Therapeutic Foster Agency is operated by a board of directors with Dr. Joseph Appiah as the Chief Executive    Officer and Chairman of the Board.

Including the following:

**1.    ORGANIZATION INFORMATION:** Include the name of Organization, complete mailing address and street address or physical location of site, name, title and phone number of contact person.

1

1.    **NAME OF ORGANIZATION:** Camellia Therapeutic Foster and
      Adoption Agency

Physical Address:           2310 Crawford Road #104
                            Phenix City, AL. 36868

Mailing Address:            P.O. Box 788
                            Phenix City, AL. 36868

Contact Person:             Dr. Joseph Appiah
                            **Chairman  of the Board & C.E.O.**
                            (334) 448-2999
                            Karen Jurls, LCSW, PIP
                            **Executive Director**
                            (334) 448-2999

2.    **GOVERNING BOARD AND OTHER AGENTS:** The names, titles, and
      responsibilities of all of the applicant's governing board of directors, officers, and
      paid consultants, delineating each individual's role and relationship to the vendor

**Name:** Dr. Joseph Appiah
**Title:**  Chairman of the Board
**Responsibilities:**      Dr. Joseph Appiah is responsible for overseeing the board of
directors. He acts as the chief executive officer of the agency.
**Role and Relationship to Vendor:**  This member has no relationship to the vendor.

**Name:** Dr. Darell Ellis
**Title:**  Vice President
**Responsibilities:**      Dr. Daryl Ellis is a member of the Board and responsible for the
decision making of the agency and is the Community Affairs Director. (Please see the
attached responsibilities for Camellia's Board of Directors)
**Role and Relationship to Vendor:** This member has no relationship to the vendor.

**Name:** Dr. Agyeman Osei Yeboah
**Title:**  2nd Vice President/Economic & Personnel Director
**Responsibilities:**      Dr. Yeboah is a member of the board and is responsible for the
decision making of the agency relating to personnel matters. (Please see the attached
responsibilities for Camellia's Board of Directors)
**Role and Relationship to Vendor:**  This member has no relationship to the vendor.

2

Governing Board and other Agents (Continued).

**Name:** Justina Okeke LGSW, M.Ed. LPN/Social Worker
**Title:** Board Member
**Responsibilities:**    Mrs. Justina Okeke is a member of the board and is responsible for making sure the social workers/staff have benefits from the agency. She also is the foster home licensure specialist. (Please see the attached responsibilities for Camellia's Board of Directors).
**Role and Relationship to Vendor:**  This member has no relationship to the vendor.

The members of Camellia's Board of Directors are appointed by Camellia's CEO and work independently from other staff members.

**\*Camellia Therapeutic Foster Agency's Board of Directors are responsible for:**
- Articulating the purpose, goal, and functions of the agency.
- Establishing written by-laws governing the   organization, duties and operation of the board.
- Establishing written operating policies concerning organizational structure, personnel practices, and policies of serving children and their families.
- Providing a plan for regular review and updating of goals, policies, purposes and procedures of Camellia
- Acquainting its members with specific requirements of minimum standards, and familiarize itself with and promote progressive philosophies of child care, and seek constantly to provide a professionally sound program for children.
- Employing a qualified executive director and delegate to him/her the responsibility for administration of Camellia
- Being responsible for providing operating and capital funds. Financial policies and practices shall be in accordance with sound budgeting disbursement, and audit procedures.
- Providing evidence that sufficient funds are available to equal twenty-five percent of the projected operating budget for the first full year of operation and annually thereafter.
- When there is a fee for adoption, the board shall establish a fee policy and publish it in the agency's operating policy. Such information shall be provided to
- Individuals and families who are considered using the agency's services.
- Assure that voluntary contributions are not accepted nor solicited from adoptive parents during the placement process and prior to the final order of adoption.
- Approving the annual budget, and revisions, if any to the annual budget, in advance of the applicable fiscal period.
- Providing for proper bonding of board officers and agency employees who handle operating of capital funds
- Providing an opinion audit on an annual basis by a certified public accountant who is not a member of the staff or a board member.
- Providing a copy of the audit to the Department which the chief officer of the board certifies has been presented to the board as a whole.

3

**3.    HISTORY:** A **brief history** of the formation and development of the applicant's organization, with the date of incorporation or, if unincorporated, the date the business began; other programs operated in the past and currently; and prior names of the organization, if any. A **description of all services provided** by the vendor, including the **location of service sites.**

**Brief History of formation and development:**
Camellia Therapeutic Foster Agency, LLC. has been a **licensed child placing** and adoption agency for the state of Alabama for three years.

Camellia Therapeutic was founded in the year 2000 by Dr. Joseph Appiah and was incorporated on January 15, 2002. Camellia Therapeutic Foster Agency' s main goal is to contribute to the  community by being a placement resource for therapeutic foster children that were in need of a safe and nurturing home environment. Camellia provides services to the Alabama Department of Human Resources for therapeutic foster child placements and Adoptions. During its time of operation, Camellia has successfully provided therapeutic placement services to the Department of Human Resources for the state of Alabama. Camellia currently has therapeutic foster homes in five of the state's nine regions. Camellia has plans to expand its services throughout the state. Camellia has retained its name from the date of its incorporation. We have previously and are presently providing all services outlined in the core services for therapeutic foster care programs for the State of Alabama.

## Description of all Services Provided by the Vendor (including the location of service sites)

Camellia Therapeutic Foster Agency's LLC. provides **therapeutic foster placement services,** an intense system of clinical and support services for youth with moderate to severe emotional or behavioral disorders. Camellia services include foster home placement, case management, and the coordination of the child's educational and medical planning. The Camellia foster parents receive extensive training and supervision to assist them in successfully addressing the needs of the child in their home. The family systems approach is integrated in the treatment planning of the child. Please note that during the step-down the child will not be moved from the home. Services will reduced with less financial benefit if the agency deems necessary to cut the daily rate.

The child/family partnership is strengthened in the delivery of our services for the child. Camellia's foster parents and staff are trained on the importance of **the Multi Ethnic Placement Act** in the delivery of services. **Regular foster homes(Code 03)** are also available for children who have stepped down from the therapeutic program. This program utilizes entry-level foster parents to provide short-term and transitional services in their home.

4

### History (Continued).

The children placed in this program often require basic care and the foster parents will need minimal support during this period. Camellia conducts adoptions for both the state and private families. Camellia recruits, trains, licenses, and supervises foster homes or adoption family homes. **Group Preparation and Selection (GPS) training and licensure** is provided to families with no expense to them.

Camellia Therapeutic Foster Agency provides **matching** for the child referred to the agency for placement, which entails looking at the child's strength and needs and the family's strength in order to find the most suitable placement for the child/family.

The Camellia Therapeutic Foster child and foster family are allowed to have a **pre-placement visit** which allows them the opportunity to become acquainted before a decision is made on the placement. The desires of the child, family and the county DHR worker are taken into consideration during this period. Placement is only considered after careful consideration of how well the prospective foster parent can meet the child's needs. Once placement is agreed upon a placement meeting is scheduled with DHR, the child and the family.

Within the first ten days of the child's placement the **intake evaluation** and the **initial treatment plan** is completed by the county's DHR, the **comprehensive treatment plan** is completed within 30 days of the initial treatment plan, and the **treatment plan reviews** occur at every ninety days following the comprehensive treatment plan by the Agency. Camellia coordinates with the DHR worker in developing the child's treatment plan. The child's ISP is thoroughly reviewed in the preparation of his/her treatment plan. Support from all team members allows each child to benefit from intensive treatment and clinical services provided by this team approach. Camellia provides **weekly face-to-face contact** with the child, each child is assigned a family consultant who meets with him/her to discuss any concerns or needs. The Camellia consultants will provide supportive coaching to the child, during these individual meetings. The consultant maintains regular **contact with child's school**; which is done in an effort to support the child's educational development. The consultant act's as an advocate for the child at school. Camellia's consultants attend all educational meetings for the child.

Camellia also provides **basic living skills training**, through the foster parents of the child, areas covered are money management, personal, healthy lifestyle, personal hygiene, laundry, meal preparation, shopping and behavior education that prepare the child for self sufficiency. Support from the consultant is provided to the foster parents on a weekly or as needed basis. Staff are available to the foster parents on a twenty four a day hour basis. Foster parents and Camellia's staff are expected to **attend all ISP's, IEP's,** and any other important meeting regarding the TFC child. They act as the child's representative and offer support to assure that he/she is receiving the most appropriate services available.

5

**History (Continued).**

Camellia encourages the foster parent to enroll the child in at least one **recreational activity** of the child's choice, the Camellia treatment team understand that each child needs some form of physical or other activity that provides them stimulation. Camellia also provides **family support** to the child's birth families and assistance **with visitation** as outlined in the ISP for the family. Camellia's services are centered on the child's individual needs. Camellia Therapeutic Foster Agency attempts to combine the benefits of a healthy functioning foster home with an assortment of specialized supportive services.

Camellia Therapeutic Foster Agency foster parents provide consistent care and serve as role models, disciplinarians, mentors and treatment team members for the child in their care. Camellia's foster parents work closely with the Camellia consultant to review and plan for the child's ongoing care and treatment. Services provided by Camellia Therapeutic Foster Agency to the foster parents are **family support, 24 hours of respite** per month **after hour crisis intervention** monthly **foster parent meetings, support groups, annual foster home re-licensure** and **semi-annual site visits** to the foster family home.

Camellia's staff **assist and coordinates transportation** of the foster child to all **appointments** for medical, dental and counseling. When necessary Camellia's staff will assist with the transportation of the child to his/her appointments. Camellia's staff are available to foster parents on **a twenty-four hour** basis for crisis or emergency situations involving the TFC child. **Family support visits** are made bi-weekly to reinforce parenting skills and encourage the foster parents to maintain a safe and nurturing home environment for the child placed in their home.

**Foster parents are educated** on the use of behavior management. Camellia encourages the foster parents to adhere to the Camellia discipline policy when dealing with inappropriate behaviors in the child placed in their care. Camellia offers monthly foster parent support meetings, reimbursement for travel for a child's appointment over 50 miles, referrals to appropriate resources as needed Other Camellia services provided by Camellia Therapeutic Foster Agency include **crisis intervention, discharge planning, 14 days of notice prior to a child being discharged, respite,** and **quality assurance.** Quality assurance is utilized to measure outcomes, monitor achievement of outcomes, monitor barriers to goals, and prevent the barriers to achieving the goals. Camellia's staff are trained to work closely with the ISP team to determine the goals that are suitable to the child's need.

History (Continued).

## Child and Family Planning Team

Camellia Therapeutic Foster Agency composes a group of individuals to focus on the needs of the family involved in the ISP process. Individuals invited and who make the team are the child's family, the DHR social worker, family friends, relatives or significant others, service providers, foster parents, the child's guardian ad-litem, and school personnel. The team is responsible for evaluating goals and identifying steps to achieve identified outcomes in various areas, including behavior management plans, safety plans and crisis plans.

## Treatment Team

Camellia composes a team for each child in placement that includes the Camellia family consultant, the child, the child's family, the foster parent, the DHR social worker, and the child's teachers, therapist and any other relevant person. This team is responsible for the development of the child's treatment plan within the TFC program and shall ensure that it is congruent with the family's ISP.

## Initial Treatment Plan

DHR completes an Initial treatment plan at the time of each child's admission into the program.
The initial treatment plan is based on early assessment and relationship-building efforts during the first ten days of admission. This plan can serve as the comprehensive treatment plan if enough information is available to prepare an adequate plan.

## Comprehensive Treatment Plan

Camellia completes a comprehensive treatment plan that is completed within thirty days of a child's admission into the program. The plan coordinates short-term and long-term goals with target dates and services to meet the identified goals of the treatment plan. The plan is developed and implemented in a manner to achieve the overall outcomes for the family identified in the ISP.

## Monthly Reports

Monthly reports are provided to DHR in regard to the child placed with Camellia by the 5th of each month. The monthly reports notes the child's progress for the month at home and in school. The report contains any significant events involving the child. The monthly report will document any behavioral or emotional concerns regarding the child at home and at school. The report entails an update on the child's current dental, medical, psychiatric and any other pertinent information. The report lists the child strength and weaknesses, and any contact with the child's family or other relevant other. The crisis plan is outlined, relevant appointments and services provided by Camellia.

7

History (Continued).

**Treatment Plan Review**
A treatment plan review will be completed at every ninety days from the date of the initial treatment plan. The Camellia worker will summarize the child's progress and make any needed changes n the treatment goals and strategies. The treatment plan review will document progress on the child's goals for the month. The Camellia treatment team members are invited and will provide their input.

**Discharge Summary**
Camellia provides DHR with a discharge summary on every child who has been discharged from the program. The discharge summary contains services provided during care, the growth and accomplishments, assessed needs which remain to be met, and recommendations of the services to meet these goals. Date of discharge, reason for discharge, and the name and telephone number and relationship of the person or agency to whom the child was discharged After-care plans will specify the responsibility for follow through.

**Crisis Intervention and Resolution**
This is a two party professional service team, composed of a master's level staff and a bachelor level staff, who in the event of a crisis involving a Camellia TFC child after normal working hours will attempt to bring the situation to a pre-crisis state.

Camellia's crisis staff are available on a twenty four hour basis to respond to any crisis involving the child placed in the Camellia TFC home. The staff will work with the foster parent, child, and any other party to diffuse the situation that has caused the crisis.

**Location of Service Sites**

RUSSELL COUNTY
Camellia Therapeutic Foster Agency
2310 Crawford Road #104
Phenix City, AL 36867
(334) 448-2999/office
(334) 448-1666/fax

MONTGOMERY COUNTY
Camellia Therapeutic Foster Agency
1434 Mulberry Street
Montgomery, AL 36106
(334) 834-4088/office
(334) 834-5888/fax

MADISON COUNTY
Camellia Therapeutic Foster Agency
2019 Sparkman Drive # A
Huntsville, AL 35810
(256) 858-6500/office
(256) 858-0055/fax

MOBILE COUNTY
Camellia Therapeutic Foster Agency
22 North Florida Street
Mobile, AL 36607
(251) 476-5156/office
(251) 476-5245/fax

8

Location of Service Sites (Continued).

JEFFERSON COUNTY
Camellia Therapeutic Foster Agency
3600 6th Avenue South
Birmingham, AL 35222
(205) 595-2760/office
(205) 595-2761/fax

Satellite Office
DALLAS COUNTY
Camellia Therapeutic Foster Agency
1003 Broad Street
Selma, AL 36701
(334) 874-3800/office
(334) 874-3005

4. MISSION STATEMENT: Provide a brief statement regarding the goals of the Organization or its' mission statement.

Camellia Therapeutic Foster Agency's mission statement is "Giving each foster child a place to call home and ultimate unification of birth families". Camellia's mission statement was derived by the desire of its founders to deliver services to place the therapeutic child in the least restrictive environment. Camellia's goal also was to give children placed in foster care a place to call home in a family setting. Camellia Therapeutic Foster Agency plans to provide the best possible care for Alabama's foster children who are entrusted in our care. It is our aim that each child will experience positive and precious lasting memories into their adulthood. The agency will ensure that we never abuse them nor overlook their needs. It is also the agency's goal to work hard to reunite them with their biological parents. Camellia Therapeutic plans to provide an environment that includes Christian values integrated with quality education and parenting to each child placed in our care. Our mission is to seek and discover the individuals need of the whole child focusing on mental, intellectual, physical, social, and above all, spiritual growth.

Our mission also strives to offer support to the families and to encourage family involvement in all areas of their child's life while they are in foster care.

Camellia plans to offer a unique setting where therapeutic foster care takes place in a variety of ways. We want to integrate laughter and tears and the reasons behind them are of utmost importance. We also want the child to feel free to express himself and to dare to dream where children believe in themselves and know they have the possibility to do anything God wants them to be. Our mission and purpose is not based on financial benefit, it is all about making a difference in the life of a child.

The primary goals of the mission statement are to:
- Offer services that provide each child a place to call home in a safe/therapeutic environment.
- Provide intervention that gives children a second chance before placement in a restrictive setting, providing them the most normative environment as appropriate to their treatment plan.

9

**Mission Statement (Continued).**

- Honor the family/child relationship by allowing TFC child to maintain contact with is/her birth families as permitted by the ISP and attend all treatment team meetings.
- Provide culturally competent services that are responsive to the racial and ethnic differences of the children/families served.
- Provide children with behavioral/emotional disturbances individualized services in accordance with their own strengths and needs and that are guided by an individualized service plan.

**5.    MANAGEMENT STRUCTURE:** Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organizational chart. Ratios of staff to supervisors should be clearly indicated.(See page 11 for Camellia's Organizational Chart)

**6.    FINANCIAL AUDIT:** The date of the most recent financial audit and the name of the audit firm.

**DATE OF MOST RECENT FINANCIAL AUDIT:**        February 5, 2005

**NAME OF AUDIT FIRM:**        Chancellor Hoffman C.P.A.

**INDEPENDENT ACCOUNTING SERVICES:**        John Kuforiji, Ph. D
                                                                             Optimal, INC.

**7.    QUALIFICATIONS AND THE EXPERIENCE OF THE VENDOR:** The vendor qualifications and experience for assuring the successful completion of the requirements of this RFP. It must include a description of past or current experience providing the proposed service and, as applicable, the rate of successful completion by previous program participants.

A list of persons with addresses, telephone numbers and e-mail addresses who are familiar with the delivery of similar services by the vendor to the Department, in the past or to other programs similar to that of the Department, if any. It must further describe any licenses and/or certifications held by the vendor.

10

## SECTION IV A PROGRAM NARRATIVE

## MANAGEMENT STRUCTURE

| **Dr. Joseph Appiah**<br>President/Board Chairman |
|---|

| Dr. Darryl Ellis<br>**Vice President**<br>**Children EPSDT Screening & Medical** | Dr. Osei-Yeboah<br>**2nd Vice President**<br>**Budget & Finance/ Employee**<br>**Benefits** | Justina Okeke, LGSW M. Ed, LPN<br>**Licensing Specialist**<br>**Board Member** |
|---|---|---|

| **Administrative Staff** |
|---|

| Camellia's Chain of Command begins with the Executive<br>Director to the Receptionist |
|---|

| Karen Jurls, LCSW PIP<br>**Executive Director** | Katrina Jefferson, MSW<br>**Quality Assurance**<br>**State-Wide Camellia Agencies** | Cathleen Dixon, LCSW PIP<br>**Supervisor of Social Services** |
|---|---|---|

| **Justina Okeke, LGSW**<br>Licensing Specialist |
|---|

| **Latonya Tinsley, MS**<br>Therapist |
|---|

| **Family Consultants** |
|---|

| Kareema Jacobs, MSW |
|---|
| Joselyn Hereford, MSW |
| Eva Ransom, MSW |
| Debra Winston, BSW |
| Lakeisha Bearden, BS |
| Clementine Ellis, BS |

| **Renee Lyles**<br>Medicaid Billing Specialist | **Brenda Ayers**<br>Receptionist/Children Transportation |
|---|---|

**Ratio of Staff to Supervisor:** Camellia Therapeutic Foster Agency, LLC. has one supervisor for every six workers.

11

## Section IV A Program Narrative

Camellia Therapeutic Foster Agency has previously and is currently serving Alabama's Department of Human Resources. We have attempted to develop a positive working relationship with each DHR county in our service area. We plan to continue this relationship with DHR as one of our main goals is to accommodate and delivery service to provide the counties with a safe and therapeutic placement for their child. We feel that we have hired a group of highly professional staff who are able to deliver services for the therapeutic child.(Please see the Vendor/Employee Qualifications below)

- **Vendor/Employee Qualifications to Assure the Successful Completion of the Program:**

| Employee | Title | Credentials |
|---|---|---|
| Agyeman Osei-Yeboah | Personnel Manager | Ph.D. |
| Karen L. Jurls | Executive Director | LCSW, PIP |
| Katrina Jefferson | Statewide Supervisor/QA | MSW |
| Cathleen Dixon | Supervisor of Social Workers/Social Services | LCSW, PIP |
| Latonya Tinsley | Therapist/Manager | MS |
| Kareema Jacobs | Family Consultant | MSW |
| Joselyn Hereford | Family Consultant/GPS Facilitator | MSW |
| Eva Ransom | Family Consultant/Manager | MSW |
| Lakeisha Bearden | Family Consultant | BS |
| Clementine Ellis | Family Consultant/GPS Facilitator | BS |
| Debra Winston | Family Consultant | BSW |
| Justina Okeke | Licensing Specialist | LGSW |
| Renee Lyles | Medicaid Billing | AA |
| Brenda Ayers | Receptionist | Diploma |

A list of our service references are listed below:

**References**

**Laura Parchman, LGSW**
DHR Supervisor
Jefferson County
4500 5th Avenue South
Birmingham, AL. 35233
(205) 918-5169
email: l.parchman@DHR.State.AL.US

**Patti Way, MSW**
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256)-535-4527
email: p.way.@DHR.State.AL.US

**References (Continued).**

**Chuck Evans, MSW**
DHR Supervisor
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4680
**email: c.evans@DHR.State.AL.US**

**Darnell Sharpeson, BSW**
DHR Social Worker
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 517-1410
**email: d.sharpeson@DHR.State.AL.US**

**Jacqueline Griffin, MSW**
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4645
**email: j.griffin@DHR.State.AL.US**

**Mary Ann Wilson, LGSW**
Program Analyst
50 Ripley Street
Montgomery, AL. 36130
(334) 242-1659
**email: m.wilson@DHR.State.AL.US**

**Cherry Jones, MSW**
Program Supervisor
Russell County
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5803
**email: c.jones@DHR.State.AL.US**

**Annie Poles, MSW**
Service Supervisor
Russell County
1003 25th Avenue
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5853
**email: a.poles@DHR.State.AL.US**

**Chasidity Perry, BSW**
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4655
**email: c.perry@DHR.State.AL.US**

**Robin King, MSW**
Jefferson County DHR
4500 5th Avenue South
Birmingham, AL. 35223
(205) 918-5193
**email: r.king@DHR.State.AL.US**

**Licenses and/or certifications held by the vendor.**
Camellia has therapeutic foster care licensure/# 34627 for the periods of March 19, 2005 to March 19, 2007. We also hold certification for "Standard Medicaid .Provider# 339091102" and Step-Down Medicaid Provider #339091202".

**B.     START UP PLAN:** All vendors must provide a plan of action detailing the steps necessary to reach program operation including target dates. New programs will necessarily require a start up plan of greater scope but all proposals from providers with a current contract with the Department must include start up plans, and must describe changes to the existing program structure as required to meet the terms of the RFP.

Camellia Therapeutic Foster Agency, LLC. is currently a licensed child placing agency for the state of Alabama. Camellia has been in operation for to three years at this point. Camellia Therapeutic plans to continue offering our service to the Department of Human Resources. Camellia plans to retain and continue recruiting staff who are both professional and qualified in the area of child development and case management. To continue to meet the needs for placement requests from DHR Camellia will continue recruiting and training foster parents. Camellia plans to assure that our parents first have the desire to care for therapeutic children and then became properly trained to deal with the behaviors of the therapeutic child. The steps necessary to gain and maintain operation are listed as follows.

- **Research:**
  Before becoming a licensed therapeutic foster care provider, in 1992, Camellia obtained material to gain knowledge of the therapeutic foster care system. We researched possible locations for office space and operation, the need for service, and began to develop a relationship with DHR

- **Funding:**
  Prior to start-up Camellia went through the process of acquiring the funds necessary to operate. Enough funding was needed to recruit and maintain staff, maintain office space, and meet full operation for a total of six months before a child could be placed.

- **Advertise:**
  After establishing a need for therapeutic foster care services, and acquiring funds necessary to operate, Camellia through advertisement, began to seek foster parents and staff to provide our program's services. Advertisements were geared towards, foster parents, social workers and DHR.

- **Licensure/Contract:**
  To obtain licensure, Camellia completed an application process and submitted all required paperwork to the office of licensure and contracts at DHR's state office. To maintain operation of agency operations relating to therapeutic foster care, Camellia needs to abide by all rules and regulations set forth. A renewal application will be resubmitted in advance of the expiration date of the current license.

14

**START UP PLAN (Continued).**

- **Office Space:**
  To operate as a therapeutic foster agency Camellia located the proper office space to house staff, and conduct agency business. To meet program operation, Camellia needs adequate office space for daily operations, staff and foster parent training, and the compiling/storing of the child and foster parent/personnel records. Camellia currently has six offices available for agency operations. Local Camellia offices are located in Huntsville, AL, Mobile, AL, Montgomery, AL, Phenix City, AL, Birmingham, AL. and Selma, AL. Each office has a reception area, individual offices for agency staff, a conference room for meetings and trainings, a room designated for file storage which includes file cabinets for housing of foster parents and child records, and restrooms for staff and public use. To maintain these office spaces, Camellia pays monthly rent, electrical bills, water bills, and gas bills.

- **Office Equipment/Supplies:**
  Before Camellia was ready to open its doors, the agency needed to secure office equipment, chairs, computers, office desks, etc. Each Camellia office is equipped with several telephone lines for incoming and outgoing telephone calls. Individual computers and printers are available for each staff members daily use. A fax machine is available for agency transmittal and receiving of documents, and a copy machine is available for copying of agency documents. Camellia has to maintain copier paper, ink pens, paper clips, file folders, file dividers, calculators, business cards for staff, highlighters, markers, pencils, staples, staplers, envelopes, letterhead, and other office equipment to maintain operation of the agency.

- **Medicaid Billing:**
  To continue agency operations, Camellia needs staff and the required system in place in order to bill Medicaid electronically. Camellia currently has the staff and system in place for proper Medicaid billing.

15

**START UP PLAN (Continued).**

- **<u>Maintain Adequate Agency Structure & Daily Operation:</u>**
  The family consultants and social workers will serve as the child, foster parents, and DHR's direct line of communications. They will assure the delivery of the core services. Camellia Staff will conduct intake, and maintain all necessary documentation for the foster parent and child files. The therapist will provide individual, group and family counseling along with crisis intervention to the child and parents, as needed. The Camellia staff supervisors will serve as support for the family consultants, social workers, and therapist, they will provide direction and supervision of all case work that is done. Camellia currently has a Quality Assurance team available for evaluation of agency function. The Quality Assurance staff will provide feedback on the quality of the agency's operation and foster parent/foster child/DHR satisfaction surveys including outcomes and measures of the child in care. Camellia plans to utilize the Quality Assurance staff to monitor staff, foster parent and children performance.

  Describe changes to the existing program structure as required to meet RFP.
  We will hire more staff and recruit quality foster parents to meet the RFP.

  Camellia requires all staff to maintain their daily time in and time out of the office for work arrival departure, home visits, or agency meeting. Camellia currently has a board of directors to monitor the daily operations of the agency. Camellia plans to maintain a board of directors to monitor the agency's operations, create and update agency policy and deal with agency grievances. Camellia currently maintains staff for janitorial services and lawn maintenance. Camellia will need to continue maintaining these staff for the maintenance of the offices indoor and outdoor structure. Camellia will need to maintain staff for intake, case management, supervision of staff, and management of office operations.

- **<u>Foster Parents</u>**
  Camellia will continue recruiting, training and licensing foster homes. To recruit foster parents, Camellia will continue placing ads in local newspapers, producing agency brochures/fliers, purchasing radio or television advertisement and paying recruitment personnel. Camellia also will visit local churches and speak with local congregations to recruit foster parents with good moral and spiritual character to mold kids into productive adults

- **<u>Therapeutic Children</u>:**
  Camellia needs to work closely with DHR to accommodate their needs for placement. Camellia plans to continue letting DHR know of placement vacancies available for therapeutic children.

16

**START UP PLAN (Continued).**

- **Maintain Positive Relationship w/DHR/Foster Parents/Public:**
  Camellia currently works closely with DHR in an effort to meet their needs for placement. Camellia will need to continue accepting referrals from DHR in an effort to properly place the child in need of therapeutic care. Camellia plans to continue accepting referrals for placement from DHR .

- **Changes to Meet terms of RFP:**
  Camellia is already providing all the services in the RFP. The limited changes are that DHR staff is required to complete intake evaluations on all children in TFC placements within ten days, and it is understood, by Camellia that if the intake evaluation is not received in ten days the agency will complete the intake evaluations but will not bill the services nor receive payment for it. The county DHR shall be responsible for paying for the activities outside the core services from the flex funds. Department of Human Resources shall be responsible to purchase the individual items to accomplish Individual Living Program goals. Camellia Agency staff along with the foster parents will continue to help in creating behavior management plans for the child with other ISP team members which Camellia Agency is already performing those services.

- **Target Date:**
  The date we plan to begin this contract is on October 1, 2005.

## C.    REFERRAL, ADMISSION AND EXCLUSION POLICY

**1.**    **Describe specific target population of children accepted into the program, to include, age, sex, and type(s) of behavior.**

The target population for children placed in the care of Camellia Therapeutic Foster Agency for placement are children who are in the state of Alabama's Department of Human Resource's custody through a court order. Children who are accepted into Camellia Therapeutic Foster Agency for placement must have at least a DSM IV diagnosis on Axis I, accompanied by behaviors that require intensive treatment and structure. Camellia accepts referrals for children between the ages of newborn to age 21 who are male or female. Examples of diagnosis for admission are emotional or behavioral problems, depression, sexual abuse issues, poor social skills, mild to severe mood disorders, conduct disorders, anxiety disorders, childhood trauma, borderline personality disorder, identity disorder, sexual offenders, etc...

17

REFERRAL, ADMISSION AND EXCLUSION POLICY (Continued).

2.    **Describe specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.**

> Camellia accepts referrals from any county DHR office for the placement of a child into our program. At the time of the intake, Camellia provides the county with a referral checklist of needed information. During the screen in process, we ask for the child's most recent psychological exam, comprehensive family assessment and social summary to identify the needs of the child. Referrals are matched to a Camellia family based on the needs of the child along with the strengths of the foster family. A pre-placement visit is then arranged with the child and the Camellia family. A Camellia staff member provides supervision during this time period. Once all parties have agreed on this placement and Camellia has received all necessary paperwork for admission; admission is finalized. **(please see attached intake application)**

3.    **Describe specific criteria for exclusion from the program.**

> Camellia accepts all referrals and does not exclude any child from our program. Each child who enters the program must have a DSM-IV diagnosis.
> Camellia TFA attempt to match each child based on strengths and needs of both the child and the foster parent. Camellia maintains a strong no reject no eject policy. Camellia adheres to the guidelines of the Multi-Ethnic Placement Act.

18

## CAMELLIA THERAPEUTIC FOSTER CARE AGENCY, LLC.
2310 CRAWFORD ROAD SUITE 104
PHENIX CITY, AL. 36767
(334) 448-2999/TELEPHONE
(334) 448-1666/FAX

### INTAKE APPLICATION

**Date of Application:**_____

**Date Placement Needed:**_____

**Reason for Placement:**_____

**Person Making Referral:**_____

**Contact Information: Telephone #:**_____**Other:**_____

**Name of Child Needing Placement:** _____
DOB:_____Sex:_____Race_____Age_____SSN:_____
Medicaid #:_____Active (Yes or No)Date Applied For:_____

**Legal Guardian:**_____

**Address:**_____

**DHR County of Responsibility:**_____

**DHR Social Worker:**_____

**DHR Contact #'s:**_____**Other:**_____

**After Hour Contact #'s :**_____**Other:**_____

**DHR Case Number:**_____

**DHR Case Plan:**_____

**Financial Eligibility Code:** _____

**Biological Mother of Child:**_____
Address:_____
Telephone Number: _____**Other:**_____
Is this Parent allowed Contact with Child: Yes or No
Is this Contact Supervised or Un-Supervised

**Biological Father of Child:**_____
Address:_____
Telephone Number: _____**Other:**_____

19

Is this Parent allowed Contact with Child: Yes or No
Is this Contact Supervised or Un-Supervised

| Siblings of Child | Age | Address | Telephone # |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Type of Contact allowed with Siblings: _____

**Is there any other relative this child may have contact with?**
Name:_____
Address:_____
Telephone Number:_____

**Is there any one who this child should not have contact with ?**
Name:_____
Address:_____
Telephone Number:_____

**Medical History of Child:**
Current Diagnosis:_____
Current Medications:_____
Name of Provider & Date of Last Medical Exam:(attach copy)
_____
Name of Provider & Date of Last Dental Exam:(attach copy)
_____
Name of Provider & Date of Last Vision Exam:(attach copy) (Circle)Glasses or Contact
_____
Name of Provider & Date of Last EPSDT Screening(attach copy)
_____
Allergies:_____
Past Diagnosis:_____
**Other:**_____

**Psychological History of Child**
Current Diagnosis:_____
Current Medications:_____

**Child's Current Medical Doctor:**
Name:_____
Address:_____
Telephone #:_____

**Current Medical Conditions that Require Special Attention:**
_____

20

**Upcoming Appointments/Court Dates for Child**
1. _____
2. _____
3. _____
4. _____

**Child's Placement History & Date:**
1. _____
2. _____
3. _____
4. _____

**Child's Current School**
Grade:_____
Name: _____
Address:_____
Telephone #/Contact Person: _____
(attach copy of current report cards)

**Does Child Have a Special Education Ruling(list)**
1. _____
2. _____
3. _____

**Has Child Been Tested for Special Education Services?**_____
Date:_____
Where:_____

**Does Child Receive Speech Therapy?**_____
Frequency:_____

**Date of Current Individualized Education Program**_____
School Provided_____
Contact Information:_____

____What Degree is Child Working On in High School
____High School Diploma
____High School Diploma with Advanced Academic Endorsement
____Occupational Diploma
____Graduation Certificate
____General Education Diploma          Program Attending:_____
                                                           Contact Info:_____

**Has Child Passed the High School Graduation Exam?**_____

**When is Child Scheduled to Take the Exit Exam for Graduation?**_____

21

**Date of Anticipated Graduation?**_____

**Check Child Current Behaviors**

___Theft                                        ___Verbally Assault

___Uncontrollable Behavior              ___Sexually Abusive towards other
                                                        children
___Defiant with Adults                     ___Threat of Run Away

___Alcohol or Drug Use                   ___Truancy

___Sexually Active                          ___Depression

___Destruction of Property               ___Poor Peer Relations

___Oppositional                              _____Other:_____

**Please comment:**_____

**Please Forward:**

| | |
|---|---|
| Application | Current Psychological Evaluation |
| Social Summary | Comprehensive Family Assessment |
| Social Security Card | Birth Certificate |
| Medicaid Card | Current EPSDT Screening |
| Current Medical | Form 724 |
| Interagency Agreement | Current ISP & School Records |
| Current Discharge Summaries | Immunization Records |

**Local Offices:**

Camellia Therapeutic Foster Agency
2310 Crawford Road #104
Phenix City, AL. 36867
(334) 448-2999/office
(334) 448-1666/fax

Camellia Therapeutic Foster Agency
2019 Sparkman Drive # A
Huntsville, AL. 35810
(256) 858-6500/office
(256) 858-0055/fax

Camellia Therapeutic Foster Agency
3600 6th Avenue South
Birmingham, AL. 35222
(205) 595-2760/office
(205) 595-2761/fax

Camellia Therapeutic Foster Agency
1434 Mulberry Street
Montgomery, AL. 36106
(334) 834-4088/office
(334) 834-5888/fax

Camellia Therapeutic Foster Agency
22 North Florida Street
Mobile, AL.36607
(251) 476-5156/office
(251) 476-5245/fax

Camellia Therapeutic Foster Agency
DALLAS COUNTY
1003 Broad Street
Selma, AL. 36701
(334) 874-3800/office
(334) 874-3005/fax

22

# IV. PROGRAM NARRATIVE

**D.    SERVICE DELIVERY:** Describe the delivery of services proposed by the vendor to meet or exceed, the Core Services outlined in Attachment A of this RFP and the provisions of the Therapeutic Foster Care Manual. The proposal should outline how the agency will serve the birth family or relatives while the child is in the therapeutic out-of-home placement to reduce the length of stay. It is expected that a child should be ready to step-down in the level of service that is needed to meet his/her needs by six (6) months, at which time he may continue his treatment  goals in the context of family. Should a child need a longer length of stay, the proposal should clearly define what the provider will do to ensure that goals are expeditiously achieved in a designated timeframe thereafter.

It is very important for Camellia Therapeutic Foster Agency to maintain the guidelines of the R.C. Decree with the ultimate goal of reunification of the child with the birth family in the delivery of the core services for therapeutic foster care. Our services are outlined in accordance to meet the guidelines of the R.C. Decree, and the Minimum Standards for Foster Family Homes and Child Placing Agencies.

Camellia strives to accommodate the placement needs of the Department of Human Resources by providing and maintaining highly trained staff and foster parents. We plan to do so by providing an effective screening process that matches each child with the most compatible Therapeutic Foster parent.

Camellia Therapeutic provides **therapeutic foster placement services,** an intense system of clinical and support services for youth with mild to moderate or severe emotional or behavioral disorders. Camellia services include foster home placement, case management, and the coordination of the child's educational and medical planning. The Camellia foster parents receive extensive training and supervision to assist them in successfully addressing the needs of the child in their home. The family systems approach is integrated in the treatment planning of the child. The child/family partnership is reinforced in the delivery of our services for the child. Camellia's foster parents and staff are trained on the importance of  **the  Multi Ethnic Placement Act** in the delivery of services. **Regular foster homes**  are also available for children who have stepped down from Camellia's therapeutic program. This program utilizes entry-level foster parents to provide short-term and transitional services in their home.

## D. SERVICE DELIVERY (CONTINUE).

Camellia's therapeutic foster parents have dual licenses so they are licensed to care for a child who has stepped down from the therapeutic program. The children placed in this program often require basic care and the foster parents will need minimal support during this period. It is estimated that children who enter the therapeutic program can be stepped down in six months of their admission. However, we base this decision on the child's individual needs, we also depend greatly on the input of the child's treatment team. Camellia conducts adoptions for both the state and private families. Camellia recruits, trains, licenses, and supervises foster homes or adoption family homes. **GPS training and licensure** is provided to these families with little or no expense to them during the adoption proceedings. Camellia Therapeutic Foster Agency plans to provide services in relation to the core services as follows below :

<div align="center">"Core  Services for Standard TFC Category of Care"</div>

### Services to Foster Children from the TFC Agency

- **Matching and Screening Process**: Camellia Therapeutic Foster Agency provides matching for the child referred to the agency for placement, which entails looking at the child's strength and needs and the family's strength in order to find the most suitable placement for the child/family. Camellia's matching criteria include composition of the foster family, the ability and willingness of the foster home to work with the child's family, the foster family's ability to communicate with the child, the proximity of the child to his/her family, local availability and access to needed supportive resources, the foster parent's skills, abilities, attitude, and   the foster family's lifestyle. The **screening process** entails screening each child's  referral for appropriateness for therapeutic foster care placement.

- **Pre-placement visits:** The foster child and family are allowed to have an  overnight visit allowing them to become acquainted. The Camellia worker will meet with the child and family to discuss the pre-placement visit. Based on the report given by the child and family, a decision is made to place the child with the  family. The pre-placement visit is documented in both the child's and foster parent's case file.

**SERVICE DELIVERY (CONTINUE).**

- **Schedule & Coordinate the Child's Treatment Plan: DHR** staff will complete the intake evaluation and initial treatment plan for each child entering the program within the first ten days of placement. The intake evaluation addresses the immediate needs of the child and all services to be provided. The initial treatment plan will rely heavily on the child's individual needs as set in the child's ISP. Camellia works closely with the DHR worker in establishing the child's treatment plan. The Comprehensive treatment plan will follow the initial treatment plan at the child's 30th day of placement. Camellia staff will conduct a treatment plan review every ninety days to assure the progression of the child's treatment plan. Support from all Camellia team members allow each child to benefit from intensive treatment and clinical services provided by the team approach.

- **Individual visits with the TFC child:** Camellia's staff maintains regular contact with the child while in the home. The Camellia family consultant meets with the child in the home individually at least once per week.

- **Monthly face-to-face or telephone contact with the child's school:** Camellia's staff maintain regular contact with the child's school to monitor his/her progress. The Camellia family consultant acts as an advocate for the child at school and will attend all educational meetings relating to the child. At a minimum, the child's consultant will have contact with the child's school.

- **Monthly face-to-face or telephone contact with child and or therapist** to monitor the child's progress in counseling.

- **Assist in referral to other programs/services the TFC child may need:** As identified in the child's ISP or as needed the Camellia family consultant will coordinate the child's transportation to all appointments, family visits, or other activities.

- **Provide 18 hours of basic living skills and five hours of group basic living skills:** The Camellia Foster parents provide a maximum of 18 hours of basic living skills relating to behavior education, money management, shopping, healthy lifestyle, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry, and public transportation, as based on the child's individual needs. Camellia staff work closely with the foster parents in ensuring the maintenance of these skills in relation to the child's individual goals.

- **Attend child's ISP and IEP:** The Camellia family consultant will attend all   IEP and ISP meetings along with the TFC foster parent.

25

## SERVICE DELIVERY (CONTINUE).

- **Assist in the development of independent living skills:** The Camellia family consultant will assist the foster parent in the development of independent living skills relevant to the child's needs. DHR shall accept the fiscal responsibility for purchasing individual items to accomplish ILP goals.

- **Monthly Group Therapy:** The Camellia family consultant will ensure that each child who enters the program is in attendance at monthly counseling sessions that are tailored toward achieving specific goals as identified in the child's ISP.

- **Five Hours of Crisis Intervention:** The Camellia family consultant is on call on a twenty four hour/seven day a week basis for emergency and crisis situation that involve the TFC child. Crisis Intervention and Resolution is provided as needed to the TFC family in an effort to alleviate the crisis and to sustain the child's placement.

- **Discharge Planning:** Discharge planning begins at intake as therapeutic foster care is a time limited program. Discharge planning is addressed in the child's treatment plan in preparation for discharge and aftercare planning. A discharge summary is provided to DHR by the 5th day of each month. It contains services provided during care, the growth and accomplishments, assessed needs which remain to be met, and recommendations of the services to meet these goals. The summary contains date of discharge, reason for discharge, and the name and telephone number and relationship of the person or agency to whom the child was discharged to and after-care plans.

- **No Reject/No Eject Policy:** Camellia maintains a no reject/no eject policy for children who meet program criteria.

- **Regularly administer outcome measures:** Camellia regularly administers outcome measures every ninety days in order to monitor the child's treatment and progress through the behavioral assessment tool included in the ISP.

- **Regular Communication with relevant parties:** Camellia maintains regular contact with DHR, the child's counselors, teachers and any other relevant party in an effort to monitor the child's progress.

- **Coordinate involvement in at least one recreational activity:** Camellia assists the foster parents in enrolling the TFC child in at least one recreational activity of his/her choice.

- **Provide a 14-day notice in the event of a disruption:** Camellia provides a 14 day notice in the event of a placement disruption.

26

**SERVICE DELIVERY (CONTINUE).**

- **Monthly Reports:** Monthly reports are provided to DHR in regard to the child placed with Camellia by the 5th of each month. The monthly reports notes the child's progress for the month at home and in school. The report contains any significant events involving the child. The monthly report will document any behavioral or emotional concerns regarding the child at home and at school. The report entails an update on the child's current dental, medical, psychiatric and any other pertinent information. The report lists the child's strengths/needs and weaknesses, and any contact with the child's family or other relevant parties. The crisis plan is outlined in the monthly report, along with all relevant appointments for the child and all services provided by Camellia.

- **Quality Assurance:** Camellia has a Quality Assurance program that monitors our program's performance in each Camellia office. The QA staff are responsible for regularly collecting and analyzing data, conducting case studies, special studies, and site visits to evaluate the program's performance according to the goals and principles of the R.C. Decree.

- **Ensure Program Compliance with <u>Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes and Therapeutic Foster Care Manuals</u>:** Camellia ensures that its' programs meet the Minimum Standards for Child Placing Agencies, <u>Minimum Standards for Foster Family Homes and Therapeutic Foster Care Manuals</u> through regular training and encouraged compliance of the manuals' policies and procedures.

- **Assistance in Creating a Behavior Management Plan:** At the time of the placement meeting Camellia staff coordinate a behavior management plan for the child entering the program. Camellia maintains staff who have experience in behavior management planning and child development.

- **Participate in the ISP team in determining goals for children and their families:** Camellia's staff participates in all ISP meetings. ISP meetings are conducted in order to assist the child's family members in understanding the nature of the child's illness and how to help the child to be maintained in the community.

<u>Service To Birth Families of Children in TFC Placements</u>

- **Be an active participate in the assessment of the parental functioning to assist the ISP team in determining treatment goals for the safe placement of the child back with her family when the goal is return to parent:** Camellia staff will work with the birth families as outlined in the child's ISP to determine the reunification of the child to the home.

27

SERVICE DELIVERY (CONTINUE).

- **Assist with implementation of the goals of the family as identified in the ISP to expedite the child's safe return home:** Camellia will work with the child's birth family to ensure referrals to appropriate resources as needed.

- **Provide 2 hours per week of therapeutic visitation coaching with the family and their children who are in the placement to assess the parents ability to safely care for the child and to determine the progress in attaining goals:** Camellia's staff will work with the child's birth family for 2 hours per week to provide therapeutic coaching and to determine the family's ability to care for the child.

- **Provide family support to birth families as outlined in the ISP treatment plan:** Camellia's staff will work with the child's birth family to assist the child's family in understanding the child's illness and how to help the child be maintained in the community.

<u>Services to TFC Families From the TFC Agency</u>

- **Difficulty of care payment as identified in the contract at a minimum of $16.00 per day:** Camellia provides a difficulty of care payment to all foster parents with a child in their home.

- **Forty hours of pre-service training including GPS prior to licensure:** Camellia provides forty hours of pre-service training to all foster families prior to their home being licensed.

- **Twenty hours of yearly training:** Camellia provides 20 hours of training to foster parents in our program annually for re-licensure.

- **Monthly Support Group Meetings:** Camellia provides a monthly support group meeting for foster parents in the program.

- **Ensure homes comply with minimum standards for foster family homes:** Camellia ensures that all homes licensed have met the standards for foster family homes.

- **Conduct annual licensure and semi annual visits to TFC home:** Camellia re-licenses it homes yearly. A semi annual visit is also made to the home.

- **Weekly face to face contact to support families to strengthen their ability to provide a safe and nurturing home environments for the child.** Camellia provides **weekly face to face contact** with the TFC family for **family support.**

28

## SERVICE DELIVERY (CONTINUE).

- **On-Call Crisis Intervention:** Camellia staff are available to assist the TFC foster parents in the event of a crisis on a twenty-four hour/seven day a week basis.

- **Forty eight hours of respite per month:** Each Camellia home is provided with 48 hours of respite per month.

- **Reimbursement for travel expenses over 50 miles for child's appointments:** Camellia provides reimbursement for travel expenses by foster families that are over a 50 mile radius from the foster home.

- **Assistance with transportation:** Camellia provides transportation assistance as needed for all TFC children's appointments.

- **Assistant with ensuring Medicaid documentation is properly maintained for billable services in compliance with policy and billing guidelines per the Medicaid provider manual:** All foster parents are instructed on the proper completion of forms needed for Medicaid documentation. Staff are available to assist the foster parents as needed.
- **Have staff available to assist the TFC family on a 24 hour basis:** Camellia staff are on call 24 hours per day and 7 days per week to assist the foster family in the event of an emergency. All foster parents have been provided with the on-call numbers to locate staff after hours.

Camellia Therapeutic Foster Agency plans to provide services in relation to the core services as follows below :

### "Core Services for Step-down TFC Category of Care"

#### Services to Foster Children from the TFC Agency

**All core services** as outlined in the Core Services for Standard TFC category of care are included in the core services for step-down TFC Category of Care.
The only differences are noted as follows to services to TFC child are:

- **Individual bi-weekly visits with the TFC child.**

- **Quarterly face to face or telephone contact with** school (minimum) to monitor the child's progress.

- **Quarterly face to face or telephone contact with child and or therapist** to monitor the child's progress in counseling.

29

SERVICE DELIVERY (CONTINUE).

- **Provide 9 hours of basic living skills and no more than 3 hours of group basic living skills training** per week: The Camellia Foster parents provide a maximum of 9 hours of basic living skills relating to behavior education, money management, shopping, healthy lifestyle, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry, and public transportation, as based on the child's individual needs. Camellia staff work closely with the foster parents in ensuring the maintenance of these skills in relation to the child's individual goals.

- **Provide 3 weeks of crisis intervention services**, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis for the child.

## Services to TFC Families From the TFC Agency

**All core services** as outlined in the Core Services for Standard TFC category of care are included in the core services for step-down TFC Category of Care.

- **Difficulty of care payment as identified in the contract at a minimum of $8.00 per day:** Camellia provides a difficulty of care payment to all foster parents with a child in their home.

- **Twenty-four hours of yearly training:** Camellia provides 24 hours of training to foster parents in our program annually for re-licensure.

- **Monthly Support Group Meetings:** Camellia provides a monthly support group meeting for foster parents in the program.

- **Ensure homes comply with minimum standards for foster family homes:** Camellia ensures that all homes licensed have met the standards for foster family homes by a License Social Worker.

- **Conduct annual licensure and semi annual visits to TFC home:** Camellia re-licenses it homes yearly. A semi annual visit is also made to the home, to be sure that the home still meets the minimum standard.

- **On-Call Crisis Intervention:** Staff are available to assist in crisis resolution on a 24 hour basis.

30

## SERVICE DELIVERY (CONTINUE).

The following includes a plan to ensure that ISP goals are expeditiously achieved should a child need a length of stay greater than six months:

- Camellia's staff will make face-to-face contact with the TFC child at least twice per month in the TFC home.
- Camellia's staff will encourage DHR staff to fulfill their responsibilities as outlined in the TFC Manual.
- Camellia's staff will also work cooperatively with DHR, the TFC child and family to expedite the step-down process.

### Comprehensive Treatment Plan(30 days  following the Initial Treatment Plan)
1.     Complete Camellia Comprehensive Treatment Plan(FP, child, and social worker may be present
2.     Send for Medicaid billing

### Treatment Plan Review(every ninety days)
1.     Complete Camellia Treatment Plan review at ninety days after Comprehensive Treatment Plan and then every ninety days.(done by Master Level Social Work Staff who is not apart of the treatment team)
2.     Send for Medicaid billing

### Monthly Reports
1.     Complete by the 5th of each month.
2.     File copy, mail copy to social worker, send copy to Medicaid(Renee) for billing.

### Discharge Summaries
1.     Complete on each child discharged from the program within 30 days of discharge.
2.     File copy, mail copy to social worker, send copy to Medicaid(Renee) for billing.

### Monthly Meetings
1.     Arrange once a month and invite all parents who have foster children, as well as those without a child in the home. Place a copy of the subject studied in each foster parent's case file.

### Other
1.     Crisis Intervention Resolution: This is a two party professional service team, composed of a master's level staff and a bachelor level staff after normal working hours.
2.     Arrange counseling for child
3.     Make sure parent has child in at least one recreational activity.
4.     Maintain contact with child's school at least once monthly.
5.     Make sure all documents in foster parents files are up to date
6.     Delivery all other services as needed.

31

E.    **TARGET AREA:** Identify the geographic scope for the service by naming the specific region and specific counties within each identified region for which the service is proposed.

Camellia Therapeutic Foster Agency is licensed statewide for therapeutic foster child placement. We are proposing slots for five regions. Camellia has a total of six offices in the state of Alabama. Our services are focused within the same geographic region to enable the agency to continue the good work they are already doing. Camellia strives to have licensed therapeutic homes available to accommodate the nine region area of the state of Alabama. The areas Camellia now serve are Region 2 at Mobile county, Region 3 at Montgomery & Dallas County, Region 4 at Russell County, Region 6 at Jefferson County, and Region 9 at Madison County.

Camellia plans to expand staff and foster homes in the future and propose the necessary slots to accommodate this plan. (See Target Chart below).

| Region | County | Seeking number of Slots |
|--------|--------|-------------------------|
| 2 | Mobile | 48 |
| 3 | Dallas & Montgomery | 50 |
| 4 | Russell | 16 |
| 6 | Jefferson | 100 |
| 9 | Madison | 100 |

Camellia Therapeutic Foster Agency, LLC. plans to continue to recruit therapeutic foster parents/homes based upon the need of each county we serve. We also plan to provide adequate services to the county DHR offices in an effort to continue serving the TFC child within the county boundaries.

F.    **DISCHARGE POLICY:**

1.    Describe the process and criteria for **reunification planning** with children/families and coordination with the ISP Team; as well as **pre discharge and aftercare planning requirements**. The proposal should explain the means that a **child's placement will be tracked to the extent possible at 6-month, 12-month, 18-month, and 24-month intervals post-discharge.** It should clearly delineate what **after care services will be provided post-discharge. Services that will be provided to family to expedite the discharge** of the child from the out-of-home placement should be clear and detailed.

32

**Discharge Policy (Continued).**

**Reunification Planning**
Camellia Therapeutic Foster Care Agency follows the guidelines for reunification between the child placed in our care and the birth parent as outlined in child's ISP. During the ISP the DHR worker will detail the plan for reunification of the TFC child. The reunification plan is added to the child's ISP by the DHR worker. The ISP team will coordinate whether the child is allowed visitation and the length of the visitation, telephone contact and with what family members, and any supervised or unsupervised contact, time and place of visitation, (monthly or bi-monthly), etc... if this is not ordered through the youth court. The Camellia worker will implement the plan in the child's treatment planning as set forth in the ISP.

- **6 month**
  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement.

- **12 month**
  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement. Also, in order to further track child's placement, at this point an ISP will be held to monitor/ evaluate progress.

- **18 month**
  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement. Also, in order to further track child's placement, at this point an ISP will be held to monitor/ evaluate progress.

- **24 month**
  Camellia's staff will track children discharged from their care (provided that all parties are cooperative) in the following areas: placements, behaviors, educational and work status, law enforcement status, and family involvement. Also, in order to further track child's placement, at this point an ISP will be held to monitor/ evaluate progress.
  Evaluate for step-down completion and possible discharge via questionnaire or satisfactory survey by mail, phone, or face-to-face, when possible.

33

## IV. Program Narrative

**Discharge Policy (Continued).**

### Pre-discharge/Aftercare Planning

Camellia will regularly administer outcome measures every 90 days in order to plan for the discharge of the TFC child. At the time of placement, Camellia's staff communicates with the DHR worker on the strengths and needs of the child. In order to estimate the TFC child's discharge date Camellia will measure the progress of the child regularly. Prior to the date of the expected discharge the Camellia worker will meet with the DHR worker in an ISP meeting to discuss the aftercare plan for the child. The aftercare plan will include the nature of aftercare services, frequency of services, and the duration of services to the child/family and to the designate responsible for service delivery. Camellia will either consult with the person/agency responsible for working with the child during aftercare or outline if the services will come directly from Camellia.

### Post-discharge Planning

Once a child is discharged from Camellia for six months, we will track the progress of the child and his/her need for re-admission. Re-admission will be allowed for respite, emergency, or regular re-admission during this six month period. We will offer relapse prevention to family and the child's family is able to participate in our monthly foster family support group. Camellia will track the child who is discharged for a minimum of six months following their discharge. Areas that will be tracked are placements, behaviors, education and work status, law enforcement stats and family involvement. Camellia will secure the discharge placement of the child from his/her DHR social worker to ensure we will be able to provide follow-up to the child.

### State the program's policy on discharge prior to program completion, including emergency discharges.

In order to transition a child into a new placement Camellia will provide all pertinent discharge material to the DHR worker. When there is a need for a child to be discharged from our program, Camellia will provide a discharge summary to the DHR worker outlining the child's needed services and plan for continued and aftercare services to prevent any interference in the child's treatment. In the event that there is a need for an emergency discharge Camellia will forward all discharge information the DHR worker within ten working days. Camellia's policy is to give a fourteen day notice prior to discharge. In that event, if a child disrupts their placement, he/she will be placed in another Camellia respite home.

34

**Discharge Policy (Continued).**

**State the program's policy on re-admission prior to program completion, concerning re-admission of children.**
TFC children who have been discharged from the program will be accepted for re-admission within six months of their discharge without a new application. After six months have past, the DHR worker will need to re-submit an application for placement along with any new pertinent information and required paperwork. (social/discharge summaries)

**Provide an example of the program's process for moving children through the goals and objectives outlined in an ISP, to include provisions of "step-down" to a less restrictive placement. The proposal must indicate how the agency will implement the step-down policy as outlined in the Therapeutic Foster Care manual.**

Camellia's process for moving children through the goals and objectives include the completion of the initial treatment plan at ten days, the comprehensive treatment plan at thirty days, and the treatment plan review at every ninety days. During each treatment plan, the child's progression, or lack of, can be seen. At this time, the treatment team will decide on steps necessary to alter the child's treatment response to the progression/step-down or lack of/continued treatment. The child's strengths and needs will be identified. A goal is identified, and the action plan is identified to complete the goal. A person responsible is assigned to see to the goals completion.

To provide for step-down to the least restrictive placement, the child's progression is measured on a regular basis. A standardized behavior assessment tool determines whether the child can be maintained in a TFC placement with fewer therapeutic services. Once it is determined that the child is ready for step-down services, the DHR worker is notified and an ISP will be scheduled to address the child's progression. When step down is initiated, **regular foster homes** are also available through Camellia for children who have stepped down from the therapeutic program. This program utilizes entry-level foster parents to provide short-term and transitional services in their home. The children placed in this program often require basic care, and the foster parents will need minimal support during this period.

**G.    PRIOR EXPERIENCE: Describe the Organization's prior history of providing the core service(s) and family Services requirements outlined in Attachment A.**

Camellia Therapeutic Foster Agency, LLC. has been licensed for approximately three years. We have provided all core services as outlined in the RFP-Attachment A,  during this time period. Camellia has provided therapeutic and regular foster care for children since it was licensed in 2002. During this time, we have followed the core services for standard TFC category of care with great diligence and care in the matching process for children and their families, identifying needs of the child's family and strengths of prospective TFC parents for initial placements and moves within the program. This includes a screening process to determine if a TFC referral is appropriate for therapeutic foster care service. Pre-placement visits are documented and stay within normal 2-3 day period. The initial treatment plans are completed within ten days, comprehensive treatment plan within 30 days, and treatment plan reviews are completed every 90 days.

Camellia staff work hard to obtain the copy of the child's ISP from the county DHR social worker in a timely manner to assure that the child's treatment plan is designed with the child's individual needs in mind.

Camellia provides the following services to the DHR agencies it serves: intake evaluations, crisis intervention and resolution, individual counseling and psychotherapy, group counseling and psychotherapy, family counseling and psychotherapy, individual basic living skills, group basic living skills, individual family support, group family support, treatment plan review, mental health consultation, and in home intervention. However, each service is provided to meet the specific and individual needs of the children placed in our therapeutic foster homes. Because of our experience providing these individualized services, Camellia has established a long-lasting relationship with the county agencies in the following regions: (Region 2, Region 3, Region 4, Region 6, and Region 9). It is our hope that our prior positive experiences will open doors for us to expand to other regions and counties where there is a need for therapeutic foster care services.

36

**H    STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS:**

1.    **Describe staffing patterns, including administrative and programmatic, and provide a brief rationale for the levels of staffing proposed.**

Camellia Therapeutic Foster Agency, LLC. feels that we have hired staff who are highly qualified and knowledgeable in the field of child care/development. Each Camellia office has a total of one family consultant/social worker assigned per every eight children. Camellia staff are assigned a maximum of eight therapeutic children per caseload. Staff casJoads are based on overall job responsibilities, difficulty of children served, and the size and density of the geographical area served. If a worker's job duties exceed his/her job responsibilities, his/her caseload is decreased. Camellia has one supervisor for every six workers.

Camellia Therapeutic Foster Agency utilizes several licensed social worker who provide licensure for our foster homes. They assure that the homes that we are licensing meets the minimum standards for foster family homes as set forth in the minimum standards handbook. Camellia's staff consists of  family consultants, social workers, and therapist who are all BS, BSW, LBSW, MS, MSW, or LGSW degreed. The family consultants work closely with the foster parents, offering family support, and are on call twenty four hours a day during the week. Camellia also employs several contract consultants who add support to the service delivery of the Camellia treatment team.

Camellia Therapeutic Foster Agency estimates that our program will need approximately 52 staff/support workers to meet the requirements of the RFP.

2.    **Provide information regarding the qualifications, including education and licensure and experience required for Administrative, Program and Treatment staff. Include job descriptions for proposed positions.**

**The Executive Director** of Camellia Therapeutic Foster Agency, LLC. shall have a master's degree in the field of social work, psychology, education, administration, or a closely related field, plus five years experience in family and children's services with progressively responsible duties in supervision and/or administration.

**Social workers** chosen for employment with Camellia are required to be licensed and shall practice social work pursuant to Code of Alabama 1975, 34-30-1 through 34-30-58, have at least a license as a graduate social worker, license as a certified social worker or a license as  a bachelors, social worker with continuing supervision from a person so licensed.

37

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

Camellia's **Family Consultants** required to possess at least a BSW or Bachelor's degree in social work or a closely related field.

**Clerical Staff** employed with Camellia are selected based on personal and technical qualifications and job descriptions.

**Other Professional staff** employed with Camellia are required to be qualified or licensed in their professional fields as required by state law.

**All staff/vendor** of Camellia are licensed and qualified in their respective fields.

| Employee | Title | Credentials |
|---|---|---|
| Agyeman Osei-Yeboah | Personnel Manager | Ph.D. |
| Karen L. Jurls | Executive Director | LCSW, PIP |
| Katrina Jefferson | Statewide Supervisor/QA | MSW |
| Cathleen Dixon | Supervisor of Social Workers/Social Services | LCSW, PIP |
| Latonya Tinsley | Therapist/Manager | MS |
| Kareema Jacobs | Family Consultant | MSW |
| Joselyn Hereford | Family Consultant/GPS Facilitator | MSW |
| Eva Ransom | Family Consultant/Manager | MSW |
| Lakeisha Bearden | Family Consultant | BS |
| Clementine Ellis | Family Consultant/GPS Facilitator | BS |
| Debra Winston | Family Consultant | BSW |
| Justina Okeke | Licensing Specialist | LGSW |
| Renee Lyles | Medicaid Billing | AA |
| Brenda Ayers | Receptionist | Diploma |

**Executive Director**\*\*Camellia Therapeutic Foster Agency's Executive Director is responsible for;

- Articulating the purpose, goal, and function of the agency.
- Establishing written operating policies concerning organizational structure, personnel practices, policies of intake, care, services, and discharge of children.
- Direct and evaluate a program of child placing which is child and family centered which is within the limits of functions and policy established by the board, or by the executive where there is no board, and which is based on sound professional concepts.
- Organizing the work of the agency, and delegate responsibility to various staff members as appropriate
- Making regular reports to the board, where applicable on all aspects of the operation of the agency and its program

38

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

- Handling expenditures according to allocations in the budget, and develop the annual budget in conjunction with the board, where applicable
- Developing a plan for orientation, training and development of staff
- Appointing, evaluating, and terminating staff
- Making provision for continuity of administrative authority in her/his own absence.
- Developing a program of public relations, including interpretations to the community, the board, and the insurance carrier.
- Notifying the state Department in the event of an incident that is considered to jeopardize the life of a child, staff member, or other person.

**Supervisor/Manager**\*\*Camellia Therapeutic Foster Agency's Supervisor Manager are responsible for:

- **Case Work Supervision**
  The supervisor provides regular support and guidance to the caseworkers through weekly supervisory meetings. Formal supervisory meetings shall be supplemented as needed by informal contact between the supervisor and the caseworker. Each supervisor's caseload shall net exceed 6 case workers
- **Treatment Planning**
  The supervisor takes ultimate responsibility for the development of a comprehensive treatment plan, based on a thorough case assessment for each child admitted into the program. The comprehensive treatment plan shall consist of the strengths, needs, and steps identified in the family's ISP, as developed by the ISP team. Also included are supervision of ongoing treatment planning, and implementation of services for each child.
- **Treatment team**
  The supervisor oversees and supports the caseworker as leader of the treatment team and shares ultimate responsibility for the team plans and decisions.
- **Crisis On-call**
  The supervisor provides coordination and back-up to assure that 24 hour on-call crisis intervention services are available and delivered as needed to the TFC foster parents, the children in care, and their families.

**Family Consultant**
\*\*Camellia Therapeutic Foster Agency's Family Consultants are responsible for:

- **Treatment Plan**
  Provides leadership of the treatment plan, organizes and manages all treatment team meetings, coordinates, team decision making regarding the care and treatment of the child and services to the child's family as identified in the comprehensive treatment plan, provides, information and training as needed to treatment team members, responsible for preparing each child's comprehensive treatment plan.

39

STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS,
AND TRAINING REQUIREMENTS(Continued).

- **Support and Consultation to Foster Parents**

  Provides regular support and technical assistance to the TFC foster parents in their implementation of the treatment plan, and other responsibilities they undertake, provide in home teaching, modeling, coaching, and feedback to foster parents, at least bi-weekly contact wit foster parent.

- **Caseloads**

  Carry a caseload of eight children, provide bi-weekly face to face contact to communicate special concerns, make direct assessments of child's progress, to monitor for potential abuse and to build relationships. Also the family consultant must have  reliable transportation with insurance and proper registration. The family consultant also must be able to type and use compute effectively, with at least a minimum of 60 wpm. All notes should be typed on the computer neatly and ready for billing.

- **Support and Consultation to Families of Children**

  Seek to enhance the child's relationship with their parents, establish contact and visitations between parents and child, involve parents in treatment team meetings. plans and decisions, keeping them informed of the child's progress in the program. The family consultant must be available to assist the parent with transportation in child appointments and must be willing to take the child if the foster parent is unable to attend the appointment.

- **Community Liaison and Advocacy**

  Jointly with ISP team identify resources and or services that may be utilized to reach the child's treatment plan.

- **Crisis On-Call**

  Be on-call to TFC foster parents, children and their families on a 24 hour/seven day a week basis. All crisis must be responded to within 15 minutes. All consultants must have a cell phone or beeper made available to the foster parent and foster child in the event of a crisis.

**\*\*Camellia Therapeutic Foster Agency's caseloads are as follows: Family Consultants are  responsible for a caseload of 8, Therapist are assigned a caseload of 18, and each supervisor has a caseload of 6.**

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

**Clerical Staff**

These staff are responsible for carrying out business, secretarial, and clerical duties, such as maintenance of records, correspondence, fiscal matters, and bookkeeping, so that professional staff can carry out the services of the agency. These staff are also available for general housekeeping including watering the office plants, making sure the lights are turned on/off each day, vacuuming the floors, regulating the heat and air conditioning and keeping the office clean of excessive debris.

3.  **Describe in detail the steps that the program owners and/or administrators take to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into question the propriety of that employee's working with this population of children. Provide documentation that each employee has had a criminal background check. If an incident or allegation is reported, founded or unfounded, describe your organization's general procedure in this regard.**

- Each Camellia staff considered for employment must complete a request for a criminal history clearance and CAN clearance prior to employment with Camellia.
- Each Camellia staff prior to employment must submit three non-relative references that will attest to his/her character, temperament and suitability to work with TFC children. All references are contacted by telephone.
- After the clearances are received from the ABI/FBI and CAN registry, and the references are returned with a positive report the staff person is made an official employee and can then report to the assigned Camellia office.
- The ABI/FBI and CAN clearances are documented in the staff's personnel file along with the reference reports.
- If an incident or allegation is reported as founded, Camellia will terminate the staff immediately. If the allegation is unfounded, Camellia will consult with the Board of Directors as to what measures to take.

**List of Camellia Therapeutic Foster Agency's Staff**

| | | |
|---|---|---|
| Agyeman Osei-Yeboah, PhD. | Karen L. Jurls, LCSW | Katrina Jefferson, MSW |
| Cathleen Dixon, LCSW | Latonya Tinsley, MS | Kareema Jacobs, MSW |
| Joselyn Hereford,MSW | Eva Ransom, MSW | Lakeisha Bearden, BS |
| Clementine Ellis, BSW | Debra Winston, BSW | Justina Okeke, LGSW |
| Renee Lyles, AA | Brenda Ayers, D | |

✷  It is certified by submission of this RFP that all of the above Camellia TFA staff have ABI/FBI & CAN clearances in their personnel files.

41

STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS,
AND TRAINING REQUIREMENTS(Continued).

4.    Describe in detail the level of education, experience and training
      possessed by management level staff in the provision of services
      identified in this RFP. Specify the organization's staff development
      program regarding orientation and on going training for all staff.

- Camellia's **Executive Director** is required to have a master's degree in the field of
  social work psychology, education, administration, or a related filed, along with five
  years experience in family and children's services with progressively responsible
  duties in supervision and administration.

- Camellia requires that all **Case supervisors/Managers** be either a LGSW, LCSW or
  LPC, a master's level degreed in either social work, counseling, psychology, or a
  closely related field with completion of a field practicum in that course, or who have
  six months of supervision by a master leveled professional or above with 2 years of
  post graduate professional experience,  or an individual with an LBSW with five years
  of experience in a therapeutic setting.

- **Social workers** chosen for employment with Camellia are required to be licensed and
  shall practice social work pursuant to Code of Alabama 1975, 34-30-1 through 34-30-
  58, have at least a license as a graduate social worker, license as a certified social
  worker or a license as a bachelors, social worker with continuing supervision from a
  person so licensed.

- Camellia's Family Consultants are required to possess at least a BSW or Bachelor's
  degree in social work or a closely related field.

- **Clerical Staff** employed with Camellia are selected based on personal and technical
  qualifications and job descriptions.

- **Other Professional staff** employed with Camellia are required to be qualified or
  licensed in their professional fields as required by state law.

STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).

## STAFF DEVELOPMENT( All staff, including volunteers)

1.    Orientation
   A.    New Staff shall receive orientation within thirty days of employment Orientation will cover (20 hours):
      - Agency Philosophy, Policies, and Procedures
      - Generally Accepted Principles of Child Care and Behavior Management Practices
      - Overview of the Child Care Institution, Group Homes, and Child Placing Agencies
      - Confidentiality Issues
   B.    The program is administered under the supervision of qualified staff to the position being assumed by the new employee. Completion of orientation must be documented in the employee's file.

2.    New Hire Training
   A.    Training consisting of a minimum of 30 hours will be completed within the first one hundred eighty days of hire.
   B.    The training shall consist of the following components:
      - Child Development
      - Behavior Management
      - The Process of Grief and Loss
      - The Dynamics of Attachment and Separation
      - The Value of Families
      - Individualized Service Plan
      - Identifying the Strengths and Needs of Families and Children
      - Behavior as an Expression of Underlying Needs
      - The Value of Partnerships
      - How Foster Children Enter the Foster Care System
      - Family Implications among Agency Personnel
      - Overview of the R.C. Consent Decree
      - Understanding and Valuing Cultural Differences

3.    Continuing Education
   A.    After one year of employment a program of in-service training will provide staff with a minimum of fifteen(15) hours of in-service training annually. Participation at conferences and workshops may be included as part of the 15 hours as documented by attendance certificates.
   B.    Training may include, but is not limited to:
      - Child Safety Issues
      - Crisis Intervention/Engaging Families
      - The Impact of the Media of Children
      - Effects of Multiple Placements

## IV. PROGRAM NARRATIVE

**H.    STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

- Cultural Sensitivity
- Significance of Birth Families
- Substance Abuse
- Gang Activity
- Universal Precautions and Infection Control
- Cardiopulmonary Resuscitation (CPR)

C.    Responsibilities

- Interns and Volunteers shall not be permitted to assume total responsibility or duties of any paid staff member
- Written job descriptions and responsibilities shall be developed for all volunteers and interns
- A staff member shall be designated to supervise and evaluate the activities of the volunteers and interns
- A file will be maintained on the schedules, hours worked and activities of all volunteers and interns

**5.    Describe how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Provide a specific plan addressing emergencies and critical incident response.**

Camellia Therapeutic Foster agency have staff available twenty-four hours each day to handle emergencies and other crisis events. The following is a list of Camellia's procedure for dealing with these occurrences.

- All foster parents will be given the numbers for the Camellia on-call worker after hours in the event of a crisis or emergency.
- The Camellia worker will respond to the foster parent immediately and within 15 minutes of the call.
- In the event of any emergency, the Camellia on-call or assigned worker should arrive on the scene within thirty minutes of the call or earlier, as it is deemed necessary. As deemed necessary the Camellia worker will provide the needed intervention by telephone in order to alleviate the situation until he/she arrives on the scene. The Camellia supervisor and/or executive director will be notified of the situation and direct the worker on the proper protocol.

44

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB   DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

**\*\*Arrest of any child or involvement by police:**  In the event that a TFC child is arrested or involved in a police altercation, the Camellia foster parent must immediately notify the Camellia consultant. The consultant will speak with the appropriate party to find out what has lead up to this incident. The consultant will immediately notify the Camellia supervisor who will notify DHR as soon as possible.

**Child Away without Permission/ Runaway Child:**        In the event that a child runs away, the following procedure should be followed by the Camellia foster parent/worker. The Foster Parent should begin attempting to locate the child throughout the neighborhood, immediate vicinity, known locations of friends of the child. The foster parent should then check the locations of known friends or relatives of the child. The foster parent should immediately report this incident to the Camellia worker. The worker will then assist the foster parent on procedure and in locating the child. The worker will assess the situation to determine the need for police or other intervention. The worker will immediately notify the child's DHR worker or the county on-call worker of the child running away. After attempting to locate the child for several hours, assessing the child's desire to run away, or locating material verifying the child intent to run away the worker will instruct/assist the foster parent to file a run away petition. If the child is located the worker will assess the situation and need for respite or another placement.

**Suicidal Threats/Ideation or Self Injurious Behaviors:**  In the event that a child threatens to harm himself Camellia TFA have established a protocol for foster parents, staff to follow. If a child threatens to harm him/herself, makes threats of bodily harm to someone else, or is noticed to participate in self-injurious activities, the foster parent should immediately notify the Camellia worker assigned or on-call to assess the situation by telephone or in person. The foster parent should make sure that the child is not left alone for any time period. The foster parent should make sure that all potentially injurious or dangerous items are locked away or out of the child's reach(medicine, knives, weapons, etc...) The Camellia worker will do a face to face assessment of the child to determine if there is a risk of self harm or harm to another party. Once this assessment is made, the worker will contact his/her supervisor for further instruction on how to handle service delivery.

45

**STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS, AND TRAINING REQUIREMENTS(Continued).**

**Medical Emergencies:**    In the  event of a medical emergency or need for medical treatment, Camellia has the following guidelines in place for foster parents with children in their care.

In the event that a Camellia TFC child has a medical emergency or needs medical treatment, the foster parent should  first assess the need for immediate treatment, if there are any questions on whether the child needs immediate medical attention the foster parent should confer with the child's medical doctor. If there is a need for immediate treatment the foster parent should take the child to the local emergency room or his/her physician immediately. The foster parent should immediately notify the child's Camellia worker or on-call worker of the situation. The Camellia worker will assist the foster parent as needed. If the child is taken for  emergency treatment the Camellia worker will meet the parent at the hospital/physician's office as deemed necessary. Neither the foster parent or Camellia worker may authorize surgery for a foster child. The Camellia worker will contact the child's DHR worker or on call worker immediately. If there is a need for any type surgery, medical procedure or administering of certain medication, involving an DHR foster child,  permission will be obtained through DHR by the way of a youth court order.

**Delinquent Behavior/Possession of Illegal Substances or Weapons:**  In the event that a youth is believed to be or found to be in possession of any illegal substances or weapons the foster parent should first attempt to remove the items from the child's possession. The foster parent should notify the child's Camellia worker immediately for assistance. The Camellia worker will determine if the situation warrants the involvement of the local police department. The child's DHR worker or the on-call worker will be notified of the situation immediately.

**Incidents of Physical Injury/ and or Abuse Neglect to a Foster Child:**  All incidents of physical injury, and or abuse/neglect suspected should be immediately reported to the case supervisor and or executive director. The Camellia worker should immediately make a verbal report and within 24 hours make a written report to DHR via the CAN report as deemed necessary. The Camellia worker should assess the situation to determine what happened and the potential for harm to the child. The case supervisor will determine the need for immediate removal of the foster child from the home.

**Discipline, seclusion, and restraint**
Camellia staff/foster parents adhere to the DHR's policy on discipline, as set forth in the Foster Family Home Standards and in the Behavioral Management Policy guide. Physical restraint is only allowed by a trained person in the event of acting to protect the child or others from injury or to  prevent excessive property damage.

46

STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB  DESCRIPTIONS,
AND TRAINING REQUIREMENTS(Continued).

6.    **Describe the use of volunteers and interns within the organization
and how they are selected and screened for background checks.**

Volunteers and interns  are used mainly as a supporting agents to professional staff. They
work directly with agency staff in assisting the staff with the completion of assignments,
maintenance of case files, and light clerical duties. All volunteers and interns who have
direct contact with the therapeutic child complete the criminal background and CAN
clearances and provide the agency with three non-relative references.

7.    **Describe in detail the plans to meet the training requirements established in
the Department's rules and training related to operating this selected
programs.**

Camellia has outlined above its Staff development program. This program is used to
ensure the training of each staff member prior to and during employment with Camellia
Therapeutic Foster Agency.

**I. REFERENCES: List all agencies (state, federal, local) for which the vendor has
performed similar services outlined in this RFP. This list should include the names,
addresses,   and telephone numbers of contact persons within those agencies
responsible for contract monitoring. DHR will be responsible for contacting these
agencies for reference information.**

<u>References</u>

Laura Parchman, LGSW
DHR Supervisor
Jefferson County
4500 5th Avenue South
Birmingham, AL. 35233
(205) 918-5169
**email: l.parchman@DHR.State.AL.US**

Patti Way, MSW
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256)-535-4527
**email: p.way@DHR.State.AL.US**

Chuck Evans, MSW
DHR Supervisor
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4680
**email: c.evans@DHR.State.AL.US**

Cherry Jones, MSW
Program Supervisor
Russell County
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5803
**email: c.jones@DHR.State.AL.US**

47

References (Continued).

Darnell Sharpeson, BSW
DHR Social Worker
Madison County
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 517-1410
email: d.sharpeson@DHR.State.AL.US

Annie Poles, MSW
Service Supervisor
Russell County
1003 25th Avenue
P.O. Box 67
Phenix City, AL. 36868
(334) 214-5853
email: a.poles@DHR.State.AL.US

Jacqueline Griffin, MSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4645
email: j.griffin@DHR.State.AL.US

Chasidity Perry, BSW
Madison County DHR
DHR Social Worker
2206 Oakwood Avenue
Huntsville, AL. 35810
(256) 535-4655
email: c.perry@DHR.State.AL.US

Mary Ann Wilson, LGSW
Program Analyst, SDHR
50 Ripley Street
Montgomery, AL. 36130
(334) 242-1659
email: m.wilson@DHR.State.AL.US

Robin King, MSW
Jefferson County DHR
4500 5th Avenue South
Birmingham, AL. 35223
(205) 918-5193
email: r.king@DHR.State.AL.US

E.    **HOLD BACK:**

As a guarantee for the delivery of services required by this RFP. and the acceptance by the Department of these service in accordance with the specifications set forth in the RFP, in the event Camellia Agency fails to deliver or perform the said services to the Department's satisfaction the Department reserves the right to withhold part of all of any funds committed by the Department under any contract that may result from a proposal submitted in response to this RFP and to cancel the said contract without any resulting liability, present and future, to the Department or to the state of Alabama.

## VII. VENDOR CERTIFICATION

A.      Vendor warrants and represents to the Department that the vendor accepts and agrees with all of the terms and conditions of the RFP certified to the department that the applicant is legally authorized to conduct business within the State of Alabama and to carry out the services described in this RFP and that all of the following statements are true and correct

_Joseph Appiah_
Vendor

_Nathaniel F. Dudley_
Notary Public

My Commission expires
1-10-07

B.      **REVOLVING DOOR POLICY**
The vendor further certify that neither the vendors trustees, officers, agents, servants, or employees is a current employee of the Department and none of the said individuals have been employees of the Department in violation of the revolving door prohibitions contained in the State of Alabama's ethics laws.

C.      **DEBARMENT**
The vendor further certifies that neither the vendor nor any of the vendor's trustees, officers, directors, agents, servants, or employees(whether paid or voluntary) is debarred or suspended or otherwise excluded from or ineligible for   participation in federal assistance programs under Executive Order 12549, "Debarment and Suspension."

D.      **STANDARD CONTRACT**
The vendor agree to use the Department's standard contract document. The vendor will further comply with all the terms and conditions of that document including, but not limited to compliance with the Title VI of the Civil rights Act of 1964, the Rehabilitation Act of 1973 as Amended, the Americans with Disabilities Act, Alabama Act 2000-775 (governing individuals in direct services positions who have unsupervised access to children) the Health   Insurance Portability and Accountability Act of 1996(HIPPA) as applicable, and all other federal and state laws, rules and regulations applicable to receiving funds from the Department to carry out the services described in this RFP.

Further any contract executed pursuant to the RFP shall be subject to review by the Department's legal counsel as to its legality of form and compliance with state contract laws, terms, and conditions, and may further be subject to review by the Alabama Legislative Contract Review Committee, Examiners of Public Accounts, the State Finance Director and the Office of the Governor.

49

**VENDOR CERTIFICATION (Continued).**

**E.    CHARITABLE CHOICE**
This Section does not apply.

**F.    FINANCIAL ACCOUNTING:**
The vendor's accounting system is consistent with General Accepted Governmental Accounting Principals(GAAP). Furhter, the vendor maintains sufficient financial accounting records to allow the vendor to account for and document the sources, including, as applicable, required matching funds.

**G.    FINANCIAL AUDIT:**
The vendor will, upon the Department's request, provide the Department a copy of its most recent financial audit report. (The report should not be submitted with the proposal.)

**H.    PROPOSAL LIFE**
The proposal submitted to the Department in response to this RFP will be binding on the applicant for ninety (90) calendar days following the due date prescribed in the RFP.

50

## V. COMPENSATION FOR PROVIDING SERVICE

FORM TO ESTABLISH RATE FOR SERVICE

CONTRACTOR:   Camellia Therapeutic Foster Agency, LLC   CONTRACT NO.   3095 (TFC)

### BUDGET RECAP OF EXPENSES

Proposed: October 1, _____ 2005 _____
September 30, _____ 2006 _____

I.   **Personnel:**

| | | | |
|---|---|---|---|
| A. | Salaries (Attach Personnel Addendum) | 2,368,000.00 | |
| B. | Fringe Benefits: | | |
| | Health Insurance | 58,000.00 | FICA  $540,000 |
| | Retirement | Match Social Security | Other _____ |
| | Group Life Insurance | 2,880.00 | |
| C. | Foster Parent | 3,323,690.00 | |

II.  **Subcontracted Services:**

| | | | |
|---|---|---|---|
| A. | Consultants | 90,000.00 | |
| B. | Audit Service | 10,000.00 | |
| C. | Transportation (Provided By Another Agency) | 3,000.00 | most transportation is done by staff/ parent |

III. **Travel:**

| | | | |
|---|---|---|---|
| A. | Mileage (Show rate of Reimbursement) | 0.32 per mile | |
| B. | Per Diem (Show Rate of Reimbursement) | 150.00 per day | (including Hotel and food) |

IV.  **Space:**

| | | | |
|---|---|---|---|
| A. | Telephone | 21,600.00 | |
| B. | Rent (include copy of lease) | 71,220.00 | for six offices |
| C. | Use Allowance (No More than 2% of Acquisition Cost/Year) | | |
| D. | Rental Rate System | 2.00 sq ft | |
| E. | Utilities | 20,000.00 | |
| F. | Maintenance of Building or Grounds | 1680.00 | |
| G. | Minor Repairs to Building | N/A | |

✱   Per diem Payment of $500 per Social Worker per month for gasoline expenses is cheaper than paying for mileage at the rate of $ .32 per mile, since each Social Worker covers at least 2000 miles per week.

**V.     Supplies:**

| | | | |
|---|---|---|---|
| A. | Office | 10,000.00 | |
| B. | Household | | |
| C. | Recreational | 188,400.00 | 314x 50x12months |
| D. | Educational | 3,000.00 | Extra tutorial services |
| E. | Medical | | |
| F. | Personal Care | 10,000.00 | |

**VI.     Equipment:**

| | | | |
|---|---|---|---|
| A. | Rental (include rental agreement) | Equipment Purchased | |
| B. | Repair | 3,000.00 | |
| C. | Depreciation (Attach Depreciation Addendum) | | |

**VII.     Other:**

| | | | |
|---|---|---|---|
| A. | Insurance | 19,200.00 | |
| B. | Vehicle Operation | 6,000.00 | |
| C. | Taxes | | |
| D. | Food in Excess of USDA | N/A | |
| E. | Foster Parent | 3,151,775.00 | at 27.50x 314x365days |
| F. | Other Allowable Cost, Specify General Categories: | N/A | |

**VIII.     Unallowable Costs:**     20,000.00
(Building Costs, Bad Debts,
Contingencies, etc.  Refer to
Unallowable Costs Section in
POS Manual.)

**IX.     Total Program Cost:**     $9,921,445.00 (M)

**X.     Program Income:**     Please report all income from all sources available to your program.
(Detail Sources)

| State DHR | County DHR | |
|---|---|---|
| | | |
| | | |

Rate Information R.F.P.

**XI.     Client Date:**     October 1, 2005- September 1, 2006

| | | |
|---|---|---|
| A. | Potential Units of Service (Multiply License Capacity by Day in Year.) | **Medicaid Eligible Children** 314 slots at $66 Fixed Rate at 365 days |

TOTAL     $7,564,260.00 (M)

DHR Eligible Units of 314 slots at $29.00 fixed rate service at 365 days

TOTAL _____ $3,323,690.00 (M) _____

I certify that the above reflects the true actual and estimated expenditures of this program for the time frames listed.

Signed _Joseph Appiah_

Title _Chairman / C.E.O_

Date _April 5, 2005_

**Personal Addendum Attached.**

\* Unit cost is based on Total Program Cost less Unallowable Costs.

PERSONNEL ADDENDUM (ATTACH TO "FORM TO ESTABLISH RATES")

PROPOSED

| A. No. of Persons | B. Position | C. Monthly Gross Salary | D. % Time on Project | E. Months Employed | F. Cost (AxCxDxE) |
|---|---|---|---|---|---|
| 1 | Executive Director | $6,000.00 | 100% | 12 months | $72,000.00 |
| 5 | Supervisor/LCSW | $5,000.00 | 100% | 12 months | $300,000.00 |
| 30 | Social Workers | $4,000.00 | 100% | 12 months | $1,400,000.00 |
| 1 | Program Director | $4,160.00 | 100% | 12 months | $50,000.00 |
| 6 | Administrative Assistant | $2,500.00 | 100% | 12 months | $180,000.00 |
| 6 | Janitors | $1,000.00 | 100% | 12 months | $72,000.00 |
| 4 | Medicaid Billing Specialist | $2,500.00 | 100% | 12 months | $120,000.00 |
| 1 | Bookkeeper | $2,500.00 | 100% | 12 months | $30,000.00 |
| 1 | Accountant | $2,500.00 | 100% | 12 months | $30,000.00 |
| 1 | Auditor/CPA | $1,200.00 | 100% | 12 months | $14,000.00 |
| 1 | Quality Assurance Director | $5,000.00 | 100% | 12 months | $60,000.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| 52 | | $36,360.00 | | | $2,368,000.00 |

| NAME | POSITION | EDUCATION(NO. YRS.) | | | DEGREES | NO. OF YRS EXPERIENCE IN FIELD OF CHILD | % WORK PER WEEK |
|---|---|---|---|---|---|---|---|
| | | High School | Under-Graduate | Graduate | | | |
| Karen Juris | Executive Director | X | X | X | MSW/LCSW | 18 | 100% |
| Katrina Jefferson | Asst. Director/QA | X | X | X | MSW | 5 | 100% |
| Cathleen Dixon | Supervisor | X | X | X | MSW/LCSW | 10 | 100% |
| Justina Okeke | Licensing Specialist | X | X | X | MSW/LCSW | 15 | 100% |
| Osei Yeboah | Personnel | X | X | X | MSW | 3 | 100% |
| Latonya Tinsley | Therapist | X | X | X | Ph. D. | 3 | 100% |
| Kareema Jacobs | Family Consultant | X | X | X | MS | 3 | 100% |
| Josely Hereford | Family Consultant | X | X | X. | MS | 2 | 100% |
| Eva Ranson | Supervisor | X | X | X | MSW | 3 | 100% |
| Lakeisha Bearden | Family Consultant | X | X | X | MSW | 16 | 100% |
| Clementine Ellis | Family Consultant | X | X | N/A | BS | 3 | 100% |
| Debra Winston | Family Consultant | X | X | N/A | BS | 3 | 100% |
| Donna Gibson | Licensing Specialist | X | X | N/A | BSW | 5 | 100% |
| Renee Lyles | Medicaid Billing | X | X | X | MSW/LGSW | 10 | 20% |
| Brenda Ayers | Transportation | X | N/A | N/A | AA | 3 | 100% |
| Corliss Massey | LPC/Therapist | X | N/A | N/A | N/A | 2 | 100% |
| | | | | | MS/LPC | 15 | 20% |



# State of Alabama
# Disclosure Statement
(Required by Act 2001-955)

ENTITY COMPLETING FORM
Camellia Therapeutic Foster Agency, LLC.

ADDRESS
2310 Crawford Road #104

CITY, STATE, ZIP
Phenix City, AL. 36867

TELEPHONE NUMBER
( 334 ) 448-2999

STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD
ALABAMA STATE DEPARTMENT OF HUMAN RESOURCES

ADDRESS
50 Ripley Street

CITY, STATE, ZIP
Montgomery, AL. 36150

TELEPHONE NUMBER
( 334 ) 242-1650

This form is provided with:

[X] Contract     [ ] Proposal     [X] Request for Proposal     [ ] Invitation to Bid     [ ] Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

[X] Yes     [ ] No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| Alabama State Dept. of Human Resources | Therapeutic Foster Care | $1.1 million |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

[ ] Yes     [X] No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| N/A | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
|---|---|---|
| N/A | | |
| | | |
| | | |

*OVER*

2. List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| N/A | | | |
| | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| N/A | |
| | |

*By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.*

_Joseph Appiah_                                    April 05, 2005
Signature                                          Date

_William L. Dudly_          4-5-05                 1-10-07
Notary's Signature          Date                   Date Notary Expires

*Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.*




# State of Alabama
# Department of Human Resources

License Number: **34627**

This is to certify that     <u>CAMELLIA THERAPEUTIC FOSTER AGENCY</u>
(Licensee)

is hereby granted this LICENSE to conduct and maintain
<u>CAMELLIA THERAPEUTIC FOSTER AGENCY</u>
(Name of Child Care Facility)

as a     <u>CHILD PLACING AGENCY</u>          for          <u>N/A</u>
(Type of Child Care Facility)                              (Number of children)

ages     <u>N/A</u>
Age range of children)

located at  <u>2310 CRAWFORD RD, SUITE 104</u>     <u>PHENIX CITY</u>
(Street Address)                            (City)

in     <u>RUSSELL,</u>                              State of Alabama.
(County)

This LICENSE shall be in force for a period of two years from the **19TH** day of **MARCH, 2005,** to the **19TH** day of **MARCH, 2007,** subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975,* or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this **16TH** day of **MARCH, 2005.**

BY  _Page B. Walley, Ph.D._
Commissioner
State Department of Human Resources

NOTE: This LICENSE must be posted in a conspicuous place on the premises.

D-1969
(8/99)

*stepdown*

EDS
P.O Box 244035
301 Technacenter Dr.
Montgomery, AL 36124-4035

DECEMBER 6, 2004

CAMELLIA THERAPEUTIC FOSTERAG LL
50 RIPLEY ST

MONTGOMERY AL 36130-0000

Re: Notification of New Alabama Medicaid Provider Number

Dear Provider:

Thank you for your interest and participation in the Alabama Medicaid Program.
Your enrollment has been reviewed and processed. Your new STATE REHAB SERVICES
performing provider identification number is 339091202 . Your billing/payee number
is 339000000 You have been enrolled for the following enrollment period:
12-01-04 through NO END . Please refer to program specific enrollment
and claims filing information on the Medicaid Provider Manual.

If any of the information on your enrollment application and/or contact should change
in the future, please notify us in writing at the address above.

Mailing addresses for specific claim types are listed in Appendix N in the Medicaid Provider
Manual. If you have any questions regarding claims processing, please contact us at 334-215-0111.
If you are in the State of Alabama, you may also call 1-800-688-7989.

If you have any questions regarding your provider number, please contact the Provider
Enrollment Unit at 334-215-0111 or 1-888-223-3630.

Sincerely,

Chasity Morgan

Provider Enrollment

Enclosure

*Standard*

EDS
P.O Box 244035
301 Technacenter Dr
Montgomery, AL 36124-4035

DECEMBER 6, 2004

CAMELLIA THERAPEUTI FOSTER AG LLC
50 RIPLEY ST

MONTGOMERY AL 36130-0000

Re: Notification of New Alabama Medicaid Provider Number

Dear Provider:

Thank you for your interest and participation in the Alabama Medicaid Program. Your enrollment has been reviewed and processed. Your new   STATE REHAB SERVICES performing provider identification number is  339091102   . Your billing/payee number is   339000000   . You have been enrolled for the following enrollment period: 12-01-04    through   NO END    . Please refer to program specific enrollment and claims filing information on the Medicaid Provider Manual.

If any of the information on your enrollment application and/or contact should change in the future, please notify us in writing at the address above.

Mailing addresses for specific claim types are listed in Appendix N in the Medicaid Provider Manual. If you have any questions regarding claims processing, please contact us at 334-215-0111. If you are in the State of Alabama, you may also call 1-800-688-7989.

If you have any questions regarding your provider number, please contact the Provider Enrollment Unit at 334-215-0111 or 1-888-223-3630.

Sincerely,

Chasity Mongo

Provider Enrollment

Enclosure



***Camellia Therapeutic Foster Care Agency, LLC***
ALABAMA STATE LICENSED CHILD PLACING & ADOPTION AGENCY
RUSSELL COUNTY • 2310 CRAWFORD ROAD, SUITE 104
POST OFFICE BOX 788 • PHENIX CITY, ALABAMA 36868-0788

DR. JOSEPH APPIAH
*Chairman & Chief Executive Officer*

PHONE: (334) 448-2999

FAX:    (334) 448-1666

E-MAIL: ctfa8@cs.com

TO:    ALABAMA DEPARTMENT OF HUMAN RESOURCES
       **STARR STEWART/POLICY, PLANNING AND
       RESEARCH**
       THERAPEUTIC FOSTER CARE PROPOSAL
       GORDON PERSONS BUILDING #2104
       50 RIPLEY STREET
       MONTGOMERY, AL. 36130-4000

On behalf of Camellia Therapeutic Foster Agency L L C, we are happy and
delighted to submit to you our R. F. P. for the above named program.

Sincerely,

Dr. Joseph Appiah
Chairman

Karen Jurls LCSW, PIP
Executive Director

ATTACHMENT E      Alabama Department of Human Resources
**Therapeutic Foster Care Proposal Cover Page**

Organization Information:

Name of Organization: Youth Villages

Address:    2890 Bekemeyer Drive

City: Arlington                          State: TN        Zip: 38002

Telephone: (901) 252-7213        Fax: (901) 252-7280

e-mail address: youthvillages.org

Federal Employer Identification Number (FEIN): F81716970

Name/title of Authorizing Official: Patrick W. Lawler

Signature of Authorizing Official: _____      Date: 4-4-5

Contact Person Information:

Name/title of program contact person: Patience Enyinda

Address: 9238 Madison Blvd. Building One, Suite 1300

City: Madison,                          State: AL         Zip: 35758

Email Address:

Telephone: (256) 774-8340              Fax: (256) 774-8380

Plaintiff EXHIBIT
5

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties_____    No. of Slot(s)_____

Region 2: Counties_____    No. of Slot(s)_____

Region 3: Counties_____    No. of Slot(s)_____

Region 4: Counties_____    No. of Slot(s)_____

Region 5: Counties_____    No. of Slot(s)_____

Region 6: Counties Jefferson,Shelby,Chilton,Talladega,Clay  No. of Slot(s)_40_
Region 7: Counties_____Randolph and Cleburne___  No. of Slot(s)_____

Region 8: Counties_____    No. of Slot(s)_____

Region 9: Counties Jackson,Madison,Morgan,Limestone,Lawrence No. of Slot(s)_40_
            Lauderdale,Colbert and Franklin

*Alabama Department of Human Resources ▪ 50 Ripley Street ▪ Gordon Persons Building ▪ Montgomery, Alabama 36130*


APR 2005
Received
Communications

## PROPRIETARY STATEMENT

Indicate any page(s) to which vendor has a proprietary claim:_____

## ATTACHMENT C

**STATE OF ALABAMA**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER**
STATE COMPTROLLER'S OFFICE

INSTRUCTIONS.   In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files.  To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.      In PART 1 below provide your Tax Identification Number and check FEIN or SSN.  Also provide the name and address to which payments should be sent.  In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.      Circle the business designation that identifies your type of trade or business in PART 2.

3.      Sign and return this form as part of the response to the RFP:

PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER __581716970__
Check one ___✓___   Federal Employer Identification Number (FEIN)
              _____   Social Security Number (SSN)

NAME OF ORGANIZATION:   __Youth Villages, Inc.__        PHONE: __901-252-7200__

LEGAL BUSINESS ADDRESS:   __PO Box 341154   Memphis, TN 38184-1154__

FAX:   __901-252-7280__   EMAIL: __deneen.alexander@youthvillages.org__

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: __Patrick Lawler, Chief Executive Officer__

PART 2 – BUSINESS DESIGNATION.  Circle the designation that identifies your type of trade or business.

1 -     CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2 -     NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 -     PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 -     SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 -     NONCORPORATE RENTAL AGENT
6 -     GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 -     FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
        (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:   Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____        __2/15/05__   __(901) 252-7200__
              SIGNATURE                               DATE                 TELEPHONE NUMBER
                                                                                     (If different from above)
__CEO__
              TITLE

**20**

# PROGRAM NARRATIVE
## A. Organization Information
Youth Villages
2890 Bekemeyer
Arlington, TN 38002

Primary Contact:
Patrick W. Lawler
Chief Executive Officer
Telephone: (901)252-7200

**Governing Board**

**Mr. Jim Barton**
P.O. Box 485
Ripley, TN 38063
Tenure- Since 1998

**Mr. Mike Bruns**
Comtrak, Inc.
PO Box 750897
Memphis, TN38175-0897
Tenure – Since 1994

**Ms. Mary Cooper**
626 Gen. George Patton Dr.
Nashville, TN 37221
Tenure – Since 1998

**Mrs. Adrienne LeBlanc**
Milestone Financial
P.O. Box 2556
Cordova, TN 38018
Tenure – Since 1997

**Mr. Rusty Lulloff**
Hilton Hotels Corporation
755 Crossover Lane
Memphis, TN 38117-4900
Tenure – Since 1999

**Mr. Phil McNeill**
Equity Inns, Inc.
7700 Wolf River
Germantown, TN 38138
Tenure – Since 2000

**Judge Joyce Broffit**
Criminal Dividion
201 Poplar Avenue
Memphis, TN 38103

**Mr. Harold Byrd**
Bank of Bartlett
6281 Stage Road
Bartlett, TN 38134
Tenure – Since 1997

**Reverend Robert Earl Jones**
Hill Chapel Missionary Babtist Church
4523 Raliegh- LaGrange
Memphis, TN 38128
Tenure – Since 2003

**Mr. Bob Loeb**
Loeb Propreties
5264   Poplar Avenue
Memphis, TN 38119
Tenure – Since 1999

**Mr. Kenneth May**
Federal Express Kinkos Galleria III
13155  Noel RoadSte. 1600
Dallas, TX 75240
Tenure - 2001

**Mr. William Menkel**
National Bank of Commerce
One Commerce Square
Memphis, TN 38150
Tenure – Since 2001

1

**Mr. Dan Overbey**
Investment Services Division
First Tennessee Investment
530 Oak Court Drive Suite 200
Memphis, TN 38117
Tenure – Since 1998

**Mr. Jim Parrish**
Morgan Keegan and Company
Morgan Keegan Tower
50 N. Front Street 21st Floor
Memphis, TN 38103
Tenure – since 2004

**Mr. Johnny Pitts**
Lipscomb & Pitts Insurance Co.
2670 Union Avenue Ext. Suite 200
Memphis, TN 38112-4416
Current Board-Chair
Tenure – Since 1996

**Mr. Mark Prudhomme**
Northwestern Mutual Life Insurance
3071 Honey Tree Drive
Germantown, TN 38138
Current Board Treasurer
Tenure – Since 1987

**Mr. Ronnie Randall**
Kele, Inc.
3300 Brother Blvd.
Bartlett, TN 38133
Tenure – Since 2004

**Mr. Bill Reeser**
St. Jude Hospital
501 St. Jude Place
Memphis, TN 38105
Tenure – Since 2001

**Ms. Sherry Schedler**
Juvenile Court of Memphis & Shelby Co.
616 Adams Avenue
Memphis, TN 38105
Phone: 405-8526
Tenure – Since 1997

**Mr. John Skelton**
Ernst & Yougn LLP
International Place
6410 Poplar Avenue Ste 500
Memphis, TN 38119
Current Board - Secretray
Tenure – Since 2003

**Ms. Carolyn Turman**
M. L. G. & W.
P.O. Box 430
Memphis, TN 38101
Tenure – Since 1997

**Ms. Betsy Walkup**
3710 Richland Ave.
Nashville, TN 37205
Tenure – Since 2002

Youth Villages is governed by a Board of Directors, which manages all the business and affairs of the organization in a manner consistent with the organization's by-laws and other applicable laws. This board makes appropriate delegations of authority to the officers and, to the extent permitted by the law, by appropriate resolution, the Board authorizes one or more board committees to act on its behalf.

The Board of Directors, in the exercise of its overall responsibility, assigns to the staff, reasonable authority for ensuring care of the facility. In the accomplishment of this objective, the Board of Directors delegates to the staff the authority to evaluate the competence of staff members and applicants for staff privileges, holding the staff responsible for making recommendations to the board concerning initial staff

2

appointments, reappointments, and the assignment or curtailment of privileges under a procedure duly established by the staff and approved by the Board as indicated. The staff conducts an ongoing review and appraisal of the quality of care rendered through the organization and reports such activities and their results to the Board through the Chief Executive Officer.

**Officers**

The Youth Villages directors elect from its Board of Directors one chair, one or more vice-chairs, secretary and treasurer. The chair appoints members to all committees, presides at meetings of the Board of Directors, and presides at meetings of the Executive Committee. The chair is authorized and empowered to sign or countersign contracts and other documents approved by the Board of Directors. The chair is responsible for reviewing the CEO's performance annually and determining the level of compensation.

The vice-chair presides in the absence of the Chair and performs duties the Chair of Board of Directors designates. The treasurer furnishes to the Board of Directors at each of its regular meetings comprehensive reports and statements showing the financial condition of the institution and an account of his/her transactions and performs other duties as directed by the Chair of the Board of Directors.

The secretary is authorized and empowered to sign or countersign contracts and other documents approved by the Board of Directors, in conjunction with Youth Villages' accounts, Policy and Procedures. The secretary is the custodian of the records of the institution and is responsible for taking and preserving minutes (including: date of meeting, members, and other participants attending, topics and issues discussed, motions, seconds, and votes, etc.) of all meetings of the Board of Directors.

## Paid Consultants

Linda Snyder, MD
Consultant Providing Child and Adolescent Psychiatric Services

Diane Stanton Wolf, LSCW
Consultant Providing Clinical Supervision Services

TFC Consultants
Consultants Providing Clinical Consultation Regarding MTFC

University of Tennessee, Memphis Medical School
Consultants Providing Medical Services

Carol Webb LPC, LMFT, MS
Consultant Providing Clinical Supervision Services

Cynthia L. Amos, M.D.
Consultant Providing Child and Adolescent Psychiatric Services

Jolene Bailey, Ph.D.
Consultant Providing Psychological Assessments

Steven R. Nyquist, M.D.
Consultant Providing Psychiatric Services

Larry Durbin
Consultant Providing Developmental Disabilities Services

Philip A. Fisher, Ph.D.
Consultant Providing Multidimensional Treatment Foster Care Services

John Hicks
Consulting Providing Psychological Assessments

Donna McConnico, LPC, NCC
Consultant Providing Clinical Supervision Services

John W. McCoy, Ph.D.
Consultant Providing Psychological Assessments

Kenneth Brent Morrow, Ph.D., LMFT
Consultant Providing Clinical Supervision Services

Ralph Samuelson, LCSW
Consultant Providing Clinical Supervision Services

Cindy Sneed, NCC, LPC-MHSP
Consultant Providing Clinical Supervision Services

**History**
A Heritage of Helping: In 19 years, Youth Villages has become a leader in providing innovative, effective mental health services for troubled children and their families.

A nonprofit organization established in 1986 with the merger of two small residential treatment programs, Youth Villages has grown to include a complete continuum of programs and services that includes intensive in-home counseling, treatment foster care and adoption, family-based care for children with serious developmental disabilities, residential and intensive residential treatment, group homes, specialized crisis services, transitional living services for children aging out of state custody and a shelter for runaway and homeless teenagers.

Last year, Youth Villages helped more than 8,000 troubled children and their families from 34 offices in 24 locations in Tennessee, Mississippi, Alabama, Texas, and the District of Columbia. The following are the location and sites for Youth Villages programs:
    Residential Treatment Centers:
    Memphis, TN: Dogwood Village, Memphis Boystown, Center for Intensive Residential Treatment
    Linden, TN: Deer Valley

    Group Homes
    Memphis, TN.: Brunswick, Coteswood, Paidia's Place, Family Link
    Jackson, TN: Hobbs House
    Nashville, TN: Binkley, Tallwood and Wallace

    In-home Services
    **Tennessee**
    Memphis, Jackson, Dyersburg, Paris, Clarksville, Columbia, Cookeville, Nashville, Knoxville, Chattanooga, Johnson City, Morristown, Dickson
    **Mississippi**
    Tupelo, Jackson, Hattiesburg
    **Alabama**
    Huntsville, Anniston
    **Arkansas**
    Jonesboro, Little Rock
    **Texas**
    Dallas
    **Washington, DC**

    Therapeutic Foster Care
    **Tennessee**

5

Memphis, Jackson, Dyersburg, Paris, Clarksville, Columbia, Cookeville, Nashville, Knoxville, Chattanooga, Johnson City
**Mississippi**
Tupelo, Jackson
**Alabama**
Huntsville

Youth Villages serves children from birth to age 21 with the goal of helping every child in the least restrictive setting, preferably in the home. If children must be removed from their homes because of emotional or behavioral problems or family situations, our goal is to reunite them with their families or, if that is not possible, help them find permanency as quickly as possible.

All of Youth Villages' programs use evidence-based treatment models, proven to be effective in helping children and families move toward success. Two of Youth Villages' programs are specifically based on empirically validated models that have been proven to have positive impacts on children and families. Our intensive in-home counseling program uses Multisystemic Therapy (MST), which has been proven effective in more than 15 years of clinical trials. Our treatment foster care program is built on the Multidimensional Treatment Foster Care model (MTFC), which also has been proven effective in clinical trails and practice. Both treatment models have received endorsements from such authorities as the National Institutes of Health, the U.S. Surgeon General, and the Coalition for Juvenile Justice.

Since 1994, Youth Villages has operated a Research and Outcome Evaluation Department. By tracking children in our programs and at 6, 12, 18, and 24 months post discharge, we have built one of the nation's largest databases on troubled children.

**1986**
- Youth Villages is formed in Memphis, Tenn. when Dogwood Village merges with another youth residential center, Memphis Boys Town, creating a new non-profit organization.
- Approximately 80 children are served annually.
- Accreditation from the Joint Commission on Accreditation of Healthcare Organizations is achieved.

**1987**
- $1.6 million capital campaign results in the construction of a 14,500-square-foot Morris-Wilson Campus School and Activities Center, the Judge Kenneth A. Turner Administration Building, and two additional children's cottages, at the Dogwood Village campus.

**1991**
- Youth Villages expands to Middle Tennessee with the addition of Deer Valley, a residential center located on more than 1,000 beautiful wooded acres near the Tennessee River in Linden.

6

**1992**
- Therapeutic Foster Care Program is initiated. Offices are opened in Memphis, Nashville, Cookeville, and Jackson, Tenn.

**1993**
- Youth Villages conducts a study of children's services needs in Rural West Tennessee. More than 126 children's services officials are interviewed as part of the study. The study reveals the region's greatest need is intensive family-based in-home care.

**1994**
- Through start-up funds provided by the Plough Foundation and the private sector, Youth Villages initiates a Home-Based Counseling Program using Multisystemic Therapy (MST) in collaboration with the Medical University of South Carolina. Additional offices are opened in Dyersburg, Clarksville, Paris, and Columbia.

**1995**
- The number of children served annually by Youth Villages tops 1,000.
- Youth Villages is a fully integrated Continuum of Care, which has become a model for mental health care providers nationwide.
- A major expansion of the Morris-Wilson Campus School and Activities Center at the Dogwood Village campus adds 5,000-square-feet to the school.
- Youth Villages receives the Tennessee Quality Achievement Award.

**1996**
- Youth Villages receives the Greater Memphis Award for Quality.
- Youth Villages expands home-based counseling to Mississippi, opens offices in Cleveland and Jackson.
- The United Way of America awards Youth Villages the Silver Excellence in Service Quality Award. Youth Villages is the first agency nationwide to receive this award.

**1997**
- The Family Link, an agency that operates the area's only emergency shelter for runaway and homeless teens, becomes a program of Youth Villages.
- Office is opened in Jonesboro, Ark.
- Youth Villages opens Paidia's Place, a community-based home for girls with developmental disabilities.
- The 11,000-square-foot Mike Bruns Family Counseling Center opens at the Memphis Boys Town campus.
- Administrator Patrick W. Lawler and Youth Villages receive the Thomas Briggs community service award.
- Youth Villages' Therapeutic Foster Care Program beings using Multi-dimensional Treatment Foster Care, an evidence based treatment model for youth with juvenile justice and mental health backgrounds.

**1998**

- Nashville-based Serendipity House, founded in 1973, becomes a program of Youth Villages, doubling our capacity to care for children in Middle Tennessee. In addition to expanding the foster care program and home-based counseling program, the partnership with Serendipity House brings new services to Youth Villages, including three community-based homes in the Nashville area.
- Youth Villages offers foster care in Mississippi through a new office in Tupelo.
- The Family Link Shelter moves into a newly renovated and more accessible 5,000-square-foot building.
- Youth Villages opens Coteswood Home, a community home for boys with developmental disabilities and no viable family support.
- Youth Villages achieves accreditation with commendation, the highest level of accreditation granted by the Joint Commission on Accreditation of Health Care Organizations.

**1999**

- Youth Villages begins offering Outpatient Psychiatric Services under the directions of new Medical Director Fred G. Thomason, M.D.
- The Tennessee Medical Association names Youth Villages recipient of its  Community Service Award.
- The Day Foundation funds a $2 million transitional living program to help children in state custody
- LHS, Inc. makes a $1.5 million, four-year grant to fund a research study for a pilot multi systemic based service model designed to prevent at-risk youth form entering state custody.
- Therapeutic foster care and Intercept home-based counseling services are expanded statewide in Mississippi.
- Hobbs House, a community-based home for boys, is opened in Jackson, Tenn.

**2000**

- Adoption services for children with special needs are initiated throughout Tennessee
- In recognition for its work with young people, Youth Villages receives the Bridges Salute to Youth Award.
- In February, Youth Villages opens Binkley Home, a community-based home in Nashville, Tenn.
- Services are expanded to East Tennessee with the opening of the Knoxville office.
- Through a donation from the Knights of Columbus, Youth Villages opens a third community-based home in the Memphis area, Brunswick Home, in September.
- Youth Villages tops 2,000 children served annually.
- The Franklin Covey Co. names Youth Villages the recipient of its Humanitarian Service Award at its 7th Annual International Symposium.
- Youth Villages is cited as a national model in a study commissioned by the American Youth Policy Forum in Washington.
- The National Coalition for Juvenile Justice highlights Youth Villages as a national model in its annual report and calls for other states to implement similar programs.

**2001**
- Youth Villages' home-based counseling program expands to Dallas, Texas, and further into East Tennessee, opening additional offices in Chattanooga and Johnson City.
- Youth Villages conducts its most successful fund raising campaign-raising more than $11 million for the construction of a new school and activities center and a residential center for children and youth on the Memphis Boys Town campus. Ground is broken for the two buildings with a completion date scheduled for Summer 2002. Highlights of the capital campaign include:
  --Matching a challenge grant from the Plough Foundation, raising a total of $6 million.
  --The receipt of the largest single contribution in Youth Villages' history-a gift of $2.5 million from the Barret Trust.
  --The Middle Tennessee regional headquarters expands in a move from leased space to a newly purchased 26,000-square-foot building in the Perimeter Hill area of Nashville.
  --Youth Villages is cited in a national report by the American Youth Policy Forum as one of eight "guiding light" models in the United States, with programs that successfully reduce the incidence of juvenile crime.

**2002**
- Youth Villages' home-based counseling program expands into Alabama with the opening of offices in Anniston and Huntsville.
- The therapeutic foster care program expands into East Tennessee in the existing locations in Knoxville, Chattanooga and Johnson City.
- An additional Mississippi office opens in Hattiesburg, offering both home-based counseling and therapeutic foster care to the coastal region of the state.
- Youth Villages' launches a new program, Choices, designed for children with severe developmental disabilities. Based on extensive research with parents, the program offers two distinct services;
  --in-home support to families of children with developmental disabilities, and
  --professional support homes for children whose families are not able to care for them in their own homes.
- The adoption program celebrates its 50th placement of a special needs child in an adoptive home.
- Construction is completed on Paul W. Barrett Jr. School, and the state-of-the-art learning and activities center opens its doors to Youth Villages.

**2003**
- Offices in Dickson and Morristown, Tennessee open in order to enhance services in Middle and East Tennessee.
- The state-of-the-art, $7.5 million Center for Intensive Residential Treatment opens at the Bartlett campus.

- The Specialized Crisis Services program is launched statewide in Tennessee, serving children less than 18 years who are experiencing an acute psychiatric emergency.
- Youth Villages helps 5,000 emotionally troubled children and families.

**2004**
- Youth Villages expands its home-based counseling program to Washington D.C.
- Youth Villages receives its child care placement license in the state of Alabama
- Youth Villages serves more than 8,000 children and families annually.

**2005**
- Washington D.C. awards Youth Villages a contract to provide Multisystmic Therapy to foster children.

**Mission & Values**

Our mission and values serve as the organization's key business drivers and as the basis for our code of ethics. During the hiring process, Youth Villages staff makes sure that new hires can align with our mission and values, and new staff are taught during orientation how to incorporate our mission and values in their everyday work. Our mission and values establish policy and guide all primary decisions made throughout the organization, including strategic and operational planning. They also guide the priorities set by the organization to ensure that time and resources remain focused on our core purpose.

Our mission and values are reviewed annually and focus groups are conducted to receive feedback from staff as to how they are used throughout the organization.

**Mission Statement**

Youth Villages helps children and families live successfully.

**Values**

**Kids needs come first...Always**

We make every decision in the best interest of each child. We adapt our programs to accommodate the special needs of children and families. Often we make personal sacrifices in order to help children and families achieve their potential.

**Children are raised best by their families.**

When at all possible, children belong with their families. We help families provide the support and structure that all children need.

**We provide a safe place.**

We provide care and treatment for children in an open, safe environment. We ensure that young people are physically and emotionally safe.

10

**We strive to achieve positive, lasting results.**
We help children and families develop skills to live successfully by focusing on areas that have a long-term impact on the family.

**We are committed to our staff.**
We recognize the many challenges our staff face each day. We value teamwork and help staff achieve their potential through an atmosphere of open communication, learning and fun.

**We are each responsible for providing the highest level of service to our customers.**
We listen and respond to our customers by delivering our best…every time, every day.

**We constantly improve our performance to achieve excellence.**
We measure our efforts by assessing our strengths and needs to identify areas for improvement. We believe that anything can be made better.

**We create new programs to meet the needs of children, families and the community.**
We develop innovative programs that serve children and families facing the most challenging circumstances. Our entrepreneurial spirit leads us to test the limits of existing services and create new opportunities.

**We do what we say we do.**
Our mission and values are more than just something we talk about. They guide all of our decisions. We believe that our integrity can only be measured by how we live by these values each day.

**Management Structure**
These leadership staff will be accountable for the implementation and operation of the programs in this proposal.

**Patrick W. Lawler, Chief Executive Officer** – Patrick Lawler has more than 25 years experience in working with troubled youth. Mr. Lawler has served as administrator for 25 years and has experience in developing and implementing innovative programs and treatment models that have been proven effective in clinical trials to have positive, long-term effects on children and their families, helping them live successfully in the community

**Dr. Timothy F. Goldsmith, Chief Clinical Officer - Clinical Services** – Dr. Goldsmith has more than 15 years experience in the field. He holds a Ph.D. from the University of Southern California and is licensed in Marriage and Family Therapy and Professional Counseling. Dr. Goldsmith was intimately involved in the development of Youth Villages' Continuum of Care, foster care, home-based and community-based treatment programs.

**Mavis Snyder, Chief Operating Officer -Therapeutic Foster Care** - Mavis Snyder holds a master's degree in counseling and has dedicated 16 of her 20 years working in the mental health field to Youth Villages. During Snyder's 16 years at Youth Villages, she has worked with youth in residential treatment and served as the director of our therapeutic foster care program since its inception in 1991, and was involved in the development of the Continuum of Care. Ms. Snyder

11

also served on the Board of Directors for the Foster Family-based Treatment Association. She has worked as a consultant and expert witness on a Federal lawsuit brought against the Florida Department of Children and Families and a private provider. She is currently a peer reviewer for the Council on Accreditation (COA).

**Hughes Johnson, Director of Performance Improvement** - Hughes Johnson has provided recreation therapy services in our residential treatment programs, served as assistant director of training, and now leads our performance improvement initiatives as the director. He holds a master's degree and has been with Youth Villages for seven years. He will lead efforts in developing training activities and measurement of program operations for this expansion.

**Brenda Stanton, Assistant Director, Foster Care** – Brenda Stanton has a master's degree in agency counseling and has worked in therapeutic foster care for Youth Villages for 13 years. She has experience in child protective services and in residential treatment. She will monitor the overall implementation of the program.

**Patience Enyinda, Foster Care Clinical Supervisor** - Enyinda is a licensed graduate social worker. She has been a service coordinator for group homes in Alabama. Enyinda was the regional coordinator for Family Finders for two years. She will be responsible for managing the foster care program.

**Stephen Bauer, Foster Care Child Counselor** - Mr. Bauer has a master's degree in divinity with an emphasis in marriage and family therapy. He has experience in providing group and individual therapy. Mr. Bauer has been with Youth Villages for three years and will provide individual counseling and serve as a member of the clinical team.

12

# Alabama FAMILIES Organization Chart



13

Staff Ratio

The regional supervisor will be responsible for supervising the clinical supervisors and the office manager. The clinical supervisor supervises the clinical team, which consists of two child counselors, two behavior specialists and one trainer/recruiter.

**Financial Audit**

Youth Villages is a 501(c) (3) organization as determined by the Internal Revenue Service. The organization adheres to the standards of the Financial Accounting Standards Board (FASB), National Society of Fund Raising Executives (NSFRE), and to the codes of ethics of the American Counseling Association, American Psychologists Association, AMA, International Association of Business Communicators, National Association of Social Workers, NSFRE and Public Relations Society of America. The last financial audit was on September 16, 2004, by DelBrocco & Associates.

**Qualifications and Experience of Vendor**

Youth Villages has been serving children and families in the child welfare and mental health system for 19 years. With established programs in Alabama, Texas, Mississippi, Tennessee, and Washington, D.C., Youth Villages has designed its programs to help children and families with the most challenging social service needs and mental health issues. The array of services covers residential treatment, intensive residential treatment, therapeutic/treatment foster care, in-home family reunification services, family preservation services, adoption services, crisis services, community based services, mentoring, transitional living, independent living foster home, and treatment support homes for youths with mental retardation/developmental delay.

Youth Villages Therapeutic Foster Care program began in 1992. The program has successfully provided services to children and families from various placement settings in Tennessee, Mississippi, and Alabama. Youths have been placed from residential treatment, intensive residential/hospital settings, in the state of Tennessee. Program expansion in Mississippi began in 1996. Since 1992, a number of modifications have been made to the service delivery system to make it more effective in serving children and families. Modifications include the following:

- Frequent evaluation and modification to treatment activities and development of specialty treatment programs.
- The recruitment of foster parents was refined to attract appropriate parents in a timelier manner.
- Helping young people make the transition to independent living.
- The addition of Clinical Consultant to oversee the provision and application of best practices for each clinical team. Consultants are licensed mental health providers and oversee the implementation of the treatment model.

Youth Villages is accredited by the Joint Commission of Accreditation of Healthcare Organizations (JCAHO.). Currently, Youth Villages is licensed as child placing agency and child care in Tennessee, Mississippi, and Alabama.

As new challenges and treatment needs are identified by DHR, other customers, and Youth Villages own outcome studies, we will continue to develop and implement strategies to more effectively serve children and families. More than 80% of all children who complete their programs at Youth Villages are living successfully -- in a less restrictive environment -- one year

14

after discharge. To measure success, we look at factors such as school behavior and attendance and lack of involvement in the juvenile justice system.

References
Gail Young
Placement Director
Mississippi Department of Human Services
Division of Family and Children's Services
P.O. Box 352
Jackson, MS. 39205
(601) 359-4499
Email Gyoung@MDHS.state.ms.us

Mrs. Bonnie Hommich
Deputy Commissioner
TN Department of Children Services
436 6th Avenue North, 7th Floor
Nashville, TN  37243
Telephone – 615-741 – 9702
Email bonnie.hommich@state.tn.us

Mr. Randal Lea
Executive Assistance to the Commissioner
TN Department of Children Services
436 6th Avenue North, 7th Floor
Nashville, TN  37243
Telephone – 615- 615 – 253 - 4360
Email randal.lea@state.tn.us

Mrs. Judy Cole
Executive Director
Office of Regional Support
TN Department of Children Services
436 6th Avenue North, 7th Floor
Nashville, TN  37243
Telephone – 615- 741 – 9702
Email judy.cole@state.tn.us

Mrs. Ellen Wilbur
Magellan Health Care
222 Second Avenue North
Ste 220
Nashville, TN 37243
615-313-4413

15

Ms. Sandra Burke,
Executive Director
Girls Inc.
60 North Third Street, 1st Floor
Memphis, TN 38103
Office: 901 – 523 - 0251

## B. Start Up Plan
In January of 2005, Youth Villages obtained a contract to provide services for 25 youth in
Region 9 of Alabama. The program is currently located in Huntsville with the intention to
expand into Region 6 and open an office in Birmingham.

The foundation for a successful therapeutic foster program is the recruiting of foster parents who
are capable and willing to work with children and their families. Recruitment of foster parents
requires hard work and persistence. This can be achieved through implementing a recruitment
program. A recruitment program begins by developing a recruiting plan for the year with
specifically targeted objectives for each month. This program is customized and is based on
developing partnerships in the community to help communicate the need for therapeutic foster
homes. Community partners assist in targeting the prospective foster parent population. A key
component in the recruiting program involves face-to-face contact with community members
such as local businesses, community leaders, local media, churches, and civic organizations. In
addition, Youth Villages engages in public speaking to heighten the awareness and need for
foster parents as well as educating the public on issues faced by children and families.

Foster parent training is a crucial component in implementing a therapeutic foster care program.
The pre-service training is designed to augment the parenting skills of foster families and provide
the foundation for working with birth families. Foster parents are trained to provide the structure,
guidance, and treatment that children need.

The focus of Youth Villages' therapeutic foster care program is to offer family based care in an
intensive therapeutic environment with the desired outcome of family reunification, when
indicated, permanency placement, or independent living. Intensive home-based counseling is
provided to families during the treatment process and continues after reunification. The children
and families are receiving services simultaneously to reduce the length of stay in an out-of- home
placement. This ensures that the children and families have a successful transition. The
following outlines the plan for Youth Villages to provide therapeutic foster care in Alabama
contingent upon receiving a contract.

The clinical team will consist of: a Clinical Supervisor master's level LCSW, master's level
child counselor, masters level behavior specialists, licensed trainer/recruiter.

## Start Up Activity

| Office | Activity | Target Date |
|---|---|---|
| Huntsville | Clinical Supervisor | Hired |
| | Child Counselor | Hired |
| | Trainer/Recruiter | 5/15/05 |
| | Behavior Specialist | 5/15/05 |

16

|  | Recruitment | Currently implemented and on-going |
|---|---|---|
|  | Orientation | Held 2nd and 4th Monday each month |
|  | Training | Currently implemented and on-going |
|  | Training Class dates | April 19 thru June 21 |
|  |  | July 12 thru September 13 |
|  |  | October 4 thru December 13 |
|  | Placements | Began in January 05 |
|  |  |  |
| Birmingham | Trainer/Recruiter | 5/15/05 |
|  | Clinical Supervisor | 5/1/05 |
|  | Child Counselor | 8/15/05 |
|  | Behavior Specialist | 8/15/05 |
|  | Recruitment | 5//05 |
|  | Orientation | Initial meeting 6/30/05 |
|  |  | Held 2nd and 4th Monday each month thereafter |
|  | Training Class Dates | July 19 thru September 20 |
|  |  | September 12 thru November 14 |

Additional Staff will be added as needed.

**Foster Parent Recruiting Plan**

Youth Villages has implemented a recruiting plan called" Expanding Family Connections". This is a yearly recruiting plan that is used to evaluate our recruiting efforts and determine which methods are productive in recruiting therapeutic foster parents. The plan is evaluated each month and yearly. Our objective is to increase awareness in the community and certify more foster homes. Some key strategies of the plan include:

- Each office has a monthly recruiting plan with weekly goals and evaluations.
- Utilize local media sources to increase awareness and obtain inquiries.
- Inquiry calls are returned within 24 hours, and potential families are invited to orientation meetings.
- Orientation meetings, which provide an overview of the program, are held twice Monthly.
- Recruiter, staff, and foster parents participate in recruiting events.
- Speaking engagements are routinely held in the in the community.
- During monthly support groups current foster parents are asked to provide names of potential foster parents.
- Techniques from the book "Guerilla Marketing" are used.
- Flyers are distributed in the community.
- Emphasis in placed upon developing community partnerships to assist in recruiting.

**C. Referral, Admission, and Exclusion Policy:**

1.  Youth Villages therapeutic foster care program target population includes youth between the ages of 0-19 years who have been removed from the custody of their parents. This includes children who may have behavioral and emotional problems, diagnoses on DSM IV Axis I and II, medical conditions, have a history of sex offending and have completed treatment for offenses, learning disabled, have mental retardation and developmental disability, etc. This includes both males and females in the custody of the Department of Human Resource (DHR).

2.  All referrals for Youth Villages will be made to the Huntsville and Birmingham offices by DHR. In accordance with licensing standards and the Alabama Minimum Standards for Child Placing Agencies, Youth Villages will place no more than one youth with behavioral/emotional disturbances in each foster home. Exceptions are made only for sibling groups and no more than one therapeutic foster child may be placed in a foster home.

The policies governing the placement process used by Youth Villages are in accordance with the Multiethnic Placement Act (MEPA). MEPA was enacted in 1994 and revised in 1996 to govern the practices of adoption placements with the enactment of IEPA, the Interethnic Adoption Provision Act. Both provisions address the practice of preference in placements based solely on racially and ethnically matched foster care and adoptive placements for children. MEPA-IEPA mandates that such practices are discriminatory and illegal. Both provisions require diligent recruitment of foster care and adoptive parents to expand the pool of qualified parents who can meet the needs of children awaiting homes.

Child placing agencies, as Youth Villages, may not (a) deny to any person the opportunity to become adoptive or foster parents, on the basis of the race, color, or national origin, or of the child involved or (b) delay or deny the placement of a child for adoption or into foster care on the basis of the race, color, or national origin of the adoptive or foster parents, or the child involved. In addition, warnings against the use of "culture" as a proxy for race, color or national origin is not permissible and may not be used to circumvent the law's prohibition against the routine consideration of race, color, national origin.

Within the Youth Villages program, selection of youth and treatment homes is based on a matching process, which is utilized to ensure the best possible treatment environment conducive for change. Selection and placement of youth will take into consideration the treatment issues and needs of the youth and the foster parents, expressed and/or demonstrated ability to meet those needs in the treatment parenting relationship.

Youth Villages uses various tools to determine an appropriate match. Among the objective and subjective measurements used are:
   •The Parenting Strengths Checklist.
   •Information obtained during the home study and group preparation and selection training classes.
   •An evaluation of parenting strengths and needs worksheet.
   •Information obtained from face-to-face interviews with the youth and prospective foster family.
   •The referral packet provided by DHR.

18

Youth Villages placement procedure
- •Appropriate referral will be made to Youth Villages' placement staff for interviewing and matching. Referrals are deemed appropriate unless the referral meets exclusion criteria.
- • If the referral matches with an available treatment home, the Clinical
- •Supervisor/Placement Counselor will present the youth to the prospective foster family.
- •If the family accepts the referral, a pre-placement meeting will be arranged, which will include at least one overnight visit. The pre-placement is not scheduled without the approval of DHR and birth family when appropriate.
- •If the pre-placement meeting is successful, placement staff will arrange a placement date with DHR.
- •If the pre-placement meeting is unsuccessful or the family declines the referral, the placement staff will proceed to look for another home. If no other home is available, the placement staff will keep the youth's name on the waiting list and notify the Placement Services Department of ongoing efforts to target recruit foster families for the referral.

## Intake Procedures
Information given to youth upon placement
Child's Handbook, which includes the following:
- • A description of Youth Villages.
- •A description of foster care.
- •Youth rights and responsibilities.
- •Youth grievance procedure.
- • Guidelines and expectations.
- • Behavioral planning process.

Personal Safety Program
- • Information on Toxic Shock Syndrome
- • Grievance Form (Initial)
- • Grievance Investigation Form
- • Acknowledgement Form

## Information given to the youth's birth family
Family Handbook, which includes the following:
- • What is Youth Villages?
- • Our Mission.
- • Family is the focus .
- • The foster care program.
- • Qualifications of treatment parents.
- • Working together to meet the needs of your child.
- • Your role in treatment.
- • Keeping in touch with your child.
- •Medical emergency services.
- • Length of stay.
- • Questions asked by parents.

19

**Information given to Foster Parents**
Copy of the Placement Contract
Child information which includes:
- Copy of birth certificate
- Copy of social security card
- Educational information needed to enroll in school

Copy of emergency medical release
Medication logs (if child on medication)
Allowance forms
Instruction regarding who and how to contact staff in the event of an emergency
Copy of Medicaid card and/or the original card
Clinical Supervisor reviews the policy and procedure manual and youth's behavior plan with foster parent within 72 hours of the placement.

Information given to custodial agency
Copy of all placement releases/authorization
Information regarding how to contact staff as needed

3. Specific criteria for exclusion from program:
Youths who are actively homicidal, suicidal, or psychotic without control of medications can not be accepted into the program. Also ineligible are youth who are constantly displaying assaultive or combative behaviors (e.g. routinely assaulting other children and adults with weapons), those who consistently demonstrate self-injurious behaviors that may result in fatal injury, and those with complex medical conditions requiring isolation.

Special matching consideration and precautions will be made for youths referred for placement with a history of sexually offending behavior and involvement in the criminal justice system. Youth Villages will not knowingly expose a family or neighborhood to such risk by placing someone who is at high risk of continued involvement in criminal activity. Placement of untreated or relapsed sex offenders will not occur. Placement of treated sex offenders will be made only when treatment professionals have determined that the client has demonstrated progress in treatment, which includes remorse for past offenses and victims, and the development and reliance on a relapse prevention plan.

**D. Service Delivery**
Youth Villages provides an integrated service delivery program that includes therapeutic foster care services and in home counseling to children and their families. The primary focus is to identify all systems that impact a child's life and their family and enable them to develop the skills to be successful in each system. Youth Villages is committed to serving children and families in the most appropriate treatment setting.

The therapeutic foster care program was developed by Youth Villages in 1992 and utilized the Re-Ed philosophy, and Oregon Social Learning Center, now known as Multidimensional Treatment Foster Care (MTFC), for the design of our treatment model. Our program is equipped to provide services for youth from birth to 21 years who have been removed from their families due to their own behavior and emotional issues or as a result of family circumstances.

20

Youth Villages has been recognized across the country as a leading provider in comprehensive services to children and families. In Patricia Chamberlain's "Treating Chronic Juvenile Offenders "(2003), Youth Villages is the largest site known to implement the MTFC model, serving 400 children and adolescents per day in Therapeutic Foster Care. Since Youth Villages began using the model in 1992, the organization has been able to serve more youth in a less restrictive environment and has been more successful in reuniting children and families since the implementation of the MTFC model.

In the past twelve years, services have been provided to teenagers with various diagnoses and family histories. The Multidimensional Treatment Foster Care model and the Casey Foundations Life Skills and Social Skills Institute Independent Living curriculum have been used with great success in helping provide a safe and conducive treatment environment. Our foster parents and staff have served as a support system to these children and in many cases have provided long-term support long after the children leave, our program.

Therapeutic Foster Care
Youth Villages' therapeutic foster care program, allows children who cannot be with their families for reasons beyond their control to receive the treatment they need in a stable home with specially trained treatment parents. It is especially critical in the successful management of a program since treatment foster care is frequently utilized as a transition to the community for youth with significant emotional and behavioral problems.

**Treatment Strategies within Foster Care**
Foster families, as the primary instrument of encouraging adaptive change, use a variety of treatment techniques. These strategies include: social/behavioral reward systems, positive reinforcement of desired behavior, communication techniques that encourage the direct expression of emotions and thoughts, negotiation/problem solving skills that develop the ability to create and implement alternatives to resolving problems, school cards, life skills, independent living skills, social skills training, which focuses on appropriate interaction in social settings and adjusting to variations in the environment, and assertiveness training. The strategies of teaching or re-educating the youth can range from role rehearsal and role playing to specific task analysis and consistent re-direction by treatment parents.

Families employ other treatment options that are supportive to the primary treatment. Family therapy with the birth family begins with a thorough assessment of the family environment to determine if reunification of the family is a viable option after treatment. Program staff coordinates treatment goals and interventions in an effort to facilitate the transfer of skills learned in treatment to the birth family or permanency placement setting. Foster Care Behavior Specialists and Child Counselors are available to work with birth families to teach them how to follow the individualized behavior management system.

Extensive related services are available for the youth, treatment family and birth families. This component of services is designed to address any atypical problems in the treatment family, as well as to ameliorate issues that have continually plagued the birth family. These services and flexible funds may include interventions such as: assisting in the placement of a homemaker in the home during a period of crisis, temporary employment of a job coach as a youth begins employment, additional funds for school events, reeducation of birth families, contracting for tutoring services, etc.

21

Home-Based Treatment

Youth Villages currently provides home-based treatment designed to serve the most seriously troubled youth. Service delivery is grounded in Multi-systemic Therapy (MST), a model based on more than 10 years of rigorous clinical trials attesting to the model's success in preventing the removal of youth from their families and in reunifying troubled youth with their families. MST is based on nine guiding principles and on the tenets of structural and strategic family therapy and cognitive behavioral therapy. Its goal is to empower parents with the skills and support needed to provide the necessary structure for their child. Home- based counselors will provide counseling and therapy to individuals and families according to a multi-systemic assessment of their needs and goals. Once the home- based counselor engages the family in treatment, therapy will center on goals as stated in the Individualized Service Plan and will involve an understanding of the sequences of behaviors between and among all systems, including family, school, peers, individuals, and the community. Home based counselors will provide cognitive-behavioral therapy when needed and family therapy based on structural and strategic family therapy principles. Included will be parenting education, case management, and child development information. Almost all counseling will take place in the home.

Services Provided to Children and Families
The following services are provided to children and families while in Youth Villages programs. The services are implemented by appropriately credentialed or licensed individuals. Youth Villages' treatment will be based on the identified services needed in the Individualized Service Plan (ISP). Individualized service plans are developed from the clinical need assessments of each child and family. Interventions and services will include, but are not limited to:

Behavior Modification\Management

      Individual Counseling
      Group Counseling
      Family Counseling
      Substance Abuse Counseling
      Psychological Services & Assessments
      Educational Services
      Individual Education Plans
      Vocational Services and Training including job placement
      Case Management
      Independent Living Education (Casey Foundation Independent Living Curriculum)
      Basic Living Skills
      Dietetic and Nutrition Services
      Crisis Intervention/Stabilization
      Community Support Services
      Extracurricular Activities
      Sexual Abuse and Sexual Perpetration Counseling
      Respite Services
      Treatment Plan Development and Review

Youth Villages has the necessary qualifications to deliver services to children and families. Qualifications to deliver services include the following:

- Extensive experience in providing foster care and in-home services
- Accreditation by Joint Commission on Association for Healthcare Organizations
- Broad range of programs to meet the needs of children and families
- Treatment philosophy based on empirical research and evidence based practices
- Successful implementation of outcome-based continuum model
- Provide high standards of care
- An established organization with over two decades of experience

## Services provided to Birth Families

Youth Villages works diligently to ensure that birth families are involved in all aspects of their child's treatment. This process begins prior to placement in allowing birth families to have input in the selection of the foster home, unless otherwise indicated by the ISP, or court order. When the ISP goal is reunification, family visitation, family therapy and interventions are established at the time of placement. The family is kept informed of all interventions, incidents, or potential movements that occur during placement. Families are notified and invited to attend meetings related to their child. Youth Villages provides visitation as outlined in the ISP and family visitation is supervised as needed. Each visitation will have specific goals and objectives for each visit. The staff will provide 2 hours per week of therapeutic visitation coaching with families and their children. Home visits are an integral part of the reunification process and are an opportunity for parents to practice their skills with the child in the home setting.

Communication with families occurs on a regular basis. As the key to treatment success, families are involved in treatment from the initial placement to the conclusion and implementation of discharge and aftercare plans. The staff will have weekly phone updates with the primary therapists as well as frequent in-home sessions by home-based treatment staff. As a child nears their reunification date, home based services is dually assigned to the case to assess the ongoing needs of the family. These services remain in the home as needed to ensure successful completion of the permanency goal. Youth Villages' in-home services offers three weekly sessions with daily sessions as indicated.

The objective of having foster care and in-home services working simultaneously with the child and family members has been a crucial factor in reducing the length of stay in treatment. The key component in reducing length of stay is working with children and families in order for all family members to be prepared for transitioning the child home.

## Placement Decision

At admission each case is evaluated using a systemic review to determine the selection of the therapeutic foster home based on the clinical need. This review is discussed with all relevant parties prior to placement to obtain agreement from DHR, resource staff, courts, and most importantly, families.

## Critical Event Review in Treatment Planning

One component in the treatment planning process involves a review of critical events since the

last treatment plan update and a discussion of interventions necessary to increase stability of the placement and effectiveness of the interventions.

Permanency

Permanency for youth and families is achieved through effective placement in appropriate evidence-based services as described in the above placement decision process. In order to ensure that services are effectively implemented and that progress toward treatment goals is achieved, weekly or biweekly case reviews occur to evaluate progress and develop new interventions. This treatment planning process, led by clinical consultant, and all team members, moves the case toward transfer to the least restrictive treatment environment and eventually to discharge. The treatment process review above is done in addition to having the quarterly review of the ISP.

Placement Stabilization Process

In the weekly clinical consultation meeting, the clinical staff identifies and reviews cases that have the potential to disrupt. The case is discussed and specific interventions are developed to stabilize the placement. The placement stabilization plan consists of: increasing sessions with the child and foster family, providing additional support to the child and foster family, modifications to the behavior plan, and calling the parents daily to monitor behaviors. The following week the plan and interventions are reviewed and changes are made as needed. The case is reviewed weekly until the placement stabilizes.

Clinical Length of Stay

In order to ensure that cases are transitioned to the most appropriate level of care, each case is reviewed based on the length of stay. As the child's case reaches the length of stay the type of interventions being implemented and barriers to successful transition to the permanency placement are reviewed and modified. This allows all the ISP team members to have an approximate time frame for transition to the permanent placement setting and eventual discharge from our programs.

Step-down process

In addition to the tools mentioned above, our program will assess the child's readiness for step-down. At the initial quarterly review of the ISP, the progress in treatment will be determined and modifications to services will be implemented. Additional services will be provided if deemed appropriate by the ISP team. Youth Villages will utilize the standardized behavior assessment tool developed by DHR to determine if the child is ready for step-down. In the event the child is not ready for step-down, Youth Villages will develop a 90- day plan, with the agreement of the ISP team, and in that time the intention will be to have the child ready for step-down or transition after being in the placement for 9 months. Typically, therapeutic foster care placements make strides in treatment at six months and the 90 day extension will be used to continue stabilization. Another behavior assessment will be administered to the child at the end of the extension period.

Providing the Core Services for Standard TFC

Youth Villages has the ability to comply with the core service standards for therapeutic foster care. Program monitoring reports will be conducted monthly to ensure compliance with DHR standards for Child Placing Agencies, Foster Homes, Therapeutic Foster Care Manual and Medicaid Rehabilitative Services. Youth Villages will provide outcome measures to DHR quarterly. The quarterly progress reports will provide a summary of the progress in treatment and

24

any changes in the ISP, and this report will be sent to DHR. The quarterly report will include the data obtained from the core indicators and the scorecard, which evaluates all aspects of our program. The following provides an overview of the service plan:

Matching and Placement

The matching process is crucial in making placements in order to have children placed in what is considered to be the most conducive treatment environment. Once a match has been identified, staff coordinates the pre-placement process between the child, the treatment family, birth relatives and DHR staff. The pre-placement process involves the presentation of background information on the child to the treatment family, various face- to-face meetings and overnight stays. Following the pre-placement visit staff will consult with the treatment family, the child, birth relative (when appropriate), and the child's DHR worker. Staff will be responsible for completing the documentation requirements for pre-placement visits and educating the foster family on the policy regarding notice of a potential disruption.

Other objective and subjective measurements used to facilitate the matching process include the following:

The Parenting Strengths Checklist
Individualized Training Form
Information obtained during the home study and training
An evaluation of parenting strengths and weaknesses
Information obtained from face-to-face interviews with youth and /or sibling group
Consultation with DHR
Review information in the referral packet
Information from interviews with the birth family

Treatment Planning

The Individualized Service Plan (ISP) will provide the basis for the youth's daily treatment. The initial ISP will be completed within 10 days and scheduling will be coordinated with DHR. A comprehensive ISP will be completed within 30 days and will be developed based on the recommendations from the ISP team. Staff will provide a progress report of the first 30 days of placement at the meeting. Youth Villages has treatment plan reviews every two weeks to monitor the progress on each case. In the event that the Intake Evaluation can not be completed by DHR, Youth Villages will conduct an Intake Evaluation.

Therapy

Therapy services, individual, group and family therapies, are provided by licensed and credentialed staff or staff who are under the supervision of licensed practitioners. All services are provided in accordance with scope of practices and licensure laws, rules and regulations. Therapy focuses on the cognitive processes and the behavioral issues related to the child's ability to live successfully in the community. The child counselor and/or behavior specialist will have weekly face to face contact with the child. The child counselor will provide the therapy for the child monthly or more frequent as clinically indicated for the child and family. Monthly group therapy sessions will be provided for the children where interventions are tailored toward specific goals on the ISP. The monthly group treatment is provided by a qualified professional. Individual behavior plans will be developed for a child, in coordination with the recommendations from the ISP, which identifies specific clinical and behavioral needs and interventions for each child, birth family, and treatment family. A behavior assessment tool

25

developed by DHR will be administered to assist with determining the areas of need.

Educational Services

Educational services are provided by the local school system where the therapeutic foster home is located. The Behavior Specialist will conduct visits to the school and provide behavioral support as needed. A monthly educational summary is documented in the child's record, and Youth Villages' staff is present at all school meetings. School responsibilities include:

- Regular visits to the school and behavioral support as needed, at a minimum monthly more frequently if needed.
- Monthly educational summary is documented in each child's records, and Youth Villages' staff is present at all school meetings.
- Attendance at Individualized Educational Plan meetings with the clinical supervisor, counselor, DHR, birth parent and other resources.
- Emergency response and crisis intervention services to school personnel when indicated.

An additional service provided will be the use of school cards for children. This card allows the student and the teacher to note how the child did at school on any given day, academically and behaviorally. The card is then given to the therapeutic foster parent each day. The child can earn privileges for the completion of the school card and for giving it to the treatment family.

Adjunct Services

The implementation of adjunct services is determined through the decisions made in the ISP team meetings. Therapeutic foster care and home-based treatment typically access specialized services in the local community that ensure easy access and enhanced participation. Augmented and additional support services are offered to resource families, biological/caregiver families, and children through a variety of trainings and specialized services. Trainings designed to provide additional support include: Individual Rights and the American Disabilities Act, What is Abuse? How do we prevent it?, Individual Support Plans, Seizure Training, Behavioral and Mental Health Supports, TQI Settlement Agreement, Self-Determination, Challenges in Physical Management, Meal Time Challenges, Competency Check-off, and Implementation Strategies. The additional training addresses specific needs of the foster parents related to the youth placed in their homes. Monthly support group meetings are conducted where the parents get first-hand advice from parents with similar experiences as well as input from their Clinical Supervisor.

Youth Villages works in conjunction with the custodial department to ensure that all medical, psychological, educational, and community needs of each child are met. Each child will be involved in pro-social activities in the community. The involvement in extracurricular activities is an essential component in assisting children to develop age appropriate skills and an opportunity to engage with their peers in an appropriate environment.

Basic and Independent Living Skills

Youth Villages will provide basic and independent living skills, both group and individual based on the targeted areas of need determined from the ISP. The treatment family and clinical staff will receive on going training to enhance their abilities to assist children in developing daily and independent living skills. The staff will provide 18 hours weekly of individual basic living skills training to include the following but not limited to: behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene,

26

housekeeping, medication management, laundry and using public transportation. The behavior specialist and treatment family will have the primary responsibility of providing the skills training with the child. The behavior management plan will reflect the specific basic living skills to be addressed based on the ISP goals. The behavior specialist will provide hands-on and practical training to the child in the treatment home setting, community, and in group situations. The staff will coordinate the child's involvement in at least one extracurricular activity. Youth Villages will use the Daniel Memorial Institute for Independent Living Skills curriculum. This program provides specific training modules and techniques that are effective in guiding children to develop the necessary skills for independent living. An assessment will be conducted to determine the mastery of skills.

Crisis Intervention Services

Youth Villages' clinical staff is available to children and families 24 hours a day, seven days a weeks. The staff will provide 5 hours of crisis interventions services per week as needed, to alleviate a crisis for the child or to assist the family in alleviating a crisis. Our program has policies and procedures in place to ensure the safety of the youth and families. The treatment family and staff receive yearly training on managing crisis situations. In the event of an emergency, the child, treatment family, and birth family have pager numbers and contact numbers for the clinical staff. The clinical staff responds to emergencies immediately. If the child's placement is at imminent risk of disrupting or in a potential dangerous situation, a team of two clinical staff will go to the home and assess the situation. Safety plans will be developed and implemented as needed. Respite services will be available if determined that a 24-hour break would be beneficial to the child and family. This respite would not be considered as part of the 48 hours of respite per month provided for the foster family. The following day staff will contact the foster family and child to monitor the home and provide follow-up services when indicated. The clinical staff reports all critical incidents to DHR.

Case Consultation and Clinical Supervision

A key element in successful program operations is the ability of the service providers to conceptualize and then develop youth and family interventions that are consistent treatment approaches, empirically based, and constantly evaluated. Consultations with DHR social workers and consistency with the ISP also serve as foundations for the course of treatment.

Clinical supervision is highly structured and systematic. Counselors are expected to prepare ahead of time a coherent assessment, intervention, measurement and reassessment plan. This process will apply to clinical issues as well as case management issues. The supervisor and managerial staff follow the same process for evaluating and developing staff as outlined in the figure below.

27

## SUPERVISION MODEL



Youth Villages' supervision model will ensure that counselors are using the following method of assessing the child and family's needs assessing safety and designing interventions:
- Engaging the family in treatment
- Assessing all systems, including family, school, peers, individual, and community
- Designing interventions based on permanency plans, child and family team decisions, and family goals
- Measuring intervention efficacy
- Assessing the family's progress
- Designing new interventions and targeted planning while continually reassessing and engaging the family in treatment

The supervision model addresses key factors that help ensure counselor success:
- Alignment with the youth and family on treatment goals
- Measurable interventions directly linked to youth and family goals
- Ongoing assessment of the fit of the youth and the family's success in following through on interventions

## Foster Parent Family Training and Services

Foster family training is the most crucial component of Youth Villages' therapeutic foster care program. The content of pre/in-service training is designed to augment the family environment and parenting skills of therapeutic foster families. The structure consists of 45 hours of classroom instruction and homework assignments: Group Preparation/Selection Training Curriculum (GPS), Multi-dimensional Treatment Foster Care (MTFC) and The Mental Retardation/Developmental Disabilities (MRDD) Pre-service Training Curriculum (where applicable). Thirty hours of in-service training is provided each year.

The pre-service training sessions address the following areas:
Program Orientation
Behavior Management
The Process of Grief and Loss
The Dynamics of Attachment and Separation
The Values of Families
Individualized Service Plan
Identifying the Strengths and Needs of the Families and Children
Behavior as an Expression of Underlying Needs
Using a Four -Step Approach to identifying and managing problem behaviors
The Value of Partnerships
How Children Enter the Foster Care System
Family Implications among Foster Parents
Underlying and Valuing Cultural Differences
Overview of the R. C. Consent Decree
Youth Villages Therapeutic Foster Care Policies and Procedures
CPR and First Aid
Effects of Multiple Placements
Significance of Birth Families
Substance Abuse

29

Gang Activity
Universal Precautions and Infection control
Baby Douglas Law

Treatment Parent In-service Training

Thirty (30) hours of in-service training is provided each year. One hour of training is provided each month in parent support groups. Parents are encouraged to attend local and state- sponsored training events.

Treatment Family Support and Services
24 hour, 7 day a week on call support
Specialized training in the home by the behavior specialists
Monthly Parent Support Groups (one hour training, one hour networking)
Treatment Parents as Mentors
Treatment Parents as Trainers
48 hours of respite each month
Weekly face-to-face contact with therapeutic foster family
Receive minimum daily rate of $16.
Mileage reimbursement provided to parents when destination is beyond 50 miles

Treatment Parent Support Groups

Parent Support groups are conducted monthly. These groups are conducted by the Clinical Supervisor, and they serve as opportunities for parents to learn new techniques for working with children. One hour of the sessions is didactic and one hour is used for networking and rapport building with staff and other parents.

Foster Parent Recertification Process

Every year, the foster family will have to complete the annual license renewal. The treatment family is required to meet the licensing standards each year to continue serving as a Therapeutic Foster Family. Before a foster home can be recertified, the home had to meet the standards outlined in the Therapeutic Foster Manual and the Minimum Standards for Foster Family Homes. Recertification includes but is not limited to:

- Completing 30 hours of training annually (including required topics), Three references will be contacted, one of which will be a family member

- Valid driver's license

- Automobile and home owners insurance

- Completion of fire inspection and home environmental survey

- Evaluation of performance from the past service year

- Physician statement (as applicable)

- Financial statement

- Motor vehicle record check

Program Evaluation and Performance Improvement Strategies
In addition to research conducted by the outcome evaluation department, foster care has a monthly program monitoring report. The monthly reviews consist of tracking and monitoring adherence to program and licensure standards. Monitors include but are not limited to:

- Compliance with DHR policies
- Compliance with JCAHO
- Adherence to ISP treatment planning
- Health screenings (EPSDT)
- Customer satisfaction surveys
- Provide documentation of service delivery
- Efficacy of treatment
- Safety monitors
- Implementation of treatment model
- Adherence to compliance with Medicaid Rehabilitative Services, Chapter 105
- R.C. Consent decree
- Compliance to documentation
- Program Compliance with MTFC
- Performance evaluations
- Tracking Discharges
- Compliance with FFTA Treatment Foster Care Standards
- Compliance with Minimum Standards for Child Placing Agencies
- Compliance with Minimum Standards for Foster Family Homes
- Compliance with Standards for Therapeutic Foster Care Manual

Quarterly Progress Reports
Quarterly progress reports shall document progress on the treatment goals, describe revisions to the goals and strategies implemented, and specify any new treatment goals and strategies initiated during the review period. The quarterly progress report will summarize progress and any changes, as identified from the ISP team, regarding long-term placement and treatment goals. A copy of the report will be sent to DHR.

**E. Target Area**
Youth Villages will provide services in the following Regions:
Region 6 – Jefferson, Shelby, Chilton, Talladega, Clay, Randolph, and Cleburne counties.
Region 9 – Jackson, Madison, Morgan, Limestone, Lawrence, Lauderdale, Colbert, and Franklin counties.

Youth Villages is requesting 40 slots in each of the above regions. Our Huntsville office will serve counties in Region 6 while an office in Birmingham (yet to open) will serve counties in Region 9. Youth Villages is aware of the need in Madison and Jefferson counties to have adequate resources to serve their children within their county boundaries and will make every effort to assure that their needs are met.

Office Locations
Two office locations in Alabama:

31

Region 6:
    9238 Madison Blvd.
    Building 1, Suite 1300
    Madison, Al 35758
    (256)774-8340
    Fax 256-774-8380
Region 9:
    Office to be located in Birmingham

**F. Discharge Policy**
Discharge and aftercare planning, reunification, outcomes, and step-down process
1. Measuring Outcomes
Most evaluation research has determined that a key measure in the success of treatment is whether youth remain in the community or in a less restrictive environment following discharge. Youth Villages research department gathers information about the status of each child at 6, 12, 18, and 24 months after returning home, as required by provider guidelines. Information on where the child resides, custody status and functioning of the child will be obtained from the Alabama Department Human Resources, parents, relatives and other adult caretakers. Current data from Youth Villages discharges indicate that 82 percent of all cases discharged are living successfully in a permanency placement at nine months following discharge.

2. Discharge prior to program completion
Youth Villages goal is to maintain placements until the child has completed the program. In the event that a placement is disrupting, our program will adhere to the 14-day- notice policy required by DHR, unless the child or family is at imminent risk of harm. Youth Villages has the policy of requiring the foster parents to give a 30- day notice before requesting a child to be removed from the home. The intent is to stabilize the placement during the notice in order to prevent the child from having to change placement.

3. Re-admission policy
Youth Villages will re-admit children who meet the criteria for placement, and a child will not be denied services unless the child meets the exclusion criteria. The policy for re-admission is for DHR to refer the child to Youth Villages and the placement staff begins the matching process. Youth Villages maintains a no reject/eject policy for all children who meet the program criteria.

4. Step-down procedure
Discharge planning and determining the aftercare needs begin upon placement. Youth Villages will follow the ISP team goals when developing the interventions to achieve permanency for the child and family. The following criteria will be used to determine readiness for step-down, transitioning home, and aftercare services when applicable:
    Progress reports demonstrate improvements made on targeted objectives
    Child's behavior has stabilized in the treatment family
    Improvements made in working on referral behaviors
    Reasonable gains are made in Educational/Vocational Services
    Scores have increased on the DHR behavior assessment tool
    Child is involved in pro-social activities
    Child is able to engage in positive peer interactions

Improvement in basic and independent living skills
Stability on medication (if applicable)
Family visitations are occurring as outlined in ISP
Family and child are having overnight visitations
Decrease in critical incidents or crisis situations
In- home services are in place and preparing for transition
Training and skills teaching is being provided to birth family
Birth family able to implement goals for visitations
Community support and services are available to birth family
Setting up aftercare services in the community based on ISP needs

Components of the criteria above will be used to determine if the child is ready for step-down. The initial quarterly review with the ISP team will evaluate the progress made. The ISP team will determine if the services provided are meeting the needs to prepare the child for step-down or reunification, if appropriate, when the child reaches six months in the current placement. Youth Villages will work in conjunction with DHR to schedule an ISP team meeting when the child has been in placement for six months. The ISP meeting will be used to determine if step-down or transition is appropriate. The DHR behavior assessment tool will be administered to evaluate progress. Youth Villages will be responsible for increasing services to the child and family if the need is indicated due to the child or family's requiring additional services before step-down or reunification occurs. Youth Villages will follow the recommendations from the ISP team and will provide service changes as outlined in the ISP.

The goal of family treatment is to help prepare the birth parents for the child's return home. Family interventions focus on increasing parenting skills, teaching communication skills, providing encouragement, appropriate discipline, using positive discipline techniques, developing support systems in the community, locating community activities for the child and family to participate, and providing support to the family during the education process, family visitations, and during the transition phase.

The clinical staff will be responsible for initiating the services to the birth family. The staff will provide skills training to the parents supervise visitations as required, and assist with the home visitations. Home visitations demonstrate the birth parents commitment to having the child return home. Parents begin to practice their skills while the child is on home passes. The child and parents are learning that things are going to be different once the child returns home. Also, the passes assist the child in being more accepting of the guidance and structure that the family is implementing. The structure and consistency the child is learning in the treatment family is a key factor in the child being able to comply with the parents rules. The child and parents will be able to take the gains made from the out –of- home placement and apply them in the home setting. Typically, in home services are added once the child and family start having weekend visitations. Youth Villages in-home services will provide three weekly sessions and daily sessions as indicated. As the child and family approach discharge, the in-home services will decline to empower the child and family. In home services will continue to work with the family once the child is transitioned home and remain in place until the family is ready for complete discharge from Youth Villages.

33

**G. Prior Experience**

Youth Villages' therapeutic foster care program allows children who cannot live with their birth families to be in a stable home with specially trained therapeutic parents. Treatment foster care is frequently utilized as a transition to the community for youth with significant emotional and behavioral problems. Youth Villages' foster care program began 13 years ago in April of 1992, after responding to a request for proposal to provide foster care services in Tennessee. By the end of the first year of operations, 90 youths were in placement and today more than 400 youths and their families receive treatment services in 16 office locations in Tennessee, Mississippi, and Alabama. In the past thirteen years, services have been provided to teenagers with various diagnosis and family histories. The Multidimensional Treatment Foster Care model and the Casey Foundations Life Skills and Social Skills Institute Independent Living curriculum have been used with great success in helping provide a safe and conducive treatment environment for youth. Our foster parents and staff have served as a support system to these kids and in many cases have provided long-term support after children have left the program.

Youth Villages' goal is to have long term success for the child and family after discharge. Some key factors that determine a positive post discharge adjustment is: support to the youth and family, respite services, access to services during crisis or potential crisis situations and community support. The child and family are ready for discharge once these services are in place.

Placement at 9 months Permanency Setting for all discharges



34

Role performance, or ability to function in the community, is also an important indicator of treatment success. Therefore, in addition to placement, our research department examined role performance for children in permanency placement was examined. It was hypothesized that youths who are actively engaged in appropriate life skills such as attending school, seeking employment or working are more likely to become self sufficient, productive adults. Safety for the youth and the community was determined by collecting information about involvement with legal authorities or runaway behavior.

Functioning in the Community

Data from all cases indicate the following:

- Appropriate role performance (attending school, seeking employment or working) 92%
- Free of involvement with legal authorities 79%
- Remained in placement (no runaway) 92%

Reporting

Performance measures for DHR are compiled, analyzed and transmitted by the Youth Villages Research and Outcome Evaluation Department. Led by senior staff with extensive evaluation experience, this data is also included in the performance scorecard process. To insure timeliness of reporting, two staff members are trained in the data collection process, which is automated on our electronic medical record system. To ensure bias- free data, members of this department are not associated in the provision of treatment. The Outcome Evaluation Department will track all discharges at 6-month, 12-month, 18-month, and 24-month intervals post discharge.

Youth Villages is experienced at providing the core and family services to fulfill the requirements outlined in the RFP Attachment A. Our programs are developed to provide the individualized treatment to children and families. Individualized treatment programs are based on clinical need assessments of each child and family. Interventions may include, but are not limited to:

Behavior Modification\Management
Individual Counseling
Group Counseling
Family Counseling
Substance Abuse Counseling
Psychological Services & Assessments
Educational Services
Vocational Services and Training
Case Management
Casey Foundation Independent Living Curriculum
Dietetic and Nutrition Services
Crisis Intervention/Stabilization
Community Support Services
Sexual Abuse and Sexual Perpetration Counseling
Clinical Consultation Services
Therapy a treatment support to the foster family
Intensive services provided to birth families

35

The Therapeutic Foster Care program integrates components of Re-Ed, MST, and
Multidimensional Treatment Foster Care in all aspects of the program.
**Multi-dimensional Treatment Foster Care Model Components**
> Therapeutic foster parent support
> Behavior management plans
> Parent Daily Report (PDR)
> Community involvement
> Multi-disciplinary and systemic approach to treatment
> Working with birth families

The following describes the program functions that support and define each of the primary
components noted above.
Therapeutic Foster Parent Support
   a) Pre- Service Training and Continuing Education
   b) Certification and Recertification
   c) Parent support group
   d) Visits to the foster homes
   e) Networking (i.e. mentoring, community resources, other parents)
   f) Respite as required or more often when requested
   g) Behavior specialist support and training
   h) 24 hour on call (returning calls and pages in timely manner)
   i) Feedback
   j) Recognition and appreciation
   k) Celebration

Incentive and Strength based Behavior Management Plans (Initial chart developed by clinical
supervisor, foster parents, child and birth parent when appropriate)
   a) Consistently review point sheets
   b) Utilize tracking form for target behaviors (review in training how to assess correlation
      and the escalation curve)
   c) Incorporate School Cards in plan
   d) Congruence between behavior chart, treatment plan, and behaviors reported on the
      PDR
   e) Accurately monitor progress on improving behavior
   f) Build in successes
   g) Set chart up to earn rewards for positive behavior
   h) Develop age-appropriate charts that are specific to the child's needs as well as easily
      adaptable to the lifestyles of the foster parents
   i) Weekly supervision with behavior specialist

Parent Daily Report Integration
Use as guide to facilitate parent support groups
   a) Incorporate in foster parent and staff training
   b) Integrate in treatment. plan and behavior charting
   c) Use aggregated data to support community resource needs (schools, courts,
      psychiatrist visits)

36

d) Use with birth families to help identify behaviors that may need to be targeted in order to reunite the family
e) Convert raw data into visual analysis of behaviors in order to monitor effectiveness of interventions
f) Integrate into Clinical Length of Stay review process in order to identify specific issues that are barriers to the child moving to permanent placement
g) Compare with the Child Desired Questionnaire in order to target potentially disruptive behaviors
h) Utilize data in re-placements to make matches

Multi-disciplinary and systemic approach to treatment
a) child involved in prosocial activities
b) working with the school system
c) developing positive peer relationships
d) attend all meetings involving the child and family
e) assist family in developing community support system
f) providing visitation with the birth family
g) working with birth families to achieve reunification

## H. Staff Qualifications, Staff Recruitment, Job Descriptions, and Training Requirements

Staffing Patterns

The staffing pattern developed for the program is essential in implementing a therapeutic foster care program. The administrative, programmatic, and staff consists of the chief operating officer, assistant director, and the regional supervisor. The staff ratios are necessary to provide the services to children and families. The following is the staff ratio for the clinical staff:

Clinical supervisor = 1:6
Child counselor = 1:8
Behavior specialist = 1:8

Education and Experience

The information below provides the education and experience required for the Administrative, Program and Treatment Staff.

Chief Operating Officer: Foster Care

Masters degree in field of social work, psychology, administration or related field and must have 3-5 years of supervisory experience in family and children's services and experience in supervision and administration

Assistant Director

Masters degree in field of social work, psychology, or related field and must have three years of supervisory experience in family and children's services and experience in supervision.

Regional Supervisor

Masters degree in field of social work, psychology, or related field and must have two years of supervisory experience in family and children's services and experience in supervision.

37

Placement Coordinator
Minimum of a Bachelor Degree in the field of social work, psychology or related field,
knowledge of policy and procedure requirements for DHR, ability to analyze data and experience
in working with the child welfare system.

Clinical Supervisor
Licensed as a certified social worker or graduate social worker, have two years experience in
family and children services.

Child Counselor
Masters degree in social work, psychology or related field and two years experience in providing
therapy, experience in developing and implementing treatment plans.

Behavior Specialist
Masters degree in social work, psychology or related field and two years experience in providing
therapy, experience in developing and implementing behavior plans.

Clinical Evaluation Manager
Minimum of a Bachelor Degree in the field of social work, psychology or related field,
knowledge of policy and procedure requirements for DHR, ability to analyze data and experience
in working with the child welfare system.

Training and Placement Manager
Masters degree in field of social work, psychology, or related field and must have two years of
supervisory experience in family and children's services and experience in supervision and skills
in marketing and recruiting.

Placement Counselor
Masters degree in social work, psychology or related field and experience in providing therapy,
and assessment skills.

Trainer
Licensed bachelor degree in social work, complete GPS training, communication skills both oral
and written

Recruiter
Bachelor degree in social work, psychology, marketing or related field.

Staff Qualifications, Education and Job Descriptions
   Leadership Team
   Chief Operating Officer: Foster Care
   Program Director: The Director is a member of the leadership team and works under the
supervision of the chief executive officer of Youth Villages. The director is responsible for
the total quality management and continuous quality improvement for the foster care
program. Responsibilities also include the selection of qualified staff, the development of
policies and procedures, proposal and grant writing, and site and program development.
Continuous quality improvement focuses on internal and external customer expectations and

38

satisfaction with outcomes that are consistent with JCAHO, state licensure, Foster Family Treatment Based Association standards, and DHR contracts. Requirements for the position: masters degree in field of social work, psychology, administration, or related field and must have three to five years of supervisory experience in family and children's services and experience in supervision and administration.

Assistant Director:  The assistant director is a member of the leadership team and works under the supervision of the director.  The assistant director is responsible for monitoring the overall implementation of program policies and procedures as well as facilitating special projects and teams. Requirements for the position:  masters degree in field of social work, psychology, or related field and have three years of supervisory experience in family and children's services and experience in supervision.

Regional Supervisor:  The regional supervisor reports to the assistant director of foster care. As the manager of the assigned region, the regional supervisor oversees the clinical staff, the maintenance of the foster homes in the region, and the on-going treatment of the foster children in those homes.  The regional supervisor is responsible for providing supervision and oversight management for all the staff in their region of responsibility.  The regional supervisor works to ensure that approved policies and procedures are administered.  The regional supervisor evaluates data from the program, provides feedback and suggestions for improvement, and manages other special projects as assigned by the director/assistant director. Requirement: masters degree in field of social work, psychology, or related field and have two years of supervisory experience in family and children's services and experience in supervision.

Placement Coordinator: The placement coordinator is supervised by the director and is on the leadership team.  The placement coordinator oversees all of the placements within the program and works closely with Youth Villages Placement Services Department. Requirements for position: minimum of a bachelor degree in the field of social work, psychology or related field, knowledge of policy and procedure requirements for DHR, ability to analyze data and experience in working with the child welfare system.

Clinical Staff
Clinical Supervisor (CS):  The clinical supervisor works under the supervision of the regional supervisor/assistant director, and is primarily responsible for serving as the clinical leader and supervisor for the child counselors and behavior specialists.  The CS is responsible for ensuring that the following clinical functions are being provided:  child and family therapy, parent daily progress reports, supervision of treatment homes including recertification, treatment parent training through support groups, youth placements, and birth family services.  The CS is responsible for maintaining scorecard data, documentation integrity, and team building activities.
Requirements for position: Licensed as a certified social worker or graduate social worker, have two years experience in family and children services.

Child Counselor (CC):  The child counselor works under the supervision of the clinical supervisor and is responsible for providing individual therapy and treatment planning for youth placed in the program.  The CC is responsible for maintain the child's documentation

and medical record. Requirements for position: masters degree in social work, psychology or related field and two years experience in providing therapy, experience in developing and implementing treatment plans.

Behavior Specialist (BS): The behavior specialist works under the supervision of the Clinical Supervisor and is responsible for developing and implementing specialized behavior management plans as it relates to daily-adaptive functioning. The BS provides problem solving for behaviors through 1:1 skills coaching, facilitation of family sessions, and assisting with in-home interventions with both the treatment family and the birth family as it relates to teaching new skills to treatment parents. Requirements for position: masters degree in social work, psychology or related field and two years experience in providing therapy, experience in developing and implementing behavior plans.

Clinical Evaluation Manager (CEM): (regional) The clinical evaluation manager works under the supervision of the regional supervisor. The clinical evaluations manager is responsible for maintaining program integrity, documentation scorecards, and consistency with JCAHO, State Licensure, FFTA standards, and DHR contracts throughout the region. minimum of a bachelor degree in the field of social work, psychology or related field, knowledge of policy and procedure requirements for DHR, ability to analyze data and experience in working with the child welfare system.

Training and Placement Staff
Training and Placement Manager (TPM): The training and Placement Manager works under the supervision of the Director/Assistant Director/Regional Manager. The Training & Placement Manager is responsible for coordinating the recruiting and training of foster parents as well as all placement and referral activity. The TPM supervises the recruiters, trainers, and placement counselors, and works closely with the Youth Villages Placement Services. Requirement for position: masters degree in field of social work, psychology, or related field and must have two years of supervisory experience in family and children's services and experience in supervision and skills in marketing and recruiting.

Placement Counselor (PC): The placement counselor works under the supervision of the training and placement manager, and is responsible for coordinating all referrals, interviews, and placement processes. The PC conducts intake interviews with prospective placements and works closely with the placement coordinator and Youth Villages Placement Services. Requirements for position: masters degree in social work, psychology or related field and experience in providing therapy, and assessment skills.

Recruiting and Training Staff:
Trainer: The trainer works under the supervision of the training and placement manager and is primarily responsible for instructing the treatment parent curriculum Group Parent Selection (GPS). Other duties include conducting home studies, maintaining records, and verification data on all applicants and potential treatment parents, and recruiting and training Resource Parent Trainers. Requirements for position: licensed bachelor degree in social work, complete GPS training, oral and written communication skills.

40

Recruiter:  The recruiter works under the supervision of the training and placement manager and has the primary responsibility of executing a marketing plan for recruiting therapeutic foster parents for an assigned region.  The recruiter is responsible for being in the community, actively making presentations of the foster program, coordinating media coverage, and answering inquiry calls concerning foster parent recruitment. Requirements for position: bachelor degree in social work, psychology, marketing or related field.

Support Staff:
Office Managers:  Office managers work under the supervision of the regional supervisor or assistant director.  They work primarily at the discretion of their supervisor and are generally responsible for organizing office support procedures.

Secretaries/Receptionists:  Secretaries/receptionists report to designated supervisors in each office.  They are responsible for answering telephone calls, greeting visitors, and performing other assigned office support.

 Criminal History Check
Youth Villages completes a criminal background check prior to an employee being offered a position and this includes interns and volunteers. The check includes obtaining fingerprints, motor vehicle report, and clearance from the sex abuse registry. People convicted of crimes are not eligible for employment without the department issuing a letter of suitability. Each office maintains a personnel file for each staff member and contains the documentation to reflect the staff's eligibility for employment. In the event an allegation is made, the director will suspend and remove the staff until the investigation is resolved. If the findings are substantiated, this would result in termination of the employee. Youth Villages will notify DHR immediately of any incidents regarding allegations.

Critical Incident Reporting and Notification of Family, Guardians, and DHR
The process for the notification of family, guardians, custodial agents, and Youth Villages' staff on the occurrence of a critical event is outlined below.

The on-site leadership staff shall first maintain the safety and meet the needs of youth and staff involved. The leadership staff and clinical team members are on call 24/7 to respond to critical incidents and emergencies. The clinical staff have provided the children and families with pager and contact numbers in the event of an emergency. The staff respond immediately to the crisis call. The staff completes the documentation of the incident in the electronic medical record. Once safety is ensured, the following notifications shall be made by the clinical supervisor:

1.  The director shall be contacted by phone immediately
2.  As soon as possible, notify:
    • Parent / Guardian or Involved Adult.
    • DHR Worker.
3.  Complete the critical incident note in the electronic medical record.
    • In the body of the note, identify that parents were notified by phone
    • In the notification section, note that the DHR and parent were notified.
    • If the incident occurs after 4:30 pm or on a weekend, list the next business day as the date of notification.

41

4. Critical incidents will be sent by the clinical staff to DHR and other state officials with a need to know.
5. All documentation concerning the event and notifications shall be noted in the medical record with copies of the documentation forwarded to the director within 24 hours.
Incidents:
- Abduction of a youth
- Abuse by staff, physical or sexual (Notify DHR )
- Arrest of staff (includes foster parents) with confirmation by law enforcement agency
- Arrest of a child or youth
- Arson
- Assault – major (medical attention off property required):
  -By a youth on another youth
  -By a youth on a staff
  -By a youth on a visitor or member of the general public
  Death, youth involvement: Includes a youth's witnessing a death or a youth's involvement in an accidental death. Not in a homicidal capacity
- Denial of critical care (notify DHR in county where incident occurred).
- Death of employee while on duty
- Bomb threat
- Emergency treatment (requires hospitalization, ER treatment)
- Evacuation/physical plant problems (safety or well-being threatened)
- Excessive force - injury to child or staff. (Notify DHR)
- Medication error that seriously affects or has the potential to seriously affect the health and safety of the child
- Weapon, possession without authorization.
- Runaway, **Notify parent and DHR case worker Immediately**
- Vehicle accident resulting in an injury or significant property damage
- Use of law enforcement: Any situation when law enforcement, local or state, has been called
- Mental Health emergency transfer.
- Allegation of rape - sexual penetration with coercion.
- Riot
- Self mutilation. When medical attention is required, the youth's custodial adult shall be notified
- Sexual Assault: Allegation, with merit, that a youth assaulted. Notify DHR in county where incident occurred.
- Suicide or serious suicide attempt.

Within 24 hours, deliver a copy of the DHR Serious Incident Report and a follow-up report to the responsible director. A phone call may be required depending on the seriousness of the incident.
- Mail a copy of the Critical incident form to the DHR case manager by 9:30 am the next business day.

Other incidents requiring notification include:
- Admission to hospital for any reason (planned/scheduled)

42

- Assault, minor (medical attention was provided on property)
  -By a youth on another youth
  -By a youth on a staff
  -By a youth on a visitor or member of the general public
- Possession or use of drugs or intoxicants that have been brought on a campus or into a foster home: narcotics, stimulants, alcohol, medication not prescribed for youth
- Failure of a youth to return from pass at the scheduled time
- Impropriety: Allegations having merit are made concerning improper acts or associations between a child and DHR or contract agency staff, including foster care parents
- Sexual Misconduct: Allegations with merit, of sexual misconduct of one or more youth
- Staff injury, major: staff required off campus treatment and did not return to work

Risk Management Team

1. The Risk Management team shall consist of leadership staff from each discipline, including but not limited to:
   - Chief Operating Officers
   - Memphis Boys Town Director
   - Dogwood Village Director
   - Deer Valley Director
   - Community-based Program Manager
   - Group Home Regional Manager
   - Director of Performance Improvement
   - Support Services Director
   - Intercept Director
   - FAMILIES Director
   - Leadership staff from programs
2. The Risk Management team shall meet quarterly or more often as needed.
3. There shall be adequate documentation of each meeting.
4. Conclusions, recommendations, and actions of the Risk Management Team shall be reported to the administrator and other designated staff.
5. The authority of the Risk Management Team is given by the administrator or his designees when conditions exist that pose an immediate threat to life or health.
6. The Risk Management Team shall review critical incidents that have been identified as questionable. If problem areas are noted, a plan of action is determined by the team.
7. An annual review of the safety program is conducted by the Risk Management Team.

Risk Assessment Process

- Risk management indicators are set by Risk Management Team to establish triggers for completion of risk assessments.
- Once identified; a member of the Risk Management Team or their designee completes a case review.
- Reviews comprise an evaluation of the clinical record and staff consultations as needed. Once completed, team members complete a summary report.

43

- The assessment includes:
- Results of review:
  - a. actions already taken since the events
  - b. evaluation of appropriateness of actions
  - c. verification of notification to appropriate parties
- Plan of future interventions:
  - a. assessment of employment or placement appropriateness
  - b. discussion of alternative interventions not previously considered
  - c. options if behaviors or situation is not alleviated
- Upon completion, the record is sent to the appropriate leadership staff to co-sign.

## Internship Program
The Youth Villages Internship Program offers unique, hands on experience working with emotionally disturbed kids in some of our therapeutic foster care offices. A week long orientation process prepares our interns to work closely with and under the supervision of licensed staff. Interns go through the same pre-employment interview, screening and background checks required for full time employment. The Department is managed by a coordinator who works in conjunction with program staff

## Staff Recruitment
Youth Villages Staff Recruitment department uses several methods to communicate career opportunities at Youth Villages. Department staff and graduates from colleges and universities serve as liaisons to institutions of higher learning throughout the United States. Staff attends career fairs and they frequent the placement departments at various institutions. In addition, staff experienced in evidences based treatment programs serves as instructors at local colleges and universities. Job vacancies are posted on the company website, national search engine websites, and at colleges and universities.

Recruitment for experienced and licensed staff is conducted by placing ads on Child Welfare and professional organization websites, such as CWLA, FFTA, NASW and ads are placed in local newspapers.

## Staff Training and Development
Youth Villages has all staff complete a one week orientation from the Performance Improvement Department, the orientation includes but not limited too: treatment philosophy, sex abuse, crisis management without the use of restraints, overview of therapeutic foster care, training in our treatment methodologies, HIPPA, computer training, etc.

Following orientation, staff completes the on- the -job training requirements before assuming a caseload. The Supervisor is responsible for ensuring the training is completed and the documentation of training hours is filed in the employee personnel file. The training consists of: behavior planning and management, the Family Connections book, by Patricia Chamberlain as an introduction to Multi-Dimensional Treatment Foster Care, working with birth families, basic and independent living skills, cultural diversity, documentation requirements, customer service, developing relationships, preventing disruptions, grief and loss issues, R.C. Consent Decree and polices, etc.

44

Youth Villages employees receive 40 hours of in-service training each year. This training is provided in each office on a monthly basis staff are also encouraged to attend conferences; the company provides yearly Employee Conference for staff; guest speakers provide staff training; several staff attend the Foster Family Treatment Based Association each year; numerous staff participate in the tuition reimbursement program to further their education; and staff are receiving supervision to obtain licensure. Staff receives supervision each week to address performance and work on professional development. The staffs has performance reviews after being employed for 6 months and receive reviews annually.

**References**
Mrs. Bonnie Hommich
Deputy Commissioner
TN Department of Children Services
436 6th Avenue North, 7th Floor
Nashville, TN 37243
Telephone – 615-741 – 9702
Email: bonnie.hommich@.state.tn.us

Mr. Randal Lea
Executive Assistant to the Commissioner
TN Department of Children Services
436 6th Avenue North, 7th Floor
Nashville, TN 37243
Telephone – 615- 615 – 253 – 4360
Email: randal.lea@state.tn.us

Mrs. Judy Cole
Executive Director
Office of Regional Support
TN Department of Children Services
436 6th Avenue North, 7th Floor
Nashville, TN 37243
Telephone – 615- 741 – 9702
Email judy.col@state,tn.us

Gary W. Mitchell, Program Manager
Office of Licensing and Resource Development
Alabama Department of Human Resources
50 Ripley St.
Montgomery, AL 36130
(334) 353-1196
email:gmitchell@dhr.state.al.us

45

Gail Young
Placement Director
Mississippi Department of Human Services
Division of Family and Children's Services
P.O. Box 352
Jackson, MS. 39205
(601) 359-4499
Email Gyoung@MDHS.state.ms.us

## V. Compensation for Providing Service

- Youth Villages proposes a daily rate of $95.00 (ninety- five dollars) per therapeutic placement to provide the services outlined in the program narrative. The proposal is projecting to serve 80 children.

- The $95.00 per diem includes the DHR and Medicaid split that became effective on January 1, 2005:
  DHR Portion = $29.00
  Net Medicaid Reimbursement = $66.00 (up to)

- Chapter 105: Rehabilitative Services to be provided by Youth Villages.
  Youth Villages currently bills Medicaid electronically for services authorized on the Individual Support Plan. The complete array of billable services proposed in our response includes the following:
  Crisis Intervention
  Individual Counseling
  Diagnostic Testing
  Family Counseling
  Group Counseling
  Medication Monitoring
  Basic Living Skills - Individual
  Basic Living Skills - Group
  Family Support
  Treatment Plan Review
  Mental Health consultation
  In-home Intervention



# State of Alabama
# Disclosure Statement

(Required by Act 2001-955)

| ENTITY COMPLETING FORM | Youth Villages, Inc. | |
|---|---|---|
| ADDRESS | P.O. Box 341154 | |
| CITY, STATE, ZIP | Bartlett, TN 38134-1154 | TELEPHONE NUMBER (901) 252-7200 |

STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD

| | Alabama Department of Human Resources - Family Services | |
|---|---|---|
| ADDRESS | Room #2225 Gordon Persons Bldg. 50 Ripley Street | |
| CITY, STATE, ZIP | Montgomery, AL 36130-4000 | TELEPHONE NUMBER (334) 353-1196 |

This form is provided with:

☐ Contract     ☐ Proposal     ☑ Request for Proposal     ☐ Invitation to Bid     ☐ Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

☑ Yes     ☐ No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| Department of Human Resources | Intensive In-Home Services | $763,680 |
| Department of Human Resources | Intensive In-Home Services-Continuum | $849,120 |
| | | |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

☐ Yes     ☑ No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| NA | | |
| | | |
| | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
|---|---|---|
| NA | | |
| | | |
| | | |

*OVER*

2. List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| NA | | | |
| | | | |
| | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

NA

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

NA

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| NA | |
| | |
| | |

*By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.*

| Signature | Date |
|---|---|

2-1805    2|15|05

My Commission Expires Mar. 15, 2005

| Notary's Signature | Date | Date Notary Expires |
|---|---|---|

2-18-05

*Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.*




# State of Alabama
# Department of Human Resources

License Number: **038095**

This is to certify that **YOUTH VILLAGES**
<div align="center">(Licensee)</div>

is hereby granted this LICENSE to conduct and maintain
<div align="center">**YOUTH VILLAGES**
(Name of Child Care Facility)</div>

as a    **CHILD PLACING AGENCY**    for    **N/A,**
<div>(Type of Child Care Facility)          (Number of children)</div>

ages    **N/A**
Age  range of children)

located at   **9238 MADISON BLVD, BLD ONE, STE 1300**    **MADISON,**
<div>(Street Address)                                    (City)</div>

in       **MADISON,**                             State of Alabama.
<div>(County)</div>

This LICENSE shall be in force for a period of two years from the **6TH** day of **OCTOBER, 2004,** to the **6TH** day of **OCTOBER, 2006,** subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975,* or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this **20TH** day of **JANUARY, 2005.**

BY _____ , Ph.D.
<div align="center">Commissioner
State Department of Human Resources</div>

NOTE: This LICENSE must be posted in a conspicuous place on the premises.

DHR-FSD-1969
(8/99)



ATTACHMENT E    Alabama Department of Human Resources
### Therapeutic Foster Care Proposal Cover Page

**COPY**

Organization Information:

Name of Organization: _National Mentor Healthcare, LLC d/b/a Alabama MENTOR_

Address: _313 Congress Street, 5th Floor_

City: _Boston_     State: _MA_     Zip: _02210_

Telephone: _(617) 790-4800_     Fax: _(617) 790-4848_

e-mail address: _Larry.Webb@thementornetwork.com_

Federal Employer Identification Number (FEIN): _04-2893910_

Name/title of Authorizing Official: _Larry Webb, Executive Director_

Signature of Authorizing Official: _____ Date: _4/1/0_

Contact Person Information:

Name/title of program contact person: _Larry Webb, Executive Director_

Address: _18 Executive Park Drive, Suite 1823_

City: _Atlanta_     State: _GA_     Zip: _30329_

Email Address: _Larry.Webb@thementornetwork.com_

Telephone: _(404) 728-1567_     Fax: _(404) 982-9877_

Target Information:
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties _____ No. of Slot(s) _____
Region 2: Counties _____ No. of Slot(s) _____

Region 3: Counties _all Region 3 counties_ _____ No. of Slot(s) _25 (12 in year 1)_

Region 4: Counties _____ No. of Slot(s) _____

Region 5: Counties _____ No. of Slot(s) _____

Region 6: Counties _all Region 6 counties_ _____ No. of Slot(s) _25 (12 in year 1)_
Region 7: Counties _____ No. of Slot(s) _____

Region 8: Counties _____ No. of Slot(s) _____

Region 9: Counties _____ No. of Slot(s) _____

Plaintiff's EXHIBIT
**6**

## PROPRIETARY STATEMENT

Indicate any page(s) to which vendor has a proprietary claim: ___none___

1

## ATTACHMENT C

**STATE OF ALABAMA**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER**
**STATE COMPTROLLER'S OFFICE**

INSTRUCTIONS.  In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files.  To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.    In PART 1 below provide your Tax Identification Number and check FEIN or SSN.  Also provide the name and address to which payments should be sent.  In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.    Circle the business designation that identifies your type of trade or business in PART 2.
3.    Sign and return this form as part of the response to the RFP:

PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER  **04 - 2893910**
Check one  **X**        Federal Employer Identification Number (FEIN)
                        Social Security Number (SSN)

NAME OF ORGANIZATION:   **National Mentor Healthcare, LLC d/b/a**     PHONE : **(617) 790-4800**
                                **Alabama MENTOR**

LEGAL BUSINESS ADDRESS:   **313 Congress St, 5th Floor, Boston, MA 02210**

FAX: **(617) 790-4848**        EMAIL: **Larry.Webb@thementornetwork.com**

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: **Larry Webb, Executive Director**

PART 2 – BUSINESS DESIGNATION.  Circle the designation that identifies your type of trade or business.

1 -    CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2 -    NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 -    PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 -    SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 -    NONCORPORATE RENTAL AGENT
6 -    GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 -    FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
       (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:    Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____        _____        **(404)  728-1567**
SIGNATURE                          DATE  **4/1/0**     TELEPHONE NUMBER
                                                        (If different from above)

**Executive Director**
TITLE

**PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES**

20



# State of Alabama
# Disclosure Statement
(Required by Act 2001-955)

| ENTITY COMPLETING FORM | National Mentor Healthcare, LLC d/b/a Alabama MENTOR | |
|---|---|---|
| ADDRESS | 313 Congress Street, 5th Floor | |
| CITY, STATE ZIP | Boston, MA 02210 | TELEPHONE NUMBER (617) 790-4800 |

STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD

| | Alabama Department of Human Resources, Family Services | |
|---|---|---|
| ADDRESS | 50 Ripley Street - Gordon Persons Building | |
| CITY, STATE ZIP | Montgomery, AL 36130 | TELEPHONE NUMBER (334) 242-1310 |

This form is provided with:

[ ] Contract   [✓] Proposal   [ ] Request for Proposal   [ ] Invitation to Bid   [ ] Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

[ ] Yes   [✓] No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| | | |
| | | |
| | | |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

[ ] Yes   [✓] No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| | | |
| | | |
| | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
|---|---|---|
| N/A | | |
| | | |
| | | |

*OVER*

2. List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| N/A | |
| | |
| | |

*By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.*

Signature _____    Date _____1/1/05_____

Notary's Signature    Tonya K Fryer Howard
Notary Public, Gwinnett County
Georgia
My Commission Expires June 4, 2006    Date 4/1/05    Date Notary Expires

*Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.*

# PROGRAM NARRATIVE
## Table of Contents

A. Organization Information and Management Structure ........................................................... 1
   1. Organization Information ....................................................................................... 1
   2. Governing Board and other Agents ........................................................................ 1
   3. History .................................................................................................................. 2
   4. Mission Statement ................................................................................................. 3
   5. Management Structure ........................................................................................... 5
   6. Financial Audit ...................................................................................................... 6
   7. Qualifications and Experience of Vendor .............................................................. 6
B. Start Up Plan ..................................................................................................................... 8
C. Referral, Admission and Exclusion Policy ........................................................................ 10
   1. Target Population .................................................................................................. 10
   2. Policy and Procedure ........................................................................................... 10
   3. Exclusionary Criteria ........................................................................................... 15
D. Service Delivery ................................................................................................................ 15
   1. Services for Children ........................................................................................... 15
   2. Services for Biological Families ........................................................................... 24
   3. Services for Foster Families .................................................................................. 25
   4. Quality Assurance & Outcomes ............................................................................ 27
E. Target Area ....................................................................................................................... 29
F. Discharge Policy ................................................................................................................ 29
   1. Reunification Planning ......................................................................................... 29
   2. Discharge Prior to Program Completion & Emergency Discharge ......................... 31
   3. Re-admission ....................................................................................................... 31
   4. Step-Down Process .............................................................................................. 32
G. Prior Experience ............................................................................................................... 32
H. Staff Qualifications, Recruitment, Job Descriptions and Training Requirements ............... 33
   1. Staffing Patterns .................................................................................................. 33
   2. Qualifications and Job Descriptions ..................................................................... 33
   3. Staff Screening Process ........................................................................................ 37
   4. Management Qualifications .................................................................................. 37
   5. Critical Incidents ................................................................................................. 38
   6. Volunteers and Interns ......................................................................................... 40
   7. Training Requirements ......................................................................................... 40
I. References .......................................................................................................................... 48

**Attachments**

Attachment A          Job Descriptions

# PROGRAM NARRATIVE

## A ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE

### 1. Organization Information

Organization Name: National Mentor Healthcare, LLC d/b/a Alabama MENTOR

Organization Address: National Mentor Healthcare, LLC d/b/a Alabama MENTOR has submitted a Child Placing Agency Application will soon be evaluating potential office space in the Montgomery and Birmingham areas. As the Start Up Plan in **Section B** of this program narrative shows, program administrators are prepared to secure an office space by May 15, 2005. In the interim, the mailing address is:
MENTOR
11 Executive Park Drive, Suite 1823
Atlanta, GA 30329

Contact Person: Mr. Larry Webb, Executive Director is the contact person for the proposed services. Mr. Webb can be reached in MENTOR's Atlanta, GA office listed above at (404) 728-1567, extension 6307.

### 2. Governing Board and other Agents

**Board of Directors:**
Gregory Torres
Elizabeth Hopper
John Gillespie
Edward Murphy

**Officers:**
*President and CEO*
Edward Murphy

*Executive Vice Presidents*
John Gillespie
Elizabeth Hopper

*Senior Vice Presidents*
Bruce Nardella
Denis Holler
Robert Longo
Juliette Fay
John Green
Dave Petersen
Hugh R. Jones III

*Vice Presidents*
Christina Pak

*CFO and Treasurer*
John Gillespie

*Assistant Treasurer*
John Green

*COO and Secretary*
Elizabeth Hopper

*Assistant Secretaries*
Denis Holler
Christina Pak

1

## 3 History

National Mentor Healthcare, LLC was formed and registered on October 22, 2004 and is a privately held proprietary Delaware Limited Liability Company. National Mentor Healthcare, LLC d/b/a Alabama MENTOR is ultimately a wholly owned subsidiary of National Mentor, Inc. (MENTOR). Both companies are part of The MENTOR Network, an integrated network of community-based residential and nonresidential providers in 29 states who share the same values and mission. Established in 1980, MENTOR is a human services organization dedicated to the provision of highly specialized and individually tailored home-based treatment services to a variety of vulnerable and disenfranchised populations, which include: children with serious emotional disturbances and/or court involvement, medically fragile children, adults and children with mental retardation or developmental disabilities, individuals with acquired brain injury, and frail elders with age-related functional limitations.

At the present time, such services are active in twenty-nine states through more than 1,500 programs. The MENTOR Network currently has service sites in the following states: AZ, CA, CO, CT, FL, GA, IL, IN, IA, KY, LA, MD, MA, MN, NV, NJ, NC, ND, OH, OK, OR, PA, RI, SC, TX, UT, VA, WV, and WI.

The MENTOR Network's service models are all community-based. At present, they include:

- Treatment foster care
- Family-based services
- Independent living
- Early intervention
- Wrap around services
- Adoption assistance
- In school, after school and alternative education programs
- Small group living & ICF Arrangements
- Alternative day programs
- Community-based supported employment
- Center-based supported employment
- Supported living
- Neurorehabilitation programs
- Case management services

Since its beginning in 1980, MENTOR has evolved from a single, residential program provider serving juvenile offenders in Massachusetts to a diversified network of companies offering a continuum of services and supports to persons with special needs in locations across the country. Named for its innovative "MENTOR Model," which designs individualized treatment according to the needs of the person being served, MENTOR was one of the first therapeutic foster care providers in the country, serving children and youth with a variety of complex emotional and behavioral needs. The company established an early reputation as a pioneer in the movement to provide community-based services for children and youth that would otherwise be served in institutional settings.

In 1983, MENTOR adapted its model to address the need for community-based programs to support individuals with developmental disabilities, and in 1986 the company expanded into Ohio and South Carolina. By the late 1980s and early 1990's, MENTOR began serving unique populations, such as children with chronic medical conditions and sexually problematic behavior. Throughout the 1990s, MENTOR continued to grow and diversify, eventually offering

2

nonresidential services such as in-home support and supported employment. In 1997, MENTOR began building an integrated network of community-based residential and nonresidential providers who share the same values and mission. The company began using the name The MENTOR Network in 1999, reflecting the far-reaching partnerships and diverse program models that collectively offer services and supports across the United States.

This history of serving individuals with a range of complex service needs and challenges has led to the development of operational expertise in service components critical to the realization of permanency planning for vulnerable children across the country. These include: a comprehensive quality assurance system, psychological and behavioral evaluation and treatment design tools, and an extensive resource and training library. The company brings its expertise in special needs recruitment and matching, conducting comprehensive home studies, and supporting foster parents, to bear on Alabama's need to for safe, stable foster care placements for children. The program design described in this proposal can be adapted to meet the needs of children with mild to severe emotional and behavioral disturbances, developmental disabilities, and medically fragile conditions, as well as youth with histories of juvenile offending.

## 4. Mission Statement

MENTOR's mission is to create a system of care that will provide individuals with complex conditions options for living in the community, supports for attaining independence, and opportunities to grow and develop personal connections in natural settings. MENTOR believes that individuals should have the opportunity to receive services and supports in their own communities regardless of the complexity of their conditions, the severity of their disabilities, or the challenges of their behavior. As an organization, MENTOR:

- Believes that human relationships are the basis for growth and change.
- Maintains that individuals have both a right and a responsibility to be active participants in the service planning / life planning process.
- Respects the individuals receiving services, their families, its employees and foster parents, as well as the customers with whom it conducts business.
- Is committed to finding positive solutions for both the individuals receiving services and their families.
- Believes that in natural community settings, the individuals receiving services have the best opportunity to develop relationships and to realize their full potential.

## Project Description and Objectives

MENTOR will provide time-limited foster care services in a home setting wherein high-risk children and adolescents are placed in normalized and therapeutic environments. In MENTOR's model, children live in the private home of a qualified caregiver known as a "Mentor," an independently contracted worker who serves as the primary agent for therapeutic change and who works with close guidance and support from a team of mental health professionals.

Mentor homes provide a highly normalized environment, where the child, interacting with parents and siblings on a daily basis, participates as a full family and community member, while he or she builds a set of pro-social and life skills competencies and participates in individually

3

appropriate educational and/or job readiness/job training activities. All placements involve one child per Mentor home, with exceptions made for sibling groups when appropriate. This individualized approach maximizes flexibility in service planning and allows service delivery to vary in duration and intensity depending on the needs of the child referred.

MENTOR designs all treatment according to each child's needs with the goal of improving interpersonal, independent, and functional living skills. Particular attention is given to each child's specific need for emotional, physical, cognitive, educational, moral, and social development, in addition to treatment for mental health issues. Services and supports are tailored to meet the individual needs and abilities of each child so that he or she does not have to conform to the activities and services of a pre-existing program. This practice ensures quality of care for the child and cost effectiveness for the purchaser.

MENTOR's ultimate program goal is to reunite participating children with their biological families, or to prepare them, when appropriate and clinically indicated, for a permanent adoptive placement or independent living. When family reunification, kinship care, or adoption are viable long-term options for participating children, the MENTOR team assists biological and adoptive families in negotiating through all transition periods. Intensive education and parent training ensure that families will fully understand the complex set of circumstances which have brought the child to his or her present situation.

Secondary program goals are to reduce the number of placement disruptions experienced by children, prevent future out-of-home placements, and to minimize inappropriate utilization of residential treatment centers, detention centers, developmental centers, and psychiatric hospitals. Additionally, it is the goal of program staff and the Mentor to provide therapeutic services and supports that result in a stable placement and positive developmental gains for the child.

Corresponding service objectives for program participants include the following:

- Maximize placement safety, success, and continuity;
- Provide children with the supports necessary to help them achieve the goals outlined in their Individual Service Plan (ISP);
- Provide a nurturing and therapeutic home environment through which the child/adolescent's psychosocial and developmental needs can be met;
- Minimize the child's emotional and social isolation by maintaining parental contact and sibling group placement (when possible) and by involving the child in community activities;
- Support the child in achieving his or her educational and vocational objectives through home study, and through coordination and planning with local school districts and employment agencies;
- Enhance the child's quality of life through service delivery and intensive case management designed to provide him or her with appropriate therapeutic interventions and wrap-around services;
- Maximize functional independence, and leverage the child's developmental advantages through age-appropriate activities of daily living;

4

- Support caseworkers in reuniting the child with his or her family of origin; if family reunification is not possible, MENTOR will assist in the development of an appropriate permanency plan for the child;
- Assist the child's biological family in developing the necessary skills to care for and relate to the child in the family's own home;
- Step the child down to lower levels of care as his/her condition improves and as he or she prepares for permanency; and
- Ensure safe and stable transition periods through the provision of aftercare supports and tracking and routine communication with DHR.

## 5. Management Structure

Larry Webb, MENTOR's Eastern Division Executive Director has been designated as the principal start-up administrator for the proposed program. Mr. Webb's brief biography can be found in **Section H.4 (*Management Qualifications*)**, of this proposal.

Initially, Mr. Webb will recruit and hire a full-time Alabama MENTOR State Director (who will act as the Program Manager/Clinical Supervisor during the start-up phase of program implementation), and a full-time Recruiter for each office location (Birmingham and Montgomery). Full-time Coordinators (Case Workers), an Administrative Assistant and Staff Accountant will be hired for each program as census increases. When a program census reaches ten children, a full-time Program Manager will be hired.

Once the program reaches full operation, clinical staff will report directly to and be supervised directly by the Program Manager/Clinical Supervisor, a Masters level clinician who will be employed on a full-time basis. Formal clinical supervision will take place on a weekly basis between the Program Manager and the Coordinators and Recruiters. Informal supervision will take place on a daily basis. Additionally, group supervision will take place in the form of weekly staff meetings which will provide the forum for utilization review, problem solving, and specialized training specific to the strengths and needs of the participating youth. The Program Manager(s) will report directly to the Alabama MENTOR State Director.

The chart presented immediately below illustrates the management structure of the proposed program at full operation and the chain of administrative command.



Ratios

Children in enrolled in Therapeutic Foster Care will be supported and monitored by a Coordinator who carries a caseload of no more than 8 TFC children/families. The Coordinator will be supervised by the Program Manager, who will also function as the Clinical Supervisor to a maximum of 6 Coordinators (Case Workers).

## 6. Financial Audit

The company was last audited on December 23, 2004 by Ernst and Young LLP. MENTOR will provide a copy of the audit at DHR's request.

## 7. Qualifications and Experience of Vendor

MENTOR's experience in delivering services to children and their families has provided the organization with a thorough understanding of the many issues that families face today. MENTOR has witnessed first-hand that many children entering the child welfare or juvenile justice systems come from homes where the parents, guardians, foster parents and/or other relatives lack basic parenting skills considered essential to the safety, well being and healthy development of children.

MENTOR, like researchers at the Georgetown University Child Development Center, believes that "when separation from the natural family is unavoidable, the treatment setting that is most likely to promote the child's adaptive adjustment is another family...family settings represent the best possible treatment environment (1989)." More recent reviews of the therapeutic foster care model continue to support this idea:

> *Treatment foster care draws much of its therapeutic effect from the power of family. In families, youth who have suffered abuse and neglect have opportunities to participate in healthy family functioning, to witness positive parenting styles, to establish trusting relationships with care givers, participate responsibly in community life and to learn prosocial skills through modeling* (Bryant, 2004)

In fact, a critical review of 40 published outcome studies found that treatment foster care contributes to improved social skills and psychological adjustment, reduced behavior problems and restrictiveness, and therefore, cost of post-discharge setting (Reddy & Pfeiffer, 1997).

As described in the **Section A.3** (*History*) of this proposal, MENTOR was among the first providers of therapeutic foster care in the United States and was a founding member of the National Foster Family-Based Treatment Association (FFTA). For nearly twenty-five years and across fifteen states, MENTOR's individualized, community-based TFC model has effectively served seriously emotionally disturbed and/or court-involved youth originating from a number of different venues, including, but not limited to: residential treatment programs, detention centers, psychiatric facilities, or a de-stabilized family home situation.

6

MENTOR has active contracts with state and/or county Departments of Child Welfare and/or Departments of Juvenile Justice to provide Therapeutic Foster Care and/or therapeutic services to children and families in the following states:

- Arizona
- Florida
- Georgia
- Illinois
- Maryland
- Massachusetts
- New Jersey
- North Carolina

- Ohio
- Oklahoma
- Pennsylvania
- Rhode Island
- South Carolina
- Texas
- Virginia

As a national organization that provides a range of residential and non-residential treatment and habilitation services, MENTOR holds various licenses and certifications which allows its programs to provide services, including but not limited to, Child Placing Agency licenses, group home, ICF/MR licenses. Licenses and certifications vary according to state and local regulations.

As outlined in **Section A.5 (*Management Structure*)**, the proposed program will be implemented and overseen by Larry Webb, MENTOR'S Executive Director who currently oversees operations in Georgia and North Carolina. Under the leadership of Larry Webb, his two Deputy State Directors and a seasoned management team, Georgia MENTOR has, since 1991, grown from an organization which principally served a handful of adults with mental retardation who were making the transition from institutional settings to the community, to a statewide network of residential and non-residential treatment and support services for children with serious emotional disturbance, court-involved youth, adults and children with mental retardation or developmental disabilities, and individuals of all ages with medical frailties.

Georgia MENTOR currently provides a variety of services to children, youth and families, including Therapeutic Foster Care, Intervention Services, Supervised Independent Living, Wraparound Services, and Adoption Placement. These residential and clinical services are delivered under contract to the Georgia Department of Juvenile Justice, the Georgia Department of Human Resources and the Department of Mental Health.

Georgia MENTOR is fully CARF accredited, and holds active membership in the following organizations: the Georgia Association of Homes and Services for Children, the Georgia Juvenile Services Association, and the Georgia Association of Retarded Citizens. Additionally, Georgia MENTOR is a member of the Georgia Brain Injury Association. Georgia MENTOR's CARF accreditation will extend through 2006; program staff received this designation with commendation. Georgia MENTOR has been licensed as a Child Placing Agency since 1991.

As the contracted provider of the Georgia Adoption Intervention Program for the past five years, Georgia MENTOR has provided clinical intervention services in its Family Intervention Team program (FIT), a family preservation strategy aimed at supporting and stabilizing special needs children and their adoptive families in crisis. The FIT program uses Strategic Family Therapy,

7

which employs time-limited treatment, and uses a strengths-based, solution focused, approach to service delivery that addresses the characteristics of individual family members, family relational dynamics and the multi-systemic context in which the family operates.

Satisfaction surveys of both families and referring agents of the FIT program have been consistently positive with high levels of satisfaction. In addition, Pre and Post-service assessments (CAFAS) have demonstrated improvement in both child and family functioning. For example, the following data illustrates the success of Georgia MENTOR's adoption support program.

Data are presented for 71 youth served between July 2002 and November 2003 who received adoption support services from the Georgia MENTOR program. Eighty (80) percent of the youth had one or more (up to 5) DSM-IV diagnoses. The Child Adolescent Functional Assessment Scale (CAFAS) was used to assess the level of functioning of youths in this program. The average CAFAS score at admission was 73.7. At the time of discharge from services, the average score was 57.5. On average, program participants showed more than 16 point improvements on the CAFAS.

In the event that this proposal submission should result in a contract award, MENTOR will draw on the clinical, operational, and managerial experience of the staff who have expertise in therapeutic foster care and in-home support programming. These dedicated and talented individuals are committed to achieving timely permanence for all children, family preservation, and measurement of program outcomes. Furthermore, all MENTOR staff stand fully behind the empowerment of both participating youth and their families.

For a list of MENTOR's references, please refer to **Section I** of this proposal.


## B. START UP PLAN

MENTOR has a long and successful history of working in partnership with state and local governments to start up new programs designed to meet the needs of a range of vulnerable populations, often with little lead time. By way of example, MENTOR recently received a contract award from the Office of Youth Development in the State of Louisiana, a territory in which the company did not have current operations. The award was made in late December of 2004. MENTOR located, secured, and outfitted office space within the course of two weeks; hired a Program Manager at the one-month mark; and has nearly secured its Child Placing Agency license. The program has a number of Louisiana families in queue for home study evaluations and will undertake these once the license is finalized. Program staff anticipate that the first placement will be made at the end of April, 2005. Thus, in this instance, the timeframe for delivering services in a new state with no existing operations was approximately fifteen weeks. Both the Louisiana Office of Youth Development and the licensing authority have been impressed with MENTOR's organizational capacity to start up programming efficiently and effectively.

8

Alabama MENTOR's Start Up Plan to reach program operation is presented below for the reader's review. Larry Webb, MENTOR's Eastern Division Executive Director has been designated as the principal start-up administrator. Mr. Webb's brief biography can be found in **Section H.4 (Management Qualifications)**, of this proposal.

| Activity/Task | Responsible Party | Timeline |
|---|---|---|
| Initiate DHR Licensure Process | MENTOR | Complete |
| Activate Registration with the Corporation Commission | MENTOR | Complete |
| Complete and Submit Child Placing Agency Application | MENTOR | Complete |
| Submit RFP Proposal Response | MENTOR | April 8, 2005 |
| Evaluate and Identify Potential Office Locations | Larry Webb | April 11 – May 6, 2005 |
| Notice of Intent to Award a Contract | Gary Mitchell, Office of Licensing & Resource Development | May 5, 2005 |
| Begin Leasing Office Space | Larry Webb | May 16, 2005 |
| Obtain CPA License | MENTOR | June 7, 2005 |
| Complete and Submit Medicaid Provider Enrollment Application | MENTOR | June 7 – June 30, 2005 |
| Recruit and Hire State Director | Larry Webb | May 16 – June, 2005 |
| Advertise, Interview and Hire (including Background Investigations) Recruiters | Larry Webb/State Director | May 16 – June, 2005 |
| Advertise, Interview and Hire Staff Accountant | Larry Webb/State Director | May 16 – June, 2005 |
| Pre-Service Training in Georgia and Alabama | MENTOR | July – August 2005 |
| Recruitment and Screening of Mentors | Recruiters & State Director | July, August & September, 2005, ongoing |
| Finalization of Contract Documents and Budgets | Susan Ward, Office of Contracts & Federal Claiming and Larry Webb | August 5, 2005 |
| Mentor Orientation | State Director & Recruiters | September & October, 2005 |
| Complete Mentor Home Studies, Final Screening, Background Checks | State Director & Recruiters | September & October, 2005 |
| Contract Start Date | MENTOR & DHR | October 1, 2005 |
| Hire Administrative Assistants (1 for each program location) | State Director | October, 2005 |
| Hire Coordinators (1 for each program location) | State Director | October, 2005 |

9

## C. REFERRAL, ADMISSION AND EXCLUSION POLICY

### 1. Target Population

MENTOR's Therapeutic Foster Care program is designed to serve male and female children, ages birth to 18, who may otherwise be placed in a residential setting, or who have already experienced multiple foster care placements or placements in other more restrictive environments. MENTOR anticipates that children and youth referred for Therapeutic Foster Care will likely have several of the following characteristics: limited informal support systems, fractured family relationships, runaway behavior, persistent poverty, parental neglect, and histories of physical and/or sexual abuse or other forms of trauma. Substance abuse, poor educational experiences, learning disabilities, negative peer involvement, and gang involvement may also be factors.

Children will carry a DSM-IV diagnosis on Axis I, which may be longstanding and/or untreated, and will require the treatment and structure offered by Therapeutic Foster Care. It is anticipated that many of the youth referred to the program may have one or more of the following diagnoses: Disruptive Behavior/Conduct/Oppositional Defiant disorders, Impulse-Control Disorders, ADHD, bipolar disorder, chronic depression, and Post-Traumatic Stress Disorder. Some children may have a developmental disability, be dually diagnosed and/or participating in an active psychotropic medication regimen.

Both male and female youth are expected to present challenges to program staff related to poor impulse control and acting out behavior which may be physical or sexual in nature. These and other factors may have lead to a host of acute and chronic medical conditions, which may include, but are not limited to pregnancy, HIV/AIDS, Hepatitis B and C, and other sexually transmitted diseases, in addition to the complications which arise following self-mutilation.

In addition to specialized treatment for psychological, emotional, or behavioral disorders, MENTOR expects that all children and youth referred for care will be in need of basic living skills development and/or independent living skills training.

### 2. Policy and Procedure

#### Admission Criteria

MENTOR's program staff is committed, wherever possible, to enabling children and youth to thrive and grow in a community-based setting. MENTOR will maintain a no reject/no eject policy for children who meet admission criteria. Admission policies and criteria are as follows:

1. All individuals referred to MENTOR are considered for admission without regard to race, gender, ethnicity, sexual orientation or type of disability.

2. Any individual considered for MENTOR's services must be able to live in a community-based placement with service supports as needed.

10

3. Services for children and adolescents are provided to those individuals who meet the criteria above and, in addition:

- Are between the ages 0 to 18 or up to age 21 if they are receiving special education services from a local education authority unless otherwise required by local regulations;
- Require alternative home placement due to natural/legal home disruption (i.e. parent incarcerated, death of a parent, abuse/neglect in the home, parent hospitalized);
- Do not require the restrictions of an inpatient psychiatric unit or other controlled or secure setting (due to the risk of dangerous behaviors or the need for seclusion or mechanical/chemical restraint)
- Are medically stable; and
- Do not require acute detoxification from alcohol or other chemical substances at the time of admission.

Alabama MENTOR will maintain a "no reject/no eject" policy for children who meet program criteria.

**Referral Process**
The MENTOR team is prepared to accept both telephonic and written referrals from the Alabama DHR. Upon receipt of a telephone referral, MENTOR will gather essential information needed for assessment of program appropriateness. DHR will be required to provide basic identifying information at the time of referral, including the child's name, birth date, age, race, religion, ethnicity, primary language, medical diagnoses, level of developmental disability, legal status, current living situation, service/placement history and the need for a sibling group placement.

This preliminary information will allow the team to confirm in a timely manner that the child meets the admission criteria, and whether a Mentor home can be made available to serve him or her. At this juncture, the team actively communicates with the referral source, the child's primary care and specialty physicians (when applicable), the child's school personnel, potential Mentors, therapists, and the child's other treatment providers to obtain any gaps in information. Within three business days Admissions staff will provide (1) statement of availability of appropriate Mentor home matches, and (2) assistance in coordinating an appropriate placement option. If it is confirmed that the child is an appropriate candidate for services, MENTOR obtains the Comprehensive Assessment/Intake Evaluation form from DHR, which must include the following information, in order to more fully evaluate his or her needs:

- An evaluation/assessment of the child's mental health, behavioral, educational, medical, developmental, and other special needs.
- The child's history of court involvement.
- The child's history, including his or her prior placement; functioning in relation to peers and family; educational; and other treatment issues.
- Diagnostic and discharge summaries from prior hospitalizations and/or residential treatment settings.
- Psychological and psychiatric assessments, if any.
- The child's current service plan, if any.

11

**Intake and Assessment**
The assessments described below are internal assessments used to assist the MENTOR team and will not be billed to Medicaid.

Once a child has been preliminarily accepted to the program, the MENTOR Coordinator will visit the child in his or her current residence, along with the referring DHR worker and the child's family (when appropriate). The Coordinator will explain the benefits of the program to the family and child and will confer with all parties about the needs of the child as well as the needs of the biological family (when appropriate).

During the visit, the Coordinator will observe first hand the child's and family's strengths, adaptive and maladaptive behaviors, family dynamics, the presence or absence of practical skill sets and/or needed resources. The Coordinator will conduct MENTOR's internal assessment of the child using MENTOR's biopsychosocial assessment tool and will also administer the Child and Adolescent Functional Assessment Scale (CAFAS), a standardized tool designed to assess the level of a child or youth's impairment in areas such as role performance, thinking, behavior toward others, moods, and substance abuse. The assessment is performed at intake, every 3 months, and at discharge to measure the child's progress as well as the program's overall impact on its participants.

When reunification is the goal, MENTOR will conduct a detailed assessment of each family using the North Carolina Family Assessment Scale (NCFAS), which, with DHR's Assessment, will serve as the basis for service design, delivery, and coordination and most importantly, gauge the family's reunification readiness. MENTOR will assess families at intake and shortly before the anticipated discharge date.

Within 10 days of the initial meeting and with input from the DHR Comprehensive Family Assessment/Intake Evaluation, the family (when appropriate), the child, any ancillary service providers, and the Coordinator will formulate the initial treatment plan. Within 30 days after the placement occurs, the Coordinator assigned to the case will develop the Comprehensive ITP, which outlines in detail the child's permanency and aftercare plan, short and long term goals, objectives, measures, service needs and anticipated timeframes for services for both the child and family. The Comprehensive ITP is developed and implemented in order to achieve the overall outcomes for the child and family identified in the ISP. The assigned Coordinator will also begin formulating a family service plan with the child's family, when indicated by the court and DHR. The plan may include a combination of structured visitation, individual and family therapy, parental training, and introduction to community resources and supports.

**Matching**
Once the child has been found to be an appropriate candidate for program admission, the MENTOR team meets to discuss possible placement matches for the child. The Recruiter draws from the pool of available Mentors and discusses potential matches with the team. As soon as an appropriate Mentor home is identified, the potential Mentor, along with appropriate team members, visits the child in his or her current place of residence, or other setting as determined by the referral source. If a connection is established between the Mentor and the child, the team

sets into motion a series of supervised home visits, when possible, to confirm compatibility, and to identify any challenges to placement success. Prior to placement at least one overnight visit is arranged and when clinically and legally appropriate, the child's biological family shall have the opportunity to meet the Mentor prior to placement.

In the case of a child preparing to transition from a Residential Treatment Facility to a less restrictive setting, MENTOR staff will seek to identify a Mentor able to develop a pre-placement relationship with the child before he or she is placed in the home to ease the transition and assure continuity of care.

To increase the likelihood of a strong, stable placement, MENTOR considers the following variables when making a match:

* Location, proximity to community and family of origin
* Foster family constellation
* Foster family strengths, skills and abilities
* Foster family's willingness to provide requisite care
* Foster family's willingness to establish a pre-placement relationship with the child while he/she participates in residential treatment, with the goal of placement upon discharge
* Foster family's ability/willingness to work collaboratively with the child's family
* Proximity to and ability to access community resources
* Ethnicity, race, culture, religion and language
* Shared special interests

As the pre-placement visits transpire, the MENTOR team evaluates the Mentor's community with an eye toward the strengths and needs of the child. Only those homes which have the necessary community resources available to the foster family and the child will be considered viable placements for referred children.

**Environments and Safety**
Appropriate matching is especially critical when serving children with extraordinary challenges, such as children with fire-setting behavior, sexual perpetrators, and children with assaultive behaviors and conduct disorder. Special consideration is given to the composition of the Mentor family and the identified risk issues presented by the youth being considered for placement. The number of children in the home, their ages, gender, stage of development and vulnerability are evaluated in light of the individual's level of functioning and ability to relate to other persons.

Measures taken historically to promote the safety of both the child in placement and the Mentor family have included, but are not limited to:

* Environmental Assessments to assess the safety of the home and local neighborhood
* Specialized Behavior Plans
* Development of self-monitoring skills
* Line-of-sight, Constant, Close, or Intermittent supervision
* Motion detectors, when indicated
* Auditory monitoring devices, when indicated
* Electronic monitoring devices, if court ordered

13

- Smoke detectors
- Door alarms
- Restricted access to potentially harmful articles and substances (matches, alcohol, etc.)
- Regular inspections for contraband
- In a crisis situation, with funding, 24-hour awake overnight supervision
- In a crisis situation, temporary placement in a more secure setting

**Placement**
Prior to the actual placement, a meeting is convened to formalize the placement plan at the child's current place of residence, or other setting, when indicated. In attendance are the referral source, the MENTOR team, the child, and where applicable, the child's family, or the legal guardian. This meeting serves as the forum for the review of the preliminary treatment plan by all interested parties, each of whom must sign the document, indicating agreement to the placement. Other documents that are distributed for review and signature include: the Placement Agreement, the Authorization to Obtain Medical and Other Services, and other individually relevant forms. At the end of this meeting, the Mentor reads, agrees to, and signs a Placement Agreement, as do officials from the referral source and all MENTOR team members. A placement date is then scheduled.

On the date of placement, the child is transported to the Mentor's home by the Coordinator, Mentor or some combination thereof, as appropriate to the needs and strengths of the child. In the first few days of the placement, the Coordinator provides intensive support to the Mentor foster parent(s) and to the child as the Treatment Plan is implemented. Frequent telephone calls home visits are made for the purposes of support and education. In addition, the MENTOR team is available to the Mentor on a 24-hour basis, 7 days a week, 365 days per year for telephone triage, and when necessary, on-site crisis intervention.

The Mentor will ensure that the child is enrolled in the public school system within five days of placement, and that appropriate transportation to and from classes is in place. Further, the Mentor attends relevant school meetings, and when applicable, participates as a full member of the child's Individual Education Planning team.

**Monitoring**
Once the placement is stabilized, the Coordinator visits the Mentor home on a weekly basis, to provide support and training to the Mentor and to monitor the progress of the child with respect to his or her treatment goals. A balance is maintained in terms of the Coordinator's time spent individually with the child, with the Mentor and conjointly with the child and Mentor/family as indicated by placement needs.

The ITP is formally revisited on a quarterly basis but is considered a "work in progress" that may be modified at any point as the needs and strengths of the child change over time. Any and all activities that take place once a placement is made are discussed during home visits and documented on a weekly basis by the Mentor, who interacts with, monitors, and observes the child on a daily basis.

14

Quarterly Treatment Plan reviews, CAFAS assessments, Home visits, Mentor notes, and other contacts (face-to-face and telephone) provide data and outcomes for the Coordinators' written reports and case logs. These reports document the child's progress toward goals and "step-down" in level of care. All documentation is placed in the child's permanent clinical record.

### 3. Exclusionary Criteria

MENTOR is known for its ability to successfully serve individuals with significant challenges who have failed in various other settings. MENTOR commits to working closely with DHR to design a package of services which meets the needs of each youth referred, regardless of the challenges of his/her behavior or the severity of his/her personal needs.

A youth may be excluded from program admission if he or she:

- Is in need of emergency inpatient psychiatric treatment or other setting due to dangerousness to self or others, or due to the need for seclusion or physical/chemical restraint.
- Is actively suicidal or homicidal.
- Requires detoxification from alcohol or other chemical substances.
- Is in need of medical/nursing care that is beyond the capability of the program, including, but not limited to: need for continuous nursing care and/or monitoring; require a two-person lift, or have technological needs which cannot be met in a home environment.

## D. SERVICE DELIVERY

### 1. Services for Children

#### *24 Hour Home Based Support and Supervision*
MENTOR integrates critical resources such as a nurturing home, appropriate community based resources, and therapeutic counseling for children and adolescents with court involvement, emotional disturbances and/or aggressive behavior. Enrollment in MENTOR's services provides the participating child with 24-hour support and supervision in a program-qualified Mentor home.

#### *Diagnostic Assessment of Functional Strengths and Limitations*
In conjunction with the DHR Intake Assessment, all children will receive MENTOR's comprehensive diagnostic assessment conducted by the Coordinator (Case Worker). This is an internal assessment used to assist the MENTOR team and will not be billed to Medicaid. MENTOR uses a biopsychosocial model of assessment and draws from a wide variety of theoretical approaches, including: behavioral, social learning, psychodynamic, and family systems theories, in order to begin to formulate the behavioral and other interventions which most closely meet the immediate and longer term needs of the participating child. MENTOR operates at all times from a strengths-based approach. Limitations are considered secondarily and are addressed through the ITP.

15

*Development and Monitoring of a Comprehensive Individualized Treatment Plan*

An initial ITP, designed to meet the child and family's immediate needs is developed for each child prior to or within 10 days of placement. The Comprehensive ITP (or CTP) is formulated and operationalized within 30 days of placement with input from the referring DHR case manager/probation officer, Mentor, birth/legal parent, and child (when appropriate), and significant others involved in the child's life (i.e. current provider; previous placement; school, etc.)

The plan is based on the child's strengths and needs, and clearly specifies his or her permanency/aftercare plan, measurable goals and objectives, timelines for accomplishment, types and frequency of interventions, and the persons responsible for the interventions. Treatment plan goals and objectives are formulated across the following domains: medical/dental, social/emotional, nutritional, clinical, behavioral, educational/vocational, and recreational.

All services are guided by the individualized plan for each child. MENTOR employs only positive approaches; no physical or mechanical restraint procedures are used. No corporal punishment or other "aversive" or restrictive procedures are used to manage children's behavior. Instead, plans are designed to emphasize a functional understanding of each child's objectionable behavior and strategies are developed to help the child learn acceptable alternative skills and behaviors. Mentors are trained to manage difficult behavior in a non-confrontational and non-restrictive manner.

The plan is, in all instances, consistent with and points toward the child's permanency plan. If the goal is to return home, MENTOR staff will provide a variety of supports to improve the functioning of the family/child relationship and to help the family meet the child's special needs. Transitional support services may include individual and/or family therapy, training in behavior modification and conflict resolution, and the identification of additional community supports that meet the needs of the family. If the goal is termination of parental rights (TPR), MENTOR staff will provide supportive social work services to the child while his or her permanency plan is modified towards the goal of eventual adoption. MENTOR will prepare all the necessary paperwork to facilitate this process. If independent living is the goal, MENTOR will ensure that youth receive Independent Skills Training (in alignment with ITP/ISP) and are working towards goals that include the development of a natural support network, employment, education, and self-sufficiency.

Services are carefully coordinated with other health, human service, and educational providers involved with the child. To strengthen the child's links to the community, additional mentoring services will be included in a child's plan. Such services may include participation in the Big Brothers/Big Sisters Program, participation on sports teams, tutoring, or organized scouting. The MENTOR team encourages the child to pursue his or her hobbies, and helps to develop the child's interests in accordance with available resources.

The Coordinator formally revisits the Comprehensive ITP with the child, DHR social worker, family, Mentor, and any ancillary service providers on a quarterly basis, but remains flexible to re-evaluate and modify the plan should the child's needs change markedly in the interim.

16

*Individual & Family Counseling (As determined by ISP)*
Children referred for services will receive individual and/or family counseling and support as dictated by the terms of their Individual Service Plan. The methods and techniques applied in counseling as well as the frequency and intensity of the services are determined by an assessment. MENTOR's approach to delivering individualized counseling is, in all instances, solution-focused.

Although psychodynamic theory informs the interventions chosen, MENTOR's counseling team focuses on the present strengths and needs of child and his or her family. Program staff at MENTOR have long understood that the troubled children referred for services do not present to program staff with challenges that have developed in a vacuum. Rather, the difficulties faced by these child are, in large part, a product of the systems in which they have, over often long periods of time, operated. Therapeutic interventions address the multiple and inter-related determinants of problem behavior. Accordingly, this treatment evaluates and operates within the child's key systems, namely his or her family, peers, school, and neighborhood. For children with more intensive mental health issues, a Master's level Coordinator will be available to provide individual therapy and family therapy as indicated in the child's ITP/ISP. If a child receives therapy from an outside child and/or family therapist, the MENTOR Coordinator will maintain monthly contact with the therapist to monitor progress in counseling.

*Monthly Group Therapy*
Monthly group therapy (counseling) sessions for TFC children will be provided by a qualified child and adolescent service professional. These counseling sessions will involve face-to-face interaction and interventions will be tailored toward achieving specific goals and/or objectives as identified in the child's/family's ISP.

*Instruction in Self-Regulation/Behavior Management Planning*
Many of the children and adolescents served by MENTOR present to program staff with extreme behavioral challenges and antisocial behavior patterns. The consistent structure of the program provides children with daily opportunities to benefit from pro-social modeling, individualized behavior management programs, and when indicated, a behavioral contracting protocol.

Behavior plans are implemented as needed in order to manage undesirable behaviors and encourage the development or increase the frequency of more desirable behaviors. Program staff believe that challenging behavior is often caused and maintained by family and other systems (environmental enhancements), and/or the lack of the appropriate skill set to manage difficult behavior. Much of the highly trained staff's work will involve educating members of the child's family and the Mentor as to both the physical and social context in which the behavior takes place, and the purpose or purposes which the undesirable behavior serves for the child (functional analysis of antecedent and consequences). Understanding the problem's role in the child's life will enable the treatment team and family to reduce or eliminate a problem by teaching a functionally equivalent alternative. Thus, the child will achieve the same end with more desirable behavior.

17

With the frequency and severity of the behavior firmly in mind, each behavior support plan outlines for the Mentor and parent some general recommendations for keeping the child's environment as supportive as possible, a set of skills which will help staff increase positive behavior, techniques for motivating the child to engage in the replacement behavior, and a detailed set of guidelines to help staff manage crisis situations.

All Mentors and staff receive training in behavior management techniques prior to providing services, while biological parents receive ongoing training during structured visitation and during quarterly support group sessions. Preparing Mentors and parents in behavior management techniques enables them to teach the child to control his or her own behavior before a problem occurs or before it escalates, increasing the likelihood of a stable placement and/or family reunification.

Participants learn to model, shape, provide feedback, reward positive behavior, apply the concepts of fading and extinction, and to make contingency contracts with the child toward this end. Time-out techniques may only be employed if and when these are specified in the child's ITP/ISP. All behavior management is positive in nature. The use of physical restraint is prohibited unless the child becomes acutely harmful to himself/herself, or others.

### Intensive Case Coordination
In partnership with DHR, MENTOR personnel will perform active case management and coordination of all services throughout the life of the child's participation in the program. Intensive, personalized case coordination connects the child and his/her family to the appropriate community-based providers. MENTOR will collaborate with other community providers in order to consider and enhance all aspects of the participating child's life, and to promote cost efficiencies and prevent service duplication. Social, emotional, medical, legal and educational resources will be explored and accessed as appropriate to each child and his/her family (when necessary). The child's integration into his or her community is a continual focus of MENTOR's professional personnel.

### Educational Support
Typically, children in Mentor homes attend public schools. Whenever possible, the child is maintained in the school in his or her own community. When this is not possible, the child's Coordinator and Mentor are responsible for enrolling the child in the school district in which the Mentor's home is located.

Many participating children will be in need of significant educational support. All children of mandatory school age will be enrolled in a school system or in a program approved by the Department of Education. The Mentor and/or Coordinator will communicate at least monthly with the local school district and participate in the child's IEP team to ensure that he or she has access to and is provided with appropriate educational opportunities. The Coordinator will link children, where appropriate, to area GED, ABE, and ESOL classes, and arrange for the provision or directly provide tutoring as necessary to improve school performance and to reduce the dropout rate.

18

The one-on-one attention that each child receives enables him or her to receive daily assistance with homework and acquire good study habits and solid organizational skills. Often, the Mentor or tutor working directly with the child is able to identify educational strengths which help point the child toward pre-vocational thinking; this lays the groundwork for further vocational development. For older children who have completed their secondary education, if desired, future educational plans are designed and operationalized. These may include college, technical college, or trade school attendance, as dictated by the preferences and abilities of participating child. As appropriate, college scholarships will be explored.

### Vocational and Employment Support
The Mentor and Coordinator will provide job-coaching activities and opportunities for age-appropriate vocational training. Youth will learn how to write a resume, seek and obtain employment, and behave on an interview. Appropriate workplace behavior will be fully explored; youth will also be provided with the opportunity to job shadow at various community businesses.

The program will link to area job training programs and employers which will help to develop participants' computer skills, or prepare them for employment in a variety of industries. Staff will ensure that identified employment opportunities for youth meet all legal and regulatory requirements for juvenile employment and that employment opportunities are consistent with the child's age, ability and interests. When a youth is employed, the Coordinator will make periodic visits to the job site to monitor the quality of the working conditions and the youth's performance and work abilities on the job.

### Basic & Independent Living Skill Development
All children participate in the daily life of the Mentor family household according to a prescribed schedule which the child designs in concert with the Coordinator and the Mentor. The schedule includes the regular performance of standard household duties and provides each child with the opportunity to learn and practice age-appropriate basic/independent living skills that are consistent with his or her needs and goals. Typically this includes ongoing instruction, training and practice in the following areas (up to 18 hours per week or 9 hours per week for Step-down TFC): hygiene and grooming skills; laundry and maintenance of clothing; appropriate social skills; housekeeping; use of recreation and leisure time; use of community resources; money management; shopping; healthy lifestyles; stress management; meal preparation; using public transportation; and medication management.

Each child/youth participating in the program will also receive up to 5 hours of group Basic/Independent Life Skills training each week in accordance with the outcomes identified in his or her ITP/ISP. MENTOR will use the PAYA curriculum (Preparing Adolescents for Young Adulthood). PAYA was developed by the Massachusetts Department of Social Services and was adapted from the Preparing Youth for Independent Living curricula, developed by the University of Connecticut School of Social Work and the Child Welfare Institute's Center for Foster and Residential Care with support from the U.S. Department of Health and Human Services and the Annie E. Casey Foundation.

The PAYA program modules are organized for ease of use and accessibility of material. Each lesson plan begins with a self-assessment, which assists the student in learning his or her particular skill level in the area of study. The assessment is followed by a skill plan, which aids the learner in organizing his or her goals for each lesson plan. The skill plan is, in turn, followed by an activity/resource workbook, which contains information and exercises for each topical area. Activities are undertaken both individually and in groups. Earlier lesson plans set the stage for later, more complicated topics. For example, problem-solving skills are introduced early in the program, as such skills will assist the student throughout the rest of the PAYA material.

In addition, the PAYA curricula contains a training guide for foster parents, group care providers, and social workers, and is fully incorporated into MENTOR's orientation for staff and volunteers.

### PAYA Module I: Money, Home, and Food Management
Money management, establishing and living within a household budget, and banking transactions are fully explored in this segment of the curricula, as are shopping skills (determining the best buy) and the methods of transportation which will enable the youth to negotiate the community in which he or she lives (buying a car, using public transportation). Students will learn how to balance a checkbook, understand their paycheck, and appreciate the ways in which credit cards work. Among other activities, students will shop for clothing and household maintenance products as part of this unit.

### PAYA Module II: Personal Care, Health, Social Skills & Safety
The lesson planning contained in this unit outlines the importance of good hygiene and taking pride in one's appearance. Good grooming and dressing techniques are treated, as are diet and exercise, and the challenges of contending with major and minor illnesses. Pre-natal, post-natal and neo-natal care are emphasized. General survival skills are explored, as are the myriad ways in which one's health is threatened (substance abuse, poor self-care, etc.). Each child learns how to proceed in a medical or other emergency. Module II, further, investigates violence in relationships, and puts a strong emphasis on developing problem solving skills and developing healthy relationships. This section introduces the concept of conceptualizing and formulating individual goals and serves as a strong building block for further study.

### PAYA Module III: Education, Job Seeking Skills, & Job Maintenance Skills
In this module, the learner is introduced to educational and vocational options and asked to explore interests to develop an educational and vocational plan which will enable him/her to develop a future vision for him/herself. Financial aid programs are introduced, as are internship programs, and job hunting strategies. Youth learn to develop a résumé and cover letter, respond to an advertisement, fill out a job application packet and conduct themselves on a professional interview. Youth also learn the ins and outs of appropriate workplace behavior and how to keep a job once they have secured it. Youth will leave this unit with a good understanding of the career ladder, and a strong sense of their own aspirations within this framework.

20

*PAYA Module IV: Housing, Transportation, Community Resources, Understanding the Law, & Recreation*
Module IV introduces the learner to the types of housing available in the community, and the resources needed to obtain appropriate housing before program discharge. Each youth will develop a housing plan that fully considers the need for roommates, furniture, security deposits, etc. Students will review sample leases and learn about homeownership options. Transportation and community safety are also introduced during this component of the program, as are leisure options and the need to respect rules, regulations, and laws.

*PAYA Module V Parts A and B: Young Parents Guide*
This module targets important topics such as relationships, sexually transmitted diseases, and pregnancy prevention and sexuality. The material also treats issues related to unplanned pregnancy, the challenges involved in being a teen and single parent, and other information and skills which are related to pregnancy and parenting, namely: prenatal care and child development.

### *Social Support Network Development*
Each participant will, as part of his or her household, receive social support from foster family members, the Coordinator assigned to his or her case, and other treatment team members. These relationships underpin and enable all work in other arenas, and are crucial to the child's success in making the transition to independence.

One of the principal goals of the program is to create and maintain a natural support network for each child that will both enhance the quality of his or her life, and serve as an ongoing resource in challenging and troubled times. The Coordinator works with the child and family to identify and engage with such peers and "mentors" within his or her extended family, neighborhood, and workplace. This resource is particularly important for older child who will soon be making the transition to less restrictive, and sometimes, independent settings.

### *Familial Visitation*
When clinically indicated and legally appropriate, MENTOR will arrange for ongoing visitation between the child and his or her family members. Face-to-face contact between children and their families is an important component of the treatment program that builds trust and increases the likelihood of a safe and stable reunification. As directed by the ISP, MENTOR will arrange for supervised and/or unsupervised visitation. Each supervised visit will be treated as an opportunity to work with the family through coaching, modeling, socialization, skill building, and linking to community resources. Supervised visitation also increases the Coordinator's awareness of any changes in the child or family's situation.

At the Child and Family Team meeting, the Coordinator will design a visitation schedule that accommodates the schedules of the child, the family, and the Mentor. Visitation will be held in diverse, hospitable, home-like environments and eventually, in the biological family's home. MENTOR staff members encourage visitation between the biological family and the youth by employing the following tactics: flexible scheduling for family counseling meetings; maintaining frequent telephone contact with family members to update them on the youth's progress; and

linking family members to natural community supports, including parent groups, churches, schools, social service agencies and extended family and community systems.

## Recreational and Leisure Activities

MENTOR recognizes the importance of supporting a child in his or her interests and related activities. Often, such activities help the child build self-esteem, develop skills, get exercise, make friends, have fun, and learn to participate as a member of a team. Mentors are encouraged to take an active role in the child's interests and activities by attending events, providing emotional support and positive feedback. A plan for involving the child in at least one extracurricular activity, based on individual needs, interests, and functional levels will be incorporated into each child's treatment plan.

In addition, the Mentor and MENTOR team will encourage each child to pursue his or her hobbies, and will help to develop the child's interests in accordance with available resources. Recreational activities will include both indoor and outdoor activities and will encourage both solitary entertainment and small group interaction. Activities will minimize television and video games and will maximize use of community recreational resources. Transportation to recreational activities will be provided by the Mentor.

## Food and Clothing

Three nutritious meals are provided to the child each day. Daily meals meet nationally recommended allowances for basic nutrition and include fresh fruits and vegetables, in season. Mentors provide the child with replacement clothing as needed. The Coordinator assures that the Mentor completes routine property inventory forms to assess the child's needs and monitors any spending limits established by DHS contractual agreement. Clothing is clean, fits well, and is appropriate to the age and gender of the child. School age child participate in choosing their own clothes, whenever possible.

## Coordinated Access to Medical and Dental Health Care Providers

MENTOR ensures that all health and dental care needs are met for all children in placement. Within 30 days of placement, the child must undertake a physical examination and behavioral health assessment. This examination may be waived if the team receives documentation of such an exam within the previous thirty days.

Similarly, a complete dental examination will ensue within the first thirty days of placement, unless the team receives documentation that such an examination has taken place within the past six months. Participating children will be required to undertake dental examinations every six months thereafter. MENTOR does not assume the cost of medical or dental treatment for children in its care.

## Medication Management Oversight

Some of the children referred for services will require a psychotropic medication regimen to assist the child in his or her efforts to make progress toward treatment plan goals. Regular visits to the Mentor home ensure compliance with medication administration, and serves to monitor the child's behavioral/emotional progress. Some child will require a medication evaluation upon admission to the program. MENTOR ensures that this service is either accessed in the

22

## 2.   Services for Biological Families

Program staff at MENTOR have long understood that the troubled youth referred for services do not present to program staff with challenges that have developed in a vacuum. Rather, the difficulties faced by these children are, in large part, a product of the systems (family, community, socio-economic, educational etc.) in which they have, over long periods of time, operated.

As the contracted provider of the Georgia Adoption Intervention Program for the past five years, Georgia MENTOR has provided similar clinical intervention services in its Family Intervention Team program (FIT), a family preservation strategy aimed at supporting and stabilizing special needs children and their adoptive families in crisis. The FIT program uses Strategic Family Therapy, which employs time-limited treatment, typically averaging three months in duration, and uses a strengths-based, solution focused, approach to service delivery that addresses the characteristics of individual family members, family relational dynamics and the multi-systemic context in which the family operates.

In addition to Georgia MENTOR's extensive experience in providing targeted intervention and case management services to children and youth with histories of court involvement, the MENTOR Network as a whole provides Family-Based In-Home Intervention programming in a number of locations, including South Carolina, Pennsylvania, Massachusetts, and Maryland. In each of these states, Network members have developed a wide range of time-limited intervention services to meet the specific needs of a variety of payors and populations.

Program staff anticipated that each child will be ready to step-down in the level of service that is needed to meet his or her needs after six months of Therapeutic Foster Services, at which time he or she may continue his or her treatment goals in the context of the family. Alabama MENTOR will provide the following services to biological families in order to reduce the child's length of stay in TFC and prepare families for successful reunification.

### Comprehensive Assessment
The North Carolina Family Assessment Scale (NCFAS) is a valid and widely used instrument that measures the impact of family reunification/preservation services. NCFAS uses five main scales and numerous sub-scales to determine how well a family is functioning. Primary domains include Environment, Parental Capabilities, Family Interactions, Family Safety, and Child Well-Being. The NCFAS permits the rating of strengths as well as problems on all domains and subscales. According to the researcher whom developed NCFAS, identifying strengths on the scale permits staff to include in the intervention those things that the family is doing well, which enhances the intervention and is affirming for the family. MENTOR will administer the NCFAS at intake to help identify areas of strength and need, and once again in preparation for reunification/discharge.

### Resource Development
MENTOR will facilitate linkages to community-based service providers and government agencies for families in need of resources and supports not provided under the contract.

24

Examples of such referrals include: housing subsidies, employment training programs, food assistance programs, child care, GED or college courses, substance abuse counseling/treatment, psychiatric treatment, to name just a few.

### Family Support
The MENTOR team will provide family support to the child's birth family as outlined in the ISP/Treatment Plan. Family support may include the provision of services to assist the child's family members to understand the nature of the child's diagnosis, symptoms, medication management, parenting support, and educational advocacy, as well as other individually appropriate supports.

### Therapeutic Visitation
In order to increase the family's ability to understand, manage, and cope with the challenges of the child's DSM-IV diagnosis as well as difficulties within the family system, MENTOR will provide 2 hours per week of therapeutic visitation coaching with families. These therapeutic visitation services will help staff to assess the parents' ability to safely care for their children and to determine progress (or lack thereof) in attaining the goals for re-unification or relative placement. Children and families will participate in formal and informal training and skill building activities during which they will learn and practice effective communication, conflict resolution, and behavior management techniques and/or other areas based on DHR and MENTOR's needs assessment. Therapeutic visitation services will be provided by MENTOR's Family Support Specialist, who will also assist the family, when indicated, in learning to manage the essential tasks of daily living: shopping, meal preparation, and nutrition; budgeting and money management; managing transportation; and general housekeeping.

Please refer to **Section F.4 (*Step-Down Process)*** for a description of the process of "stepping down" children to a lower level of care as ISP goals and objectives are met.

### 3. Services for Foster Families

### Visitation
Coordinators will visit each foster family (and child) on a weekly basis to provide support and technical assistance, answer questions, and discuss challenges and achievements. Technical assistance may include help with in-home treatment strategies, problem solving and goal-setting. Coordinators also provide emotional support, education, coaching, and feedback. Visitation will decrease to twice monthly once the child steps down to Traditional Care.

### Respite
Respite Care services are highly correlated with placement stability and are viewed by MENTOR as an essential support for a healthy and productive placement. Respite Care services are an effective service strategy because they can help prevent caregiver burnout, give the child a break from the primary care-giving relationship, as well as an opportunity to develop new relationships, and teach the child to build and transfer skills in an alternate setting.

MENTOR simplifies administrative oversight for the referring agency and eases the transition for the Mentor, child, or family by assuming all planning and coordination of Respite Services.

Foster families and children will receive 48 hours of Respite Care per month that may be arranged by the hour, overnight, and for entire weekends as indicated by the child's ITP/ISP or at the request of the Mentor. Twenty-four hours of Respite per month will be available for children in Step-Down TFC.

Respite Services are available to all participating children and Mentors. In addition to the children enrolled in its programs, MENTOR is prepared to partner with other Child Placing Agencies to provide Respite Services to children in their care.

### 24/7 Availability and Crisis Support
Although MENTOR places emphasis on prevention and treatment programming, it is anticipated that children and adolescents in placement may experience crises at various points during their stay in the program. Qualified MENTOR staff will provide five hours per week of crisis intervention services (as needed) to stabilize children and/or assist their families in deescalating a crisis involving the child.

MENTOR maintains a 24-hour a day emergency on-call "beeper" system that rotates among clinical staff members. In addition to the beeper system, MENTOR maintains an on-call notebook that contains emergency plans for each child as well as other pertinent information needed by the staff member on-call. This system is buttressed by weekly (and sometimes, daily) clinical staff meetings where the status of and anticipated difficulties with each child are reviewed.

### Support Network
MENTOR will create a support network among foster families by offering a monthly support group. The monthly sessions will include opportunities for sharing resources, socializing, and participating in topical educational sessions. During this time, issues such as stress management, coping with difficult behaviors, the youth's impact on the foster family, etc. are explored.

### Pre-service Orientation, Ongoing Training and Skill Development Opportunities
To promote Mentor role satisfaction, program staff encourage Mentors to enhance their skills and explore new educational topics. MENTOR staff know that foster parents provide higher quality services and are more willing to take on difficult challenges if they receive sufficient information and are offered adequate, relevant skill development opportunities. Therefore, Mentors are provided with clear, practical information on the variety of issues they may face. Program staff provide varied types of skill development opportunities, including video training modules and role playing exercises. Education sessions are documented in each Mentor file, and are acknowledged by providing the Mentor with a certificate of completion.

As discussed in **Section H.7 (*Training Requirements)* of this program narrative, Mentors are provided with a minimum of 40 hours of pre-service orientation, including 30 hours of GPS-MAPP and 24 hours of annual training each year thereafter.

### Foster Parent Appreciation Programs
Social functions and personal acknowledgements all contribute to MENTOR's foster parent retention rate. Mentors who have been with the company for several years agree that this type of

26

support offered by the program staff solidifies their commitment to continued service delivery. Some examples of creative ways MENTOR may show appreciation to foster parents are:

- Conducting support groups or meetings at a restaurant, for a change of venue;
- Recognizing foster parent birthdays with a card, phone call, cake or luncheon during a support group meeting;
- Planning a "fun day" at a nearby park for foster parents and the individuals they serve, if possible;
- Giving foster parents an appointment calendar each year for tracking dates such as support groups, client medical checkups; and
- Providing foster parents a magnet for the refrigerator with the required emergency phone numbers printed on it.
- Providing a "scholarship" for a skill development session or conference or workshop, including providing respite.

### Reimbursement for Mileage and Assistance with Transportation

Mentors will be reimbursed for mileage to a child's appointments, activities and family visits if the destination is outside a fifty mile radius from the foster home. MENTOR staff will provide transportation assistance when needed.

### Difficulty of Care Payment

Alabama MENTOR will pay Mentors a daily Difficulty of Care payment as identified in their contract, which will be a minimum of $16.00 per day for TFC children and $8.00 per day for children in Step-Down TFC. The Difficulty of Care payment will be based on the level of supervision required and the intensity of services needed.

### Home Compliance and License Renewal

MENTOR staff will ensure that the program's Mentor homes comply with the *Minimum Standards for Family Foster Homes* and will conduct annual license renewals and semi-annual home visits.

### Assistance with Medicaid Documentation

MENTOR staff will assist Mentors in ensuring that required Medicaid documentation of provided billable services is properly maintained and is in compliance with all policy and billing guidelines per the *Medicaid Provider Manual, Medicaid Rehabilitative Services, Chapter 105.*

### 4. Quality Assurance & Outcomes

MENTOR believes that it has a responsibility to be accountable to both clients and to the referring agency for the quality of care delivered, and the corresponding outcomes of its clients. Regular, comprehensive assessments of program strengths and weaknesses ensures that referred youth receive high quality community-based services, and informs the delivery of all such services in the future.

Quality of care is monitored through a comprehensive system that assures a focus on continuous quality improvement. Program data is retrieved monthly and evaluated by the Program Manager

according to the company's "Continuous Quality Improvement Plan". The following focus areas receive the Manager's constant attention:

- Careful monitoring of planned vs. unplanned discharges.
- Monthly monitoring of service plans and written reports, including the degree of the youth's goal attainment;
- Assessment of consumer and purchaser satisfaction, as indicated by analysis of responses from children, children's families, Mentors and referral sources through the use of satisfaction surveys.
- Incident Report Review: Examines the frequency and types of incidents and tracks program response to incidents.
- Quarterly Case File Review: Assesses the appropriateness of the youth's treatment plan, completeness of youth records, and implementation of the treatment plan.
- Monthly Utilization Review: Assesses the allocation of program resources in relation to the youth's needs, with the goal of moving each participant to the least intensive level of care appropriate to his or her clinical status.
- Safety Issues and Infection Control Review: Monitors status of homes and program offices to ensure safety.
- Program Evaluation and Outcome Analysis: Assesses the quality of program services and measures outcomes from services. This activity is regularly undertaken with assistance from the corporate office.
- Training/Risk Management: Assesses incidents and provides related training resources to program staff.
- Corporate Compliance: All of MENTOR's programs are required to be in compliance with internal operating standards in addition to all applicable federal, state and local regulations that govern business practices and the provision of high quality services. In keeping with this goal, MENTOR has developed a comprehensive Compliance Program. This program serves to prevent unwanted events from occurring, help the organization learn about these unwanted events quickly, and convey expectations and educate all employees and independent contractors to the Company's standards and its expectations for ethical practices. The Compliance Program is made up of three components: (1) a Code of Conduct, consisting of a statement of values and ethics and a guide to day-to-day business practices, (2) a Compliance Plan Handbook, comprised of an outline of the Compliance Program, and (3) a Compliance Hotline - a toll-free number that operates 7 days a week, 24 hours a day, 365 days a year.

**Evaluation of Performance & Outcomes**
MENTOR will regularly collect and analyze data related to service delivery and outcomes to ensure that high quality services are provided.

MENTOR will regularly administer the Child and Adolescent Functional Assessment Scale (CAFAS), a standardized tool designed to assess the level of a child or youth's impairment in areas such as role performance, thinking, behavior toward others, moods, and substance abuse at a minimum of every 90 days to measure the child's progress as well as the program's overall impact on its participants.

When reunification is the goal, MENTOR will measure each family's progress using the North Carolina Family Assessment Scale (NCFAS). NCFAS uses five main scales and numerous subscales to determine how well a family is functioning. Primary domains include Environment, Parental Capabilities, Family Interactions, Family Safety, and Child Well-Being. The NCFAS permits the rating of strengths as well as problems on all domains and subscales. MENTOR will administer the NCFAS at intake and shortly before the anticipated discharge date.

In addition to the monthly reports provided to DHR, MENTOR will provide an annual report to DHR within sixty days following the end of a contract year. This report will outline the efficiency and effectiveness of the services as well as the outcomes of the services for the youth served in the program. The report will address the following areas:

- Length of stay in the program.
- Number of children who "stepped-down" in level of care
- Average percentage of ITP objectives that are successfully met at the time of discharge
- Average change in CAFAS scores (at admission, 6-months, and at discharge)
- Average change in NCFAS scoress
- Number of youth who were referred to and have participated in higher education, vocational training and other community-based programs
- Cost efficiency
- Other areas as requested by DHR

MENTOR looks forward to working with DHR to establish numerical targets and benchmarks based on the challenges and goals of the youth referred to the program.

## E. TARGET AREA

Alabama MENTOR proposes to provide services to children in need of Therapeutic Foster Care in the following Regions:

- Region 3 (Autauga, Dallas, Lowndes, Montgomery, Wilcox, Crenshaw, Butler and Conecuh Counties)
- Region 6 (Jefferson, Shelby, Chilton, Talladega, Clay, Randolph and Cleburne Counties)

## F. DISCHARGE POLICY

### 1. Reunification Planning

Because permanency is the intended outcome of foster family care services provided by MENTOR, the discharge planning process begins upon program admission. Many children will require a time-limited stay, as they prepare to reunite with their biological or extended families, or move on to a permanent adoptive family home. Others will require longer-term services while their families attend to their own needs or while the family system stabilizes following a crisis situation. Some children may have permanency plans which dictate that independent living is in the child's best interest.

29

Each of these situations is fully considered, both at the time of program admission, and as the Comprehensive Treatment Plan is formulated and modified over time by MENTOR and DHR. The MENTOR team will direct considerable effort toward implementing a carefully planned transition, regardless of the child's destination. In most instances, a child transitions gradually, with a number of planned transitional visits, which increase in frequency and duration as the discharge date approaches.

MENTOR's ultimate program goal is to reunite participating youth with their biological families, or to prepare them, when appropriate and clinically indicated, for a permanent placement, including adoption or independent living. Please refer to **Section D.2** for a description of the services provided to families to expedite reunification.

Once the determination has been made that a child is ready for a planned discharge, MENTOR will arrange for a Treatment Team meeting during which time the discharge, transition and aftercare process will be discussed and goals for the child and family will be identified and outlined. Discharge planning includes, but is not limited to identifying goals and service responsibilities related to: education, job development, utilization of community resources and housing.

When family reunification and kinship care are viable long-term options for participating youth, the MENTOR team assists families in negotiating through all transition periods. In every instance, permanency and case planning fully incorporates the youth's biological family and other members of her informal support system, unless such participation is deemed clinically or legally inappropriate. Once reunification has been achieved, the Coordinator will visit the child and family in their home once a week for one month post-reunification. This practice provides the Coordinator with the opportunity to monitor the child's safety, comfort, and level of adjustment in the home and evaluate the family's overall functioning.

MENTOR recognizes that for those children with the goal of adoption or independent living, the separation/termination process may be painful and confusing. Emphasis is thus placed on thorough preparation for and continual processing of termination issues. The team anticipates that the child may exhibit regressive tendencies and anxiety as termination approaches, and will schedule family sessions accordingly, be they with the foster family, the biological family, or with the prospective adoptive parents.

After a child is discharged from the program, his or her assigned Coordinator will maintain responsibility for aftercare tracking, with support from the Program Manager. Alabama MENTOR staff will use MENTOR's newly designed census system, an automated system designed to monitor and track clients throughout their placement and post-discharge. Areas that will be tracked every 6 months for 2 years, as individually appropriate, are: living situation/placements, educational and work status, law enforcement status, and family involvement and stability. If MENTOR determines the youth or family is struggling to maintain gains or is in crisis, a team meeting with the youth, family, DHR and any ancillary service providers will be called to determine next steps. If attempts to track a child's placement are unsuccessful, all efforts to provide aftercare tracking will be documented in the child's record.

## 2. Discharge Prior to Program Completion & Emergency Discharge

An unplanned discharge occurs when:

- A minor leaves the program on an unauthorized absence;
- The individual is in need of more intensive structure, treatment, or security than can safely be provided in the program;
- The individual (or guardian) chooses to terminate services against the program's advice; or
- The individual repeatedly refuses to cooperate despite efforts of the staff to intervene and engage him or her in the service process.

If an unplanned discharge occurs because an individual leaves the program without notice, the Program Manager immediately notifies the legal guardian (as applicable) and referring agency staff as soon as possible, but not later than the next working day. Notification of law enforcement authorities occurs in accordance with state law and Service Plan requirements.

When an unplanned termination is anticipated, the Coordinator notifies the Program Manager. As appropriate to specific circumstances, the individual's legal guardian and the referring agency case manager are notified. With consideration to the nature and severity of the circumstances leading to the termination decision, program staff, the legal guardian and the referring agency staff develop an appropriate discharge strategy in order to avoid a precipitous termination.

Whenever possible, MENTOR will provide a 14 day notice in the event a disruption should occur, as appropriate to the child's health and welfare.

### Emergency Discharge
An emergency discharge may occur when a youth becomes a danger to him/herself or other program participants. In the case of an emergency discharge, MENTOR will notify the youth's authorized representative in writing of the determination that the program cannot continue to meet the needs of the youth, and that the youth will be removed from services within twenty-four hours. Emergency discharge occurs only after considerable efforts have been made to maintain the youth in placement and discharge is determined to be the only appropriate and safe option for the youth.

MENTOR will not prevent a youth's removal from the program under emergency circumstances by an authorized person. Emergency circumstances include, but are not limited to: removal by law enforcement officers when a youth is arrested or when the other youth in the home are endangered by a continued presence in the home, or relocation by the youth's guardian or other authorized representative.

## 3. Re-admission

MENTOR will re-admit any youth who does not experience a successful discharge back into the program if he or she meets admission criteria and is under 21 years of age at the time of re-admission.

31

### 4. Step-Down Process

MENTOR program staff understand that Therapeutic Foster Care is intended as an time-limited intervention that provides children with intensive services and supports which are intended to decrease over time as their conditions stabilize and goals are realized. MENTOR, in concert with DHR, will participate in biannual behavioral assessments to determine step-down readiness with the goal of transitioning the child to the Step-Down TFC after six months and continuing to step-down every six months until permanency has been achieved.

As an active participant in the step-down assessment process, MENTOR will monitor each child's progress through weekly face-to-face visitation with the child and Mentor, regular contact with birth families, quarterly Treatment Plan reviews and by conducting quarterly CAFAS assessments. This ongoing attention to the child's conduct and status will allow MENTOR staff to adjust treatment plan strategies and interventions as needed along the way to ensure the child is progressing and that challenges and setbacks are addressed immediately and effectively.

Monitoring at this level will also provide MENTOR staff with valuable supplemental information to help determine the child's readiness to decrease services and begin the step-down process. If DHR and the treatment team feel that a decrease in services, structure, and/or support after six months would be detrimental to the child's well-being, MENTOR, in collaboration with treatment team, will reevaluate the child's needs, challenges, and strengths and will modify the treatment plan accordingly to ensure the child has the support needed to achieve his or her goals.

Once the child transitions to Step-Down Foster Care, the Coordinator will visit the child twice monthly to monitor progress. If DHR and the treatment team determine that a child is in need of therapeutic services after successfully stepping down to Traditional Foster Care, MENTOR will secure appropriate authorization from DHR to reinstate services as specified in the modified ISP.

### G. PRIOR EXPERIENCE

As described in **Section A.3 (*History*)** and **Section A.7 (*Qualifications and Experience of Vendor*)**, MENTOR has nearly 25 years of experience providing Therapeutic Foster Care for children and youth with special needs. The company is known across the country for its comprehensive case management and wraparound approach to service delivery for children and families. MENTOR's practices are in alignment with the DHR approach to provide intensive support to children, biological, and foster families in order to provide a safe, stable home for children while they are placed out of their homes, and when possible, reunified with their families.

Please refer to **Sections A.3 and A.7** for a complete description of MENTOR's history and prior experience providing similar services.

32

## H. STAFF QUALIFICATIONS, RECRUITMENT, JOB DESCRIPTIONS AND TRAINING REQUIREMENTS

### 1. Staffing Patterns

Initially, the proposed program will employ a full-time Alabama MENTOR State Director (who will act as the Program Manager/Clinical Supervisor during the start-up phase of program implementation), and a full-time Recruiter in each location (Birmingham and Montgomery). Full-time Coordinators (Case Workrs), an Administrative Assistant and Staff Accountant will be hired as needed as the program census increases. When program census reaches ten children, a Program Manager will be hired. An organizational chart depicting the proposed structure, including lines of authority is included in **Section A.5** (*Management Structure*) of this program narrative.

Once the program reaches full operation, clinical staff will report directly to and be supervised directly by the Program Manager, a Master's level clinician who will be employed on a full-time basis. Formal clinical supervision will take place on a weekly basis between the Program Manager and the Coordinators and Recruiters. Informal supervision will take place on a daily basis. Additionally, group supervision will take place in the form of weekly staff meetings which will provide the forum for utilization review, problem solving, and specialized training specific to the strengths and needs of the participating youth. The Program Manager will report directly to the Alabama MENTOR State Director.

Children in enrolled in Therapeutic Foster Care will be supported and monitored by a Coordinator who carries a caseload of no more than 8 TFC children/families, although caseload size may vary based on case complexity, travel requirements, and the experience and skill of the staff person. Children in Step-Down TFC will count as one half case in the caseload count.

### 2. Qualifications and Job Descriptions

#### *The Mentor (Foster Parent)*
MENTOR's foster parents are known as "Mentors". Mentors are independently contracted workers who are carefully recruited, screened, and selected for their ability to provide intensive services and supports to all participating children. Many such workers have experience in the provision of health and human services when they begin delivering services on behalf of the company. Typically, Mentors have established ties in their communities and are active participants in many neighborhood and community activities.

Mentors are required to undertake pre-service orientation and undergo an extensive screening process prior to delivery of any and all services. Mentors must, in addition, participate in continuing education; participation in such seminars is a condition of continued service delivery on behalf of the organization.

Using structured and supported activities, Mentors help children acquire skills that promote self esteem and independence, facilitate communication, encourage participation in recreation and

33

leisure activities, and foster the attainment of the goals specified in each child's Individual Treatment Plan.

### State Director

The State Director is responsible for the overall quality assurance of the Alabama MENTOR program and ensures that youth supervision and related safety issues are always the immediate priority of all program staff. The State Director works with the Program Manager to select, train, motivate and supervise staff; provide formal and informal program assessment and monitoring; assist with crisis intervention; and develop and maintain positive and cooperative relationships with the referral source and local agencies. He or she is responsible for developing an organizational structure and acquiring the resources necessary to attain state goals. In addition the State Director prepares the annual budget for all services and participates in reforecasting activities and expenditure approval. The State Director will also perform the duties of the Program Manager/Clinical Supervisor in the start-up phase of the program.

The State Director must be either a psychologist, physician, professional counselor, or Master's level social worker and be appropriately licensed under Alabama law; or must possess a Master's Degree from an accredited university or college in psychology, social work, counseling or other equivalent area and who has met the requirements outlined in the *Therapeutic Foster Care Manual*. He or she must also have five years of experience in family or children's services with supervision and administration responsibilities.

### The Program Manager (Case Supervisor)

The Program Manager provides clinical supervision for the program, oversees recruitment efforts and Mentor training, and provides staff supervision and evaluation. He or she is responsible for program compliance, development of services, and quality improvement functions. Development and oversight of the budget is also within the purview of the Program Manager.

The Program Manager supervises Coordinators/Clinical staff, assigns caseloads, and evaluates the performance of all direct service workers for quality assurance purposes. He or she provides support and guidance to Coordinators through weekly supervisory meetings and manages staff training and development. He or she also supervises clinical and crisis management and has the ultimate responsibility for the development and implementation of a comprehensive treatment plan for each child. The Program Manager conducts utilization review of cases to assure the services being provided are both appropriate for the level of care and meet quality/best practice standards.

The Program Manager (Case Supervisor) must be a licensed clinical social worker (LCSW) or licensed professional counselor (LPC); or must possess a Master's Degree from a college or university with an accredited program in the respective degree of psychology, social work, counseling or other area that requires equivalent course work and must have successfully completed a practicum as a requirement for the degree or who has 6 months post-Master's level professional experience supervised by a Master's level or above with 2 years of post-graduate professional experience; or must be a licensed bachelor of social work (LBSW) with 5 years experience in children's therapeutic setting.

### The Coordinator (Case Worker)

Each child served by MENTOR is assigned a Coordinator, a professional with expertise in the assessment, treatment, and case management services being provided, who is the practical leader of the treatment team. The Coordinator visits the child on a weekly basis to facilitate the implementation of the Comprehensive Treatment Plan (based on the ISP) and to monitor and support Mentors and other direct service providers. Routine home visits are also conducted to assure the health and safety of the child in the Mentor home environment. More formal Health and Safety Assessments are completed on a quarterly basis and an annual reevaluation home study is done prior to re-certifying the home each year. The Coordinator also participates in the on-call system to assist children and Mentors in a crisis situation.

The Coordinator, in addition, coordinates the activities of ancillary professionals and treatment team meetings. He or she develops opportunities for community interaction, identifies and accesses community resources, and provides technical assistance to the Mentor, or direct service provider. The Coordinator is instrumental in assisting the child to plan for the future via the development of an individual educational/vocational plan. Educational and vocational goals are fully incorporated into each child's plan, as are, when indicated, family service plans and behavior management plans. The Coordinator helps to support and enhance the child's relationship with his or her family members (when clinically indicated) and facilitates family visitation and involvement.

The Coordinator is also responsible for facilitating internal Respite Services for Mentors, and for children enrolled in MENTOR's programs.

The Coordinator must possess a BSW or Bachelor's degree, or MSW or Master's degree in a closely related human services field. Approximately half of Alabama MENTOR's Coordinators will be Master's level clinicians who will be available to provide individual therapy and family therapy and consultation for behavioral planning.

### The Recruiter

Mentors are the company's most vital resource. Therefore, it is important that this group of people is carefully recruited, screened, trained, and monitored. The staff position responsible for developing a pool of qualified Mentors is the Recruiter. At MENTOR, the Recruiter is a staff person who conducts advertising campaigns, performs in-depth initial home studies, conducts criminal background checks, obtains health screening information, verifies references, and provides and/or facilitates orientation and pre-service training. The Recruiter, under the direction of the Program Manager, is responsible for ensuring the quality and size of the Mentor reserve (or "pool") and for preparing Mentors to receive their first placement. MENTOR makes every effort to recruit and select a group of Mentors who reflect the ethnic, racial, religious, and linguistic diversity of the child served by the company.

The Recruiter must possess a BSW or a Bachelor's degree in a human services or closely related field.

35

*Family Support Specialists*
The Family Support Specialist is program-qualified to perform the following functions in concert with the Coordinator (Case Worker):

- Assessment of parents' readiness for reunification and ability to safely care for the child/children in the home.
- Coaching in anger and behavior management and in self-regulation techniques.
- Coaching to help the family develop and maintain healthy communication skills, and general problem-solving methods.
- Instruction in all ADLs and IADLs. as appropriate to the family. Family Support Specialists will assist family members in learning to accomplish the essential tasks of daily living: shopping, meal preparation, and nutrition; budgeting and money management; managing transportation; and general housekeeping and laundry.
- Assistance with homework.
- Training to establish family routines and rituals.
- Teaching which encompasses child/youth development and effective parenting.
- Provision of transportation to program-specific appointments when necessary.
- Provision of informal training and skill building activities to help parents learn and practice other skills and techniques in areas based on DHR and MENTOR's needs assessment.

The Family Support Specialist will help the family access services in a number of ways including but not limited to: Filling out housing or job applications, writing resumes, providing transportation to appointments, researching public transportation routes, problem solving, and developing household routines.

The Family Support Specialist must possess a BSW or a Bachelor's degree in a human services or closely related field.

*Consulting Professionals*
A team comprised of multi-disciplinary professionals is available to both the Mentor and the Coordinator. These professionals may, in addition, provide services to the child as needed, including: psychological and psychiatric services; physical, occupational, and language therapy; and as appropriate, specialized vocational, pre-vocational, and educational services. MENTOR will maintain a minimum of monthly face-to-face or telephone contact with therapists and other professionals in order to monitor the child's progress in counseling.

*Staff Accountant and Administrative Assistant*
A sufficient number of administrative and accounting support workers will be employed to carry out business, secretarial and clerical duties, such as maintenance of records, correspondence, fiscal matters, and bookkeeping so that the services of the program can be carried out.

*Job Descriptions*
Job descriptions for the staff positions described above are appended to this program narrative in **Attachment A.**

36

### 3. Staff Screening Process

Prior to hiring any staff position, an authorization for release of Alabama criminal history is submitted to the Alabama Bureau of Investigations. The criminal record check must indicate the absence of a criminal record (as required in the *Alabama Minimum Standards for Residential Child Care Facilities*) in order for the applicant to begin working with any youth. Clearance of State Central Registry on Child Abuse/Neglect is also required. In addition, an OIG (Office of Inspector General) Exclusion check is completed on each applicant. A minimum of three professional references are also required from all applicants. Documentation of each check and reference is maintained in the employee's file. Alabama MENTOR will comply with the requirements set forth in the "Character and Suitability" section of the *Minimum Standards for Child Placing Agencies* and in the *Minimum Standards for Foster Family Homes*.

Any incident or allegation of abuse or human rights violation is investigated by the Human Resources Department or the Risk Management Department pursuant to Risk Management procedures set forth MENTOR's Operating Practices. In addition, statutory authorities are notified of the allegation in accordance with applicable reporting requirements. The substantiation of any such allegation may result in the immediate termination of the employee or independent contractor.

### 4. Management Qualifications

As shown in the organizational chart in **Section A.5 (*Management Structure*)** of this program narrative, the program will be implemented and overseen by Larry Webb, the Executive Director who oversees MENTOR's operations in Georgia and North Carolina. Mr. Webb is a seasoned child welfare professional with more than thirty years of experience in both the direct service and program administration arenas serving at-risk and troubled youth. Mr. Webb joined MENTOR in 1991 as Georgia MENTOR's first State Director. Prior to joining MENTOR, Mr. Webb held several positions in state government including Executive Director of the Juvenile Justice Coordinating Council, a position appointed by the Governor of Georgia to coordinate the state's services to children. Additionally, Mr. Webb worked extensively for the Georgia Department of Juvenile Justice where he gained significant fiscal, research, analytical, and program development experience. During his tenure with the Department, he held positions including Legislative Liaison, Director of Management Information, Director of Research, Court Services Worker and Attention Home Coordinator. Mr. Webb holds an MS in Sociology from Valdosta State College. He has particular expertise in fiscal and risk management systems.

MENTOR strives to provide all employees with the training and tools they need to do their jobs well. All staff receive a general orientation to the company and pre-service training prior to delivering services. Staff are also required to complete in-service training on an annual basis. A variety of training opportunities are available throughout the year to help staff continue to acquire knowledge and develop professionally. Please refer to **Sub-section 7 (*Training Requirements*)** of this Section for a complete description of MENTOR's staff pre-service orientation/training and ongoing training content and requirements.

37

In addition to required training topics and hours, all staff have access to a company-wide resource library for training and professional development. At present, the library contains more than 650 current materials for program use. Accessible by employees network-wide, the Training Resource Library supplements formal training sessions with videos and books on a variety of subject matters relating to the strengths and needs of at-risk and troubled youth. This lending library continually expands to accommodate requests from the field for materials on specific subjects.

## 5. Critical Incidents

MENTOR maintains an Emergency Fact Sheet on all youth in placement. One copy is maintained in the youth's permanent clinical record, one copy is maintained in the On-Call Emergency Book, and a final copy is given to the youth's guardian, where appropriate. This approach ensures that all persons charged with caretaking responsibilities have access to the information they need in the case of extraordinary circumstances and in times of crisis. The Emergency Fact Sheet includes, at a minimum, the following:

- The youth's full name, gender, date of birth, religion, and race;
- The name, address, and telephone number of the father, mother, and/or legal guardian;
- The name, address, and telephone number of the youth's case manager from the referring agency;
- The name, address, and telephone number of the person or persons to be notified in the case of an emergency;
- The reason for the placement;
- The youth's Medicaid or health insurance information;
- The youth's legal custody status;
- Significant medical and psychiatric information which might bear on assessing an emergency situation, and planning an emergency intervention, including:
- Current Medications
- Allergies
- Significant Medical History
- Current Medical Problems
- Primary Care Physician
- Dentist
- Psychiatric Diagnoses ---
- Significant Behavioral Problems
- Special Nutritional Needs; and
- The interventions recommended to anticipated emergencies, in addition to factors to consider in identifying emergency respite providers.

This Fact Sheet provides the youth-specific basis for the handling of all medical, dental, psychiatric and other emergencies. All MENTOR programs maintain active relationships and affiliation agreements with emergency medical and psychiatric facilities to address the needs of youth in crisis. These resources are listed in the On-Call Emergency Book.

MENTOR's Health-Related Emergency Procedures are detailed immediately below.

a. MENTOR documents that all youth receiving services are provided with timely, reasonable assistance in managing medical, dental, psychiatric, and personal health needs, whether these needs are of an emergency or routine nature.

b. If a youth experiences serious sickness or injury, the direct service employee takes the necessary emergency action and then notifies the Program Manager and youth's parent/guardian as soon as possible. An Incident Report is completed.

c. If a youth refuses to accept prescribed medication or refuses to allow the Mentor to provide assistance with medically necessary personal health care needs, the Mentor immediately informs the Coordinator and Program Manager. The Program Manager:

- Attempts to determine, through discussions with and/or observations of the youth, the reasons he/she is refusing medication or assistance with medically necessary health needs;
- Attempts to determine, through discussions with and/or observations of the youth, whether the medication or medical task has a negative reaction or side-effect;
- Consults with the prescribing/treating physician or other medical provider to determine other treatment options and risks associated with the youth's non-compliance with treatment;
- Discusses with the youth the risks associated with his/her refusal to accept medication or assistance with the health related task, as appropriate to the youth's age and developmental level;
- Arranges for the prescribing/treating physician or other medical provider to discuss with the youth the risks associated with his/her refusal to accept medication or assistance with the health-related task, as appropriate to the youth's age and developmental level;
- Notifies the youth's legal/medical guardian, referral source, and service planning team of the youth's refusal to accept medication or assistance with the health related tasks, despite the risks of such refusal; and
- Schedules a meeting with the service planning team to develop a plan to address the youth's refusal to accept medication or assistance with the health-related task.
- If the prescribing/treating physician or other health provider determines that the youth's refusal to accept medication or assistance constitutes a serious medical emergency, the Coordinator arranges for the transportation of the youth to the physician's office or hospital and for the implementation of further medical recommendations.

d. In the event of a medication error, the following steps are taken:

- Medical attention is sought, if necessary;
- An entry of the incident is made in the youth's permanent clinical record;
- An Incident Report is filed;
- The youth is kept under close supervision until all danger has passed;
- Changes in the youth's condition are reported to the youth's physician; and
- Changes in condition are documented in the youth's permanent clinical record.

39

e.  If MENTOR program staff suspect that a youth is seriously ill, or is carrying an infectious disease, the youth is examined by a physician immediately, and treatment is initiated, if appropriate.  A report of this examination is incorporated into the youth's permanent clinical record.

f.  If MENTOR program staff suspect that a youth has been abused and/or neglected, the youth is examined by a physician immediately, and treatment is initiated, if appropriate.  A report of this examination is incorporated into the youth's permanent clinical record.

## 6.  Volunteers and Interns

MENTOR does not contract with volunteers to provide direct services to individuals in MENTOR's care, except student interns under written agreement with academic institutions and in compliance with state regulations.  The following policies apply:

a.  Student interns are under the supervision of appropriate designated staff members at all times.

b.  Training and professional development activities, appropriate in assisting interns in implementing their assigned duties, are provided for each intern.  These activities are documented in an individual record for each intern, in accordance with expectations set forth in agreements with the academic institution.

c.  MENTOR will comply with state law and local licensing requirements regarding screening and background checks for interns who work directly with individuals receiving services.

## 7.  Training Requirements

### Staff Orientation and Pre-Service Training

Pre-service training occurs during the employee's first week of employment.  In the weeks following a classroom-style orientation, each employee job shadows a seasoned employee, making field visits, practicing therapeutic interventions, and learning first-hand the proper methods of documentation of all case activities.  All training participation is documented in the employee's file.  An outline of MENTOR's 40-hour Pre-Service Orientation is presented below.

| Topic | Activities and Tasks | Hours |
|---|---|---|
| Day One | | |
| Introduction to MENTOR | ▪ Mission & Philosophy<br>▪ Structure<br>▪ Service Models<br>▪ History & Development of TFC<br>▪ Goals & Objectives<br>▪ Approach to Service | 1 hour |
| Review of MENTOR Policies and | ▪ Program Rules & Regulations<br>▪ Clinical Services | 1.5 hours |

| Procedures | • Client Rights<br>• Emergency Procedures<br>• Personnel Policies | |
|---|---|---|
| Juvenile Supervision, Crisis Intervention, Discipline, Level System | • Supervision<br>• Rewards and Consequences<br>• Elopement Procedures<br>• Crisis Intervention | 2.5 hours |
| Overview of the Population | • Population Characteristics<br>• Program Design<br>• Substance Abuse<br>• Aggression<br>• Serious Emotional Disturbances<br>• Sex Offender Populations<br>• Criminal Thinking<br>• Child/Youth Development | 3 hours |
| **Day Two** | | |
| Specific Job Responsibilities of all Treatment team positions | • Program Manager<br>• Coordinator/ Intake Coordinator<br>• Recruiter<br>• Mentor (Foster Parent)<br>• Referring Agencies<br>• Roles of each staff in ISP process | 1 hour |
| Assessment and DSM IV Diagnoses | • Common diagnoses and their criteria | 1 hour |
| Working with the MENTOR Team and others | • Social Workers<br>• Educational Providers<br>• Mental Health Professionals<br>• Physicians, nurses, PT, OT, Nutrition | 2 hours |
| Overview of the Local Service System in Alabama | • Continuum of Treatment Options<br>• Funding Sources<br>• Licensing Agencies<br>• Ancillary Service Providers | 2 hours |
| Alabama State Regulations and Policies | • Mandated Reporting<br>• Licensing Requirements<br>• Roles and Responsibilities in Licensing Investigations<br>• Alabama Standard Operating Procedures/R.C. Consent Decree<br>• Alabama Court System | 2 hours |
| **Day Three** | | |
| Supervision and Support of Mentors (foster parents) | • Role of foster parent/Mentor<br>• Role of Coordinator<br>• Effective Communication<br>• Providing training and support | 2 hours |

41

| Medication Administration | • Procedures, Precautions, Side-Effects | 2 hours |
|---|---|---|
| Family Systems Theory | • Dynamics of the biological family<br>• Dynamics of the foster family<br>• Dynamics of the adoptive family<br>• Case Presentations<br>• Attachment Theory/Separation<br>• Grief and Loss | 3 hours |
| Behavior Planning | • Analyzing Behaviors<br>• Positive Behavior Supports<br>• Passive Restraints | 1 hour |
| **Day Four** | | |
| Universal Medical Precautions and First Aid | • CPR<br>• Communicable diseases | 2 hours |
| Documentation Procedures | • Confidentiality Issues<br>• Legal perspective<br>• Clinical perspective<br>• Concise, clear documentation<br>• Review of standard forms<br>• Observing and Describing Behavior<br>• Incident Report Writing<br>• Record Keeping<br>• HIPAA | 2 hours |
| Record Review | • Read sample client files | 2 hours |
| Service/Treatment Planning, Permanency Planning/Step Down Planning | • Goals<br>• Options<br>• Positive Based Behavioral Plans<br>• Placement Stability | 2 hours |
| **Day Five** | | |
| Juvenile Rights and Grievance Procedure | • Policy<br>• Rights of Children in Care<br>• Grievance Procedures | 1 hour |
| Basic & Independent Living Skill Development | • PAYA curricula and activities | 1 hour |
| Advanced Behavior Management | • Behavior Management Techniques<br>• Behavior Plans | 4 hours |
| Cultural Competence | | 2 hours |

**Staff In-Service Training**

Each year, staff must undertake a minimum of 40 hours of in-service training. These training seminars, available on an ongoing basis, are, in addition, supplemented by staff attendance at professional workshops, conferences, and seminars. All training hours, topics and instructors are documented and kept on file at the program office. Periodically, MENTOR surveys its staff through the administration of a training needs assessment, so that in-service topics have

42

relevance to both their positions within the organization and their professional growth interests. Typical in-service training topics include, but are not limited to:

- Principles and Practices of Juvenile Care and Supervision
- Program Procedures and Programmatic Goals
- Juvenile Rights and Grievance Procedures
- Procedures and Legal Requirements concerning the Reporting of Abuse and Critical Incidents
- Behavioral Observation
- Adolescent Psychology
- Child Growth and Development; Sexual Development
- Basic Counseling Skills
- Handling of Violent Juveniles
- Crisis Prevention Instruction
- Crisis Response Instruction
- Significant Legal Issues
- Security Procedures (i.e., searches and contraband)
- Socio-Cultural Life-Style of Juveniles
- Report and Incident Report Writing
- Emergency Procedures, First Aid, CPR
- Unusual Occurrence Reports (UORs)
- Standard Operating Procedures
- Communicable Diseases
- Working with Sex Offenders
- DSM-IV, Advanced
- Substance Abuse/Advanced Substance Abuse Treatment
- ADA Training
- Skill Development which reviews Developmental Disabilities, Health and Safety, Communication, Normalization, Personal Rights and Values
- Instruction in Behavioral Intervention, Behavioral Planning, and Data Recording
- Home Safety Precautions
- Medical Needs of Youth
- Working with Children who have Interagency Involvement

- Permanency Planning
- Complexities, demands, and special needs of children in placement
- Special Education/Tutoring Children with Special Needs
- Recognizing and dealing with learning disabilities
- Effects of Environmental Deprivation
- Attachment Theory
- Stress Management
- Separation and Abandonment Issues
- Communication skillstreaming
- Building Self Esteem
- HIV/HBV issues and other Blood Borne Pathogens
- Family Systems Theory
- Sexual Abuse/Treatment of Sexual and Physical Abuse Victims
- Psychopharmacology in Childhood and Adolescence
- Depression and Affect Disorders
- Attention Deficit Disorder and Hyperactivity
- Negotiation skillstreaming
- Teaching Parenting Skills to Biological Parents
- Management of Aggressive Behavior
- Cultural Sensitivity and Responsiveness
- Eating Disorders
- Suicide/Depression
- Cognitive Therapy with Adolescents
- Advanced Parent Effectiveness Training
- Abnormal Personality Disorders
- Recreational Therapy
- Foster parent/Mentor rights and responsibilities
- Foster parent/Mentor licensing and placement regulations
- Foster parent/Mentor grievance processes
- Bonding and/or safeguarding children's property

43

**Mentor (Foster Parent) Recruitment, Screening and Development**

Mentor treatment home heads of household enter the program with diverse social and ethnic backgrounds, levels of education, interests, and communities of origin. They originate from urban, suburban, and rural neighborhoods, and come to the program for Mentor consideration through a variety of recruitment mechanisms, which include, but are not limited to:

- Newspaper advertisements;
- Radio spots;
- Cable television advertisements;
- Flyers and bulletins;
- Presentations to community groups;
- Presentations to houses of worship;
- Regularly scheduled recruitment "parties"; and
- Other Mentors or Staff

Once interested Mentor candidates have been identified, an orientation session is held in either the MENTOR office or in the prospective Mentor's home. This seminar marks the beginning of the Mentor screening process and provides potential candidates with the opportunity to learn both about the benefits of the program and the population they will be supporting. Following a presentation and question and answer period, every interested candidate is asked to complete a screening questionnaire. This assessment tool examines not only the family constellation and type of residence, but also investigates their motivation for enrolling in the program. Candidates may be eliminated at this juncture for a variety of reasons, which include, but are not limited to: inadequate housing arrangements, lack of transportation, improper family constellation (too many children, for example), or the revelation of a criminal history. Applicants may also decide that they are not interested in pursuing the application process further.

Candidates who have been preliminarily screened are asked to complete an Application Packet. This packet is designed to explore the prospective Mentor's attitudes about children, understand a typical household day, and provide MENTOR with a detailed account of the history of the family.

If the completed packet reveals a history which is consistent with Mentor candidacy, the program Recruiter conducts a formal home visit, at which time a Home Inspection/Health and Safety review is undertaken. In some instances, repairs and/or modifications to the home are needed before the team may proceed further with the application.

Following the home inspection, the Recruiter conducts a formal home study; he or she makes a bio-psychosocial assessment of all adult family members living in the home at this time. Family members are questioned regarding their own childhood, their parents, their important relationships, and their satisfaction with life in general. The Recruiter also explores family member's feelings regarding children who have been abused and neglected, feelings about disciplining children, and their thoughts about cultural sensitivity. All children living both in and out of the home are interviewed extensively as well. This comprehensive assessment, done over the course of several visits, culminates in a final report, which either recommends the family for Mentor home placement or disqualifies the family from further consideration.

Prior to further consideration, each family member must pass a criminal record background check, child abuse clearance, OIG clearance and must receive Mantoux/tuberculosis clearance. Additionally, the prospective Mentor's physician must give medical authorization to proceed further with the application process. The MENTOR team also requires the potential Mentor to provide three references. It is MENTOR's practice that candidates interested in supporting a Medically Fragile child must agree to spend forty hours in the home of an active Mentor home serving a medically fragile child, so as to experience first hand the rewards and challenges of such an arrangement. MENTOR will institute this practice in Alabama once the program is up and running and a pool of active homes serving this population is available.

MENTOR staff must consider the following factors before accepting an individual as a Mentor:
- He or she must be at least 25 years of age.
- He or she must have a demonstrated commitment to working with children who exhibit difficult-to-manage behaviors.
- He or she must have a realistic view of the child's capabilities and limitations.
- He or she must possess the ability to see beyond the child's surface behavior and address the underlying issues causing the behavior.
- He or she must be able to set limits, and understand the necessity of establishing personal boundaries;
- He or she must be committed to working as part of the MENTOR team, and communicating extensively with ancillary service providers.
- He or she must accept MENTOR's treatment philosophy and have the ability to follow treatment plans and agency protocols.
- He or she must have the physical capacity to care for the child to whom he or she is matched (some children may require lifting or require other strenuous activities).
- He or she must be willing to have a respite Mentor stay in the family home during periods of respite care. *(Only for Medical Foster Care).*
- He or she must be willing to allow ancillary service providers into the treatment home.
- He or she must have a reliable vehicle and be willing to transport the child to any and all therapy, medical, and dental appointments.
- He or she must have access to reliable back up and a network of support.
- The Mentor family must be financially stable and must demonstrate emotional stability both individually and as a family unit.

## Mentor Education and Development
MENTOR provides pre-service and in-service education to all independently contracted Mentors, and encourages them to participate in outside educational opportunities whenever possible. Such education ensures that Mentors understand their responsibilities to the program and its participants and that they are fully prepared to respond to the challenges presented by caring for children with special needs.

Mandatory pre-service education for Mentors is at least 40 hours (plus first aid and CPR) in duration and takes place over the course of several weeks. The mandatory GPS-MAPP curriculum is 30 hours in length and usually done in a series of 3-4 hour meetings. The pre-service orientation process is designed to familiarize the Mentor with the MENTOR model,

policies, and procedures and to educate him or her about the different types of children involved in the program. In addition to GPS-MAPP curriculum (detailed on the next page), the following courses are included in the orientation:

- Introduction to MENTOR – Philosophy and Mission
- Introduction to population served – expectations and realities
- Introduction to the service model – TFC/FFTA Standards (history)
- Role of the Mentor parent – ABC Model
- Role of the treatment team members
- Program Policies and Procedures/Operating Practices
- Minimum Standards for Foster Family Homes
- Emergency procedures
- Record keeping and reporting requirements
- Mandated reporting – Identifying and Preventing severe child abuse/sexual abuse
- Professional documentation
- Universal precautions and infection control
- Cardiopulmonary Resuscitation and First Aid
- Child supervision
- Structured day programming
- Community resources
- Pharmacology
- Behavior management/Positive Approaches
- Crisis de-escalation/prevention/intervention
- Tutoring the special needs child
- Understanding mental health issues and its impact on families
- Client rights
- Fire safety
- Grief and loss for children in care - The Child in Care's point of view
- Family Integration - working with bio/extended families of children in care
- Cultural competency/diversification
- Strengths, Needs, and Service Assessment
- ISPs, reunification, concurrent planning and permanency
- The family's role in the treatment team
- Family strengthening and visitation
- Special needs of the TFC child (sexual abuse issues, understanding emotional disturbance, medication management, educational and vocational needs, emotional deprivation of children)
- Overview of R.C. Consent Decree and Rights of R.C. Class Members and their families
- Team and group approach & partnership principles
- Parenting techniques
- TFC foster family strengthening (matching, non-TFC siblings' needs and services
- Understanding allegations of abuse/neglect and the reporting process
- Building positive relationships and interpersonal helping skills
- Stress management

46

- Unconditional Care
- Foster parents' role in the ISP & ITP
- HIPAA

Group Preparation and Selection – Model Approach to Partnerships in Parenting (GPS-MAPP) will comprise 30 of the pre-service training hours. This curriculum guides potential foster parents through the complex issues they will face as foster parents. Through carefully designed activities, staff help Mentors decide if their expectations and abilities match the realities of being a foster parent. When Mentors fully understand the needs of children and their families, they are able to work more effectively with children and their families and it is more likely that permanency for the child will be achieved.

The topics covered in GPS-MAPP pre-service training will include, but not be limited to the following:

- Roles and Responsibilities of Foster Parenting
- How Children Enter the Foster Care System
- Family Implications Among Foster Parents
- Foster Care Experience from various perspectives
- Attachment and the Impact of Separation on Children & Effect of Multiple Placements
- Grief and Loss
- Child Development
- Techniques for Managing Behavior based on Positive Reinforcement
- Importance of Identity, Self-concept and Connections
- Understanding and Valuing Cultural Differences
- The Value of Families
- Family Reunification & Alternative Permanency Goals
- The Importance of Partnerships
- Individualized Service Plan
- Identifying the Strengths and Needs of Families and Children
- Behavior as an Expression of Underlying Needs

In support of making the "First Placement the Best Placement" Mentors also receive child-specific training both from the MENTOR team and in the case of Medically Fragile Children, the skilled nursing facility or medical professionals before the child is placed in the Mentor home.

**Mentor In-Service Training**
All Mentors are required to fully participate in at least 24 hours of in-service training (not including CPR, First Aid and other non-clinical training) on an annual basis as a condition of continued service delivery. Twelve hours of annual in-service training must include the following topics prescribed by the *Minimum Standards for Foster Family Homes:*

- Child Safety Issues, including CPR and Pediatric and Infant First Aid
- Crisis Intervention/Engaging Families
- Effects of Multiple Placements

47

- Cultural Sensitivity and Responsive Services
- Significance of Birth Families
- Substance Abuse
- Gang Activity
- Universal Precautions and Infection Control

Other in-service education topics may include:
- Medical Issues
- Normal Child and Adolescent Development
- Positive Reinforcement
- Relationship Building
- Stress Management
- Early Intervention
- Management of Aggressive Behavior
- Cultural Sensitivity
- Understanding Abuse and Neglect
- Ethical Issues
- Family Systems Theory
- Tutoring
- Sex and Drug Education
- Advanced Child Supervision
- Permanency Planning
- Teaching Parenting Skills to Biological and Extended Family Members

The MENTOR team makes frequent training needs assessments and revises the curricula accordingly, so as to ensure that the topics have relevance for the Mentor's work. Such reassessments, further, ensure that the team disseminates the most current thinking with respect to all topical areas.

## I. REFERENCES

1.    Jacquelynn T. Kasufkin, Supervisor, Direct Services/Foster Care
      Division of Out-of-Home Care
      South Carolina Department of Social Services
      P.O. Box 1520
      Columbia, SC 29202-1520
      (803) 898-7254
      jkasufkin@dss.state.sc.us

2.    Kristy Whitmire, Quality Assurance Liaison
      Alta California Regional Center
      2135 Butano Drive
      Sacramento, CA 95825
      (916) 978-6437

3.    Paula Morelock, Director of Juvenile Corrections
      Texas Youth Commission
      P.O. Box 4260
      Austin, TX 78765
      (512) 424-6093

4.    Christi Mallette, Parole Administrator
      Texas Youth Commission
      4900 North Lamar Blvd.
      Austin, Texas  78765
      (512) 424-6085

5.    Jim Humphrey, Quality Assurance Supervisor
      Texas Youth Commission
      6400 FM 969
      Austin, Texas  78724-5305
      (512) 927-8181

6.    Gracie Salazar, Contract Specialist
      Texas Youth Commission
      6400 FM 969
      Austin, Texas  78724-5305
      (512) 927-8181

7.    Maggie Olivier, Social Worker
      Rhode Island DCYF
      650 Ten Rod Road
      N. Kingstown, RI 02852
      (401) 294-5356

8.    Christina Fugate and Ashley Wagner (for Georgia MENTOR program)
      The Bureau of Milwaukee Child Welfare
      6111 N. Teutonia
      Milwaukee, WI 53209
      (414) 616-6135

9.    Tamica Allen
      Clayton County Department of Juvenile Justice
      409 Arrowhead Blvd.
      Jonesboro, GA 30236
      (770) 473-2426

10.   Kim Hanson
      Floyd County Department of Juvenile Justice
      512 Riverside Parkway - Suite 500
      Rome, GA 30161
      (706) 295-6256

11.    Sandra Mydell
       Chatham County Department of Family and Children Services
       P.O. Box 2566
       Savannah, GA 31498
       (912) 651-2716

12.    Kathleen Rinehart and Luci Avery ( MATCH Wrap Around Services)
       Division of Family and Children Services, DHR
       Two Peachtree St., N.W.
       Suite 18-403
       Atlanta ,GA. 30303-3142
       (404) 657-3572

13.    Gail Greer, Acting Deputy Director (In Home Intervention Services for post adoptive
       families)
       Office of Adoptions, DHR
       Two Peachtree St., N.W.
       Atlanta, GA. 30303-3142
       (404) 657-3550

14.    Curtis Washington
       1513 East Cleveland Ave.
       Building 100A - Suite 200
       East Point, GA 30344
       (404) 559-4216

15.    Sue Riner
       Wayne County Court Service Office
       142 South Brunswick
       Jesup, GA 31598

16.    Treva Hamilton, Program Manager
       Illinois Department of Children and Family Services (DCFS)
       1026 South Damen
       Chicago IL 60626
       (312) 793-8527
       (Illinois MENTOR subcontractor)

17.    Mecklenburg Area MHDDSA Authority
       429 Billingsley Road
       2nd Floor
       Charlotte NC 28211

18.    Tamara Indest/Melba Oubre
       Office of Youth Development
       P. O. Box 94304-Capitol Station
       Baton Rouge, LA  70804-9304.
       (225) 219-4223

# ATTACHMENT A

## Job Descriptions

| Position Title:  Alabama MENTOR State Director (Executive) | |
|---|---|
| Reports To:  Larry Webb, Eastern Division Executive Director | Position Supervises: Program Manager (direct); Alabama operations |
| Department/Program: Children's Services | Location:  Alabama |

Responsibilities:

- Ensure that youth supervision and related health and safety issues are always the immediate priority of all staff while maintaining the overall quality of service, efficiency of operation, and contractual compliance.

- Select, train, develop, and motivate appropriate staff to achieve or surpass, agency goals as well as personal career objectives.

- Develop an organizational structure and acquire the resources necessary to attain state goals.

- Prepare annual budget for all services; participate in reforecasting activities and expenditure approval.

- Assist management staff with problem solving and crisis management.

- Ensure that Program Manager has systems in place to respond quickly to individual referrals.

- Assist Program Manager in developing and maintaining positive communication with local agencies.

- Collect and report program statistics and other reporting as required.

- Develop and maintain working relationships with all funding sources, regulatory bodies, and interagency liaisons and assist in marketing and development of new business as assigned.

- Oversee the recruitment and training of all professional and paraprofessional staff; Delegate responsibilities to staff, as necessary and appropriate.

- Attend and participate in team meetings as requested.

- Maintain effective communications and a positive employee relations climate among all personnel.

- Maintain confidentiality, respect human rights, and practice universal precautions.

- Participate in legal, licensing, regulatory, and certification activities as needed.

- Participate in pre-service and in-service training and assist in development and revision of all training materials for staff and foster parents.

- Participate in rotational on-call system and crisis management activities on a 24/7 basis as needed.

- Provide clinical supervision for program staff relevant to treatment planning.

- Provide formal and informal program assessment and monitoring.

- Coordinate, schedule and monitor all Quality Assurance, Utilization Review, program evaluation, and licensing and accreditation activities.

- Responsible for coordination with clinical program affiliates, private clinicians and consultants.

- Provide direct counseling and treatment to clients as needed.

- Recommend, develop, and implement new avenues for program growth and innovation in service delivery.

**Qualifications:** The State Director must be either a psychologist, physician, professional counselor, or Master's level social worker and be appropriately licensed under Alabama law; or must possess a Master's Degree from an accredited university or college in psychology, social work, counseling or other equivalent area and who has met the requirements outlined in the *Therapeutic Foster Care Manual*. He or she must also have five years of experience in family or children's services with supervision and administration responsibilities. He or she must have knowledge therapeutic foster care services, must have a through understanding of the philosophy, purpose, and policy of the agency and must demonstrate administrative skill and leadership capacities. Criminal history must meet or exceed company standards at time of hire and be maintained at this level throughout employment.

| Position Title: Program Manager | |
|---|---|
| Reports To: State Director, Alabama MENTOR | Position Supervises: Coordinators, Recruiters, Family Support Specialists, Administrative Support personnel |
| Department/Program: Children's Services | Location: Alabama |

Responsibilities:

- Provide individual supervision to Coordinators and Recruiter on a weekly basis.

- Serve as contact person for all program intakes; process referrals, intakes, assessments, matching and placement of children.

- Assess needs of all youth and their families referred for service and oversee development and coordination of the treatment plan.

- Responsible for overall quality assurance of the program, including quality of services, maintenance of clinical files, and contractual compliance.

- Responsible for budget development and expenditure approval; project revenue and monitor monthly expenses, in conjunction with supervisor.

- Serve as liaison to all persons conducting audits.

- Oversee the recruitment and training of all professional and paraprofessional staff; participate in pre-service and in-service training; and assist in development and revision of all training materials for staff.

- Provide individual and group therapy as prescribed by the treatment needs.

- Attend and participate in all team meetings.

- Maintain confidentiality, respect human rights, and practice universal precautions.

- Assist with legal, licensing, regulatory, and certification activities as needed.

- Participate in rotational on-call system and crisis management activities on a 24/7 basis.

- Formulate and oversee implementation a discharge plan for all youth in care.

- Assign caseloads, evaluate performance for quality assurance, manage staff development and training.

- Ensure that assigned social work personnel perform their duties in compliance with all regulatory, contractual, corporate, and legal requirements.

- Supervise clinical and crisis management and establish on-call duties.

- Develop and maintain working relationships with all funding sources, regulatory bodies, and interagency liaisons and assist in marketing and development of new business as assigned.

- Oversee recruitment, including selecting, contracting, and terminating foster parents and oversee foster parent supervision, training, and evaluation.

- Serve as a liaison with consulting staff (psychiatrists, psychologists, physicians, etc.).

- Oversee appropriate interface with billing system and other operating units as necessary.

**Qualifications:** The Program Manager (Case Supervisor) must be a licensed clinical social worker (LCSW) or licensed professional counselor (LPC); or must possess a Master's Degree from a college or university with an accredited program in the respective degree of psychology, social work, counseling or other area that requires equivalent course work *and must have successfully completed a practicum as a requirement for the degree or who has 6 months post-Master's level professional experience supervised by a Master's level or above with 2 years of post-graduate professional experience;* or must be a licensed bachelor of social work (LBSW) with 5 years experience in children's therapeutic setting. Must have current driver's license; a safe, working vehicle; and appropriate levels of insurance coverage. Criminal history must meet or exceed company standards at time of hire and be maintained at this level throughout employment.

| Position Title: Clinical Coordinator (Case Worker) | |
|---|---|
| Reports To: Program Manager | Position Supervises: N/A |
| Department/Program: Children's Services | Location: Alabama |

**Responsibilities:**

- Evaluate and assess all children for placement and continued placement in a foster family home; place the child in the foster family home.

- Develop, coordinate, and update child's service plan.

- Make home visits and conduct foster parent group meetings as required.

- Provide supervised visitation to child and biological family.

- Maintain current and complete progress and contact notes and any other appropriate documentation in accordance with corporate, licensing, and regulatory standards.

- Attend and participate in all team meetings.

- Maintain confidentiality, respect human rights, and practice universal precautions.

- Assist with legal, licensing, regulatory, and certification activities as needed.

- Provide pre-service and in-service training to foster parents as assigned and assist in foster parent training, planning, and development.

- Secure individual foster parent contracts and complete annual performance evaluations for assigned foster parents; make recommendations for foster parent pay adjustments and terminations.

- Participate in rotational on-call system providing emergency coverage and crisis intervention support as assigned.

- Aftercare tracking of children (every 6 months for 24 months)

- Other duties as assigned.

**Qualifications:** Master's degree from a fully accredited college or university in social work or related field or BSW or a Bachelor's degree in social sciences or closely related human services field. Must have current driver's license; a safe, working vehicle; and appropriate levels of insurance coverage. Criminal history must meet or exceed company standards at time of hire and be maintained at this level throughout employment.

**Position Title: Recruiter**

| Reports To: Program Manager (Executive) | Position Supervises: N/A |
|---|---|
| Department/Program: Children's Services | Location: Alabama |

Responsibilities:

- Coordinate and develop advertising and conduct the recruitment process, including informational meetings.

- Review foster parent applications, medical examinations and references.

- Conduct orientation and home study evaluations.

- Assist in scheduling and conducting pre-service and in-service training and assist in development and revision of all training materials for Staff.

- Record and maintain the statistics necessary to measure the effectiveness of various recruitment efforts.

- Assist the Program Manager and the Coordinator in matching foster parents and children.

- Maintain appropriate records in compliance with funding source requirements.

- Develop informative activities related to company services.

- Attend and participate in all team meetings as requested.

- Maintain confidentiality, respect human rights, and practice universal precautions.

- Other duties, as assigned.

Qualifications: The Recruiter must possess a BSW or a Bachelor's degree in social sciences or closely related human services field. He or she must possess demonstrated marketing skills, hold a valid driver's license, and come to the program with at least two years of experience in home recruitment for at-risk and troubled youth. Criminal history must meet or exceed company standards at time of hire and be maintained at this level throughout employment.

| Position Title: Family Support Specialist | |
|---|---|
| Reports To: Program Manager | Position Supervises: N/A |
| Department/Program: Children's Services | Location: Alabama |

Responsibilities:

- Implement the ISP/Family's Service Plan, excluding the provision of therapy.

- Visit the family, 2 hours per week, to assess parents' ability to safely care for their children at home

- Provide supportive intervention services

- Monitor youth and family progress using observation and progress notes

- Comply with all MENTOR and DHR policies and procedures

- Under the direction of the Program Manager, provide assistance to referred families in the following need areas as they relate to the ISP/Family Plan:

- Effective communication and conflict resolution
- Behavior management techniques
- Budgeting, banking, and money management
- General service coordination
- Instruction in Activities of Daily Living
- Transportation
- Advocacy services
- Housing assistance
- Homework support
- Assist with paperwork/application completion

- Maintain current and complete progress and contact notes and any other appropriate documentation in accordance with corporate, licensing, and regulatory standards.

- Attend and participate in all team meetings as requested.

- Maintain confidentiality, respect human rights, and practice universal precautions.

- Other duties as assigned.

Qualifications: The Family Support Specialist must have earned a BSW or a Bachelor's degree in social sciences or closely related human services field. Must have current driver's license; a safe, working vehicle; and appropriate levels of insurance coverage. Criminal history must meet or exceed company standards at time of hire and be maintained at this level throughout employment.

| Position Title: Administrative Support | |
|---|---|
| Reports To: Program Manager | Position Supervises: N/A |
| Department/Program: Children's Services | Location: Alabama |

Responsibilities:

- Prepare correspondence, foster parent payroll information, billing information, regulatory and legal information, and other relevant documents.

- May assist with human resources related tasks, including employee accruals, payroll, and filing and updating of office personnel records.

- Participate in rotational on-call system, providing emergency coverage and crisis intervention support.

- Process invoices and reimbursements as assigned.

- Receive and refer visitors and telephone callers.

- Maintain office areas and oversee maintenance of office equipment.

- Prepare and distribute incoming and outgoing mail.

- Perform other duties as assigned.

Qualifications:  Administrative Support personnel must have a high school diploma and be at least twenty-one years of age.  At least one year of related experience strongly preferred.

# COMPENSATION FOR PROVIDING SERVICES PLAN

## A.    DAILY RATE

Alabama MENTOR's required compensation for providing a TFC placement that meets the program requirement and core services outlined in the RFP is a daily rate of $105.50 per child. This rate assumes a total of 24 beds at the end of the first year (approximately 12 beds in Region 3 and approximately 12 beds in Region 6). Alabama MENTOR will expand its capacity as needed based on referrals from DHR.

## B.    MEDICAID

If the submission of this proposal results in the notification of intent to award a contract, MENTOR will secure an office and immediately apply for a Medicaid number and the capacity to bill electronically for core services authorized on the ISP. Administrative personnel have had contact with the Medicaid office and were informed that an application could be processed within 10 days of submission.

## C.    NET MEDICAID REIMBURSEMENT

The portion of the daily rate of $105.50 that MENTOR proposes to be paid directly by the Department is $47.00. MENTOR proposes to recover $58.50 through net Medicaid reimbursement.

## APPLICATION FOR A LICENSE TO
## CONDUCT/OPERATE A CHILD CARE FACILITY

_X_ First Application                    _____ Application for Renewal

In accordance with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, application is hereby made for a license to conduct or operate the following child care facility or facilities:

_____ Child Care Institution             _____ Day Care Center

_____ Group Home                         _____ Nighttime Center

__X__ Child Placing Agency                  _____ Special Activities Program

I request the Department to begin the licensing study.

Applicant/Owner: _National Mentor Healthcare LLC  d/ba Alabama Mentor_
　　　　Name of Person/Corporation                Social Security Number of Applicant/Owner

　　　_Mr. Larry Webb_　　　　　　　　　　_TAX ID: 042893910_
　　　Name & Title of Person*
　　　Submitting Application

Have you ever been arrested, charged or convicted of a criminal Offense?
Yes _____ No __X__ If yes, give details of when, where and the nature of the incident.

Have you ever been investigated for suspected child abuse/neglect?
Yes _____ No __X__ If yes, give details of when, where and the nature of the incident.

I/We certify that the information given on this application is true and correct to the best of my/our knowledge. I/We understand that any misrepresentation of information may be grounds for denial of the application.

　　　　　　　　　　　Signed by: _Larry Webb_
　　　　　　　　　　　　　　　　·Person Submitting Application
　　　　　　　　　　　　　　　_18 Executive Park Drive, Ste. 1825_
　　　　　　　　　　　　　　　Number and Street Address
　　　　　　　　　　　　　　　_Atlanta,  GA   30329_
　　　　　　　　　　　　　　　City　　　County　　State   Zip Code

Date: _2/15/05_
　　　　　　　　　　　　　　　Number and Street Address

　　　　　　Mail to:　　Alabama Department of Human Resources
　　　　　　　　　　　　Family Services Partnership
　　　　　　　　　　　　Gordon Persons Building
　　　　　　　　　　　　50 Ripley Street
　　　　　　　　　　　　Montgomery, AL 36130-4000

* Attach statement verifying that the person submitting application has authority to do so, (if applicable).

Your Social Security number is required by the Department's Administrative Rules in order to provide an individual identification, a mechanism of matching criminal record information and an identification for purposes of Title XX contract and services.

DHR-DFC-740 Rev. 9/02

ALABAMA DEPARTMENT OF HUMAN RESOURCES
MONTGOMERY, ALABAMA

INFORMATION FORM FOR LICENSING STUDY

Complete and Mail to:   Alabama Department of Human Resources
Family Services Partnership
Gordon Person Building
50 Ripley Street
Montgomery, AL 36130-4000

Type of Facility:

_____ Child Care Institution

_____ Group Home          X  Child Placing Agency

Name of Facility: _Alabama Mentor_

Address: _In process, pending contract award_
(No. and Street)              (city)              (County)              (Zip Code)

Telephone Number: _N/A_
(Office Phone)                    (After Hours for Emergencies)

Name of Applicant: _National Mentor Healthcare, LLC d/b/a Alabama Mentor_
(Name of Person or Corporation)

Name and Title of Person with Responsibility and Authority to Work with Department Representative:

_Larry Webb, Executive Director_

Address: _18 Executive Park Drive Ste. 1823 Atlanta, GA 30329_
(No. and Street)              (city)              (County)              (Zip Code)

Telephone Number: _(404) 728-1567_     _Pending_
(Office Phone)                    (After Hours for Emergencies)

I.  ADMINISTRATION

A. FUNCTION OF THE FACILITY

1. Types of children served _See enclosed._

2. Capacity of the Facility _See enclosed._

DHR-DFC-741  (Rev. 9/02)          1

3. Ages of Children _____ *See enclosed.* _____

4. Geographic Area Served _____ *See enclosed* _____

5. Attach a description of the focus and function of the Facility, if this is an initial application or if amended since last application process.

6. Attach any publication giving information in addition to the above.

## B. ADMISSION AND DISCHARGE

Attach copies of admission and discharge policies and practices, if this is an initial application or if amended since last application process.

## C. BOARD

1. If there is a board, describe how members are appointed _____ *See enclosed.* _____

2. How often does the board meet? _____ *See enclosed.* _____

3. Dates of regular meetings _____ *See enclosed.* _____

4. Attach a list of the names and addresses of all members of the Board; indicate when the term of each expires; and specify the Chairman and committee members of each committee of the Board.

## D. ORGANIZATION

1. If incorporated, attach copy of incorporation papers, if this is an initial application or if amended since last application process.

2. Attach copy of by-laws and constitution, if this is an initial application or if amended since last application.

## E. FINANCIAL INFORMATION

1. Attach copy of projected or current budget.

2. Attach copy of most current audit, if applicable.

3. Attach policies regarding charges and services, if this is an initial application or if amended since last application process.

## F. PERSONNEL

1. Attach copy of personnel policies, including job description and qualifications, if this is an initial application or if amended since last application process.

2. List staff members and give requested information below. (Attach additional sheets as necessary to indicate duties assigned other than indicated by the title of the position.)

DHR-DFC-741 (Rev. 9/02)                    2

<u>**SCORING INSTRUMENT**</u>

<u>THERAPEUTIC FOSTER CARE  SERVICES FOR CHILDREN</u>

Vendor Name: _____ *United* _____

I.    **MANDATORY REQUIREMENTS**
Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ⎯⎯ | |
| B. | A completed Taxpayer Identification form is included? | ⎯⎯ | ⎯⎯ |
| C. | A completed Disclosure Statement form is included? | ⎯⎯ | ⎯⎯ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ⎯⎯ | ⎯⎯ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ⎯⎯ | ⎯⎯ |

**Note: If <u>No</u> is checked for any item A through E, provide a brief explanation. ____**

_____
_____
_____

II.    **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

A. Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person.  This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor.  The proposal provides a brief statement regarding the goals of the Organization or its mission statement.   Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B. History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any.  A description of all the services provided by the vendor, including the locations of service sites.

C. Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D. Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

**Percent awarded Section II: ___ 90 ___ x 25 max points = ___ 22.5 ___ Total**



Plaintiff'S EXHIBIT
7

III.    **Start Up Plan (50 Points Max)**

    A. Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

    B. Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

    **Percent awarded Section III:** _____*90*_____ **x 50 max points =** _____*45*_____ **Total**

IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

    A. Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

    B. Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

    C. Proposal describes specific criteria for exclusion from the program.

    **Percent awarded Section IV:** _____*90*_____ **x 75 max points =** _____*67.5*_____ **Total**

V.    **Service Delivery (250 Points Max)**

The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

    A. Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

    B. Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

    C. Program Services for Therapeutic Foster Care Providers:

        1. Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)

        2. Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

        3. Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: _____90_____ x 250 points = ___225___ Total

VI.    **Target Area (50 Points Max)**

   A.  If service is proposed as statewide, is the proposal identified as such?
   B.  If the service is not statewide, the proposal should identify reasons why.

   Percent awarded Section VI: _____80_____ x 50 max points = ___40___ Total

VII.    **Discharge Policy (75 Points Max)**

   A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
   B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
   C.  The proposal describes the vendor's policy concerning re-admission of children.
   D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

   Percent awarded Section VII: _____85_____ x 75 max points = __63.75__ Total

VIII.    **Prior Experience (75 Points Max)**

   The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

   Percent awarded Section VIII: _____90_____ x 75 max points = __67.50__ Total

IX.    **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

   A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
   B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
   C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
   D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

**Percent awarded Section IX:** ___90___ x 150 max points = ___135___ **Total**

## X.  References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

**Percent awarded Section X:** ___90___ x 50 max points = ___45___ **Total**

## XI.  Compensation for Providing Service (200 Points Max)

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

**Percent awarded for Section XI:** ___100___ x 200 max points = __200__ **Total**

**Total Points awarded:**

Section II:  22.5
Section III:  45
Section IV:  67.5
Section V:  225
Section VI:  40
Section VII:  63.75
Section VIII:  67.50
Section IX:  135
Section X:  45

711.25

Section XI:  _200_

**Final Points for Proposal:** _911.20_

**Signature of Scorer:** _____     **Date:** _____

ATTACHMENT E    Alabama Department of Human Resources
**Therapeutic Foster Care Proposal Cover Page**

**Organization Information:**

Name of Organization:_____UNITED METHODIST CHILDREN'S HOME_____

Address:_____P.O. BOX 830; 1712 BROAD STREET_____

City: _____SELMA_____State: _AL_____Zip: _36702-9900_____

Telephone: _(334) 875-7283_____Fax: _(334) 875-5161_____

e-mail address:_____mgalloway@umchalwf.com_____

Federal Employer Identification Number (FEIN): __63-0302145_____

Name/title of Authorizing Official:____Mike Galloway / President & CEO_____

Signature of Authorizing Official:_____Date: 4-4-05

**Contact Person Information:**

Name/title of program contact person: JIM BYRUM / ASSISTANT EXECUTIVE DIRECTOR___

Address:_____P.O. BOX 830; 1712 BROAD STREET_____

City: _____SELMA_____State: _AL_____Zip: __36702-9900___

e-mail address:_____jbyrum@umchalwf.com_____

Telephone: _(334) 875-7283 ext. 243_____Fax: _(334) 875-5161_____

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

| | | | |
|---|---|---|---|
| Region 1: Counties | Pike (8), Barbour (2), Henry (2), Houston (20), Dale (4), Coffee (4), Covington (2) and Geneva (12) | No. of Slot(s) | 54 |
| Region 2: Counties | Clark (2), Washington (2), Monroe (2), Escambia (6) and Baldwin (20) | No. of Slot(s) | 32 |
| Region 3: Counties | Butler (2), Conecuh (2) and Dallas (8) | No. of Slot(s) | 12 |
| Region 4: Counties | None | No. of Slot(s) | 0 |
| Region 5: Counties | Tuscaloosa (8) | No. of Slot(s) | 8 |
| Region 6: Counties | Jefferson (4), Talladega (4), Clay (3) and Cleburne (3) | No. of Slot(s) | 14 |
| Region 7: Counties | Cullman (17), Walker (5), Blount (3), Winston (2), Fayette (3), Lamar (2) and Marion (2) | No. of Slot(s) | 34 |
| Region 8: Counties | St. Clair (10), Calhoun (7) and Etowah (6) | No. of Slot(s) | 23 |
| Region 9: Counties | None | No. of Slot(s) | 0 |

## PROPRIETARY STATEMENT

Indicate any page(s) to which vendor has a proprietary claim:___None_____

_____

_____

# UNITED METHODIST CHILDREN'S HOME

## IV. PROGRAM NARRATIVE – THERAPEUTIC FOSTER CARE FOR CHILDREN

### A. ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE

1. Organization Information:

   The corporate headquarters of the United Methodist Children's Home (UMCH) is located at 1712 Broad Street, Selma, Alabama; mailing address is P.O. Box 830, Selma, AL 36702-0830. Mr. Mike Galloway is the President and CEO. He can be contacted at 334-875-7283, extension 241.

2. Governing Board and Other Agents:

   A Board of Directors comprised of 32 regular Board members and 9 Ex-officio board members, including an *Alumni* Ex-officio position, constitutes the governing body for UMCH. All Board members must be United Methodists and live within the regions UMCH serves (Alabama/West Florida). The Board is ethnically diverse and includes men and women of varying age groups who represent a wide range of community leaders. The Board is primarily responsible for decisions relating to strategic/long-range planning, approval of departmental and program budgets, and policy-setting activities. UMCH Board members are as follows:

   | | |
   |---|---|
   | Rev. Doreen Duley, Chair | Mr. Don Johnston |
   | Mr. Luke Coley, 1st Vice-Chair | Rev. Hal Noble |
   | Rev. McCreal Chapman, 2nd Vice-Chair | Mr. Luke O'Neil |
   | Mrs. Leslie Barineau, Secretary | Rev. Rick Owen |
   | Mr. Earl Edwards, Treasurer | Mr. Jenks Parker |
   | Mrs. Pat Brasher, Alumni, Ex-officio | Mrs. Sylvia Peach |
   | Bishop Will Willimon, Ex-officio | Mrs. Marion Phillips |
   | Bishop Larry Goodpaster, Ex-officio | Dr. Jim Richardson |
   | Mrs. Linda Sherry, Ex-officio | Mrs. Jane Roberts |
   | Rev. Joe Bullington | Mrs. Linda Robinson |
   | Mr. Norman Burton, Ex-officio | Mr. Roy Smith |
   | Rev. Dale Cohen | Rev. Robert Spicer |
   | Mr. Roy Day | Mrs. Pamula Spivey |
   | Rev. Joseph Estes | Rev. Paul Wolfe |
   | Ms. Chere Flanagan | Lt. Col. Bob Smith |
   | Rev. David Freeman, Jr. | Mr. Lee Werling |
   | Mr. Wayne Hall | Rev. Paul Wolfe |
   | Mr. John Hardeman, Ex-officio | NAC Vacancy, Ex-officio |
   | Dr. Lawrence Ford | AWFC Vacancy, Ex-officio |
   | Ms. Hazel Holiness, Ex-officio | |

   The Agency contracts with Bob McCartney, Ph.D., for psychological consultations.

3.   History of the Organization:

The UMCH, a faith-based, non-profit, social services organization, was founded in September 1890, as a small orphanage. Known as the Alabama Methodist Orphanage, the facility was originally located in Summerfield, AL. The orphanage operation relocated to Selma, AL in the fall of 1911. The name of the organization was changed in 1939 to the Methodist Children's Home.

In 1990, UMCH was among four (4) providers chosen to "pilot" initial Therapeutic Foster Care (TFC) programs. The Agency began with a contract for six (6) TFC placements in the Dothan area. UMCH now offers therapeutic foster care services statewide. UMCH staff has served on virtually all major state DHR committees involving policies and procedures relating to therapeutic foster care. TFC staff has been involved in provider meetings, TFC conferences and foster parent associations and continues to be visible in all areas that relate to assessment and delivery of services for TFC children and training and support of foster parents. TFC staff continues today, as in the past, to work cooperatively with DHR staff to train therapeutic foster parents along with traditional foster parents and adoptive parents.

The UMCH of today is a multi-faceted organization providing diverse services to children and families throughout Alabama and West Florida. Programs include Comprehensive Family Support, Family Options, Assessment Services, Basic and Moderate Residential Care, Mothers and Infants (Babies First), Transitional Living, Therapeutic Foster Care, Enhanced Foster Care and Family Resource Programs. The UMCH has many years of experience and is well qualified to provide therapeutic foster care services for DHR referred children. UMCH makes the commitment today, as in the past, to provide quality care in a warm, accepting environment.

4.   Mission Statement:

The overall mission of UMCH is to provide spiritual, social, physical and educational opportunities for children, youth, and their families whom we serve, helping them to live productive and wholesome lives.

5.   Management Structure:

The Board of Directors is the ultimate governing body of the UMCH. The President and CEO is the chief operations officer of the organization. The second level of management consists of the Leadership Team directly responsible to the President and CEO. These individuals represent the primary areas of operations: Business and Finance (Business Manager), Human Resources, Public Relations and Development, Spirituality (Chaplain), and Programs (Assistant Executive Director).

The Assistant Executive Director has direct supervisory authority for the Quality Assurance Coordinator and the Regional Directors for the four (4) geographical

regions. He has direct authority relating to all program activities. Regional Directors supervise all Program Supervisors in their regions. The greatest ratio of supervisory staff to a Regional Director in our residential programs is currently 8:1. The greatest ratio of supervisory staff to a Regional Director in our therapeutic foster care programs is 6:1. The Supervisor for each program supervises all program staff. The greatest ratio of staff to Supervisor in our therapeutic foster care programs is 6:1.

The Business Manager supervises three (3) staff persons involved in payroll, accounts payables/receivables, and Medicaid billing.

The Director of Development supervises a fulltime staff assistant and a fulltime communications coordinator. They are involved in activities that relate to marketing, fundraising and public relations.

The Director of Human Resources supervises a fulltime human resources assistant. They are involved in activities that relate to the recruitment and selection of external job applicants ensuring compliance with state and federal EEOC laws, managing the internal promotional program, new employee orientation, monitoring disciplinary action job description and policy and procedure preparation, and complaint resolution.

The following is the Agency Organizational Chart, providing a visual of the overall management structure.



6.    Financial Audit:

The last financial audit, prepared by Jackson Thornton, P.C., of Montgomery, AL, was conducted in May, 2004.

7.    Qualifications and Experience:

The UMCH, a licensed child-placing agency, has provided adolescent and child care services for over a century. The primary goal of the Agency has always been, and remains, to provide children the opportunity to live in a caring and positive environment while receiving the services and treatment they require to be healthy, productive members of society. The emotional and behavioral issues faced by children in the system of care are widely diverse. UMCH has expanded and adapted programs to meet the changing and diverse needs. The UMCH has been providing TFC services to children in the custody of the Department of Human Resources (DHR) for fifteen (15) years. We enjoy a collaborative relationship with the DHR.

UMCH TFC treatment protocols are tailored for the child who needs intervention for behavioral and/or emotional issues in order to successfully maintain placement with family members or some other less restrictive placement. The focus of all UMCH TFC programs is on the individualized needs of a child and the means by which maximum treatment benefits are obtained. TFC staff and foster parents work in partnership with school personnel, DHR social workers, counselors, psychiatrists and other individuals who are involved in the care and welfare of the children. Treatment plans are reviewed every ninety (90) days to assure that the delivery of services is always timely and effective. UMCH staff and foster parents attend *Individualized Service Plan* (ISP) meetings to promote consistency and continuity of care for the child and the child's family. TFC staff is well-versed in educational regulations regarding children with special needs in the school environment. TFC staff promotes necessary and timely educational advocacy for all children. TFC foster parents serve as primary advocates for the child in the school environment.

TFC staff is experienced in the management of culturally and behaviorally diverse adolescents. The Agency provides training to new hires that includes, but is not limited to, the history and philosophy of the Agency, basic child behavior management principles, the RC Consent Decree, ISPs, primary issues of children in care, HIPAA and cultural sensitivity. In addition, TFC caseworkers participate in twenty (20) hours of pre-service training prior to assuming their casework responsibilities. This training includes, but is not limited to, an overview of therapeutic foster care philosophy and history, review of the *Therapeutic Foster Care Manual*, training in treatment methodologies, crisis intervention and passive physical restraint, grief and loss issues of children, value of birth family involvement and attachment, life (significant other) attachments, behavior management theories and practices, effects of multiple placements for children, documentation procedures and minimizing disruptions. In addition, TFC caseworkers must attend the first available GPS class for prospective foster parents. This training is reinforced on an ongoing basis. UMCH is committed

to effectively responding to the cultural, emotional and behavioral needs of children placed in our care.

UMCH is dedicated to the highest standard of care. The UMCH Quality Assurance (QA) staff conducts routine audits of all programs to evaluate compliance with UMCH, DHR standards and Medicaid (105) requirements, to assess the quality of treatment planning and to review program outcomes. Data related to discharge information is compiled and maintained in a database in the QA office. This information is utilized to assess patterns of discharge planning, subsequent placement and determination of the level of success of each placement.

The following tables represent the statistics for 2004 that relate of the basic demographics of children placed in UMCH TFC programs:

| Children Served in Therapeutic Foster Care | Actual Clients | Percentage |
|---|---|---|
| Males | 55 | 51% |
| Females | 52 | 49% |
| Total Children Served in 2004 | **107** | **100%** |

| Children Served in Therapeutic Foster Care | Actual Clients | Percentage |
|---|---|---|
| African American | 30 | 28% |
| Caucasian | 76 | 71% |
| Other | 1 | 1% |

The Agency currently operates TFC programs throughout the state of Alabama based in the Southeast Region (Dothan, Troy), Southwest Region (Robertsdale, Evergreen) and the Northern Region (Anniston and Jasper). UMCH has developed a Family Resource Center in Birmingham. This program focuses on preventive services to children and families. It is further proof of the commitment of UMCH to provide the diversity of services needed for children and families to promote healthy family units. The Agency currently has contracts for three (3) family preservation programs: Comprehensive Family Support located in Andalusia, Family Options located in Dothan and Family Options in Mobile County.

UMCH has many years of experience in designing and implementing a wide spectrum of programs to meet the needs of children and families. The UMCH holds an *Educational Assessment Guidelines Leading Toward Excellence* (EAGLE) Accreditation through the United Methodist Association, issued for excellence and recognized by the Council on Accreditation (COA).

The following represents a list of persons familiar with the delivery of services by UMCH.

**Baldwin County DHR** - Hal Knox, Denise Stanley, Shayla Smith, Anna Etheridge, Elaine January
P.O. Box 56, Robertsdale, AL 36567
(251) 947-8340

**Blount County DHR** - Bridgette Bothwell, Rex Murphree
P.O. Box 68, Oneonta, AL 35121
(205) 274-5200

**Calhoun County DHR** - Kimberly McCombs
P.O. Box 1869, Anniston, AL 36202
(256) 231-7540

**Clay County DHR** - Gina Morgan
P.O. Box 940, Ashland, AL 36251
(256) 369-6817

**Cleburne County DHR** - Katherine McMullen
P.O. Box 25, Heflin, AL 36264
(256) 463-1700

**Conecuh County DHR** - Lou Boykin, Ida Abrams, Kimberly Guidroz, Renee Rogers, Lucy Calloway
P.O. Drawer 565, Evergreen, AL 36401
(251) 578-3500

**Cullman County DHR** - Connie Yarbrough, Anda Holcombe, Marie Chandler, Christy Basinger,
P. O. Drawer 990, Cullman, AL 35058
(256) 737-5300

**Dale County DHR** - Elizabeth Babine, Ronnie Smith, Jenny Hedeen, Beth Barnett
P.O. Box 447, Ozark, AL 36361-0447
(251) 445-4900

**Escambia County DHR** - Lynn Barnes, Margaret Singleton, Tracey James, Mrs. Lassiter
P.O. Box 868, Brewton, AL 36427
(251) 809-2000

**Etowah County DHR** - Jonathan Adams
P.O. Box 8445, Gadsden, AL 35902
(256) 549-4132

**Fayette County DHR** - Jimmie Hardin, Meredith Moore, Dawn Anderson, Myra Early
P.O. Box 489, Fayette, AL 35555
(205) 932-1665

**Houston County DHR** - Rosemary Lieser, Ramona Ross, Judy Whatley, Sally Schenz
P.O. Box 2027, Dothan, AL 36302-2027
(251) 677-0400

**Geneva County DHR** - Joani Martin, Leslie Handerson, Sandra Ward, Christie Hughes
P.O. Box 385, Geneva, AL 36340-0385
(251) 684-5800

**Henry County DHR** - Derrick Sauls, Brian Etheridge, Jerri Murphy
P.O. Box 367, Abbeville, AL 36310-0367
(251) 585-4100

**Monroe County DHR** - Barbara Wesley, Donna Watson, Bonnie Kyles
P.O. Box 1668, Monroeville, AL 36461
(251) 743-5900

**Mobile County DHR** - Deidre Williams
P.O. Box 1906, Mobile, AL 36633
(251) 450-9100

**St. Clair County DHR** - Penny Waltz, Kimberly Green
3105 15th Avenue North, Pell City, AL 35125
(205) 812-2100

**Talledega County DHR** - Andy Carden
P.O. Drawer 539, Talledega, AL 35161-0539
(256) 761-6672

**Tuscaloosa County DHR** - Gail Cornett
P.O. Box 70100, Tuscaloosa, AL 35407
(256) 554-1100

**Walker County DHR** - Martha Jones, Gloria Perry
P.O. Box 1772, Jasper, AL 35502
(205) 387-5400

**Washington County DHR** - Charity Ready, Jessica Carpenter
P.O. Box 600, Chatman, AL 36518
(251) 847-6100

**Winston County DHR** - Dale Hendrix, Doreen Tidwell
P.O. Box 116, Double Springs, AL 35553
(205) 489-1500

## ATTACHMENT C

### STATE OF ALABAMA
### <u>REQUEST FOR TAXPAYER IDENTIFICATION NUMBER</u>
### STATE COMPTROLLER'S OFFICE

INSTRUCTIONS.    In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files. To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1. In PART 1 below provide your Tax Identification Number and check FEIN or SSN. Also provide the name and address to which payments should be sent. In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2. Circle the business designation that identifies your type of trade or business in PART 2.

3. Sign and return this form as part of the response to the RFP:

**PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.**

IDENTIFICATION NUMBER _____ **63-0302145** _____

Check one ____✓____ Federal Employer Identification Number (FEIN)
_____ Social Security Number (SSN)

NAME OF ORGANIZATION:    UNITED METHODIST CHILDREN'S HOME        PHONE : __(334 ) 875-7283___

LEGAL BUSINESS ADDRESS:    P.O. BOX 830; 1712 BROAD STREET    SELMA, AL 36702-0830

FAX: __(334) 875-5161___        EMAIL: _____mgalloway@umchalwf.com_____

**PART 2 – BUSINESS DESIGNATION.** Circle the designation that identifies your type of trade or business.

1 - CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION (A corporation formed under the laws of any state within the United States)
(2) - NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 - PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 - SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 - NONCORPORATE RENTAL AGENT
6 - GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 - FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
    (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE: Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

**SIGNATURE**
(If different from above)

February 24, 2005      (334 ) 875-7283, ext. 241
DATE                     TELEPHONE NUMBER

President & CEO
TITLE

**PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES**

## B. START UP PLAN

The UMCH proposes to continue to provide treatment services for male and female children and adolescents referred by the Department of Human Resources who meet the requirements of therapeutic foster care. Generally, TFC referrals are school-aged children and adolescents, ages 5 – 18 years. Occasionally, a child is referred who is younger than six (6) years. These referrals require the referring county to receive prior approval for placement in TFC before the child is referred. A young adult who still remains in the custody of DHR, but who is over eighteen (18) years of age, may be referred for TFC services. All children and adolescents who meet the behavioral criteria for therapeutic foster care, and for whom a foster home match is made will be considered for placement regardless of sex and age. All policies and procedures enacted in this program shall be guided by the services outlined in this RFP and the principles and goals outlined in the *System of Care*. All existing TFC programs meet the guidelines with respect to staffing requirements. With few exceptions, current program operations encompass all basic core requirements stipulated in this RFP. All identified necessary revisions in program components, policies or procedures to meet the requirements of this RFP will be implemented by the beginning of the contract year, October 1, 2005.

TFC staff currently promotes the philosophy that a child should be placed in the closest proximity possible to his/her birth family. In this spirit, TFC staff makes every effort to work collaboratively with regional DHR county offices to place primary importance on those children whose family members are located in the regional area. UMCH does, however, accept referrals from all county offices to any of our TFC programs. Ultimately, the goal of UMCH is to serve the child and the child's family as effectively as possible regardless of the county of origin.

All referrals to UMCH TFC are carefully screened to promote the highest probability of success for a child. At a minimum, a social history, relevant educational information, placement history, and psychiatric and psychological information are required at the time of referral. This information is crucial in correctly assessing a child's appropriateness for placement, as well as identifying issues that will be integral to identifying the best foster home match for the child.

TFC staff carefully matches referrals to available foster homes. UMCH has a written protocol for the matching process to which all TFC programs must adhere. This process promotes the best possible outcome for the family and the child. The child's needs are assessed and each available family is considered in light of the child's needs and variables such as family composition, lifestyle and their own parenting strengths and needs.

At least one (1) overnight pre-placement visit is required prior to admission to provide an opportunity for the program staff, the DHR social worker and the child to determine if the referral is a good "match" with the program and the foster home. This visit is documented in the TFC foster family record and indicated in the child's referral information. If a child is

admitted to the program, the documentation of the pre-placement visit is inserted in the child's record.

Once the pre-placement visit is completed and the decision to admit the child is made, an ISP is held and the arrangements for placement are made. TFC staff and the foster family participate in the initial placement ISP to allow for the best overall planning for the child and the child's family. Ideally, the child's birth family is present and will meet with program staff and the foster family to work collaboratively for the success of the child and the fruition of the permanent plan. Individualized treatment goals for the child are developed from the established strengths and needs of the child and the child's family as identified in the ISP and the DHR comprehensive family assessment/intake evaluation and with input from the child, the child's family, the DHR worker, the TFC foster family, TFC staff and any other treatment team member present. UMCH assists in developing any ILP goals as appropriate for adolescents and coordinates the corresponding delivery of services.

The county DHR social worker for the child is responsible for completing the Medicaid billable *Intake Evaluation* ideally at the time of admission to TFC but must be provided within ten (10) days of admission. TFC programs will continue to complete an in-house *Intake Assessment* that meets the Medicaid guidelines, although the time devoted to this activity will not be billed to Medicaid. The *Children's Assessment of Functioning Scale* (CGAS) or the *Global Assessment of Functioning* (GAF) is completed at the time of intake. The *Initial Treatment Plan* is completed for all admissions within the first ten (10) days. Any additional instrument provided to UMCH by DHR will be utilized as a source of assessment for the child, along with the ISP, case history material, input from family members, input from the child and all other available relevant sources. If the *Initial Treatment Plan* is not comprehensive in scope, a *Comprehensive Treatment Plan* is developed after the initial thirty (30) days in care to expand and finalize treatment issues and interventions. A *Treatment Plan Review* is completed every ninety (90) days from the date of the Initial Treatment Plan to provide an ongoing assessment of goals and treatment methods and client progress. A monthly report is submitted to each child's DHR social worker that details a child's progress and activities for the prior month. ISPs are held every six (6) months to review the progress and stated goals for the child and the child's family. TFC staff and foster parents attend all ISPs to assure that the treatment team has all available information regarding the child, the child's progress, or lack thereof, and current treatment modalities. Satisfaction surveys are provided at the end of the first ninety (90) days of a child's placement to the child, the foster family, the birth family, and the placing agency for additional assessment of how the placement is progressing. Thereafter, the surveys are completed annually and at the time of discharge.

TFC staff and foster parents work collaboratively with all providers involved in the child's care and treatment and routinely consult with each child's therapist, teachers, DHR social worker and others who have primary involvement in the child's treatment regimen. Monthly consultations are mandated with the child's therapist to monitor the outcomes and progress of counseling. TFC staff is required to visit the child at his or her school at least once per month. Agency staff will continue to consult with the DHR social worker and other

providers as needed, not to exceed the daily caps. TFC staff and foster parents provide needed links to any wraparound services as identified in the child's ISP. TFC staff and foster parents assist in the development of ILP goals as identified in the child/family ISP. TFC caseworkers submit *Monthly Progress Reports* to DHR social workers for all children in UMCH TFC/Step-Down care.

Treatment modalities include, but are not limited to, daily basic living skills training, monthly group training for children and parents, ongoing educational advocacy, family support services, social skills training, mental health consults, behavior education and an ongoing in-home behavior modification program that incorporates a "token economy" component. Crisis intervention services are provided, as needed, to facilitate placement stability for children and families. Although group therapy is not currently offered at all TFC programs, all UMCH programs currently offer monthly basic living skills sessions for children. Policy and procedures will be revised to mandate that all TFC programs provide a minimum of monthly group counseling sessions for all children placed in the programs. During the TFC placement, each child will receive no more than eighteen (18) hours per week of individual basic living skills and no more than five (5) hours per week of group basic living skills, unless individual need and circumstances require more skills training. The child's TFC caseworker meets with him/her each week to discuss any issues the child may have, progress made in the home and/or at school, any activities, family contact, gifts or other services that child has received in the past week. A child in step-down receives nine (9) hours per week of individual basic living skills and no more than three (3) hours per week of group basic living skills, to include all categories of basic living skills training. TFC caseworkers will contact the schools and therapist of step-down children on a quarterly basis. In the event a child demonstrates the need for an individualized behavior plan, an ISP will be scheduled to formulate a plan. Appropriate methods and assessment will be identified. TFC staff will coordinate execution of the plan.

Program procedures currently provide for the required allowances and funding for personal and extra items. Documentation of these expenditures is maintained in the child's record. Occasionally, DHR may fund "special items." All children in UMCH programs receive routine and emergency medical and dental care. TFC staff works with the foster family and the DHR social worker to ensure EPSDT screenings are completed in accordance with DHR standards of care. TFC foster parents distribute any prescribed medications according to physician's orders and maintain a medication log for each child detailing the names and strengths of medications dispensed, the amount given, times given and the initials of the foster parent who dispensed the medication. TFC foster parents are instructed to discuss with the child's physician any possible side effects and how to determine if the child is suffering any ill effects from medications. Medication side effects are discussed with the child, if age and developmental function allows, and any child fourteen (14) years or older who is on any psychiatric drugs must sign the Consent for Medication form. The DHR social worker must also sign the Consent for Medication form. Foster parents also maintain a log of all non-prescription drugs dispensed to each child.

UMCH shares the philosophy that a child's involvement in community activities increases confidence and self-esteem. Current UMCH policy dictates that all children in care must be involved in a minimum of one extracurricular activity of their choosing, unless there are compelling reasons for non-involvement. TFC staff and foster family members make every effort to assist children in developing their talents and link them with the appropriate community programs that match their interests. Transportation is provided for children to extracurricular activities. The child's county DHR office is financially responsible for the cost of the activity and the materials required in the performance of the activity.

Current procedures mandate that contact is made with school personnel a minimum of once per month to monitor a child's academic progress and behaviors in the school setting. TFC caseworkers are required to visit children a minimum of once per month in the school environment. TFC staff/foster parents attend all school activities in which a child is involved. TFC staff/foster parents attend all *Individualized Educational Plans* (IEPs) for TFC children and participate in the advocacy for any other special educational assistance for a child who demonstrates a need.

TFC staff/foster parents strongly support the sustained contact between a child and his or her family. The staff provides support services to the family and facilitates family contact and the implementation of the goals as designated in the child's ISP. Two (2) hours per week of therapeutic visitation coaching with families and children is currently provided in some cases when foster parents supervise visits. However, visitation support services are **always** provided as indicated in the child/family ISP. UMCH will adjust our procedures to reflect the therapeutic visitation coaching stipulated in this RFP and as directed in the child/family ISP. All services provided by UMCH to the family or relatives of a child in placement must be authorized in the ISP in order for TFC staff/foster parents to provide specific and ongoing services to the birth family. TFC staff works closely with DHR staff to assist the child and family to achieve the best possible case outcome. UMCH is a service-driven, non-profit agency. Program staff attempts to work for the reunification of families in any means within the scope of program authority.

The child/family ISP and the child's treatment plan give direction as to the length of stay in the program. TFC foster homes provide structured, informal individualized behavioral programs that provide the necessary boundaries and services a child needs to receive maximum benefits from placement. Children learn the appropriate link between behavior and consequences, both on a positive and negative level. TFC staff/foster parents adhere to the philosophy that positive and creative discipline is the best way to teach a child how to live harmoniously in their families and in the society, at large. TFC staff/foster parents utilize all tools at their disposal to help a child experience maximum treatment benefits and achieve ISP goals within the shortest timeframe possible. Discharge planning begins at the time of placement. Unless a child represents a significant threat to self or others, a 14-day notice will be given in the event of a disruption. After six (6) months in care, all children will be initially assessed for possible step-down to less restrictive treatment modalities. DHR is currently developing an assessment tool that will provide the clinical assessment relating to the child's manageability of behaviors and/or emotive functioning. UMCH is currently one of the

agencies selected to "pilot" the step-down program. Therefore, the Agency is familiar with the philosophies and methods of the step-down protocol. All policies and procedures will be revised by October 1, 2005 to incorporate step-down as a viable category of care within the TFC framework.

UMCH is involved in the ongoing recruitment and training of prospective foster parents. UMCH staff recruits the highest quality of TFC foster parents who are committed to the philosophies of RC, the mission of UMCH and whose lifestyles and schedules allow for full participation in the life and treatment of the children. UMCH has staff in each TFC program that are GPS-Certified Leaders and available to provide the thirty-hour (30) GPS training on an ongoing basis. TFC programs have staff available to offer *Deciding Together* to those parents who are unable to attend the GPS sessions. Additionally, all UMCH TFC programs provide the ten (10) hours of therapeutic training in accordance with state DHR TFC regulations. These topics include issues of children in care, the need for attachments to significant others, guidelines and requirements of RC, agency policies and procedures specifically related to foster care, behavior management, effects of multiple placements for children, defusing and de-escalating crisis situations, cultural sensitivity and all topics as required. UMCH makes every effort to schedule trainings at the most convenient times for prospective foster parents. TFC foster parents are afforded the opportunities to obtain the required annual twenty-four (24) hours of continuing education through monthly group in-service sessions. The topics covered in group sessions include, but are not limited to, positive parenting techniques, issues of foster parenting, issues of children in care, grief and loss, separation, significant life attachments, diagnostic categories most common to children in TFC, avoiding "power" struggles and behavioral management.

UMCH provides each TFC foster parent with a handbook that outlines the policies and procedures related to their roles as foster parents. UMCH has written protocols to follow in emergency situations, including guidelines for the use of physical restraint, allegations of abuse or injury, discovery of drugs and alcohol, when a child is absent from the home without permission, arrest or other involvement in the legal system and the procedures and availability of compensation for loss or damage incurred by the foster family for actions of the child in care.

Each TFC foster parent has weekly face-to-face contact, at a minimum, with a TFC caseworker to discuss any issues or problems that may occur and the best means to resolve any problematic situations. TFC caseworkers meet with step-down foster parents bi-weekly. TFC caseworkers provide feedback and ongoing training to all foster parents with respect to billing requirements and procedures associated with billing Medicaid Rehabilitative Services. TFC parents receive no less than $16.00 per day "difficulty of care" payment from UMCH. Step-down foster parents receive no less than $8.00 per day. Mileage reimbursement is provided to both TFC and step-down foster parents for mileage incurred for activities and appointments occurring beyond a 50-mile radius. In rare, emergency circumstances, TFC staff will provide assistance to any UMCH TFC foster parent for transportation needs.

Designated licensing staff in each program provides the initial licensing of all foster homes and visits the foster homes on a semi-annual and annual basis. All foster parents must meet the licensing requirements as stated in the *Minimum Standards for Foster Family Homes*. All foster parents currently receive ongoing support, expertise and crisis response twenty-four (24) hours, seven (7) days a week. TFC foster parents receive monthly opportunities for forty-eight (48) hours of respite; step-down foster parents receive monthly opportunities for twenty-four (24) hours of respite.

TFC professional staff receives, in addition to the initial orientation training, twenty (20) hours of pre-service training. This training includes provisions and requirements of RC Consent Decree, an overview of therapeutic foster care philosophy and guidelines, history and development of therapeutic foster care, training in clinical methodology, assessing and managing difficult behaviors, diagnostic categories most common to children in TFC, and all other areas as stipulated in the *Therapeutic Foster Care Manual (revised 2004)*. In addition, new TFC caseworkers are required to attend the first available GPS class for prospective foster parents.

UMCH currently maintains a database that provides tracking information containing the basic demographics of a child, length of stay, discharge and placement information. The database will be revised to provide additional information regarding the aftercare services provided to children as required by this RFP. Clients, immediate family members, and the client's DHR social worker are asked to complete Satisfaction Surveys after the first ninety (90) days in admission, annually and upon the client's discharge. UMCH maintains a QA department that provides oversight to the programs to ensure compliance with all state and federal regulations and guidelines with respect to billing, service delivery, program maintenance and operations. All TFC programs comply with QA requirements as stipulated in the *Therapeutic Foster Care Manual (revised 2004)*.

UMCH proposes to recruit, train and license homes in Dallas County. UMCH currently has staff available to train and license the homes. If slots in Dallas County are awarded, staff will be hired to provide supervisory duties and casework duties. Pending receipt of criminal background clearances, a minimum of two (2) homes will be ready to accept children by October 1, 2005.

## C.  REFERRAL, ADMISSION AND EXCLUSION POLICY

1.    The UMCH accepts referrals statewide for male and female children of all ages meeting the referral criteria for the TFC program. All UMCH programs comply with Title VI of the 1964 Civil Rights Acts and do not discriminate in admissions. Referrals are considered for all children and adolescents who demonstrate the behavioral and/or emotional management problems which interfere with healthy functioning in the home, school or community setting and whose needs cannot be adequately or safely met in less restrictive settings.    TFC referrals should not include children whose behaviors and/or thought processes clearly demonstrate a need for a more restrictive setting than TFC provides, i.e.,

intensive security, lock-down measures, homicidal tendencies, active suicidal behaviors. Referrals received for children under the age of six (6) years will need special approval prior to admission.

2.  **At the time of referral**, the social worker must provide the following:

    a) A complete social history/intake evaluation
    b) Any relevant psychological and/or medical information, including documentation of a DSM Axis I diagnosis and support for the need for TFC placement
    c) A copy of the most current ISP, if applicable
    d) All relevant educational information

The information required is necessary to make an initial evaluation regarding the child's appropriateness for placement and to appropriately match the child with a foster home. A good "match" between child and foster family is essential in order to maximize the potential for successful placements. UMCH carefully screens all referrals. All referrals who meet the criteria for admission as stipulated in the RFP are considered for placement. A child referred for TFC **must** have an Axis I diagnosis and documentation of behaviors that support the need for the placement. UMCH makes every effort to locate an appropriate foster home match and place the child in as timely a manner as possible.

The screening process includes a careful evaluation of all available material relevant to the emotional and behavioral functioning of the child. The program supervisor reviews the material, consults with TFC caseworkers and, on occasion, with the regional director. The program supervisor and/or other TFC staff (caseworkers, licensing staff) reviews the profiles of all available foster homes to determine which of the homes provides a good match with the foster child. The foster homes are then contacted to assess the interest of each of the foster families in fostering the child. A foster home is chosen from this process that is considered an appropriate match and who shows an interest in fostering the child.

Once a referral is deemed appropriate and matched to a foster family, the DHR social worker is notified and a pre-placement visit arranged. The pre-placement visit must consist of at least one overnight visit. The child, the foster family and DHR and UMCH staff are consulted to evaluate the success of the pre-placement visit. If the pre-placement visit is considered successful, the DHR social worker is notified and arrangements for placement are made. An ISP is held at the time of admission to ensure appropriate treatment planning and continuity of care. Prior to formal placement of the child, the DHR social worker must provide complete information for the child's record in accordance with *Minimum Standards for Child Placing Agencies (2002)* and *Therapeutic Foster Care Manual (2004)*.

In the new contract year, the child's DHR social worker is responsible for completing the initial *Intake Evaluation* and providing this document to the UMCH treatment staff either upon admission or shortly thereafter and minimally within the first ten (10) days. This

document and the child/family ISP will provide the primary basis for the development of initial treatment goals. UMCH TFC staff will also complete an in-house *Intake Assessment* within the first ten (10) days of the admission date that adheres to all Medicaid guidelines but will not bill Medicaid for this activity. At the time of the ISP and the initial DHR Intake, the child is assessed in various behavioral and emotional areas. The CGAS or the GAF is utilized as an additional assessment of behavioral and emotional functioning.   UMCH TFC staff develops an *Initial Treatment Plan* within ten (10) days of admission further identifying treatment issues derived from the ISP, the DHR Intake Evaluation, the *UMCH Intake Assessment* and all other available emotional and behavioral assessments. If the *Initial Treatment Plan* is not comprehensive, a *Comprehensive Treatment Plan* is completed at the end of thirty (30) days that expands and revises, if necessary, the treatment goals and strategies. *Treatment Plan Reviews* are completed every ninety (90) days from the date of the *Initial Treatment Plan*. The CGAS or the GAF is utilized in conjunction with the *Treatment Plan Review* to provide further assessment and determination of progress and areas of need. Any additional assessments required or requested by DHR will also be utilized.


3.     Children who exhibit the following behaviors are not appropriate for admission to TFC programs: active homicidal or suicidal thoughts, severe mental retardation, serious developmental issues, or behaviors that present a significant risk to the child, to others or to property.


## D.  SERVICE DELIVERY

### *Services to TFC Children*

UMCH TFC programs rely heavily on providing a warm, accepting and secure family atmosphere as the foundation to promote positive behavioral change and emotional healing. The primary focus of UMCH programs is to provide the maximum treatment benefits and skills building necessary for children to experience growth, healing and responsible living within the context of family living. The mission and goal underlying all UMCH program activities is to assist children in developing the stability and coping skills necessary for healthy and productive living and to promote the reunification with the family or other permanent living alternative.


All referrals to UMCH TFC are carefully screened to promote the highest probability of success for a child.   At a minimum, a social history, relevant educational information, placement history, and psychiatric and psychological information are required at the time of referral.   This information is crucial in correctly assessing a child's appropriateness for placement as well as identifying issues that will be integral to identifying the best foster home match for the child


UMCH staff carefully matches referrals to available foster homes. UMCH has a written protocol for the matching process to which all UMCH TFC programs must adhere. This process promotes the best possible outcome for the family and the child. The child's needs

are assessed and each available family is considered in light of the child's needs including variables such as family composition, lifestyle, and their own parenting strengths and needs.

At least one (1) overnight pre-placement visit is required prior to admission to provide an opportunity for program staff, the DHR social worker, and the child to determine if the referral is a good "match" with the program and the foster home. At the conclusion of the pre-placement visit, UMCH staff speaks with the foster family, the child and the DHR social worker to assess the success of the visit and determine if admission to the program is the next step. These visits are documented in the foster parent record and indicated in the child's referral information. If a child is admitted to the program, the documentation of the pre-placement visit is inserted in the child's record.

Once the pre-placement visit is completed and the decision to admit the child is made, an ISP is held and the arrangements for placement are made. UMCH staff and the foster family participate in the initial placement ISP to allow for the best overall planning for the child and the child's family. Ideally, the child's birth family is present and will meet with program staff and the foster family to work collaboratively for the success of the child and the fruition of the permanent plan. Individualized treatment goals for the child are developed from the established strengths and needs of the child and the child's family as identified in the ISP and the DHR comprehensive family assessment/intake evaluation and with input from the child, the child's family, the DHR worker, the TFC foster family, TFC staff and any other treatment team member present. UMCH staff assists in developing any ILP goals as appropriate for adolescents and coordinates the corresponding delivery of services.

Measurable, outcome-based treatment goals and appropriate treatment interventions are developed for each child based on information obtained from a variety of sources. The DHR Intake Evaluation, along with the child/family ISP, will provide the primary impetus for the development of the treatment goals. The identified strengths and needs of the child's family are crucial in correctly assessing the overall dynamics of the family as this directly relates to the services and activities needed for successful reunification. Any other available assessments provided by DHR and/or any other providers gives valuable insight into the treatment protocol necessary to meet the needs of the child and family. The CGAS or the GAF, used at admission and at ninety-day (90) intervals, provides pertinent information about the child's functioning across a continuum of behaviors. Input from the birth family and treatment providers provides the treatment team information integral to addressing issues and problems that interfere with a child's daily functioning. UMCH TFC caseworkers integrate this information to identify a child's treatment needs and subsequently develop treatment goals and methodologies to address each identified need. TFC staff/ foster parents attend all ISPs to promote effective treatment development and case planning. UMCH TFC program staff and foster parents work with the ISP team to develop appropriate independent living skills, determine appropriate allowances, special items or gifts, etc., for youth in care.

Currently, the *UMCH Intake Assessment* is completed within the required ten (10) days of admission. Although DHR staff will provide the initial *Intake Evaluation* for the child,

UMCH TFC program staff will continue to complete the *UMCH Intake Assessment* as well. The aforementioned standardized assessment tools and other previously mentioned resources will be resources used to adequately identify and address initial treatment needs. After the DHR *Intake Evaluation* and the *UMCH Intake Assessment* are completed, an *Initial Treatment Plan* is developed to further define and refine the child's treatment needs, treatment goals and therapeutic interventions. If the *Initial Treatment Plan* is not comprehensive in scope, a *Comprehensive Treatment Plan* is developed after thirty (30) days incorporating input from the UMCH staff, the TFC foster family, the child, DHR staff, the child's birth family and all other available treatment team members. The *Comprehensive Treatment Plan* finalizes the treatment goals and strategies for the next sixty (60) days until the first scheduled *Treatment Plan Review*. *Treatment Reviews* are required every ninety (90) days from the date of the *Initial Treatment Plan*.

Initial discharge planning occurs at the time of placement. The treatment team is provided a copy of the discharge plan at the time of the admission ISP. This plan should include a "crisis" plan or proposed action in the event of an emergency situation. The discharge plan is reviewed at the time of each ISP (6-month intervals) to assure appropriate discharge plans are in place. Unless a child presents a significant risk to self, others or property, firm discharge plans will be initiated at least thirty (30) days prior to expected date of discharge. In the event of an unexpected disruption, UMCH staff will make every feasible effort to provide a 14-day notice. Obviously, if a child is at personal risk, such as suicide risk, immediate treatment options must be considered.

Children receive daily individual basic living skills training, not to exceed eighteen (18) hours weekly of individual skills training unless the need for additional services is clearly demonstrated. Children may also receive basic living skills trainings in the group setting. Total training in a given week should not exceed eighteen (18) hours of individual basic living skills training and five (5) hours of group training. Training areas consist of, but are not limited to, money management, shopping, public transportation, food preparation, laundry, medication management, healthy lifestyles, positive social skills, stress management, and personal hygiene. Behavior education is the primary method utilized for providing immediate feedback and redirection for promoting desired behaviors and extinguishing undesirable behaviors. Group counseling sessions are provided which includes focus on issues related to the goals of family reunification and permanency.

Within the realm of the Therapeutic Foster Care Program, the foster home milieu offers the primary elements of the overall therapeutic environment. The family environment provides a normalized family environment in lieu of an "institutionalized" setting, provides opportunities for ongoing therapeutic interventions and consistent social skills training through regular interactions with foster family members, and provides the child consistent, stable adult figures. This environment is especially conducive for training in the basic living skills areas necessary for productive and healthy living. The basic living skills training is accomplished primarily through daily individual one-on-one instruction, verbal feedback, modeling, redirection and role-playing.      These services are authorized through the child/family ISP and the amount of training is based on the identified needs of the child.

Basic living skills training beyond the maximum stipulated in this RFP will be supported by case documentation and specifically authorized in the child/family ISP. Additionally, therapeutic foster parents provide children needed stability, nurturing, and support.

The behavioral therapy programs implemented in all UMCH therapeutic foster homes follow a teaching model designed to assist children in identifying the correlation between behaviors and natural or logical consequences. Areas of daily evaluation often include the following:

- Peer and adult relationships
- Academic performance and/or behaviors in the school environment
- Personal hygiene
- Performance of chores
- Respect for persons/property

Each child's ISP and individual treatment plan serve as a tool for determining specific target behaviors. Foster parents and TFC program staff work closely with children in the behavioral areas designated. The primary focus of our behavior therapy program is on rehabilitation and the reinforcement of positive behaviors. The program promotes a classic behaviorist approach of reinforcing positive behaviors through rewards, thereby extinguishing undesired behaviors. Therefore, as a child increases his or her level of responsibility and maturity, the child is allowed more opportunities to gain privileges and rewards. The daily evaluations are reviewed with the children each day. Praise and encouragement is given to foster positive behaviors. Stars, stickers, point systems, incentives, money and the "treasure box" are all facets of the behavioral modification programs. When a child demonstrates particular difficulties complying with program and/or foster home rules or targeted behaviors, opportunities for restitution are provided. This often includes a system of "earn backs" such as writing a report, performing an additional task or chore, or doing something positive for another person. Occasionally, natural consequences are allowed to assist a child in learning the social mores and to promote understanding of what results may naturally occur in the case of certain behaviors. For example, if a child damages or destroys the property of another, he/she may be asked to provide, in small measure, some financial restitution. A child may request to earn additional money for such restitution through the completion of extra chores. Natural consequences can be a useful learning tool. In most situations, TFC staff and foster parents rely on positive reinforcement and logical consequences to help a child modify and manage behaviors.

In the event that a child has serious behavioral difficulties that need a more multi-faceted approach, a behavior management plan may be developed to focus more intensive behavior management interventions to these specific behaviors. An assessment by treatment team members, and perhaps other outside providers, provides the foundation for the individualized behavior management plan. The need for this service will be decided in the context of the ISP process.

Foster parents encourage constructive feedback among children and foster family members. Frequent "family" meetings are often held between children and foster families members to work out any interpersonal conflict and to allow children opportunities to provide input in the planning of special activities and outings as well as other family activities.

Foster parents and program staff access appropriate links to wrap around services as identified by the child's ISP. Adolescents learn how to effectively find the community resources they need to help them meet their needs and/or goals. TFC staff coordinates efforts to meet the child's transportation needs.

Academic effort is an important part of a child's overall development. UMCH adheres to the philosophy that it is important for children to put forth effort to achieve any goal, large or small. Success is often measured in very small increments, but any measure of success provides a foundation of self-esteem building. Each child is expected to participate in a designated "study time" to complete homework assignments, study class lessons and develop self-discipline and other appropriate study skills. The study time required for a child directly correlates with his/her frustration tolerance, hyperactivity level, school anxiety, diagnostic considerations and any other relevant characteristics. Homework notebooks are often required to help the child organize his/her work and track progress. Foster parents are available to check all schoolwork and provide any needed assistance. Children who demonstrate difficulties with grades or behaviors at school are monitored through daily or weekly reports from their teachers. This allows the staff, foster parents and teachers to work collaboratively in helping the child reach academic and behavioral goals. TFC staff maintains a minimum of monthly contact with relevant school personnel to further monitor the child's progress. Tutoring services are provided to children who need more work in any academic area. If a child requires intensive tutoring services, this will be authorized by the ISP and funding obtained via the DHR *Form 1878*. Children are provided encouragement and assistance to participate school-related fairs, displays and other school-related projects. Creative ways to motivate children are utilized (i.e., wrapping school supplies with motivational cards). These activities offer a child-friendly means of academic motivation. UMCH programs and foster parents often provide needed financial assistance for school year books, special school supplies and other school-related expenses.

Foster parents, under the supervision of program staff, monitor the medical and dental needs of the children and assure they receive all necessary care. Foster parents dispense all prescribed and over-the counter medications and provide the necessary medication monitoring and education for residents. Foster parents are instructed to be knowledgeable regarding any possible side-effects of any medications a child takes and to carefully watch children for any signs of ill effects of medications. UMCH has a written protocol for procedures in emergency medical situations. Program staff assists foster parents in assuring that all eligible children have a yearly EPSDT screening.

In addition to foster home activities, children are given the opportunities to hone their social skills through involvement in extracurricular activities. Children are required to be involved

in at least one extracurricular activity that allows them to develop talents, increase self-esteem and improve interpersonal relationships. Transportation is provided to these activities. DHR is responsible for financial costs incurred through the child's participation in the primary extra-curricular activity.

Each child receives an allowance as required by guidelines. In addition, the foster home provides funding to children to pay for any "special" needs they have, i.e., haircuts, feminine hygiene products, personal hygiene products, gifts, etc. In special cases, DHR may authorize payments for other items.

All UMCH TFC program staff and foster parents promote family reunification whenever feasible. In that spirit, TFC staff/foster families cooperate in any way possible to facilitate the reunification of children with their families (see subsection on *Services to Birth Family and Relatives of Children in TFC Placements*). Program staff and foster parents provide all needed support services as identified in a child's ISP. TFC staff/foster parents are willing to provide any assistance possible to children to promote positive family relationships. TFC staff/foster parents are available to assist with transportation needs, visitation supervision, processing the visit and any other services that enable a child to move closer to his/her permanency goals as delineated in the child/family ISP.

The TFC caseworker plays an important role in the therapeutic activities related to the children in care. This individual is the leader of the child's treatment team. This individual is responsible for organizing treatment team meetings and coordinates team decision-making related to the child's treatment plan and the child/family ISP. He/she is intimately involved with the child's case providing case assessment, case management, parent support, crisis intervention up to five (5) hours per week or as needed and other duties as assigned. The maximum number of children currently assigned to a TFC caseworker does not exceed ten (10) children. He/she meets with children at least once per week and has weekly face-to-face contact with foster parents, or more often as needed, to explore specific problem areas, provide therapeutic feedback and to reinforce skills training. The TFC caseworker is easily accessible to the child and to the foster family to provide the emotional and parenting support, guidance and expertise needed to ensure that each child is receiving the appropriate care and treatment in a nurturing and positive environment. The TFC caseworker monitors the training hours for foster parents to assure they receive the initial and ongoing training required to effectively work with the children. The TFC caseworker, or other designated staff, maintains monthly contact with a child's therapist to monitor the child's progress and/or outcomes of counseling. The TFC caseworker is the primary contact between the program, the DHR social worker, and any other treatment providers involved in child's case. This individual is an integral part of the child's treatment team and provides the necessary supervision of the child and family to ensure that all possible efforts are made to meet the child's needs.

The TFC caseworker and all program staff seeks to establish a strong therapeutic alliance with the children. TFC caseworkers often attend after-hours activities in which the children

participate, i.e., athletics, recitals. TFC staff continuously seeks to locate scholarships for camps, summer programs, athletic activities and other similar programs so that children may be involved in a wide array of activities. TFC staff celebrates holidays with children distributing treats and cards at Christmas, Valentines Day, Halloween, etc. Foster mother/daughter teas have been held to celebrate the relationships between mothers and daughters.

TFC staff participates in pre-service and ongoing professional development as required in the *Minimum Standards for Child Placing Agencies* (2002) and the *Therapeutic Foster Care Manual* (2004). All newly hired employees are required to attend an Orientation Training that provides information related to the organizational history and goals, HIPAA regulations, RC Consent Decree guidelines, basic principles of child management and all other topics as required in state standards regulating child-placing agencies and therapeutic foster care programs. Training opportunities are provided on-site and off-site to provide staff easy access to the necessary training. TFC program supervisors, regional directors, QA staff and other management staff are all involved in the training of program staff. All staff persons with direct responsibility for children are trained in Crisis Prevention and Intervention (CPI) techniques to help de-escalate crisis situations and prevent unexpected disruptions. As previously mentioned in the *Start-Up Plan* narrative, TFC professional staff receives, in addition to the initial orientation training, twenty (20) hours of pre-service training. This training includes provisions and requirements of RC Consent Decree, an overview of TFC philosophy and guidelines, history and development of therapeutic foster care, training in clinical methodology, assessing and managing difficult behaviors, diagnostic categories most common to children in TFC, defusing and de-escalating crisis situations including passive physical restraint, grief and loss issues for children, value of birth family in the treatment process, attachments to significant others, cultural sensitivity, documentation and evaluation requirements, effects of multiple placements, preventing disruptions, role in the ISP process, HIPAA and working with foster families. In addition, new TFC caseworkers are required to attend the first available GPS class for prospective foster parents.

Quarterly meetings are held with all TFC supervisory staff, the Coordinator for Quality Assurance, the Assistant Executive Director and other designated corporate staff to discuss program issues, new regulations or policies issued by DHR or UMCH and any other relevant topics. Staff training on specific issues typically occurs at these meetings as well.

All TFC foster homes meet the requirements stipulated in *Minimum Standards for Foster Family Homes*. TFC staff offer monthly training sessions for parents that provide the necessary opportunities to meet the twenty-four (24) hours annually of continuing education required by state regulations. Semi-annual visits are made to all foster homes and annual renewals conducted each year by the license renewal date. Designated TFC social workers ensure that all homes and foster parents are in full compliance with Alabama minimum standards and UMCH policies and procedures.

## *Services to Birth Family and Relatives of TFC Children*

UMCH recognizes the basic right of children to be with their own families. The Agency also recognizes that many families have complex issues in many areas and require a multi-faceted approach to help them achieve the best possibility of becoming united again as a family unit. TFC program staff is committed to providing therapeutic activities designed to enhance the birth parents' abilities to create safe, stable and nurturing home environments that promote healthy child development and increase the possibility for family reunification. The basic beliefs and values related to family reunification are as follows:

- Children should be with their birth families whenever feasible.
- Continuing family connection when children are in care increases the likelihood of reunification and may ease the process of reintegrating a child back into the family.
- A child's relationship with his/her family is always important.
- The majority of families, if properly assisted, can care for their children.
- Identifying, enhancing, and building family strengths into the ISP will encourage birth parent involvement, ownership, and compliance.
- Providing hope to families can often be a catalyst for change.
- The home environment is both a source of and solution to the problems of children and their families.
- Appropriate intervention is helpful in promoting positive change.
- Reunifying a child with his/her birth family is not a one-time event.

TFC staff is committed to family reunification for all children whenever and wherever possible. TFC staff works diligently and collaboratively with the children and their families as outlined in the child/family ISP to support and encourages connections between children and birth family members. The first and most important aspect of working with the birth family is to develop a therapeutic alliance with the family members, in particular the primary caregiver. It is essential for the success of all future therapeutic activities with the family.

The TFC caseworker coordinates the approved visitation and contact between children and their families. TFC staff/foster parents work therapeutically with children to assist them in processing feelings, separation anxieties, loneliness and other emotional consequences of being separated from one's family. This allows TFC staff/foster parents to also assess the impact of the visit for a child and evaluate issues relating to the parenting and interactions of the birth parents. TFC staff/foster parents often provide visitation supervision. During this time, staff/foster parents observe the interactions between children and their families and offer parenting coaching. In cases where this situation occurs on a regular basis as directed by the ISP, TFC staff/foster parents will provide two (2) hours weekly of parenting coaching for birth parents. TFC staff/foster parents will discuss with birth parents pertinent issues relating to the child's emotional and/or behavioral management problems to further assist the family in learning how to adequately meet the child's needs and to promote understanding of the family dynamics. TFC staff/foster parents offer feedback to the ISP team regarding parent/child interactions and any issues relating to the safety of the child. Often, birth parents find it difficult to trust someone competing for their child's affection and usurping their authority as parents of the child. TFC foster parents must be clear regarding their role, which

is to supplement and support birth families, not to take the place of the birth parent in the child's life. By developing a respectful relationship with the child's birth family, and serving as mentors for birth families, TFC foster parents can have a lasting positive impact.

TFC staff/foster families can assist birth families in other numerous ways such as providing parenting support and education to the child's family/caregiver about the child's issues and how those issues impact the overall family relationships. TFC staff/foster parents will assist parent/caregivers in learning to access needed community services for themselves and other family members such as housing, medical care, etc. TFC staff/foster parents will assist parents/caregivers in learning to access needed community services for themselves and other family members. TFC staff will continue to invite birth families to attend *Treatment Plan Review* meetings and ISP meetings and will assist with transportation needs whenever feasible. These meetings, as well as family visitations, provide excellent opportunities to meet individually with birth family members and to set aside time to provide individual parenting training and support. These present opportunities to empower a parent/caregiver to recognize problem areas and engage in conflict resolution. TFC staff/foster parents will help birth parents learn to appropriately advocate for their children in the school environment through encouraging them to attend IEP meetings and by discussing a child's educational needs and the means by which they can access services to meet those needs. UMCH will invite birth family members to attend activities in which the child is involved, i.e., sports, school activities, dancing, gymnastics, etc. Their presence at these activities promotes involvement in the child's life and provides TFC staff/foster parents various opportunities to work directly with the parents on child/family issues. TFC staff/foster parents will provide assistance for transportation whenever possible. Psycho-educational techniques that may be utilized include:

- Child Management/PET (Parent Effectiveness Training) Model
- REBT (Rational Emotive Behavioral Therapy)
- Modeling

As TFC staff/foster parents are not legal guardians of children and thereby do not make the decisions relating to a child's contact with birth family members and reunification plans, all services performed to and with the birth family must be identified in and approved by the child's ISP. UMCH does acknowledge that aftercare services are an important component of the service continuum. Aftercare plans are developed through the discharge planning process and are based on the individual family/child history, identified needs, family dynamics and family/child goals.

### *Services to TFC Families*

#### *Support Services*

The UMCH is committed to partnering with the Alabama Department of Human Resources community service groups, churches and other providers to build awareness of the need for quality foster care services in the state of Alabama and to mobilize citizens to take action to improve the lives of children in foster care.

A TFC social worker is designated in each program to serve as the licensing specialist to work with the foster families to help them understand and navigate through the process of initial training and licensing that can appear overwhelming. UMCH TFC licensing staff works with foster family homes to ensure that foster homes meet all licensing requirements, these families understand the state and UMCH policies and regulations relating to the licensing requirements and that they have a realistic concept of foster parenting. TFC social workers conduct the initial licensing of the homes, semi-annual visits to assure continuing compliance and annual renewals. It is the responsibility of the licensing personnel to track the foster parent training hours and ensure those requirements are met prior to initial licensure and annual renewals.

Once a child is placed in the home, UMCH provides therapeutic foster parents with a daily "difficulty of care payment." This payment shall not be less than $16.00 per day. In addition, all foster parents will receive reimbursement for mileage costs incurred for transporting children to appointments beyond a 50-mile radius from the foster home. The need for the travel distance will be clearly documented in the child's ISP. It is the expectation that foster parents will provide all necessary transportation for the children; however, TFC staff will assist with transportation needs as the need arises.

UMCH recognizes the importance of providing foster parents with a diverse support system. TFC staff believes the following practices followed in UMCH TFC programs provide all foster parents with a wide array of benefits and supports that will enhance their experiences and increase retention:

- Provide a clear description of the foster parent's role in service delivery. TFC staff believes it is imperative that foster parents clearly understand the roles and responsibilities assigned to them. Handbooks are provided to foster parents that clearly outline roles and responsibilities of foster parents and policies and procedures relating to foster parent issues and therapeutic foster care guidelines. Annual *Foster Parent Agreements* are completed by foster families and TFC staff to further clarify the expectations for staff and for foster families.

- Provide competency-based, pre-service training of forty (40) hours (GPS and TFC training) combined with good home and family assessments. Provide foster parents relevant in-service training, twenty-four (24) hours per year. These in-service sessions focus on skill development, parenting issues and other topics that are directly related to the responsibilities of the foster families in light of the needs of the children in care. These monthly sessions also provide the opportunities for foster parents to bond and support one another.

- Provide full information to foster family about child's family, child's behavioral and emotional history, child's placement history and any other information relevant to the care and welfare of the child and the foster family. TFC staff collaborates with foster family members as a part of the treatment team. TFC staff includes foster parents in all meetings relevant to the care of the child and keeps them apprised of any information received about the child placed in their home. TFC staff elicits input from foster families about the treatment needs of the child.

- Provide ongoing supervision and expertise to foster families to strengthen their abilities to meet the needs of the children in their homes. This involves telephone and face-to-face contact to discuss child's behaviors and assess current methods utilized to address the behaviors. TFC workers provide emotional support as well as professional expertise. TFC staff often sends motivational cards to foster parents during times of difficulties as an added means of support. TFC staff also meets weekly with foster parents to provide support, monitoring, and consultation. This meeting takes place in the foster home no less than every other week. Step-down parents have face-to-face contact with the TFC worker bi-weekly, unless there is a demonstrated need for more frequent face-to-face contact.

- Provide the necessary initial training and continued training and support regarding documentation requirements, including the required Medicaid documentation of billable services and the continuing documentation of services provided to children in TFC foster homes.

- Provide TFC foster parents with 24-hour crisis assistance. There is always a TFC caseworker available to assist a foster parent in times of crisis or in the event the foster parent just needs support and encouragement.

- Provide TFC foster parents needed respite care, forty-eight (48) hours per month for TFC parents; twenty-four (24) hours a month for step-down parents. TFC staff understands the need for a "break" for foster families and makes every effort to provide such needed respite weekends.

- Provide TFC foster parents with assistance and access to services needed by children placed in the home through expertise, wraparound services, and any other needed services.

- Provide foster parents with support to participate in local and national foster parent organizations. UMCH supports foster parents in expanding their skills and knowledge base through professional development activities and networking.

- Provide TFC foster parents with recognition for their accomplishments. UMCH TFC programs are involved in a variety of activities to recognize the accomplishments of foster parents including, Parent Recognition Banquets, Birthday Cards to foster family members, Mother's Day and Father's Day cards for foster mothers and fathers, articles placed in area papers praising foster families, providing gift cards for foster parents going the "extra mile" and other similar projects. Adoption cards are sent during National Adoption Month to those TFC families who have adopted their TFC child.

- Provide TFC foster parents a means of expressing grievances. Foster parents are provided a written protocol for grievances relating to UMCH staff. TFC staff has an "open-door" policy with foster parents and encourages them to express any concerns or complaints.

- Conduct exit meetings to ascertain why foster parents leave fostering. This is a quality assurance policy that promotes positive change in areas that need changing and allows us to evaluate our programs through the eyes of those with whom we work.

*Recruitment*

The UMCH considers collaboration an essential element in the coordination, outreach and service delivery aspects of foster parent recruitment and retention. Years of experience in recruiting and developing foster homes has shown that foster parent recruitment is largely community work and relationship building. UMCH adheres to the philosophy that the most effective recruitment campaigns involve outreach efforts which are built on community partnerships. UMCH utilizes a multi-tier approach to recruitment activities.

The ultimate goals of TFC foster parent recruitment are:

- To implement a recruitment strategy for foster families that results in a pool of foster families that will meet the needs of the children in the state of Alabama child welfare system.

- To provide TFC foster parents pre-service and subsequent in-service training that provides them with the information and skills they need to fulfill their roles and responsibilities in a caring and effective manner. The pre-service training is the GPS curriculum of the *Model Appropriate to Partnership in Parenting Program*. In-service training emphasizes strategies to help TFC foster parents cope with the issues of being a foster family caregiver as well as an understanding of the issues of children in care.

- To promote high TFC foster parent retention rates through the development of strong partnerships with foster families. Good partnerships reflect the proper respect for the TFC foster parent's time, resources and energy, commitment and follow-through by Agency staff, a child-centered, family-focused approach, strong lines of communication with foster parents, and 24-hour availability of staff.

All recruitment activities provide information aimed at improving community understanding for the need of TFC foster parents in the state of Alabama, creating a positive and realistic picture of foster parenting and creating a diverse pool of foster homes to serve needs of children and families across a wide spectrum. An important aspect of the overall UMCH TFC recruitment plan involves general community outreach. Activities include arranging for Agency staff to speak at Parent/Teacher Associations, various civic organizations, local chapters of the Foster Parent Association, community support groups such as CHADD, neighborhood associations, faith-based groups and other community groups that foster an interest in children and families. TFC staff participates in festivals, fairs and other regional special activities by sponsoring a booth, distributing T-shirts and flyers and partnering with other community agencies to sponsor special activities.

The recruitment of TFC foster homes is clearly a central task in meeting the needs of children in the Alabama child welfare system. UMCH understands that today's foster families must be able to be multi-faceted in their care and treatment of foster children and be able to "multi-task" to meet the many needs of these children. The rules and regulations of fostering have dramatically changed in the last decade. With all the demanding requirements, it can be difficult to recruit and retain foster parents. The UMCH has over 15 years of experience in recruiting, training, and licensing foster homes. UMCH has processes in place in our current

therapeutic foster care programs to measure the effectiveness of recruitment and retention activities, as well as mechanisms to make changes and improvements.

## *Training*

The pre-service training is Group Partnership and Selection (GPS)/MAPP Program. UMCH TFC staff assesses the schedules of the various foster families and devises the most efficacious timeframe for training. TFC staff considers alternative training times to coincide with the primary training agenda. TFC staff attempts to be as inclusive as possible to make training accessible for all potential foster families. This is routine in all areas served. The GPS program is a competency-based curriculum that emphasizes teamwork between all partners in the treatment process. It is a curriculum that offers TFC foster parent "hands-on" techniques and information about the issues that bring children into care, how those issues translate in emotional and behavioral distress and the importance of culture and family in the fostering process. The Agency has staff in each program certified to teach the GPS groups. An additional ten (10) hours is required for licensure. Core curriculum topics include licensing issues, facts related to at-risk children and their families, legal issues, RC Consent Decree, UMCH policies and procedures related to TFC, effects of multiple placements, family ties and other attachments, grief and loss, partnership in treatment, special issues, medication management, behavior management and principles of child care, documentation requirements, positive parenting, strengths and needs, child abuse allegations and grievances processes, stress management, ISPs, IEPs, HIPAA and other topics as required. Monthly in-service training is offered to TFC foster families to assist them in complying with the required annual continuing education hours. In-service training topics include, but are not limited to issues of children in care, disruption prevention, behavior management and positive parenting, cultural sensitivity, attachments, loss and separation, child safety and injury prevention, sexual abuse, HIV infection, addictions, oppositional defiant behaviors and other behaviors common to children in TFC placements, educational advocacy, step-down protocols, drug and alcohol issues and gang prevention.

## ***Services to Step-down Children***

UMCH TFC staff is committed to full involvement in the movement of TFC children to less restrictive environments. TFC staff shares in the philosophy that a child needs to be in the least restrictive, most "normalized" setting possible. TFC staff provides all necessary information and expertise to help promote decisions that are truly in the best interests of the children in our programs. UMCH engages in effective training and "matching" processes with foster parents to ensure an adequate understanding and expectation related to step-down protocols and that children do not experience undue trauma related to stepping down in the levels of care.

All children will be assessed for a movement to step-down at the ISP review held six (6) months after admission. DHR will provide an assessment that is behavior-specific to assess the possibility of the move to the less restrictive placement. Additionally, UMCH provides assessments through *Monthly Progress Reports*, *Treatment Plan Reviews*, foster parent documentation, and reports from other providers. All these assessments should be congruent

and clearly demonstrate a need for a reduction in services. As children progress in the program, it is anticipated that their need for treatment will diminish. TFC staff currently discusses with foster parents the wisdom of allowing children to experience the success of achieving goals through the step-down process. The Agency is working with all foster parents to promote a positive, healthy perspective regarding levels, or categories, of care for children in therapeutic foster care. UMCH asks its TFC foster parents to consider themselves as the foster family resource for a child, even when the child is determined to fall in the step-down category. UMCH is committed to minimizing the number of moves a child experiences and reducing any trauma or anxiety a child incurs due to the step-down process.

For children in UMCH TFC programs that are stepping down to homes within the programs, individualized *Initial Treatment Plans* are completed within ten (10) days of the decision for step-down to reflect the changes in a child's treatment needs, treatment methodologies and change of program status. The DHR comprehensive family assessment/intake evaluation will be a prime source of information along with the child/family ISP. TFC staff will request these documents prior to the actual admission in the step-down category. Treatment goals are developed in consult with the child's DHR social worker and any other relevant treatment team members. If the *Initial Treatment Plan* is not comprehensive, *a Comprehensive Treatment Plan* is developed at the end of (30) days to finalize and expand treatment goals and methods. *Treatment Plan Reviews* are done every ninety (90) days to assess the current treatment plan, the child's progress, changes to existing services and any additional services needed. ISPs are conducted at six-month intervals to reassess the child's plan. The ISP identifies the child's non-treatment needs such as clothing, allowances, observance of special occasions, purchases of special items for which DHR assumes the financial responsibility. TFC staff and foster parents attend ISPs to provide necessary feedback and to be well-acquainted with the child/family service plan. TFC staff assists in the development of independent living skills as identified in the ISP. DHR is fiscally responsible for costs associated with achieving ILP goals.

TFC staff provides a detailed discharge summary for those children stepping down into homes other than those in UMCH programs. TFC staff provides any additional information that will assist the new placement resource and the child in achieving the best possible chance of success.

TFC caseworkers meet, at a minimum, bi-weekly with the child. They are in regular contact with the child's DHR social worker and have quarterly face-to-face contact or telephone contact with school personnel to monitor the child's progress academically and behaviorally in the school environment. More frequent contact will be initiated if needed. For children in individual or family counseling, the TFC caseworker is in contact with the therapist on a quarterly basis to monitor the outcomes of counseling. TFC caseworkers and foster parents provide the appropriate links to community services as identified in the child/family ISP. The child's TFC caseworker maintains regular contact with the child's DHR social worker, at a minimum of once per month. TFC caseworkers coordinate all transportation needs to appointments, activities and family visits as determined by the child's ISP.

Children in the step-down level of care receive nine (9) hours of individual basic living skills training per week and no more than three (3) hours of group basic living skills training per week. In cases where more training hours are needed, the need will be specifically identified and approved in the child/family ISP. This training is primarily provided in the foster home and includes, but is not limited to, behavior education, personal hygiene, money management, stress management, housekeeping and laundry skills, shopping and food preparation and healthy lifestyles. The child's treatment plan reflects the need for training in these therapeutic areas and all services will be authorized in the child's ISP. If a child demonstrates a need for a more intensive therapeutic intervention, a multi-faceted behavioral management plan may be developed with input from UMCH staff, DHR staff and other relevant providers. The possibility of "stepping-up" a child in treatment category may also be investigated if a child is demonstrating a need for an increase in treatment and other services. Group counseling is offered those children demonstrating the need for the service. These sessions will reflect the needs of children as identified in their respective ISPs. Crisis intervention services will be provided up to three (3) hours per week or as needed. All billable services are billed under the Medicaid Rehabilitative Services option and accurate documentation of services is maintained.

TFC staff and foster parents provide family support and visitation as outlined in the child/family ISP. This may take the form of family education regarding the child's behavioral and emotional functioning, parenting support, modeling, visitation support, educational advocacy, and other issues related to positive parent/child relationships.

Monthly reports are submitted to each child's DHR caseworker detailing the child's progress and activities for the prior month. Documentation of the child's activities and progress is maintained in the child's record.

All children in TFC step-down homes are involved in an extracurricular activity of their choosing. Children will be encouraged to choose those activities that enhance their own natural talents and provide the greatest potential for increases in self-esteem. DHR is fiscally responsible for the costs associated with extracurricular activities and TFC staff/foster parents will provide the transportation to such activities.

All children who meet the criteria for admission into step-down are considered for placement. No child is rejected based on race, creed, national origin, sex or any other non-essential characteristic. When a child demonstrates behaviors that may potentially lead to a disruption in the placement, UMCH staff will request an ISP to determine if the child needs to "step-up" in care or needs some alternative arrangement. Every effort will be made to provide the DHR social worker with the requested 14-day notice in the event that a child must be removed from the TFC program. TFC staff/foster parents are an integral part of the discharge planning process regardless of whether it represents a "step-down," "step-up" or parallel move and do not hesitate to offer concrete recommendations.

All foster homes caring for children in step-down placement of children will meet the requirements outlined in the *Minimum Standards for Foster Family Homes*. All children placed in UMCH TFC programs will be in safe, secure and nurturing environments.

The UMCH does not expect to participate in the third category of care, traditional foster care services, unless it is situation in which siblings are placed with a therapeutic child.

### Services to Step-down Parents

Step-down parents receive a payment from UMCH of no less than $8.00 per day for each child in the step-down category of care placed in the home. In addition, the foster parents will receive reimbursement for mileage costs incurred for transporting children to appointments beyond a 50-mile radius from the foster home. The need for the travel distance will be clearly documented in the child's ISP. It is the expectation that foster parents will provide all necessary transportation for the children; however, TFC staff will assist with transportation as needed.

Step-down parents receive the same types of supports that TFC parents receive from TFC staff (see subsection *Support Services* under *Services to TFC Families*). Step-down parents are provided monthly opportunities of twenty-four (24) hours of respite.

TFC caseworkers meet face-to-face with step-down parents a minimum of biweekly but must visit the foster home a minimum of once per month. TFC staff is on-call for step-down parents twenty-four (24) hours, seven (7) days a week. The TFC caseworkers provide the supervision and ongoing training for Medicaid compliant documentation of all Medicaid-billable services provided in the home.

All step-down homes must meet the licensing requirements of the state of Alabama. TFC licensing staff conducts semi-annual and annual visits to foster homes to ensure compliance.

### Quality Assurance

UMCH has a written Quality Assurance (QA) Program to monitor and evaluate the performance of each program and compliance with external guidelines as well as internal policies and procedures. Auditing of programs is completed on several levels. On an individual program level, the Program Supervisor audits records and documentation requirements on a monthly basis, selecting records at random. Program Supervisors meet individually with TFC caseworkers to monitor their activities and to assure that required visits and contacts are made timely and the treatment plan is properly executed. The Regional Director meets individually with the Program Supervisors on a monthly basis to monitor and evaluate the activities of the program. At this time, the Regional Director also randomly

selects records to audit to ensure documentation compliance. The Regional Director may interview children and foster parents to further assess the program's activities.

The QA staff visits programs a minimum of once per year and conducts more intensive audits of case studies, child records, foster parent records, Medicaid documentation, Treatment Plans, Treatment Plan Reviews, and other relevant documents. UMCH programs have experience in billing a variety of services under the Medicaid Rehab Option and are knowledgeable of the requirements outlined in Chapter 105 of the Medicaid Rehabilitative Services manual. QA staff conducts periodic staff trainings reinforcing Medicaid regulations and requirements.

Each UMCH TFC program has a QA Team comprised of community persons who have an interest in the care and welfare of children. These teams meet at various intervals, depending on the program but meet at least annually. They select a case to review and discuss the means by which the child's needs were assessed, service was delivered and the overall case plan. This team assists TFC staff in viewing program activities through a different "lens."

Satisfaction Surveys are a source of evaluation and information regarding programs. Children, foster parents, birth parents and the DHR social worker are given the opportunities to provide evaluations of the programs. Satisfaction Surveys are given at the end of the first ninety (90) days in care, annually thereafter and at discharge. The results of these surveys are considered when revising policy and procedures.

UMCH QA staff maintains a database of demographic information of children admitted to TFC programs and information relevant to discharge, i.e., discharge placement, less or more restrictive, whether or not family was reunified, planned or unplanned discharge, etc.

UMCH is committed to providing the highest quality of care by the most efficient means possible. At all levels, the intent of program audits is not only to ensure that records and activities are in compliance with DHR, Medicaid and UMCH guidelines but also to assure that the service delivery is in accord with the treatment plans and leads to quality treatment and positive case outcomes.

## E. TARGET AREA

UMCH proposes to provide services as outlined in the RFP for Therapeutic Foster Care through UMCH programs located as specified in the following table. All TFC programs are available to take referrals statewide. See Attachment E.

| REGION | COUNTIES with (Slots) | SLOTS (per Region) |
|--------|------------------------|--------------------|
| 1 | Pike (8), Barbour (2), Henry (2), Houston (20), Dale (4), Coffee (4), Covington (2) and Geneva (12) | 54 |
| 2 | Clark (2), Washington (2), Monroe (2), Escambia (6) and Baldwin (20) | 32 |
| 3 | Butler (2), Conecuh (2) and Dallas (8) | 12 |
| 5 | Tuscaloosa (8) | 8 |
| 6 | Jefferson (4), Talladega (4), Clay (3) and Cleburne (3) | 14 |
| 7 | Cullman (17), Walker (5), Blount (3), Winston (2), Fayette (3), Lamar (2) and Marion (2) | 34 |
| 8 | St. Clair (10), Calhoun (7) and Etowah (6) | 23 |
| **TOTAL AGENCY SLOTS** | | **177** |

## F. DISCHARGE POLICY

1. UMCH staff promotes family reunification whenever possible. The staff works in concert with DHR to provide services to facilitate reuniting children with their families as per the DHR child/family ISP. UMCH does not make the placement decisions for a family. The Agency views our role as a proactive, supporting role providing those services identified in the DHR plan for the child and family and the child's UMCH treatment plan to assist the family unit in reaching the treatment and services goals necessary for successful reunification. TFC staff collaborates with the DHR staff at ISPs, Treatment Plan Reviews, school meetings and any other appropriate time through ongoing contact and progress reports and other opportune times to determine the best overall means of achieving the permanency plan for the family. TFC staff recognizes that their input is essential in identifying obstacles to reunification as well as providing recommendations for expediting the reunification process. TFC staff does not hesitate to offer suggestions and/or recommendations. TFC program staff is willing to provide any necessary family support, parenting coaching, family counseling, supportive counseling and visitation support to help the child and family achieve their goals.

Reunifying a child with his/her family is not a single, one-time event. Rather, it is a process involving the reintegration of the child into a family environment that may or may not have changed significantly from the environment the child left. During the time apart, the child and/or parent may have dramatically changed behavioral/emotional patterns, developed new relationships and created new expectations about the nature of their relationship. All these factors must be considered when facilitating both physical and psychological reunification.

TFC staff shall initiate and coordinate the development of an individualized reunification plan in conjunction with the discharge plan. To best meet the multiple needs of children and their families, collaborative planning and the integration of service delivery efforts will be strongly encouraged. Therefore, the reunification plan will be developed in partnership with the TFC staff and foster parents, DHR staff, teachers, counselors, children and their families and any others who have been involved in the care and welfare of the family or child. The team will assess the family's needs, identify services to meet those needs and determine the

means by which to access needed services. As many factors have an impact on what services may be needed, there is no set "formula" for the development of the reunification plan other than individual family assessment. For example, a family may need assistance in accessing suitable housing, medical care and other community services. In this case, the plan will address the concrete ways that TFC staff can assist families in finding the resources they need. In the event a child has special educational needs, the birth parents may initially need assistance in properly advocating for the child. The reunification plan may stipulate that a TFC staff person will attend the IEP meeting with the birth parent to assure that the child receives all necessary services. Frequently, a child's return increases the family's stress level. All family members must renegotiate their new roles and their newly formed family system. Therefore, the reunification plan will address ways that staff/foster parents can help family members cope with the stress reunification can bring. A family may need a "respite" from the child occasionally. The previous foster home may be identified as a respite resource for the child. Some families may not have achieved the stability necessary for successful reunification without the implementation of more intensive services. UMCH has Family Options and Comprehensive Family Services programs that can provide the intensive services a family may need. Recommendations for DHR referrals for programs such as these may also be part of the reunification plan.

The aftercare plan is also developed through the ISP process for implementation upon a child's discharge from the program. The plan specifies the nature, frequency, means by which contact is initiated, any specific contacts and incorporates the post-discharge services provided. UMCH staff tracks the child through telephone calls, visits, family, and/or DHR contacts. UMCH will provide aftercare services as delineated in the DHR discharge plan. Tracking will initially occur 30, 60 and 90-day intervals to assess placement success. Thereafter, at 6, 12, 18 and 24-month intervals post-discharge contact will occur with the child and/or child's family, DHR personnel, visitation resource persons, and any other potential sources of information about the child to assess continuing stability and progress of the family. Information relating to family progress, location, persons contacted, and any other pertinent facts is documented utilizing the UMCH TFC Tracking Form.

For each identified need, TFC staff will provide referrals and coordination for follow-up care/services that are accessible to the family or TFC staff/foster parents will provide concrete services that are family-centered, community-based and culturally sensitive. The implementation of this plan shall be part of the child's aftercare plan and will be reassessed at the tracking intervals or as progress, or lack thereof, indicates.

2.    Firm discharge planning is initiated when the child has achieved maximum benefits from the program, has achieved goals of the ISP, the release is ordered by the court or the custody holder has alternative placement plans. The discharge planning conference is initiated at least thirty (30) days prior to expected discharge. UMCH programs abide by this discharge policy unless a child has demonstrated that he/she is a significant risk to self or to others, or exhibits extremely aggressive behaviors that present an immediate threat to others. In the event these situations occur, it may be necessary to immediately find alternative placement for the child. Generally, if a placement is in jeopardy of disrupting, an emergency

treatment team meeting is called to determine whether revision in services is warranted, a more restrictive setting is needed or any other issues regarding the means by which the child's treatment team can best address the current needs of the child. A crisis plan is developed for all children that identify procedures and placement resources in the event of a potential disruption. Every effort is made to provide a minimum of a 14-day notice to assist in finalizing an alternative placement. TFC staff is committed to keeping a child in the program until the child has reached maximum treatment benefits.

Once the discharge plan is executed, TFC staff works collaboratively with the child, the child's placement resource and the DHR social worker to expedite a smooth transition for the child.

3.   Any child that has been discharged from the program is eligible for re-admission provided he/she meets the criteria for admission for therapeutic foster care.

4.   Two (2) case studies from two (2) UMCH TFC programs illustrate the process that UMCH follows, in collaboration with DHR, to assist a child in achieving the stated goals of the ISP and the individualized treatment plan and the processes by which step-down is achieved. The first case study provides an in-depth view of the means by which TFC staff assists children and families in reaching their reunification goals. The second case study illustrates stepping a child down from a TFC placement.

**Example #1**

A 15-year old female diagnosed with Major Depressive Disorder, with psychotic features, was accepted into the TFC program in Anniston. Her admission GAF was 55. Her initial ISP and Treatment Plan goals were:

1.   Reunification with family
2.   Weekly family visitation
3.   Experience school success
4.   Increase familial and social support systems
5.   Overcome depression and suicidal ideation and return to a sense of joy, peace and security
6.   Develop future orientated goals
7.   Reduce the intensity and frequency of hostile and defiant behavior toward adults
8.   Replace hostile, defiant behavior toward adults with respect and cooperation
9.   Demonstrate improved self-esteem through accepting compliments, identifying positive characteristics about herself, being able to say no to others, and the absence of self-disparaging remarks
10.  Decrease the frequency and intensity of hostile, negativistic, and defiant interactions with parents and other adults

The following interventions were utilized by TFC staff, foster parents, and child's counselor: modeling, redirection, positive reinforcement and rewards, natural and logical consequences, implementation of an organizational system for school, implementation of a routine schedule, teaching self-control strategies (i.e., stop, look, listen and think), teaching problem solving skills, and teaching basic living skills individually and in a group setting. Specifically, UMCH implemented the following interventions:

1. Suicide contract signed to help her awareness of her own thoughts and accountability.
2. Behavior contract specified daily rewards and privileges for compliance
3. Counselor, foster parents, and UMCH caseworker assisted client in developing self-talk as a way of boosting her confidence and positive self-image.
4. Therapy and supportive counseling assisted her in becoming aware of how she expresses and acts out negative feelings about herself.
5. Foster parents provided assistance to the client's parents in establishing clearly defined rules, boundaries, and consequence for misbehavior.
6. Counselor, foster parents, and TFC caseworker provided behavior education to increase her awareness of the ways in which she blames others for her misbehavior and fails to accept responsibility for her actions.
7. Counselor, foster parents, and TFC caseworker provided feedback and behavior education regarding her level of self-understanding about self-defeating behaviors linked to the depression.
8. Counselor, foster parents, and TFC caseworker reinforced the client's open expression of underlying feelings of anger, hurt, and disappointment.
9. Foster parents and TFC caseworker assisted client by implementing a school work/homework notebook and planner.
10. Foster parents and TFC caseworker assisted and encouraged her participation in extracurricular activities.
11. Foster parent gave youth a weekly allowance and a clothing allowance teaching and modeling money management skills (i.e., budgeting, pricing, etc.).
12. Foster parent taught and modeled basic living skills and independent living skills.
13. Foster parent taught and modeled for youth how to drive a vehicle

The TFC staff and foster parents provided extensive visitation support for the child and family. The foster parents provided transportation to and from weekly visits occurring on weekends and comprised a round trip of approximately 150 miles. Initially visits were scheduled for two hours. During this time the foster parents provided visitation support in the form of modeling parenting skills and parental coaching. They also assisted the birth family with shopping, financial support and assistance with home maintenance. The visits increased to overnight, and eventually weekend visits. The foster parents continued to provide visitation support through the date of reunification. The TFC caseworker also assisted the birth family by teaching parenting skills and utilizing the birth parents as a resource for information about the children in care.

Overall, this young girl made significant progress in the areas of behavior, self-esteem, and basic living skills. She was in the therapeutic foster care program for ten (10) months. She

received treatment activities in the program and foster home and received individual and group mental health counseling and medication monitoring by a psychiatrist. Below is a summary of progress:

1. She was able to perform self-care tasks without reminders
2. Incidences of lying decreased
3. Incidences of stealing decreased
4. No incidents and/or threats of self-injurious behaviors
5. Improved relationship with sibling in care and birth parents
6. She earned her earned learning permit for driving
7. She demonstrated competence in basic housekeeping tasks
8. She was able to perform money management (budgeting, etc.)
9. She was able to prepare basic meals
10. She adequately performed to perform basic laundering skills
11. Improved lifestyle – i.e. healthy eating and exercise
12. Improved school performance as evidenced by promotion to next grade
13. Improved social skills as evidenced by participation in peer activities without incident
14. Improved relationships with peers and adults as evidenced by positive relationships

This youth was discharged from the UMCH TFC program on January 3, 2005. She was reunified with her birth parents as part of a planned discharge. At the time of discharge, her GAF was 61.

**Example #2**

The UMCH TFC program based in Houston County entered into an agreement with State Department of Human Resources in September 2004 to begin a pilot program for providing step-down services to TFC children. In compliance with the guidelines identified for step-down services, the program staff began identifying TFC children that the treatment team deemed appropriate for step-down, having achieved the individual goals as identified in the DHR Individual Service Plan (ISP) and the TFC Treatment Plan.

An eleven year-old female was initially admitted to the TFC program in Houston County. Her treatment plan/ISP goals were:

1. She will resolve conflicts of separation anxiety.
2. She will resolve conflicts with family members.
3. She will experience school success.
4. She will have positive and appropriate interactions with adult authority figures.
5. She will learn to socialize in age-appropriate ways.
6. She will acquire basic and independent living skills.

Interventions utilized were:

1. Counseling to address family issues.
2. Foster parents and TFC caseworker monitored academic performance and school behaviors through reports from the teachers.
3. Basic Living Skills Training (individual and group)
4. Behavior education regarding appropriate interactions with authority figures.
5. Behavior education regarding appropriate peer-relationships.
6. TFC caseworker provided supervision for family visits.
7. Foster parents developed relationship with child's mother and provided parenting education and assistance.
8. Foster parents and TFC staff encouraged child to participate in extracurricular activities.
9. Care and treatment under the supervision of a psychiatrist.

Her academic and conduct improvements began to surface when she entered high school. She earned a position on the varsity cheerleading squad. Her grades began to reflect A's and B's. Her school conduct reports reflected vast improvement. She was involved in school activities such as ROTC, counselor and guidance aid and FFC.

In August, 2004, the treatment team agreed that she was appropriate for step-down services. It was determined that she needed to continue to work on interpersonal relationship skills. She continues to have regular visits with her family; however, the DHR caseworker determined that the family was not an appropriate placement resource and the TFC foster parents have signed a long-term foster care agreement. The client is pursuing admission to Troy State University and part-time employment. She continues to maintain her progress and is doing well in the foster home.

## G.   PRIOR EXPERIENCE

The UMCH has been providing therapeutic foster care services to children in the custody of the Department of Human Resources for fifteen (15) years. Our programs and partnership with DHR have strengthened over the years. We enjoy a strongly collaborative relationship with the Department of Human Resources.

In 1990 UMCH was among four (4) providers chosen to pilot initial TFC programs. The agency began with a contract for six (6) TFC placements in the Dothan area. UMCH now offers TFC services statewide. TFC staff has served on virtually all major state DHR committees involving policies and procedures relating to therapeutic foster care. TFC staff has been involved in provider meetings, TFC conferences and foster parent associations and continues to be visible in all areas that relate to assessment and delivery of services for TFC children and training and support of foster parents. TFC staff continues today, as in the past, to work cooperatively with DHR staff to train therapeutic foster parents along with traditional foster parents and adoptive parents.

UMCH TFC treatment protocols are tailored for the child who needs intervention for behavioral and/or emotional issues in order to successfully maintain placement with family members or some other less restrictive placement. The focus of all UMCH TFC programs is on the individualized needs of a child and the means by which maximum treatment benefits are obtained. UMCH currently operates TFC based in offices throughout the state: Robertsdale, Evergreen, Dothan, Troy, Anniston and Jasper. UMCH has a long history with the Department of Human Resources in fostering a warm, accepting environment for children while providing effective, timely and individualized treatment. As previously indicated, UMCH was selected as part of the initial "pilot program" for the provision of step-down services for children in therapeutic foster care.

DHR reports from annual site-visits indicate that the programs are doing an excellent job in providing appropriate treatment and meeting DHR standards. UMCH has developed policies to reinforce DHR guidelines and, in some cases, to exceed them. UMCH has good utilization rates and strives to continuously recruit TFC foster parents to maintain a strong pool of available foster homes.

UMCH is a faith–based, non-profit Agency. The Agency's focus is on the service delivery areas and the holistic care and treatment of all the children and families served. UMCH has provided loving and effective treatment to children and families for over a century. UMCH commits to following in that tradition.

## H. STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS AND TRAINING REQUIREMENTS

1.    UMCH programs are divided into four (4) geographical regions. Each region has a **Regional Director** who has direct responsibility for the staff in the programs in their given region. Regional directors provide expertise, guidance and a "check and balance" to ensure programs are providing the highest quality of care within all required guidelines. This individual assumes final responsibility for the oversight of the programs in that region and all activities related to the provisions of Therapeutic Foster Care.

**Program Supervisors** provide the daily supervision for the TFC caseworkers and all program activities. These individuals supervise all TFC staff oversee all activities related to care and treatment of children in care. The program supervisors are on-site daily and are the first level of supervisory contact for DHR and other outside treatment providers. The highest ratio of group home staff supervised by a group home supervisor is 6:1.

**Therapeutic Foster Care Caseworkers** are the treatment team leaders for the children placed in the TFC programs. They are also the primary resource for foster parents. They provide the bulk of the support services and expertise for foster parents and coordinate the treatment

activities of the child. The TFC caseworker is assigned no more than a maximum of eight (8) cases.

***Therapeutic Foster Care Social Workers*** are the designated licensing personnel in the TFC program. These individuals are involved in the recruitment, training, initial licensing and maintenance of foster homes. These individuals develop a strong working alliance with the foster families and offer input into the matching process.

***Administrative support staff*** provides the administrative and clerical support needed in the group home. Support staff types reports, keeps filing current, provides Medicaid billing support and generally frees up time for professional staff and child care workers that is better spent in treatment activities.

2.   ***Regional Directors*** supervise all programs in their assigned regions. These individuals must have a master's degree in social work, counseling, or psychology from an accredited college or university. Professional licensure is preferred and strongly encouraged. In addition, master's level regional directors must have a minimum of five (5) years experience in a clinical setting working with families and/or children and adolescents. The master's degree requirement can be waived for a bachelor's level licensed social worker who has ten (10) or more years experience in working with children and adolescents. The Regional directors review treatment plans, are available to review and staff referrals, staff cases, conduct internal program audits and conduct periodic staff training. The regional director provides the necessary guidance and expertise to all program staff. Regional directors are required to meet individually with their program supervisors at least once a month at the program site. They must review records on-site to audit for quality and compliance. Regional directors review Medicaid billing for content and accuracy. These reviews provide another level of "checks and balances."

***Program Supervisors*** supervise all TFC program staff and provide expert resource and support for the treatment activities related to the children in care. Program supervisors must either have a bachelor's level social work license and five (5) years experience in a children's therapeutic setting or a master's degree in social work, psychology or counseling with a clinical practicum or two (2) years professional experience supervised by someone with two (2) or more years of professional experience. Program supervisors take ultimate responsibility for the development of the treatment plan and provide the oversight for all treatment activities. The program supervisor must review referrals or staff referrals with the licensing specialist, TFC caseworker and, in some cases, the regional director. Additionally, the program supervisor reviews and approves Medicaid documentation and billing, coordinates training activities for foster parents and staff and provides the coordination and back-up to assure the twenty-four (24) hour crisis support is available. The program supervisor is responsible for conducting random audits of child and foster parents to assure compliance with all external and internal regulations. The program supervisor meets weekly with all TFC caseworkers to discuss issues related to children and/or foster families, to review Medicaid documentation and to evaluate the case activities. These individuals also are

available for consults with other providers and may attend ISPs, IEPs and other meetings related to a child's treatment.

*TFC Caseworkers* must possess, at a minimum, a bachelor's degree in social work, psychology, sociology or related field and have a minimum of one (1) year experience in working with children and/or families. They supervise the placement of the child and provide support, expertise and crisis intervention for the children and families on his/her caseload. The caseworker is the lead person for the child's treatment team. This person organizes necessary treatment activities, initiates necessary school and ISP meetings and provides all necessary case management services.

*Therapeutic Foster Care Social Workers* must possess social work degree from an accredited college/university and maintain current licensure in the state of Alabama. They must be knowledgeable in the *Minimum Standards for Foster Homes.* The primary responsibilities of the social worker are to assist in recruitment, training, and licensing of foster homes. They provide support services and evaluations for foster homes.

*Administrative Staff Assistants* must be competent in clerical skills. They must be able to multi-task and provide all support services needed. These individuals help child care staff and professional staff free up time that is better served providing direct services to residents.

---

Job Description: **REGIONAL DIRECTOR**

Reports To: Assistant Executive Director

SYNOPSIS
Under the direction of the Assistant Executive Director, the Regional Director is responsible for planning, developing, supervising and evaluating all programs within his or her region. The scope of the job includes responsibility for all administrative, supervisory and therapeutic duties within the Region. This position requires extensive travel over a multi-county delivery area.

DUTIES AND RESPONSIBILITIES
- Provides management and supervision to Supervisors within the Region.
- Ensures program occupancy rates are maintained.
- Meets regularly with Supervisors regarding program delivery.
- Monitors intake assessments.
- Ensures all programs are operated within minimum UMCH, DHR, contract and other related standards.
- Assists Supervisors with activities on an as required basis.
- Plans, develops and supervises new and existing programs within the Region.
- Confers with appropriate staff regarding referrals, placements and discharges.
- Facilitates and attends meetings.
- Serves and/or chairs committees and work teams when required.

- Recruits and trains staff.
- Supervises a staff of full-time and/or part-time employees.
- Responds to emergencies and crisis situations.
- Develops program goals and objectives.
- Evaluates subordinates using UMCH Performance Appraisal.
- Sets performance expectations and provides performance feedback.
- Works with key staff on management and leadership issues, strategic planning, community relations and other related activities.
- Adheres to UMCH policies, procedures and standards.
- Develops and follows an approved annual budget.
- Monitors Program expenditures and manage their Regional budget.
- Develops, submits and maintains documents, reports, records and files.
- Delivers formal and informal presentations to churches, committees, schools, community groups and others on behalf of UMCH.
- May formally represent the Agency to other agencies, groups, and individuals.
- Drives automobile and travels extensively.
- Facilitates and/or attends staff meetings, training programs, conferences and other related programs.
- Develops, implements and follows safety plans and procedures.
- Performs other duties and responsibilities as required.

## KNOWLEDGE, SKILLS AND ABILITIES
- Knowledge of UMCH policies, procedures and standards
- Knowledge of DHR policies, procedures and standards
- Knowledge of the goals, objectives and principles of Family Preservation
- Knowledge of recruitment and selection policies, procedures and standards
- Knowledge of budgetary procedures
- Skill in evaluating employee behavior and taking appropriate action
- Skill in operating computers and basic software packages
- Skill in handling interpersonal relationships between clients, subordinates, staff members, public officials, church officials and the general public
- Ability to supervise diverse staff, including the establishment of goals and objectives
- Ability to set performance expectations and provide performance feedback
- Ability to develop and work within the assigned budget
- Ability to complete documents, reports and records in a timely manner
- Ability to maintain utmost confidentiality
- Ability to develop plans, policies and procedures
- Ability to organize files and documents
- Ability to be assertive in decision-making
- Ability to communicate verbally and in writing using the English Language
- Ability to follow pertinent safety practices and procedures
- Ability to act calmly and professionally under stressful situations
- Ability to work a flexible schedule
- Ability to handle multiple tasks
- Ability to lift up to forty (40) pounds
- Ability to drive an automobile

UMCH
Therapeutic Foster Care Services

## MINIMUM QUALIFICATIONS

A Master's Degree, from an accredited college or university, in Social Work, Psychology or Counseling, three (3) years paid experience working with families, children and/or youth and LGSW, LBSW or LPC licensure required. LCSW preferred; or a Bachelor's Degree and LBSW licensure and ten (10) years paid experience working with families, children and/or youth required. Supervisory experience preferred. A valid Alabama driver's license and proof of automobile liability insurance required. A satisfactory background check that includes personal and employment references, criminal history (ABI/FBI clearance), driving record, Child Abuse/Neglect Registry required. A satisfactory pre-employment physical examination that includes a drug-screen and TB-skin test required. Must be able to communicate effectively verbally and in writing using the English language. Computer literacy preferred and strong interpersonal skills essential.

## MAINTENANCE

Depending on assigned region, the Regional Director may be provided housing and utilities or automobile allowance.

---

Job Description: **PROGRAM SUPERVISOR THERAPEUTIC FOSTER CARE (TFC)**

Reports To: Regional Director

## SYNOPSIS

Under the direction of the Regional Director, the TFC Supervisor performs supervisory and TFC program duties and responsibilities as directed by the UMCH administration and as directed by contract with Alabama Department of Human Resources (DHR). The Supervisor will conduct the administration of TFC programs that provide services to a multi-county catchment area. The focus of the program will be a commitment to work with Foster Care Children and Foster Parents. This includes a variety of functions ranging from Foster Care parent recruitment to training and development. The job requires the Supervisor to work odd hours and be on-call should emergencies arise. The position requires extensive travel.

## DUTIES AND RESPONSIBILITIES

- Maintains an on-going system of recruitment, selection, training and licensure of TFC homes.
- Reviews, Screens, and places referrals (foster children) in Therapeutic Foster Homes.
- Ensures that all pertinent support services are provided in a timely manner as outlined in the DHR contract.
- Assists the TFC caseworkers with the development of a Comprehensive Treatment Plan.
- Periodically accompanies caseworkers on home visits.
- Performs performance appraisals on subordinates using the UMCH Performance Appraisal System.
- Drives an automobile and travels extensively.
- Supervises a staff of full-time and/or part-time employees.
- Evaluates subordinates using UMCH Performance Appraisal.
- Develops goals and objectives.
- Sets performance expectations and provides performance feedback..
- Adheres to UMCH policies, procedures and standards.
- Follows an approved annual budget.

- Develops, submits and maintains documents, reports, records and files.
- Delivers formal and informal presentations to churches, committees, schools, community groups and others on behalf of UMCH.
- Facilitates and/or attends staff meetings, training programs, conferences and other related programs.
- Develops, implements and follows safety plans and procedures.
- Drives an automobile and travels extensively.
- Performs other duties and responsibilities as required.

KNOWLEDGE, SKILLS AND ABILITIES
- Knowledge of UMCH policies, procedures and standards
- Knowledge of DHR polices, procedures and standards
- Knowledge of recruitment and selection policies, procedures and standards
- Skill in evaluating employee behavior and taking appropriate action
- Skill in operating computers and basic software packages
- Skill in handling interpersonal relationships between clients, subordinates, staff members, public officials, church officials and the general public
- Ability to supervise diverse staff, including the establishment of goals and objectives
- Ability to set performance expectations and provide performance feedback
- Ability to develop and work within the assigned budget
- Ability to complete documents, reports and records in a timely manner
- Ability to maintain utmost confidentiality
- Ability to develop plans, policies and procedures
- Ability to organize files and documents
- Ability to be assertive in decision-making
- Ability to communicate verbally and in writing using the English Language
- Ability to follow pertinent safety practices and procedures
- Ability to act calmly and professionally under stressful situations
- Ability to work a flexible schedule
- Ability to handle multiple tasks
- Ability to lift up to forty (40) pounds
- Ability to drive an automobile

MINIMUM REQUIREMENTS
LCSW or LBSW and a Master's degree in a related field that requires equivalent clinical coursework and who has successfully completed a practicum, or has six (6) months post master's level professional experience supervised by a master's level or above with two years of post graduate professional experience or LBSW with five (5) years of paid experience working with children in a therapeutic setting.. Supervisory experience preferred. Must possess a valid driver's license and have reliable transportation and show proof of liability insurance. Must withstand a Criminal Background Check, Reference Check, Pre-employment Physical, Drug Screen and Child Abuse/Neglect Check. He/she must be able to communicate verbally and in writing using the English Language. Computer literacy preferred and strong interpersonal skills are essential.

Job Description: **CASEWORKER THERAPEUTIC FOSTER CARE (TFC)**

Reports To: Program Supervisor

SYNOPSIS

The TFC caseworker's primary function is to work with foster care children and foster parents. This includes a variety of services including assisting with foster parent recruitment, foster parent training and evaluation, coordination of necessary support services, relationship building, and family goal setting. The job requires the caseworker to work odd hours and be on-call should family emergencies arise. The position requires extensive travel over a multi-county delivery area.

DUTIES AND RESPONSIBILITIES
- Provides case management to children in a foster care environment, visiting each foster home weekly.
- Develops quarterly summaries, medical logs and other required records and documents.
- Provides support and assistance to foster parents.
- Plans and supervises visits by biological family.
- Maintains contact with DHR, school teachers and officials, the medical community, judges, attorneys, juvenile court, UMCH and the general public.
- Handles stressful situations calmly and professionally.
- Assists in recruiting and interviewing prospective foster parents.
- Successfully completes all required training.
- Develops, submits, and maintains documents, reports, records and files in a timely manner.
- Facilitates and/or attends staff meetings, training programs, conferences and other related programs.
- May formally represent the Agency to other agencies, groups and individuals.
- Works a random schedule.
- Assists with budget preparation.
- May be on-call 24 hours per day for long periods of time.
- Drives an automobile and travels extensively.
- Performs other duties and responsibilities as required.

KNOWLEDGE, SKILLS AND ABILITIES
- Knowledge of UMCH policies, procedures and standards
- Knowledge of DHR policies, procedures and standards
- Knowledge of the goals, objectives and principles of Family Preservation
- Knowledge of recruitment and selection policies, procedures and standards
- Knowledge of budgetary procedures
- Skill in evaluating client and foster parent behavior and taking appropriate action
- Skill in handling interpersonal relationships between clients, staff members , public officials, church officials and the general public
- Skill in the computer and basic software packages
- Ability to formally conduct presentations
- Ability to train and evaluate Foster Parents
- Ability to set performance expectations and provide performance feedback

- Ability to develop and work within the assigned budget
- Ability to complete documents, reports and records in a timely manner
- Ability to maintain utmost confidentiality
- Ability to develop plans, policies and procedures
- Ability to organize files and documents
- Ability to be assertive in decision-making
- Ability to communicate verbally and in writing using the English Language
- Ability to follow pertinent safety practices and procedures
- Ability to act calmly and professionally under stressful situations
- Ability to work a flexible schedule
- Ability to handle multiple tasks
- Ability to lift up to forty (40) pounds
- Ability to drive an automobile

## MINIMUM QUALIFICATIONS
A Bachelor's Degree in Social Work or related field. LBSW and experience working with children, families, and/or youth preferred.    Must possess a valid driver's license and have reliable transportation and show proof of liability insurance. Must withstand a Criminal Background Check, Reference Check, Pre-employment Physical, Drug Screen and a Child Abuse/Neglect Check. He/she must be able to communicate verbally and in writing using the English Language. Computer literacy preferred and strong interpersonal skills are essential.

---

Job Description: **SOCIAL WORKER THERAPEUTIC FOSTER CARE (TFC)**

REPORTS TO:  Program Supervisor

## SYNOPSIS
The TFC social worker's primary function is to work with foster care children and foster parents. This includes a variety of services including assisting with foster parent recruitment, foster parent training and evaluation, coordination of necessary support services, relationship building, and family goal setting.  The job requires the social worker to work odd hours and be on-call should family emergencies arise. The position requires extensive travel over a multi-county delivery area.

## DUTIES AND RESPONSIBILITIES
- Completes Home Studies.
- Provides GPS Training for foster parents.
- Provides case management to children in a foster care environment, visiting each foster home weekly.
- Develops treatment plans, quarterly summaries, medical logs and other required records and documents.
- Provides support and assistance to foster parents.
- Plans and supervises visits by biological family.
- Maintains contact with DHR, school teachers and officials, the medical community, judges, attorneys, juvenile court, UMCH and the general public.
- Handles stressful situations calmly and professionally.

- Assists in recruiting and interviewing prospective foster parents.
- Successfully completes all required training.
- Develops, submits, and maintains documents, reports, records and files in a timely manner.
- Facilitates and/or attends staff meetings, training programs, conferences and other related programs.
- May formally represent the Agency to other agencies, groups and individuals.
- Works a random schedule.
- Assists with budget preparation.
- May be on-call 24 hours per day for long periods of time.
- Drives an automobile and travels extensively.
- Performs other duties and responsibilities as required.

## KNOWLEDGE, SKILLS AND ABILITIES
- Knowledge of UMCH policies, procedures and standards
- Knowledge of DHR policies, procedures and standards
- Knowledge of the goals, objectives and principles of Family Preservation
- Knowledge of recruitment and selection policies, procedures and standards
- Knowledge of budgetary procedures
- Skill in evaluating client and foster parent behavior and taking appropriate action
- Skill in handling interpersonal relationships between clients, staff members , public officials, church officials and the general public
- Skill in the computer and basic software packages
- Ability to formally conduct presentations
- Ability to train and evaluate Foster Parents
- Ability to set performance expectations and provide performance feedback
- Ability to develop and work within the assigned budget
- Ability to complete documents, reports and records in a timely manner
- Ability to maintain utmost confidentiality
- Ability to develop plans, policies and procedures
- Ability to organize files and documents
- Ability to be assertive in decision-making
- Ability to communicate verbally and in writing using the English Language
- Ability to follow pertinent safety practices and procedures
- Ability to act calmly and professionally under stressful situations
- Ability to work a flexible schedule
- Ability to handle multiple tasks
- Ability to lift up to forty (40) pounds
- Ability to drive an automobile

## MINIMUM QUALIFICATIONS
A Bachelor's Degree in Social Work or related field and must be eligible to sit for and successfully complete licensure (LBSW). If the LBSW is not obtained, the employee will remain on probation for an additional six (6) months or until licensure is obtained. If licensure is not obtained within twelve (12) months of employment, the employee may be terminated. Experience working with children, families, and/or youth preferred. Must possess a valid driver's license and have reliable transportation and show proof of liability insurance. Must withstand a Criminal Background Check,

Reference Check, Pre-employment Physical, Drug Screen and a Child Abuse/Neglect Check. He/she must be able to communicate verbally and in writing using the English Language.  Computer literacy preferred and strong interpersonal skills are essential.

Job Description:  **STAFF ASSISTANT**

Reports to: Appropriate Supervisor, Manager or Director

## SYNOPSIS
Under supervision, may perform a wide range of standard secretarial and office support functions. This includes information processing assignments up to moderately complex financial/accounting tasks. Staff assistants are responsible for all files, documents, reports and correspondence within their area of responsibility. He/she will also schedule meetings, handle office mail, and deal with visitors.

## DUTIES AND RESPONSIBILITIES
- Assists with day-to-day projects.
- Types and/or processes text and information such as letters, reports, memoranda. May compose routine correspondence.
- Takes and transcribes case notes, reports and correspondence containing confidential information.
- Sets up and maintains files, reports and documents in an orderly fashion.
- Receives visitors and directs routine inquiries from visitors, staff and the general public.
- Opens and routes mail.
- Purchases office supplies.
- Schedule appointments and makes travel arrangements.
- Answers the telephone.
- Prepares forms and operate office machines.
- Gathers materials for reports and related documents.
- Maintains and prepares various staff and office reports and records as required in a timely manner.
- Prepares and maintains client and financial records.
- Maintains spreadsheet information, annual physicals, detailed exams and other information on residents.
- Acts as a liaison between staff, other regional agencies and the general public.
- Processes and/or oversees the processing of financial/business forms.
- Prepares or assists in preparing various financial reports.
- May handle bank transactions.
- May prepare monthly billing (Medicaid, state contracts, etc.)
- May train less experienced staff.
- Performs other duties and responsibilities as required.

## KNOWELEDGE, SKILLS AND ABILITIES
- Knowledge of UMCH policies, procedures and standards
- Knowledge of DHR policies, procedures and standards
- Knowledge of UMCH safety practices and health procedures
- Skill in handling telephone inquiries and directing calls

- Skill in filing , setting up and maintaining office systems and procedures
- Skill in basic English Language usage, grammar, spelling and punctuation
- Ability to handle interpersonal relationships between staff members and the general public
- Ability to set up and maintain office systems
- Ability to perform typing, word processing  and use other software packages
- Ability to organize and maintain client records, personnel records and financial records.
- Ability to complete documents, reports in a timely manner
- Ability to prepare financial reports and perform other statistical or financial record-keeping functions
- Ability to follow all pertinent local, state and federal regulations
- Ability to follow pertinent safety practices and procedures
- Ability to use office equipment including computers, typewriters, copiers, fax machines and other related machines
- Ability to maintain utmost confidentiality
- Ability to be assertive in decision-making
- Ability to communicate verbally and in writing using the English Language
- Ability to handle multiple tasks
- Ability to lift up to forty (40) pounds

MINIMUM QUALIFICATIONS
High School Diploma or GED and one (1) year paid experience in secretarial or computer work. Associate's Degree preferred. Must be able to communicate verbally and in writing using the English Language. Strong interpersonal skills are essential. May be required to take relevant clerical tests. He/she must withstand a Criminal Background Check, Reference Check, Pre-employment Physical, Drug Screen and Child Abuse/Neglect Check.

---

3.    Staff positions are filled through recruitment efforts consisting of announcements at local colleges and universities, newspaper advertisements, UMCH website, Alabama employment agency and word of month.   Resumes are received and initial interview appointments scheduled after all resumes have been reviewed by designated management staff.

The candidates must complete an application packet that includes a criminal history waiver, complete work history, personal history and professional and personal references. The candidate must agree to a pre-employment fingerprint check, CAN Report, drug test and general physical exam. Candidates must provide proof of educational attainment and copies of licenses. These items must be completed prior to employment. All employees of UMCH *must* have all required criminal checks prior to full employment.

Generally, candidates are interviewed by several management level persons. The candidate is asked pertinent questions regarding personal philosophy, work ethic and ideas regarding child management. UMCH rejects those candidates whose philosophy of child welfare and

discipline techniques prove to be incompatible with Agency philosophy of positive, holistic child management.

If an employee is alleged to have engaged in any abuse or neglect of a resident, UMCH policies require that DHR is notified immediately. DHR initiates an investigation. Depending upon the allegation, the worker may be placed on paid administrative leave pending the outcomes. Any employee who has a "founded" allegation is immediately dismissed from Agency employment.

4.    All *Regional Directors* who supervise the programs for which we propose TFC services have a master's degree in social work, counseling, or psychology or is a LBSW with ten (10) years or more experience working with children and adolescents. Three (3) of the four (4) regional directors currently supervising TFC programs are licensed in social work or counseling. The other regional director has a MSW. All current regional directors have over five (5) years experience working in a child and adolescent therapeutic setting. Each regional director participates in intra-agency and external educational workshops and conferences and often exceeds the required training hours. Regional directors are required to document all training hours on a training log and submit the log to the UMCH Human Resources office.

All *Therapeutic Foster Care Program Supervisors* in our programs statewide are licensed social workers. Two (2) of our program supervisor's have master's degrees and all have at least five (5) years of experience working with the child and adolescent population. Program supervisors must meet the training requirements stipulated by their licensing board and DHR *Minimum Standards for Residential Child Care Facilities*. UMCH provides time-off for supervisors to attend conferences and workshops related to their field. Intra-agency training opportunities are also provided throughout the year. All training hours are documented and reviewed by the UMCH Human Resources staff.

All *Therapeutic Foster Care Caseworkers* working in UMCH programs have a bachelor's degree in social work, psychology, sociology or closely related field. They are all experienced workers with the child and adolescent population and are closely involved in training of foster parents and children. The must meet the minimum continuing education hours as stipulated by their licensing board or as directed in *Minimum Standards for Child Placing Agencies*. UMCH professional staff assists them in obtaining this goal by offering on-site training and other off-site training opportunities. All training hours are documented and reviewed by the UMCH Human Resources staff.

*Therapeutic Foster Care Social Workers* are required to have a degree in social work and a current Alabama licensure. The TFC social worker's primary function is to work with TFC foster parents. This includes a variety of services including assisting with foster parent recruitment, foster parent training, evaluation and licensing, coordination of necessary support services, relationship building, and family goal setting. The job requires the social

worker to work odd hours and be on-call should family emergencies arise. The position requires extensive travel over a multi-county delivery area.

The **Administrative Staff Assistant** has multiple tasks. This includes information processing assignments up to moderately complex financial/accounting tasks. Staff Assistants are responsible for keeping all files current, compile and file all necessary documents, type reports and correspondence. He/she also schedules meetings, handle office mail, and deal with visitors.

All newly hired staff is required to attend Orientation within thirty (30) days of initial hire date. This provides the new hires the opportunity to learn about the Organization, its mission and philosophy, benefits offered, personnel policies, an overview of child management and the RC consent decree, HIPAA and other topics that are relevant as well all topics required by *Minimum Standards for Residential Child Care Facilities.*

TFC program professional staff receives, in addition to the initial orientation training, twenty (20) hours of pre-service training. This training includes an overview of therapeutic foster care philosophy and guidelines, history and development of therapeutic foster care, training in clinical methodology, assessing and managing difficult behaviors, diagnostic categories most common to children in TFC, defusing and de-escalating crisis situations including passive physical restraint, grief and loss issues for children, value of birth family in the treatment process, attachments to significant others, cultural sensitivity, documentation and evaluation requirements, effects of multiple placements, preventing disruptions, role in the ISP process, HIPAA and working with foster families. In addition, new TFC caseworkers are required to attend the first available GPS class for prospective foster parents.

5.    In the event of an emergency or crisis, program staff adheres to the child's crisis plan. This crisis plan, developed at the initial placement ISP, outlines procedures the treatment team determined appropriate responses to crisis situation. Typically, when a crisis occurs, the foster parents attempt to initially de-escalate the situation and adequately handle the crisis as per the child's crisis plan. If the foster parents are not able to adequately manage the situation in a brief span of time, the child's TFC caseworker or on-call staff person is notified. The situation is discussed, further assessed and appropriate interventions identified. It may be necessary to place the child in a respite home to allow the child and the foster family a "cooling off" period. If the child's behaviors are escalating to the extent it is determined the child presents a potential significant risk to person or property, law enforcement may be notified and the DHR social worker or on-call DHR worker is notified immediately. In the case of a medical emergency, the DHR worker or on-call DHR worker is notified immediately. In extreme cases where a child poses a significant risk and it is determined that he or she cannot be safely maintained at the foster home, an immediate alternative placement may be requested. However, TFC staff strives to avoid disruptions and makes every necessary attempt to effectively manage crisis situations.

The program follows all DHR guidelines regarding behavior management, seclusion, restraints and medication management.

6.    Volunteers are recruited and utilized wherever possible. All volunteers who will have ongoing contact with the residents is required to submit to a CAN Report. We request and check at least one (1) reference for each volunteer. The program supervisor determines where and when volunteers are needed and what duties they may perform. The program supervisor works closely with the volunteers and provides the appropriate supervision, guidance and expertise.

UMCH accepts students for field placements or internships whenever practical. TFC program supervisors, who accept students for field placements or internships, abide by the following standards:

1.    Complete all background and criminal history checks, obtain drug screen and physical examination.
2.    Normally, interns are not allowed to drive UMCH vehicles or transport children. Complete MVR and add intern to Agency insurance if the intern is to be involved in transporting residents. If the intern is to transport children in their private vehicle, the intern must show proof of liability insurance and current driver's license.
3.    The intern will attend Orientation within thirty (30) days of starting date.
4.    Complete the appropriate *Internship Waiver Form*, including the signature blocks, and place a copy of the form in the internship's personnel file.
5.    Designate a staff member to supervise and evaluate the student.

The program supervisor develops a written plan detailing the student's tasks and responsibilities. Copies of the plan are provided to each student and his/her school advisor.

7.    As previously stated, UMCH provides on-site and off-site opportunities throughout the year for all staff or meet the training hours required by the Alabama Board of Social Work, The Counseling Board and/or the DHR *Minimum Standards for Residential Child Care Facilities*.

## I.    REFERENCES

See *Section B* for the listing of Agency references.



# State of Alabama
# Disclosure Statement

### (Required by Act 2001-955)

| ENTITY COMPLETING FORM | |
|---|---|
| **UNITED METHODIST CHILDREN'S HOME** | |

| ADDRESS | |
|---|---|
| **P.O. BOX 830; 1712 BROAD STREET** | |

| CITY, STATE, ZIP | TELEPHONE NUMBER |
|---|---|
| **SELMA, AL  36702-0830** | **(334) 875-7283** |

STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD

**DEPARTMENT OF HUMAN RESOURCES**

| ADDRESS | |
|---|---|
| **50 RIPLEY STREET, ROOM # 2225** | |

| CITY, STATE, ZIP | TELEPHONE NUMBER |
|---|---|
| **MONTGOMERY, AL  36130-4000** | **( 334) 242-9500** |

This form is provided with:

☐ Contract    ☒ Proposal    ☐ Request for Proposal    ☐ Invitation to Bid    ☐ Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

☒ Yes    ☐ No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| **Dept. of Human Resources** | **Child & Family Services** | **$ 4,428,214** |
| | | |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

☐ Yes    ☒ No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| **N/A** | | |
| | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE AGENCY/DEPARTMENT |
|---|---|---|
| **NONE** | | |
| | | |

*OVER*



# State of Alabama
## Department of Human Resources



License Number: **278**

This is to certify that    **UNITED METHODIST CHILDREN'S HOME**
(Licensee)

is hereby granted this LICENSE to conduct and maintain
**UNITED METHODIST CHILDREN'S HOME**
(Name of Child Care Facility)

as a    **CHILD PLACING AGENCY**        for        **N/A,**
(Type of Child Care Facility)                            (Number of children)

ages    **N/A**
Age  range of children)

located at  **1712 BROAD STREET**                **SELMA,**
(Street Address)                                  (City)

in        **DALLAS,**                        State of Alabama.
(County)

This LICENSE shall be in force for a period of two years from the **30TH** day of **NOV**, **2004**, to the **30TH** day of **NOV, 2006**, subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this **7TH** day of  **MARCH**, **2005**.

BY _____, Ph.D
Commissioner
State Department of Human Resources

NOTE:  This LICENSE must be posted in a conspicuous place on the premises.

DHR-FSD-1969
(8/99)



**Prepared for:**

# Alabama Department of Human Resources
# Family Services

# 2005 PROPOSAL

# THERAPEUTIC FOSTER CARE
# FOR CHILDREN



*Keeping
God's
Children
First*

United Methodist
Children's Home
*Alabama and West Florida*

**Submitted by:**

# United Methodist Children's Home
### Of Alabama and West Florida
P.O. Box 830, 1712 Broad Street
Selma, AL 36702-0830
334.875.7283
Fax: 334.875.5161





*Keeping
God's
Children
First*

**United Methodist
Children's Home**
*Alabama and West Florida*

April 4, 2005

Alabama Department of Human Resources
Mr. Gary Mitchell
Program Manager
Family Services, Room #2225
S. Gordon Persons Building
50 Ripley Street
Montgomery, AL 36130-4000

RE:    2005 DHR Proposal for Therapeutic Foster Care for Children

Dear Mr. Mitchell:

On behalf of the United Methodist Children's Home (UMCH), please accept the attached 2005 DHR Proposal and other required documents to provide *Therapeutic Foster Care for Children*. UMCH has been serving the needs of children and their families for over 114 years in the State of Alabama. We strongly believe that every child is entitled to live in a safe, caring and nurturing environment. UMCH continues to make available the most appropriate substitute care at the highest quality possible. We appreciate the opportunity to continue our relationship with Alabama Department of Human Resources.

It is my understanding that we will be notified by the Department of your intent to award a contract by May 5, 2005. Please direct any questions regarding the program narrative to Mr. Jim Byrum, Assistant Executive Director. Questions related to the budget or rate structure should be directed to our Business Manager, Mrs. Linda Moore.

Sincerely,

Mike Galloway
President & CEO

Attachments

Ministry Headquarters
P. O. Box 830, 1712 Broad Street
Selma, AL 36702-0830
334.875.7283, Fax 334.875.5161

*www.umch.net*

Public Relations & Development Office
4820 Overton Road, Suite 200
Birmingham, AL 35210-3805
205.951.1978, Fax 205.951.1935

ATTACHMENT E    Alabama Department of Human Resources
**Therapeutic Foster Care Proposal Cover Page**

Organization Information:

Name of Organization: __Therapeutic Programs, Inc.__

Address: ___2900 McGehee Road___

City: __Montgomery__    State: __Alabama__    Zip: __36111__

Telephone: 334 280-3330    Fax: (334 280-1007

e-mail address: __mitchellw@mnw.net__

Federal Employer Identification Number (FEIN) __63-1184188__

Name/title of Authorizing Official: __William J. Mitchell, Executive Director__

Signature of Authorizing Official: _[signature]_    Date: __4/8/05__

Contact Person Information:

Name/title of program contact person: __William J. Mitchell, Executive Director__

Address: ___2900 McGehee Road___

City: __Montgomery__    State: __Alabama__    Zip: __36111__

Email Address: __mitchellw@mnw.net__

Telephone: (334  280-3330    Fax: 334 280-1007

Target Information:
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties __Pike, Barbour, Henry, Houston, Dale__ No. of Slot(s) __45__
Coffee, Covington, Geneva

Region 2: Counties __Mobile, Baldwin, Escambia, Monroe,__ No. of Slot(s) __100__
Washington, Clarke, Choctaw

Region 3: Counties __Autauga, Dallas, Lowndes, Montgomery__ No. of Slot(s) __75__
Wilcox, Crenshaw, Butler, Conecuh

Region 4: Counties __Coosa, Tallapoosa, Chambers, Elmore__ No. of Slot(s) __70__
Macon, Lee, Bullock, Russell

Region 5: Counties __Pickens, Tuscaloosa, Bibb, Perry,__ No. of Slot(s) __64__
Hale, Greene, Sumter, Marengo

Region 6: Counties __Jefferson, Shelby, Chilton, Clay,__ No. of Slot(s) __165__
Talladega, Randolph, Cleburne
Region 7: Counties __Marion, Lamar, Fayette, Walker,__ No. of Slot(s) __54__
Winston, Cullman, Blount

Region 8: Counties __St. Clair, Calhoun, Etowah, DeKalb__ No. of Slot(s) __68__
Cherokee, Marshall

Region 9: Counties __Jackson, Madison, Morgan, Colbert,__ No. of Slot(s) __134__
Limestone, Lawrence, Franklin, Lauderdale

*Alabama Department of Human Resources ▪ 50 Ripley Street ▪ Gordon Persons Building ▪ Montgomery, Alabama*

PLAINTIFF EXHIBIT
8

**ATTACHMENT C**

**STATE OF ALABAMA**
**REQUEST FOR TAXPAYER IDENTIFICATION NUMBER**
**STATE COMPTROLLER'S OFFICE**

INSTRUCTIONS.    In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files.  To insure that accurate tax information is reported on Form 1099 for federal income tax purposes, please:

1.    In PART 1 below provide your Tax Identification Number and check FEIN or SSN.  Also provide the name and address to which payments should be sent.  In addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.    Circle the business designation that identifies your type of trade or business in PART 2.

3.    Sign and return this form as part of the response to the RFP.

PART 1 – TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER    _63 -1184188_
Check one   _✓_    Federal Employer Identification Number (FEIN)
                         Social Security Number (SSN)

NAME OF ORGANIZATION:    _Therapeutic Programs, Inc._    PHONE: _(334) 280-3330_

LEGAL BUSINESS ADDRESS:    _2900 McGehee Road, Mtgmry, AL  36111_

FAX: _(334) 280-1007_    EMAIL: _mitchellw@mnw.net_

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: _William J. Mitchell, Ed. D.  (CEO)_

PART 2 – BUSINESS DESIGNATION.  Circle the designation that identifies your type of trade or business.

1 -    CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION   (A corporation formed under the laws of any state within the United States)
2 -    NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3 -    PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 -    SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5 -    NONCORPORATE RENTAL AGENT
6 -    GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7 -    FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
        (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE:    Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF IT IS TRUE, CORRECT AND COMPLETE.

_[signature]_                    _4/8/05_        _(334) 280-3330_
         SIGNATURE                        DATE            TELEPHONE NUMBER
                                                                        (If different from above)

_Owner & CEO_
         TITLE

**PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES**

# THERAPEUTIC PROGRAMS, INC
# PROGRAM NARRATIVE

## IV. A. ORGANIZATION INFORMATION AND MANAGEMENT STRUCTURE

### 1. Organization Information:

| | |
|---|---|
| **Name :** | Therapeutic Programs, Inc. |
| **Address:** | 2900 McGehee Road |
| | Montgomery, Alabama 36111 |
| **Contact Person:** | William J. Mitchell, Executive Director |
| **Phone Number:** | (334) 280-3330 |

### 2. Governing Board and Other Agents:

The governing board consists of the Executive Director, and President of Therapeutic Programs, Incorporated (TPI) William J. Mitchell, Ed.D, and the Corporate Vice President, Joan Mitchell, LPC. William and Joan Mitchell are married.

### 3. History:

TPI incorporated on September 27, 1996 as an "S" Corporation with William J. Mitchell, Ed.D., as President. TPI's administrative office is located at 2900 McGehee Road, Montgomery, Alabama. TPI was previously a sole proprietorship known as Montgomery Counseling Center (MCC). MCC existed in the same location since 1985.

In 1989, William Mitchell proposed a program of therapeutic foster care to the Alabama Department of Human Resources. This proposal was based on his perception of the needs of foster children and their foster families with whom he had been working for over 10 years. Following his proposal, an RFP was issued by DHR. Mitchell responded to that RFP and was awarded a contract to develop four TFC homes in the Montgomery area. Over the past 16 years, the program has served thousands of children and families throughout Alabama.

Therapeutic Programs, Inc. provides foster homes specifically trained in the strengths-based treatment paradigm for minors under the protective custody of DHR. Children selected for this program have special needs which cannot be met in their own homes or in regular foster homes. The program provides an essential component in the array of services for empowering and enabling at-risk families. TPI follows all requirements and guidelines of the *Minimum Standards for Child Placing Agencies* and the *Therapeutic Foster Care Manual.*

TPI has 12 offices throughout the state with 11 District offices and one free standing satellite office in Winfield. The District offices are located in Montgomery,

Birmingham, Cullman, Gadsden, Huntsville, Florence, Tuscaloosa, Auburn, Phenix City, Mobile and Dothan. Four satellite sites have staff assigned to Chilton, Pike, Randolph and Talladega Counties who provide services specifically for children from those counties. Each TPI District Office and satellite office employs licensed social workers who oversee the training of prospective foster parents and the approval of their homes. At this time TPI has approximately 550 children in care with 658 licensed or soon-to-be licensed TFC homes. There are 176 employees, and the company serves 57 of the 67 counties in Alabama. The physical locations of the 12 offices are as follows:

| TPI – Montgomery | TPI – Central | TPI – Chattahoochee |
|---|---|---|
| 2900 McGehee Road | 211 Summitt Pkwy. | 1705 14th Street |
| Montgomery, Al 36111 | Suite 118 | Phenix City, Al 35209 |
| | Birmingham, Al 35209 | |
| | | |
| TPI – Cullman | TPI – Auburn | TPI – Gulf Coast |
| 101 2nd Avenue SE | 2515 East Glenn Avenue | 601 Bel Air Blvd. |
| Cullman, Al 35055 | Suite 206B | Suite 200 |
| | Auburn, Al 36830 | Mobile, Al 36606 |
| | | |
| TPI – North Central | TPI – North East | TPI – North West |
| 3322 South Memorial Pkwy. | 500 South 5th Street | 237 Azalea Drive |
| Bldg. 646 | Gadsden, Al 35902 | Florence, Al 35631 |
| Huntsville, Al 35801 | | |
| | | |
| TPI – West Central | TPI – Wiregrass | TPI – Winfield |
| 3076 Palisades Court | 101 Hidden Glen Way | 180 Foothill Rd. |
| Suite E | Dothan, Al 36303 | Winfield, Al 35594 |
| Tuscaloosa, Al 35405 | | |

## 4. Mission Statement:

To provide warm, stable and therapeutic foster homes for displaced emotionally and behaviorally challenged children.

To increase the psychological health of the children served through carefully planned therapeutic interventions.

To promote the safe and successful return of children to their family of origin.

## 5. Management Structure:

### a. Management Structure

The Administrative staff of TPI includes the following:

| William J. Mitchell, Ed.D. | Executive Director and President |
|---|---|
| Joan C. Mitchell, M.S., LPC | Corporate Vice President |
| Clara Logan Price, LCSW | Assistant Executive Director |

2

| Saralu Belkofer, M.S.,LPC | Quality Assurance Director |
|---|---|
| Joe Cameron, B.S. | Human Resources Coordinator |
| Carmen Bowdoin, CPA | Business Manager |

There are eleven District Program Directors, four of whom hold either a LCSW or LGSW degree and seven with a Master's degree in Social Work or Counseling. Three child psychiatrists under contract with TPI provide psychiatric consultation to children served in 7 of the 12 site locations. There are 15 supervisors and 114 professional staff who provide licensure, intake, assessment, family support, quality assurance, and other casework duties. TPI has 26 secretaries and data entry operators who support the professional staff. In addition, each District Program has a Social Work Unit that oversees program compliance with state regulations and guidelines regarding the recruitment, screening, training, selection and approval of therapeutic foster homes.

The financial functioning of the Program is handled by the Business Manager, a highly competent CPA, who provides regular financial reports assessing the fiscal health of the corporation. These reports are shared with Aldridge, Borden and Company, TPI's consulting accounting firm that reviews the reports, advises the Executive Director and conducts periodic audits. The business manager evaluates accuracy of charge sheets and backup documentation. TPI maintains general, professional, directors & officers, and employment practices liability insurance.

TPI has the personnel and infrastructure to expand its operations. The corporation is positioned to grow and diversify its services to meet the increasing needs of Alabama's emotionally and behaviorally challenged foster children, and to work intensively with their biological families in order to return the children home as quickly and successfully as possible.

### b. Organizational Chart

The Organizational Chart is as follows:



All Administrative staff report directly to the Executive Director with the exception of the secretaries/data entry operators who report directly to the Business

Manager. The Program Directors for the following District Programs report directly to the Assistant Executive Director.

Central (Jefferson County and Surrounding Area)



Chattahoochee (Russell County and Surrounding Area)



Cullman (Cullman County and Surrounding Area)



Gulf Coast (Mobile County and Surrounding Area)



Montgomery (Montgomery County and Surrounding Area)



North Central (Madison County and Surrounding Area)



5

North East (Etowah County and Surrounding Area)



North West (Lauderdale County and Surrounding Area)



The Plains (Lee County and Surrounding Area)



6

West Central (Tuscaloosa County and Surrounding Area)



Wiregrass (Houston County and Surrounding Area)



## 6. Financial Audit:

Aldridge, Borden and Company, P.C. is TPI's accounting consultant. The most recent audit was completed on May 28, 2004. The 2005 audit will be available by April 30, 2005.

## 7. Qualifications and Experience of Vendor:

### a. Past and Current Experience

During 2004, TPI celebrated 15 years of service to therapeutic foster children and their families in Alabama, after having been selected in 1989 by the Department of Human Resources as one of the four agencies to pilot the TFC program in Alabama. The staff of TPI has developed, over the past 15 years, an extensive and rich body of knowledge and expertise in the field of therapeutic foster care. TPI's service delivery has been child/family focused, strength/needs based and responsive to the requirements of DHR. Dr. Mitchell and the TPI staff have a track record of successfully establishing and maintaining therapeutic foster home programs across the state. Since its inception in 1989, TPI has smoothly grown from an untested proposal to a statewide program.

TPI currently has 658 licensed or soon-to-be licensed therapeutic foster homes approved throughout the state, with over half of those homes located in the 11 counties where children are to be served within their county boundaries. TPI is currently averaging placement of over 550 children per day in these homes. TPI's professional staff has a proven record of working in partnership with DHR staff statewide to provide individualized services to the children placed and to expedite the child's return to his or her family when it is appropriate.

7

### b. Licenses and Certifications

In August, 2004, TPI received accreditation from the Council on Accreditation (COA). COA accreditation is recognition of an organization's commitment to credibility, integrity and achievement. COA's rigorous accreditation process resulted in a finding that TPI is a well managed and responsible organization that provides the highest standard of service to its clients. TPI has been licensed as a Child Placing Agency in the state of Alabama for over 10 years.

### c. Rate of Successful Completion by Program Participants

TPI served 856 children and youth in regular TFC care from 1/1/04 through 12/31/04. Forty-eight (48%) of the 326 children discharged were reunited with their family, placed in an adoptive home, stepped down to traditional foster care, moved to an ILP program, or emancipated.

### d. Admission Data

A survey conducted in October, 2004 of the most recent 100 admissions to TPI, revealed that over fifty percent (50%) of referrals came to TPI from more restrictive settings such as detention facilities, boot camps, Mt. Meigs DYS campus, psychiatric hospitals and residential facilities. Twelve percent (12%) were "lateral" moves who came to TPI from other TFC programs. Approximately thirty eight percent (38%) were stepped up to TFC care from the biological family home, adoptive home or traditional foster care. It should be noted that almost all of those who "stepped up" to TFC care had multiple restrictive placements prior to being placed again with their biological family and, when referred to TPI, were re-entering the system.

The admissions data reflect that children and youth entering TPI fall into the "high end" category of the TFC range. They are older youth who have been in the foster care system for years with multiple restrictive placements, history of delinquency, history of physical and sexual abuse, substance abuse, mental illness, many with dual diagnoses, STDs, other health related issues and in most cases poor school performance. TPI has recruited therapeutic families who have provided services to these very difficult-to-place children and youth. For those children whose parental rights have been terminated and an adoptive resource is identified, TPI has assisted with the adoptive placement. Since the majority of those whose parental rights have been terminated do not have an adoptive resource, TPI's goal is to provide a safe and stable home environment in the least restrictive setting, and to assist the youth to build connections that will help them succeed when emancipated, adopted or when ready to move to a step down placement. A continuing need for TFC services is illustrated by the finding that TPI received 1,027 referrals during 2004.

### e. Child- Global Assessment Scale (C-GAS)

For the last two years, TPI has used the C-GAS (Children's Global Assessment of Functioning Scale) to evaluate and enhance the quality of its services to children. TPI staff will receive training on the Multi-Systemic Assessment Tool (MAT-CW) on April 21 conducted by Dr. John Lyons, the developer of the instrument. Beginning in June of

8

2005, the C-GAS will be replaced by the (MAT-CW) which will be incorporated by DHR to assess individual, program and system outcomes of children in out-of-home care.

### f. Satisfaction Surveys

TPI conducts satisfaction surveys each year to assess how the company is perceived by stakeholders and how satisfied they are with our services. The most recent survey conducted in February of 2004 yielded very encouraging results. In response to the question, "What is your overall level of satisfaction with TPI", over 92 percent of the 240 DHR caseworkers who responded reported their level of satisfaction as being good to very good. This high level of satisfaction is likely associated with the caseworkers' observation of significant improvements in their children in the following areas after placement with TPI:

| Category of Satisfaction | Prior to Placement | Following Placement |
|---|---|---|
| Safety and stability of child | 15.74% | 90.46% |
| Success in school | 8.11% | 73.15% |
| Functioning in community | 6.07% | 74.17% |
| Child's relationship with others | 4.66% | 61.86% |
| Child's emotional stability | 2.79% | 56.00% |
| Likelihood of child achieving Long term placement | 5.09% | 65.23% |

### g. SDHR Site Visits

SDHR Program Specialists make annual site visits to all eleven TPI program locations. Site Visit reports consistently give high praise to TPI. Strengths of the programs that are frequently noted include: 1) professional staff as well as foster parents who are committed to the families served, 2) a commitment to the RC Consent Decree and the ISP process, 3) trained, experienced and highly qualified staff, 4) well organized case records with information easily available, 5) standards in place regarding supervisor to worker ratio and worker to child ratio, 6) complies with training requirements for professional staff and foster parents with training documented as well as evaluations for the training, 7) professional staff enrolled for Medicaid Rehabilitation Services, 8) treatment plans and reviews for children completed in a timely manner, 9) goals for children are measurable and time limited, 10) TPI specifies strategies that promote and regularly evaluate progress to achieve outcomes, 11) discharges are usually planned and involve a smooth transition, 12) children are visited as required, 13) foster homes are visited weekly and as needed, 14) TPI has a written Quality Assurance Plan, 15) satisfaction surveys are utilized and filed in case records, 16) children are tracked on discharge that includes 3 and 6 month evaluations, 17) foster parent records contain ABI/FBI clearances and other required documentation, 18) reference contacts for foster parents at annual renewals, 19) medical/dental appointments for children are well documented, 20) thorough foster parent agreement, 21) exhibits strong standards regarding practice, 22) strong engagement skills noted in staff, 23) desire to always match children with the appropriate home, 24) TPI has handbook for foster parents, 25)

pictures of foster parents in parent records, 26) evidence of excellent home studies, and 27) good working relationships with county DHR office staff.

### b. List of individuals who are familiar with the delivery of services by TPI

Following is a list of persons familiar with the delivery of services by TPI. Please refer to section IV-I, References, page 48, for additional references.

J. Barry, Abston, Esq.
221 East Side Square, Suite 1
Huntsville, Alabama 35801
(256) 534-3336
law3245@bellsouth.net

Tracy Womack
Russell County Middle School
4716 Old Seale Highway
Seale, Alabama 36875
(334) 855-4453
wommackt@rcsd.net

Brandon Hardin MSW, LGSW
Senior Social Work Supervisor
Jefferson County DHR
1321 5th Avenue South
Birmingham, Alabama 35202

Anissa M. Broussard, DMD, LLC
1200 20th Street South, Suite 202
Birmingham, Alabama 35205
(205) 930-9797

Rebecca K. Williams, CRNP
Cullman Primary Care, P.C
503 Clark Street, NE
Cullman, Alabama 35055.
(256) 739-0801

J. Michael Key, LCSW
Cullman County DHR
P.O. Box 990
Cullman, Alabama 35056-0990
(256) 737-5300

Emmadene T. Winston, D.S.W.

Lynn Hart, Director
Russell County Child Advocacy Center
1011 South Railroad Street
Phenix City, Alabama 36867
(334) 297-4962
lynnhartcac@bellsouth.net

Lori Storey
South Girard Jr. High
521 Fontaine Road
Phenix City, Alabama 36869
(334) 298-2527
lstorey@pcboe.net

Chris Monceret, Director
Shelby County DHR
PO Box 1906
Columbiana, Alabama 35051

Susan D. Martin, MS
Brooks' Place
Child Advocacy Center of Cullman, Inc.
P. O. Box 1252
Cullman, Alabama 35056
(256) 739-2243

Jewel E. B. Euto, Ed. D., Ph.D., NMD
Tri-County Counseling & Natural
Health Clinic
1306 Somerville Rd. SE
Decatur, Alabama 35601
(256) 340-9429

Kimberly Beam, LCSW
Montgomery County DHR
P.O. Box 250380
Montgomery, Alabama 35125-0380

P.O. Box 230873
Montgomery, Alabama 36123
(334) 293-3100

Robert Humphreys, Assist. Principal
Brookwood High School
15981 Highway 216
Brookwood, Alabama 35444
(205) 342-2777
robert.humphreys.bwhs@tcss.net

Beverly Whitfield, MA
P.O. Box 1063
Tuscaloosa, Alabama 35403
(205) 759-0411
(205)454-3957

J.Cleone Brock, LPC
Counseling for Positive Change
2140 East University Drive, Suite C
Auburn, Alabama 36830
(334) 502-8786

John T. Coleman, Attorney
500 Webster Road, # 500
Auburn, Alabama 36832

Greg Williams, Ph.D., LPC
CrossWay Counseling Centers
27625 U. S. Highway 98
Daphne, Alabama 36526
(334) 626-7959

Diane Roberson-Hill, M.Ed., LPC
The Carpenter's House, PC
601 Bel Air Blvd. Suite 409
Mobile, Alabama 36606
(251)476-9994
Garcher11@aol.com

Althea L. McClellan
Parent Involvement Teacher
Lauderdale County Board of Education
P.O. Box 278

(334) 260-0493

Rachel Allgood, MA. LPC
Children's Service Manager
Indian Rivers Community
Mental Health Center
P.O. Box 2190
Tuscaloosa, Alabama 35403
(205) 349-6488
rallgood_irmhc@yahoo.com

George Ashley, Ph.D., Chair
Department of Social Work
Oakwood College
7000 Adventist Blvd.
Huntsville, Alabama 35896
(256) 726-7344

Angela Colvin Burque, LCSW
Director of Field Instruction
Auburn University
7030 Haley Center
Auburn, Alabama 36849-5256
7030 Haley Center

Isabella Thomas-Heinsohn, LPC
8215 Madison Blvd.
Madison, Alabama 35758
(256) 772-7900

Viloette Simpson, HIPPY Director
Early Childhood Directions, Inc.
3101 International Drive, Suite 700
Mobile, Alabama 36606
(251) 473-1060

T. David Cunningham, LPC
231 Cove Road
Jacksonville, Alabama 36265
(256) 435-8728
drdavidlpc@yahoo.com

Karen Thompson
Educational Talent Search
Northwest-Shoals Community College
(256) 331-5485

11

Florence, Alabama 35631
(256( 765-0082

kthompson@nwscc.edu.net

Jacqueline C. Winston
Assistant Professor
University of North Alabama
Florence, Alabama 35632-0001
(256)765-4391

Daniel Long, Lead Teacher
Dale County Mental Retardation Board
Vivian B. Adams School
2047 Stuart Tarter Road
Ozark, Alabama 36360
(334) 774-5132

## IV.  B.  *START UP PLAN*

TPI proposes to provide TFC services in all 9 Regions as outlined in the RFP. Since TPI has existing site locations throughout the state, the start up cost will be minimal. TPI has well established district offices throughout Alabama with experienced staff and sound relationships with county DHR staff. Because of the positive relationships with DHR and because TPI is a known and trusted provider, start-up should be relatively straightforward requiring minimum preparation time. TPI also has a network of professional referral sources and long-term relationships with schools in all areas of the state. If TPI is awarded a contract to provide TFC services in response to this proposal, the company will initiate a prearranged start-up plan. The scope of that plan will depend on the scope of the contract awarded to the company.

### a. Continuum of Family Care

TPI plans to expand its current array of services into a multifaceted Continuum of Family Care. The principal steps in start up will involve assessing the needed number of TFC homes, enhancing work with biological families, and training staff and foster parents in the step-down process. TPI staff currently works closely with many biological families of our children; however, the company, in accord with the RFP, plans to significantly increase and strengthen its family support services.

TPI has prior experience managing a large Family Options Program and still retains staff from that program. TPI has also developed a proposal for a Continuum of Family Care which has been shared with state and local DHR representatives who expressed great interest in the service. The company will use that expertise and remaining staff on which to base its continuum of care. Staffing will function within the current organizational structure. Program Directors will direct the family support services in their regions. Supervisors will be selected to supervise line staff, and foster parent mentors, and to directly participate in delivering services to families. Experienced TFC foster parents will be used to mentor biological families by instructing them in techniques that they have found effective while working with TFC children. TFC parents are already acting as mentors to biological families on an informal basis, and the expansion and formalization of a mentoring program seems highly promising to provide effective, cost efficient services to families.

12

### b. Continuum of Family Care services

TPI will consult with county DHR staff to determine the extent of their need for Continuum of Family Care. The services can be extended to families who are experiencing problems but whose children are still with them. The Continuum of Family Care will also be available to children returning to their families from placement in facilities other than TPI. The Continuum of Family Care will include the following services which will be time-limited, short term, and intensive with the intent of fostering independence and increasing the family's ability to effectively utilize community resources independent of DHR:

1. Family counseling and parenting skills training in:
   a.  Behavioral techniques
   b.  Appropriate use of discipline techniques
   c.  Communication skills
   d.  Problem-solving skills
   e.  Stress management skills
   f.  Anger management skills
   g.  Financial management skills

2. Aiding the family in meeting medical needs, for example, arranging for substance abuse treatment for family members and assisting in making available follow-up support resources when treatment is complete. Assisting in finding and arranging treatment and evaluation for special needs children in the family.

3. Teaching the family housekeeping, homemaking and other organizational skills needed to provide a nurturing environment.

4. Referring and linking the family with follow-up services to meet the family's needs and to support the family's continued stability. Helping returning child enroll in school.

5. Transporting the family to access other services when needed.

7. Supervision of family visitation.

### c. Staff training

Training of staff and mentors will be based on the Homebuilders Model currently being used in Alabama's Family Options Programs. The guiding principles of the Continuum of Family Care will be the values as enunciated by the Intensive Family Preservation Service of the Homebuilders Model. These are listed below.

- Safety of the children is the foremost concern.
- It is best for children to be raised in their own families whenever possible.
- A child's relationship with his/her family is always important.
- Most families, if properly assisted, can care for their children.
- We can't predict which situations are most amenable to change.
- Almost all people have the ability to change.

13

- Mutual respect in the client-worker relationship works best.
- It is our job to give hope to families, not their job to be motivated.
- A crisis is an opportunity for change.
- Empowerment means enabling people to make their own agenda for change—not imposing one on them.
- The environment is both a source of and solution to the problems of children and their families.
- Inappropriate interventions can do harm.
- Respect diversity and accept family lifestyles, and child rearing methods, so long as they promote a child's health and safety.
- Families are our colleagues or partners.
- Family members usually don't intend to do each other harm.
- People are doing the best they can.

Since TPI employs a number of experienced staff, once awarded the contract, training on the Continuum of Family Care would start immediately in preparation for full implementation in the new fiscal year. Current training plans are to begin in June 2005 with training being conducted on a regional basis by experienced staff. Following is the timeline TPI will use in preparation for implementation of these additional services:

1. May 1, 2005 - Identify staff who will receive the Continuum of Family Care training
2. May 15, 2005 - Finalize the training curriculum
3. June 16, 2005 – Conduct training in Montgomery for the Montgomery, Auburn, Chattahoochee and Wiregrass District offices staff
4. July 7, 2005 – Conduct training in Birmingham for the Central, North East and West Central District Offices staff
5. August 11, 2005 – Conduct training in Cullman for the Cullman, North Central and North West District offices staff
6. September 8, 2005 – Conduct training in Mobile for the Gulf Coast District office staff
7. September 22, 2005 – Conduct makeup training in the Montgomery office for any staff unable to attend the training in their respective area
8. October 1, 2005 – Begin implementation of the services in proposal as outlined in the contact.

### d. Implementation of services

If the proposal is successful and a contract is awarded to TPI, the Executive Director and TPI staff will undertake the following steps immediately:

1. Meet with DHR County representatives to review their need for TFC homes.
2. Compare the awarded slots to the existing homes serving children.
3. Identify areas that are underserved and institute strategies to address those needs.
4. Identify biological families who are candidates for the family support services.
5. Ensure that all counties in awarded regions will have a minimum of 2 TFC homes within a six month period.

6. Assess personnel needs in each region to ensure that all children are adequately served and transfer, hire, or otherwise modify personnel.
7. Recruit additional TFC homes as needed.
8. After three months have a follow-up meeting with DHR County staff to assess TPI's progress in meeting their Continuum of Family Care needs and make adjustments in recruitment, service delivery, or other components of program services based on results of the meeting.

# IV.    C.    *REFERRAL, ADMISSION AND EXCLUSION POLICY*

## 1. Target Population

Individuals under twenty-one who have a DSM-IV Axis I diagnosis, and who are referred by County DHR's will be considered for admission into the program. The child should present evidence of an emotional and/or behavioral disturbance to a degree that the problem has a low probability of being ameliorated through less restrictive therapeutic modes.

In most cases, the child's birth or foster family will be experiencing difficulty in dealing with his/her problems. A child stepping down to a therapeutic foster home from a more restrictive setting such as a psychiatric hospital or residential treatment facility will also be accepted for placement. It is anticipated that the child will have made significant progress in treatment that prepares him/her for a less restrictive community placement. Often, the child will also be experiencing academic and/or management problems at school. The following is a list of behaviors which might be considered typical of a child admitted into the program:

1. Children who are experiencing emotional or behavioral disturbances due to emotional, physical, sexual abuse and neglect;
2. Children who are oppositional, non-compliant, angry, and have little self-control;
3. Children who cannot adjust to other foster home settings;
4. Children who are angry and vent feelings through violent temper tantrums;
5. Children exhibiting self-destructive behaviors;
6. Children who use alcohol, tobacco or other drugs;
7. Children requiring skill and supervision greater than can be provided in traditional foster care.

## 2. Policy and Procedure for Admission

All referrals to the program will originate with County DHR's. It is anticipated that a referral will begin with a child's caseworker. When a caseworker desires to have a child considered for admission, he or she will consult with his or her supervisor about the appropriateness of the referral. If it is agreed that a referral be made, the caseworker will contact the TPI Program Director or Intake Specialist. He or she will take initial information and discuss with the caseworker the feasibility of admission and the steps necessary to admit the child.

15

Steps in Admission

1. DHR caseworker and supervisor discuss appropriateness of referral.
2. DHR caseworker discusses admission with the TPI Intake Specialist, or Program Director. Referral information including Social Summary, Psychological Testing, Multi-Systemic Assessment Tool (MAT-CW), Medical Information, School Records, and Medicaid eligibility, Comprehensive Family Assessment/Intake Evaluation, ISP, EPSDT and other pertinent information will be received by the TPI Staff.
3. The Intake Specialist begins a review of available TFC homes to determine if a family matches the strengths and needs of the child/family.
4. The prospective TFC family is contacted and informed about the referral to assess their interest.
5. Program Director, Supervisor, Intake Specialist and/or Family Consultant, caseworker, child and biological parents (when appropriate) meet with prospective foster parents. Other individuals who are part of the treatment team and/or ISP team will be invited to attend.
6. The child completes two pre-placement visits of 2 to 3 days at the foster home.
7. Following pre-placement visits, the child enters the Program. Within 10 days of admission, an assessment and an initial treatment plan will be completed and written. Within 30 days, the Comprehensive Treatment Plan will be developed and will be based upon the goals established in the ISP.
8. After six months, an ISP will be conducted to assess the child's progress.

If a matching therapeutic foster family is available, the admission procedure can be accomplished in no more than 10 days.

## 3. Exclusion Policy: No Reject/No Eject Policy

TPI maintains a "no reject/no eject policy". Youth under age twenty-one who are in DHR custody and have a DSM-IV Axis I diagnosis will be considered for admission. Only children who present a clear danger to self or others, and those specifically restricted by DHR policy will not be considered for admission. Placement, of course, will be dependent on the availability of a TFC home that presents as an acceptable match for the child. For a child under age six, TPI will require that the County DHR making the referral obtain SDHR permission.

## 4. Termination of Services

Services will be terminated based on recommendation from the ISP. Termination will be based on achievement of goals, reunification with family, or movement to a less restrictive permanent placement. There will be no punitive termination of children from therapeutic foster care, and foster parents are expressively prohibited from using the threat of removal as a consequence of behavior. If a placement is in jeopardy of disrupting, the caseworker will be immediately notified and an ISP called to address the issues. TPI will provide a 14 day notice if a disruption appears likely.

16

*IV.    D.    SERVICE DELIVERY*

TFC is a form of treatment within a family setting for children exhibiting emotional and behavioral disorders. It is anticipated that most children will respond to the treatment strategies and begin demonstrating improvement in their emotional stability and behaviors after an initial six months of care. Intense coordination between DHR and TPI is required to continually assess the child's strengths and needs, while concurrently working with the child's family, so that the child may return to his or her family of origin. Permanency planning should begin at the time of admission in order for a placement to be available when the child is ready to leave the program. If the child has not made substantial progress within the first six months of treatment, careful assessment of the barriers to success will be undertaken and strategies developed by the treatment team to remove those barriers. The child will be re-evaluated every three months to assess progress and attempt to incorporate new therapeutic techniques to expedite the child's readiness for step-down.

**1. TPI Services to Foster Children:**

A TPI Family Consultant (FC) will visit weekly with the TFC child to review the child's progress and address any issues impacting the child's adjustment. The FC will also supervise the TFC foster family in providing treatment for the child in accordance with the treatment plan.

The FC will make at least monthly face-to-face or telephone contact with the child's school to monitor progress.

The FC will maintain regular contact (at least monthly) with the child or family's therapist in order to monitor progress in counseling.

TPI will assist in the referral to other programs or services the child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.

TPI will assist the child with development and maintenance of skills by the provision of up to 18 hours weekly of individual basic living skills training and up to 5 hours per week of group basic living skills training to include but not limited to behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas will be taken from needs identified as deficits for the child and authorized in the context of the ISP.

The TPI foster family and the FC will coordinate the child's involvement in at least one extracurricular activity, e.g., Boy or Girl Scouts, karate, swimming, sports, etc. in accord with direction from the ISP.

The TPI foster parent and the FC will attend ISP's and IEP's along with the child.

The foster family and the FC will assist in the development of independent living skills, as identified in the ISP.

TPI will provide monthly group therapy (counseling) sessions for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and/or objectives as identified in the family's ISP.

TPI will provide up to five hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family to alleviate a crisis.

Discharge and permanency planning will be an integral part of the initial and any subsequent ISP's while the child is in care with TPI.

TPI will endeavor to provide a 14 day notice in the event of a disruption in the placement as appropriate to the child's health and welfare.

TPI will administer outcome measures quarterly as out-lined in the *Therapeutic Foster Care Manual*, pages 73-75.

TPI will report monthly to DHR describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.

TPI will maintain regular communication with DHR, counselors, teachers and other persons relevant to the child in care.

TPI will maintain a Quality Assurance program which assesses the quality and quantity of outcomes, demographic data and documentation.

TPI will ensure the adherence to and compliance with *Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes*, and the *Therapeutic Foster Care Manual*.

TPI staff will assist in creating a behavior management plan for the child with the other members of the ISP team. TPI will maintain staff that has expertise in the development of behavior management plans.

TPI staff will participate in the ISP team's decision process to determine goals for children and their families, including allowances, need for clothing, and observance of special occasions.

## 2. TPI Program Staff Partnership with Biological Families:

In compliance with basic tenets of the System of Care and in support of good principals of child welfare, TPI will seek to partner with biological families by utilizing TPI's Continuum of Family Care based on the Homebuilders Model of service delivery

18

as described on page twelve. Decisions regarding involvement of biological families with foster children will be made in the ISP.

TPI staff will participate in the assessment of parental functioning to assist the ISP team in determining treatment goals for a safe placement of the child back with the family, when appropriate, or with relatives, when relative placement is the goal.

TPI staff will assist with the implementation of the goals for the family as identified in the ISP to expedite the child's safe return home. This process will include making referrals to appropriate resources, when TPI is not able to provide the service.

When reunification is the placement goal, TPI will provide up to 4 hours per week of therapeutic visitation with biological families and their children who are in TFC placements to assess the parents' ability to safely care for their children and to determine the progress (or lack of progress) in attaining the goals for re-unification or relative placement.

Based on the ISP, TPI will provide family support to birth families. The support will include services to assist family members to understand the nature of the child's emotional or behavioral disorder and how to help the child be maintained in the community by providing education about symptoms, medication management, parenting support, educational advocacy and other services as identified in the family's ISP. (Please see more detailed discussion of in-home services on pages 12 & 13).

### 3. Services to TFC Families from TPI:

TPI will pay a minimum daily difficulty of care payment to the TFC foster family of $16.00 per day. This will be contained in the contract between TPI and each TFC foster family. The standard document will be submitted to DHR for approval.

Prior to licensing, every prospective foster parent will receive 40 hours of pre-service training including GPS.

All foster parents must complete 24 hours annually of continuing training.

TPI will conduct monthly support group/meeting for TFC parents.

TPI will ensure that its TFC homes comply with *Minimum Standards for Foster Family Homes.*

TPI staff will conduct annual license renewals and semi-annual visits.

TPI staff will conduct weekly face-to-face contact/support meetings with foster families to strengthen their ability to provide a safe nurturing environment for the child.

19

TPI staff will be available 24 hours per day, 7 days per week for support of families and to handle crisis situations.

TPI will provide up to 48 hours per month of respite. Additional respite needs will be addressed in TPI's contractual agreement with its foster families.

TPI will reimburse travel expenses to foster families when travel totals over 50 miles during one trip, unless other payment arrangements have been made in the ISP.

TPI staff will assist with transportation of its children when needed. However, transportation of the foster child is the foster family's responsibility.

TPI will assist and ensure that required Medicaid documentation of provided billable services is being properly maintained and is in compliance with all policy and billing guidelines per the *Medicaid Provider Manual*, Medicaid Rehabilitative Services, Chapter 105.

## 4. Step-Down Services:

Step-Down is a principal goal of and the natural culmination of treatment in TFC. The most desirable form of step-down is a return to the family of origin, followed by a placement with a relative. Other forms of step-down are independent living, emancipation, stepping-down to a less intensive form of TFC, or stepping-down to traditional foster care. After a child has been in TPI placement for 6 months, TPI staff and DHR staff will conduct an assessment of the child's readiness for step-down and determine what barriers may exist to step-down. Step-down will be continually assessed after this timeframe to determine when a child may be stepped down.

According to the *Therapeutic Foster Care Manual*, there are three categories of TFC: Standard TFC, Step-Down TFC, and Traditional Foster Care. TPI anticipates that there will be occasions when a TFC child will step-down to one of the two step-down categories while remaining in the original Standard TFC home. These occasions will be prompted by the following conditions:

1. The child has established a strong bond with the foster parents and a move would adversely affect the child's stability and emotional well being.

2. The ISP team has established that there are no relative placement resources.

3. The child can be maintained in the placement with fewer therapeutic services.

When a child is stepped-down to Step-Down TFC, TPI will provide core services to the child and foster family as outlined in the Step-Down Core Services of the *Therapeutic Foster Care Manual*.

20

TPI will coordinate the child's treatment plan through an ISP with the treatment team to make appropriate modifications to match step-down services to the child's perceived needs and strengths.

TPI staff will make individual, bi-weekly visits with the TFC child.

TPI will make quarterly face-to-face or telephone contact with the school to monitor the child's progress.

TPI will make quarterly face-to-face or telephone contact with the child's and/or family therapist to monitor progress in counseling.

TPI will assist with referrals to other programs/services the TFC child may need, as identified in the family's ISP, including the coordination of transportation to appointments, family visits and activities.

TPI will assist the child with the development or maintenance of skills by the provision of up to 9 hours weekly of individual basic living skills training and up to 3 hours per week of group basic living skills training to include, but not limited to, behavior education, money management, shopping, healthy lifestyles, stress management, meal preparation, personal hygiene, housekeeping, medication management, laundry and using public transportation. Individual goals in each of these therapeutic areas will be taken from needs identified as deficits for the child and should be authorized in the context of the ISP.

The TPI foster family and the FC will coordinate the child's involvement in at least one extracurricular activity, e.g., Boy or Girl Scouts, karate, swimming, sports, etc. in accord with direction from the ISP.

The TPI foster parent, the FC, and when appropriate, the biological family members will attend ISP's and IEP's along with the child.

TPI will provide family support to the birth family, and supervise family visitation as outlined in the ISP/Treatment Plan. This support includes the provision of services to assist the child's family members to understand the nature of the child's emotional and behavioral disorder and how to help the child be maintained in the community by providing education about the child's problems, expected symptoms, medication management, parenting support, therapeutic visitation support, educational advocacy and/or to encourage school success, as identified in the family's ISP. It is expected that if the child's permanency plan is to return home, more time may be spent providing family support when a child has reached a step-down level.

TPI will assist in the development of independent living skills, as identified in the ISP.

21

TPI will provide monthly group therapy (counseling) sessions for TFC children by a qualified child and adolescent services professional in a face-to-face interaction where interventions are tailored toward achieving specific goals and or objectives as identified in the family's ISP.

TPI will provide up to three hours per week of crisis intervention services, as needed, to alleviate a crisis for the child or to assist the family alleviate a crisis for the child.

TPI will play an active role in the discharge planning for the child.

TPI will endeavor to provide a 14 day notice in the event of a disruption in the child's placement as appropriate to the child's health and welfare.

TPI will administer outcome measures quarterly.

TPI will submit a report to DHR monthly describing services provided during the month and the child's progress toward achieving goals that are outlined in the treatment plan.

TPI will maintain regular communication with DHR, counselors, teachers and other persons relevant to the child in care.

TPI will maintain a Quality Assurance program which assesses the quality and quantity of outcomes, demographic data and documentation.

TPI will ensure the adherence to and compliance with _Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes,_ and the _Therapeutic Foster Care Manual._

TPI staff will assist in creating a behavior management plan for the child with the other members of the ISP team. TPI will maintain staff that has expertise in the development of behavior management plans.

TPI staff will participate in the ISP team with determining goals for children and their families, including allowances, need for clothing, and observance of special occasions.

## 5. Services to TFC Step-Down Families from TPI:

TPI will pay a minimum daily difficulty of care payment to the TFC foster family of $ 8.00 per day. This will be contained in the contract between TPI and each TFC foster family. The standard document will be submitted to DHR for approval.

All foster parents must complete 24 hours annually of continuing training.

TPI will conduct monthly support group/meeting for TFC parents.

TPI will ensure that its TFC homes comply with *Minimum Standards for Foster Family Homes.*

TPI staff will conduct annual license renewals and semi-annual visits.

TPI staff will conduct bi-weekly face-to-face contact/support visits with foster families to strengthen their ability to provide a safe nurturing environment for the child.

TPI staff will be available 24 hours per day, 7 days per week to support families and to handle crisis situations.

TPI will provide up to 24 hours per month of respite. Additional respite needs will be addressed in TPI's contractual agreement with its foster families.

TPI will reimburse travel expenses to foster families when travel totals over 50 miles during one trip unless other payment arrangements have been made in the ISP.

TPI staff will assist with transportation of its children when needed. However, transportation of the foster child is the foster family's responsibility.

TPI will assist and ensure that required Medicaid documentation of provided billable services is being properly maintained and is in compliance with all policy and billing guidelines per the *Medicaid Provider Manual*, Medicaid Rehabilitative Services; Chapter 105.

Wrap Around Services - Occasionally, children in placement will require additional services to address therapeutic needs. Individual and family counseling, beyond what is provided by TPI can be obtained either through program staff or through referral to outside providers. Psychiatric treatment is often required and program staff will work with caseworker, foster families and counselors to ensure that appropriate treatment is obtained. TPI will request an 1878 for all services not included in the core services that are identified in the ISP to be provided by TPI.

## 6. Recruitment and Approval of Foster Parents:

### a. Recruitment

Applicants will be recruited using a variety of techniques found effective over the 16 years in which TPI has operated. Newspaper ads, articles, posters, flyers, speaking engagements, radio and television may be used. The Program Director and TPI TFC Licensure Specialists will recruit directly in churches and civic organizations. Consultation with County DHR representatives will be utilized in an effort to recruit the specific types of foster homes needed. Referrals from existing foster parents are a major source of recruits and TPI provides incentives for successful referrals.

### b. Selection

Foster parents will be selected based on a rigid set of criteria to ensure their effectiveness and appropriateness in providing a therapeutic home-life for foster children. Parents will be screened, trained and licensed based on guidelines outlined in *Minimum Standards for Foster Family Homes* and *Therapeutic Foster Home Care Manual.* In general, foster parents will demonstrate the following characteristics:

- Be a married couple, or stable single person
- Have a stable household
- Have financial stability
- Demonstrate good personal judgment
- Have dependable transportation
- Demonstrate warmth and understanding
- Demonstrate a positive and cooperative attitude
- Demonstrate skill in handling difficult children
- Be willing to participate in training and regular foster home meetings
- Be willing to submit to screening procedures
- Be in good physical health
- Be willing to abide by guidelines of the TPI TFC Program

The foster parents will serve as both parents and as primary therapists for their foster child. They will be carefully selected and trained to handle such a weighty responsibility. Prior to receiving foster children into their homes, the foster parents will complete training preparing them to handle the special needs of the children. All procedures of the program will be discussed and written guidelines will be given to the foster parents. The Program Director, Supervisor, Family Consultant, or other staff will provide continuing training and support. Twenty-four hour emergency consultations will be available through the program.

### c. Screening

A home visit will be scheduled early following recruitment to conduct an initial screening of the home for standard compliance and to assess the interest level of the individuals to become foster parents. A staff member will provide the family with additional information regarding therapeutic foster care, and discuss the training and screening procedures. The screening procedures include Child Abuse and Neglect reports, ABI/FBI clearances, at least three references, and all other clearances as required in the *Minimum Standards for Foster Family Homes.*

### d. Training

Specific training of therapeutic foster parents will occur during the approval procedure. This training curriculum will be the Group Preparation and Selection (GPS) Training. In addition, at least ten (10) more hours of Pre-Service Training based on the Core Curriculum for Pre-Service Training for Therapeutic Foster Families will be offered by TPI. The "Deciding Together" training module will be used when working with a small number of prospective foster parents. A log of initial and continuing training will

24

be maintained in foster parent files. A Certificate of Completion will be awarded to participants at the conclusion of training.

TPI will train therapeutic foster parents in the concept that therapeutic foster care is a time-limited treatment approach that treats children in their community and in close proximity to their families. The strategy is for children to receive the needed services during treatment and after 6 months to be stepped down to their biological family, other relative or regular foster care. When appropriate, the child may be stepped down within the TFC home.

## IV.    E.    TARGET AREA

TPI is in the unique position of currently having foster homes in 57 of the 67 counties in Alabama. The company has eleven (11) district offices and five satellite locations. TPI intends to provide services identified in the RFP to children and families in all 67 counties in Alabama. Homes will be recruited in the remaining 10 counties as dictated by need. TPI will ensure that all counties have at least two TFC foster homes. TPI will work closely with the eleven counties mandated to place children within the county to ensure that they have adequate resources to serve their children. Services will be provided in all 9 regions to serve 775 TFC children. The number of actual children served would increase, as one TFC slot could serve two step-down children. This proposal includes the request for the following number of standard TFC slots for the identified regions:

| REGIONS | REQUESTED SLOTS | SLOTS AVAILABLE 6/31/05 |
|---|---|---|
| Region 1 (Pike, Barbour, Henry, Houston, Dale, Coffee, Covington, Geneva) | 45 | 51 |
| Region 2 (Mobile, Baldwin, Escambia Monroe, Washington, Clarke, Choctaw) | 100 | 94 |
| Region 3 (Autauga, Dallas, Lowndes Montgomery, Wilcox, Crenshaw Butler, Conecuh) | 75 | 61 |
| Region 4 (Coosa, Tallapoosa, Chambers Elmore, Macon, Lee, Bullock, Russell) | 70 | 76 |
| Region 5 (Pickens, Tuscaloosa, Bibb, Perry Hale, Greene, Sumter, Marengo) | 64 | 39 |
| Region 6 (Jefferson, Shelby, Chilton, Talladega, Clay, Randolph, Cleburne) | 165 | 115 |

| | | |
|---|---|---|
| Region 7 (Marion, Lamar, Fayette, Walker, Winston, Cullman, Blount) | 54 | 45 |
| Region 8 (St. Clair, Calhoun, Etowah, Cherokee, DeKalb, Marshall) | 68 | 37 |
| Region 9 (Jackson, Madison, Morgan, Limestone, Lawrence, Lauderdale, Colbert, Franklin) | <u>134</u> | <u>140</u> |
| **Grand Totals** | **775** | **658** |

## IV.    F.    *DISCHARGE POLICY*

### 1. Process and criteria for reunification and tracking following discharge

When the child is nearing the completion of treatment, pre-discharge planning will begin. TPI staff will participate in the comprehensive Strengths/Needs Assessment of the family and assist DHR in the development of the family ISP or Service Agreement designed to reunite the family as soon as possible. TPI will assist the family in finding the resources necessary to comply with the ISP/Service Agreement requirements. The TPI staff will help in arranging appointments, reminding the family of the appointments, and assisting with transportation when necessary. TPI will continue its relationship with the family until a permanent resolution is achieved.

TPI staff will strive to work in partnership with the biological family by collaborating with the family to actively address needs as determined by the ISP. TPI will arrange for family counseling and provide parenting skills training. This training will include behavioral techniques, use of appropriate discipline, and communication skills. Family members should feel more self-sufficient and hopeful when they discover that they are able to learn and use new skills effectively.

This personal approach will result in more families persisting in preparing themselves for their child's eventual return home. It will enable more children in out-of-home placement to step-down and return to their biological families.

Once a child returns home, to a relative placement, or to any other placement, TPI will endeavor to track the child and family's progress and stability with the concurrence of DHR at 6-month, 12-month, 18 and 24-month intervals. In conjunction with perceived needs identified in the ISP, and with the approval of DHR, TPI will offer aftercare services to the child and family. Aftercare services will include the following:

      a.  Basic living skills training.
      b.  Individual or group counseling.
      c.  Family support services.
      d.  On-Call services.

26

    e. Crisis intervention.
    f. Referral services.
    g. Respite.

After a child returns home or to a relative placement, TPI will make respite placement available to provide crisis stabilization or a cooling off period if that is deemed appropriate by the DHR caseworker. Such respite might salvage a placement by giving all parties a chance to re-group and calm down.

## 2. TPI policy on emergency discharges or discharge prior to program completion

Every effort will be made to prevent premature or emergency discharges. TPI will strive to provide 14 day notice if a child needs to move. However, occasionally for the safety of the child or the family an untimely discharge may be necessary. TPI staff will closely coordinate the timetable for the move with DHR and will assist in recommendations for possible placements.

## 3. TPI policy concerning readmission of children

Children who have previously been discharged from TPI can be readmitted into TPI by following the initial referral process. Preference will be given to children who have previously been placed with TPI. When a child in TPI has to be admitted into a short term hospital or residential placement for assessment or stabilization, TPI will hold the placement for the child for up to two weeks.

## 4. Movement through goals and objectives to step-down

When a child is referred to TPI, an ISP is planned with the referring caseworker to review the child and his or her family's strengths and needs, and to initiate treatment and permanency planning. The treatment planning derived from the original ISP is incorporated into the Initial and Comprehensive Treatment Plans and further refined in subsequent Treatment Plan Reviews. Permanency planning is a part of all these treatment meetings and is continually assessed. Step-down of the child to a less restrictive placement will be targeted to occur within six months after admission. Return of the child to his or her family of origin is the permanency plan of choice. TPI will actively seek out family and relative placements for the child. With DHR's approval, the program will initiate therapeutic visitations between the child and family members utilizing TPI staff and foster family mentors.

Maintaining connections with the child's family is viewed as an important component to the child's treatment and permanency. Other step-down objectives will include relative placement, independent living and emancipation, step-down to traditional foster care, and step-down within the TFC family. TPI treatment families are trained to view step-down as a natural progression of therapeutic foster care. Treatment strategies will be specifically designed to achieve permanency as quickly as possible, to address the child and family needs and to build on their strengths. The effectiveness of treatment

27

strategies will be assessed by measuring progress on the associated goals and reporting that progress to the DHR caseworker on a monthly basis. TPI plans to incorporate the MAT-CW as its outcome measure in order to coordinate with DHR's review process.

## IV.    G.    PRIOR EXPERIENCE

Over the last 16 years, TPI has provided therapeutic service to thousands of Alabama's families and children. TPI was one of four agencies that submitted a proposal in response to DHR's initial requests for proposals for therapeutic foster homes. The Executive Director and other members of TPI have served on multiple task forces appointed by DHR to develop standards for TFC homes, criteria for admission, training requirements for foster parents and staff and case load standards. TPI operated a large Family Options Program covering most of North Alabama from 1997 until 2001. The company has an Assessment Home Program for Mobile and Madison Counties that has been in operation since 1999.

TPI has been a strong force in advocating for services to children and their families and has been instrumental in the return and reunification of hundreds of children. The company has consistently partnered with DHR to provide the core services identified in this RFP as well as other RFP's. TPI has maintained a higher level of care than has been required by the standards and core services. Although the core services and family service requirements in Attachment A of the RFP are broader and more extensive than those currently in effect, TPI has the capacity to implement these changes, and welcomes the opportunity to help children achieve permanency.

## IV.    H.    STAFF    QUALIFICATIONS,    STAFF    RECRUITMENT,    JOB DESCRIPTIONS AND TRAINING REQUIREMENTS

### 1. Staffing Pattern

TPI-Administration includes the following positions: Executive Director, Corporate Vice President, Assistant Executive Director, Business Manager, Quality Assurance Director, Human Resource Coordinator, and Executive Secretary/Personnel Coordinator. The Executive Director and Management Team, composed of all TPI-Administration staff, will review and address the need for other staff as the company expands and needs arise.

The rationale for the level of staffing proposed is based on the _Therapeutic Foster Care Manual_ and the _Minimum Standards for Child Placing Agencies._ TPI requires supervisors oversee no more than six (6) employees. The Family Consultants maintain a maximum caseload of eight (8) children. The licensing staff maintains a ratio of one staff member to 40 foster families.

A TPI District Office typically reflects the following staffing pattern:

Number of Children in Placement    Staff

28

| | |
|---|---|
| 0 to 4 | Director, Secretary |
| 4 to 12 | Director, 1 Family Consultant, Secretary |
| 12 to 18 | Director, 2 Family Consultants or 1 Family Consultant and 1 Licensing Specialist, Secretary |
| 18 to 24 | Director, 2 Family Consultants, 1 Licensure Specialist (Director and Licensure Specialist may carry small case load), 1 Secretary |
| 24 to 28 | Director, 3 Family Consultants, 1 Licensure Specialist, ¼ QA Specialist, 1 Secretary |
| 28 to 31 | Director, 4 Family Consultants, 1 Licensure Specialist, ½ QA Specialist, 1 Secretary |
| 32 to 40 | Director, 5 Family Consultants, 1 Licensure Specialist, ½ QA Specialist,1 Secretary/Office Manager |
| 41 to 48 | Director, 1 Supervisor, 6 Family Consultants, 1 Licensure Specialist, 1 QA Specialist/Intake, 1Secretary/Office Manager, 1 Secretary/Receptionist |
| 49 to 56 | Director, 2 Supervisors, 7 Family Consultants, 2 Licensure Specialists, 1 QA Specialist, ½Intake, and1Secretary/Office Manager,1Secretary/Receptionist |
| 57 to 64 | Director, 2 Supervisors, 8 Family Consultants, 2 Licensure Specialists, 1 QA Specialist, ½Intake, 1 Secretary/Office Manager, 1 Secretary/Receptionist |
| 65 to 72 | Director, 2 Supervisors, 9 Family Consultants, 2 Licensure Specialists, 1 QA Specialist,1/2 Intake, 1 Secretary/Office Manager, 2 Secretary/Receptionist |
| 73 to 80 | Director, 2 Supervisors, 10 Family Consultants, 2 Licensure Specialist, 1 QA Specialist, ½ Intake, 1 Secretary/Office Manager, 2  Secretary/Receptionist |
| 81 to 88 | Director, 2 Supervisors, 11 Family Consultants, 2 Licensure Specialists, 1 Intake, 1QA Specialist, 1 Secretary/Office Manager, 3 Secretary/Receptionist |

29

| | |
|---|---|
| 89 to 96 | Director, 3 Supervisors, 12 Family Consultants, 2 Licensure Specialist, 1 Intake Family Consultant, 1 QA Specialist, 1 Secretary/Office Manager, 3 Secretaries/Receptionists |
| 97 to 104 | Director, 3 Supervisors, 13 Family Consultants, 3 Licensure Specialist, 1 Intake Family Consultant, 1 QA Specialist, 1 Secretary/Office Manager, 3 Secretaries/Receptionist |

Typically, a new program will be staffed with a Program Director and secretary. The Program Director should be someone qualified to conduct GPS training. The Program Director will carry a partial caseload, providing services to the children and families, until the program can support a family consultant. As the program grows, a licensure specialist who is a licensed social worker will be added to train and approve therapeutic foster homes as they are recruited. The Program Director supervises all staff until the ratio reaches 1:6. A supervisor is then hired. Because of the need to assure that quality services are provided and policy is correctly implemented, a part time quality assurance specialist is added when census reaches 24. Prior to that the Program Director in coordination with the QA Director provides quality assurance. The quality assurance person may also serve as a part-time family consultant or intake specialist. As the program grows, the time spent conducting quality assurance duties will increase and other duties will decrease. When a District Program exceeds 104 children in care, staffing will be based on the rationale described above.

## 2. Job Descriptions including Qualifications, Education, Licensure and Experience

All TPI employees must meet the following qualifications: 1) Suitable CAN and ABI/FBI clearances, 2) Suitable Medical, 3) Valid Alabama Driver's License with good driving history, 4) Dependable Transportation and Auto Insurance, and 5) Adhere to Code of Ethics in respective profession if licensed. Following are the positions, job descriptions, and specific qualifications of all employees of TPI in alphabetical order.

1) Assessment Home Coordinator

The assessment home coordinator's primary duties include managing the placement of children in the Assessment Home Program and supervising any assessment home family consultants. The coordinator helps match children with foster parents, assigns staff caseloads, reviews and approves initial treatment plans, develops relationships with community resources, attends ISP's for assessment children, reviews and approves assessment reports for children, assists with obtaining psychological evaluations, EPSDT and other information on children in Assessment, addresses partnership issues with assessment foster home parents, provides training for foster parents, develops and/or reviews and approves all assessment reports submitted to DHR, and, assists with scheduling IEP's and obtaining appropriate school placements. Additionally, the assessment home coordinator meets weekly with all staff under

supervision, conducts semi-annual and annual evaluations of assigned staff, reviews and approves Medicaid billing by professional staff, provides training for professional staff and is available 24/7 for crisis intervention for children in assessment.

Requirements
LBSW/MS with five years of experience in children therapeutic setting
Good verbal and written communication skills
High level of computer skills

2) Assessment Home Family Consultant

The assessment home family consultant's primary duties are to carry a case load of up to 4 children placed in assessment homes and supervise the assessment home parents. The consultant develops Initial Treatment Plans that are consistent with the child's ISP, visits the child in the assessment home three times per week and completes weekly reports regarding child's progress. The worker makes careful observations of the child's behavior, emotional reactions, social interactions, and academic proficiency and records the observations as part of the child's assessment. He or she provides the assessment home parents with support to maintain the child in the home and to implement the treatment plan, assists with obtaining and maintaining appropriate school placements for each child in caseload, provides 24/7 coverage and crisis intervention to child and assessment home parents, completes all documentation of services provided in compliance with the Medicaid Rehabilitation Services Manual, prepares and submits for approval reports to be forwarded to DHR, and meets regularly with assessment home coordinator.

Requirements
Bachelor's degree in social work/counseling/or related social service field
Good verbal and written communication skills
Basic computer skills

3) Assistant Executive Director

The assistant executive director shall report directly to the executive director and carry out duties as assigned which support the mission of TPI. The assistant executive director serves as an ambassador for TPI, provides leadership to all staff, provides consultation and supervision to program directors and other designated staff, assists with the expansion of therapeutic foster care, assists with the development of new service programs, maintains a current understanding of DHR standards and directs TPI staff in compliance, works to resolve programmatic needs, and, serves at the discretion of the executive director to carry out other duties as identified.

Requirements
LCSW or Masters degree with considerable experience in direct provision of child welfare services and supervision of staff. The assistant executive director must be knowledgeable of policies and procedures of the agency, knowledgeable of existing

31

resources with experience in program development with a high level of administrative skills. The assistant executive director must also be able to articulate clearly and set a positive, healthy example that reflects the positive mental health philosophy of TPI.

4) Business Manager

The business manager is responsible for the financial and business areas of TPI and assures that all business transactions of TPI are consistent with General Accepted Governmental Accounting Principles (GAAP). The business manager is responsible for all receivables and payables, prepares and submits monthly reports to SDHR, prepares monthly Difficulty of Care payroll for TPI foster parents, prepares semi-monthly payroll for TPI staff, prepares and submits monthly bill to SDHR for services rendered per contract, prepares monthly and quarterly taxes for company, supervises data entry staff, serves as the administrator for all insurances for company, serves as the administrator for the 401K, prepares monthly Medicaid report, tracks leave for all staff, processes paperwork and payroll for all new hires, makes bank deposits, balances all bank books including District Program accounts, and, prepares and provides to the CPA firm copies of monthly financial reports.

Requirements
Must have an accounting degree, M.B.A. or C.P.A.
Extensive experience in bookkeeping and in managing receivables and payables
High level of integrity
High degree of computer skills
Must be bondable

5) Corporate Vice President

The corporate vice president is a member of the management team/administration involved in policy making, personnel decisions and other aspects of the operations of the corporation. Other responsibilities include reviewing updates and revisions in SDHR policies and procedures and assisting with their implementation, developing and facilitating training for TPI staff with emphasis on training for program directors, monitoring medical and dental services being provided to all children placed with TPI, serving as a member of the grievance and resolution committee for employees and serves as an advisor to the executive director.

Requirements
Licensed Master's degree in counseling/social work/psychology plus 10 years experience

6) Executive Director

The executive director will assume overall responsibility for the operation of the company. He will direct the management team in developing policy and procedures for the company to follow. He will supervise the corporate vice president, assistant executive director, the business manager, the quality assurance director, the human resources

coordinator, and the executive secretary/personnel coordinator.
The responsibilities and duties of the executive director are as follows:

Develops proposals and strategies for program development; supervises personnel in his chain of responsibility; oversees the overall fiscal functioning of the company; signs contracts and agreements; consults with legal counsel; consults with accountant; consults with Alabama DHR representatives; coordinates, reviews and approves development of all policies governing TPI's program of services; and, leads the management team and district directors in planning, policy and decision-making processes.

Requirements:
The executive director must possess at least a Master's Degree in Counseling, Psychology, or Social Work and have a minimum of ten years of experience related to the care and therapy of emotionally or behaviorally disordered children.

7) Executive Secretary/Personnel Coordinator

The responsibilities and duties of the executive secretary/personnel coordinator are as follows:

Receives and screens all incoming calls for the executive director; schedules appointments as necessary; submits request for MVR and maintains a file for all reports received; maintains current file of all Employee Handbook Receipts; sets up personnel files on new employees and maintains current employee personnel files by filing information received; assists other TPI Administrative staff with scheduling and preparation for training meetings; assists with preparation of payroll and other bills as needed; attends all management team meetings and records and prepares report of the meetings; maintains and purchases supplies for the administrative supply room; and, maintains confidential file of medical information on all personnel.

Requirements
Excellent computer skills
Five years of secretarial experience
High degree of skill in communication
Must be bondable

8) Family Consultant

The family consultant serves as a direct link between TPI and the therapeutic foster parents. The family consultant supervises the foster parents who provide basic living skills services to the children placed in their homes. He or she visits in the foster home of each therapeutic foster child in caseload at least one time per week for a minimum of 1 (one) hour per week, facilitates the Treatment Team Meeting to develop the initial treatment plan for children in caseload within ten (10) calendar days of placement, develops the comprehensive treatment plan within thirty (30) calendar days of placement, participates in the matching of child to the therapeutic foster home, attends

33

ISP's for foster children in caseload, assists in obtaining and maintaining appropriate school placement including attendance and participation in IEPs, visits the school once per month to consult with school officials to assess progress of each foster child in caseload and makes recommendations that will enhance child's academic, behavioral and emotional development.

The consultant coordinates Treatment Team Meetings for child on a quarterly basis, develops new or revised treatment plan, and submits to supervisor (Qualified Mental Health Professional) for review and approval. He or she helps develop and reviews behavior charts; ensures that all children in caseload receive EPSDT screenings, dental, routine medical exams, provides 24/7 coverage and provides crisis intervention services as needed, ensures children in caseload are participating in an extra curricular activity, assists at monthly group therapy sessions, provides transportation for children in caseload during times of crisis, coordinates treatment, visitation or other communication with biological family or others involved in the treatment of the children in caseload as stated in the child's Treatment Plan or ISP; complies with all Medicaid rules and regulations regarding provision and documentation of Medicaid Services, and meets weekly with supervisor.

Requirements
Bachelor's degree in social work/counseling/or related social service field
Good verbal and written communications skills
Basic computer skills

9) Family Consultant/Continuum of Family Care Worker (Proposed New Position)

The continuum of family care caseworker's primary duties will be to assist families to address issues that would otherwise lead to their child's removal from the home and to address issues in order to more speedily return children in out-of-home care to their families. The continuum of family care caseworker responds to referrals within 48 hours, attends ISP's and concurrent planning meetings to assist DHR and the family in arriving at a workable permanency plan for their child, assists the family in finding the resources necessary to comply with their service agreement, helps arrange appointments, reminds the family of the appointments and assists with transportation when necessary. This worker provides family support services, family counseling, parenting skills training, therapeutic visitation support and other services as needed, monitors the family's progress in meeting the requirements of the ISP or service plan, and provides monthly progress reports to DHR. He or she maintains regular contact with the DHR caseworker, works flexible hours determined by needs of the family, is available 24/7 to the families in caseload, visits the family frequently (two hours per week or more if necessary), stays in close contact with families through notes, letters, phone calls, visits, and visits the family a minimum of bi-weekly for the duration of the family's involvement with TPI. The continuum of care worker advocates for the family based on the belief that it is best for a child to be raised in his or her own family when possible, translates and interprets to the family the requirements necessary for the child's continued placement or return to the family, counsels and motivates the family to comply with

34

requirements, assesses risk/safety factors, and aids families in meeting medical needs and substance abuse treatment needs. This worker teaches the family housekeeping, homemaking and organizational skills needed to provide a nurturing environment, schedules and holds staffing 7 days prior to anticipated closure of case, meets all requirements for billing to Medicaid for all allowed services and, submits to supervisor all required reports and/or documentation.

Requirements
A BSW or bachelor's degree in a human services related field and experience in working with children and families
Good verbal and written communication skills
Basic computer skills

10) Foster Parent Mentor (proposed new position)

A foster parent mentor's primary responsibilities will be to participate in the treatment planning for a child, meet with the child's biological family, visit with the child and family as necessary in the biological parent's home, provide information to the biological family on the techniques that have worked in diminishing problems associated with emotional and behavioral difficulties, assist the biological family in obtaining necessary services to fulfill the family's service agreement, assist the biological family with homemaking skills and also to serve as a respite resource for the child once the child has returned home.

Requirements
Two years experience as a foster parent or two years of equivalent experience providing services to families and children
Reliable transportation

11) Human Resources Coordinator

The human resources coordinator serves as a liaison between the administrative staff of TPI and line staff, (family consultants, licensing specialists, secretaries, and foster families). He or she serves as the primary contact for staff or foster parents who have a grievance with TPI. He or she begins the grievance process as outlined in the TPI policy. The human resources coordinator assists in training of staff and foster parents, visits district programs at least once every two months, investigates issues related to level of morale, turnover rate and employees' satisfaction with job, and assists in the implementation and operation of Kaleidacare, TPI's information management system.

Requirements
Bachelor's degree
Minimum of five years experience in social services setting
High degree of computer skills
Demonstrates skill in communication and conflict resolution
Possesses a thorough knowledge and understanding of TPI policies regarding: 1) equal

employment opportunity; 2) hiring and firing; 3) grievance procedures; 4) promotions and pay scales; and 5) disciplinary action

12) Intake Specialist

The intake specialist is responsible for receiving and documenting all information needed to place a child in a therapeutic foster home.

The responsibilities and duties of the Intake Specialist are as follows:

Intake/Matching - Maintains a current and accurate list of all available therapeutic foster parents with information about the foster parents that will expedite the matching and acceptance of a child; responsible for all incoming referrals by documenting all pertinent information, contacts the foster parent selected as a possible match for a child referred and schedules time for the foster parents to read and discuss the referral information, schedules meeting between foster parents, child and his/her DHR social worker, schedules a pre-placement visit, remains on call 24/7 during pre-placement visits and until family consultant is assigned; sets meeting with the family consultant, supervisor, DHR social worker, biological parents, child, foster parents and other pertinent individuals, conducts the initial intake evaluation, and helps write the initial treatment plan; sets up file on new cases, and meets weekly with supervisor.

Other Related Responsibilities – The intake specialist also maintains a log of all referrals, including those accepted and those not accepted with reason for any rejections, and notifies local DHRs and school systems of children placed in their counties and school system. He or she attends, if designated by program director, all local DHR provider meetings, schedules a time each month to visit the DHR in counties served by program for the purpose of meeting with Social Workers and Supervisors to maintain partnership relationship, attends local DHR and Health Fairs, and attends GPS training.

Requirements
A BSW or bachelor's degree in a human services related field and considerable experience in working with therapeutic foster parents and children.
Good verbal and written communications skills
Basic computer skills

13) Licensure Specialist

This licensed social worker serves as the person who recruits, trains, approves, and re-approves foster homes. The licensure specialist identifies avenues for advertising, responds to inquiries, and screens prospective foster parents by sending packets of material to families, and answers phone inquiries. He or she conducts GPS, Deciding Together, Therapeutic Foster Care Training and In-service training for foster parents, makes visits to prospective foster homes to ensure compliance *with Minimum Standards for Foster Homes* and the *Therapeutic Foster Home Care Manual*, and completes the written foster home study for each family, including contacting references, obtaining

fingerprints for Criminal Background Checks, submitting CAN clearances and verifying all required data. This individual submits letter to County DHR regarding prospective foster parents, obtains ACWIS numbers for approved foster homes and conducts updates as needed. He or she adds newly approved foster homes to the data base on Kaleidacare, assists with development of annual training calendar for in-service training for foster parents, tracks in-service training for foster parents, and maintains adequate supply of GPS material for training. He or she conducts 6 and 12 month re-approval of foster homes; obtains input from family consultants regarding foster homes when conducting the re-approvals, assists with matching of foster parents to determine agency's ability to serve child, attends ISPs as needed, facilitates the transfer of foster homes as needed, tracks approved foster homes by county, addresses partnership issues with foster families as needs arise, closes foster homes as needs arise; maintains LBSW, LGSW or LCSW licensure requirements; participates in peer reviews as necessary, and meets weekly with supervisor.

Requirements
LBSW, LGSW or LCSW with experience in foster home approval preferred
Has or will attend GPS and Deciding Together Leadership Training
Good verbal and written communications skills
Basic computer skills

14) Licensure/Program/Medicaid/Data Entry Secretary

The responsibilities and duties of individual assigned to do licensing, program, Medicaid data entry secretarial positions are as follows:

The program secretary organizes charts on new children coming into the program, types group notes, staff meeting notes, school letters or any other requested documents, proofs monthly reports and Treatment Plan Reviews for signatures, files all weekly, monthly, and quarterly documents in children's records -- such as behavior and medication charts, home and school visit notes, individual group notes, monthly reports, Treatment Plan Reviews, EPSDT's, ISP's, IEP's, all other educational documents, and any additional DHR or referral documents or letters, keeps track of needed reports or documents from family consultants such as monthly reports, Treatment Plan Reviews, EPSDT's, referral information, and, meets weekly with supervisor for supervision. The program secretary also opens office, retrieves answering service messages, distributes faxes; answers multi-line phone system and pages family consultants or other persons as needed, schedules appointments for children with the psychiatrist, and maintains adequate office supplies.

The licensing unit secretary  assists with answering multi-line phone system, organizes charts on new parents coming into the program, files all weekly, monthly, quarterly, and yearly documents in parent files, keeps track of needed reports or documents from licensing specialist, maintains list of open homes for weekly review and maintains spreadsheets for such weekly reviews. This individual records and tracks CEU's for re-approval, files foster home studies in chart, up-dates parent records on Kaleidacare, prepares GPS notebooks for new GPS classes, types and prints GPS and Therapeutic

37

Training certificates, mails applications and brochures to new prospective parents, contacts foster parents by phone or letter as information is needed for approval, new approvals or updates. He or she types and prints approvals and re-approvals for each family, places a copy in chart, types and mails notification letters to County DHR, mails approval letters and ID cards to parents upon approval, and makes sure each chart is complete with all current information.

Requirements
Ability to deal with the public
Ability to operate office equipment
High School Graduate or GED
Experience with TPI and EDS Data Entry
Good typing skills

15) Psychiatrist (Contract Position)

The psychiatrist(s) under contract with TPI conducts psychological assessments and prescribes psychotropic medications based on the child's diagnosis, provides behavior management interventions to the family and child, provides crisis consultation, and, arranges for hospitalization when indicated.

Requirements
Board Certified Psychiatrist
Hospital Privileges

16) Quality Assurance Director

The quality assurance director serves to ensure that TPI meets and maintains the highest quality services for children and families served, maintains the standards set by SDHR for Child Placing Agencies and Therapeutic Foster Homes, and meets the standards and policies set by Alabama Medicaid Agency for billing for Medicaid Rehabilitation Options Services. The QA director makes recommendations that will improve the efficiency of TPI, and develops corrective action plans when needs are identified. This individual monitors the District Programs Peer Review System, and formalizes the collection of data and statistics that measure the quality and quantity of services provided, i.e., 1) Parent/Child Satisfaction Surveys 2) Demographic data on children entering program 3) Disruptions in TPI program 4) Discharges to less or more restrictive settings. The QA director also provides written reports of needs assessment, assists TPI with maintaining COA Standards; collects and maintains data and statistics for the Annual Report to SDHR; maintains training data on professional staff to assure compliance standards for Child Placing Agencies and Therapeutic Foster Home Programs.

Requirements
Master's degree in social work or social service related field
Extensive travel to district offices

Experience in children's therapeutic setting
Must be bondable

### 17) Quality Assurance Specialist

The quality assurance specialist serves to ensure that TPI meets and maintains the highest quality services for the children and families served. This individual reviews performance to ensure that TPI meets/exceeds the standards set forth by SDHR for Child Placing Agencies and Therapeutic Foster Homes, Alabama Medicaid Agency for billing for Medicaid Rehabilitation Option Services, Foster Family-based Treatment Association (FFTA) and Council of Accreditation (COA). The QA specialist establishes and facilitates the peer review system for District Program, audits each quarter 25% of the District Program's charts to include at least one record from each of the family consultants, and audits the foster parents' documentation (Medicaid Reporting Form/Progress Summary) of the services they provided to the child. The QA specialist audits bi-weekly one client file from each family consultant's caseload, establishes quarterly meeting dates and arranges suitable meeting place for the QA Committee, notifies Committee members of the time and place of all meetings, obtains signed agreement from all committee members regarding confidentiality, prepares a "Summary of Case Review Findings" report for the program director and Committee chair after each Quarterly Review, and tracks in-service training hours for professional staff.

Requirements
Bachelors Degree in Social Work or other human service field
At least 2 years experience working in therapeutic services
High level of computer skills
Strong organizational skills
Strong oral and written communication skills
Ability to learn how to write quality outcome measures

### 18) Supervisor

The Supervisor's primary duties are to manage the day to day activities of family consultants and/or licensing specialists who supervise foster parents and implement the therapeutic foster child's Treatment Plan. This supervision includes general decision making regarding admissions, discharges, activity involving TFC foster parents and children and supervision of program staff. The supervisor meets with assigned staff for weekly conferences, conducts semi-annual and annual evaluations of assigned staff, attends treatment team staffing for children entering program, assigns child/therapeutic foster homes to appropriate staff, provides input to assist with proper matching of child with therapeutic foster home, reviews treatment plans to assure services are consistent with the child's needs identified in ISP and other documents, attends meetings for semi-annual and annual evaluations of foster parents, reviews and approves Medicaid billing by professional staff, attends ISPs as needed or requested; addresses partnership issues with foster families as needs arise, maintains LBSW, LGSW or LCSW licensure requirements, and participates in peer reviews as necessary.

39

Requirements
Licensed bachelor of social work with five years of experience in children's therapeutic setting.

19) Supervisor-In-Charge

The SIC has duties identical to those of the Supervisor with the addition of being in charge of the office in the absence of the Program Director.

Requirements
Minimum of licensed bachelor of social work with five years of experience in children's therapeutic setting

20) District Program Director

The district program director has responsibility for the overall function of the district office. This individual supervises and trains staff for their positions, assists with crisis intervention, maintains a good working relationship with DHR, meets weekly with Supervisors and/or other under direct supervision.

He or she also writes and places ads in papers as needed, creates recruitment strategies, compiles application material, screens applications of prospective foster parents, conducts interviews with prospective foster parents, assists licensure specialist in visiting homes, and  determines compliance with *Minimum Standards for Foster Family Homes.*

When the responsibility is not assigned to other staff, the district program director screens referrals from DHR, makes sure that application material contains necessary information (i.e., psychological, medical, school information, etc.), contacts caseworker for needed material on child, reviews application of child, presents application to staff, contacts caseworker when appropriate home is found, interviews child and caseworker, reviews child's history with foster parents, schedules pre-placement visit with prospective foster family, takes child to prospective foster home for pre-placement visitation, interviews child and foster parents after visit to determine if interaction was positive and schedules second pre-placement visit. He or she assigns child/family to family consultant, and monitors status of treatment plan that is due within first 10-days of child's placement. The Director leads group meetings at night, and ensures 24 hour crisis coverage. He or she also assists with training of foster parents and family consultants, leads social skills training for children, and leads either adult or teen groups.

Requirements
Master's Degree in Social Work or Social Service Related Field
At least five years of experience involving increasing levels of supervision and management working with foster children and families.

### 3. Staff Clearances to Work with this Population

Once a prospective employee has been identified, the individual is required to complete: 1) Child Abuse and Neglect Clearance (CAN), 2) ABI/FBI Finger Print and accompanying forms, 3) Motor Vehicle Record Clearance form and 4) provide names, addresses and phone numbers of three or more references, including former and/or current employers. If the individual is a licensed professional such as LBSW, LGSW, or LCSW, the TPI Personnel Coordinator queries the Board of Social Work Examiners website to verify the current status of the individual's license. Once an employee is hired, the clearance information is filed in the employee's personnel record.

TPI has ABI/FBI clearances and CAN clearances on all employees. These reports are on file in the TPI Montgomery office and are available for review by SDHR.

If an allegation of abuse, neglect or other incident of malfeasance is reported about a staff member, TPI will report the allegation to DHR immediately. The staff member in question will be placed on paid administrative leave while the report is investigated. If the allegation is founded the staff member will be disciplined according to TPI's Progressive Discipline Policy. If an incident is considered serious, the employee on whom the report is founded will be terminated from employment with TPI.

If an allegation of abuse, neglect or other incident of malfeasance is reported about a foster parent, the child in the foster parent's home will immediately be moved to another foster home; DHR will immediately be notified of the allegation, and the report will be thoroughly investigated. If the allegation is founded, the foster parent's contract with TPI will be terminated. All of TPI staff and foster parents are advised of their mandated responsibility to report any incident of abuse or neglect.

### 4. Education, Experience and Training of Management Staff and Staff Development Program

#### a. Education, Experience and Training of Management Staff:

The Administrative staff of TPI includes the Executive Director, who holds a doctorate in counseling, is licensed as a Professional Counselor, and has 35 years experience working with children and families. He was elected to the National Board of directors of the FFTA, a national organization of TFC providers. The Corporate Vice President is a LPC and has 22 years of experience working with children and families. The Assistant Executive Director is a LCSW with 38 years of direct and administrative experience serving children and families. The Quality Assurance Director is a LPC with 6 years experience working with children and families. The Business Manager is a CPA with 7 years of experience. The Human Resource Coordinator has a Bachelor's degree with 10 years of experience.

There are eleven District Program Directors, four of whom hold either a LCSW or LGSW degree and seven with a Master's degree in Social Work or Counseling. TPI

41

presently has supervisors and direct staff with experience in providing in-home services based on the Homebuilders model.

### b. Staff Development Program

TPI is committed to hiring the most qualified employees for all positions and provides opportunities for employees to receive continuing education within their respective professional fields. TPI has a schedule of orientation for new employees, and offers regular in-service training and paid attendance to conferences and special seminars. The company also provides annual specialized training for all staff.

TPI has a structured training program for all new employees as well as ongoing training for all staff and foster parents. During the initial week of employment, all employees are given orientation to TPI and to their particular job responsibilities. They receive instruction from the Program Director or supervisor regarding the policies of the program and what is expected of the position, the chain of command of TPI, the policy regarding sick leave, vacation time, office hours and other information concerning office protocol and training on Kaleidacare. They are required to read the Program narrative, the Employee Handbook, and their Job Description. The training outlines in the *Therapeutic Foster Care Manual* and the *Minimum Standards for Child Placing Agency* are used by the Program Director and supervisor to identify the specific topics that will be covered in the first six weeks of orientation. Hours of training are tracked by the QA Specialist and a copy of the Orientation Training Hours is placed in all employees' personnel files.

An additional part of the orientation process for new employees is in the form of a visit to the Montgomery office. This day visit is an opportunity for new staff to meet Dr. Mitchell and other members of management, learn about the history of TPI, and give feedback regarding their training in the district programs. They are asked to complete a questionnaire regarding the training process, and are given an opportunity to ask questions, make comments, or voice concerns.

Employees should have been on the job at least one month before making the Montgomery orientation visit. One day every 2 months is designated for the orientation in Montgomery. The orientation program begins at 10 AM and concludes by 2 PM. The visit allows new staff to feel more connected to TPI as a whole, offers management the opportunity to meet new employees, and gives valuable feedback regarding the training process in each office.

**Family Consultant Orientation Training** - The training schedule for a new Family Consultant (FC) consists of 6 weeks of on-the-job-training. By the end of week one, the FC will have received the basic orientation to TPI. The FC will have read a child's chart, been assigned a "buddy", shadowed the "buddy" on home visits or other service visits, written a version of the visit and met for one-on-one supervision with the program director and supervisor.

During weeks two and three, the FC is assigned two cases; shadows "buddy" on additional visits, and receives instruction in the proper use of the Behavioral Chart,

42

Medicaid Billing Sheets, mileage logs and other forms. The employee will also have attended staff meetings, group meetings of foster parents, group meetings of children, and learned crisis intervention protocol.

During weeks four, five and six, the FC is assigned two additional cases per week. The supervisor meets with the new FC three hours during week four, two hours during week five, and one hour from then on. The supervisor attends the employee's first two ISP's and IEP's and reviews the meeting and documentation with the new worker.

The Staff Training and Support form will reflect 20 hours of pre-service training, and will be placed in the personnel file at the district and main offices of TPI. Also the new FC will attend the first therapeutic training of foster parents that comes available after he or she is hired.

**Licensure Specialist Orientation Training** - All Licensure Specialists (LS) who conduct home studies for prospective foster parents must be licensed social workers in good standing with the Alabama Board of Social Work Examiners. Prior to being hired for this position, prospective employees will be required to provide to TPI a copy of his/her Alabama license with a current seal verifying that he/she is licensed to practice social work in the state of Alabama.

The LS training is similar to the FC training and is conducted over the first 6 weeks of employment. The difference consists of training on the specific duties of the LS who will be responsible for recruiting, training, approving, evaluating and re-approving the therapeutic foster parents. By the end of the sixth week, the LS will have read the Minimum Standards for Foster Family Homes and Therapeutic Foster Home Care Manual, a child's chart and a foster home study, gained knowledge of the goals and principles of the RC Consent Decree, shadowed his/her "buddy", received at least 20 hours direct supervision from the Program Director and supervisor, attended all GPS and Therapeutic Training during first six weeks of orientation, and received assigned cases beginning with two cases during weeks two and three. Employees with no prior experience will be given other training as needed to meet the requirements of the job of LS. A more detailed training outline is on file in the TPI Administration office.

**Intake Specialist Orientation Training** - The program director or supervisor will provide specialized orientation training for this employee during the first two weeks in this position. It is anticipated that the Intake Specialist will be a promotion from current employees who have knowledge of TPI and the children served, therefore the training will focus primarily on the new tasks associated with the employee's assignment. The employee will shadow the individual currently responsible for Intake within the office. The employee will be trained on the information needed prior to a child's admission to the program and shown how to input this into Kaleidacare, match the child to a home, arrange pre-placements and placements, and attend meetings with local DHR offices.

**Quality Assurance Specialist Orientation Training** - As with the Intake Specialist, it is anticipated that the QA Specialist will be an experienced TPI employee who will be promoted to the position; therefore, the employee will have general knowledge of services provided through TPI.

The training schedule for a new QA Specialist is based upon a two-week period of time. The new QA Specialist will shadow the individual currently performing the QA duties and will observe the weekly audit and assist in a "hands on" manner. The QA Specialist will be trained on facilitation of the Quarterly Peer Review, the procedure regarding documentation of In-service Training Hours, and the procedure for conducting Satisfaction Surveys. This individual will also be trained on the Outcome Measure Verification accomplished by tracking at 3, 6, 12, 18 and 24 months for all children discharged from TPI.

**Secretarial Orientation Training** - A successful secretarial applicant should have a strong clerical background with computer skills, excellent spelling ability, excellent telephone manner, and good rapport in dealing with the public.

The following schedule is used to train secretaries:
The new secretary receives at least one hour of orientation from the program director regarding the policies of the program, what is expected of his/her position, the chain of command of TPI, policy regarding sick leave, vacation time, office hours and other information concerning office protocol.

The secretary will read the Employee Handbook, and the Secretarial Job Description. The program director will meet with the new secretary, discuss and answer any questions.

**Specialized Training** - TPI - Cultural Sensitivity/Harassment Training - All new TPI employees will receive within 30 days of hire a minimum of 2 hours training on the topic "Understanding and Valuing Cultural Differences" and the agency's zero tolerance policy on harassment. The program director, supervisor, human resource coordinator or other appropriate individual designated by the program director, will conduct this training. The program director may require the employee to attend training conducted by professionals within the community if such training is available.

Behavior Management Practices – All new professional employees receive 8 hours of training on the agency's behavior management practices, including skill building in analyzing behaviors, recognizing the behavior's antecedent and skills to change the antecedent and consequent conditions. Employees also receive an annual 4 hour refresher course.

CPR and First Aid Training – New staff who are not certified at the time of hire, are required to attend the next scheduled CPR and First Aid training. Most district offices have certified trainers. If there is no certified trainer on staff in a particular office, this training is obtained locally through the American Red Cross, YMCA, or private certified

44

trainer. All professional staff are provided with a first aid kit that is required to be carried in their vehicle.

Blood Borne Pathogen Training – At least one individual from each District Office has participated in a three hour training session on how to control infectious diseases and blood borne pathogens within offices and service areas. These individuals then train the other staff and foster parents in the Exposure Control Plan, documentation of training and documentation of any incidents.

    In-Service Training - TPI meets the *Therapeutic Foster Care Manual* standard of 40 hours of staff In-Service training per year. TPI has provided annual training for all staff, established a training budget for each District office, and encouraged staff participation in all applicable training opportunities. To assure that each staff person receives the necessary number of In-service training hours, as well as the mandatory content, a training agenda has been established and provided to each program director. The program directors are instructed to use one half-hour to one hour in each weekly staff meeting to conduct In-Service training. A training log is maintained in each district office by the QA Specialist to monitor the training hours for the office staff.

Program Directors' Training – Program Directors meet quarterly in Montgomery for general training regarding policies, procedures and other changes in TFC care. Directors and TPI Administrative Staff also meet annually in April for a three day training seminar.

Other Staff In-Service Training – All TPI Supervisors meet annually in June in Montgomery for a day of training. Intake Specialists meet annually in August. Licensing Specialists meet annually in March. QA Specialists attend quarterly meetings in Montgomery for training. All secretarial staff meet annually in December in Montgomery for a day of training.

Weekly In-Service Professional Training – Program Directors hold weekly staff meetings to review cases and conduct other TPI business regarding policy and procedures. During this time, the staff receives 30 minutes to an hour of in-service training. Attendance Logs and Training Agendas are maintained. Each TPI District office maintains extensive training records for each staff person. This information is available and is reviewed by the SDHR Program Monitor who conducts annual site visits. TPI Administration has developed a comprehensive training agenda for all staff and has provided training materials, books, videos, tapes, etc. Program Directors have a training budget for procuring specialists in particular areas to give seminars, and may also use the training budget to pay the registration fees for staff to attend conferences or other select training seminars.

Foster Parent Training – All TPI District offices conduct monthly group meetings for all foster parents. During the meetings two hours of continuing training is presented on a variety of therapeutic topics including positive mental health, behavioral techniques, crisis management and techniques for working with biological families.

45

<u>Licensure Training</u>– All licensed staff are required to remain in good standing with their respective licensure board, attend training to maintain their respective license and provide documentation of licensure renewals.

TPI is approved by the Alabama Board of Social Work Examiners for provision of training for licensed social workers.

## 5. TPI's Response to Critical Incidents and Emergencies

Each District office has a 24/7 on-call system for responding to critical incidents and emergencies. All professional staff within a TPI District office are required to carry pagers and/or cell phones. Foster parents are required to immediately notify TPI staff of any critical incidents or emergencies. Foster parents are provided with names and pagers and/or phone numbers of staff within their respective District office. Offices have one pager number or cell phone that is rotated among staff who are on call 24/7 for specified time. The pager or cell phone is then passed to the next person on call at the end of the shift. Professional staff are required to respond to all pages and calls within 15 minutes. Foster parents and/or county DHR caseworkers can be assured of an immediate response when needed.

TPI staff interventions will vary based on the nature of the incident/emergency. Responses may include addressing the issue through a phone discussion, home visit, school visit, respite, or involvement with the DHR caseworker, law enforcement, medical or other professional personnel. Staff who are on call also have access to their supervisor or program director. If necessary, these individuals will assist the on call professional with decision making or actual on site support. It is TPI's intent to stabilize and preserve the placement, and if respite seems to be indicated, each office maintains a list of homes that have the capacity to provide respite to children with different needs. All incidents/emergencies require that the assigned TPI professional complete an incident report within 72 hours describing the incident and the interventions. These reports are reviewed by the program director and forwarded to the executive director.

Runaway Procedure Protocol:
1. Foster parents are to try to ascertain if the child is in nearby vicinity or at a known location (i.e. relatives, friends, other).
2. Assess safety issues
3. Immediately notify TPI staff.   After assessment, it will be determined if law enforcement is to be notified.
4. TPI staff will notify the DHR caseworker/supervisor or the DHR on call worker if the runaway occurs after hours.

Foster parents and TPI staff shall avoid the following:
1. Threatening a child that he/she will be locked up.
2. Trying to talk with a child immediately following a runaway episode when foster parents or child may be angry.

46

3. Taking the runaway episode personally. Running away could be a survival technique learned prior to this placement, and this incident could be an opportunity to teach the child a new way of handling problems.

Suicidal Risk Protocol:

If a child makes a suicide attempt, medical emergency personnel are to be summoned immediately. When a child shows signs of suicidal thinking, the following procedures are recommended:

1. Foster parent should immediately call/notify Family Consultant, Supervisor or Program Director to discuss child's verbalizations or behaviors indicating active suicidal ideation.
2. **DO NOT** leave child alone.
3. Get help from family members to structure environment (put away objects that the child could use in a harmful manner toward self or others).
4. TPI staff will assess need for further interventions.
5. TPI will notify DHR promptly of the suicidal threat as well as other indicated parties as pertinent to the child's welfare.
6. TPI and DHR will work together in making a decision about the appropriate placement or interventions that will be necessary to assure the child's safety and treatment.

Incident reports **must** be made under the following conditions:

1.   Physical or sexual abuse reported by the foster child.
2.   Physical or sexual allegations made against the foster child.
3.   Threatened harm or danger to a foster child.
4.   Threatened harm or danger to another individual by the foster child.
5.   Any incidents involving the use or potential use of fire arms.
6.   Any incidents involving use of unauthorized vehicles.
7.   Any incidents involving the use of illegal drugs or substance abuse by the foster child or foster parent.
8.   Any serious behavior problems or physical aggression resulting in physical restraint of the foster child to prevent injury, harm or danger to self or others.
9.   Any incidents involving the assistance or intervention of law enforcement officials.
10.  Threats of suicide or attempted suicide by the foster child.
11.  Failure to administer medication as prescribed (Allowing child to administer own medication, giving child medication in amounts and at times not prescribed, allowing child to deliver medication to school personnel, respite foster parents, etc.).
12.  Psychiatric Hospitalization.
13.  Other type hospitalization.
14.  Runaway.
15.  Theft of property or property damage, both intentional and unintentional.
16.  School related behavior issues resulting in suspension or expulsion.
17.  Other serious acts of harm by or to a foster child not listed.

47

18.    Child left alone and/or unsupervised.

The Family Consultant is to take the following action when completing an incident report:

1.    Immediately contact Supervisor or Director.
2.    Complete the report within 72 hours of the incident.
3.    The report form as found on Kaleidacare is to be completed in its entirety.
4.    Under the Location of Incident and Persons Present, include the name of the District Program.
5.    In addition to the basic information, location of incident and persons present, the Family Consultant is to give detail information regarding the incident, interventions used and the resolution. If there is more than one type of incident regarding the same child, the report should address each report individually with interventions and resolution clearly stated for each.
6.    Print, sign and date copy of report.
7.    The Program Director is to review and approve Family Consultant's report.
8.    Submit a hard copy to the Executive Director.
9.    Place a hard copy of the report in the child's record in Section 10.
10.   As required by Alabama Child Abuse and Neglect Reporting Laws, injuries to a foster child must be reported to the Local DHR office holding custody of the child.
11.   A follow-up report signed and dated by Program Director must be submitted within 30 days to the Executive Director to report on the outcome resolution.

The Management Team will review incident reports deemed significant by the Executive Director quarterly to assess need for additional corrective action or policy revisions.

## 6. Volunteers and Interns

TPI works with various university social work departments throughout the state and allows students to do their internship with this agency. Interns must meet the same qualifications as employees of TPI with regard to having a valid driver's license, auto insurance, good driving record, suitable CAN and ABI/FBI clearances, suitable medicals and suitable reference checks. TPI does not utilize volunteers other than intern students. Each program director works directly with the school of social work of the university and develops an individualized curriculum for the student's internship. Files on interns are stored with personnel files in the Montgomery TPI office.

## IV.    I.    REFERENCES

In addition to individuals from the State Department of Human Resources, the following list includes at least one (1) reference from each of the 9 Regions.

48

Alabama Department of Human Resources
50 North Ripley Street
Montgomery, Alabama 36130
Susan Ward, Administrator
(334) 242-1650

Gary Mitchell, Program Manager
(334) 242-9500

Gloria Derico, Program Specialist
(334) 242-1650

Etowah County DHR
P.O. Box 8445
Gadsden, Alabama 35902-8445
Henry Small, Director
(256) 549-4103
Jefferson County DHR
P.O. Box 11926
Birmingham, Alabama 35202-1926
Granville Andrews, Supervisor
(205) 945-3700

Tuscaloosa County DHR
P.O. Box 70100
Tuscaloosa, Alabama 35407-0100
Christy Holt, Supervisor
(205) 554-1100

Madison County DHR
2206 Oakwood Avenue, NW
Huntsville, Alabama 35810-4499
Tonita Phelps, Assistant Director
(256) 535-4500

Mobile County DHR
P.O. Box 1906
Mobile, Alabama 36633-1906
Stanley Robinson, Supervisor
(251) 415-3500

Elmore County DHR
P.O. Box 787
Wetumpka, Alabama 36092-0707
Sue Parker, Supervisor
(334) 514-3200

Russell County DHR
P.O. Box 67
Phenix City, Alabama 36868-0067
Wanda Martin, Director
(334) 214-5854
Cullman County DHR
P.O. Box 987
Cullman, Alabama 35056-0987
Marsha Parker, Supervisor
(256) 737-5300

Lauderdale County DHR
P.O. Box 460
Florence, Alabama 35631-0460
Katherine Watson, Supervisor
(256) 765-4000

Houston County DHR
P.O. Box 2027
Dothan, Alabama 36302-2027
Sally Schenz, Supervisor
(334) 677-0400

Please refer to pages 10 to 12 for additional references.

**Summary:**

Therapeutic Programs, Inc. proposes to continue providing the same high quality therapeutic foster care that has been provided for the last 16 years, and to strongly support the enhancements included in the RFP regarding increased work with biological families and stepping-down children as soon as they are ready. We will develop an intensive, time-limited, crisis oriented, short term, family focused support service to prepare families for their child's return home. We will continue to assist them to decrease future family disruptions. We will seek to decrease the length of

time in TFC and to increase the percentage of children who return home. Our foster parents will be instructed in the time-limited aspect of TFC and in the role that they can play in the child's life by stepping-down with the child to a less intensive placement when other placements are not available.

William J. Mitchell, Ed.D.
Executive Director
Therapeutic Programs, Inc.

## Compensation for Providing Service

### A. Daily Rate:

Therapeutic Programs, Inc. proposes developing a total of 775 slots within all nine geographical regions. The proposed rate which covers all program requirements and expanded core services will be $ 110.00 per day for a yearly total of 110 X 775 X 365 = 31,116,250. Please note that the actual number of children served would be greater than 775 because two step-down children could be served utilizing only one TFC slot. A breakdown of the proposed daily rate for each region is listed below:

| REGIONS | REQUESTED SLOTS | Compensation per Region |
|---|---|---|
| Region 1 | 45 | 1,806,750 |
| Region 2 | 100 | 4,015,000 |
| Region 3 | 75 | 3,011,250 |
| Region 4 | 70 | 2,810,500 |
| Region 5 | 64 | 2,569,600 |
| Region 6 | 165 | 6,624,750 |
| Region 7 | 54 | 2,168,100 |
| Region 8 | 68 | 2,730,200 |
| Region 9 | 134 | 5,380,100 |
| **Grand Totals** | 775 | 31,116,250 |

### B. Medicaid Capability:

TPI has billed Medicaid for Rehabilitation Services since the inception of the Option in 1996. The company possesses a thorough knowledge of Chapter 105 of the Medicaid Provider Manual. The company certifies that it has the capacity to bill Medicaid electronically for core services authorized on a child's ISP.

### C. Reimbursement Ratios:

The portion of the daily rate proposed to be paid directly by the Department of Human Resources will be $ 37.40 per day per child.

The portion that TPI will recover through "net Medicaid reimbursement" will be $ 72.60 per day per child.



# State of Alabama
# Disclosure Statement
### (Required by Act 2001-955)

| ENTITY COMPLETING FORM | William J. Mitchell, Executive Director | |
|---|---|---|
| ADDRESS | 2900 McGehee Road | |
| CITY, STATE, ZIP | Montgomery, Alabama  36111 | TELEPHONE NUMBER (334) 280-3330 |

| STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD | Department of Human Resources | |
|---|---|---|
| ADDRESS | 50 Ripley Street | |
| CITY, STATE, ZIP | Montgomery, AL  36130-4000 | TELEPHONE NUMBER (334) 242-1160 |

This form is provided with:

[ ] Contract    [✔] Proposal    [ ] Request for Proposal    [ ] Invitation to Bid    [ ] Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

[✔] Yes    [ ] No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
|---|---|---|
| Department of Human Resources | Therapeutic Foster Care & | Fiscal Year 03-04 |
| Department of Human Resources | Assessment Services | $20,490,444 |
| | | |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

[ ] Yes    [✔] No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
|---|---|---|
| Not applicable | | |
| | | |
| | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
|---|---|---|
| No Public Officials will benefit from the proposed transaction | | |
| | | |
| | | |

**OVER**

2. List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| No individuals fall into this category | | | |
| | | | |
| | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

Not applicable

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

Not applicable

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| No consultant or lobbyist was used to obtain the contract, | |
| proposal or invitation to bid. | |
| | |

By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.

_____          4/8/05
Signature                                Date

_____          4/8/05
Notary's Signature                       Date

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: May 18, 2005
BONDED THRU NOTARY PUBLIC UNDERWRITERS
Date Notary Expires

Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.



# State of Alabama
## Department of Human Resources

License Number: **23941**

This is to certify that

**Therapeutic Programs, Inc**
(Licensee)

is hereby granted this LICENSE to conduct and maintain

**Therapeutic Programs, Inc**
(Name of Child Care Facility)

as a    **Child Placing Agency**          for          **N/A**,
(Type of Child Care Facility)                    (Number of children)

ages **N/A**,
(Age range of children)

located at **2900 McGehee Road,**                    **Montgomery**
(Street Address)                                (City)

in **Montgomery**,                            State of Alabama.
(County)

This LICENSE shall be in force for a period of two years from the **18th** day of **June, 2004,** to the **18th** day of **June, 2006,** subject, however, to be revoked on the failure of the above-named Child Care Facility to comply with the provisions of Title 38, Chapter 7, *Code of Alabama 1975*, or the standards and regulations prescribed by the Department of Human Resources of the State of Alabama in accordance with the provisions of said law.

IN WITNESS WHEREOF, I have hereunto set my hand this **14th** day of **July, 2004**.

BY _____, Ph.D,
Commissioner
State Department of Human Resources

.R-FSD-1969
(8/99)

**NOTE:** This LICENSE must be posted in a conspicuous place on the premises.

RECEIVED

NOV 1 8 2004

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: *Camillia Therapeutic Foster & Adoptions Agency LLC*

I.    **MANDATORY REQUIREMENTS**
      Failure of the vendor to provide the following mandatory items will result in the
      disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
| B. | A completed Taxpayer Identification form is included? | ___ | ___ |
| C. | A completed Disclosure Statement form is included? | ___ | ___ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

      **Note: If No is checked for any item A through E, provide a brief explanation.** ____

      _____
      _____
      _____

II.    **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

*Grammatical errors*    A.    Organization Information: Includes the name of Organization, mailing address, site
*Poor organization*           address, name, title and phone number of contact person. This section includes
                              the names, titles and responsibilities of the governing board of directors, officers,
*Did not give length*         and paid consultants, delineating each individual role and relationship to the
*of time w/ agency*           vendor. The proposal provides a brief statement regarding the goals of the
*Mission statement*           Organization or its mission statement.    Proposal also includes the date of the most
*does not mention treatment*  recent financial audit and the name of the audit firm.

*Initial Treatment*    B.    History: A brief history of the formation and development of the vendor's
*Plan /DHR*                  organization, with the date of incorporation or, if unincorporated, the date the
*Mentions C. Discipline*     business began, other programs operated in the past and currently, and prior
*Policy - does not define*   names of the organization, if any. A description of all the services provided by the
                             vendor, including the locations of service sites.

*References listed*    C.    Management Structure: Describe the management structure of the Organization to
*here.*                      include the sub-units and the established chain of administrative command.
                             Include an organization chart. Ratios of staff to supervisors should be clearly
                             indicated.

*Not in line.*         D.    Qualifications and Experience of Vendor: The proposal includes a description of
                             the vendor's qualifications and experience for assuring the successful completion
                             of the requirement of the RFP.

                       Percent awarded Section II: ___40___ x 25 max points = ___10___ Total

Plaintiff's EXHIBIT
9

III.    Start Up Plan (50 Points Max)

*Does not address training of staff* A. Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

*Does not address training of FP on stepdown* B. Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

Percent awarded Section III: ___40___ x 50 max points = ___20___ Total

IV.    Referral, Admission and Exclusion Policy (75 Points Max)

*Does not address Preschool children approval* A. Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

B. Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

*Does not address assult fire setting suicide weapons* C. Proposal describes specific criteria for exclusion from the program. *No reject no rsccl  H day notice*

Percent awarded Section IV: ___40___ x 75 max points = ___30___ Total

V.    Service Delivery (250 Points Max)

*Page 2 of RFP. in home services to birth parents not mentioned* The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

A. Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

*Step Down-* B. Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

C. Program Services for Therapeutic Foster Care Providers:

*Initial Treatment Plan-error* 1. Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)

*Does not refer to Beh Man Plan training* 2. Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

*Are goals in the ISP included in the monthly report* 3. Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

*Adoption - conducts*
*Respite*

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

*Startup*
*No not in*
*this area.*
*states has Med*
*software -*

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

*Does not speak*
*to how they will*
*handle suspensions*

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

*not in this area*
*Page 46 staff*

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

*Not in this area*
*Under Discharge*
*on p.27*
*Does not spell out*

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

*NO*

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

*States FP page 30.*
*p.39*
*Does not mention billing*

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

*As needed*
*who will provide*

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

*Yes Not under*
*Service delivery*

12. Does the proposal address how the program will, consistent with the ISP, ensure the youth's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

*not under*
*Service*
*delivery* *No*

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

*No*

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

*No*

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

*Page 28,29*
*Respite*

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: ____30____ x 250 points = ____75____ Total

## VI.    Target Area (50 Points Max)

*Does not speak
to need
Reason-
There are offices there- no other reason*

A.  If service is proposed as statewide, is the proposal identified as such?
B.  If the service is not statewide, the proposal should identify reasons why.

Percent awarded Section VI: ____40____ x 50 max points = ____20____ Total

## VII.    Discharge Policy (75 Points Max)

*Youth court?
How will they
measure progress
no reject reject
emergency discharge
Step down -
regular foster
home
entry-level foster*

A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
C.  The proposal describes the vendor's policy concerning re-admission of children.
D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

Percent awarded Section VII: ____40____ x 75 max points = ____30____ Total

## VIII.    Prior Experience (75 Points Max)

*Success?
Children served
out comes
foster homes*

The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

Percent awarded Section VIII: ____40____ x 75 max points = ____30____ Total

## IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)

*Highly qualified
as evidenced by ...*

A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.

*Experience .*

B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.

*not clear if
they would hire
+ release or wait to
hire   P.41*

C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.

*Experience
not listed

Training of staff*

D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

*Page 46*

*investigation p 46*

*Camellia staff*
*should not*
*begin assessment*

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

*Confidentiality*
*statement*

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: _____40_____ x 150 max points = _____60_____ Total

X.    **References (50 Points Max)**

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: _____40_____ x 50 max points = _____20_____ Total

XI.    **Compensation for Providing Service (200 Points Max)**

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: _____100_____ x 200 max points = 200 Total

Total Points awarded:

| Section II: | | 10 |
|---|---|---|
| Section III: | | 30 |
| Section IV: | | 3 d |
| Section V: | | 75 |
| Section VI: | 20 | 20 |
| Section VII: | | 30 |
| Section VIII: | | 30 |
| Section IX: | | 60 |
| Section X: | | 20 |

295

Section XI: _____200_____

Final Points for Proposal: _____495_____

Signature of Scorer: _____    Date: _____

Alabama Department of Human Resources
## Therapeutic Foster Care Proposal Cover Page

Organization Information:

Name of Organization: _Children and Families First of Alabama_

Address: _120 West 11ᵗʰ Street_

City: _Anniston_　　　　State: _Alabama_　Zip:_36207_

Telephone:_( 256 ) 591-6229_　　Fax: _( 256 ) 831-4837_

e-mail address:_darleneldavis@bellsouth.net_

Federal Employer Identification Number (FEIN):_20-2635262_

Name/title of Authorizing Official: _Darlene L. Davis, Executive Director_

Signature of Authorizing Official: _[signature]_　　Date: _4/10/05_

Contact Person Information:

Name/title of program contact person: _Darlene L. Davis, Executive Director_

Address:_120 West 11ᵗʰ Street_

City: _Anniston_　　　　State: _Alabama_　Zip:_36207_

Email Address:_darleneldavis@bellsouth.net_

Telephone:_( 256 ) 591-6229_　　Fax:_( 256 ) 831-4837_

**Target Information:**
*Indicate proposed target areas. Specify county/counties and proposed number of slots.*

Region 1: Counties _N/A_　　　　No. of Slot(s)_N/A_

Region 2: Counties _N/A_　　　　No. of Slot(s)_N/A_

Region 3: Counties _N/A_　　　　No. of Slot(s)_N/A_

Region 4: Counties _N/A_　　　　No. of Slot(s)_N/A_

Region 5: Counties _N/A_　　　　No. of Slot(s)_N/A_

Region 6: Counties _Jefferson(20) Shelby (10) Chilton(10) Talladega (20) Clay (10) Randolph (10) Cleburne (10)_　No. of Slot(s) _90_

Region 7: Counties _N/A_　　　　No. of Slot(s)_N/A_

Region 8: Counties _St. Clair(20) Calhoun (20) Etowah (20) Cherokee (10) DeKalb(10) Marshall (10)_　No. of Slot(s)　_90_

Region 9: Counties _N/A_　　　　No. of Slot(s) _N/A_

*Alabama Department of Human Resources · 50 Ripley Street · Gordon Persons Building · Montgomery, Alabama 36130*




PLAINTIFF'S
EXHIBIT
10

PROPRIETARY STATEMENT

Indicate any page(s) to which vendor has a proprietary claim: Pages 16-19 are asked to be proprietary.

The Paradigm of Care Model is the creative work of the Executive Director and the Assistant Director. The

Paradigm of Care Model is intended to be published and copyrighted.

## ATTACHMENT C

### STATE OF ALABAMA
### REQUEST FOR IMPAYER IDENTIFICATION NUMBER
#### STATE COMPTROLLER'S OFFICE

INSTRUCTIONS. In order to receive payment by the State of Alabama, a correct tax identification number, name and address must be on our files. To insure that accurate tax information is reported on Form 1099 for fed" income tax purposes, please:

1.    In PART 1 below provide your Tax Identification Number and check FEIN or SSN. Also provide the name and address to which payments should be sent. in addition, provide the name of the legal signatory authority for your organization (the individual authorized in your Constitution and/or By-laws to legally obligate the organization, for example, sign a contract on behalf of the organization).

2.    Circle the business designation that identifies your type of trade or business in PART 2.
3.    Sign and return this form as part of the response to the RFP:

PART I - TAXPAYER IDENTIFICATION NUMBER, NAME AND ADDRESS.

IDENTIFICATION NUMBER  20-2635262
Check one ____X____    Federal Employer Identification Number (FEIN)
                       Social Security Number (SSN)

NAME OF ORGANIZATION:    Children and Families First of Alabama            PHONE: 256-591-6229

LEGAL BUSINESS ADDRESS:    20 West 11th Street Anniston, Alabama 36207

FAX:    256-831-4837        EMAIL: darleneldavis@bellsouth.net

NAME & TITLE OF LEGAL SIGNATORY AUTHORITY: Darlene L. Davis, Executive Director

PART 2 - BUSINESS DESIGNATION. Circle the designation that identifies your type of trade or business.

1 -    CORPORATION, PROFESSIONAL ASSOCIATION OR PROFESSIONAL CORPORATION (A corporation formed under the laws of any'state within the United States)
2      NOT FOR PROFIT CORPORATION (Section 501 (c) (3))
3      PARTNERSHIP, JOINT VENTURE, ESTATE OR TRUST
4 "    SOLE PROPRIETORSHIP OR SELF-EMPLOYED (Identification number must be Social Security Number)
5      NONCORPORATE RENTAL AGENT
6      GOVERNMENTAL ENTITY (City, County, State or U.S. Government)
7      FOREIGN CORPORATION OR FOREIGN NATIONAL OR OTHER FOREIGN ENTITY
       (A corporation or other foreign entity formed under the laws of a country other than the United States or an individual temporarily in the United States who pays taxes as a citizen of a country other than the United States.)

NOTE: Failure to complete and return this form may subject you to backup withholding in the amount of 20% of future payments pursuant to Section 3406, Internal Revenue -Code.

UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE EXAMINED THIS REQUEST AND TO THE BEST OF MY KNOWLEDGE AND BELIEF, IT IS TRUE, CORRECT AND COMPLETE.

_____    April 10, 2005    ( 256 ) 591-6229
        SIGNATURE                  DATE                        TELEPHONENUMBER
                                                               (If different from above)
Executive Director
        TITLE

### PLEASE INCLUDE FEDERAL IDENTIFICATION NUMBER ON ALL INVOICES

20

# Children and Families First of Alabama

## IV.   PROGRAM NARRATIVE

## A. ORGANIZATIONAL INFORMATION AND MANAGEMENT STRUCTURE

### 1. Organizational Information and Contact Person

Corporate Headquarters:

Children and Families First of Alabama
20 West 11th Street
Anniston, Alabama 36207
Telephone #: 256-591-6229
Executive Director: Darlene L. Davis
darleneldavis@bellsouth.net

### 2. Governing Board and Other Agents

Children and Families First of Alabama is a corporation organized exclusively for charitable purposes with the meaning of Section 501(c)(3) of the Internal Revenue Code. The Board of Directors shall be not less than three or more than five, unless changed by a duly adopted amendment to the Articles. The Directors, except for the President of the Board, receive no compensation for their services as Directors, but may receive reimbursement for their expenses as may be determined by the Board.

The Board Members of Children and Families First of Alabama are as follows:

| Name | Address | Position | Term |
|------|---------|----------|------|
| Eva Pei Yee Lin | 146 Little Mill Road Sandown, NH 03874 | Director | 4/2006 |
| Kyle Dawson | 40 Christopher Lane Alamo, CA 94507 | Chairperson | 4/2006 |
| Brian Uitti | 405 Alcazar Court Danville, CA 94526 | Director | 4/2006 |
| Pam Uitti | 405 Alcazar Court Danville, CA 94526 | Vice-Chair | 4/2006 |
| Robert Burton | 1785 Lynwood Drive Concord, CA 94519 | Director | 4/2006 |

1

The Corporation Officers and Non-Board Members are as follows:

| Name | Address | Title |
|------|---------|-------|
| Patrick E. Davis | 2837 Willow Pass Road<br>Concord, CA 94519 | President |
| William Burdine | 2837 Willow Pass Road<br>Concord, CA 94519 | Executive<br>Director of BAAYFS |
| Brian Uitti | 405 Alcazar Court<br>Danville, CA 94526 | Corporation Secretary |
| Ann McDonough | 4244 Elario Drive<br>Concord, CA 94519 | Corporation CPA |
| Peter Kutrubes | 146 Little Mill Road<br>Sandown, NH 03874 | Corporation Attorney |
| Darlene Davis | 4105 Cloverdale<br>Anniston, AL 36207 | Executive Director CFFA |

## 3. History

### A. Formation and development of organization

Children and Families First of Alabama originated with the single idea of creating a child placing agency that better addressed the placement needs of children and youth in need of out-of-home care. Together, a counselor and social worker created a treatment model for therapeutic foster care based on using a multi-dimensional assessment tools to assess child/youth placement needs, foster home placement, treatment levels, and discharge.

### B. Incorporation

Children and Families First of Alabama was incorporated on April 6, 2005 under the laws of the State of Alabama as a nonprofit 501(c) (3) organization.

### C. Current Programs

Children and Families First of Alabama offers no current operating programs because the agency is in the process of applying for licensure as a Child Placing Agency.

### D. Program Services

Children and Families First of Alabama will be providing services upon approval of its application as a Child Placing Agency. It is the program intention to provide a continuum of care to include traditional foster care, enhanced foster care and therapeutic foster care services.

2

4. Mission Statement

To provide a continuum of quality community and family-based services to at-risk children/youth and families by caring, advocating and supporting the realization and development of independent essential life skills.

A. Goals

- Stabilize and integrate the child into a supportive loving and caring community
- Enable the development of life skills that lead to healthy and productive relationships with family, self, and others
- Empower a positive self esteem and self respect
- Empower an understanding of personal rights and respect for the rights of others
- Enable emancipation, if needed, toward independent living
- Maintain regular Public School attendance
- Enable employment opportunities to gain work experience
- Engage participation in opportunities in school and community programs of sports, music, and the arts
- Engage participation in opportunities for spiritual formation and development through religious activities in the community
- Increase protective factors
- Encourage a sense of service to the community

B. Philosophy and Vision

The philosophy of the program is based on the work of three influential educators: Viktor Frankl's Man's Search for Meaning, Benjamin Singer's The Future Focused Role Image, and Frederick Polak's The Image of Auschwitz. Frankl's message is based on his prison experience at Auschwitz where he discovered that it is essential to have something *meaningful* and *significant* to do and a *purpose* to *live* for. Polak's research maintains that individuals with *vision* are powerfully enabled while individuals without vision are at risk. Singer identified that the power of a child's vision combined with the *support* of a loving-caring community can motivate success and overcome adversity and hardship. Children and Families First of Alabama, through a caring and supportive community endeavors to instill each child with a sense of **meaning, significance, purpose, and vision.**

5. Management Structure

Children and Families First of Alabama is governed by a Board of Directors (Refer to Section A. Item 3). The President is a paid employee, responsible for ensuring the appropriate execution according to the mission of the board. The Executive Director of Children and Families First of Alabama will report directly to the President. The Children

3

and Families First Executive Director is responsible for the fiscal policies and practices of the agency and oversees the Marketing/ Fundraising, Quality Assurance and Community Outreach. The Assistant Director will report directly to the Executive Director and is responsible for supervision of social services. The Assistant Director is responsible for the supervision of social workers, foster parents, volunteers and mentors, and office manager. The Assistant Director shall have supervisory responsibility for no more than five social workers (a ratio of 5 to 1).

Below is the organizational chart for Children and Families First of Alabama:



6. **Financial Audit**

Children and Families First of Alabama does not have a financial audit due to the agency's recent incorporation. The vendor will use an accountant that utilizes an accounting system that is consistent with General Accepted Governmental Accounting Principles (GAAP) and maintains accounting records that account for and document the source and application of all funds from all sources.

## 7. Qualifications and Experience of Vendor

This is the first time that Children and Families First of Alabama will work as a Child Placing Agency to provide services to children/youth and families in Alabama. The staff is composed of individuals with broad knowledge and work experience of providing services in Alabama to children/youth in therapeutic foster care and their families/relatives. The key staff of Children and Families First of Alabama has worked collaboratively over the past ten (10) years with seven (7) school systems in the State of Alabama, six (6) county Department of Human Resources, and other adjunct agencies in the counties where the children/youth, the foster parents and the families live. The key staff has served on the Quality Assurance Team in county Department of Human Resources, county Children Policy Councils, and numerous advocacy task forces for children/youth and their families in Alabama, as well as the United States of America. Collectively the key staff of Children and Families First of Alabama has over one hundred (100) years of service to children/youth, foster families, kinship care placement and birth families.

Children and Families First of Alabama is dedicated to excellence in the delivery of services to the children and families of Alabama. Our children deserve the best and excellence should be expected. In order to hold us to excellence, all staff working with children/youth and their families will have training beyond the standard training required by the standards for a Child Placing Agency.

The President/Founder of this agency is an ordained minister in the North California/Nevada Conference of the United Methodist Church. He has a bachelor of science degree in secondary education and biology from Jacksonville State University and a Master's of Divinity from Emory University. He has dedicated the past thirty three-years (33) to working with children/youth and their families throughout his career in Alabama and California as a youth minister, educator, and United Methodist minister.

The President/Founder of this agency is an ordained minister in the North California/Nevada Conference of the United Methodist Church. He has a bachelor of science degree in secondary education and biology from Jacksonville State University and a Master's of Divinity from Emory University. He has dedicated his life to working with youth throughout his career in Alabama and California.

The Executive Director is a licensed professional counselor in Alabama and national board certified counselor. She has a Bachelor of Arts degree in psychology with a minor in biology from Jacksonville State University and a Master of Science degree in counseling from Jacksonville State University. She has worked with children and families throughout her career in Alabama and California. Her work has gained recognition in her development of a children's program for abused children whose parents were involved in Parent Anonymous currently known as Concern for Children. This pilot was one of twelve grants awarded in the United States. Working collaboratively with a colleague, they gained recognition for their program development for mentally ill adults living in a half-way house. This recognition was given by the

5

National Institute of Mental Health. The Executive Director is a certified Trauma Resolution Therapist, and a trained facilitator for Parent Project®. The Executive Director has worked with hundreds of children/youth during the span of her career collaboratively with the Department of Human Resources to reunify children with their families.

The Assistant Director is a licensed bachelor level social worker. She has a Bachelor of Social Work from Jacksonville State University and a Master of Science Degree in counseling from Jacksonville State University. She is a trained Group Preparation and Selection co-leader and has worked in therapeutic foster care for ten years. She has served as a member of a county quality assurance team for four years as well as served as the co-chair of the committee. She is skilled in writing and implementing behavior specific treatment plans, behavior support plans and able to conduct multi-dimensional assessments. She is knowledgeable of both the minimum and therapeutic standards for Alabama foster care as well as Medicaid services.

The Quality Assurance Officer is a licensed clinical social worker, private independent practitioner, and a member of the Academy of Certified Social Workers. She has a Bachelor of Social Work Degree from Montevallo University and a Master of Social Work Degree from the University of Alabama. She has worked with the chronic mentally ill during the span of her career. She and the Executive Director worked seven years together with chronic mentally ill. They gained recognition for their program development for mentally ill adults living in a half-way house. This recognition was given by the National Institute of Mental Health. While working in the community of mental health she took a leave of absence to work as a Medicaid Reviewer with the State Department of Mental Health.

The Office Manager has worked with a therapeutic foster care agency for over ten years. She is certified to teach CPR and First Aid. She also has ten years experience as an Office Manager with a group of mental health professionals. She is experienced and knowledgeable of Medicaid standards as well as certified in medical billing and coding.

8. **The following is a case study of a young child that the Executive Director and Assistant Director treated collaboratively.**

1. **Identifying information**

| | |
|---|---|
| Client: | M |
| Age/Gender: | 5 year old female |
| Intake Diagnosis: | PTSD, Intermittent Explosive Disorder |
| Medication: | None |
| Admission GAF: | 55 |

## 2. Behavioral/Emotional Issues at Intake

- Frequent temper tantrums
- Refusal to follow rules
- Constant arguing with adults
- Cries frequently when frustrated, afraid or hurt
- Experiences frequent nightmares
- Agitation
- Irritability
- Sexual Abuse
- Sexualized behavior
- Regressive Behavior
- Loss of parent due to incarceration
- Loss of parent due to murder
- Multiple placements

## 3. ISP/Treatment Plan Goals

- Placement with adoptive family
- Visits with adoptive family
- School success
- Eliminate all inappropriate sexual behaviors
- Terminate temper tantrums and replace them with calm, respectful compliance with adult directions
- Resolve the loss and begin reinvesting in relationships with others and in age-appropriate activities

## 4. Summary of Interventions

- Educated adoptive parents on ways to help M deal with her losses
- Educated adoptive parents on the stages of the grieving process and how to answer questions
- Train the adoptive parents in specific ways they can provide comfort, consolation, love, companionship, and support to M in grief
- Conducted session with the foster parent to say good-bye to M in a healthy, affirming way
- Facilitated good-bye session with M and foster parents for the purpose of giving M permission to move on with her life
- Consulted, designed and implemented a plan to manage M's emotional distress and negative outbursts at school
- Implemented the necessary steps to protect M and other children in the foster home from sexual play
- assessed the foster family dynamics and identified factor and precipitating events that contributed to the emergence of sexual play
- Educated the foster family and the adoptive parents concerning the impact of trauma

- Helped the foster parents and the adoptive parents clarify and communicate to M what is acceptable and unacceptable behavior in the family.
- Taught the foster parents and the adoptive parents how to implement behavior modification
- Monitored the interventions and made adjustments as necessary to ensure success
- Taught foster parents and adoptive parents effective parenting techniques
- Worked collaboratively with the therapist providing individual therapy

## 5. Progress

- Foster Parents were able to say good bye to M and give permission for moving on with her life
- M was able to grieve her losses and has invested herself in bonding with her adoptive parents
- M is no longer engaging in inappropriate sex play
- Temper tantrums have decreased significantly and the intensity has decreased as well
- M is successful in her academic performance

## 6. Discharge

M was discharged after eights months of work.  She has been adopted by the adoptive parents she was placed with.  At the time of discharge her GAF was 70.

## 9. References

Marsha Busby
Director of Cleburne County Department of Human Resources
Post Office Box 25
Heflin, Alabama 36264
(256) 463-1705

Sharon Clegg
Finance Officer Cleburne County Department of Human Resources
Post Office Box 25
Heflin, Alabama 36264
(256) 463-1710

Deborah DuHon
Program Supervisor Cleburne County Department of Human Resources
Post Office Box 25
Heflin, Alabama 36264
(256) 463-1700

References continued:

Nancy Vernon, Attorney
P. O. Box 130
Jacksonville, Alabama 36265
(256) 435-5402
Nnvt@aol.com

Brenda Stedham, Attorney
313 East 11th Street
Anniston, Alabama 36207
(256) 236-1119

Paula Clark, Regional Coordinator State of Alabama Department of Public Health
223 Haynes Street
Talladega, Alabama
(256) 315-4897
Pclark@adph.state.al.us

## B. START UP PLAN

Children and Families First of Alabama will provide excellent service delivery to system of care children and their families. The administrative staff and professional staff of Children and Families First of Alabama are dedicated to a family and community based system of service delivery. Children and Families First of Alabama will adhere to the standards set forth in the regulations governing Foster Care, Therapeutic Foster Care and a Child Placing Agency. Our goal is to be ready to place children in appropriate foster care homes by October 1, 2005.

Children and Families First of Alabama is submitting the following projected time table for providing a plan of action:

| ACTIVITY | DATE | STATUS | |
|---|---|---|---|
| Development of Board and Structure | January, 2005 | Completed | |
| Board Meeting | February, 2005 | Completed | |
| Submit RFP for TFC | April N, 2005 | Pending | Contract before License |
| Submit Application For Child Placing Agency | April 20, 2005 | Pending | |

9

| ACTIVITY | DATE | STATUS |
|---|---|---|
| Check Posting of Notice of Intent to Award TFC Contract | May 5, 2005 | Pending |
| Marketing to Agencies and Community | May 12, 2005 | Developing Brochures and media |
| Meet with Alabama State Department | May 26, 2005 | Awaiting Selection |
| Recruit Foster Families | June 1, 2005 | Pending |
| Submit Application for Medicaid Provider Enrollment | June 1, 2005 | Pending |
| Train Foster Families | July 1, 2005 | Pending |
| Finalize Contract Documents and Budget | August 5, 2005 | Pending |
| Finalize Hiring of Staff | August 15, 2005 | Agreements secured for administrative staff and social worker(s) |
| Train Staff in Policy & Procedures | August 15, 2005 | Ongoing |
| Assure the capacity to bill Medicaid electronically for core services authorized on the ISP | August 15, 2005 | Pending |
| Place Referrals | October 1, 2005 | Ongoing |
| Have a minimum of two (2) TFC homes in each county of target areas | May, 2006 | Ongoing |

## C. REFERRAL, ADMISSION AND EXCLUSION POLICY

Children ages birth until they age out of the system are referred to Children and Families First of Alabama, Therapeutic Foster Care Program from the state of Alabama. The primary target regions in Alabama are Region 6 and Region 8 with referrals accepted from any county in Alabama. Children served through the Therapeutic Foster Care Program have special emotional and behavioral needs that require out of home placement but are not in need of psychiatric hospitalization, correctional facilities, or residential treatment programs.

### 1. Target Population – Therapeutic Foster Care (TFC)

Children and Families First of Alabama will provide therapeutic foster care services to children from birth until they age out of the system, male or female, with emotional and/or behavioral problems that would preclude traditional foster care as a viable option. Referrals must have a DSM-IV R diagnosis on Axis I that would require the treatment

and structure offered through TFC. A DSM-IV R diagnosis alone does not warrant a placement into TFC. The diagnosis must have an accompanied behavior that would require the treatment and structure of TFC before a child/youth would be a candidate for TFC placement. The diagnosis must be documented by a current psychological or psychiatric evaluation within the last 24 months.

A. **Services for Non-TFC Siblings**

Children and Families First of Alabama will provide services to siblings of TFC children/youth from birth until they age out of the system and male or female. The agency will provide homes for non-TFC siblings which may not have diagnoses requiring TFC service. The agency will not bill for services for the non-TFC siblings unless approval is authorized through the ISP. A treatment plan will be developed for the non-TFC sibling(s) based on needs identified in the comprehensive assessment.

B. **Services for Enhanced Foster Care (EFC)**

Children and Families First of Alabama will provide Enhanced Foster Care services in order to keep sibling groups of four (4) or more together. Foster parents will meet the State criteria for EFC, and the decision to make EFC shall be determined by the ISP team.

2. **Admission and Intake Policy and Procedure**

Children and Families First of Alabama will have available foster parents trained to provide Therapeutic Foster Care, Therapeutic Foster Care for Step-Down, Enhanced Foster Care and Traditional Foster Care. The agency shall maintain a no reject/eject policy providing a child/youth is appropriate for the program and a placement can be identified. All programs will adhere to the same Admission and Intake Policy and Procedure.

A referral to Children and Families First of Alabama is made by initial contact with the agency. This contact may be made face-to-face or through telephone contact. The referral procedure is outline below.

A. **Referral Procedure**

The admission process begins with a referral to Children and Families First of Alabama. County DHR offices may refer any child/youth who meets the criteria for admission by submitting a referral packet to the agency with the following information:

A. DHR 1870 Application for Service
B. Psycho/Social History and Comprehensive Child and Family Assessment
C. Completion of Agency Assessment of Service Form
D. Individualized Service Plan

11

    E.  Summary of Placement History and Outcomes
    F.  Current and Previous Psychological/Psychiatric Evaluation and DSM-IV
       Diagnosis
    G.  Medical History
    H.  Academic Information
    I.  EPSDT Referral
    J.  Discharge Plan

After submission of a referral, Children and Families First of Alabama will begin the assessment process to determine whether the child/youth meets the agency admission criteria and determine the level of service delivery the agency can provide. After determination of the level of service, the agency will match a child/youth with an available foster care home within the recommended level of service. The admissions process will begin when a foster home has been identified as a resource for a child/youth and family.

## B. **Admission Procedure**

Following completion of the preadmission assessment, Children and Families First of Alabama will do the following:

1.  Obtain and record information that will enable a plan to be developed for a child/youth and his/her family
2.  Involve in planning for the child/youth, the family, relatives or other adults who have meaning to the child/youth
3.  Meet with the foster home matched with the child/youth to review child/youth's and family records to insure they have the attributes that would best serve the child, as well as his/her family. All the agencies therapeutic foster care homes are assessed and assigned a level based on their skills and training. The matching process is completed with information gathered from GPS training, agency assessments, and/or the contract process.
4.  Schedule a meeting and/or visit between the foster family and child/youth for purpose of getting acquainted and assessing compatibility. After the visit, the agency will meet with both the foster family and child/youth to assess the progress of the visit. If it is determined that the child/youth and/or foster family are not a good match, the agency will reassess the child/youth's needs and resume the matching process if another foster home is available.
5.  If both child/youth and foster family agree and time permits, a second visit will be scheduled. It is preferred that the second visit be in the foster home to acquaint the child/youth with the home, community, and lifestyle. After the visit, the agency will meet with both the foster family and child/youth to assess the progress of the visit. If it is determined that the child/youth and/or foster family are not a good match, the agency will reassess the child/youth's needs and resume the matching process if another foster home is available. If time does not permit a second visit, refer to Step six (6).

6. If both child/youth and foster family agree to move forward with the placement, an overnight visit will be scheduled. It is preferable that the overnight visit be for one or two nights and that the child/youth return to their previous placement so the agency may assess the final visit. If at any time during the preplacement process either the child/youth and/or foster home wishes to end process, the agency will respect the decision and seek to remediate any problems if possible. After the visit, the agency will meet with both the foster family and child/youth to assess the progress of the visit.

7. If both the child/youth and foster family are determined to be the best match, a placement date will be identified and the admissions process will continue.

## C. Admission Requirements

1. At the time of admission, Children and Family First of Alabama shall have one of the following:

    A. A signed Placement Agreement (DHR-DEC-824) for children who are not in the custody of DHR at the time of admission.

        (a) The agreement is to be with one of the following:
            (i)   Parent of the child;
            (ii)  The person (other than the parent) or agency having legal custody of the child by virtue of a court order and a copy of the court order granting such custody; or
            (iii) The agency authorized to provide out-of-home care by virtue of an agreement between the parent and the agency copy of the authorization between the agency and the parent shall be included.

        or

    B. An Inter-agency Agreement (DHR-DFC-823) (for children who are in the custody of DHR at the time of admission) which includes:

        (a) Statement regarding provision of medical, dental, surgical, and hospital services; and participation in recreational, social, and educational;
        (b) A copy of the most recently completed ISP form.

        or

    C. A court order granting custody of the child to the child care facility, if appropriate. Neither the Placement Agreement nor the Inter-Agency Agreement is needed if the child care facility is granted custody through a court order.

2. The referring DHR County will complete an agency admissions packet and submit it to the agency **prior** to placement of a child/youth.

3. When a child is to be placed, appropriate representatives of the referring agency, Children and Families First of Alabama, appropriate family members, and, when

13

advisable, the child shall share in the planning. There shall be developed a written case/treatment plan which shall include at least the following:

A. The date the plan is developed.
B. Expected outcome or goal of placement (permanent plan) and overall time frame for achievement.
C. An assessment that identifies the strengths and needs of the child and family and designates measurable, realistic, achievable and time limited service objectives or goal. Assessments completed by Children and Families First of Alabama are as follows:
D. Preparation for placement, including pre-placement visits when plan is developed prior to placement.
E. Designation of the actions that each person (i.e. the child, the child's family, the foster family, the child-placing agency and the referring agency) will take to reach the objectives and goals; including timelines for achievement.
F. Visiting plan for child with his/her family and any other persons significant to the child, if appropriate.
G. Written consent for emergency medical or surgical care, necessary vaccinations and immunizations, and routine medical care and treatment.
H. A written plan of the financial responsibility of the parent, guardian, legal custodian, or other responsible person or agency.
I. Review the plan every forty-five (45) days.
J. The agency or person legally responsible for the child (ren) shall receive a copy of the written plan.

## 3. Criteria for Exclusion from Program

The following are the criteria for exclusion from the Children and Families First of Alabama therapeutic foster care program:

1. Child is actively psychotic/delusional that he/she is considered a danger to themselves, the placement family and/or the community. An example is the child has command hallucination that tells them to harm themselves and/or someone else.

2. Child is suicidal/homicidal to the point that 24 hour supervision is needed to prevent him/her from killing themselves or others.

3. The child's physical well-being requires around the clock nursing care.

4. The aggressive behavior (physical attacks, severe property damage) can not be managed behaviorally by using verbal directions and intense behavioral management techniques.

14

D. SERVICE DELIVERY

Services provided by Children and Families First of Alabama are as outlined in the **Minimum Standards for Child Placing Agencies**, the **Minimum Standards for Foster Family Homes,** and the **Therapeutic Foster Care Manual** though not limited to these standards.

Children and Families First of Alabama will have foster parents trained to provide Therapeutic Foster Care, Therapeutic Foster Care for Step-Down, Enhanced Foster Care and Traditional Foster Care.

The Children's and Families First of Alabama Therapeutic Foster Care (TFC) program is an intensive program for emotionally disturbed children which incorporates clinical treatment services provided within a supportive foster home setting. The goal of TFC is to enable a child to overcome emotional, behavioral or psychiatric problems in a highly supportive, individualized, and flexible placement, thereby assisting the child to move to a less intensive placement, or to return to the natural home or family setting. TFC services are behavioral, psychological, and psychosocial in orientation. Therapeutic Foster Parents (TFP) are selectively recruited and trained in behavioral management and treatment interventions designed to meet the individual needs of the child. Therapeutic foster parents will agree to allow a child/youth placed with them to step-down. This prevents another placement from taking place.

Children and youth placed in therapeutic foster care have multidetermined problems. To optimize the probability of favorable outcomes, interventions should have the capacity to address the multiple risk factors contributing to the problem. Therefore intervention will have the capacity to address pertinent risk factors across the youth's social network (i.e. family, peers, school, and support system).

All clinical staff will be trained using the Paradigm of Care model. This model of treatment is a family and community based. A key feature of the Paradigm of Care model is its capacity to address multiple risk factors. Important to this treatment model is that these risk factors are addressed in a highly individualized and strategic fashion. This model requires a careful and ecologically based functional analysis of identified problems. Interventions are then selected strategically to provide maximum leverage for achieving a specified goal. Thus, the interventions are comprehensive, but individualized.

The Paradigm of Care model addresses ten (10) principles of treatment areas that are important when developing a comprehensive treatment plan. These areas are:

- Staff understands how identified problems relate in context to a broader system
- Staff shall emphasize the positive and use systemic strengths as producers of change (i.e. protective factor evaluation)
- Interventions are designed to facilitate responsible behavior and decrease irresponsible behavior in the youth/child and family (i.e. protective factors vs.

| Agency Service | Time Frame | Provider |
|---|---|---|
| Group basic living skills education | Monthly | CFFA Social Worker |
| Individual Counseling | Per requested need | CFFA Counselor |
| Family Counseling – Birth family | Twice monthly | CFFA Counselor |
| Independent living group | Monthly | CFFA Agency |
| Behavior Support Plan (BSP) | Implemented daily | CFFA Foster parent, Case Worker, Counselor and other staff |
| Multi-dimensional assessment of child/youth and/or family | Intake, treatment, case reviews, discharge & aftercare | CFFA Social Worker, Director, and/or Counselor |
| Discharge planning | Intake and throughout placement | CFFA Social Worker, Director, and/or Counselor |
| Family meetings | Monthly | CFFA Social Worker |
| Extracurricular activity | Weekly | CFFA Agency |
| Social service project | Yearly | CFFA Agency |
| Behavior support services | Per requested need | CFFA Agency |
| Tutoring | Per requested need | CFFA Tutor |
| Support for medical and dental services | Per requested need | CFFA Social Worker & Foster parent |
| Transportation support | Per requested need | CFFA Social Worker, Staff, and Foster parent |
| Financial support (allowance, school and community activities, clothing, etc.) | Per requested need | CFFA Agency |

b)    Level Two (Yellow)  (Mild 1 – 2 Months)

| Agency Service | Time Frame | Provider |
|---|---|---|
| Crisis Intervention | 24-hour support 7-days a week | CFFA Social Workers/Director |
| Emergency & Planned Respite | 48-hours per month | CFFA Foster home |
| Weekly home visits and weekly telephone contact with TFC parent(s) and TFC child/youth | Weekly | CFFA Social Worker |
| Weekly contact with child/youth's teacher(s) and/or school counselor | Weekly | CFFA Social Worker and/or foster parent |
| Case management | Throughout placement | CFFA Social Worker |
| Treatment plan review | Every 45-days | CFFA Assistant Director |
| Quality assurance review | Every 90-days | CFFA QA Officer |
| Mental health consultations | Ongoing | CFFA Social Worker and Directors |

| Agency Service | Time Frame | Provider |
|---|---|---|
| Therapeutic visitation support with birth family | Per ISP | CFFA Social Worker, foster parent, or other staff |
| Individual basic living skills education | Daily | CFFA Social Worker and foster parent(s) |
| Group basic living skills education | Monthly | CFFA Social Worker |
| Individual Counseling | Per requested need | CFFA Counselor |
| Family Counseling – Birth family | Twice monthly | CFFA Counselor |
| Independent living group | Monthly | CFFA agency |
| Behavior Support Plan (BSP) | Implemented daily | CFFA foster parent, case worker, counselor and Other staff |
| Multi-dimensional assessment of child/youth and/or family | Intake, treatment, case reviews, discharge & aftercare | CFFA Social Worker, director, and/or counselor |
| Discharge planning | Intake and throughout placement | CFFA Social Worker, director, and/or counselor |
| Extracurricular activity | Weekly | CFFA agency |
| Social service project | Yearly | CFFA agency |
| Behavior support services | Per requested need | CFFA agency |
| Tutoring | Per requested need | CFFA tutor |
| Support for medical and dental services | Per requested need | CFFA Social Worker & foster parent |
| Transportation support | Per requested need | CFFA Social Worker, staff, and foster parent |
| Financial support (allowance, school and community activities, clothing, etc.) | Per requested need | CFFA agency |

c)   **Level Three (Red)** (Moderate to Severe 1 – 3 Months)

| Agency Service | Time Frame | Provider |
|---|---|---|
| Crisis Intervention | 24-hour support 7-days a week | CFFA Social Workers/Director |
| Emergency & Planned Respite | 48-hours per month | CFFA agency foster home |
| Weekly home visits and weekly telephone contact with TFC parent(s) and TFC child/youth | Weekly | CFFA Social Worker |
| Weekly contact with child/youth's teacher(s) and/or school counselor | Weekly | CFFA Social Worker and/or foster parent |
| Case management | Throughout placement | CFFA Social Worker |
| Treatment plan review | Every 45-days | CFFA Assistant Director |
| Quality assurance review | Every 90-days | CFFA QA Officer |

| Agency Service | Time Frame | Provider |
|---|---|---|
| Mental health consultations | Ongoing | CFFA Social Worker and Directors |
| Therapeutic visitation support with birth family | Per ISP | CFFA Social Worker, foster parent, or other staff |
| Individual basic living skills education | Daily | CFFA Social Worker and foster parent(s) |
| Group basic living skills education | Monthly | CFFA Social Worker |
| Individual Counseling | Per requested need | CFFA Counselor |
| Family Counseling – Birth family | Twice monthly | CFFA Counselor |
| Independent living group | Monthly | CFFA agency |
| Behavior Support Plan (BSP) | Implemented daily | CFFA foster parent, case worker, counselor and Other staff |
| Multi-dimensional assessment of child/youth and/or family | Intake, treatment, case reviews, discharge & aftercare | CFFA Social Worker, director, and/or counselor |
| Discharge planning | Intake and throughout placement | CFFA Social Worker, director, and/or counselor |
| Extracurricular activity | Weekly | CFFA agency |
| Social service project | Yearly | CFFA agency |
| Behavior support services | Per requested need | CFFA agency |
| Tutoring | Per requested need | CFFA tutor |
| Support for medical and dental services | Per requested need | CFFA Social Worker & foster parent |
| Transportation support | Per requested need | CFFA Social Worker, staff, and foster parent |
| Financial support (allowance, school and community activities, clothing, etc.) | Per requested need | CFFA agency |

## 3. Training for Therapeutic Foster Parents in Levels Program

Children/youth entering the system of care in the 21st Century display more serious behavior and emotional problems. This can be attributed to the fact that these children have been exposed to more abusive and neglectful family circumstances. Children/youth are often the victims of neglect caused by parents who are actively addicted to drugs. Research tells us that children who do not have their basic needs met in the first three years of life tend to have difficulties in attachment. These difficulties display themselves in very trying and challenging behaviors. Often children are aggressive and families do not feel safe caring for children/youth with these types of behavioral problems.

Children and Families First of Alabama work with children/youth is based on the Paradigm of Care. This model begins with strengths and needs of children/youth being assessed prior to placement. From this assessment children/youth are methodically match

with foster parents who have the skills to meet the needs. Our goal is to provide each child/youth with the safety, stability, self-esteem and sense of hope that comes with a single and best foster care placement.

The Paradigm of Care identifies skills and supports foster parents need to maintain stable placements. Particular attention to the skills and supports needed by foster parents for children/youth are identified at all three level of care. Thus, foster parents will have specialized training specific to the level of care.

All Therapeutic Foster Care providers must meet the training requirements of the **Therapeutic Foster Care Manual**, the **Minimum Standards for Foster Family Homes**, and the **Minimum Standards for Child Placing Agencies**. In addition to the forty (40) pre-service training that is required, Children and Families First of Alabama will require that their Therapeutic Foster Care providers have a minimum of twenty (24) pre-service training hours prior to a child being placed in their home.

Training completed by Therapeutic Foster Care providers will be documented in the foster family record. Each provider will have a professional development plan which describes the contents and objectives of in-service training.

## a. Training At Level One (Green) and Respite Providers

- Group Preparation and Selection and required training according to standards set forth by the State Department of Human Resources
- Parent Project®-parenting curriculum for destructive children/youth
- Working With Birth Family
- Rebuilding Children's Lives-trains foster parents who care for children with challenging behavioral problems
- Behavioral Charting
- Dealing with Sexually Acting Out Behaviors in Foster Care
- Thirty (30) hours of training every year to help them understand the needs and characteristics of children in therapeutic care to provide knowledge concerning care and emotional support that children/youth need and appropriately manage children's behavior

## b. Training At Level Two (Yellow)

- Group Preparation and Selection and required training according to standards set forth by State Department of Human Resources
- Parent Project®-parenting curriculum for destructive children/youth
- Working With Birth Family
- Rebuilding Children's Lives - training foster parents who care for children with challenging behavioral problems
- Behavioral Charting
- Dealing with Sexually Acting Out Behaviors in Foster Care
- Psychotropic Medication

- Practical Ways to Prevent and Reduce Aggression in Children
- Teen Under The Influence-recognition of the problem and what to do about it
- Mental Illness In Children
- Forty (40) hours of training every year to help them understand the needs and characteristics of children in care to provide knowledge concerning care and emotional support that children/youth need and appropriately manage children's behavior.

### c.  Training at Level Three (Red)

- Group Preparation and Selection and required training according to standards set forth by State Department of Human Resources
- Parent Project®-parenting curriculum for destructive children/youth
- Working With Birth Family
- Rebuilding Children's Lives - train foster parents who care for children with challenging behavioral problems
- Behavioral Charting
- Dealing with Sexually Acting Out Behaviors in Foster Care
- Psychotropic Medication
- Practical Ways to Prevent and Reduce Aggression in Children
- Teen Under The Influence-recognition of the problem and what to do about it
- Working With Aggressive/Explosive Children/Youth
- Mental Illness In Children
- Legacy Of Childhood Trauma
- Behavioral Treatment of Self Abuse
- Forty-five (45) hours of training every year to help them understand the needs and characteristics of children in care to provide knowledge concerning care and emotional support that children/youth need to appropriately manage children's behavior

## B.  Service Delivery for Therapeutic Foster Care

Children and Families First of Alabama will at a minimum provide the following services to birth families and/or relatives, therapeutic foster children, and therapeutic foster parents in both therapeutic foster care and Step-Down therapeutic foster care:

### 1.  Services to Birth Family or Relatives of Child/Youth in TFC

Children and Families First of Alabama will provide:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Multi-dimensional assessment(s) of parental functioning | Intake, treatment, case reviews, discharge & aftercare | CFFA Social Worker, Director, and/or Counselor |

24

Services to Birth Family/Relatives of Child/Youth in TFC continued:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Case management to include referrals to services outside the agency and to support the ISP Team in family reunification | Duration of TFC placement | CFFA Social Worker |
| Therapeutic visitation coaching with birth family or relatives of child/youth | Two (2) hours per week | CFFA Social Worker, foster parent, or other staff |
| Family support as outlined in the ISP/ Treatment Plan | Duration of TFC placement | CFFA Staff |
| Crisis Intervention | Duration of family visits | CFFA Social Workers/Director |
| Monthly support group | Monthly | CFFA Staff |
| Monthly Family Meetings (birth parents/relatives to review progress towards ISP goals) | Monthly | CFFA Staff |
| Parent Project Training | 30 hours | CFFA Staff |
| Quality assurance review | Every 90-days | CFFA QA Officer |
| Behavior Support Plan (BSP) For child/youth in TFC | Duration of TFC placement | CFFA foster parent, Social Worker, Counselor, and other staff |
| Transportation support | Per requested need | CFFA Social Worker, staff, and foster parent |
| Financial support (allowance, school and community activities, clothing, etc.) | Per requested need | CFFA Agency |
| Assist family/relatives with mental health consultations | Per requested need | CFFA Social Worker |
| Discharge planning | Duration of TFC placement | CFFA Social Worker, Director, and/or Counselor |
| Aftercare services | 24-months after placement | CFFA Agency |

1. <u>Services to Child/Youth in Therapeutic Foster Care:</u>

Children and Families First of Alabama will provide:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Agency TFC child/youth assessment for referral, matching and placement(s) | Prior to admission or if change of placement is needed | CFFA Staff |
| Preplacement visits with TFC foster parent(s) | Prior to placement | CFFA Staff and foster parent(s) |
| Schedule and coordinate the initial treatment plan | Within 10-days of admission date | CFFA Social Worker/Director |
| Schedule and coordinate the comprehensive treatment plan | Within 30-days of Admission date | CFFA Social Worker/Director |
| Schedule and coordinate the Treatment plan review | Every 45-days | CFFA Director |
| Weekly home visits and weekly telephone contact with TFC parent(s) and TFC child/youth | Weekly | CFFA Social Worker |
| Weekly contact with child/youth's teacher(s) and/or school counselor | Weekly | CFFA Social Worker and/or foster parent |
| Monthly face-to-face or telephone contact with child and/or family therapist | Monthly | CFFA Social Worker |
| Case management to include referral(s) to other program/services as identified in the ISP | Duration of TFC Placement | CFFA Social Worker |
| Individual basic living skills training | 18 units per week | CFFA Social Worker and foster parent(s) |
| Group basic living skills training | 5 hours per week | CFFA Social Worker |
| Extracurricular activity | Duration of TFC Placement | CFFA Social Worker & Foster parent(s) |
| Representation and participation at ISP and IEP meetings | Duration of TFC Placement | CFFA Social Worker, Foster Parent(s) and/or Director |
| Independent living skills training (group & individual) | Duration of TFC Placement | CFFA Social Worker, Foster Parent(s) and/or Director |
| Group Therapy | Twice Monthly | CFFA Counselor |

26

| Agency Service | Time Frame | Provider |
|---|---|---|
| Crisis Intervention | 24-hour support 7-days a week | CFFA Social Worker/Director |
| Discharge planning | Intake and duration of TFC placement | CFFA Social Worker, Directors, and/or Counselor |
| No Reject/Eject Policy | Prior to Placement as long as appropriate level of care is available | CFFA Directors |
| Administer outcome measure | Every 90-days | CFFA Social Worker |
| Monthly report to DHR describing progress with goals and services | Monthly | CFFA Social Worker |
| Maintenance of regular communication with all treatment team members | Weekly | CFFA Social Worker |
| Quality Assurance reviews to assure compliance with Minimum Standards for Child Placing Agencies, Minimum Standards for Foster Family Homes, and Therapeutic Foster Care Manual and assessment of outcomes and measures | Every 90-days | CFFA Q&A Officer |
| Development of a Behavior Support Plan (BSP) for each child/youth | Duration of the TFC placement | CFFA Director |
| Participation in the ISP team | Duration of the TFC placement | CFFA Agency |
| Therapeutic visitation support with birth family | Per ISP | CFFA Social worker, foster parent, or other Staff |
| Monthly Family Meetings (birth parents/relatives to review progress towards ISP goals) | Monthly | CFFA Staff |
| Individual Counseling | Per requested need | CFFA Counselor |
| Family Counseling | Per requested need | CFFA Counselor |
| Social service project | Yearly | CFFA Agency |
| Behavior support services | Per requested need | CFFA Agency |
| Tutoring | Per requested need | CFFA Tutor |
| Support for medical and dental services (i.e. referrals, transportation, etc.) | Per requested need | CFFA Social Worker & foster parent |
| Transportation support | Per requested need | CFFA Social Worker, staff, and foster parent |
| Financial support (allowance, school and community activities, clothing, etc.) | Per requested need | CFFA Agency |
| Aftercare services | 24-Months from discharge | CFFA Agency |

27

2. Services to TFC Families

Children and Families First of Alabama will provide:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Difficulty of care payment as identified in the TFC Contract with a minimum daily rate of $16.00 per day | Duration of the TFC placement | CFFA Agency |
| Forty (40) hours of pre-service training to include GPS | Prior to approval | CFFA Agency |
| A minimum of twenty-four (24) hours of annual training to each TFC parent | Duration of the TFC Approval | CFFA Agency |
| Support group/meeting for TFC parents | Monthly | CFFA Agency |
| Ensure homes comply with Minimum Standards for Foster Family Homes and Therapeutic Foster Care Standards | Prior to approval | CFFA Agency |
| Annual and semi-annual evaluations and renewal of approval | 6-months and 12-months | CFFA Agency |
| Weekly home visits and weekly telephone contact with TFC parent(s) and TFC child/youth | Weekly | CFFA Social Worker |
| Crisis Intervention and availability of CFFA Staff | 24-hour support 7-days a week | CFFA Social Workers/Director |
| Emergency & Planned Respite | 48-hours per month | CFFA Agency foster home |
| Reimbursement for mileage and expenses related to caring for the child/youth | Duration of TFC Placement | CFFA Agency |
| Transportation support | Per requested need | CFFA Social Worker and staff |
| Medicaid documentation training and support | Prior to approval and Ongoing | CFFA Agency |
| Agency TFC foster parent levels assessment (matching & placement) | Prior to matching | CFFA Agency |
| Information disclosure of all available information of child/youth and family prior to placement | Prior to Placement | CFFA Agency |
| Preplacement visits with TFC child/youth | Prior to placement | CFFA Agency |

Services to TFC Families Continued:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Family Counseling | Per requested need | CFFA Counselor |
| Individual Counseling | Per requested need | CFFA Counselor |
| Provision of formal and informal support network (support group and foster parent organization) | Duration of Licensure | CFFA Agency |
| Assistance with individual basic living skills education | Duration of TFC Placement | CFFA Agency |
| Damages and Liability Policy | Duration of TFC Placement | CFFA Agency |
| Legal Advocacy | Duration of TFC Placement | CFFA Agency |
| Partnership of TFC parent(s) in treatment plan development, implementation and reviews | Duration of TFC Placement | CFFA Agency |
| Assistance with individual basic living skills education of TFC child/youth | Duration of TFC Placement | CFFA Agency |
| Assistance with implementation of Behavior Support Plan (BSP) | Duration of TFC Placement | CFFA Agency |
| Assistance with identifying an extracurricular activity for the TFC child/youth | Duration of TFC Placement | CFFA Agency |
| Assistance with identifying a social service project | Duration of TFC Placement | CFFA Agency |
| Aftercare support to foster parent and family members (support group, counseling, family meeting to provide closure, etc.) | End of TFC Placement | CFFA Agency |

## B. Service Delivery for Step-Down Therapeutic Foster Care

Children and Families First of Alabama will at a minimum provide the following services to birth families and/or relatives, therapeutic foster children, and therapeutic foster parents in both therapeutic foster care and Step-Down therapeutic foster care:

## 1. Services to Birth Family or Relatives of Child/Youth in Step-Down TFC

Children and Families First of Alabama will provide:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Multi-dimensional assessment(s) of parental functioning | Intake, treatment, case reviews, discharge & aftercare | CFFA Social Worker, Director, and/or Counselor |

29

## Services to Birth Family/Relative of Child/Youth in Step-Down TFC - Continued

| Agency Service | Time Frame | Provider |
|---|---|---|
| Case management to include referrals to services outside the agency and to support the ISP Team in family reunification | Duration of TFC placement | CFFA Social Worker |
| Therapeutic visitation coaching with birth family or relatives of child/youth | Two (2) hours per week | CFFA Social Worker, foster parent, or other staff |
| Family support as outlined in the ISP/ Treatment Plan | Duration of TFC placement | CFFA Staff |
| Crisis Intervention | Duration of family visits | CFFA Social Workers/Director |
| Monthly support group | Monthly | CFFA Staff |
| Monthly Family Meetings (birth parents/relatives to review progress) | Monthly | CFFA Staff |
| Parent Project Training | 30 hours | CFFA Staff |
| Quality assurance review | Every 90-days | CFFA QA Officer |
| Behavior Support Plan (BSP) For child/youth in TFC | Duration of TFC placement | CFFA foster parent, Social Worker, Counselor, and other staff |
| Transportation support | Per requested need | CFFA Social Worker, staff, and foster parent |
| Financial support (allowance, school and community activities, clothing, etc.) | Per requested need | CFFA Agency |
| Assist family/relatives with mental health consultations | Per requested need | CFFA Social Worker |
| Discharge planning | Duration of TFC placement | CFFA Social Worker, Director, and/or Counselor |
| Aftercare services | 24-months after placement | CFFA Agency |

2. Services to Child/Youth in Step-Down Therapeutic Foster Care:

  Children and Families First of Alabama will provide:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Preplacement visits with TFC foster parent(s) | Prior to placement | CFFA Social Worker & Agency |
| Schedule and coordinate the initial treatment plan | Within 10-days of admission date | CFFA Social Worker/Director |
| Schedule and coordinate the comprehensive treatment plan | Within 30-days of Admission date | CFFA Social Worker/Director |
| Schedule and coordinate the Treatment plan review | Every 45-days | CFFA Director |
| Weekly home visits and weekly telephone contact with TFC parent(s) and TFC child/youth | Weekly | CFFA Social Worker |
| Weekly contact with child/youth's teacher(s) and/or school counselor | Weekly | CFFA Social Worker and/or foster parent |
| Monthly face-to-face or telephone contact with child and/or family therapist | Monthly | CFFA Social Worker |
| Case management to include referral(s) to other program/services as identified in the ISP | Duration of TFC Placement | CFFA Social Worker |
| Individual basic living skills training | 9 units per week | CFFA Social Worker and foster parent(s) |
| Group basic living skills training | 3 hours per week | CFFA Social Worker |
| Extracurricular activity | Duration of TFC Placement | CFFA Social Worker & Foster parent(s) |
| Representation and participation at ISP and IEP meetings | Duration of TFC Placement | CFFA Social Worker, Foster Parent(s) and/or Director |
| Independent living skills Training (group & individual) | Duration of TFC Placement | CFFA Social Worker, Foster Parent(s) and/or Director |
| Group Therapy | Twice Monthly | CFFA Counselor |
| Crisis Intervention | 24-hour support 7-days a week | CFFA Social Worker/Director |
| Discharge planning | Intake and duration of TFC placement | CFFA Social Worker, Directors, and/or Counselor |

31

## Services to Child/Youth in Step-Down Therapeutic Foster Care - Continued

| Agency Service | Time Frame | Provider |
|---|---|---|
| No Reject/Eject Policy | Prior to Placement as long as appropriate level of care is available | CFFA Directors |
| Fourteen (14) day notice if needed for higher level of care | Prior to unanticipated discharge | CFFA Directors |
| Administer outcome measure | Every 90-days | CFFA Social Worker |
| Monthly report to DHR describing progress with goals and services | Monthly | CFFA Social Worker |
| Maintenance of regular communication with all treatment team members | Weekly | CFFA Social Worker |
| Quality Assurance reviews to assure compliance with Minimum Standards for Child Placing Agencies, Minimum Standards For Foster Family Homes, and Therapeutic Foster Care Manual and assessment of outcomes and measures | Every 90-days | CFFA Q&A Officer |
| Development of a Behavior Support Plan (BSP) for each Child/youth | Duration of the TFC placement | CFFA Director |
| Participation in the ISP team | Duration of the TFC placement | CFFA Agency |
| Therapeutic visitation support with birth family | Per ISP | CFFA Social worker, foster parent, or other Staff |
| Individual Counseling | Per requested need | CFFA Counselor |
| Family Counseling | Per requested need | CFFA Counselor |
| Social service project | Yearly | CFFA Agency |
| Behavior support services | Per requested need | CFFA Agency |
| Tutoring | Per requested need | CFFA Tutor |
| Support for medical and dental services | Per requested need | CFFA Social Worker & foster parent |
| Transportation support | Per requested need | CFFA Social Worker, staff, and foster parent |
| Financial support (allowance, school and community activities, clothing. etc.) | Per requested need | CFFA Agency |
| Aftercare services | 24-Months from discharge | CFFA Agency |

32

2. Services to TFC Families in Step-Down TFC

Children and Families First of Alabama will provide:

| Agency Service | Time Frame | Provider |
|---|---|---|
| Difficulty of care payment as identified in the TFC Contract with a minimum daily rate of $8.00 per day | Duration of the TFC placement | CFFA Agency |
| A minimum of twenty-four (24) hours of annual training to each TFC parent | Duration of the TFC Approval | CFFA Agency |
| Support group/meeting for TFC parents | Monthly | CFFA Agency |
| Ensure homes comply with Minimum Standards for Foster Family Homes and Therapeutic Foster Care Standards | Prior to approval | CFFA Agency |
| Annual and semi-annual evaluations and renewal of approval | 6-months and 12-months | CFFA Agency |
| Weekly home visits and weekly telephone contact with TFC parent(s) and TFC child/youth | Weekly | CFFA Social Worker |
| Crisis Intervention and availability of CFFA Staff | 24-hour support 7-days a week | CFFA Social Workers/Director |
| Emergency & Planned Respite | 48-hours per month | CFFA Agency foster home |
| Reimbursement for mileage and expenses related to caring for the child/youth | Duration of TFC Placement | CFFA Agency |
| Transportation support | Per requested need | CFFA Social Worker and staff |
| Medicaid documentation training and support | Prior to approval and Ongoing | CFFA Agency |
| Agency TFC foster parent levels assessment (matching & placement) | Prior to matching | CFFA Agency |
| Information disclosure of all available information of child/youth and family prior to new Step-down placement | Prior to Placement | CFFA Agency |
| Preplacement visits with Step-down TFC child/Youth if placement is new | Prior to placement | CFFA Agency |

33

| Agency Service | Time Frame | Provider |
|---|---|---|
| Family Counseling | Per requested need | CFFA Counselor |
| Individual Counseling | Per requested need | CFFA Counselor |
| Provision of formal and informal support network (support group and foster parent organization) | Duration of Licensure | CFFA Agency |
| Assistance with individual basic living skills education | Duration of TFC Placement | CFFA Agency |
| Damages and Liability Policy | Duration of TFC Placement | CFFA Agency |
| Legal Advocacy | Duration of TFC Placement | CFFA Agency |
| Partnership of TFC parent(s) in treatment plan development, implementation and reviews | Duration of TFC Placement | CFFA Agency |
| Assistance with individual basic living skills education of TFC child/youth | Duration of TFC Placement | CFFA Agency |
| Assistance with implementation of Behavior Support Plan (BSP) | Duration of TFC Placement | CFFA Agency |
| Assistance with identifying an extracurricular activity for the TFC child/youth | Duration of TFC Placement | CFFA Agency |
| Assistance with identifying a social service project | Duration of TFC Placement | CFFA Agency |
| Aftercare support to foster parent and family members (support group, counseling, family meeting to provide closure, etc.) | End of TFC Placement | CFFA Agency |

## E. TARGET AREA

The geographic scope for the services provided by Children and Families First of Alabama are Region 6 and Region 8. Requested slot for Region 6 is ninety (90) and for Region 8 is ninety (90).

| Region Six (6) | Number of Slots |
|---|---|
| Jefferson | 20 |
| Shelby | 10 |
| Chilton | 10 |
| Talladega | 20 |
| Clay | 10 |
| Randolph | 10 |
| Cleburne | 10 |
| **Total** | **90** |

| Region 8 | Number of Slots |
|---|---|
| St. Clair | 20 |
| Calhoun | 20 |
| Etowah | 20 |
| Cherokee | 10 |
| DeKalb | 10 |
| Marshall | 10 |
| **Total** | **90** |

The goal of Children and Families First of Alabama is to have a minimum of two (2) therapeutic foster care homes needed for the requested slots in each county by February, 2006.

## F. DISCHARGE POLICY

The following policy describes how a child and family will move through the goals and objectives outlined in the ISP and Step-Down Process.

### 1. Pre-Discharge Policy

Children and Families First of Alabama, with the coordination of the ISP Team, will develop and implement a pre-discharge plan. The pre-discharge plan will contain the following elements:

1. Provide a target date for discharge that is coordinated with the ISP Team at the time of placement. The target date is to be continuously considered during the Case Reviews and the ISP Team Meetings.

2. Inform the responsible county DHR at least thirty (30) days in advance of the proposed date of discharge.

3. Assess parent/guardian using the Parenting Assessment Skills Survey (PASS).

4. Develop parent goals using the following assessment tools: PASS, Family Assessment Measure, Multidimensional Needs Assessment, and Parenting Stress Survey.

5. Assess parent goals monthly to make a determination concerning status of the parental goals that are addressed in the ISP and/or agency Treatment Plan (aka Family Meetings).

6. Provide support group monthly for the parent/relative.

7. Provide educational groups offered by Children and Families First of Alabama.

8. Provide monthly reports regarding the parent/relative progress or lack there of toward treatment goals.

9. During the thirty days prior to discharge the PASS, Family Assessment Measure, and Parenting Stress Survey will be administered and compared with the assessment/survey administered at the time of the child's placement.

10. Offer Parent Project® training to parent(s) relative(s).

2. **Process and Criteria for Reunification Planning**

   To ensure that children/youth and family will be provided services to expedite discharge of the child from the out-of-home placement, Children and Families First will provide the following services:

   A. Assess the child/youth's parent and/or relative using assessments that will address strength and needs of placement
   B. Provide training to improve skills of the parent/relative (i.e. Parent Project)
   C. Provide educational groups to improve skills/knowledge important to successful reunification
   D. Provide monthly support group to family and relatives
   E. Provide monthly parent/relative meetings (aka Family Meetings) addressing the families progress towards the goals/objective of the ISP and/or agency treatment plan

F. Work in collaboration with the agency or counselor working with the family if Children and Families First of Alabama does not provide the service

3. **Discharge/Aftercare Policy**

Children and Families First of Alabama, with the coordination of the ISP Team, will develop and implement a discharge/aftercare plan for children/youth that have completed the program. The planning for aftercare will begin and be concurrent with treatment in therapeutic foster care. The aftercare plan will be coordinated and implemented with the support of the child/youth's family and/or placement home. All aftercare contact will be documented and if the family/placement is unable to be reached by phone, a letter with questions will be sent with a stamped, self-addressed envelope. The plan will include though not be limited to the following:

### Table of Family and Children's First
### Aftercare Policy and Procedure

| Time Frame | Service | Outcome |
|---|---|---|
| One month or 30-days | • Weekly contact with child/youth and family by telephone and one face-to-face contact<br>• Complete a multi-dimensional assessment* of child/youth and/or family functioning<br>• Agency satisfaction surveys will be compiled and completed<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Two months or 60-days | • Two (2) contacts with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Three months or 90-days | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Four to Five months or 90-days | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |

37

| Time Frame | Service | Outcome |
|---|---|---|
| Six months or 180-days | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Months 7 - 11 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| 1 year or 12 months | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Months 13 - 17 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Month 18 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Months 19 - 24 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |

| Time Frame | Service | Outcome |
|---|---|---|
| Two years<br>Or<br>24 months | • A final face-to-face contact with the child/youth and family will be held. A review of the family's progress will be discussed. No further services will be extended unless it is agreed on by the family, responsible county Department of Human Resources, and Children and Families First of Alabama<br>• Final multi-dimensional assessment will be conducted<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| After 24 month or Two years | • Child/youth and family may attend monthly educational and/or support groups offered by agency | • Report of contact and assessment submitted to county DHR within five (5) working days |

### 4. Non-Program Completion Discharge/Emergency Discharge

1. Discharge from Children and Families First of Alabama will take place if a determination is made by the ISP team that a child/youth is not achieving progress toward goals and/or requires a higher level of treatment. When a more restrictive level of treatment is needed, the agency will submit a written fourteen (14) day notice with recommendations to the County DHR. An example of this type of discharge is a child moving to intensive residential care due to chronic running away, sexual perpetration, and/or sexually reactive behavior in which no alternative placement within the agency is available.

2. Discharge from Children and Families First of Alabama will take place if a child is determined by a mental health professional to be in need of a psychiatric hospitalization to prevent suicidal/homicidal behavior. This type of discharge would be considered emergency discharge.

3. Discharge from Children and Families First of Alabama will take place if a child is arrested for a crime committed that involves placement in a juvenile detention facility. This type of discharge would be considered emergency discharge.

### 5. Re-Admission Policy

1. All children/youth that have been discharged from Children and Families First of Alabama may be considered for readmission.

2. A member of the Administrative Staff, a master's level therapist, and Social Worker/Case Worker, and a Foster Parent will meet to discuss the advisability of re-admission of the child/youth to the Agency. This decision will be made within 48 hours of the referral. This decision process would not hinder the referral process from taking place unless a decision of **No Re-Admission** is determined.

39

6. Process of Child/Youth Movement in TFC

Children and Families First of Alabama therapeutic foster care program is committed to maintaining a strong therapeutic foster care program that provides a normalized, yet intensive treatment environment in order to prepare children/youth for successful permanency, either through successful reintegration into their family, or through adoption, kinship care, or transitional living in the community. The agencies goal for each child/youth is to actively progress toward the child/youth's permanency plan as measured by a reduction in agency level of care, one foster home from intake to discharge, and discharge in accordance with the ISP and treatment plan.

Services provided to the child/youth and birth family/relatives in the agencies **Paradigm of Care** model is need-based. As the child/youth and birth family moves toward permanency, agency services will be responsive to the family needs. The agencies goal is to provide a reduction in level of care services; however, services will be delivered in accordance with individual and family assessments.

Children and Families First Therapeutic Foster Care Program offers three (3) levels of care within the therapeutic care continuum. A levels approach to treatment will provide need-based and flexible services to each child/youth and family in our treatment program. Using the Paradigm of Care model children/youth will descend thru levels based on measurable outcomes with the goal of basic maintenance and transition to TFC Step-Down. The levels reflect high, medium, and low treatment needs matched with high, medium, and low levels of service (i.e. a child/youth in the Level 3 program would receive Level 3 services and be matched with a Level 3 therapeutic foster home).

The Paradigm of Care model and the process of a child/youth's movement through therapeutic foster care to step-down in preparation for permanency is illustrated in the diagram on the following page.



# TFC Admission to Discharge Timeline

| Referral | Admission | Review | Level 2 | Review | Level 1 | Review | Step-down | Discharge | Aftercare |
|---|---|---|---|---|---|---|---|---|---|
| | | **(1-3 Months)** | **(1-2 Months)** | | **(1-2 Months)** | | | | |
| | | | Paradigm of Care - Six (6) Months | | | | | | |

· Assessments
· Matching
· Placement

· Initial
Treatment Plan
· Case mgt.
· Assessments

-Case mgt.
-Support
-TFC parents
-Education &
Training to
birth family

· Treatment
Plan Reviews
· Family
Assessments

-Case mgt.
-Support
-TFC parents
-Education &
Training to
birth family

· Treatment
Plan Reviews
· Family
Assessments

-Case mgt.
-Support
-TFC parents
-Education &
Training to
birth family

· Treatment
Plan Reviews
· Family
Assessments

-24 Month
Support
-Assessments
-Case
management

41

G. **PRIOR EXPERIENCE**

Children and Families First of Alabama is a newly incorporated agency. Though this agency is new to Alabama, the staff that has agreed to take positions with Children and Families First of Alabama have many years of experience in the field of working with Therapeutic Foster Care as an agency and working with the children placed in this service of care. The assistant executive director and social workers have worked in other Therapeutic Foster Care agencies in these positions. These individuals have dedicated their careers to advocating for children and families and have always worked in the best interest of children and families first, hence the name of our agency.

Individually, the staff have a history of providing strong, dependable service to the youth and families served. These individuals that have agreed to work for Children and Families First of Alabama are known for excellence in the care of those they serve. These individual will continue the excellence of service to those we will serve as an employee of Children and Families First of Alabama.

All staff that serve families and children in Alabama will meet the standards, if not more than, that have been laid out in the **Therapeutic Foster Care Manual,** the **Minimum Standards for Foster Family Homes**, and the **Minimum Standards for Child Placing Agencies.**

H. **STAFF QUALIFICATIONS, STAFF RECRUITMENT, JOB DESCRIPTIONS AND TRAINING REQUIREMENTS**

1. **Staffing and Rationale for the Levels of Staffing Proposed**

Children for whom the state of Alabama has the greatest responsibility are those in the legal custody of the Department of Human Resources. The objective for these children is return to parents/relative or, if not possible, placement in another family with a permanent legal relationship through adoption or custody. For children who cannot return to their birth families or be permanently placed in another family, the objective is to develop sufficient life and decision making skills so that they will be able to live independently and ultimately function effectively as adults and as spouses and parents in their own families.

Thus, Children and Family First of Alabama will operate under a family and community based system of social service delivery. It is based on the principle that the more vulnerable and at risk the child and family, the greater the need and responsibility for intervention. Services are provided to reduce the risk and prevent the need for a more intrusive level of intervention in the life of the family and child.

The plan for service delivery in a climate where needs are of profound concern. Swift and available delivery of service is needed. Thus, highly qualified staff at the master's level with a minimum of five years experience, bachelor's level staff with a minimum of three years experience and administrative staff with a minimum of ten years experience will be

42

on staff for the critical service delivery.

Children and Families First of Alabama will have a staff compromised of an 1) Executive Director, 2) Assistant Director, 3) Social Worker(s), 4) Quality Assurance Officer, and Office Manager. Staff with supervisory responsibilities will adhere to the standards regulating the number of staff they may supervise (i.e. 5 to 1 ratio of staff to supervisor). The agency Social Worker(s) will have no more than eight (8) therapeutic foster children in their caseloads.

2. **Information Regarding Qualifications, Experience and Job Descriptions**

All administrative staff has ten plus years of experience in service delivery to children and families that are receiving services from the Department of Human Resources. The job descriptions are listed in detail below.

A. **Executive Director**

1. A master's degree in the field of social work, psychology, education, administration, or a related field, plus five years experience in family and children's service with progressively responsible duties in supervision and administration.

2. The duties of the executive shall include, but are not limited to, the following:

   a. Direct and evaluate a program of child placing which is child and family-centered, which is within the limits of function and policy established by the board, which is based upon sound professional concepts.

   b. Organize the work of the agency and delegate responsibility to various staff members as appropriate.

   c. Make regular reports to the President of the Board on all aspects of the operation of the agency and its programs.

   d. Handle expenditures according to allocations in the budget and develop the annual budget in conjunction with the board.

   e. Develop a plan for orientation, training, and development of staff.

   f. Appoint, evaluate, and terminate staff.

   g. Make provision for continuity of administrative authority in his/her absence.

   h. Develop a program of public relations, including interpretation to the community.

   i. Notify the State Department of Human Resources in the event of an incident that is considered to jeopardize the life of a child, staff member or other person.

    j.  Make regular reports to the Department in accordance with requirements by the Department of Human Resources.

## B. Assistant Director

1. Provide support and consultation to social workers/case worker.

2. Provide regular support and guidance to the social worker/case worker through weekly supervisory meetings.

3. Supervise no more that six social workers/case workers.

4. Ultimate responsibility for the development of a comprehensive treatment plan based on a through case assessment for each child admitted to the program.

5. Ensure that the comprehensive treatment plan complements the steps identified in the family's ISP.

6. Oversees and supports the social worker/case worker as leader of the treatment team and shares ultimate responsibility for team plans and decisions.

7. Provides coordination and back-up to assure that 24-hour on-call crisis intervention services are available and delivered as needed to the TFC foster parents, the children in care and their families.

8. Possess a Master' Degree from a college or university with an accredited program in the respective degree in psychology, social work, counseling or other area that requires equivalent course work and who has successfully completed a practicum as a requirement for the degree.

9. A minimum of 5 years experience in the field-post master's degree.

## C. Social Worker/Case Manager

1. Initiates the development of the treatment plans based upon the strengths and needs identified in the family's ISP.

2. Provides support and consultation to TFC foster parents, to families of children in care and to other team members related to their role in the treatment plan.

3. Advocate for, coordinate and link children and their families with needed services available within the TFC agency or greater community.

4. Responsible for the primary day-to-day responsibility for leadership of the treatment team.

44

5. Organizes and manages all treatment team meetings.

6. Coordinates team decision-making regarding the care and treatment of the child and services to the child's family, as identified in the comprehensive treatment plan.

7. Collaborates with their supervisor and the Department of Human Resources to ensure the comprehensive treatment plan is congruent and compliments the family's ISP and all services provided by the Children and Families First of Alabama are authorized by the ISP prior to their provision, if compensation by DHR is expected.

8. Ensures that all core services of the assigned families and children are in place and document.

9. Provides information and training as needed to treatment team members who may not be familiar with the TFC model.

10. Participates in identifying goals and coordinating treatment services provided to the child by persons or agencies outside the TFC program.

11. Works in collaboration with supervisor to prepare each child's comprehensive treatment plan.

12. Support and consult with the therapeutic foster parents.

13. Provide and coordinate services for not more than eight cases.

14. Have a minimum of weekly face-to-face contact with each child on their case load.

15. Support, educate and consult birth family/relative.

16. Ensure core services are provided for birth family/relative.

17. Work collaboratively with the Department of Human Resources to identify community resources and/or services that may be used to achieve goals of the child's treatment plan.

18. Shall rotate on-call services to TFC parents, children and their families.

19. Shall possess a BSW or bachelors in a closely related field and have a minimum of three years experience in the field or possess a minimum of a bachelor's degree in the field and have experience as a foster parent. A MSW or a master's degree in a related field with no experience.

i. <u>Description to Ensure Staff have not been Subject to Incident or Investigation,
Documentation of Criminal Background Check, Organization Response to
Incident/Allegation that is Founded or Unfounded</u>

A profile of each employee will be maintained in the personnel record that is pertinent to
hiring. This profile will include an Alabama Bureau of Investigation and Federal Bureau of
Investigation criminal records checks and a Central Registry child abuse/neglect clearance,
and a minimum of three non-relative references.

If any of the checks and clearances return founded, the person will not be employed unless
there is sufficient reason to know the person is no risk to children or the agency. Prior to
being employed the person will have special approval by the state licensing agent.

i. <u>Level of Education, Experience, Training of Management Staff. Organizational Staff
Development Regarding Orientation and Ongoing Training</u>

The Executive and Assistant Director of Children and Families First of Alabama will possess
a master's degree in a social service field and have a minimum of five (5) years experience in
the field. The Office Manager will have a minimum of three (3) years experience work
experience in a Child Placing agency and have experience in working with and billing
services to state agencies.

All professional staff will have a minimum of forty (40) documented hours of pre-service
training prior to assuming casework responsibilities and receive a minimum of twenty (20)
hours of ongoing training each year. This training will be scheduled by the agency and a
record of training will be maintained in the personnel record.

Training shall address:

- An overview of therapeutic foster home care
- The history and development of therapeutic foster care
- Orientation to the agency's treatment philosophy
- Skill training in the specific treatment methodologies it employs
- The use of passive physical restraints
- Crisis intervention
- Grief and loss issues for children in foster care
- The significance and value of birth families to children placed in TFC
- Cultural competence and culturally responsive services
- Significance of relationship building and connections to significant others
- Policies and procedures, including documentation in evaluation requirements
- Skill building in analyzing behaviors, recognizing the behavior's antecedent
  and facilitating the development of skills to change the antecedent and
  consequent conditions. Professional staff shall also participate in the first
  available sequence of the agency's pre-service training for therapeutic foster
  parents following the start of their employment

- Characteristics, strengths and needs of R.C. class members and their families
- The philosophy and characteristics of the system of care required by the R.C. Consent Decree
- The rights of R.C. class members and their families as set forth by the Consent Decree
- The damage caused to children through multiple placements
- Staff's role in minimizing multiple placements
- Staff's role in the ISP process
- All R.C. policies, including behavior management, ISP, siblings' placement, visitation, etc.
- Health Insurance Accountability and Portability Act (HIPAA)
- Attend GPS training
- Attend Parent Project training

## 5. Organization Response to Critical Incidents and Emergencies

All critical incidents and emergencies will have professional staff involvement. The county Department of Human Resources social worker/case manager will be notified by telephone as soon as possible of the critical incident and/or emergency. By the end of the next working day a Critical Incident/Emergency Form will be completed with the signature of the professional staff involved and the signature of the Executive Director or the Assistant Director. A copy of the written report will be sent to the county Department of Human Resources social worker/case worker.

## 6. Use of Volunteers and Interns and Background Check Documentation

A written signed agreement between colleges/universities and Children and Families First of Alabama will be on file prior to an intern beginning a practicum. All interns and volunteers will have been cleared by the Alabama Bureau of Investigation, Federal Bureau of Investigation, Alabama Central Registry for child abuse/neglect and an Alabama motor vehicle check. Additionally, they will be required to complete the application process including an interview with Directors, submission of a resume, completion of an application, furnish references, provide proof of car insurance, and any other process the agency deems appropriate for approval.

A written signed agreement between the volunteer and Children and Families First of Alabama will be on file prior to a volunteer providing volunteer service. No volunteer will be left alone with a child unless they have been cleared by the Alabama Bureau of Investigation, Federal Bureau of Investigation, the Alabama Central Registry for child abuse/neglect and three references.

## 7. Description of Process to Meet Requirement Training Established in the Department's Rules and Training Related to Operating Therapeutic Foster Care

A checklist of all twenty-two types of training will be placed in the employee personnel record with time frames for completion. Administrative staff will ensure that all

47

requirements are met as stated in the standards for operating Therapeutic Foster Care. As training is completed written evidence of completion of training will be placed in the personnel record.

The agency Quality Review Officer will perform periodic reviews of employee and volunteer/intern records to assess compliance with training standards and make recommendations for future training needs.

## I. REFERENCES

The list of name provided below are people at the state, federal and local levels that may be called to ask about services that have been provided by Darlene L. Davis that will be the Executive Director of Children and Families First of Alabama or Bay Area Alliance for Youth and Family Services. The references listed under Alabama are familiar with the delivery of services by Darlene L. Davis.

**Marsha Busby**
Director of Cleburne County Department of Human Resources
Post Office Box 25
Heflin, Alabama 36264
256-463-1705

**Sharon Clegg**
Finance Officer of Cleburne County Department of Human Resources
Post Office Box 25
Heflin, Alabama 36264
256-463-1710

**Deborah DuHon**
Program Supervisor of Cleburne County Department of Human Resources
Post Office Box 25
Heflin, Alabama 36264
256-463-1700

**Nancy Vernon**
Attorney
P. O. Box 130
Jacksonville, Alabama 36265
256-435-5402
nvernon@.com

**Brenda Stedham**
Attorney
313 East 11th Street
Anniston. Alabama 36207
256-236-1119

Paula Clark
Regional Coordinator State of Alabama Department of Public Health
223 Haynes Street
Talladega, Alabama
256-256-315-4897
Pclark/@adph.state.al.us

## V. COMPENSATION FOR PROVIDING SERVICE

### A. Per Diem Rates

**Daily rate per child/youth:** $191.00
**Number of beds offered at this rate:** 180

### B. Medicaid Billing Capacity

Children and Families First of Alabama plans to have the capacity to bill Medicaid electronically for core services authorized on the ISP prior to awarding of the contract for FY'06.

### C. Net Medicaid Reimbursement

Children and Families First of Alabama will generate up to $96.00 per day of Medicaid revenue with the rate split as follows:

$66.00 – Agency
$29.00 - DHR

This is a split rate with a portion from DHR and a capped amount from the Net Medicaid Revenue generated from the provider's Medicaid billing.

Children and Families First is requesting an additional $125.00 per day in compensation to be paid by the Department, for a total daily rate of $191.00 per child/youth.

$66.00 – Medicaid Net Reimbursement to Agency
$125.00 – State Contract Rate

Children and Families First is offering to provide therapeutic foster care services utilizing an innovative and well-designed model of treatment with core services exceeding the State requirements. The treatment model provides a descension in level of care as improved functioning occurs, with the objective of readiness for Step-Down therapeutic foster care, and goal of permanency.

The core services to the foster parents as well as services to the child/youth and to the birth family and/or relative will be consistent in each level to allow provider homes to maintain a child/youth in their home rather than requiring a child to be moved. Additionally, the proposed Aftercare Plan for our program exceeds the core requirements with the implementation of an increase in contact and assessments.



# State of Alabama
# Disclosure Statement
(Required by Act 2001-955)

ENTITY COMPLETING FORM
Children and Families First of Alabama

ADDRESS
20 West 11th Street

CITY, STATE, ZIP
Anniston, AL  36207

TELEPHONE NUMBER
(256)   591-6229

STATE AGENCY/DEPARTMENT THAT WILL RECEIVE GOODS, SERVICES, OR IS RESPONSIBLE FOR GRANT AWARD
Alabama Department of Human Resources

ADDRESS
50 Ripley Street, Gordon Persons Building

CITY, STATE, ZIP
Montgomery, Alabama  36130

TELEPHONE NUMBER
(334)   242-1650

This form is provided with:

☐ Contract      ☒ Proposal      ☐ Request for Proposal      ☐ Invitation to Bid      ☐ Grant Proposal

Have you or any of your partners, divisions, or any related business units previously performed work or provided goods to any State Agency/Department in the current or last fiscal year?

☐ Yes        ☒ No

If yes, identify below the State Agency/Department that received the goods or services, the type(s) of goods or services previously provided, and the amount received for the provision of such goods or services.

| STATE AGENCY/DEPARTMENT | TYPE OF GOODS/SERVICES | AMOUNT RECEIVED |
| --- | --- | --- |
| N/A | | |

Have you or any of your partners, divisions, or any related business units previously applied and received any grants from any State Agency/Department in the current or last fiscal year?

☐ Yes        ☒ No

If yes, identify the State Agency/Department that awarded the grant, the date such grant was awarded, and the amount of the grant.

| STATE AGENCY/DEPARTMENT | DATE GRANT AWARDED | AMOUNT OF GRANT |
| --- | --- | --- |
| N/A | | |

1. List below the name(s) and address(es) of all public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF PUBLIC OFFICIAL/EMPLOYEE | ADDRESS | STATE DEPARTMENT/AGENCY |
| --- | --- | --- |
| N/A | | |

OVER

2. List below the name(s) and address(es) of all family members of public officials/public employees with whom you, members of your immediate family, or any of your employees have a family relationship and who may directly personally benefit financially from the proposed transaction. Identify the public officials/public employees and State Department/Agency for which the public officials/public employees work. (Attach additional sheets if necessary.)

| NAME OF FAMILY MEMBER | ADDRESS | NAME OF PUBLIC OFFICIAL/ PUBLIC EMPLOYEE | STATE DEPARTMENT/ AGENCY WHERE EMPLOYED |
|---|---|---|---|
| N/A | | | |

If you identified individuals in items one and/or two above, describe in detail below the direct financial benefit to be gained by the public officials, public employees, and/or their family members as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

Describe in detail below any indirect financial benefits to be gained by any public official, public employee, and/or family members of the public official or public employee as the result of the contract, proposal, request for proposal, invitation to bid, or grant proposal. (Attach additional sheets if necessary.)

N/A

List below the name(s) and address(es) of all paid consultants and/or lobbyists utilized to obtain the contract, proposal, request for proposal, invitation to bid, or grant proposal:

| NAME OF PAID CONSULTANT/LOBBYIST | ADDRESS |
|---|---|
| N/A | |

By signing below, I certify under oath and penalty of perjury that all statements on or attached to this form are true and correct to the best of my knowledge. I further understand that a civil penalty of ten percent (10%) of the amount of the transaction, not to exceed $10,000.00, is applied for knowingly providing incorrect or misleading information.

Signature _____     Date 4-10-05

Notary's Signature _____     Date 4-10-05

CHANDRA COWAN
NOTARY PUBLIC
ALABAMA STATE AT LARGE
MY COMMISSION EXPIRES
Date Notary Expires
Feb. 2008

Act 2001-955 requires the disclosure statement to be completed and filed with all proposals, bids, contracts, or grant proposals to the State of Alabama in excess of $5,000.

II. SOCIAL SERVICE

Attach a detailed and specific description of the provision for social services, if applicable. (If social service is provide through another source, attach a copy of the written agreement or contract along with the above.)

III. PLANT (Not applicable for Child-Placing Agencies)

A. Attach a certificate of approval based on an inspection by the fire department, made within the last three months.

B. Attach a certificate of approval based on an inspection by the health department, made within the last three months.

C. Attach a statement showing compliance with all local zoning laws, where applicable.

I/We certify that the information given on this form is true and correct to the best of my/our knowledge. I/We understand that any misrepresentation of information may be grounds for denial of the application.

Signature:

(Executive)

Signature:

(Board Chairman)

Date: 4-10-05

31

4.  Geographic area served   Region 6 (Jefferson, Shelby, Chilton, Talladega, Clay, Randolph and Cleburne) and Region 8 (St. Clair, Calhoun, Etowah, Cherokee, Dekalb and Marshall).

5.  Attach a description of the focus and function of the Facility, if this is an initial application or if amended since last application process.

6.  Attach any publication giving information in addition to the above.

## B.  ADMISSION AND DISCHARGE

Attach copies of admission and discharge policies and practices, if this is an initial application or if amended since last application process.

## C.  BOARD

1.  If there is a board, describe how members are appointed   The current board has four (4) members appointed.  Nominees are appointed by the current board.

2.  How often does the board meet?   Monthly

3.  Dates of regular meetings   2nd Wednesday of each month @ 7:30 PM (Pacific Time)

4.  Attach a list of the names and addresses of all members of the Board; indicate when the term of each expires; and specify the Chairman and committee members of each committee of the Board.

## D.  ORGANIZATION

1.  If incorporated, attach copy of incorporation papers, if this is an initial application or if amended since last application process.

2.  Attach copy of by-laws and constitution, if this is an initial application or if amended since last application process

## E.  FINANCIAL INFORMATION

1.  Attach copy of projected or current budget.

2.  Attach copy of most current audit, if applicable.

3.  Attach policies regarding charges and services, if this is an initial application or if amended since last application process.

## F.  PERSONNEL

1.  Attach copy of personnel policies, including job description and qualifications, if this is an initial application or if amended since last application process.

2.  List staff members and give requested information below. (Attach additional sheets as necessary to indicate duties assigned other than indicated by the title of the position.)

# Focus and Function of Agency

The focus and function of Children and Families First of Alabama is to provide services to children and families through services offered as a Child Placing Agency.

## Formation and development of organization

Children and Families First of Alabama originated with the single idea of creating a child placing agency that better addressed the placement needs of children and youth in need of out-of-home care. Together, a counselor and social worker created a treatment model for therapeutic foster care based on using a multi-dimensional assessment tools to assess child/youth placement needs, foster home placement, treatment levels, and discharge.

## Incorporation

Children and Families First of Alabama was incorporated on April 6, 2005 under the laws of the State of Alabama as a nonprofit 501(c) (3) organization.

## Current Programs

Children and Families First of Alabama offers no current operating programs because the agency is in the process of applying for licensure as a Child Placing Agency.

## Program Services

Children and Families First of Alabama will be providing services upon approval of its application as a Child Placing Agency. It is the program intention to provide a continuum of care to include traditional foster care, enhanced foster care and therapeutic foster care services.

## Mission Statement

To provide a continuum of quality community and family-based services to at-risk children/youth and families by caring, advocating and supporting the realization and development of independent essential life skills.

## Goals

- Stabilize and integrate the child into a supportive loving and caring community
- Enable the development of life skills that lead to healthy and productive relationships with family, self, and others
- Empower a positive self esteem and self respect
- Empower an understanding of personal rights and respect for the rights                    of others

- Enable emancipation, if needed, toward independent living
- Maintain regular Public School attendance
- Enable employment opportunities to gain work experience
- Engage participation in opportunities in school and community programs of sports, music, and the arts
- Engage participation in opportunities for spiritual formation and development through religious activities in the community
- Increase protective factors
- Encourage a sense of service to the community

**Philosophy and Vision**

The philosophy of the program is based on the work of three influential educators: Viktor Frankl's <u>Man's Search for Meaning</u>, Benjamin Singer's <u>The Future Focused Role Image</u>, and Frederick Polak's <u>The Image of Auschwitz</u>. Frankl's message is based on his prison experience at Auschwitz where he discovered that it is essential to have something *meaningful* and *significant* to do and a *purpose* to *live* for. Polak's research maintains that individuals with *vision* are powerfully enabled while individuals without vision are at risk. Singer identified that the power of a child's vision combined with the *support* of a loving-caring community can motivate success and overcome adversity and hardship. Children and Families First of Alabama, through a caring and supportive community endeavors to instill each child with a sense of **meaning, significance, purpose, and vision**.

## Admission and Intake Policy and Procedure

Children and Families First of Alabama will have available foster parents trained to provide Therapeutic Foster Care, Therapeutic Foster Care for Step-Down, Enhanced Foster Care and Traditional Foster Care. The agency shall maintain a no reject/eject policy providing a child/youth is appropriate for the program and a placement can be identified. All programs will adhere to the same Admission and Intake Policy and Procedure.

A referral to Children and Families First of Alabama is made by initial contact with the agency. This contact may be made face-to-face or through telephone contact. The referral procedure is outline below.

# Referral Procedure

The admission process begins with a referral to Children and Families First of Alabama. County DHR offices may refer any child/youth who meets the criteria for admission by submitting a referral packet to the agency with the following information:

A. DHR 1870 Application for Service
B. Psycho/Social History and Comprehensive Child and Family Assessment
C. Completion of Agency Assessment of Service Form
D. Individualized Service Plan
E. Summary of Placement History and Outcomes
F. Current and Previous Psychological/Psychiatric Evaluation and DSM-IV Diagnosis
F. Medical History
G. Academic Information
H. EPSDT Referral
I. Discharge Plan

After submission of a referral, Children and Families First of Alabama will begin the assessment process to determine whether the child/youth meets the agency admission criteria and determine the level of service delivery the agency can provide. After determination of the level of service, the agency will match a child/youth with an available foster care home within the recommended level of service. The admissions process will begin when a foster home has been identified as a resource for a child/youth and family.

# Admission Procedure

Following completion of the preadmission assessment, Children and Families First of Alabama will do the following:

1. Obtain and record information that will enable a plan to be developed for a child/youth and his/her family

2. Involve in planning for the child/youth, the family, relatives or other adults who have meaning to the child/youth

3. Meet with the foster home matched with the child/youth to review child/youth's and family records to insure they have the attributes that would best serve the child, as well as his/her family. All the agencies therapeutic foster care homes are assessed and assigned a level based on their skills and training. The matching process is completed with information gathered from GPS training, agency assessments, and/or the contract process.

4. Schedule a meeting and/or visit between the foster family and child/youth for purpose of getting acquainted and assessing compatibility. After the visit, the agency will meet with both the foster family and child/youth to assess the progress of the visit. If it is determined that the child/youth and/or foster family are not a good match, the agency will reassess the child/youth's needs and resume the matching process if another foster home is available.

5. If both child/youth and foster family agree and time permits, a second visit will be scheduled. It is preferred that the second visit be in the foster home to acquaint the child/youth with the home, community, and lifestyle. After the visit, the agency will meet with both the foster family and child/youth to assess the progress of the visit. If it is determined that the child/youth and/or foster family are not a good match, the agency will reassess the child/youth's needs and resume the matching process if another foster home is available. If time does not permit a second visit, refer to Step six (6).

6. If both child/youth and foster family agree to move forward with the placement, an overnight visit will be scheduled. It is preferable that the overnight visit be for one or two nights and that the child/youth return to their previous placement so the agency may assess the final visit. If at any time during the preplacement process either the child/youth and/or foster home wishes to end process, the agency will respect the decision and seek to remediate any problems if possible. After the visit, the agency will meet with both the foster family and child/youth to assess the progress of the visit.

7. If both the child/youth and foster family are determined to be the best match, a placement date will be identified and the admissions process will continue.

# Pre-Discharge Policy

Children and Families First of Alabama, with the coordination of the ISP Team, will develop and implement a pre-discharge plan. The pre-discharge plan will contain the following elements:

1. Provide a target date for discharge that is coordinated with the ISP Team at the time of placement. The target date is to be continuously considered during the Case Reviews and the ISP Team Meetings.

2. Inform the responsible county DHR at least thirty (30) days in advance of the proposed date of discharge.

3. Assess parent/guardian using the Parenting Assessment Skills Survey (PASS).

4. Develop parent goals using the following assessment tools: PASS, Family Assessment Measure, Multidimensional Needs Assessment, and Parenting Stress Survey.

5. Assess parent goals monthly to make a determination concerning status of the parental goals that are addressed in the ISP and/or agency Treatment Plan (aka Family Meetings).

6. Provide support group monthly for the parent/relative.

7. Provide educational groups offered by Children and Families First of Alabama.

8. Provide monthly reports regarding the parent/relative progress or lack there of toward treatment goals.

9. During the thirty days prior to discharge the PASS, Family Assessment Measure, and Parenting Stress Survey will be administered and compared with the assessment/survey administered at the time of the child's placement.

10. Offer Parent Project® training to parent(s) relative(s).

## Process and Criteria for Reunification Planning

To ensure that children/youth and family will be provided services to expedite discharge of the child from the out-of-home placement, Children and Families First will provide the following services:

1. Assess the child/youth's parent and/or relative using assessments that will address strength and needs of placement

2. Provide training to improve skills of the parent/relative (i.e. Parent Project)

3. Provide educational groups to improve skills/knowledge important to successful reunification

4. Provide monthly support group to family and relatives

5. Provide monthly parent/relative meetings (aka Family Meetings) addressing the families progress towards the goals/objective of the ISP and/or agency treatment plan

6. Work in collaboration with the agency or counselor working with the family if Children and Families First of Alabama does not provide the service

# Discharge/Aftercare Policy

Children and Families First of Alabama, with the coordination of the ISP Team, will develop and implement a discharge/aftercare plan for children/youth that have completed the program. The planning for aftercare will begin and be concurrent with treatment in therapeutic foster care. The aftercare plan will be coordinated and implemented with the support of the child/youth's family and/or placement home. All aftercare contact will be documented and if the family/placement is unable to be reached by phone, a letter with questions will be sent with a stamped, self-addressed envelope. The plan will include though not be limited to the following:

## Table of Family and Children's First
## Aftercare Policy and Procedure

| Time Frame | Service | Outcome |
|---|---|---|
| One month or 30-days | • Weekly contact with child/youth and family by telephone and one face-to-face contact<br>• Complete a multi-dimensional assessment* of child/youth and/or family functioning<br>• Agency satisfaction surveys will be compiled and completed<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Two months or 60-days | • Two (2) contacts with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Three months or 90-days | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Four to Five months or 90-days | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |

| Time Frame | Service | Outcome |
|---|---|---|
| Six months or 180-days | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Months 7 - 11 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| 1 year or 12 months | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Months 13 - 17 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Month 18 | • One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Complete a multi-dimensional assessment of child/youth and/or family functioning One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support | • Report of contact and assessment submitted to county DHR within five (5) working days |

| Time Frame | Service | Outcome |
|---|---|---|
| Months 19 - 24 | groups<br>• One (1) contact with child/youth and family by telephone, mail or face-to-face contact<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| Two years Or 24 months | • A final face-to-face contact with the child/youth and family will be held. A review of the family's progress will be discussed. No further services will be extended unless it is agreed on by the family, responsible county Department of Human Resources, and Children and Families First of Alabama<br>• Final multi-dimensional assessment will be conducted<br>• Attend monthly agency support groups | • Report of contact and assessment submitted to county DHR within five (5) working days |
| After 24 month or Two years | • Child/youth and family may attend monthly educational and/or support groups offered by agency | • Report of contact and assessment submitted to county DHR within five (5) working days |

## Non-Program Completion Discharge/Emergency Discharge

1. Discharge from Children and Families First of Alabama will take place if a determination is made by the ISP team that a child/youth is not achieving progress toward goals and/or requires a higher level of treatment. When a more restrictive level of treatment is needed, the agency will submit a written fourteen (14) day notice with recommendations to the County DHR. An example of this type of discharge is a child moving to intensive residential care due to chronic running away, sexual perpetration, and/or sexually reactive behavior in which no alternative placement within the agency is available.

2. Discharge from Children and Families First of Alabama will take place if a child is determined by a mental health professional to be in need of a psychiatric hospitalization to prevent suicidal/homicidal behavior. This type of discharge would be considered emergency discharge.

3. Discharge from Children and Families First of Alabama will take place if a child is arrested for a crime committed that involves placement in a juvenile detention facility. This type of discharge would be considered emergency discharge.

## Re-Admission Policy

1. All children/youth that have been discharged from Children and Families First of Alabama may be considered for readmission.

2. A member of the Administrative Staff, a master's level therapist, and Social Worker/Case Worker, and a Foster Parent will meet to discuss the advisability of re-admission of the child/youth to the Agency. This decision will be made within 48 hours of the referral. This decision process would not hinder the referral process from taking place unless a decision of **No Re-Admission** is determined

## Board of Directors

| Name | Address | Position | Term |
|------|---------|----------|------|
| Eva Pei Yee Lin | 146 Little Mill Road Sandown, NH 03874 | Director | 4/2006 |
| Kyle Dawson | 40 Christopher Lane Alamo, CA 94507 | Chairperson | 4/2006 |
| Brian Uitti | 405 Alcazar Court Danville, CA 94526 | Director | 4/2006 |
| Pam Uitti | 405 Alcazar Court Danville, CA 94526 | Vice-Chair | 4/2006 |
| Robert Burton | 1785 Lynwood Drive Concord, CA 94519 | Director | 4/2006 |

CORP       71    724
Recorded In Above Book and Page
04/06/2005 02:43:40 PM
Arthur C. Murray
Judge of Probate
Calhoun County, Alabama

Recording Fee           18.00
TOTAL                   18.00

Articles of Incorporation for
Children and Families First of Alabama
A Domestic Non-Profit Corporation

Pursuant to the provisions of the Alabama Non-Profit Corporation Act, the undersigned hereby adopts the following Articles of Incorporation.

**Article I**

The name of the corporation is *Children and Families First of Alabama, a Domestic Non-Profit Corporation*.

**Article II**

The duration of the corporation is perpetual, unless otherwise stated.

**Article III**

The corporation has been organized for the following purposes:

1.     This corporation is organized exclusively for charitable purposes within the meaning of Internal Revenue Code section 501(c)(3) (or the corresponding section of any future federal internal revenue law. Notwithstanding any other provision of these articles, the corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the purposes of this corporation, and the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under Internal Revenue Code section 501(c)(3) (or the corresponding provision of any future federal internal revenue law), or (b) by a corporation, contributions to which are deductible under Internal Revenue Code section 170(c)(2) (or the corresponding provision of any future federal internal revenue law).

2.     Specifically, the purpose of this corporation shall be to assist the State of Alabama and all related government agencies in placing children who are wards of the State of Alabama with foster families in order to provide these children with safe and nurturing environments.

**Article IV**

The corporation shall have no members.

**Article V**

The location of the Corporation's registered office is *4105 Cloverdale Road, Anniston, Alabama 36207*, and the name of the registered agent at that office is *Darlene Davis*.

**Article VI**

The names and addresses of the Directors are:

1.   Robert Burton, 1785 Lynwood Drive, Concord, California 94518.
2.   Kyle Dawson, 40 Christopher Lane, Alamo, California 94507.
3.   Brian Uitti, 405 Alcazar Court, Danville, California 94526.
4.   Pamela Uitti, 405 Alcazar Court, Danville, California 94526.
5.   Eva Pei Yee Lin, 146 Little Mill Road, Sandown, New Hampshire 03873.

**Article VII**

The name and address of the Incorporator is as follows:

Peter L. Kutrubes, 560 Lennon Lane, Suite 100, Walnut Creek, California 94598.

**Article VIII**

(a) No substantial part of the activities of this corporation shall consist of carrying on propaganda or otherwise attempting to influence legislation except as permitted under Internal Revenue Code section 501(h), and this corporation shall not participate or intervene in (including publishing or distributing statements) any political campaign on behalf of any candidate for public office.

(b) The property of this corporation is irrevocably dedicated to charitable purposes, as set forth in Article III. No part of the net earnings of this corporation shall inure to the benefit of its directors, trustees, officers, private shareholders or members, or to any individual.

(c) On the winding up and dissolution of this corporation, after paying or adequately providing for the debts and obligations of the corporation, the remaining corporate assets shall be distributed to an organization (or organizations) that is organized and operated exclusively for charitable purposes and that is tax exempt under Internal Revenue Code section 501(c)(3).

IN WITNESS THEREOF, the undersigned incorporator executed these Articles of Incorporation on this 31st Day of March, 2005.

PETER L. KUTRUBES

CORP     71     726

# State of Alabama

# Calhoun County

## CERTIFICATION OF NON-PROFIT INCORPORATION

### OF

### Children and Families First of Alabama

### A Domestic Non-Profit Corporation

The undersigned, as Judge of Probate of Calhoun County, State of Alabama, hereby certifies that duplicate original of Articles of Incorporation, duly signed pursuant to the provisions of Section 10-3A of the Alabama Business Corporation Act, have been received in this office and are found to conform to law.

ACCORDINGLY the undersigned, as such Judge of Probate, and by virtue of the authority vested in him by law, hereby issues this Certificate of Non-Profit Incorporation of Children and Families First of Alabama, a Domestic Non-Profit Corporation, and attaches hereto a duplicate original of the Articles of Incorporation of Children and Families First of Alabama, a Domestic Non-Profit Corporation..

GIVEN Under My Hand and Official Seal on this the 6th Day of April, 2005.

_____
Judge of Probate

# Proposed Budget     Children & Families First          FY 2006

| | Budget | 1st Qtr. | Monthly | % of Expense |
|---|---|---|---|---|
| Office Manager | | $            - | $            - | 0.0% |
| Administration | | $            - | $            - | 0.0% |
| Social Worker | | $            - | $            - | 0.0% |
| Support Staff | 15,600 | $    3,900 | $    1,300 | 28.7% |
| **Total Personnel** | 15,600 | $    3,900 | $    1,300 | 28.7% |

| | Budget | 1st Qtr. | Monthly | Difference (%) |
|---|---|---|---|---|
| Advertising | $    1,000 | $    250 | $    83 | 1.8% |
| Dues and subscriptions | 100 | $    25 | $    8 | 0.2% |
| Employee benefits | 4,680 | $    1,170 | $    390 | 8.6% |
| Liability Insurance | 1,200 | $    300 | $    100 | 2.2% |
| Recreation - Children | 1,200 | $    300 | $    100 | 2.2% |
| Clothing/Care - Children | 1,200 | $    300 | $    100 | 2.2% |
| Maintenance and repairs | 600 | $    150 | $    50 | 1.1% |
| Office supplies | 1,000 | $    250 | $    83 | 1.8% |
| Postage | 750 | $    188 | $    63 | 1.4% |
| Rent or mortgage | 12,000 | $    3,000 | $    1,000 | 22.0% |
| Training | 600 | $    150 | $    50 | 1.1% |
| Travel | 8,000 | $    2,000 | $    667 | 14.7% |
| Telephone | 3,000 | $    750 | $    250 | 5.5% |
| Utilities | 3,000 | $    750 | $    250 | 5.5% |
| Supportive Services | 500 | $    125 | $    42 | 0.9% |
| **Total Operating** | 38,830 | $    9,708 | $    3,236 | 71.3% |

| | Budget | 1st Qtr. | Monthly | |
|---|---|---|---|---|
| | $    54,430 | $    13,608 | $    4,536 | |

## V. COMPENSATION FOR PROVIDING SERVICE

### A. Per Diem Rates

Daily rate per child/youth: $191.00
Number of beds offered at this rate: 180

### B. Medicaid Billing Capacity

Children and Families First of Alabama plans to have the capacity to bill
Medicaid electronically for core services authorized on the ISP prior to awarding
of the contract for FY'06.

### C. Net Medicaid Reimbursement

Children and Families First of Alabama will generate up to $96.00 per day of
Medicaid revenue with the rate split as follows:

> $66.00 – Agency
> $29.00 - DHR

This is a split rate with a portion from DHR and a capped amount from the Net
Medicaid Revenue generated from the provider's Medicaid billing.

Children and Families First is requesting an additional $125.00 per day in
compensation to be paid by the Department, for a total daily rate of $191.00 per
child/youth.

> $66.00 – Medicaid Net Reimbursement to Agency
> $125.00 – State Contract Rate

Children and Families First is offering to provide therapeutic foster care services
utilizing an innovative and well-designed model of treatment with core services
exceeding the State requirements. The treatment model provides a descension in
level of care as improved functioning occurs, with the objective of readiness for
Step-Down therapeutic foster care, and goal of permanency.

The core services to the foster parents as well as services to the child/youth and to
the birth family and/or relative will be consistent in each level to allow provider
homes to maintain a child/youth in their home rather than requiring a child to be
moved. Additionally, the proposed Aftercare Plan for our program exceeds the
core requirements with the implementation of an increase in contact and
assessments.

| Program | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | | | | | 24 | 8 | 4 | | | 36 |
| SAFY | 8 | | 29 | 20 | 8 | 83 | 16 | 7 | 30 | 201 |
| UMCH | 13 | 16 | 8 | | 8 | 14 | 14 | 23 | | 96 |
| TPI | 13 | 33 | 28 | 20 | 20 | 83 | 12 | 50 | 54 | 313 |
| LCYDC | | | | 20 | | | | 75 | | 20 |
| AL Mentor | | | 8 | | | 12 | | | | 20 |
| Wilmer Hall | | 8 | 8 | | | | | | | 16 |
| Youth Villages | | | | | | 40 | | | 30 | 70 |
| FIT Homes | 10 | 20 | | | 12 | | | | | 42 |
| Seraaj | 10 | 16 | 8 | 19 | 8 | 45 | 8 | | 20 | 208 |
| Eagle Rock | | | | | | | | 8 | | 8 |
| Child/Fam Svs | 8 | | | | | | | | | 8 |
| Alliance | | | | | | 18 | | | | 18 |
| Gateway | | | | | | 50 | | | | 50 |
| Mtn View | | | | | | | | 18 | | 18 |
| Catholic SS | | 16 | | | | | | | | 16 |
| New Way Out | | 16 | 8 | 8 | 8 | 30 | | | | 70 |
| NBA CSC | | | | | | | | | | 0 |
| Camellia | | | | | | | | | | 0 |
| Success Hms | | | | | | | | | | 0 |
| Fam Values | | | | | | | | | | 0 |
| Ability + | | | | | | | | | | 0 |
| Total | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |


EXHIBIT
11

## Alabama Department of Human Resources

## Therapeutic Foster Care Vendor Reallocation by Regions

| Program | Score | I | II | III | IV | V | VI | VII | VIII | IX | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Brewer-Porch | 904.25 | | | | | 32 | 8 | 4 | | | 44 |
| SAFY | 893.5 | 8 | | 37 | 20 | 8 | | 16 | 6 | 30 | 207 |
| UMCH | 893.25 | 21 | 16 | 8 | | 8 | 14 | 13 | 22 | | 103 |
| TPI | 892.75 | 13 | 49 | 28 | 28 | 20 | | 12 | 62 | 54 | 377 |
| LCYDC | 889.5 | | | | 20 | | | | | | 20 |
| AL Mentor | 887 | | | 8 | | | 12 | | | | 20 |
| Child/Fam 1st | | | | | | | | | | | 16 |
| Wilmer Hall | 787.5 | | 8 | 8 | | | | | | | 70 |
| Youth Villages | 869.25 | | | | | | | | | 30 | 42 |
| FIT Homes | 867 | 10 | 20 | | | 12 | | | | | 212 |
| Seraaj | 854.75 | 10 | 16 | 8 | 19 | 8 | | 8 | 43 | 20 | 0 |
| Eagle Rock | 849.25 | | | | | | | | | | 0 |
| Child/Fam Svs | 838 | | | | | | | | | | 17 |
| Alliance | 833.25 | | | | | | 17 | | | | 49 |
| Gateway | 820 | | | | | | | | | | 17 |
| Mtn View | 818.65 | | | | | | | | 17 | | 16 |
| Catholic SS | 817.25 | | 16 | | | | | | | | 0 |
| New Way Out | 811 | | | | | | | | | | 0 |
| NBA CSC | 754.25 | | | | | | | | | | 0 |
| Camellia | 753.3 | | | | | | | | | | 0 |
| Success Hms | 712.5 | | | | | | | | | | 0 |
| Fam. Values | 683.5 | | | | | | | | | | 0 |
| Ability + | 639 | | | | | | | | | | 0 |
| Total | | 62 | 125 | 97 | 87 | 88 | 413 | 54 | 150 | 134 | 1210 |


EXHIBIT
12

4/18/05

TFC - Scoring    Sign in/out

Joyce Wilson    10:00
Karen Robinson    10:00
Bobbi Olsen    10:00
Julia Ann Kyle    10:00
Andru O. [illegible]    10:35    11:25 - 11:28  out of room
Joyce Wilson    11:00 - 11:10  out of room
[illegible] Robinson    11:50 - 12:30  lunch
Andru    11:46 - 12:32  Lunch
J Wilson    11:50  lunch  11:50
Bobbi Ols[illegible]    11:50  lunch - 12:32
Julia Ann Kyle    11:50  lunch - 12:32
Julia [illegible]

[illegible]    1:32 - 1:42  out of room    3:05 - 3:12 out
Bobbi Ol[illegible]    2:20 - 2:27
J Wilson    3:30 - [illegible]5
H Robinson    3:33
Andru [illegible]    3:39  out
Joyce Wilson    3:45  out
Julia Ann Kyle    3:45  out
Bobbi Ol[illegible] -  3:48  out

PLAINTIFF'S EXHIBIT 13

SIGN - IN
4/19/09

Andy Jude                7:25              8:15 ~ 8:20    out
Julia Ann Hyde           7:25
Roberson                 7.40
Joyce Wilson             8.00
Betty Ol                 8:30
Andy Jude                8:50 - 8:55
Joyce w                  9:30 · 9:35
Julia Ann Hyde           9:38  out  - 9:45
Andy Jude                9:45  out
Bobbi Olson              9:50   - 9:53
Roberson                 9.50 - 9.53
J Wilson                 10.00 - 1.15
Julia Ann Hyde           10:45 out
Betty Ol                 11:30      12.22
Rob                      11.30 out - 02:00
Roberson wh  12.34  un  out 1.20
Roberson - 3.15
Bobbi Olson              2:35 - 2:55
Laura Roberson  3:00 out
Joyce  3:40 - out

Sign In/Out Sheet
4/26/05
Bobbi Olm — 8:00    8:46
Ondy fuchs — 7:45 - 11:30    Lunch
12:30 - 2:00

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: _____Alabama Mentor_____

I.    **MANDATORY REQUIREMENTS**
      Failure of the vendor to provide the following mandatory items will result in the
      disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
| B. | A completed Taxpayer Identification form is included? | ___ | ___ |
| C. | A completed Disclosure Statement form is included? | ___ | ___ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

Note: If <u>No</u> is checked for any item A through E, provide a brief explanation. ____
_____
_____
_____

II.   **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

      A. Organization Information: Includes the name of Organization, mailing address, site
         address, name, title and phone number of contact person. This section includes
         the names, titles and responsibilities of the governing board of directors, officers,
         and paid consultants, delineating each individual role and relationship to the
         vendor. The proposal provides a brief statement regarding the goals of the
         Organization or its mission statement. Proposal also includes the date of the most
         recent financial audit and the name of the audit firm.
      B. History: A brief history of the formation and development of the vendor's
         organization, with the date of incorporation or, if unincorporated, the date the
         business began, other programs operated in the past and currently, and prior
         names of the organization, if any. A description of all the services provided by the
         vendor, including the locations of service sites.
      C. Management Structure: Describe the management structure of the Organization to
         include the sub-units and the established chain of administrative command.
         Include an organization chart. Ratios of staff to supervisors should be clearly
         indicated.
      D. Qualifications and Experience of Vendor: The proposal includes a description of
         the vendor's qualifications and experience for assuring the successful completion
         of the requirement of the RFP.

      Percent awarded Section II: ____80____ x 25 max points = ___20___ Total

PLAINTIFF'S EXHIBIT 14

III.   **Start Up Plan (50 Points Max)**

   A. Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.
   B. Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

   **Percent awarded Section III:** ___75___ **x 50 max points =** ___37.5___ **Total**

IV.   **Referral, Admission and Exclusion Policy (75 Points Max)**

   A. Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.
   B. Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.
   C. Proposal describes specific criteria for exclusion from the program.

   **Percent awarded Section IV:** ___75___ **x 75 max points =** ___56.25___ **Total**

V.   **Service Delivery (250 Points Max)**

   The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

   A. Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

   B. Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

   C. Program Services for Therapeutic Foster Care Providers:

      1. Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)
      2. Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?
      3. Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: ___90___ x 250 points = ___225___ Total

VI.    **Target Area (50 Points Max)**

    A. If service is proposed as statewide, is the proposal identified as such?
    B. If the service is not statewide, the proposal should identify reasons why.

    Percent awarded Section VI: ___70___ x 50 max points = ___35___ Total

VII.    **Discharge Policy (75 Points Max)**

    A. Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
    B. The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
    C. The proposal describes the vendor's policy concerning re-admission of children.
    D. The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

    Percent awarded Section VII: ___75___ x 75 max points = ___56.25___ Total

VIII.    **Prior Experience (75 Points Max)**

    The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

    Percent awarded Section VIII: ___80___ x 75 max points = ___60___ Total

IX.    **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

    A. The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
    B. Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
    C. Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
    D. The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.
F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.
G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

**Percent awarded Section IX:** ___70___ **x 150 max points =** ___105___ **Total**

X. **References (50 Points Max)**

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

**Percent awarded Section X:** ___70___ **x 50 max points =** ___35___ **Total**

XI. **Compensation for Providing Service (200 Points Max)**

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.
B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.
C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

**Percent awarded for Section XI:** _100%_ **x 200 max points =** _200_ **Total**

**Total Points awarded:**
Section II: ___20___
Section III: ___375___
Section IV: ___5625___
Section V: ___225___
Section VI: ___35___
Section VII: ___2625___
Section VIII: ___60___
Section IX: ___105___
Section X: ___35___

Section XI: _____

**Final Points for Proposal:** _____

**Signature of Scorer:** _____    **Date:** _____

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: _____ *Youth Villages* _____

I.  **MANDATORY REQUIREMENTS**
Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
| B. | A completed Taxpayer Identification form is included? | ___ | ___ |
| C. | A completed Disclosure Statement form is included? | ___ | ___ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

**Note: If No is checked for any item A through E, provide a brief explanation.** ___

_____

_____

II.  **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

A. Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement.  Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B. History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any.  A description of all the services provided by the vendor, including the locations of service sites.

C. Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D. Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

**Percent awarded Section II:** ___ *95* ___ **x 25 max points =** ___ *23.75* ___ **Total**



PLAINTIFF'S EXHIBIT 15

III.    **Start Up Plan (50 Points Max)**

A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.
B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

**Percent awarded Section III:** ____$85$____ **x 50 max points =** ___$42.5$___ **Total**

IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.
B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.
C.  Proposal describes specific criteria for exclusion from the program.

**Percent awarded Section IV:** ____$85$____ **x 75 max points =** ___$60$___ **Total**

V.    **Service Delivery (250 Points Max)**

The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

C.  Program Services for Therapeutic Foster Care Providers:

1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)
2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?
3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: _____ *80* _____ x 250 points = _____ *200* _____ Total

VI.    **Target Area (50 Points Max)**

   A.  If service is proposed as statewide, is the proposal identified as such?
   B.  If the service is not statewide, the proposal should identify reasons why.

   Percent awarded Section VI: _____ *70* _____ x 50 max points = _____ *35* _____ Total

VII.    **Discharge Policy (75 Points Max)**

   A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
   B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
   C.  The proposal describes the vendor's policy concerning re-admission of children.
   D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

   Percent awarded Section VII: _____ *70* _____ x 75 max points = _____ *52.5* _____ Total

VIII.    **Prior Experience (75 Points Max)**

   The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

   Percent awarded Section VIII: _____ *90* _____ x 75 max points = _____ *67.3* _____ Total

IX.    **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

   A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
   B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
   C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
   D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: ___75___ x 150 max points = ___112.5___ Total

X.   **References (50 Points Max)**

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: ___90___ x 50 max points = ___45___ Total

XI.   **Compensation for Providing Service (200 Points Max)**

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: ___100___ x 200 max points = ___200___ Total

**Total Points awarded:**     Section II:   ___23.75___
Section III:  ___42.50___
Section IV:   ___60___
Section V:    ___200___
Section VI:   ___35___
Section VII:  ___52.50___
Section VIII: ___67.50___
Section IX:   ___112.50___
Section X:    ___45___
                          ___638.75___

Section XI: _200_

**Final Points for Proposal:** _838.75_

**Signature of Scorer:** _____     Date: _____

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

**Vendor Name:** _Alabama Mentor_

I.    **MANDATORY REQUIREMENTS**
      Failure of the vendor to provide the following mandatory items will result in the
      disqualification of the proposal.

                                                                   Yes          No

      A.   Vendor met the deadline for receipt of proposal?        ✓            ___
      B.   A completed Taxpayer Identification form is included?   ✓            ___      _CX_
      C.   A completed Disclosure Statement form is included?      ✓            ___     _4/15/05_
      D.   Proposal contains a copy of current child placing agency license
           or application to be licensed?                          ✓            ___
      E.   An original proposal, with original signature of person(s)
           legally authorized to bind the vendor to the proposal, plus
           the required number of copies (5) per RFP document?      ✓            ___

      **Note: If No is checked for any item A through E, provide a brief explanation.** ____

      _____

II.   **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

      A.   Organization Information: Includes the name of Organization, mailing address, site
           address, name, title and phone number of contact person. This section includes
           the names, titles and responsibilities of the governing board of directors, officers,
           and paid consultants, delineating each individual role and relationship to the
           vendor. The proposal provides a brief statement regarding the goals of the
           Organization or its mission statement. Proposal also includes the date of the most
           recent financial audit and the name of the audit firm.
      B.   History: A brief history of the formation and development of the vendor's
           organization, with the date of incorporation or, if unincorporated, the date the
           business began, other programs operated in the past and currently, and prior
           names of the organization, if any. A description of all the services provided by the
           vendor, including the locations of service sites.
      C.   Management Structure: Describe the management structure of the Organization to
           include the sub-units and the established chain of administrative command.
           Include an organization chart. Ratios of staff to supervisors should be clearly
           indicated.
      D.   Qualifications and Experience of Vendor: The proposal includes a description of
           the vendor's qualifications and experience for assuring the successful completion
           of the requirement of the RFP.

      **Percent awarded Section II:** _90_ x 25 max points = _22.5_ **Total**

PLAINTIFF'S
EXHIBIT
16

III.   **Start Up Plan (50 Points Max)**

    A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

    B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

    **Percent awarded Section III:** ___90___ x 50 max points = ___45___ **Total**

IV.   **Referral, Admission and Exclusion Policy (75 Points Max)**

    A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

    B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

    C.  Proposal describes specific criteria for exclusion from the program.

    **Percent awarded Section IV:** ___75___ x 75 max points = __56.25__ **Total**

V.   **Service Delivery (250 Points Max)**

    The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

    A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

    B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

    C.  Program Services for Therapeutic Foster Care Providers:

        1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP?  The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter.  (Note: The discharge plan shall be developed at the time of placement.)

        2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

        3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: _____75_____ x 250 points = __189.5__ Total

VI.  **Target Area (50 Points Max)**

  A.  If service is proposed as statewide, is the proposal identified as such?
  B.  If the service is not statewide, the proposal should identify reasons why.

  Percent awarded Section VI: __70__ x 50 max points = __35__ Total

VII.  **Discharge Policy (75 Points Max)**

  A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
  B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
  C.  The proposal describes the vendor's policy concerning re-admission of children.
  D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

  Percent awarded Section VII: __75__ x 75 max points = __56.25__ Total

VIII.  **Prior Experience (75 Points Max)**

  The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

  Percent awarded Section VIII: __80__ x 75 max points = __60__ Total

IX.  **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

  A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
  B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
  C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
  D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: ____90____ x 150 max points = __135__ Total

X. **References (50 Points Max)**

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: ____100____ x 50 max points = __50__ Total

XI. **Compensation for Providing Service (200 Points Max)**

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: __100%__ x 200 max points = __200__ Total

**Total Points awarded:**

| Section II:   | 22.5  |
|---------------|-------|
| Section III:  | 45    |
| Section IV:   | 56.25 |
| Section V:    | 187.5 |
| Section VI:   | 35    |
| Section VII:  | 56.25 |
| Section VIII: | 10    |
| Section IX:   | 135   |
| Section X:    | 50    |

SMH 4/18/05    SM 4/21/05

647.5
200
847.5

Section XI: _____

Final Points for Proposal: _____

Signature of Scorer: _____    Date: _____

# SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

Vendor Name: _____ *Alabama Mentor* _____

### I. MANDATORY REQUIREMENTS

Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | —— | —— |
| B. | A completed Taxpayer Identification form is included? | —— | —— |
| C. | A completed Disclosure Statement form is included? | —— | —— |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | —— | —— |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | —— | —— |

**Note: If No is checked for any item A through E, provide a brief explanation.** ____

_____

_____

### II. ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)

A. Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B. History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

C. Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D. Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

Percent awarded Section II: ___ 80% ___ x 25 max points = ___ 20 ___ Total

III.   **Start Up Plan (50 Points Max)**

    A.   Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.

    B.   Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

    **Percent awarded Section III:** $\underline{100}$ % x 50 max points = $\underline{50}$ Total

IV.   **Referral, Admission and Exclusion Policy (75 Points Max)**

    A.   Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.

    B.   Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.

    C.   Proposal describes specific criteria for exclusion from the program.

    **Percent awarded Section IV:** $\underline{100}$ % x 75 max points = $\underline{75}$ Total

V.   **Service Delivery (250 Points Max)**

The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

    A.   Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

    B.   Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

    C.   Program Services for Therapeutic Foster Care Providers:

        1.   Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)

        2.   Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?

        3.   Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: __90%__ x 250 points = __225__ Total

VI.    **Target Area (50 Points Max)**

    A.  If service is proposed as statewide, is the proposal identified as such?
    B.  If the service is not statewide, the proposal should identify reasons why.

    Percent awarded Section VI: __90%__ x 50 max points = __45__ Total

VII.    **Discharge Policy (75 Points Max)**

    A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
    B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
    C.  The proposal describes the vendor's policy concerning re-admission of children.
    D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

    Percent awarded Section VII: __100%__ x 75 max points = __75__ Total

VIII.    **Prior Experience (75 Points Max)**

    The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

    Percent awarded Section VIII: __100%__ x 75 max points = __75__ Total

IX.    **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

    A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
    B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
    C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
    D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: __100%__ x 150 max points = __150__ Total

## X.    References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: __100%__ x 50 max points = __50__ Total

## XI.    Compensation for Providing Service (200 Points Max)

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: __100%__ x 200 max points = __200__ Total

**Total Points awarded:**

| | |
|---|---|
| Section II: | 20 |
| Section III: | 50 |
| Section IV: | 75 |
| Section V: | 225 |
| Section VI: | 45 |
| Section VII: | 75 |
| Section VIII: | 75 |
| Section IX: | 150 |
| Section X: | 50 |

**Section XI:** _____

**Final Points for Proposal:** _____

**Signature of Scorer:** _____    **Date:** _____

## SCORING INSTRUMENT

## THERAPEUTIC FOSTER CARE SERVICES FOR CHILDREN

**Vendor Name:** _Alabama Mentor_

I.  **MANDATORY REQUIREMENTS**
Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ____ | ____ |
| B. | A completed Taxpayer Identification form is included? | ____ | ____ |
| C. | A completed Disclosure Statement form is included? | ____ | ____ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ____ | ____ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ____ | ____ |

**Note: If No is checked for any item A through E, provide a brief explanation.** ____

_____

_____

II.  **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

A.  Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person. This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor. The proposal provides a brief statement regarding the goals of the Organization or its mission statement. Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B.  History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any. A description of all the services provided by the vendor, including the locations of service sites.

C.  Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command. Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D.  Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

**Percent awarded Section II:** _100_ **x 25 max points =** _25_ **Total**

III.   **Start Up Plan (50 Points Max)**

   A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.
   B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

   **Percent awarded Section III:** ___90___ x 50 max points = ___43___ **Total**

IV.   **Referral, Admission and Exclusion Policy (75 Points Max)**

   A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.
   B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.
   C.  Proposal describes specific criteria for exclusion from the program.

   **Percent awarded Section IV:** ___100___ x 75 max points = ___75___ **Total**

V.   **Service Delivery (250 Points Max)**

   The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

   A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

   B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

   C.  Program Services for Therapeutic Foster Care Providers:

      1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)
      2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?
      3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

**8.** Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: _____90_____ x 250 points = _____225_____ Total

VI.    **Target Area (50 Points Max)**

   A.  If service is proposed as statewide, is the proposal identified as such?
   B.  If the service is not statewide, the proposal should identify reasons why.

   Percent awarded Section VI: _____60_____ x 50 max points = _____30_____ Total

VII.    **Discharge Policy (75 Points Max)**

   A.  Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
   B.  The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
   C.  The proposal describes the vendor's policy concerning re-admission of children.
   D.  The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

   Percent awarded Section VII: _____100_____ x 75 max points = _____75_____ Total

VIII.    **Prior Experience (75 Points Max)**

   The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

   Percent awarded Section VIII: _____100_____ x 75 max points = _____75_____ Total

IX.    **Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)**

   A.  The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
   B.  Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
   C.  Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
   D.  The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: _____90_____ x 150 max points = ___135___ Total

## X. References (50 Points Max)

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

Percent awarded Section X: ____100____ x 50 max points = ___50___ Total

## XI. Compensation for Providing Service (200 Points Max)

A. Proposal includes the total amount of compensation that the facility requires to provide services outlined in Attachment A. The compensation is listed as the daily rate per child and the number of beds offered at this rate.

B. The proposal certifies that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'05.

C. The vendor has identified the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: ___100%___ x 200 max points = ___200___ Total

Total Points awarded:

Section II: ___25___
Section III: ___95___
Section IV: ___75___
Section V: ___225___
Section VI: ___30___
Section VII: ___75___
Section VIII: ___75___
Section IX: ___135___
Section X: ___50___

**Section XI:** _____

**Final Points for Proposal:** _____

**Signature of Scorer:** _____     **Date:** _____

## <u>SCORING INSTRUMENT</u>

## <u>THERAPEUTIC FOSTER CARE  SERVICES FOR CHILDREN</u>

Vendor Name: _____ *Alabama- Mentor* _____

I.    **MANDATORY REQUIREMENTS**
Failure of the vendor to provide the following mandatory items will result in the disqualification of the proposal.

|  |  | Yes | No |
|---|---|---|---|
| A. | Vendor met the deadline for receipt of proposal? | ___ | ___ |
| B. | A completed Taxpayer Identification form is included? | ___ | ___ |
| C. | A completed Disclosure Statement form is included? | ___ | ___ |
| D. | Proposal contains a copy of current child placing agency license or application to be licensed? | ___ | ___ |
| E. | An original proposal, with original signature of person(s) legally authorized to bind the vendor to the proposal, plus the required number of copies (5) per RFP document? | ___ | ___ |

**Note: If <u>No</u> is checked for any item A through E, provide a brief explanation.** ___

_____
_____
_____

II.    **ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)**

A.  Organization Information: Includes the name of Organization, mailing address, site address, name, title and phone number of contact person.  This section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor.  The proposal provides a brief statement regarding the goals of the Organization or its mission statement.   Proposal also includes the date of the most recent financial audit and the name of the audit firm.

B.  History: A brief history of the formation and development of the vendor's organization, with the date of incorporation or, if unincorporated, the date the business began, other programs operated in the past and currently, and prior names of the organization, if any.  A description of all the services provided by the vendor, including the locations of service sites.

C.  Management Structure: Describe the management structure of the Organization to include the sub-units and the established chain of administrative command.  Include an organization chart. Ratios of staff to supervisors should be clearly indicated.

D.  Qualifications and Experience of Vendor: The proposal includes a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP.

**Percent awarded Section II:** ___.9 0___ **x 25 max points =** ___22.5___ **Total**

III.    **Start Up Plan (50 Points Max)**

   A.  Vendor provided a plan of action detailing the steps necessary to reach program operation including target dates.
   B.  Providers with current contracts have provided a start up plan and have described changes to the existing program structure as required to meet the terms of the RFP.

   **Percent awarded Section III:** _____.80_____ x 50 max points = ___40.0___ **Total**

IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

   A.  Proposal describes specific target population of children accepted into the program, to include age, sex, and type(s) of behavior.
   B.  Proposal includes specific policy and procedure for admission and intake including criteria for referral and acceptance into the program.
   C.  Proposal describes specific criteria for exclusion from the program.

   **Percent awarded Section IV:** _____.90_____ x 75 max points = ___67.5___ **Total**

V.    **Service Delivery (250 Points Max)**

   The proposal describes the delivery of service to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.

   A.  Planning Responsibility: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child, indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree?

   B.  Definition of Therapeutic Foster Care Provider: Does the proposal address how the facility meets the definition of being a Therapeutic Foster Care provider by describing the setting, which provides room, board and the array of services for a child.

   C.  Program Services for Therapeutic Foster Care Providers:

   1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)
   2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth?
   3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services

provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR?

5. Does the proposal address how the provider plans to ensure that children are receiving needed educational services, participation in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP?

6. Does the proposal address how the provider plans to ensure that child receive routine and emergency medical care?

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment?

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service?

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service?

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP?

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? .

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service?

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service?

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them. Does the program describe what services will be provided during the in-home service provision?

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided?

Percent awarded Section V: _____ 90 x 250 points = _____ 225.0 Total

## VI.    Target Area (50 Points Max)

A. If service is proposed as statewide, is the proposal identified as such?
B. If the service is not statewide, the proposal should identify reasons why.

Percent awarded Section VI: _____ .70 x 50 max points = _____ 35.0 Total

## VII.    Discharge Policy (75 Points Max)

A. Proposal describes the process and criteria for reunification planning with children/families and coordination with the ISP Team; as well as pre-discharge and aftercare planning requirements.
B. The proposal describes the vendor's policy on discharge prior to program completion, including emergency discharges.
C. The proposal describes the vendor's policy concerning re-admission of children.
D. The proposal provides an example of, or describes the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement.

Percent awarded Section VII: _____ .60 x 75 max points = _____ 45.0 Total

## VIII.    Prior Experience (75 Points Max)

The proposal describes the Organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP.

Percent awarded Section VIII: _____ 70 x 75 max points = _____ 52.5 Total

## IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)

A. The proposal describes staffing patterns, staff availability, including administrative and programmatic, and provides a brief rationale for levels of staffing proposed.
B. Proposal provides information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff. Job descriptions are included for proposed positions.
C. Proposal describes, in detail, the steps that the vendor takes to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. The proposal documents that each employee has had a criminal background check. The proposal also, describes the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded.
D. The proposal describes, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP. The proposal describes the organization's staff development program regarding orientation and on going training for all staff.

E. The proposal describes how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe. Proposal provides a specific plan addressing emergencies and critical incident response.

F. Proposal describes the use of volunteers and interns within the organization and how they are selected and screened for background checks.

G. Proposal describes, in detail, the organizations plans to meet the training requirement established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program.

Percent awarded Section IX: _____ 80 _____ x 150 max points = _120.0_ Total

X.   **References (50 Points Max)**

The proposal lists all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP. The list includes the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring.

_____ x 50 max points = _____ Total



847.5
830.0
935.
96.5
857.5

4435.0
887
5)4435

887

XI.  **Co[mpensation] [Po]ints Max)**

A. [compensation that the facility requires to ...] The compensation is listed as the daily [rate and ... at this rate.

B. [... capacity to bill Medicaid ... the ISP, or that they have a letter of ... prior to awarding a contract for FY'05.

C. T[he ... identified] the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement". (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.

Percent awarded for Section XI: _100%_ x 200 max points = _200_ Total

**Total Points awarded:**

Section II: _____ 22.5
Section III: _____ 40.0
Section IV: _____ 67.5
Section V: _____ 225.0
Section VI: _____ 35.0
Section VII: _____ 45.0
Section VIII: _____ 52.5
Section IX: _____ 120.0
Section X: _____ 50.0

657.5
200
857.5

**Section XI:** _____

**Final Points for Proposal:** _____

**Signature of Scorer:** _____     **Date:** ___4/18/05___



*Alabama Department of Human Resources*
### *Therapeutic Foster Care for Region 8*

## SCORING INSTRUMENT

Vendor Name: _____**Youth Villages**_____ RFP Number: *2005-100-04*_____

*Please indicate either a "yes" or "no" response by placing an "X" on the line provided.*

### I.    MANDATORY REQUIREMENTS

*Failure by the vendor to provide the following mandatory items will result in the disqualification of the proposal.*

|  |  | Yes | No |
|---|---|---|---|
| A. | Did the Vendor meet the deadline for receipt of proposal? | X | |
| B. | Is a completed Taxpayer Identification form is included? | X | |
| C. | Is a completed Disclosure Statement form is included? | X | |
| D. | Does the proposal contain a copy of current child placing agency license or application to be licensed? | X | |
| E. | Did the Vendor submit an original proposal, with an original signature of person(s) legally authorized to bind the vendor to the proposal and the required five (5) copies? | X | |

*Note: If No is checked for any item A through E, the proposal is deemed non-responsive and no further consideration will be given.*

> *Proposals will be scored using the following scale: 0 – Did not address/no capacity to meet the criterion; 10 – 30 – Marginal to poor description of/capacity to meet the criterion; 40 – 60 – Average description of/capacity to meet the criterion; 70 – 90 – Above average description of/capacity to meet the criterion; 100 – Excellent description of/capability to meet the criterion.*

### II.   ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)

A. ***Organization Information***: Did the Vendor include the name of organization, mailing address, site address, name, title and phone number of contact person (this section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor)?   *Yes_____✓_____  No_____*
Does the proposal include a brief statement of the goals of the organization or its mission statement? )?   *Yes_____✓____  No_____*
Does the proposal include the date of the most recent financial audit and the name of the audit firm? )?   *Yes_____✓____  No_____*

B. ***History:*** Does the proposal include: a brief history of the formation and development of the its organization; the date of incorporation or, if unincorporated, the date the business began; other programs operated in the past and currently; and if applicable, prior names of the organization? )?   *Yes_____✓_____  No_____*
Does the proposal include a description of all the services provided by the vendor, including the locations of service sites? )?   *Yes_____✓___  No_____*

C. ***Management Structure***: Did the Vendor describe the management structure of the organization, its sub-units and the established chain of administrative command? )?   *Yes_____✓_____  No_____*
Does the proposal include an organization chart? )?   *Yes_____  No_____*
Are ratios of staff to supervisors clearly indicated? )?   *Yes_____  No_____*

Evaluator Number_____/_____

PLAINTIFF'S EXHIBIT 17

1

*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**

**D. Qualifications and Experience of Vendor**: Does the proposal include a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP? Yes_____ ✓  No_____    22.5

**Percent awarded Section II:** ___90___ x 25 max points = ____ **Total**
                                                              BH

III.    **Start Up Plan (50 Points Max)**

A.   Did the Vendor provide a plan of action detailing the steps necessary to reach program operation and target dates? Yes_____ ✓  No_____
                                        *or*
B.   If the Vendor is a current contract provider, did the Vendor provide a start up plan and describe changes to the existing program structure as required to meet the terms of the RFP? Yes_____ /  No_____

**Percent awarded Section III:** ___90___ x 50 max points = ___45___ **Total**

IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

A.   Does the proposal describe specific target population of children accepted into the program, to include age, sex, and type(s) of behavior? Yes___ ✓  No_____
B.   Does the proposal include specific policies and procedures for admission and intake including criteria for referral and acceptance into the program? Yes___ ✓  No_____
C.   Does the proposal describe specific criteria for exclusion from the program? Yes____ No_____

**Percent awarded Section IV:** ___90___ x 75 max points = ___67.5___ **Total**

V.    **Service Delivery (250 Points Max)**

*The proposal must describe the delivery of services to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.*

A.   **Planning Responsibility**: Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child? Yes_____ No___ ✓ Does the proposal indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree? Yes_____ ✓  No_____

B.   **Definition of Therapeutic Foster Care Provider**: Does the proposal describe how the facility will meet the requirements (room and board, the array of services for a child) of a Therapeutic Foster Care provider? Yes___ ✓  No_____

C.   **Program Services for Therapeutic Foster Care Providers**:

1.   Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? *The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)* Yes___ ✓  No_____
                                                              BH



*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**

2. Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth? Yes_____✓_____  No_____

3. Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? *Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.* Yes__✓___  No_____

4. Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR? Yes_____  No___✓___

5. Does the proposal describe how the provider plans to ensure that children will receive needed educational services, participate in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP? Yes___✓___  No_____

6. Does the proposal address how the provider plans to ensure that children will receive routine and emergency medical care? Yes_____  No___✓___

7. Does the proposal address how the provider currently completes or plans to complete tracking outcome data? Yes___✓___  No_____

8. Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment? Yes___✓___  No_____

9. Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service? Yes_____  No___✓___

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service? Yes___✓___  No_____

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP? Yes_____  ✓ No_____

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? Yes___✓___  No_____

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service? Yes___✓___

*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**



No_____

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service? Yes_____ ✓ No_____

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? *This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them.* Does the program describe what services will be provided during the in-home service provision? Yes_____ ✓ No_____

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided? Yes_____ ✓ No_____

**Percent awarded Section V:** __70__ x 250 points = __175__ **Total**

## VI.    Target Area (50 Points Max)

A. Does the vendor describe how services will be provided in region 8?

**Percent awarded Section VI:** __80__ x 50 max points = __40__ **Total**

## VII.    Discharge Policy (75 Points Max)

A. Does the proposal describe the process and criteria for reunification planning with children/families and coordination with the ISP Team, as well as pre-discharge and aftercare planning requirements? Yes_____ ✓ No_____

B. Does the proposal describe the vendor's policy on discharge prior to program completion, including emergency discharges? Yes_____ ✓ No_____

C. Does the proposal describe the vendor's policy concerning re-admission of children? Yes_____ ✓ No_____

D. Does the proposal provide an example of, or describe the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement? Yes_____ ✓ No_____

**Percent awarded Section VII:** __80__ x 75 max points = __60__ **Total**

## VIII.    Prior Experience (75 Points Max)

Does the proposal describe the organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP? Yes_____ ✓ _____ No_____

**Percent awarded Section VIII:** __80__ x 75 max points = __60__ **Total**

## IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)

*Alabama Department of Human Resources*
### Therapeutic Foster Care for Region 8



A. Does the proposal describe staffing patterns, staff availability for administrative and programmatic areas and a brief rationale for levels of staffing proposed? Yes_____ No_____

B. Does the proposal provide information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff? Are Job descriptions included for proposed positions? Yes_____ No_____

C. Does the proposal describe, in detail, the steps that the vendor will take to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. Does the proposal document that each employee has had/will have a criminal background check? Does the proposal describe the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded? Yes_____ No_____

D. Does the proposal describe, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP? Does the proposal describe the organization's staff development program regarding orientation and on going training for all staff? Yes_____ No_____

E. Does the proposal describe how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe? Does the proposal provide a specific plan to address emergencies and critical incident response? Yes_____ No_____

F. Does the proposal describe the use of volunteers and interns within the organization and how they are selected and screened for background checks? Yes_____ No_____

G. Does the proposal describe, in detail, the organizations plans to meet the training requirements established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program? Yes_____ No_____

**Percent awarded Section IX:** _80_ x 150 max points = _120_ Total

## X.    References (50 Points Max)

Does the proposal list all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP? Does the list include the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring? Yes_____ No_____

**Percent awarded Section X:** _90_ _BH_ x 50 max points = _45_ Total

## XI.    Compensation for Providing Service (200 Points Max)

A. Does the proposal include the total amount of compensation that the facility requires to provide services outlined in Attachment A? Is the compensation listed as the daily rate per child and the number of beds offered at this rate? Yes_____ No_____

B. Does the proposal certify that the vendor has the capacity to bill Medicaid electronically for core services authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'06? Yes_____ No_____

C. Did the vendor identify the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement"? (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.)

**Percent awarded for Section XI:** _60_ x 200 max points = _250_ Total

*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**

**Total Points awarded:**     **Section II:** _22.5_

**Section III:** _45_

**Section IV:** _67.5_

**Section V:** _125_

**Section VI:** _40_

**Section VII:** _60_

**Section VIII:** _60_

**Section IX:** _120_

**Section X:** _75_

**Section XI:** _200_

**Final Points for Proposal:** _835_

Evaluator Number_____/_____

6

*Alabama Department of Human Resources*
### *Therapeutic Foster Care for Region 8*



## SCORING INSTRUMENT

**Vendor Name:** _____ **Youth Villages** _____ **RFP Number:** *2005-100-04* _____

*Please indicate either a "yes" or "no" response by placing an "X" on the line provided.*

### I.     MANDATORY REQUIREMENTS
*Failure by the vendor to provide the following mandatory items will result in the disqualification of the proposal.*

|  |  | **Yes** | **No** |
|---|---|---|---|
| A. | Did the Vendor meet the deadline for receipt of proposal? | x | |
| B. | Is a completed Taxpayer Identification form is included? | x | |
| C. | Is a completed Disclosure Statement form is included? | x | |
| D. | Does the proposal contain a copy of current child placing agency license or application to be licensed? | x | |
| E. | Did the Vendor submit an original proposal, with an original signature of person(s) legally authorized to bind the vendor to the proposal and the required five (5) copies? | x | |

*Note: If No is checked for any item A through E, the proposal is deemed non-responsive and no further consideration will be given.*

> *Proposals will be scored using the following scale: 0 – Did not address/no capacity to meet the criterion; 10 – 30 – Marginal to poor description of/capacity to meet the criterion; 40 – 60 – Average description of/ capacity to meet the criterion; 70 – 90 – Above average description of/capacity to meet the criterion; 100 – Excellent description of/capability to meet the criterion.*

### II.     ORGANIZATION INFORMATION & MANAGEMENT STRUCTURE (25 Points Max)

A.  ***Organization Information***: Did the Vendor include the name of organization, mailing address, site address, name, title and phone number of contact person (this section includes the names, titles and responsibilities of the governing board of directors, officers, and paid consultants, delineating each individual role and relationship to the vendor)?  *Yes_____X_____ No_____*
Does the proposal include a brief statement of the goals of the organization or its mission statement? )?  *Yes_____X_____ No_____*
Does the proposal include the date of the most recent financial audit and the name of the audit firm? )?  *Yes__X_____ No_____*

B.  ***History***: Does the proposal include: a brief history of the formation and development of the its organization; the date of incorporation or, if unincorporated, the date the business began; other programs operated in the past and currently; and if applicable, prior names of the organization? )?  *Yes_____ No_____*
Does the proposal include a description of all the services provided by the vendor, including the locations of service sites? )?  *Yes_____ No_____*

C.  ***Management Structure***: Did the Vendor describe the management structure of the organization, its sub-units and the established chain of administrative command? )?  *Yes_____X_____ No_____*
Does the proposal include an organization chart? )?  *Yes__X_____ No_____*
Are ratios of staff to supervisors clearly indicated? )?  *Yes__X_____ No_____*



*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**

**D. Qualifications and Experience of Vendor:** Does the proposal include a description of the vendor's qualifications and experience for assuring the successful completion of the requirement of the RFP? Yes__X__   No_____

**Percent awarded Section II:** _____$30$_____ x 25 max points = ___$7.50$___ **Total**


III.    **Start Up Plan (50 Points Max)**

    A.  Did the Vendor provide a plan of action detailing the steps necessary to reach program operation and target dates? Yes__$30$__   No_____

                                      *or*

    B.  If the Vendor is a current contract provider, did the Vendor provide a start up plan and describe changes to the existing program structure as required to meet the terms of the RFP?  Yes_____   No_____

    **Percent awarded Section III:** _____$30$_____ x 50 max points = ___$1500$___ **Total**


IV.    **Referral, Admission and Exclusion Policy (75 Points Max)**

    A.  Does the proposal describe specific target population of children accepted into the program, to include age, sex, and type(s) of behavior? Yes___X___   No_____
    B.  Does the proposal include specific policies and procedures for admission and intake including criteria for referral and acceptance into the program? Yes_X_   No_____
    C.  Does the proposal describe specific criteria for exclusion from the program? Yes_X_  No_____

    **Percent awarded Section IV:** ___$50$___ x 75 max points = $3750$ **Total**


V.    **Service Delivery (250 Points Max)**

*The proposal must describe the delivery of services to meet, or exceed, the Family Services Program requirements and Core Services outlined in Attachment A of this RFP.*

    A.  **Planning Responsibility:** Does the proposal narrative support the provider's ability to accept DHR as having planning responsibility for the child? Yes_X_   No_____
    Does the proposal indicate that the family's ISP will drive all service delivery and have all services comply with the RC Consent degree? Yes___X___   No_____

    B.  **Definition of Therapeutic Foster Care Provider:** Does the proposal describe how the facility will meet the requirements (room and board, the array of services for a child) of a Therapeutic Foster Care provider? Yes__X__   No_____

    C.  **Program Services for Therapeutic Foster Care Providers:**

        1.  Does the proposal address how the provider plans to participate and/or provide meaningful input in the ISP process including scheduling and coordinating the child's treatment plan in conjunction with the family's ISP? *The following timeline will be maintained: the initial treatment plan developed within 10 days from admission date; the comprehensive treatment plan developed within 30 days from admission date; and, a treatment plan review held every 90 days thereafter. (Note: The discharge plan shall be developed at the time of placement.)* Yes__X__   No_____



*Alabama Department of Human Resources*
## *Therapeutic Foster Care for Region 8*

2.  Does the proposal address how the provider will assist in developing a behavioral management plan for the child or youth? Yes___ $\times$___  No_____

3.  Does the proposal address how the provider currently completes or plans to complete a monthly report to referring county DHR describing services provided during the month and the child's progress toward achieving the goals outlined in the treatment plan? *Progress notes shall be received by the 10th day of the following month outlining goals achieved from the previous month treatment plan.* Yes___ $\times$___  No_____

4.  Does the proposal address how the provider plans to work with the placing DHR office to ensure that the EPSDT screening is completed according to schedule; update EDS software with the provider number and screening dates, as appropriate; provide copy of screening to county DHR? Yes___ $\times$___  No_____

5.  Does the proposal describe how the provider plans to ensure that children will receive needed educational services, participate in and follow-up on children's IEP's, monthly contact with the schools of the residents, quarterly site visits with the schools of residents, transportation to school, and access to alternative educational settings as identified in the family's ISP? Yes___ $\times$___  No_____

6.  Does the proposal address how the provider plans to ensure that children will receive routine and emergency medical care? Yes___ $\times$___  No_____

7.  Does the proposal address how the provider currently completes or plans to complete tracking outcome data? Yes___ $\times$___  No_____

8.  Does the proposal address how the provider will, upon the child's immediate discharge, survey the child, the family and the DHR social worker to assess satisfaction of services, care and treatment? Yes___ $\times$___  No_____

9.  Does the proposal address how medication monitoring and administration, as appropriate to meet the needs of the individual child will be provided? Does it address how the program will bill for this service? Yes___ $\times$___  No_____

10. Does the proposal address how the agency will provide basic living skills training to meet the specific treatment needs of the child in care? Does it address how the program will bill for this service? Yes___ $\times$___  No_____

11. Does the proposal address how the program will provide local transportation to appointments such as physicians, counseling, extra-curricular, family visits, etc. as identified in the ISP? Yes___ $\times$___  No_____

12. Does the proposal address how the program will, consistent with the ISP, ensure the child's involvement in at least one extra-curricular activity of the child's or youth's own choosing, e.g. band, karate, various sports, Boy or Girl Scouts, etc? Does it address how the program will bill for this service? Yes___ $\times$___  No_____

13. Does the proposal address how the program will provide the child with mental Health Consultation with DHR, counselors, teachers, and other professionals relevant to the child not to exceed the daily caps in the Medicaid Rehab Manual and as authorized by the ISP? Does it address how the program will bill for this service? Yes___ $\times$___



*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**

No_____

14. Does the proposal address how the program will provide the child with a minimum of a monthly contact with the therapist of the child or family to monitor progress or outcomes in counseling? Does it address how the program will bill for this service? Yes___X___  No_____

15. Does the proposal address how Supportive services to the family as agreed in the ISP will be provided? Does it address how the program will bill for this service? *This may include but is not limited to supervision of family visitation, providing space where the family can visit comfortably, and flexibility of program structure that allows family contact at times that work for them.* Does the program describe what services will be provided during the in-home service provision? Yes___X___  No_____

16. Does the program describe what services will be provided to the TFC foster parents as well as the training that will be provided? Yes___X___  No_____

**Percent awarded Section V:** ___40___ x 250 points = __10 000__ **Total**

## VI.    Target Area (50 Points Max)

A. Does the vendor describe how services will be provided in region 8? y ∈ S

**Percent awarded Section VI:** ___30___ x 50 max points = __1500__ **Total**

## VII.    Discharge Policy (75 Points Max)

A. Does the proposal describe the process and criteria for reunification planning with children/families and coordination with the ISP Team, as well as pre-discharge and aftercare planning requirements? Yes___X___ No_____

B. Does the proposal describe the vendor's policy on discharge prior to program completion, including emergency discharges? Yes___X___ No_____

C. Does the proposal describe the vendor's policy concerning re-admission of children? Yes_____ No_X_____

D. Does the proposal provide an example of, or describe the program's process for moving children through the goals and objectives outlined in the ISP, to include provisions of "step down" to a less restrictive placement? Yes___X___ No_____

**Percent awarded Section VII:** ___40___ x 75 max points = _3000_ **Total**

## VIII.    Prior Experience (75 Points Max)

Does the proposal describe the organization's prior history of providing the core services and Family Service program requirements as outlined in Attachment A of the RFP? Yes_X_ _____ No_____

**Percent awarded Section VIII:** ___30___ x 75 max points = __2250__ **Total**

## IX.    Staff Qualifications, Staff Recruitment, Job Descriptions & Training Requirements (150 Points Max)

*Alabama Department of Human Resources*
**Therapeutic Foster Care for Region 8**



A. Does the proposal describe staffing patterns, staff availability for administrative and programmatic areas and a brief rationale for levels of staffing proposed? *Yes* __X__ *No*_____

B. Does the proposal provide information regarding the qualifications, including education and licensure and experience required for administrative, program and treatment staff? Are Job descriptions included for proposed positions? *Yes* __X__ *No*_____

C. Does the proposal describe, in detail, the steps that the vendor will take to ensure that all staff, regardless of level, have not been the subject of any incident or investigation which would call into the propriety of that employee's working with this population of children. Does the proposal document that each employee has had/will have a criminal background check? Does the proposal describe the organization's general procedure regarding if an incident or allegation is reported, founded or unfounded? *Yes* __X__ *No*_____

D. Does the proposal describe, in detail, the level of education, experience and training possessed by management level staff regarding the provision of services identified in the RFP? Does the proposal describe the organization's staff development program regarding orientation and on going training for all staff? *Yes* __X__ *No*_____

E. Does the proposal describe how the organization will respond to critical incidents and emergencies with adequate staff on site within a reasonable timeframe? Does the proposal provide a specific plan to address emergencies and critical incident response? *Yes* __X__ *No*_____

F. Does the proposal describe the use of volunteers and interns within the organization and how they are selected and screened for background checks? *Yes* __X__ *No*_____

G. Does the proposal describe, in detail, the organizations plans to meet the training requirements established in the Department's <u>Minimum Standard</u> rules regarding training related to operation of this selected program? *Yes* __X__ *No*_____

**Percent awarded Section IX:** ___40___ x 150 max points = __6000__ Total

## X.  References (50 Points Max)

Does the proposal list all agencies (state, federal, local) for which the vendor has performed similar services outlined in this RFP? Does the list include the names, addresses and telephone numbers of contact persons within those agencies responsible for contract monitoring? *Yes* __X__ *No*_____

**Percent awarded Section X:** ___100___ x 50 max points = __5000__ Total

## XI.  Compensation for Providing Service (200 Points Max)

DO not multiple

A. Does ███ proposal include the total amount of compensation that the facility requires to pro███ ices outlined in Attachment A? Is the compensation listed as the daily rate per chi███ number of beds offered at this rate? *Yes* ___X___ *No*_____

B. Does ███ proposal certify that the vendor has the capacity to bill Medicaid electronically for co███ s authorized on the ISP, or that they have a letter of intent that states their plan to reach this goal prior to awarding a contract for FY'06? *Yes*_____ *No*_____

C. Did the vendor identify the portion of the daily rate, identified in Section A, above, that is proposed to be paid directly by the Department and the portion that the vendor will recover through "net Medicaid reimbursement"? (For the purpose of this provision, the "net Medicaid reimbursement" cannot exceed sixty six percent (66%) of the total compensation described in Section A, above.)

**Percent awarded for Section XI:** __150__ x 200 max points = __250__ Total

Evaluator Number____5____                                        5

*Alabama Department of Human Resources*
***Therapeutic Foster Care for Region 8***



**Total Points awarded:**    **Section II:**  _7.50_

                             **Section III:**  _1500_

                             **Section IV:**  _37.50_

                             **Section V:**  _1000_

                             **Section VI:**  _1500_

                             **Section VII:**  _3000_

                             **Section VIII:**  _2250_

                             **Section IX:**  _6000_

                             **Section X:**  _5000_

                             **Section XI:**  _200_

**Final Points for Proposal:** _____

06/15/2005 10:56 FAX 2052957781 CCC Doc... 20/2007 Page 1 of 1
10/19/2004 11:22 FAX 1... CAMELLIA THERAPEUTIC FOS...

Page 1 of 1

Subj:   **FW; Camellia TFC**
Date:   10/14/2004 10:49;43 AM Eastern Standard Time
From:   gmitchell@dhr.state.al.us
To:     ctfac5@cs.com
*Received from Internet: click here for more information*

FY!

-----Original Message-----
From:   Mitchell, Gary W.     PERS DHR
Sent:   Wednesday, October 13, 2004 3:25 PM
To:     Parchman, Laura      JEFF DHR
Subject:  RE: Camellia TFC

We never advised counties that they could not use his program but to make
sure that his homes had appropriate suitability letters. We have completed
100% review of his homes and all were in compliance at the time of the
review.

Gary

-----Original Message-----
From:   Parchman, Laura      JEFF DHR
Sent:   Wednesday, October 13, 2004 2:25 PM
To:     Mitchell, Gary W.     PERS DHR
Cc:     Scott-Smith, Anita    JEFF DHR
Subject:  Camellia TFC

Gary,

I received a call from Dr. Apiah today, requesting that we began making
referrals to Camellia again. I need clearance from you and Caro in order to
do this.



Thursday, October 14, 2004     CompuServe: Ctfac6

<a>Crisis Stabilization Services RFP</a>

# Alabama Department of

Services   News   Commissioner   Contact Us   Counties

## *** NOTICE OF CANCELLATION ***

The Department reserves the right at its sole discretion, at any time and for any reason, to reject any or all of proposals submitted in response to this RFP, or to cancel this RFP, if it is deemed by the Department to be in best interest to do so. The Department hereby issues this notice of cancellation of the Crisis Stabilization #2006-100-03.

*Refer to this page for future updates*





Printed EXHIBIT
20

1              IN THE CIRCUIT COURT FOR THE

2                  COUNTY OF MONTGOMERY

3                    STATE OF ALABAMA

4

5    CAMELLIA THERAPEUTIC FOSTER
     AGENCY,
6
             Plaintiff,
7
                              CIVIL ACTION
8        VS.
                         FILE NO. 2:06 CV-735-MHT
9

10

11   ALABAMA DEPARTMENT OF
     HUMAN RESOURCES,

12           Defendant.

13                                      **COPY**

14

15              *        *        *

16

17          DEPOSITION OF MARY N. BAGGETT, taken on

18   behalf of the Plaintiff, pursuant to the

19   stipulations set forth herein, before Jeana S.

20   Boggs, Certified Court Reporter and Notary Public,

21   at the offices of Janice D. Spears-Turk, 2735 Office

22   Park Circle, Montgomery, Alabama, commencing at

23   approximately 11:20 a.m., Monday, May 14th, 2007.

```
 1                    MARY N. BAGGETT,

 2   of lawful age, having been first duly sworn, was

 3   examined and testified as follows:

 4

 5                 DIRECT EXAMINATION

 6

 7   BY MS. SPEARS-TURK:

 8   Q   Good morning, Mrs. Johnson (sic).  My name

 9       is Janice Spears-Turk, and I'm one of the

10       attorneys for the plaintiff in this matter,

11       Camellia Therapeutic Agency.  I'm going to

12       ask you a series of questions; and when I

13       ask those questions, I'm going to assume

14       that you understood them if you answered

15       them for me.  If you at any time want to

16       take a break or anything, and it's not going

17       to be that long, but if you need to take a

18       break, feel free to just ask for one.

19   A   Okay.

20   Q   State your full name for the record for me.

21   A   Mary N. Baggett.

22   Q   Okay.  You are Mrs. Baggett?

23   A   Yes, I am.
```

1    Q    Okay.  Now, Mrs. Baggett, what is your

2         position title with the Department of Human

3         Resources?

4    A    Program specialist.

5    Q    Okay.  And as a program specialist, what are

6         your duties and responsibilities?

7    A    I work in the Office of Resource Management,

8         and I visit therapeutic foster care agencies

9         at least once annually.  And I evaluate

10        their programs to make sure they're in

11        compliance with the foster family home

12        minimum standards and the therapeutic foster

13        home guidelines.

14   Q    What is your job title?

15   A    Resource consultant.

16   Q    And how long have you held the title of

17        resource consultant?

18   A    Since October, 2002.

19   Q    In the position of resource consultant, who

20        is your immediate supervisor?

21   A    Gary Mitchell.

22   Q    M-I-T-C-H-E-L-L?

23   A    Yes, ma'am.

1    Q    And is who is Mr. Mitchell's supervisor?

2    A    Susan Ward.

3    Q    Under the direction of Mr. Mitchell, have

4         you ever had the occasion to review the

5         therapeutic foster care agency's homes or --

6         let me back up.

7              Do you review their homes, or do

8         you review the actual service provider

9         themselves?

10   A    I review the actual provider's records,

11        their files.

12   Q    Okay.  So, you review the provider's files.

13   A    Uh-huh (positive response).

14   Q    Now, I'll ask the question.  As a resource

15        consultant, have you ever had the occasion

16        to review the files of Camellia Care Foster

17        Agency as a provider?

18   A    Yes.

19   Q    And when did you review files for this

20        particular agency?

21   A    The first --

22   Q    Or provider.  I'm going to use the word

23        "provider" to make sure we don't get it

| 1 | A | No. |
| 2 | Q | What about the Jefferson County regional |
| 3 | | office in 2005? |
| 4 | A | No. |
| 5 | Q | So, as these offices opened, you would then |
| 6 | | review them? |
| 7 | A | Yes. |
| 8 | Q | Are these the only offices for Camellia |
| 9 | | Therapeutic Foster Care that you reviewed |
| 10 | | their records? |
| 11 | A | Yes. |
| 12 | Q | Russell County, Madison County, and |
| 13 | | Jefferson County. |
| 14 | A | Correct. |
| 15 | Q | Now, when you began monitoring the records |
| 16 | | for Camellia Therapeutic Foster Care Agency |
| 17 | | in 2002 in Russell County, what things would |
| 18 | | you be looking for in your monitoring of |
| 19 | | that office? |
| 20 | A | We have a checklist that we use to review |
| 21 | | the foster family home record, and we have a |
| 22 | | checklist to review the children's -- the |
| 23 | | foster children's record. |

| | | |
|---|---|---|
| 1 | A | I don't think I visited any of the |
| 2 | | facilities more than the others. |
| 3 | Q | During your -- or after your visits to the |
| 4 | | facility -- and I heard you say you only |
| 5 | | were required to visit at least once |
| 6 | | annually? |
| 7 | A | Uh-huh (positive response). |
| 8 | Q | Did you have to make a reporting to a |
| 9 | | supervisor as to what you would find? |
| 10 | A | Yes, ma'am. |
| 11 | Q | And is there some form that you used to make |
| 12 | | those or to give those findings to your |
| 13 | | supervisor? |
| 14 | A | There's no form.  There's a format that we |
| 15 | | write our reports. |
| 16 | Q | And did you write reports in reference to |
| 17 | | Doctor Appiah's facilities? |
| 18 | A | Yes. |
| 19 | Q | And you would have provided those reports to |
| 20 | | your immediate supervisor? |
| 21 | A | Yes, ma'am. |
| 22 | Q | And he would be the individual who would |
| 23 | | have those reports? |

1  under my direction and supervision; that the

2  deposition is a true and accurate transcription of

3  the testimony/evidence of the examination of said

4  witness by counsel for the parties set out herein;

5  that the reading and signing of said deposition was

6  waived by witness and counsel for the parties.

7        I further certify that I am neither of

8  relative, employee, attorney or counsel of any of

9  the parties, nor am I a relative or employee of such

10  attorney or counsel, nor am I financially interested

11  in the results thereof.  All rates charged are usual

12  and customary.

13        This the 7th day of June, 2007.

14

15

16

17

18        Jeana S. Boggs
          Certified Court Reporter and
19        Notary Public
          Commission expires: 8/7/2010

20

21

22

23

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

     CIVIL ACTION NO.:  2:06 cv735-MHT

5

6    CAMELLIA THERAPEUTIC FOSTER

     AGENCY, LLC, REPRESENTED BY

7    JOSEPH APPIAH, CHAIRMAN

     THERAPEUTIC FOSTER CHILDREN,

8    FOSTER PARENTS AND STAFF,

     >>

9    >>Plaintiff(s),

10   vs.

11   ALABAMA DEPARTMENT OF

     HUMAN RESOURCES,

12

     >>Defendant(s).

13

14

15                      DEPOSITION OF

16      CAMELLIA THERAPEUTIC FOSTER AGENCY, LLC,

17          REPRESENTED BY JOSEPH APPIAH

18   >>>>>>>JOB NO. 1101-53347

19

20

21

22   BEFORE:    Victoria M. Castillo,

                Court Reporter and

23              Notary Public

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 9

1    with the operation of Camellia Therapeutic than

2    you?

3          A.>I am more knowledgeable.

4          Q.>You are the most knowledgeable

5    person?

6          A.>Yes, about this situation.

7          Q.>You are the most knowledgeable

8    person?

9          A.>Yes.

10         Q.>The second indented paragraph asks

11   for representatives of the company who are the most

12   knowledgeable regarding the review of the DHR

13   Request for Proposal, RFP, referred to in the

14   complaint and the discussions, preparations, and

15   submission of response or proposal or inquires to

16   DHR regarding the RFP.  Is that person you,

17   Dr. Appiah?

18         A.>Yes, sir.

19         Q.>You are the most knowledgeable person

20   representing the corporation in those matters?

21         A.>Chairman and Chief Executive Officer.

22         Q.>You are the Chairman and Chief

23   Executive Officer of Camellia Therapeutic Foster

Page 10

1   Agency?

2        A.>Yes, sir.

3        Q.>How long have you held that position?

4        A.>I am the founder, so from the

5   beginning.

6        Q.>You are the founder?

7        A.>Yes.

8        Q.>We will get back to that in a

9   moment.

10       A.>Yes, sir.

11       Q.>The third paragraph asks for the

12  correspondence and contact between DHR and Camellia

13  Therapeutic Foster Agency about the RFP.  Is the

14  person most familiar with those matters

15  representing the Agency going to be you,

16  Dr. Appiah?

17       A.>Yes, sir.

18       Q.>Let's get back to your relationship

19  to Camellia Therapeutic Foster Care Agency.

20  Camellia Therapeutic Foster Care Agency is a

21  corporation; is that correct?

22       A.>Limited liability.

23       Q.>It is a limited-liability company?

**MERRILL LEGAL SOLUTIONS**
**Court Reporting*Legal Videography*Trail Services**

Page 12

1          A.>Yes.  I brought two more friends in.

2          Q.>Who are these friends?

3          A.>Dr. D. A. Ellis, family practitioner,

4     Phenix City, Alabama.

5          Q.>Family practitioner -- a physician?

6          A.>Yes, family practitioner.

7          Q.>In Phenix City, Alabama?

8          A.>Yes.

9          Q.>Who is the other board member?

10         A.>Honorable Arthur Sumbry, City

11    Councilman.

12         Q.>Phenix City, City Councilman?

13         A.>Yes, sir.

14         Q.>Dr. D. A. Ellis, is that a man or a

15    woman?

16         A.>A man.

17         Q.>So there is a three-member board that

18    governs Camellia Therapeutic?

19         A.>Ellis's business is to be sure that

20    we have children, and we have a problem with trying

21    to find a physician to do any assessment for them.

22    He would be willing to accept them.

23         Q.>Let's back up for a minute.  You have

Page 23

1    your possession relating to the more than 70 foster

2    parents contracted with Camellia Therapeutic Foster

3    Agency referenced in Paragraph 8 of the Amended

4    Complaint.  Have you produced documents relating to

5    that request?

6        A.>Yes, it is right here.

7            >MS. SPEARS-TURK:   These are the

8    names.

9        >>THE DEPONENT:   70 foster parents,

10   it has their names right here.

11           >MS. SPEARS-TURK:   Documents in

12   reference to those individuals.

13       A.>Here is the document I have.

14       Q.> (Mr. Long)  Dr. Appiah, I understand

15   part of your complaint is you claim that you have

16   contracts with these foster parents and these

17   contracts were somehow adversely affected by the

18   RFP.  So I am asking you to verify the information

19   in your complaint; that is, that you have contracts

20   with these therapeutic foster parents?

21       A.>Okay.  It was my understanding when

22   this was filed that I trained foster parents,

23   prepared them for this.  And I have more than 70

Page 24

1    foster parents, and I am giving you the names.

2    These are people that I have gone out and recruited

3    them and trained them and licensed them, and DHR

4    has taken them.  I have an agreement with them --

5    you come here and let me train them to become a

6    foster parent.  So that's when I give you-all the

7    names.

8         Q.>The foster parents that you are

9    referencing in Paragraph 8 are foster parents that

10   you licensed as a --

11        A.>And trained.

12        Q.>As a --

13        A.>Potential foster parents.

14        Q.>But you don't have a contract with

15   them?

16        A.>We don't have a written contract.

17   But this is what they do:  When they come in, you

18   agree that you are going to train them and hire

19   them to be foster parents.  That is the

20   understanding.  That is how we do it.

21        Q.>So you don't have a document or a

22   written contract document for each one of these

23   foster parents?

Page 167

1                           CERTIFICATE

2

3    STATE OF ALABAMA

4    AT LARGE

5

6              >I hereby certify that the above

7    and foregoing deposition was taken down by me in

8    stenotype and the questions and answers thereto

9    were transcribed by means of computer-aided

10   transcription and that the foregoing represents and

11   true and correct transcript of the testimony given

12   by said witness upon said deposition.

13              >I further certify that I am

14   neither of counsel nor of kin to the parties to the

15   action, nor am I in anywise interested in the

16   result of said cause.

17

18

19

20

21

22   _____

          Victoria M. Castillo, Court Reporter

23        Commissioner and Notary Public

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CIVIL ACTION NO.:  CV-2:06-cv-735-MHT

CAMELLIA THERAPEUTIC FOSTER
AGENCY, LLC, REPRESENTED BY
JOSEPH APPIAH, CHAIRMAN,
THERAPEUTIC FOSTER CHILDREN,
FOSTER PARENTS and STAFF,

        Plaintiffs,

vs.

ALABAMA DEPARTMENT OF HUMAN
RESOURCES,

        Defendant.

        *       *       *       *       *

        DEPOSITION OF STARR STEWART, taken on

behalf of the Plaintiffs, pursuant to the

stipulations set forth herein, before Anita D.

Griffith, Certified Court Reporter and Notary

Public, at the offices of Kathryn M. Dickey,

Attorney At Law, Suite B, 322 Alabama Street,

commencing at approximately 9:00 a.m., Thursday, May

24, 2007.

| 1 | A | Three years. |
| 2 | Q | Okay. What is your position? |
| 3 | A | I am the director of policy planning and |
| 4 | | research. |
| 5 | Q | Okay. And what are your responsibilities in |
| 6 | | that position? |
| 7 | A | They include coordinating procurement for |
| 8 | | services for children and families, as well |
| 9 | | as working on various service oriented type |
| 10 | | projects; that does not include benefit |
| 11 | | services. I'm also responsible for posting |
| 12 | | policies online and ensuring accuracy of |
| 13 | | policies -- of child welfare policies. |
| 14 | | That's basically it. |
| 15 | Q | All right. Have you been in that position |
| 16 | | the entire three years? |
| 17 | A | Yes. |
| 18 | Q | Okay. What did you do prior to your |
| 19 | | employment with the Alabama Department of |
| 20 | | Human Resources? |
| 21 | A | Prior to that, I worked at Children's Trust |
| 22 | | Fund of Alabama, and I was a program |
| 23 | | director there, and I was responsible for |

| 1 | | managing the federal project that also |
|---|---|---|
| 2 | | provided services.  They were community- |
| 3 | | based services for children and families. |
| 4 | Q | Okay.  I was wondering how you came into a |
| 5 | | high level, so you had to have had some |
| 6 | | experience in the past. |
| 7 | A | Yes. |
| 8 | Q | What is your role regarding the selection of |
| 9 | | foster care agencies for the Department of |
| 10 | | Human Resources? |
| 11 | A | I don't make selections. |
| 12 | Q | Okay.  What is your role in terms of the |
| 13 | | RFP's? |
| 14 | A | I am responsible for working with divisions |
| 15 | | to develope and issue RFP's.  My primary |
| 16 | | responsibility is formatting them so that |
| 17 | | there's clarity in what the Department is |
| 18 | | seeking as far as services to children and |
| 19 | | families.  That also includes coordinating |
| 20 | | and facilitating vendor conferences if the |
| 21 | | division decides that it's needed.  I'm |
| 22 | | responsible for receipt of proposals or |
| 23 | | responses to RFP's and for also coordinating |

| 1 | | the evaluation of RFP's -- of any procure- |
|---|---|---|
| 2 | | ment. |
| 3 | Q | Okay. Let me show you what we've marked as |
| 4 | | Plaintiff's Exhibit 1 to the deposition.  Do |
| 5 | | you recognize this document, Ms. Stewart? |
| 6 | A | It looks familiar. |
| 7 | Q | Can you identify this document? |
| 8 | A | This is a request for proposals entitled |
| 9 | | "Therapeutic Foster Care For Children" dated |
| 10 | | Monday, February 28th of '05. |
| 11 | Q | All right.  And what exactly is a request |
| 12 | | for proposals for Therapeutic Foster Care |
| 13 | | For Children? |
| 14 | A | A request for proposals is an invitation for |
| 15 | | qualified vendors to submit a response -- or |
| 16 | | to offer their services to the state based |
| 17 | | on the requirements of the document. |
| 18 | Q | All right.  And you used the term "qualified |
| 19 | | vendors."  What is a qualified vendor? |
| 20 | A | The qualifications are included within each |
| 21 | | RFP, and those -- the criteria is listed |
| 22 | | there. |
| 23 | Q | All right.  And if you will look in this |

1    deposition is a true and accurate transcription of

2    the testimony/evidence of the examination of said

3    witness by counsel for the parties set out herein;

4    that the reading and signing of said deposition was

5    NOT waived by witness and counsel for the parties.

6          I further certify that I am neither of

7    relative, employee, attorney or counsel of any of

8    the parties, nor am I a relative or employee of such

9    attorney or counsel, nor am I financially interested

10   in the results thereof.  All rates charged are usual

11   and customary.

12          This the 28th day of May, 2007.

13

14

15    Anita D. Griffith
      Certified Court Reporter and
16    Notary Public
      Commission expires: 8/7/2007
17

18

19

20

21

22

23

**Boggs Reporting & Video Services**
**334.264.6227/800.397.5590/www.boggsreporters.com**

```
 1              IN THE CIRCUIT COURT FOR THE

 2                 COUNTY OF MONTGOMERY

 3                  STATE OF ALABAMA

 4

 5   CAMELLIA THERAPEUTIC FOSTER
     AGENCY,
 6
            Plaintiff,
 7
                             CIVIL ACTION
 8       VS.
                        FILE NO. 2:06-CV-735-MHT
 9

10   ALABAMA DEPARTMENT OF
     HUMAN RESOURCES,
11
            Defendant.
12
                                    COPY
13

14

15           *        *        *

16

17         DEPOSITION OF SUSAN VIRGINIA WARD, taken

18   on behalf of the Plaintiff, pursuant to the

19   stipulations set forth herein, before Jeana S.

20   Boggs, Certified Court Reporter and Notary Public,

21   at the offices of Janice D. Spears-Turk, 2735 Office

22   Park Circle, Montgomery, Alabama, commencing at

23   approximately 9:56 a.m., Monday, May 14th, 2007.
```

| 1 | Q | For the record, would you please state your |
| 2 | | full name. |
| 3 | A | Susan Virginia Ward. |
| 4 | Q | Okay. Ms. Ward, have you ever had your |
| 5 | | deposition taken before? |
| 6 | A | No, ma'am. |
| 7 | Q | Okay. How did you prepare for today's |
| 8 | | deposition? |
| 9 | A | Just met with James, and just looked at what |
| 10 | | I do. |
| 11 | Q | Okay. |
| 12 | A | That's about it. |
| 13 | Q | All right. What is your position with DHR? |
| 14 | A | I'm the division director over the division |
| 15 | | of resource management. |
| 16 | Q | All right. And how long have you been in |
| 17 | | that position? |
| 18 | A | As a division director, about a year. |
| 19 | | Before then, we weren't a division. |
| 20 | Q | Okay. What were you before then? |
| 21 | A | We were called the Office of Contracts and |
| 22 | | Federal Claims. It's gone through several |
| 23 | | names over the last three or four years. |

1      It's changed many times.

2    Q    All right.

3    A    But I've been over contracts since about

4         2002.

5    Q    Okay.  And what are your primary

6         responsibilities?

7    A    I oversee the activities for the Office of

8         Contracts, the Office of Licensing, the

9         Office of Resource Development, and the

10        Office of Utilization Review.

11   Q    All right.  Can you break that down and tell

12        me specifically what you do regarding

13        activities of the Office of Contracts?

14   A    We award contracts to vendors that have been

15        selected through the RFP process, if that's

16        a requirement.  We also maintain contracts

17        for county offices that they can't manage at

18        the county level.

19   Q    Okay.  Now, you mentioned RFP.

20   A    P.

21   Q    Process?

22   A    (Witness nodding.)

23   Q    How long has that been in place?

```
 1        you said that the responses are part of the
 2        files that you keep.
 3    A   They give me the narrative.
 4    Q   Okay.
 5    A   I don't get the whole proposal.
 6    Q   All right.  You don't get their full
 7        response, just the narrative?
 8    A   Uh-huh, (positive response).
 9    Q   Okay.
10    A   And it has no information on it other than
11        what they said.  You know, it's how they
12        would do their program, how they would serve
13        the children.
14    Q   Okay.  All right.  Have you ever seen this
15        document?
16                        (At which time, the
17                         referred-to document was
18                         marked as Plaintiff's Exhibit
19                         No. 3 by the Reporter.)
20    A   I don't think I've ever seen this document.
21    Q   All right.  Let me ask you about these
22        individuals.  Do you know Jerry Mitchell?
23    A   Yes, ma'am.
```

```
 1   Q   Who is he?
 2   A   He is director of the Office of Resource
 3       Development.
 4   Q   And what are his responsibilities?
 5   A   He helps work with the counties to develop
 6       any new resources the children need.  It's
 7       his staff that goes out and looks at
 8       individual children's records at different
 9       providers all over the State to determine
10       that children are receiving the services
11       they need.
12   Q   Okay.  What about Mary Ann Wilson?
13   A   Mary Anne Wilson works in the Office of
14       Contracts, and she was the program analyst
15       for Doctor Appiah's contract.
16   Q   What does a program analyst do?
17   A   They basically monitor the contract for
18       compliance.  They deal with the -- we're
19       really -- Office of Contract has kind of a
20       unique in that we are -- we represent the
21       Department and the provider.  We are the
22       provider's voice to the Department sometimes
23       when it comes to contracting issues.  And
```

```
 1    Q    The selection process.
 2    A    Oh, no, no, no.  I don't have those.  I
 3         might have his contract -- you know, I might
 4         have to get it out of storage.  I might have
 5         his contract he had prior to the RFP, but we
 6         don't keep anything with the RFP.
 7    Q    Okay.  Do you know how many years --
 8         approximately how many years Doctor Appiah
 9         operated foster care agencies?
10    A    No.  I know that he -- no.  I think that he
11         was trying to be -- it took awhile to get a
12         license.  But I remember for sure having a
13         contract in 2003.
14    Q    All right.  And how do you remember for sure
15         a contract in 2003?
16    A    Well, because I didn't start there myself
17         until two -- '02.  And, you know, I would
18         try to know the contracts that we had for
19         providers.
20    Q    Okay.  Do you remember how many providers
21         you had in 2003?
22    A    That's a very good question.  Not -- no, I
23         could tell you how many we have now.
```

```
 1   A    No, ma'am.
 2   Q    Okay.  Is there any other agency on this
 3        list that's not a current agency?
 4   A    I don't know anything about Children/Family
 5        Services.  Eagle Rock is not, and New Way
 6        Out is not.
 7   Q    Okay.  What about NBA CSC?
 8   A    No, ma'am.  None of those below 800 would be
 9        a provider.  I'm sorry.  I thought -- no NBA
10        CSC is not a provider.  Successful Homes is
11        not a provider.  Family Values is not a
12        provider.  Ability Plus is not a provider.
13   Q    Do you know the race of the owner of NBA
14        CSC?
15   A    I do not.
16   Q    Camellia?
17   A    Well, if Doctor Appiah is the owner, I know
18        his race, but I don't always know the
19        owners.  I deal with the CEOs, and, you
20        know, their acting executive directors.  But
21        that doesn't always mean I know who owns it.
22   Q    Okay.  Do you know if race is indicated on
23        any of the documents that the vendors or
```

1      prospective vendors submit?

2  A  I have no idea.

3  Q  You mentioned 800 -- that none of those

4      below 800 would be a current vendor.  Why is

5      that?

6  A  I don't know.

7  Q  Why did you say it?

8  A  That's what they told me.

9  Q  Who told you?

10  A  When I got the list, they just said that 800

11      was the cut off.

12  Q  Who told you?

13  A  Ms. Stewart.

14  Q  Ms. Stewart?

15  A  (Witness nodding in the affirmative).

16  Q  That's Starr Stewart?

17  A  Yes, ma'am.

18  Q  Okay.  Let me show you what's marked 13.

19                (At which time, the

20                referred-to document was

21                marked as Plaintiff's Exhibit

22                No. 13 by the Reporter.)

23  Q  Again, the handwriting on this chart was

1   questions and answers thereto were reduced to 59

2   typewritten pages under my direction and

3   supervision; that the deposition is a true and

4   accurate transcription of the testimony/evidence of

5   the examination of said witness by counsel for the

6   parties set out herein; that the reading and signing

7   of said deposition was waived by witness and counsel

8   for the parties.

9         I further certify that I am neither of

10   relative, employee, attorney or counsel of any of

11   the parties, nor am I a relative or employee of such

12   attorney or counsel, nor am I financially interested

13   in the results thereof.  All rates charged are usual

14   and customary.

15         This the 7th day of June, 2007.

16

17

18

19

20   Jeana S. Boggs

21   Certified Court Reporter and
     Notary Public
     Commission expires: 8/7/2010

22

23

```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION                COPY

4

5    CIVIL ACTION NO.:  CV-2:06-cv-735-MHT

6

7    CAMELLIA THERAPEUTIC FOSTER
     AGENCY, LLC, REPRESENTED BY
8    JOSEPH APPIAH, CHAIRMAN,
     THERAPEUTIC FOSTER CHILDREN,
9    FOSTER PARENTS and STAFF,

10             Plaintiffs,

11   vs.

12   ALABAMA DEPARTMENT OF HUMAN
     RESOURCES,
13
               Defendant.
14

15          *      *      *      *      *

16          DEPOSITION OF JANICE WILSON, taken on

17   behalf of the Plaintiffs, pursuant to the

18   stipulations set forth herein, before Anita D.

19   Griffith, Certified Court Reporter and Notary

20   Public, at the offices of Kathryn M. Dickey,

21   Attorney At Law, Suite B, 322 Alabama Street,

22   commencing at approximately 3:00 p.m., Tuesday, May

23   29, 2007.
```

| | | |
|---|---|---|
| 1 | | RFP.  Once they went through that procedure, |
| 2 | | they had to write their proposal and get it |
| 3 | | in at a certain time. |
| 4 | Q | So if I'm understanding you, just anybody |
| 5 | | couldn't walk in and get one of these? |
| 6 | A | They were released by the State Department |
| 7 | | of Human Resources.  I'm sure they had a |
| 8 | | list that -- an invitation list, so to |
| 9 | | speak, that they would have released it to. |
| 10 | Q | Okay.  And that invitation list was based on |
| 11 | | interest? |
| 12 | A | I was not a party to that. |
| 13 | Q | Okay.  Did you have anything to do with |
| 14 | | drafting this Request For Proposals |
| 15 | | document? |
| 16 | A | I did not. |
| 17 | Q | Do you know who did? |
| 18 | A | I do not. |
| 19 | Q | Okay.  What was your role with the February |
| 20 | | 28th, 2005, Request For Proposals. |
| 21 | A | I was asked to participate in the evaluation |
| 22 | | process. |
| 23 | Q | Okay.  And who asked you? |

| | | |
|---|---|---|
| 1 | A | Gary Mitchell. |
| 2 | Q | Who is Gary Mitchell? |
| 3 | A | He works in resource development at the |
| 4 | | State Department of Human Resources. |
| 5 | Q | All right.  Have you ever participated in an |
| 6 | | evaluation process prior to this one? |
| 7 | A | I have. |
| 8 | Q | All right.  How many times? |
| 9 | A | Well, about two years ago I participated in |
| 10 | | evaluating proposals for case aid.  Prior to |
| 11 | | that, in my career at Montgomery County DHR, |
| 12 | | in 1994, at Montgomery County, I was the |
| 13 | | social worker in charge of releasing five |
| 14 | | RFP's. |
| 15 | Q | Okay. |
| 16 | A | And then in 1995, we released ten child- |
| 17 | | specific RFP's, and then in 1996, I released |
| 18 | | RFP for what we call enhanced foster care, |
| 19 | | which is actually foster care for large |
| 20 | | sibling groups of three or more. |
| 21 | Q | Okay.  You're very specific about those |
| 22 | | dates.  Did you study any documents prior to |
| 23 | | this deposition? |

| | | |
|---|---|---|
| 1 | A | I received a telephone call on Thursday, |
| 2 | | making me aware of this deposition. On |
| 3 | | Friday morning, I met with my attorney, |
| 4 | | James Long. On Friday afternoon, I went |
| 5 | | back to the office and looked to see when I |
| 6 | | had participated in other RFP procedures. |
| 7 | Q | Okay. Tell me how many evaluators were |
| 8 | | involved in this particular process. |
| 9 | A | I do not recall. |
| 10 | Q | Did you meet with them? |
| 11 | A | When -- In the situations where I have |
| 12 | | reviewed RFP's, you work alone, and you may |
| 13 | | work when other people are in the room |
| 14 | | working, and you may work on your own. When |
| 15 | | this one was reviewed, there were other |
| 16 | | people in the room, but since you're working |
| 17 | | alone, you don't have interaction with them. |
| 18 | Q | All right. Let me show what you we've |
| 19 | | marked as Plaintiff's Exhibit 2 and ask |
| 20 | | you -- let me ask you to identify this |
| 21 | | document. |
| 22 | A | This is the scoring document for the |
| 23 | | Therapeutic Foster Care proposals. |

| | | |
|---|---|---|
| 1 | Q | Okay.  Did you have anything to do with |
| 2 | | drafting this document? |
| 3 | A | I did not. |
| 4 | Q | Do you know who did? |
| 5 | A | I do not. |
| 6 | Q | Okay.  Is this document similar to what |
| 7 | | you've used in the past? |
| 8 | A | The outline specifics are not. |
| 9 | Q | Okay.  Just tell me what you did when you |
| 10 | | received this document and the various |
| 11 | | responses to the request for proposals. Tell |
| 12 | | me how you proceeded to evaluate each one. |
| 13 | A | I reviewed the proposals; I scored the |
| 14 | | proposals on this sheet as far as I was |
| 15 | | instructed to do. |
| 16 | Q | And how were you instructed? |
| 17 | A | I was instructed to stop the review process |
| 18 | | at the middle of -- well, after Roman |
| 19 | | numeral ten. |
| 20 | Q | And what was the reason for that? |
| 21 | A | I do not know. |
| 22 | Q | Is that the end of the scoring? |
| 23 | A | It is not. |

| | | |
|---|---|---|
| 1 | Q | What is left?  I mean -- All right.  3:10 |
| 2 | | (sic) you completed scoring each section for |
| 3 | | each proposal? |
| 4 | A | But not the compensation. |
| 5 | Q | Okay. |
| 6 | A | I did not score the compensation. |
| 7 | Q | Okay.  Do you know who scored the |
| 8 | | compensation? |
| 9 | A | I did not. |
| 10 | Q | I didn't think you would. |
| 11 | | Do you know who might know that? |
| 12 | A | Well, the people who completed the compiling |
| 13 | | of the scores at the state office. |
| 14 | Q | Well, I know that, but do you have any idea |
| 15 | | who at the state office does that? |
| 16 | A | I do not. |
| 17 | Q | Do you think Gary Mitchell may know? |
| 18 | A | He may. |
| 19 | Q | On the last page there is a signature for |
| 20 | | scorer and a date.  Do you remember whether |
| 21 | | or not you signed -- |
| 22 | A | I did not sign it. |
| 23 | Q | And you did not date it; is that correct? |

```
1                    MR. LONG:  I have an objection to this
2                        document.  She hasn't identified
3                        that she knows anything about all
4                        these.  All she's identified --
5                        She's identified the last one.
6    Q   All right.  Just look at the last one.
7    A   The beginning of it?
8    Q   Yes, start at the beginning.
9    A   James gave me a copy.  I have a copy.
10   Q   Well, if you don't mind, look at this one,
11       since this is the exhibit.  At the very
12       beginning, Roman numeral one is Mandatory
13       Requirements:  Failure of the vendor to
14       provide the following mandatory items will
15       result in the disqualification of the
16       proposal.  That part is not completed.  Do
17       you know why you didn't complete that part?
18   A   I was not instructed to complete that part.
19   Q   Okay.  So you were told to stop at Roman
20       numeral ten and not do Roman number one?
21   A   That's correct.
22   Q   Do you know who did Roman numeral one?
23   A   I do not.
```

| | | |
|---|---|---|
| 1 | Q | All right.  Look at Roman numeral two, |
| 2 | | Organization Information and Management |
| 3 | | Structure, twenty-five points maximum. |
| 4 | | Could you explain your points that you |
| 5 | | provided Dr. Appiah? |
| 6 | A | Forty times twenty-five, so that was ten |
| 7 | | points. |
| 8 | Q | All right.  Now -- |
| 9 | A | Ten out of twenty-five. |
| 10 | Q | What do you mean ten out of twenty-five? |
| 11 | | Explain what you did.  How did you get that |
| 12 | | score? |
| 13 | A | Well, you multiply forty -- Forty times |
| 14 | | twenty-five is ten. |
| 15 | Q | And you get ten? |
| 16 | A | Forty percent. |
| 17 | Q | Forty percent? |
| 18 | A | Yes. |
| 19 | Q | All right.  Where did you get the forty |
| 20 | | percent? |
| 21 | A | That was the score. |
| 22 | Q | All right.  Let me show you -- if I can find |
| 23 | | Dr. Appiah's -- This is Exhibit 4.  It may |

| | | |
|---|---|---|
| 1 | | help to follow along with Dr. Appiah's |
| 2 | | proposal.  Do you recognize Exhibit 4 as |
| 3 | | being Dr. Appiah's proposal for Camellia |
| 4 | | Therapeutic Foster and Adoption Agency. |
| 5 | A | I do because James gave me a copy of it on |
| 6 | | Friday. |
| 7 | Q | Okay.  Now, can you tell me how you got |
| 8 | | forty percent on this Section 2? |
| 9 | A | I can.  When I began the review, there were |
| 10 | | several grammatical errors in this proposal. |
| 11 | Q | Okay.  What does grammar have to do with |
| 12 | | providing foster care? |
| 13 | A | Well, we hope that our foster parents -- |
| 14 | | Foster parents have to be able to read and |
| 15 | | write, but basically, you would want a |
| 16 | | proposal that had good grammar. |
| 17 | Q | Did you find any other proposals that did |
| 18 | | not have good grammar? |
| 19 | A | I don't recall today.  This was in 2005. |
| 20 | Q | Okay.  Are you reading from notes? |
| 21 | A | I am. |
| 22 | | MS. DICKEY:  Okay.  Could we have a |
| 23 | | copy of those? |

| 1 | | MR. LONG:  Certainly. |
|---|---|---|
| 2 | | BY MS. DICKEY: |
| 3 | Q | All right.  What was the maximum number of |
| 4 | | points for -- I know twenty-five, but I'm |
| 5 | | still not sure where you got the forty |
| 6 | | percent.  I know you took some points away |
| 7 | | for poor grammar.  How did you come to the |
| 8 | | conclusion that it would be forty percent? |
| 9 | A | Well, that was not the only thing that I |
| 10 | | reduced points for. |
| 11 | Q | Okay.  What else? |
| 12 | A | The organization of the proposal was not -- |
| 13 | | was poor. |
| 14 | Q | Could you be more specific? |
| 15 | A | The organization of the proposal did not |
| 16 | | follow the scoring instrument.  In addition, |
| 17 | | under the history, when the initial treat- |
| 18 | | ment plan -- comprehensive treatment plan |
| 19 | | and treatment plan reviews were discussed, |
| 20 | | in the initial treatment plan, it was stated |
| 21 | | that DHR did the initial treatment plan, and |
| 22 | | that's incorrect, and that was stated |
| 23 | | several times in the document. |

| | | |
|---|---|---|
| 1 | Q | Could you be more specific on DHR doing the |
| 2 | | initial what? |
| 3 | A | When a child goes into therapeutic foster |
| 4 | | care, there is an initial treatment plan. |
| 5 | | The initial treatment plan is done by the |
| 6 | | therapeutic agency, and several times in |
| 7 | | this document -- well, I'll correct myself |
| 8 | | -- more than once in this document it states |
| 9 | | that DHR completes the initial treatment |
| 10 | | plan, and that's incorrect. |
| 11 | Q | Okay.  Could you find that in here, please, |
| 12 | | and show me. |
| 13 | A | Well, I may be able to. |
| 14 | | On Page 7, it states DHR completes |
| 15 | | an initial treatment plan at the time of |
| 16 | | each child's admission into the program, and |
| 17 | | I know that that is stated more than once in |
| 18 | | this document, and that is incorrect. |
| 19 | Q | All right.  Is that a procedure that has |
| 20 | | changed, or has it never been that DHR did |
| 21 | | the initial treatment plan? |
| 22 | A | It has never been that DHR did the initial |
| 23 | | treatment plan.  It's spelled out in the |

| | | |
|---|---|---|
| 1 | A | I don't know. |
| 2 | Q | I mean, did you just pull forty percent out |
| 3 | | of the air? |
| 4 | A | No.  That was what I felt it scored. |
| 5 | Q | All right.  What about Section 4? |
| 6 | A | Section 4 is Referral, Admission and |
| 7 | | Exclusion Policy, and in this proposal, it |
| 8 | | does state that children are accepted from |
| 9 | | infancy -- or it might say newborn -- to age |
| 10 | | twenty-one, but anyway, that's not entirely |
| 11 | | correct.  The children who are preschool -- |
| 12 | | You have to have a consult with the state |
| 13 | | office before you can accept a child that's |
| 14 | | preschool into Therapeutic Foster Care, so |
| 15 | | that was not elaborated on.  In addition to |
| 16 | | that, in the Referral, Admission and |
| 17 | | Exclusion, they say they have a no-eject, |
| 18 | | no- reject policy, and then a few bullets |
| 19 | | blow that, they say they have a fourteen -- |
| 20 | | it's not in this part; it's in another part |
| 21 | | -- but anyway, they say they have a |
| 22 | | fourteen-day notice, but they don't address |
| 23 | | children who are assaulted, who are |

65

1  deposition is a true and accurate transcription of
2  the testimony/evidence of the examination of said
3  witness by counsel for the parties set out herein;
4  that the reading and signing of said deposition was
5  NOT waived by witness and counsel for the parties.

6          I further certify that I am neither of
7  relative, employee, attorney or counsel of any of
8  the parties, nor am I a relative or employee of such
9  attorney or counsel, nor am I financially interested
10 in the results thereof.  All rates charged are usual
11 and customary.

12          This the 10th day of June, 2007.

13

14

15  Anita D. Griffin
    Certified Court Reporter and
16  Notary Public
    Commission expires: 8/17/2007
17

18

19

20

21

22

23

**Boggs Reporting & Video Services**
334.264.6227/800.397.5590/www.boggsreporters.com